UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| **Stanley Zhong, Nan Zhong,** and **SWORD (Students Who Oppose Racial Discrimination)**, <br><br> Plaintiffs, <br><br> v. <br><br> **The Regents of the University of Michigan,** <br><br> Defendant. | Case: 2:25−cv−10579 <br> Assigned To : Leitman, Matthew F. <br> Referral Judge: Grand, David R. <br> Assign. Date : 2/27/2025 <br> Description: CMP ZHONG ET AL v THE REGENTS OF THE UNIVERSITY OF MICHIGAN (JP) <br><br> Case No. _____ <br><br> COMPLAINT <br><br> JURY TRIAL DEMANDED |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES**

## I. INTRODUCTION

1. Plaintiffs Stanley Zhong ("Stanley"), Nan Zhong ("Nan"), and Students Who Oppose Racial Discrimination ("SWORD"), represented by Nan Zhong on behalf of its members and all others similarly situated, collectively referred to as "Plaintiffs," bring this civil rights action against the University of Michigan ("UM", "Defendant") for engaging in racially discriminatory admissions practices that disadvantage highly qualified Asian-American applicants, including Stanley and members of SWORD.

2. Despite Stanley's exceptional academic achievements and remarkable professional accomplishments at a young age, his application to the undergraduate program at the University of Michigan was rejected. This result stands in stark contrast to his receipt of a full-time job offer from Google for a position requiring a Ph.D. degree or equivalent practical experience.

3. Stanley's experience is emblematic of a broader pattern of racial discrimination against highly qualified Asian-American applicants at UM. These admissions practices violate the Fourteenth Amendment to the United States Constitution, Title VI of the Civil Rights Act of 1964, and the Michigan Constitution's prohibition on racial discrimination in public education.

## II. JURISDICTION AND VENUE

4. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, as this action arises under the Constitution and laws of the United States, including Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d.

5. Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this district.

### III. PARTIES

**A. Plaintiffs**

**A1. Co-plaintiff Stanley Zhong**

6. Co-plaintiff Stanley Zhong, born in 2005, is an Asian American residing in California. Stanley's parents are first-generation immigrants to the United States from China. Stanley Zhong is a US citizen.

7. As a self-taught programmer, Stanley has distinguished himself in various coding contests, ranking highly enough to receive an invitation from Google for a full-time job interview in 2019, without Google realizing he was only 13 years old. Upon disclosure of his age, the interview was canceled due to Google's policy against hiring minors (See Exhibit 1 for email exchanges with a Google recruiter).

8. Competing against top professionals from around the world, Stanley advanced to the Google Code Jam Coding Contest semi-final in 2021 (See Exhibit 2).

9. Competing against top professionals from around the world, Stanley advanced to the Meta (Facebook) Hacker Cup semi-final in 2023 (See Exhibit 3).

10. Stanley won the 2nd place in MIT (Massachusetts Institute of Technology) Battlecode's global high school division twice (2nd place and 1st place in

1    the US, respectively) (See Exhibit 4). He was invited to MIT with expenses

2    paid.

3    11. Stanley won the 2nd Place in CMU (Carnegie Mellon University)

4    cybersecurity competition picoCTF (See Exhibit 5). He was invited to CMU

5    with expenses paid.

6    12. Stanley won the 6th place in Stanford ProCo (See Exhibit 6).

7    13. Stanley advanced to the USA Computing Olympiad (USACO) Platinum

8    Division (See Exhibit 7).

9    14. In April 2020, after seeing an NPR news story that the unemployment

10   office's system programmed in COBOL was not keeping up with the

11   workload caused by COVID (See Exhibit 8), Stanley taught himself

12   COBOL, sent his sample code on GitHub (See Exhibit 9) to COBOL

13   Cowboys featured in the news story, and volunteered to help. Mr. Bill

14   Hinshaw, COBOL Cowboys CEO, graciously called Stanley and offered

15   encouraging words (although he did mention putting a 14-year-old in front

16   of his clients would probably freak them out). (See Exhibit 10 for the email

17   exchange with Mr. Bill Hinshaw to set up the call.)

18   15. After the attempt to volunteer for COBOL Cowboys fell through, Stanley

19   saw news reports about surging demand for e-signing services caused by

20   the COVID lockdown. Stanley was unhappy that DocuSign didn't provide

any relief. So, he launched an unlimited free e-signing service named RabbitSign in 2021 (See Exhibit 11).

16. Built on Amazon Web Services (AWS), RabbitSign was designed and implemented so well that AWS's Well-Architected Review concluded that it was "one of the most efficient and secure accounts" they'd ever reviewed (See Exhibit 12).

17. To showcase RabbitSign's exemplary use of AWS Serverless and compliance services, AWS decided to feature it in a case study—a prestigious recognition that is notoriously difficult to attain, even for seasoned professionals (See Exhibit 13).

18. Shortly before Stanley turned 18, five randomly selected full-time Google engineers, who were specifically trained and qualified to evaluate candidates, devoted no less than ten hours collectively to evaluating Stanley's skills, including his technical expertise and soft skills, such as teamwork. Based solely on their assessments, without any external influence, these Google engineers concluded that Google should hire Stanley for an L4 position, which requires a Ph.D. degree or equivalent practical experience. Consequently, Google made an offer for a full-time L4 position to Stanley in September 2023, shortly after Stanley turned 18 (See Exhibit 14).

19. Google's compensation structure is tied to the level of its employees' positions, creating a natural disincentive to over-assess an employee's qualifications.

20. Mr. Dan Bloomberg, a longtime Google employee who served on the hiring committees for 18 years, has agreed to testify regarding Google's interview process when this lawsuit proceeds to trial.

21. In January 2025, Stanley received his performance evaluation as a Google employee for the entirety of 2024, with a rating and manager assessment indicating that he fully met the expectations for his position at Google and demonstrated a strong growth trajectory.

22. Because of his groundbreaking work to provide the world's only unlimited free HIPAA-compliant e-signing service to help lower America's healthcare cost, Stanley received an inbound interview request from *Viewpoint with Dennis Quaid*, a series of short documentaries on innovations aired on CNBC, Fox Business, Bloomberg, and public TV stations across the US. Their past guests included President George H.W. Bush, Secretary Colin Powell, and Fortune 500 CEOs. (See Exhibit 15 for the industry news coverage for RabbitSign's free HIPAA-compliant e-signing. See Exhibit 16 for the episode of *Viewpoint with Dennis Quaid* featuring RabbitSign and Stanley.)

23. Stanley's high school grade point average was 3.97 (unweighted) and 4.42 (weighted) (See Exhibit 17).

24. Although Stanley's high school does not publish individual student rankings based on grade point average, he is confirmed to be within at least the top 9% of his class, as he qualified for the University of California's ("UC") "Eligibility in the Local Context" (ELC). (See Exhibit 18 for Stanley's ELC qualification.) ELC guarantees admission to a UC campus for California high school students who rank in the top 9% of their class, as determined by their GPA in UC-approved coursework completed in the 10th and 11th grades.

25. U.S. News and World Report ranks Stanley's high school (Henry Gunn High School) #14 in California and #135 nationally (See Exhibit 19).

26. Niche ranks Stanley's high school (Henry Gunn High School) #1 best public high school in San Francisco Bay Area and  #4 best public high school in California (See Exhibit 20).

27. Stanley achieved a maximum PSAT score without any preparation (See Exhibit 21).

28. Stanley scored 1590 (out of 1600) on the SAT with only a few nights of self study without any paid test prep (See Exhibit 21 as well). He took the SAT only once.

29. Stanley was a National Merit Scholarship finalist (See Exhibit 22).

30. While in high school, Stanley participated in and led numerous extracurricular and volunteer activities.

31. Stanley served as a founding officer and president of the competitive programming club at his high school (See Exhibit 23).

32. Stanley co-founded and served as the 2nd president of a nonprofit named OpenBrackets, which brought free coding lessons to 500+ kids in underserved communities in California, Washington, and Texas over 2 years (See Exhibit 24). It received positive feedback from Stackoverflow co-founder, Mr. Jeff Atwood.

33. Because of his work at OpenBrackets, Stanley received the highest level of the President's Volunteer Service Award (See Exhibit 25).

34. Stanley's college application essay was pretty much captured in the Viewpoint interview mentioned supra. It discussed why he created RabbitSign, how he overcame rejections to eventually find a partner to provide free HIPAA-compliant e-signing to help lower America's healthcare cost, and how RabbitSign is the first Activism Corporation created to counter corporate greed.

35. For enrollment in fall 2023, Stanley applied to the undergraduate Computer Science program at the University of Michigan at Ann Arbor. His application was rejected.

36. In direct connection with UM's rejection of his applications, Stanley Zhong suffered emotional distress.

37. Stanley's story was reported in national news in October 2023 (See Exhibit 26) and cited in a congressional hearing in September 2023 (See Exhibit 27).

38. After Stanley's story hit the news in October 2023, multiple college admission counselors examined his application, including his essay. None of them could figure out a legitimate reason why Stanley was rejected. Some of them have offered to testify as expert witnesses when this lawsuit proceeds to trial.

39. Stanley was denied the opportunity to compete for admission to UM on equal footing with other applicants on the basis of race or ethnicity due to UM's discriminatory admissions policies and practices.

40. Stanley is ready and able to apply to UM when it ceases its intentional discrimination against Asian Americans.

41. Stanley, Nan, and SWORD reached out to multiple legal resources and entities for representation. However, these entities either declined to take the case or failed to respond. Consequently, Stanley is compelled to represent himself as a pro se litigant.

**A2. Co-plaintiff Nan Zhong**

42. Co-plaintiff, Nan Zhong, an Asian-American resident of California, is Stanley Zhong's father.

43. A first-generation immigrant from China, Nan has a direct and personal stake in this matter due to the discriminatory practices of UM's admissions process.

44. The 2024 decision of the Second Circuit Court of Appeals in *Chinese American Citizens Alliance of Greater New York (CACAGNY) v. Adams*, 116 F.4th 161, affirms that an "equal protection claim can be asserted by individuals alleging they suffered harm from the discriminatory policy or law, as well as other individuals (such as a parent or guardian) or organizations that also have standing to sue."

45. Nan suffered emotional distress as a direct result of UM's discriminatory policies, thereby establishing his standing to bring this claim.

46. Nan's children intend to apply for admission to UM but will be denied the opportunity to compete on equal footing with other applicants due to UM's discriminatory admissions policies. As a result, they may face rejection based on race or ethnicity rather than merit. These personal impacts further establish Nan's standing to bring this claim.

47. Beyond personal impact, Nan is acutely aware of the chilling effect that Asian-American students face when asserting their legal rights in college admissions. Public hostility toward such efforts is well-documented, particularly on college campuses.

48. For example, during the *SFFA v. Harvard* trial, widespread protests erupted against SFFA's challenge to race-conscious admissions (See Exhibit 28). Even after the Supreme Court ruled against Harvard, then-president Claudine Gay responded with open defiance, stating, "We will comply with the court's decision. But it doesn't change our values." (See Exhibit 29.) While the first half of her statement reflects legal necessity, the latter half unmistakably signals defiance. Notably, following the Supreme Court's ruling in SFFA, not a single Harvard administrator apologized for the harm their policies inflicted on Asian-American applicants.

49. Academics such as Professor Janelle Wong and Professor Viet Thanh Nguyen publicly asserted that no Asian American had suffered discrimination in the college admissions process, misleading the public with statements like, "Not a single Asian-American student has testified that they faced discrimination in the high-profile Harvard case." (See Exhibit 30.) Such assertions are demonstrably inaccurate and serve to suppress legitimate grievances. On November 4, 2024, Nan challenged both Professor Janelle Wong and Professor Viet Thanh Nguyen to a public debate. Neither replied as of the filing of this lawsuit.

50. This hostile climate has a direct, suppressive effect on potential plaintiffs. Many Asian-American applicants rejected by colleges initially expressed interest in joining SWORD's lawsuit. However, after spending just a few months on college campuses as freshmen, most withdrew.

51. A particularly striking example occurred at a panel discussion following a screening of the MSNBC documentary *Admission Granted* in San Francisco on May 9, 2024. The reaction of the audience, a few hundred people strong, vividly illustrated this bias. When the moderator introduced a Harvard student advocating for race-conscious admissions, the room erupted in thunderous applause and cheers. In contrast, the Asian-American student whose case launched the SFFA lawsuit received only sparse clapping—approximately a quarter of which likely came from Nan alone.

52. This pervasive social hostility—manifesting in microaggressions and overt hostility—creates a profound chilling effect that discourages Asian-American students from challenging discriminatory policies, effectively silencing those who have been harmed. It is therefore reasonable to infer that numerous Asian-American applicants, either already harmed by UM's admissions practices or anticipating future discrimination, remain silent due to legitimate concerns about retaliation or social pressure. Under the chilling effects doctrine, which recognizes that individuals may refrain from asserting their rights due to fear of reprisal, Nan's standing to sue is further reinforced.

53. Stanley, Nan, and SWORD reached out to multiple legal resources and entities for representation. However, these entities either declined to take the case or failed to respond. Consequently, Nan is compelled to represent himself as a pro se litigant.

### A3. Co-plaintiff Students Who Oppose Racial Discrimination (SWORD)

54. Co-plaintiff, Students Who Oppose Racial Discrimination ("SWORD"), is a voluntary membership organization focused on stopping racial discrimination in college admissions through litigations. It was established in October 2024 by people harmed and outraged by flagrant racial discrimination in college admissions.

55. SWORD is a coalition comprising prospective applicants to higher education institutions, individuals who were denied admission, their parents, and supporters of the organization's mission to eliminate racial discrimination in higher education admissions.

56. Nan Zhong is the President of SWORD.

57. SWORD's website is https://sword.education.

58. SWORD has at least one Asian-American member who is currently in high school and intends to apply for admission to UM ("Future Applicants").

59. Future Applicants will be denied the opportunity to compete for admission to UM on equal footing with other applicants on the basis of race or ethnicity due to UM's discriminatory admissions policies. As a result, Future Applicants may be denied admission to UM because of these discriminatory policies and practices.

60. SWORD has at least one Asian-American member whose children either intend to apply for admission to UM or applied for but were denied admission to UM in recent years ("Parents").

61. Parents' children were or will be denied the opportunity to compete for admission to UM on equal footing with other applicants on the basis of race or ethnicity due to UM's discriminatory admissions policies. As a result, Parents' children were or may be denied admission to UM because of these discriminatory policies and practices. Consequently, Parents in Michigan were or may be forced to pay higher out-of-state tuition for their children.

62. Under *Hunt v. Washington State Apple Advertising Commission, 432 U.S. 333 (1977)*, SWORD qualifies for associational standing because 1) SWORD has members who have standing to sue UM themselves, 2) this lawsuit is germane to SWORD's purpose, and 3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

63. Stanley is not a member of SWORD.

64. The emotional toll experienced by Stanley and Nan exemplify the broader emotional and potential economic harms associated with racially discriminatory admissions practices by UM. Such policies do not merely affect statistical representation; they impose real-world consequences on a large group of individual applicants.

65. Stanley, Nan, and SWORD reached out to multiple legal resources and entities for representation. However, these entities either declined to take the case or failed to respond. Consequently, as President of SWORD, Nan is compelled to represent the organization as a pro se litigant.

**B. Defendant**

66. Defendant is a public university system in the State of Michigan, subject to Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et. seq*.

## IV. FACTUAL ALLEGATIONS

### A. Asian Applicants Receiving Discriminatory Results

67. For undergraduate enrollment in fall 2023, Stanley applied to UM. Despite his extraordinary qualifications, he was rejected. This outcome defies common sense and contradicts expert assessments of his application. As the Supreme Court noted in *Miller v. Johnson*, 515 U.S. 900,901 (1995), "bizarreness" can serve as "persuasive circumstantial evidence that race for its own sake…was a legislature's dominant and controlling rationale." Similarly, the stark disparity between Stanley's qualifications and the UM admissions decisions raises serious concerns about the role of race in UM's admissions process. This striking incongruity strongly suggests that UM's admissions policies are being applied in a discriminatory fashion.

68. Plaintiffs believe and allege that Stanley's rejection by UM was not based on his qualifications but on his race, as an Asian American.

**B. Widespread Anti-Asian Discrimination at Elite Universities**

69. After the state audit in 1987 (See Exhibit 31), University of California Berkeley Chancellor Ira Michael Heyman publicly apologized in 1989 for admissions policies that led to a decline in Asian-American undergraduate enrollment (See Exhibit 32).

70. On September 22, 2016, *Inside Higher Education* released a survey of admission officers. It revealed 42% of admission officers from private colleges and 39% of admission officers from public colleges believe that colleges hold Asian-American applicants to a higher standard (See Exhibit 33).

71. On May 25, 2016, Dr. Michele Hernandez, former Dartmouth admission officer, revealed on *Huffington Post* "how even the so-called 'holistic process' can discriminate against Asian students" and how Ivy League college admission officers often use racial stereotypes to discriminate against Asian-American applicants (See Exhibit 34).

72. Harvard openly gave preferential treatment to some racial groups at the expense of Asian-American applicants until its practice was ruled illegal by the Supreme Court in *SFFA v. Harvard* in 2023. Notably, following the Supreme Court's ruling in SFFA, not a single Harvard administrator apologized for the harm their policies inflicted on Asian-American applicants.

73. As documented in the SFFA's legal complaint against Harvard (page 60), Asian-American applicants and their families know that they are being discriminated against by elite universities (See Exhibit 35).

74. As documented in the SFFA's legal complaint against Harvard (page 57), college counselors acknowledge discrimination against Asian Americans at elite universities (See Exhibit 36).

75. It is well documented that many Asian-American applicants attempt to appear "less Asian" on their college applications to avoid potential bias (See Exhibit 37).

76. Admission officers at elite universities have described Asian-American applicants using derogatory racial stereotypes, such as labeling them as "yet another textureless math grind" (See Exhibit 39).

77. Evidence also shows that elite universities were aware of discriminatory practices but often ignored or denied the issue until confronted with legal challenges. For instance, in 2006, Jian Li, an Asian-American applicant, filed a formal complaint against Princeton University for racial discrimination in admissions. Following this action, Princeton's admission rate for Asian-American students rose from 14.7% in 2007 to 25.4% in 2014 (See Exhibit 38). Similarly, after SFFA sued Harvard in 2015, the percentage of Asian-American admits increased from 17% in 2014 to 22% in 2016 (See Exhibit 38 as well).

78. These patterns demonstrate a troubling reality: institutions were capable of increasing Asian-American enrollment with little change in applicant qualifications, suggesting prior suppression of Asian admissions through discriminatory policies. This raises legal concerns about UM's own admissions practices. Legal scrutiny is warranted to uncover the extent of UM's awareness of and complicity in similar practices that have disadvantaged highly qualified Asian-American applicants.

79. Compiling his Pulitzer Prize-winning reporting into a book titled *The Price of Admission*, Daniel Golden documented multiple highly qualified Asian applicants rejected by the University of California, Harvard, Yale, Princeton, Brown, Columbia, Stanford, and Massachusetts Institute of Technology. For example, UCLA rejected Stanley Park, a Korean American student who faced serious adversity (single immigrant parent with cancer and no college degree), while accepting non-Asian students with SAT scores 520 and 560 points lower. (See Exhibit 39 for the relevant excerpt from *The Price of Admission*.)

80. In 2003, Mr. John Moores, then chairman of the UC Board of Regents, accused UC's flagship campus of "blatantly" discriminating against Asian Americans (See Exhibit 40).

81. Following the implementation of a holistic review system, UCLA prohibited faculty members on its Admissions Committee from accessing admissions data. In response, Professor Tim Groseclose invoked whistleblower

protections and resigned from UCLA in protest (See Exhibit 41). In *Cheating: An Insider's Report on the Use of Race in Admissions at UCLA*, Professor Groseclose described how then-UCLA Chancellor Norm Abrams explicitly cited raising African American enrollment as the motivation behind adopting holistic admissions. In addition, Professor Groseclose's statistical analysis showed that, for a group of applicants receiving the same scores from their initial readers, UCLA admitted 55% poor African Americans, 38% rich African Americans, 23% poor North Asians and 18% rich North Asians. Note that *rich* African Americans were admitted much more frequently than *poor* North Asians. UC never disputed the accuracy of Professor Groseclose's account. (See Exhibit 42 for excerpts from Professor Tim Groseclose's book *Cheating*.)

82. In a study commissioned by UCLA, only later obtained through public records requests, sociology professor Robert Mare documented a consistent pattern of anti-Asian discrimination in admissions at UCLA. His report said, "'North Asian' (Chinese, Japanese, Korean, Indian/Pakistani American) applicants receive somewhat less favorable holistic read scores than applicants in other ethnic identity groups who are otherwise similar in measured academic qualifications, personal characteristics, and measured challenges and hardships." It further indicated that "among otherwise equivalent applicants, whites, African Americans and Latinos are overrepresented among those admitted, and Asian-American applicants are underrepresented." Additionally, the report noted that "the

disadvantages of Asian applicants occur, with varying magnitudes,
throughout the admissions process." (See Exhibit 56 in case 2:25-cv-0495
DJC CSK in the U.S. District Court for the Eastern District of California).

83. After Dr. Jennifer Lucero took over UCLA medical school admissions in
June 2020, the number of Asian matriculants at UCLA medical school
declined from 84 to 55 from 2019 through 2022, a drop of 35% (See
Exhibit 43). Precipitous changes in admission rates strongly suggest
deliberate conscious race-based directives.

**C. Deep-Rooted Culture of Identity Over Academics and Legal Evasion
in Higher Education**

84. Around 1990, then-UM President James J. Duderstadt instituted the
Michigan Mandate, describing it as "a blueprint for fundamental change in
the ethnic composition of the university community." (See Exhibit 44.) He
claimed it strategically linked 'academic excellence and social diversity.'
Decades later, the current UM President Santa Ono echoed this
sentiment, stating, "At the University of Michigan, we are convinced that
academic excellence goes hand-in-hand with diversity, inclusion and
equity." However, UM's rejection of highly qualified applicants like Stanley
suggests a departure from genuine academic excellence in favor of
ideological priorities.

85. In 2023, Brown University's Medical School prioritized Diversity, Equity,
and Inclusion (DEI) over clinical skills in its faculty promotion criteria,

raising concerns about the potential impact on patient care quality (See

Exhibit 45).

86. Mr. Steven Dubinett, the dean of UCLA medical school, directs a center

that houses a race-based fellowship. Its web page was deleted after

media exposure (See Exhibit 46), indicating awareness of its illegality.

87. A New York Times opinion piece by a former UC admissions reader

shared her detection of "unspoken directives", questioned whether

"Proposition 209 serve(s) merely to push race underground" and

described the admission reading process as "an extreme version of the

American non-conversation about race." (See Exhibit 47.)

88. Following public outcry over the Varsity Blues scandal, California state

lawmakers commissioned an audit of the University of California's

admissions practices. The California State Auditor's 2020 report found that

UC "has allowed for improper influence in admissions decisions, and it has

not treated applicants fairly or consistently." Specifically, the audit revealed

that UC Berkeley and UCLA "admitted thousands of applicants whose

records demonstrated that they were less qualified than other applicants

who were denied admission." (See Exhibit 48).

89. In a public talk to a large audience, Professor Erwin Chemerinsky, the

Dean of the University of California Berkeley Law School, admitted that his

school systematically considers race in its internal decision-making and

actively conceals this practice (See Exhibit 49). As evidenced in the video,

when discussing the consideration of race in faculty hiring, Mr. Chemerinsky described and preached the "unstated Affirmative Action" practiced at UC as follows: "Don't say that [you are considering the candidate's race]. You can think it. You can vote it… Don't ever articulate that is what you are doing." He also said "If I'm ever deposed, I'm going to deny I said this to you." His statements reveal deliberate intent by senior university administrators to actively conceal their use of race in decision-making.

90. In November 2022, *The New Yorker* staff writer Jay Caspian Kang quoted Mr. Erwin Chemerinsky as follows:

> "What colleges and universities will need to do after affirmative action is eliminated is find ways to achieve diversity that can't be documented as violating the Constitution," Mr. Chemerinsky stated. "So they can't have any explicit use of race. They have to make sure that their admissions statistics don't reveal any use of race. But they can use proxies for race." (See Exhibit 49 as well.)

This statement is a clear acknowledgment that university officials intend to bypass constitutional and legal prohibitions on racial discrimination by employing indirect methods—namely, "proxies for race"—to achieve the same racial outcomes that explicit race-based policies once facilitated.

91. The use of racial proxies to achieve racial balancing is unconstitutional. In *Parents Involved in Community Schools v. Seattle School District No. 1*,

551 U.S. 701, 743 (2007), the Supreme Court held that racial balancing is not a compelling state interest and that the government may not achieve racial diversity through indirect methods that amount to race-conscious decision-making. Similarly, in *SFFA v. Harvard*, 600 U.S. 181 (2023), the Supreme Court reaffirmed that admissions policies designed to achieve racial diversity by using proxies for race are equally unconstitutional.

92. The statements made by Mr. Chemerinsky provide strong circumstantial evidence that senior university administrators are knowingly and deliberately structuring its admissions policies to evade legal prohibitions on racial discrimination.

93. As a law professor, Mr. Chemerinsky must know what he was preaching is illegal. By his own admission, he clearly knew it was illegal. Yet, he preached it with a sense of pride and braggadocio. It is worth emphasizing that Mr. Chemerinsky is the Dean, the top administrator, of UC Berkeley Law School. Mr. Chemerinsky's statements happened to be in a public talk, happened to be captured in video, and happened to be shared on the web. What is visible to the public must be only the tip of the iceberg. It is reasonable to infer the preaching and practice of "unstated Affirmative Action" is widespread in universities' admissions and hiring process, which lacks transparency and accountability.

94. Similar to the 'unstated Affirmative Action' approach advocated by Mr. Chemerinsky at UC, the University of Washington (UW) implemented this

practice by re-ranking candidates based on race while maintaining an appearance of neutrality. In 2023, the UW psychology department's hiring committee re-ranked finalists to prioritize hiring a Black candidate over a white and an Asian candidate who were originally ranked first and second, respectively. UW's report concluded that "race was used as a substantial factor in the selection of the final candidate and the hiring process." The report, which redacts all the names of those involved, suggests that faculty members tried to hide the extent to which race was considered, including in the hiring report. "I advise deleting the statement below as it shows that URM [underrepresented minority] applications were singled out and evaluated differently than non-URM applications (which is not allowed as [redacted] noted)," one email read, according to the report. "My inclination is to hold these meetings only for POC [People of Color] candidates. I'm also mindful that our Provost is now getting anxious about anything that's directed to only some identity groups (i.e., they are getting worried about fallout from the pending Supreme Court affirmative action rulings)," a person wrote in an email. "My read is that they'll get fearful of litigation and overcorrect into colorblindness. Maybe our committee can preemptively think our way around this type of future directive," the faculty member wrote. (See Exhibit 53 in case 2:25-cv-00348 in the U.S. District Court for the Western District of Washington.) This case provides a concrete example of how UW prioritized race in hiring, in clear violation of the law. The incident only came to light probably due to a public records request

1   from an external group. Given the pervasive culture of racial preference, it

2   is reasonable to infer that this was not an isolated occurrence.

3  95. Senior university administrators not only preach and practice "unstated

4    Affirmative Action", they also actively persecute those who advocate for

5    academic excellence over identity politics. From 2022 to 2024, Professor

6    Perry Link, Chancellorial Chair for Teaching Across Disciplines at UC

7    Riverside and a leading authority on modern and contemporary Chinese

8    literature and culture, faced disciplinary action after expressing concerns

9    during a faculty search committee meeting about prioritizing a Black

10   candidate's race over qualifications. His comments, which he stated were

11   intended to caution against elevating race as the "overriding criterion,"

12   were reported to university officials without his knowledge. Professor Link

13   was subsequently removed from the search committee and subjected to a

14   prolonged disciplinary process, including hearings resembling a trial,

15   where termination was suggested as a penalty. Although a faculty

16   committee unanimously found him innocent of the charges, Chancellor

17   Kim Wilcox issued a formal letter of censure, overriding the committee's

18   recommendation (See Exhibit 50). Professor Perry Link was accused of

19   making racist comments during the hiring process but was not informed of

20   the specific remarks deemed problematic until nearly a year later. UC

21   Riverside eventually acquitted him of all charges but allegedly threatened

22   to penalize him if he spoke publicly about the ordeal. Despite UC's threats,

23   Professor Link, a distinguished scholar at age 80, courageously made the

incident public (See Exhibit 51). If UC has attempted to silence a

prominent tenured professor, it is reasonable to infer the tremendous

pressure any professor, non-tenured administrator or staff would face if

they were to speak up. Therefore it is reasonable to infer that numerous

similar cases exist at UC and other universities in which victims chose to

remain silent, fearing retaliation that could jeopardize their careers and

livelihoods. This incident highlights senior university administrators'

preoccupation with immutable characteristics such as race, in clear

violation of the Constitution. It also demonstrates the great lengths to

which they go to silence any dissidents or whistleblowers. Furthermore, it

clearly illustrates the importance of exercising the chilling effect doctrine

when it comes to the legal standing in lawsuits concerning universities'

student admissions and faculty hiring.

96. Professor Perry Link has agreed to testify when the lawsuit filed by

Stanley, Nan and SWORD against the UC (Case No. 2:25-cv-0495 DJC

CSK in the U.S. District Court for the Eastern District of California) goes to

trial.

97. It is noteworthy that California and Washington have had state laws

explicitly prohibiting racial preference or discrimination in public education

since 1996 and 1998, respectively, through Proposition 209 and Initiative

200. Nevertheless, both the University of California (UC) and the

University of Washington (UW) appear to have disregarded the will of

voters and the rule of law. Similarly, Michigan has prohibited racial

preferences and discrimination in public education since 2006 under Proposal 2. Yet, the entrenched culture of legal evasion within higher education institutions suggests that many universities continue to operate as though they are above the law.

98. Both the University of Michigan and the University of California are constitutionally prohibited from using racial preferences in student admissions. Nevertheless, both institutions have demonstrated a clear desire to circumvent these bans (See Exhibit 52). After Michigan's Proposal 2 passed in 2006, UM hosted a 2-day workshop featuring UC administrators, who shared their strategies for navigating California's Proposition 209, enacted in 1996 (See Exhibit 59). Reports by Professor Robert Mare and the California State Auditor uncovered major issues in UC's admissions practices, warranting the same level of scrutiny for UM. UC's actions strongly suggest how UM may be operating. This raises concerns that UM is following Mr. Chemerinsky's advice to "just do it without leaving any paper trail." Such tactics could make it difficult for Plaintiffs to obtain direct evidence of discriminatory intent against Asian-American applicants. In this context, Plaintiffs' claims should be assessed based on whether UM's admissions policies create a discriminatory impact on Asian-American applicants, either individually or collectively. As Mr. Chemerinsky himself acknowledged, statistical analysis is key to identifying racial discrimination in admissions. Plaintiffs intend to conduct such an analysis during the discovery phase of this lawsuit.

**D. UM's Motive and Intent for Racial Balancing its Student Body**

99. In its amicus brief filed with the US Supreme Court in *SFFA v. Harvard*,
UM stated that "U-M's Sustained Race-Neutral Initiatives Have Not
Achieved Racial Diversity In Enrollments" (See Exhibit 53). The brief fails
to define the criteria of achieving racial diversity—a point Plaintiffs intend
to explore during discovery. Nevertheless, UM's statement reveals its
intent to increase enrollment for certain racial groups, a motive that
implicates strict scrutiny under constitutional law. The brief also
rationalized UM's rejection of a percentage plan because "a percentage
plan would have minimal or negative effects on racial diversity" (See
Exhibit 53 as well). This further exemplifies UM's use of race in its
decision-making.

100.    In July 2023, following the Supreme Court's ruling in *SFFA v. Harvard*,
UM President Santa Ono stated that he was "deeply disheartened by the
court's ruling" (See Exhibit 54). This statement openly signaled the
university's continued desire to consider race in admissions, despite the
Court's decision.

101.    In 2014, when an organization named By Any Means Necessary lost
its challenge to Proposal 2 in the Supreme Court, then-UM president Mary
Sue Coleman announced defiantly, "Despite this decision from the
Supreme Court, the University of Michigan remains deeply committed to

using every legal tool at our disposal to bring together a diverse study

body." (See Exhibit 55.)

102.    The Equal Protection Clause of the Fourteenth Amendment prohibits

states from denying any person "the equal protection of the laws." The

Clause's "central purpose is to prevent the States from purposefully

discriminating between individuals on the basis of race." See *Shaw v.*

*Reno*, 509 U.S. 630, 642 (1993). Thus, a state law or policy that

discriminates on the basis of race is subject to strict scrutiny, regardless of

its intended beneficiaries. See *Adarand Constructors, Inc. v. Peña*, 515

U.S. 200, 227 (1995).

103.    As the Supreme Court noted in *SFFA v. Harvard*, 143 S. Ct. 2141,

2169 (2023), "College admissions are zero-sum. A benefit provided to

some applicants but not to others necessarily advantages the former

group at the expense of the latter." The distinction between preferential

treatment and adverse impact is illusory—both actions are inherently

racially motivated and inseparable, representing merely different ways of

describing the same net discriminatory conduct. In a zero-sum situation,

when assessing whether a policy constitutes racial discrimination, courts

should focus on the presence of racial intent, regardless of whether that

intent manifests as preferential treatment or adverse impact. As the

Supreme Court affirmed in *SFFA v. Harvard*, "[W]hat cannot be done

directly cannot be done indirectly. The Constitution deals with substance,

not shadows," and the prohibition against racial discrimination is "levelled

1    at the thing, not the name." *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277,

2    325, 18 L.Ed. 356 (1867).

3    104.    Article I, Section 26 of the Michigan Constitution explicitly states: "*The*

4    *University of Michigan, Michigan State University, Wayne State University,*

5    *and any other public college or university, community college, or school*

6    *district shall not discriminate against, or grant preferential treatment to,*

7    *any individual or group on the basis of race, sex, color, ethnicity, or*

8    *national origin in the operation of public employment, public education, or*

9    *public contracting.*" This provision unequivocally prohibits both adverse

10    discrimination and preferential treatment on the basis of these

11    characteristics.

12    **E. UM's Action for Racial Balancing its Hiring and Admissions**

13    105.    In addition to its evident motive and intent for racial balancing, UM

14    possesses the means and opportunity to manipulate the racial

15    composition of its student body under its current "holistic" admissions

16    framework, which lacks transparency, independent third-party oversight

17    and accountability. Indeed, UM's intent is matched by its actions.

18    106.    A university policy that amounts to racial balancing is "patently

19    unconstitutional." *Grutter v. Bollinger*, 539 U.S. 306, 329 (2003). Racial

20    balancing seeks to ensure a specified percentage of a racial group within

21    the student body merely due to race or ethnicity. *Id.* Courts have

consistently rejected proportional representation as a constitutional

justification for race-based admissions. See *Id.* at 343.

107.    Admissions and hiring are inherently interconnected and inseparable in the context of racial discrimination within educational institutions. Faculty and administrators play a pivotal role in shaping academic standards, mentoring students, and influencing the culture and policies of a university, including admissions criteria and practices. A racially biased hiring process can create and perpetuate a discriminatory culture by fostering an environment where certain racial perspectives are prioritized over objective, merit-based considerations. Racially-motivated hiring policies often have a direct ripple effect on student admissions. It is unrealistic and unreasonable to assume that a university can operate one process in a race-conscious manner while keeping the other race-neutral, as both are fundamentally linked in their goals and execution. Therefore, examining both admissions and hiring practices is essential to providing a holistic assessment of whether a university's policies violate constitutional and statutory protections against racial discrimination.

108.    UM insists on implementing both "holistic reviews" and a "test-optional" admissions policy. However, this position is inherently contradictory. A review cannot be truly holistic if it deliberately excludes objective measures like standardized tests, especially for STEM applicants where such metrics are crucial for assessing academic preparedness. This decision appears to be a calculated move to compromise intellectual

honesty and academic integrity, potentially facilitating the concealment of

discriminatory practices against Asian-American applicants. Notably,

leading institutions like MIT, Dartmouth, Yale, Brown, Harvard, Caltech,

Cornell, and the University of Texas at Austin have reinstated

standardized testing, further highlighting the questionable nature of UM's

continued "test-optional" policy post-COVID. These circumstances

necessitate legal scrutiny of UM's policy, its underlying motivations, its

disparate impact on Asian-American applicants, and whether UM

continues to merit the traditional judicial deference granted to bona fide

academic institutions.

109.    Like the "unstated Affirmative Action" described by Mr. Chemerinsky at

UC, UM's hiring process appears to be driven by identity while maintaining

a façade of neutrality (See Exhibit 56, part 1).

110.    The prevailing belief at UM is that advocating for a "level playing field"

in admissions in a diversity statement is considered "career suicide" (See

Exhibit 56, part 2).

111.    UM's Collegiate Fellows program claims not to consider race, yet at

least 80% of its hires were people of color (See Exhibit 56, part 3), a

statistic that strongly suggests race-based selection.

112.    Further, UM has fostered a climate of fear similar to UC's, discouraging

dissents and academic freedom. Students and faculty whisper that "I can't

say anything in class anymore. I'm going to get run out of class" (See Exhibit 56, part 4).

113.    Until December 5, 2024, UM required diversity statements in faculty hiring and promotions. Under this system, even a Nobel Prize winner might not be considered if they prioritized academic research over diversity initiatives.

114.    Given that UM is or was not conducting itself as a bona fide academic institution for student admissions or faculty hiring, any traditional judicial deference afforded to academic institutions should not apply in lawsuits concerning student admissions or faculty hiring at UM.

115.    UM's Diversity FAQ page states that "*But consideration of socio-economic factors, alone, does not help us enroll a student body that is racially or ethnically diverse, nor does it help us achieve gender diversity. For example, there are far more white students from low-income families applying to the University than minority students from low-income families. Socioeconomic status is not a substitute for race or ethnicity.*" (See Exhibit 57.) This statement suggests that UM prioritizes race over socioeconomic status in admissions, potentially favoring minority students from affluent backgrounds over white students from low-income families. Such an approach raises serious concerns about whether UM is more committed to superficial diversity metrics than to genuine social justice.

1    Moreover, the kind of race-based decision-making exemplified by this

2    constitutes a violation of the Michigan Constitution.

3    116.    In a 2017 report by the Equality of Opportunity Project — further

4    covered in the New York Times' The Upshot —, UM ranked last in

5    economic mobility and diversity among elite public colleges. The median

6    family income of a student at UM is $154,000 — the highest of 27 public

7    colleges classified as "highly selective." The Upshot also highlighted that

8    66 percent of students come from the top 20 percent of the income

9    distribution, while 9.3 percent of the student body come from the top 1

10   percent of the income distribution alone, also the highest of the 27

11   institutions. Just 3.6 percent of students hail from the bottom 20 percent of

12   income levels. Additionally, UM ranked last out of 25 highly selective

13   public colleges and all Big Ten schools in terms of economic social

14   mobility. The Upshot estimates only 10 percent of UM alumni moved up

15   two or more income quintiles. Stony Brook University in New York came in

16   first with 34 percent and University of California-Irvine placed second with

17   27 percent. (See Exhibit 58.) This aligns with the implications of UM's

18   Diversity FAQ page, suggesting that UM prioritizes minority students from

19   affluent backgrounds over white students from low-income families.

20   117.    It appears that, in its effort to racially balance its student body, UM is

21   willing to sacrifice socio-economic diversity.

118.   After Proposal 2, UM introduced essays focused on identity (See Exhibit 59), emphasizing personal identity over academic merit. Additionally, UM employs Descriptor Plus, a College Board program designed to help schools "shape [their] class profile" and "[t]arget hard-to-attract populations," including minority students. This tool utilizes College Board and U.S. census data to categorize high schools into 180,000 geographic clusters with distinct "behavior profiles." (See Exhibit 59 as well.) UM's use of Descriptor Plus warrants legal scrutiny to determine whether it serves as a proxy for race in admissions decisions.

119.   According to the 2020 U.S. Census, Michigan's Asian population grew by 40.5% over the prior decade, making it the fastest-growing ethnic group in the state (See Exhibit 60). Similarly, Asian American Pacific Islander Vote (AAPIV) estimated that the AAPI voter pool in Michigan grew by 59% from 2010 to 2020. This compares to a 4% change for the statewide eligible voting population over the same period (See Exhibit 60 as well). It is reasonable to infer that the Asian population in Michigan continued to grow at a similar pace after 2020. However, at UM Ann Arbor, one of the most selective campuses of the UM system, Asian admits have trended flat or down since 2020. The percentage of Asian students enrolled went from 19.4% (1,334 out of 6,879) in 2020 to 18.2% (1,322 out of 7,278) in 2024. (See Exhibit 61.) According to Michigan Daily, Asian admits at UM went from 19.0% in 2023 down to 17.2% in 2024 (See Exhibit 62).

120.   The gap between Asian population growth and admission rates strongly suggests systemic discrimination. As the Court explained in *Reno v. Bossier Parish School Board*, 520 U.S. 471, 487 (1997), the natural consequences of an action often provide probative evidence of intent. Here, the persistent adverse impact on Asian-American applicants indicates a racially motivated policy, despite UM's denials.

121.   In 2023, the year Stanley applied, UM Ann Arbor enrolled 432 African American students (See Exhibit 61). The 25th and 75th percentile SAT scores for UM students were 1350 (670+680) and 1530 (750+780), respectively (See Exhibit 61 as well), suggesting a median SAT score of approximately 1440 ((1530+1350)/2). Nationally, 225,954 African American students took the SAT in 2023, with approximately 1% (roughly 2,259 students) scoring in the top range of 1400–1600 (See Exhibit 63). If UM's African American enrollees reflected the general SAT distribution of UM enrollees, approximately 216 of them would have scored above the median of 1440, with an even larger number exceeding 1400. This would mean UM enrolled at least 9.6% of the nation's top African American SAT performers.

122.   Based on this analysis, the estimated percentage of national top scorers (those in the 1400-1600 SAT range) enrolled at UM is approximately 9.6% for African Americans, 1.6% for Asian Americans, 5.9% for Hispanic Americans, and 3.7% for White students (See Exhibit 64).

123.    Unless African-American applicants are six times more likely than Asian-American applicants to be drawn to UM (as suggested by the 9.6% to 1.6% ratio), these figures imply that Asian American applicants face significantly higher SAT score thresholds for admission. Considering the geographic distribution of high-achieving students, such a high concentration of top scorers from certain racial groups appears statistically improbable. While SAT scores are not the sole measure of merit, this statistical anomaly raises serious concerns about whether UM's admissions policies align with constitutional and legal prohibitions against racial preferences.

124.    Studies comparing the academic qualifications of admitted or enrolled students by race fail to fully capture the extent of racial discrimination faced by Asian-American applicants. By rejecting highly qualified Asian-American applicants like Stanley, UM artificially narrows the academic qualification gap between admitted or enrolled students of different racial groups. As a matter of mathematical fact, the more highly qualified Asian-American applicants the university rejects, the smaller the observed qualification gap among admitted or enrolled students becomes. To accurately assess the extent of racial discrimination, it is necessary to compare not only the admitted or enrolled Asian-American students but also the rejected Asian-American applicants against admitted or enrolled students from other racial groups. However, limitations in the publicly available UM admissions data currently prevent such an analysis. The

plaintiffs intend to pursue this essential data comparison during the discovery phase of this lawsuit.

125.    Additionally, out of the 7,466 students enrolled at UM Ann Arbor in 2023, only 102 (approximately 1.37%) were National Merit Finalists (See Exhibit 61 as well). Despite this, Stanley—a National Merit Finalist—was rejected, further raising concerns about UM's admissions practices.

126.    The argument that Asian Americans are over-represented in UM's student body relative to the general population does not negate claims of discrimination. Equal protection requires that individuals be treated as individuals, not as members of a racial class. See *Miller v. Johnson*, 515 U.S. 900, 911 (1995). Even if aggregate Asian enrollment remains relatively high, systemic bias may suppress their numbers below what they would be in a race-neutral system. "[I]nvidious discrimination does not become less so because the discrimination accomplished is of a lesser magnitude." See *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 277 (1979).

127.    The Second Circuit's 2024 decision in *Chinese American Citizens Alliance of Greater New York (CACAGNY) v. Adams* supports this case. The court held that a facially neutral policy driven by racial motives violates equal protection, even if aggregate enrollment improves. The ruling states "if discriminatory intent is proven, a negative effect or harm from that discriminatory policy on individual Asian-American students

1 applying to the SHSs [Specialized High Schools] would be sufficient to

2 trigger strict scrutiny review". The court further held that a policy or a

3 program "is not immunized from strict scrutiny because it underperforms in

4 an unconstitutional mission with respect to a targeted racial group in the

5 aggregate." Therefore, university policies aiming to suppress Asian

6 enrollment—whether or not Asian Americans are over-represented—are

7 subject to strict scrutiny and won't survive it.

8 128. Moreover, *CACAGNY* rejected the defense that admitting students to

9 any school within a system negates discrimination claims. The Second

10 Circuit Court stated that denying a student access to their preferred

11 institution due to race is actionable. Similarly, admitting Asian-American

12 students to less selective UM campuses does not absolve more selective

13 campuses from discrimination claims.

14 129. In *CACAGNY*, the Second Circuit Court stated that "Applying Supreme

15 Court precedent, we have generally recognized three types of

16 discriminatory laws: (1) a facially discriminatory law or policy that

17 expressly classifies individuals on the basis of race; (2) a facially neutral

18 law that is enforced in a discriminatory fashion; and (3) a facially neutral

19 law that was adopted with discriminatory intent and resulted in a

20 discriminatory effect. *See Chabad Lubavitch of Litchfield Cnty., Inc. v.*

21 *Litchfield Hist. Dist. Comm'n,* 768 F.3d 183, 199 (2d Cir. 2014)."

130.   In this case, at least two types of discriminatory policies and practices identified by the Second Circuit Court are evident:

    a.   **Discriminatory enforcement**: UM's absurd and incongruous admission outcomes strongly indicate that UM exercises its admissions policies in a discriminatory fashion.

    b.   **Discriminatory intent and effect:** The pervasive culture of "unstated affirmative action" at universities underscores discriminatory intent, with substantial evidence of its adverse impact on Asian-American applicants, both individually and collectively.

These actions constitute violations of the Equal Protection Clause of the Fourteenth Amendment, Title VI of the Civil Rights Act of 1964, and Article I, Section 26 of the Michigan Constitution.

**F. UM Ignoring Complaints**

131.   UM officials have ignored complaints about questionable admissions outcomes and allegations of racial discrimination, reflecting a broader lack of transparency and accountability in their admissions process. On January 26, 2025, Nan contacted the UM Board of Regents and President Santa Ono regarding Stanley's admission results, requesting an investigation. As of this filing, they have not responded.

132.    This mirrors the University of California's prolonged refusal to engage with Nan, who sought dialogue for over a year before filing a lawsuit against UC and the U.S. Department of Education on February 11, 2025, in the U.S. District Court for the Eastern District of California (Case No. 2:25-cv-0495 DJC CSK).

133.    The denial of Stanley's application to UM—combined with UM's complete failure to even acknowledge the issue—cannot be dismissed as mere random error. Rather, these actions reveal a pattern of systemic bias and deliberate indifference, suggesting malice toward Stanley and, by extension, other similarly situated Asian-American applicants. While it is true that Google's job offer came after UM's rejection—meaning UM could not have foreseen that Google would recognize Stanley's skills had already reached the Ph.D. level—the fundamental issue remains: the technical achievements included in Stanley's UM applications were substantially the same as those sent to Google. While Google found Stanley's achievements sufficient to consider him for a Ph.D.-level position, UM, in contrast, deemed him unqualified for undergraduate admission. This stark contrast underscores a systemic barrier that profoundly affects Asian-American applicants' experiences in college admissions. Even when their qualifications reach the Ph.D. level, they may still be denied undergraduate admission. This fosters a pervasive sense of helplessness—the belief that the system is rigged to reject you regardless

1    of your merits—that contributes significantly to the mental health

2    challenges within the Asian-American youth community.

3    134.   This case echoes the dark legacy of the Chinese Exclusion Act of

4         1882—a shameful chapter in our nation's history for which Congress

5         formally apologized in June 2012. Disturbingly, as of the filing of this

6         lawsuit—after UM became aware of Google's assessment of Stanley's

7         skills—UM still refuses to engage in any discussion about his applications,

8         which only compounded the emotional distress Stanley and Nan have

9         endured.

10   **G. Lack of Response by Government Officials**

11   135.   Stanley's mother filed a civil rights complaint with the Office for Civil

12        Rights (OCR) at the U.S. Department of Education. However, the OCR

13        dismissed the case after misinterpreting her email, relying on reasoning

14        that directly contradicted her intended meaning. When she pointed out the

15        misunderstanding, the OCR refused to reopen the case, stating it had

16        been closed. The official dismissal letter cited a rationale the OCR knew to

17        be false. Despite her repeated requests to correct the letter and remove

18        the inaccurate reasoning, the OCR declined to make any changes, even

19        after she escalated the matter. (For the full record of email exchanges with

20        the OCR, see Exhibit 75 in case 2:25-cv-0495 DJC CSK in the U.S.

21        District Court for the Eastern District of California.) OCR's failure to

1    enforce civil rights laws has let the direct harm to Stanley and other

2    Asian-American applicants persist.

3    136.    Nan also raised his concerns with California Assemblymember Marc

4    Berman, mentioning that hundreds of his constituents were deeply

5    concerned about UC's admissions practices. Despite several email

6    exchanges, Mr. Berman did not respond substantively. (For the full record

7    of email exchanges with Mr. Berman and his staff, see Exhibit 76 in case

8    2:25-cv-0495 DJC CSK in the U.S. District Court for the Eastern District of

9    California.)

10   137.    In November 2023, Nan organized a petition that gathered over 4,000

11   endorsements for letters expressing concerns about UC admissions.

12   These letters were sent to Governor Gavin Newsom and Lt. Governor

13   Eleni Kounalakis, both of whom serve as ex officio Regents of the

14   University of California. Neither replied. (For the letters, see Exhibit 77 and

15   Exhibit 78 in case 2:25-cv-0495 DJC CSK in the U.S. District Court for the

16   Eastern District of California.)

17   138.    Since Plaintiffs were unable to get government officials to engage in

18   California, where they are residents and taxpayers, they have little reason

19   to expect assistance from officials in Michigan. As a result, litigation

20   remains the only viable option.

**H. Legal Basis**

139.    The Supreme Court's decision in *SFFA. v. Harvard* unequivocally established that racial discrimination in college admissions is unconstitutional.

140.    UM's racial discriminatory admission policies and practices violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

141.    UM's racial discriminatory admissions policies and practices also violate Title VI of the Civil Rights Act of 1964, which prohibits racial discrimination in programs receiving federal financial assistance.

142.    UM's racial discriminatory admissions policies and practices also violate Article I, Section 26 of the Michigan Constitution, which expressly forbids racial discrimination in public education.

143.    In addition to direct evidence of discrimination, racial "prejudice or stereotype" may be proven through circumstantial evidence. *See Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 266 (1977).

144.    Further supporting this claim, the Second Circuit Court of Appeals, in *Chinese American Citizens Alliance of Greater New York (CACAGNY) v. Adams*, 116 F.4th 161 (2d Cir. 2024), unanimously affirmed that an equal protection claim may proceed if "any individual has been negatively

affected or harmed by a discriminatory law or policy based on race, even if there is no disparate impact on members of that racial class in the aggregate." Under the principle of *stare decisis*, this ruling provides persuasive authority for the present lawsuit.

## V. CLAIMS FOR RELIEF

**COUNT I - Violation of the Fourteenth Amendment (Equal Protection Clause)**

145.    Plaintiffs reallege and incorporate by reference the allegations set forth above.

146.    Defendant's admissions policies and practices violate the Equal Protection Clause of the Fourteenth Amendment by discriminating against Asian-American applicants, including Stanley, on the basis of race.

147.    As a result of Defendant's discriminatory policies and practices, Plaintiffs have suffered harm, including the loss of educational opportunities, emotional distress, and reputational damage.

148.    Plaintiffs have been and will continue to be injured by Defendant's ongoing discriminatory admissions policies, which deny them an equal opportunity to compete for admission based on race or ethnicity.

149.    Plaintiffs are entitled to a declaratory judgment, pursuant to 28 U.S.C. §2201, and a permanent injunction because there is no plain, adequate, or

speedy remedy at law to prevent Defendant from continuing to use admissions policies and practices that discriminate on the basis of race or ethnicity in violation of the Fourteenth Amendment and because the harm Plaintiffs will otherwise continue to suffer is irreparable.

**COUNT II - Violation of Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d)**

150.    Plaintiffs reallege and incorporate by reference the allegations set forth above.

151.    Defendant receives federal financial assistance and is therefore subject to Title VI of the Civil Rights Act of 1964, which prohibits discrimination on the basis of race, color, or national origin in any program or activity receiving federal financial assistance. Defendant's admissions policies and practices discriminate against Asian-American applicants, including Stanley, in violation of Title VI.

152.    As a result of Defendant's discriminatory policies and practices, Plaintiffs have suffered harm, including the loss of educational opportunities, emotional distress, and reputational damage.

153.    Plaintiffs have been and will continue to be injured by Defendant's ongoing discriminatory admissions policies, which deny them an equal opportunity to compete for admission based on race or ethnicity.

154.   Plaintiffs are entitled to a declaratory judgment, pursuant to 28 U.S.C. §2201, and a permanent injunction because there is no plain, adequate, or speedy remedy at law to prevent Defendant from continuing to use admissions policies and practices that discriminate on the basis of race or ethnicity in violation of Title VI of the Civil Rights Act of 1964 and because the harm Plaintiffs will otherwise continue to suffer is irreparable.

**COUNT III - Violation of Michigan Constitution (Article I, Section 26)**

155.   Plaintiffs reallege and incorporate by reference the allegations set forth above.

156.   Article I, Section 26 of the Michigan Constitution prohibits racial discrimination in public education. Defendant's discriminatory admissions policies and practices violate this provision by denying Asian-American applicants, including Stanley, equal access to public educational opportunities.

157.   As a result of Defendant's discriminatory policies and practices, Plaintiffs have suffered harm, including the loss of educational opportunities, emotional distress, and reputational damage.

158.   Plaintiffs have been and will continue to be injured by Defendant's ongoing discriminatory admissions policies, which deny them an equal opportunity to compete for admission based on race or ethnicity.

159.   Plaintiffs are entitled to a declaratory judgment, pursuant to 28 U.S.C.

§2201, and a permanent injunction because there is no plain, adequate, or

speedy remedy at law to prevent Defendant from continuing to use

admissions policies and practices that discriminate on the basis of race or

ethnicity in violation of Article I, Section 26 of the Michigan Constitution

and because the harm Plaintiffs will otherwise continue to suffer is

irreparable.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, Stanley, Nan, and SWORD, on behalf of its members

and all others similarly situated, respectfully request that this Court:

160.   Declare UM's Admissions Practices Unconstitutional

    a.   Declare that Defendant's student admissions policies and practices

       violate:

           i.   The Fourteenth Amendment to the U.S. Constitution,

           ii.   Title VI of the Civil Rights Act of 1964, and

           iii.   Article I, Section 26 of the Michigan Constitution (Proposal

              2).

    b.   Enjoin Defendant from engaging in racially discriminatory

       admissions and hiring practices, and order it to take all necessary

       steps to eliminate the effects of past discrimination.

161.   Mandate Institutional Reforms & Accountability Measures at UM

a.  Issue an injunction requiring Defendant to issue a formal public apology to Asian-American applicants.

b.  Issue an injunction requiring Defendant to dismiss, after a full and fair public hearing, all Admissions Directors and other administrators responsible for the admission cycles that are determined to be racially discriminatory since 2006.

c.  Issue an injunction requiring Defendant to dismiss, after a full and fair public hearing, all administrators who knowingly defend this lawsuit while being aware of racial preferences in admissions or hiring.

d.  Issue an injunction requiring Defendant to dismiss, after a full and fair public hearing, all administrators who knowingly certified compliance with federal anti-discrimination laws while being aware of racial preferences in admissions or hiring.

e.  Refer individuals who knowingly made false certifications under penalty of perjury for criminal prosecution.

162.  Mandate Oversight & Transparency in Admissions at UM

a.  Issue a permanent injunction requiring Defendant to establish an independent admissions oversight board, approved by this Court, with sole authority over the hiring and firing of Admissions Directors at each UM campus.

b.  Issue a permanent injunction requiring Defendant to fund recurring independent audits of its admissions process, approved by this

1    Court, including a breakdown of accepted and rejected applicants'

2    qualifications by racial group.

3    c.  Issue a permanent injunction requiring Defendant to implement

4        admissions procedures that prevent personnel from accessing or

5        inferring an applicant's race or ethnicity.

6    d.  Issue a permanent injunction requiring Defendant to implement

7        hiring procedures that prevent personnel from accessing or

8        inferring a candidate's race or ethnicity.

9    e.  Require Defendant to repeat its admission process independently

10       on a small group of randomly chosen applicants for each admission

11       cycle in order to demonstrate repeatability and self-consistency in

12       admissions decisions.

13   163.  Require Mandatory Training & Compliance Measures at UM

14   a.  Require annual Proposal 2 training for all UM personnel involved in

15       admissions or hiring.

16   b.  Require all trained personnel to explicitly acknowledge that violating

17       Proposal 2 or failing to report violations may result in disciplinary

18       action, including termination.

19   164.  Declare Judicial Scrutiny of UM's Academic Policies

20   a.  Declare that Defendant should no longer receive traditional judicial

21       deference as a bona fide academic institution unless it:

22       i.  Collects standardized test scores from all applicants in its

23           admission process,

ii. Ceases prioritizing immutable characteristics over academic merit in admissions and hiring.

165. Award Monetary Damages & Attorney's Fees

    a. Award nominal, compensatory, and punitive damages to Plaintiffs.

    b. Award reasonable attorneys' fees and costs incurred in this action.

    c. Grant such other and further relief as this Court deems just and proper.

**VII. JURY DEMAND**

Pursuant to the Seventh Amendment to the United States Constitution and Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury on all issues so triable.

---

I declare under penalty of perjury that the allegations in the complaint are true.

Respectfully submitted,

*Stanley Zhong*

Stanley Zhong (Pro Se)

211 Hope St #390755

Mountain View, CA 94039

*Nan Zhong*

Nan Zhong (Pro Se)

Individually and as President of SWORD

211 Hope St #390755

Mountain View, CA 94039

nanzhong1@gmail.com

**Dated:** February 23, 2025