UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| **Stanley Zhong,** and **Nan Zhong** as next friend of his **Minor Son**, | Case No. 5:25-cv-10579 |
| Plaintiffs, | |
| v. | FIRST AMENDED COMPLAINT |
| **The Regents of the University of Michigan,** in their official capacities**; The University of Michigan; Santa Ono**, in their individual and official capacity as the former President of the University of Michigan; **Domenico Grasso**, in their individual and official capacity as the interim President of the University of Michigan; **Adele C. Brumfield**, in their individual and official capacity as the Vice Provost for Enrollment Management at the University of Michigan; **Other persons Does 1-10** acting in concert with those named above, | JURY TRIAL DEMANDED |
| Defendant. | |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES**

## I.    INTRODUCTION

1.    Plaintiffs Stanley Zhong ("Stanley") and Nan Zhong ("Nan"), acting on behalf of

his Minor Son, pursuant to Federal Rule of Civil Procedure 5.2(a), collectively

referred to as "Plaintiffs," bring this civil rights action against the University of Michigan ("Michigan," or "UM") and the named Michigan officials (collectively, "Defendants").

2.  Plaintiffs allege that the University of Michigan discriminated against Stanley based on race, and it discriminates generally against Asian Americans causing his Minor Son to fear that any application will subject him to diminishment and humiliation on the basis of race in violation of: (1) the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution; (2) Title VI of the Civil Rights Act of 1964; (3) 42 U.S.C. § 1981; (4) Article I, Section 26 of the Michigan Constitution (Proposal 2); and (5) the Elliott-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2402

3.  This case is about the most basic of American promises: to give meaning to the Declaration of Independence's promise that *all human beings are created equal*. Especially over the past half-century, the nation has made a concerted effort to transform this ideal from a lofty aspiration to enforceable guarantee. At the heart is the simple but profound rule: that racial discrimination is more than unfair—it is illegal and indeed, unconstitutional.

4.  And yet, in one of the most competitive and consequential domains of American life, college admissions, our elite public universities like University of Michigan—and the government actors who fund and partner with them—proudly discriminate against Asian American applicants based on their race and have done so for decades.  Michigan operates as though anti-discrimination law protects only

*certain* minorities of their preference. Under this conception, Asian Americans are treated not as beneficiaries of civil rights, but as exceptions to them.

5.  The University of Michigan does not openly call these policies what they are—racial discrimination. Instead, UM uses euphemistic language like "affirmative action." Under this logic, racial favoritism is rebranded as "progress," and Michigan reframes race preferences as *positive*. But discrimination by another name is still discrimination. Framing it as a benefit to some rather than a burden on all is a sleight of hand. Forcing one competitor to begin a race far behind the starting line is no different than giving his rival a head start. In a zero-sum admissions process, selecting winners based on race necessarily predetermines losers. University of Michigan's rhetoric obscures the harm. It does not erase it.

6.  The results speak for themselves. For years, Michigan's college admissions systemically penalized hard-working Asian American students—not because they lack merit, but because they don't fit the racial preferences that Michigan wants to engineer. In the name of vague notions of restitution for past racial injustice, universities like Michigan have simply created new victims.

7.  Stanley and the Minor Son of Nan Zhong do not ask for special treatment. They ask only for what the Constitution guarantees: an equal shot. A chance to be evaluated on the strength of their character, their intellect, and their achievements, without penalty for race. The Constitution demands nothing less.

8.  Plaintiffs seek declaratory and injunctive relief to ensure that UM's admissions policies comply with federal and state law and to allow Asian Americans

FIRST AMENDED COMPLAINT                                    Page 3 of 39

applicants like Stanley Zhong and the Minor Son an equal opportunity to compete for admission on the basis of merit, free from discrimination. Plaintiffs also seek nominal damages and other appropriate relief for the injuries suffered to their civil rights.

## II.  THE PARTIES

### A.  PLAINTIFFS

9.  Plaintiff Stanley Zhong is a second-generation Asian American student who at all relevant times was a resident of the state of California. Stanley was denied admission to the University of Michigan despite extraordinary academic credentials.

10. Like his older brother, Nan Zhong's Minor Son is an Asian American student and a minor child with strong academic ambitions and performance to match.  He intends to apply to the University of Michigan. Because he faces a credible and imminent risk of being subjected to the same discriminatory admissions policies, the Minor Son has standing to seek prospective relief.  He is a resident of the state of California.

11. Plaintiff Nan Zhong proceeds on behalf of and as next friend of his Minor Son pursuant to Fed. R. Civ. P. 17(c); he is a first-generation immigrant from China and a permanent resident of California. He is also the father of Stanley Zhong.

### B.  DEFENDANTS

12. Collectively, Defendants, The Regents of the University of Michigan, and each Regent individually, make up the constitutional governing board of the University of Michigan, a public institution established under the laws of the State of

Michigan. As such, each Regent individually is a state actor subject to the Equal

Protection Clause of the Fourteenth Amendment, 42 U.S.C. § 1981, the

Elliott-Larsen Civil Rights Act (ELCRA), and Article I, Section 26 of the

Michigan Constitution. The Regents are responsible for overseeing and approving

all university policies, including those governing undergraduate admissions.  Each

individual Regent is a resident of the state of Michigan.

13. Defendant the University of Michigan is a public educational institution and a

recipient of federal financial assistance, subject to Title VI of the Civil Rights Act

of 1964. The University's undergraduate admissions office, operating under the

direction of senior administrators and the Regents, is directly responsible for

implementing the discriminatory policies and practices challenged in this action.

Its principal place of business is 1109 Geddes Ave, Ann Arbor, Michigan.

14. Defendant Santa Ono served as President of the University of Michigan during

the relevant admissions cycle and made public statements affirming the

University's commitment to race-conscious admissions policies. He is sued in his

individual and official capacity.  Ono is a resident of Michigan.

15. Defendant Domenico Grasso is the interim President of the University of

Michigan and currently exercises authority over the University's operations and

enforcement of admissions policies. He is sued in his individual and official

capacity.  Grasso is a resident of Michigan.

16. Defendant Adele C. Brumfield is the Vice Provost for Enrollment Management at

the University of Michigan. In that role, she oversees undergraduate admissions

and related policies. She is sued in her individual and official capacity.  Brumfield is a resident of Michigan.

17. Defendants Doe 1 through 10 are individuals whose identities are currently unknown but who acted in concert with the named Defendants in formulating or implementing the discriminatory admissions policies described in this Complaint. Plaintiffs will amend this Complaint to identify these individuals once their identities are discovered through formal proceedings.

## III.   JURISDICTION AND VENUE

18. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, as the claims arise under the Constitution and laws of the United States. The Court also has jurisdiction under 28 U.S.C. § 1343(a)(3) because Plaintiffs seek to redress the deprivation of civil rights under color of state law.

19. The Court has supplemental jurisdiction over Plaintiffs' state-law claims—including the claim under the Elliott-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2402, and the Michigan Constitution, Art. I, § 26—pursuant to 28 U.S.C. § 1367, because those claims form part of the same case or controversy as the federal claims. Plaintiffs further seek declaratory relief under 28 U.S.C. §§ 2201–2202.

20. Venue is proper in the Eastern District of Michigan under 28 U.S.C. § 1391(b) because the Defendant is located in this District and a substantial part of the events or omissions giving rise to the claims occurred in this District.

IV.   FACTS

A.   THE LEGACY OF ANTI–ASIAN DISCRIMINATION

21. The Zhongs belong to an oppressed minority given the history of the United States.  Asian Americans have long faced systemic exclusion and discrimination in the United States. The Chinese Exclusion Act of 1882 barred Chinese immigrants from entering the country—a policy so discriminatory that Congress formally apologized in 2012. Other Asian communities have faced similar patterns of xenophobia, violence, and exclusion throughout U.S. history. During World War II, over 120,000 Japanese Americans were forcibly incarcerated based solely on their ancestry.

22. In recent decades, this sad history has continued among the nation's most elite educational institutions.  These institutions of higher education, including Michigan, subject Asian Americans to a quiet but no less insidious form of discrimination—cloaked in the language of "affirmative action" and "holistic review."  Michigan, like other institutions of higher education, holds Asian American applicants to higher standards than applicants of other races, penalizing Asian applicants specifically because they were born with the wrong skin color.

23. Across the country, defenders of race-conscious admissions have downplayed or outright denied the existence of anti–Asian American discrimination. But these denials, however, are untenable. Within the world of college admissions, discrimination against Asian Americans has become the worst-kept secret: admissions officers, consultants, and students alike understand that being Asian is a major disadvantage because these institutions discriminate on the basis of race behind closed doors.

24. In this, Michigan simply follows an industry-wide pattern.

25. Pulitzer Prize–winning journalist Daniel Golden documented this ubiquitous nationwide trend in his book titled *The Price of Admission*, exposing how elite universities like Michigan routinely pass over Asian American applicants with exceptional qualifications in favor of far less qualified candidates from preferred racial groups.

26. A 2016 national survey revealed that 42% of private college admissions officers and 39% of their public counterparts acknowledged that Asian American applicants are held to higher standards than students of other races. Studies suggest that privileged, wealthy African American applicants are admitted at significantly higher rates than low-income, underprivileged Asian American applicants with identical academic credentials. If affirmative action were truly about leveling the playing field, this outcome is indefensible.

27. Discriminating against disadvantaged Asian students in favor of affluent Black (or Hispanic) applicants does not advance equality of opportunity; it betrays it.

28. Michigan and other elite institutions' policies reveal that the goal was never fairness— it is about achieving predetermined racial preferences, no matter whose rights are trampled.

29. Asian American students like Stanley and prospective applicants like the Minor Son have long internalized the unspoken rules of this deeply unjust admissions process.  They resort to downplaying their achievements and interests in math and science.  They avoid mention of bilingual households, or they omit involvement

in Asian cultural organizations.  They seek to appear "less Asian" to escape the penalty for their racial identity.

30. These learned behaviors are passed down from older students, for example from Stanley to Minor Son.  Guidance counselors and even college admissions consultants also communicate to Stanley, Minor Son, and other Asian American students the harsh reality that Asian identity is treated as a liability.  This racial double standard is common knowledge, a moral stain on our educational institutions, and a direct violation of the American compact that all Americans are entitled to their civil rights.

31. Plaintiffs and similarly situated Asian American students have felt compelled to obscure their heritage or downplay their authentic achievements out of fear that their racial identity will count against them.

32. Asian Americans who challenge this discrimination do so at great personal risk. On campus, advocating for equal treatment under the law has been perversely rebranded as an attack on civil rights—an Orwellian inversion that suggests those rights belong only to the "right kind" of minority.

33. Under this system at Michigan and throughout the body of American academic institutions, Asian Americans endure a dual-indignity—first, they are subjected to systemic discrimination in the admissions process.  Then, should they be lucky enough to reach campus and object to that injustice, they are vilified as opponents of "equity" or "allies" of the oppressors or branded "racist."  This national climate manifest at Michigan and throughout the body of academic institutions, condemns

discrimination against some groups, but celebrates discrimination against Asian Americans and other groups.

**B.  THE UNIVERSITY OF MICHIGAN'S ENDURING COMMITMENT TO RACIAL ENGINEERING**

34. The University of Michigan has a long and well-documented history of promoting racial preferences in its admissions practices. In the early 1990s, then-President James Duderstadt unveiled the "Michigan Mandate, A Strategic Linking of Academic Excellence and Social Diversity," calling it "a blueprint for fundamental change in the ethnic composition of the university community."

35. To the extent that President Duderstadt celebrated the dismantling of older systems of racial exclusion and worked to ensure that students of all backgrounds had access to Michigan based on merit, he deserves credit.

36. However, despite lofty rhetoric of "cultural diversity," the Mandate's focus was unambiguously on race. Tellingly, President Duderstadt specifically emphasized "76 new minority faculty"; mentioning only "African-American Faculty Hires" and "new Hispanic American faculty … added."

37. The "Mandate" reveals that whatever Michigan says about "diversity" and "culture," what Michigan actually means is "race."

38. A decade later, then President Santa Ono reaffirmed the same ideology, declaring: "At the University of Michigan, we are convinced that academic excellence goes hand-in-hand with diversity, inclusion and equity."  At the University of Michigan, "diversity" remained a euphemism for racial engineering— now used

not to open the door to talent but to justify denying opportunity to students who failed to meet the university's preferred demographic profile.

39. Even when race-based admissions policies drew public scrutiny, meaningful reform has been elusive. For example, in 1989 UC Berkeley's Chancellor issued a public apology for admissions practices that had suppressed Asian enrollment. Yet the same issues persisted: in 2003, the chairman of the UC Board of Regents openly accused the university of "blatantly" discriminating against Asian Americans, and studies in 2012 and 2014 by sociology professor Robert Mare confirmed a consistent pattern of anti-Asian bias in admissions.

40. This cycle—public contrition followed by quiet continuation of race-based admissions — is a defining feature of how elite universities, not only Michigan, respond to allegations of anti-Asian discrimination.  The University of Michigan is one of the worst offenders.

41. UM has represented its industry in higher education in this regard.  UM has spent decades fighting to preserve discrimination on the basis of race. That commitment was on full display in *Grutter v. Bollinger*, 539 U.S. 306 (2003) and *Gratz v Bollinger*, 539 US 244, 251; 123 S Ct 2411; 156 L Ed 2d 257, 269 (2003), two cases in which Michigan vigorously defended its use of race as an admissions factor.

42. Nearly twenty years later, little had changed. In August 26, 2022, *The New York Times* reported that Michigan administrators were openly frustrated that "Despite persistent, vigorous and varied efforts to increase student body racial and ethnic diversity by race-neutral means . . . the admission and enrollment of

underrepresented minority students have fallen precipitously in many of U-M's schools and colleges."

43. On information and belief, this was not true of Asian Americans in 2022. Asian Americans of sufficient caliber were available but looked over in admissions because "ethnic diversity" did not include Asians. They were disproportionately excluded.

44. Then in the lead-up to *Students for Fair Admissions v. Harvard*, 600 U.S. 181 (2023), Michigan once again fought tooth-and-nail to preserve its ability to discriminate against Asian American students.

45. Michigan submitted an amicus brief to the Supreme Court in which it acknowledged that Michigan considered race "for years" when making admissions decisions.

46. The brief also rationalized UM's rejection of a percentage plan because "a percentage plan would have minimal or negative effects on racial diversity." This further exemplifies UM's intent and desire to racially engineer its student body.

47. The brief vigorously argued for the revival of race-based admissions policies by lamenting how "race-neutral admissions policies have not significantly increased enrollment of underrepresented minorities"--meaning minorities exclusive of Asian Americans who would achieve admission on the basis of merit. In plain terms, the University admitted that it cannot achieve its preferred racial composition without relying on race-conscious decision-making.

48. When confronted with a choice—between advancing "diversity" (i.e. race-based admission) goals or upholding equal treatment for high-achieving groups like

Asian Americans—Michigan sides with diversity, even if it means racially

discriminating. In practice, this results in academically superior Asian Americans

applicants being systematically disadvantaged to make room for less qualified

candidates from other racial groups.

49. Michigan also admits that "fostering the promise of individualism in admissions

sometimes *requires*… attention to facts about race," (emphasis added). In other

words, Michigan contradictorily argues that to treat applicants as individuals, they

must first classify them by race.  And as the statistics show, Michigan

systematically considers Asian Americans to be a "race" that confers less

"individualism" than others.  The one, true individualism that matters, individual

merit, is discounted so that Asian Americans may be excluded.  In this way,

"individualism" can only be recognized through the lens of racial group identity.

This turns equal protection on its head and reveals the extent to which Michigan

has (unfortunately) come to view race as a defining feature of personhood.

50. By defending its continued use of racial criteria, openly expressing dissatisfaction

with the racial composition of its student body, and framing race-conscious

admissions as a permanent institutional value, Michigan has revealed its intent

and confirmed its ongoing use of unconstitutional and discriminatory practices.

This discriminates against Asian Americans like Stanley and Minor Son because,

by virtue of merit, their "race" would be overrepresented according to Michigan'

preferences.

C. **MICHIGAN'S "HOLISTIC REVIEW" MASKS ONGOING DISCRIMINATION**

51. Michigan's dogged legal efforts to justify race discrimination is part of this long history of double standards for Asian Americans.

52. In *Students for Fair Admissions v. Harvard*, 600 U.S. 181 (2023), the Supreme Court held unequivocally that race-based admissions policies violate the Equal Protection Clause. Two years later, in *Ames v. Ohio Department of Youth Services*, 605 U.S. ___ (2025), the Court reaffirmed that constitutional protections against racial discrimination apply equally to all racial groups—including those not labeled "underrepresented."

53. In the wake of *SFFA*, the percentage of Asian American students at top universities surged, validating what had long been suspected: elite schools would admit more qualified Asian students once merit was considered instead of race — universities had simply chosen not to. It was only under the glare of legal scrutiny that these institutions retreated from race-based practices they could no longer justify or conceal.

54. Not so Michigan, where even after *SFFA* made clear that racial balancing violates both the Equal Protection Clause and Title VI, Michigan responded not obeying the law, but with defiance.

55. As currently adopted by Michigan, the preferred end run around anti-discrimination law is called "holistic review." Though couched as a commitment to individualized consideration, the term "holistic" as used in Michigan's admissions is a euphemism for unconstitutional race-balancing.

56. Even the euphemism "holistic" suggests a thorough and individualized evaluation process. But on information and belief, and based on available data regarding

admissions practices in higher education, Michigan admissions officers are expected to review at least 8.75 applications per hour—less than seven minutes per applicant. This breakneck pace is entirely incompatible with any genuine notion of "holistic" review.

57. The challenge is only compounded by the sheer volume of applications Michigan receives—more than 115,000 for its 2025 undergraduate admissions cycle.

58. Maintaining any meaningful level of consistency across such a vast pool, under severe time constraints, necessarily forces readers to rely heavily on easily digestible, quantifiable metrics such as SAT scores and GPA.

59. Yet when it comes to subjective criteria like "fit" or "contribution to campus culture," Michigan's reliance on quantifiable proxies becomes more troubling. On information and belief, Michigan uses race—or more accurately, self-reported racial identity—as a crude stand-in, a convenient shortcut, a purportedly "objective" indicator of cultural value or personal perspective.  Michigan bypasses the need for any genuine individualized understanding but calls it "holistic."

60. Universities, including Michigan, continue to engineer racial outcomes under the cover of subjective judgment and plausible deniability. But this change in terminology remains merely cosmetic; the discriminatory intent also remains.

61.  For example, and as documented by Professor Tim Groseclose in a detailed study of UCLA admissions, the switch to "holistic" review was adopted explicitly to increase enrollment of so-called "underrepresented minorities," at the expense of

more qualified Asian American applicants. He found that, even among applicants with identical reader scores, acceptance rates varied dramatically by race.

62. On May 25, 2016, a former Dartmouth admissions officer revealed how "holistic" review allowed committees to mask racial bias behind vague, subjective criteria—often resorting to stereotypes to dismiss Asian American candidates as "yet another textureless math grind." These dehumanizing stereotypes reflect not genuine individual assessment, but racial generalizations disguised as discretion.

63. Michigan uses "holistic review" in its admissions process in the same way in conformity with practices documented throughout higher education.

64. Some university leaders have been even more candid. In an extraordinary public admission, UC Berkeley Law Dean Erwin Chemerinsky said the quiet part out loud when he described how universities practice "unstated Affirmative Action," preaching that "Don't say that [race]. You can think it. You can vote it… Don't ever articulate that is what you are doing." He also said, "If I'm ever deposed, I'm going to deny I said this to you." These comments—caught on video—confirm that elite institutions cling to racial preferences, but have just evolved ever more elusive ways of doing so.

65. Michigan is an enthusiastic participant in this racial doublespeak.

66. Both the University of Michigan and the University of California are constitutionally prohibited from using racial preferences in student admissions. Nevertheless, both institutions have demonstrated a clear desire to circumvent these bans. After Michigan's Proposal 2 passed in 2006, UM hosted a 2-day workshop featuring University of California administrators, who shared their

strategies for "navigating" (more properly working around) California's Proposition 209, enacted in 1996.

67. After the Supreme Court struck down Michigan's mechanical, point-based racial preferences in *Gratz*, the University simply rebranded its race-conscious policies "holistic"—a transparent attempt to evade judicial scrutiny.

68. Rather than celebrating when the Supreme ultimately held that considering race in admissions violates the constitution and Title VI, then-University of Michigan President Santa Ono publicly lamented the outcome in *SFFA*, declaring that he was "deeply disheartened by the Court's ruling." That statement, from the university's highest official at the time, is an open admission that Michigan prefers the academic status quo of racial discrimination and would continue to pursue it by other means.

69. The result is a process that is neither "holistic" nor individualized. It is a rushed, inconsistent system that relies on superficial and impermissible self-reported racial categorization to evaluate subjective traits.

70. The discriminatory purpose behind Michigan's policies is further laid bare by its own public statements. On its Diversity FAQ page, the University flatly declares that "socioeconomic status is not a substitute for race or ethnicity" and has gone so far as to claim that truly treating an applicant as an individual requires considering their race. If the goal were truly to level the playing field and expand opportunity for the disadvantaged, socioeconomic status might be a logical and equitable focus that would avoid running afoul of the law's prohibition on racial discrimination (as is actually practiced in other states like Texas).

FIRST AMENDED COMPLAINT

71. Instead, Michigan explicitly rejects that approach precisely because it would not produce its desired racial engineering preferences. The implication is unmistakable: the University's priority is not to uplift the underserved, but to engineer a specific racial composition, *even if that means favoring affluent non-Asian minority applicants over low-income Asian students*. In doing so, Michigan betrays the professed moral foundation of affirmative action and reveals its true purpose—not equality of opportunity, but as a backdoor for invidious racial discrimination.

D. **EXTRAORDINARY QUALIFICATIONS OF STANLEY ZHONG**

72. It is against this backdrop that Stanley faced the admissions process. Stanley is not merely a qualified applicant—he is, by any objective measure, among the top college applicants in the country.

73. Stanley Zhong attended Henry M. Gunn High School, ranked #14 in California by U.S. News & World Report and the #1 best public high school in the San Francisco Bay Area according to Niche. Within this elite setting, Stanley still stood head and shoulders above his peers.  He distinguished himself as a National Merit Scholarship finalist and earned a place in at least the top 9% of his class—qualifying for the University of California's "Eligibility in the Local Context" program. He achieved a perfect PSAT score without any preparation and went on to score 1590 out of 1600 on the SAT, after just a few nights of self-study and without any paid tutoring or test prep.

74. Stanley's excellence extended well beyond the classroom. While still in high school, he co-founded OpenBrackets, a nonprofit that delivered free coding

lessons to more than 500 students in underserved communities across California, Washington, and Texas. For this work, he was awarded the President's Volunteer Service Award at its highest level. He also founded and led his school's competitive programming club and took on leadership roles in a variety of academic and volunteer organizations.

75. Stanley is a self-taught programmer whose extraordinary talent has earned him top honors in some of the world's most competitive coding contests—often outperforming professional engineers. He placed 2nd in Carnegie Mellon's picoCTF cybersecurity challenge and was invited to CMU with expenses paid, took 6th in Stanford's ProCo, and reached the elite Platinum Division of the USA Computing Olympiad. Twice, he placed 2nd globally (and 1st in the U.S.) in MIT's Battlecode high school division, earning invitations to MIT. He also ranked among the top 500 worldwide in both Google's Code Jam (427th) and Meta's Hacker Cup (329th)—competitions dominated by seasoned professionals. His skill was so advanced that in 2019, Google invited him for a full-time software engineering interview, unaware he was only 13 years old; the interview was canceled only after his age came to light.

76. Stanley repeatedly demonstrated extraordinary initiative far beyond his years. After reading an NPR story in April 2020 about state unemployment systems buckling under COVID-related demand due to outdated COBOL infrastructure, Stanley independently taught himself COBOL, published sample code to GitHub, and volunteered his help to the "COBOL Cowboys" featured in the

article—earning a personal phone call and words of encouragement from their CEO.

77. A year later, frustrated by the lack of affordable e-signature tools during the pandemic, Stanley launched RabbitSign, the world's only unlimited free HIPAA-compliant e-signing platform. Built on Amazon Web Services, RabbitSign was so secure and well-architected that AWS named it one of the best-engineered applications they had reviewed and featured it in a case study. Stanley's innovation drew national attention: RabbitSign was spotlighted on *Viewpoint with Dennis Quaid*—a program that has previously interviewed Fortune 500 CEOs and U.S. presidents—for its potential to help reduce healthcare costs through accessible, secure digital tools.

78. Just before his 18th birthday, Stanley underwent one of the most rigorous and objective evaluations available in the modern labor market: Google's full-time software engineering interview process. Five randomly assigned Google engineers, each professionally trained and authorized to assess candidates, devoted over ten hours to evaluating Stanley's technical skills, communication abilities, and teamwork—precisely the traits elite universities purport to assess through "holistic" admissions. Importantly, the structure of Google's process eliminates any risk of favoritism: interviewers are randomly assigned, shielded from outside influence, and incentivized to avoid inflating evaluations, as doing so could lead to internal compensation disparities.

79. Based solely on their independent assessments, the engineers recommended Stanley for an L4 software engineering role, a position typically reserved for

candidates with a Ph.D. or equivalent industry experience. Google extended the offer in September 2023, just after Stanley's 18th birthday. His performance evaluation in January 2025 confirmed the wisdom of that decision: Stanley met all expectations and showed strong potential for continued growth. That Google—an employer with far more applicants than even the most competitive universities—recognized Stanley as qualified for a postdoctoral-level role, while the University of Michigan deemed him unworthy of undergraduate admission, speaks volumes about the discriminatory standards UM applies to Asian American applicants.

### E.  STANLEY APPLIED ON MERIT—MICHIGAN REJECTED ON RACE

80. For enrollment in the Fall 2023, Stanley applied to the Computer Science program at the University of Michigan–Ann Arbor.

81. Like many Asian American candidates for admission, Stanley naively dared to hope that, despite the well-known barriers facing applicants who look like him, his individual merit might still prevail. That maybe, just maybe, Michigan would look past his race.

82. Unfortunately, like too many Asian American students, he learned that it would not. Despite extraordinary academic credentials, nationally recognized accomplishments, his application was rejected in January 2023.

83. Stanley's story was reported in national news in October 2023 and cited in a congressional hearing in September 2023, multiple independent college admissions experts and counselors (unconnected to UM) reviewed Stanley's application materials at the family's request.

84. Tellingly, not one of these experts could identify a legitimate, performance-based reason why Stanley would have been rejected by a school of UM's caliber. By all objective indicators, Stanley appeared to be the kind of candidate any top university would eagerly admit. The absence of any apparent, merit-based explanation for this "bizarre" result raises a strong inference that Stanley's race played a role in UM's decision.

85. The statistical evidence further reveals the extent of anti-Asian discrimination in Michigan's decision to deny Stanley's application.

86. The Asian American population in Michigan grew by over 40% from 2010 to 2020 and likely continued rising thereafter.  But the percentage of Asian students admitted to UM Ann Arbor has remained flat or declined.

87. Between 2020 and 2024, Asian American enrollment at UM Ann Arbor dropped from 19.4% to 18.2%, despite explosive growth in the state's Asian population.

88. The University of Michigan's own admissions data reveal how their racially engineered outcomes disproportionately disadvantage Asian American applicants.

89. In 2023, UM Ann Arbor enrolled approximately 432 African American students compared to 1511 Asian Americans.[1]  But admitting approximately 3 Asian American students to every one Black American student does not tell the whole story of exclusion on the basis of race.

90. In the broad middle of Michigan's admitted freshman class, students who are disproportionately high-achieving on the SAT, are spread between the 25th and

---

[1]
https://obp.umich.edu/wp-content/uploads/pubdata/factsfigures/firstyearsprofile_umaa_2024_10-22-24.pdf

75th percentile of SAT scores for UM students.  These scores ranged between 1350 and 1530.  These are Michigan's own publicly available statistics.

91. This strongly suggests a median SAT score of approximately 1440 for all students.

92. By comparison, national statistics show that 225,954 African American students took the SAT in 2023.  Approximately 1% of these students (roughly 2,259) scored in the top range, i.e. 1400–1600.

93. By simple deduction, UM's 432 African American enrollees at Ann Arbor alone would be expected to reflect approximately 9.6% of the nation's top African American SAT performers if the admissions criteria were based on merit rather than race, and the students were evenly distributed.  Yet Michigan's freshman class at Ann Arbor is only a tiny portion of the nation's total entering freshmen (estimated at over 2 million students), and even if one narrows this to only top-50 schools, Michigan's share is far, far less than 10% of all students.  Similar statistics can be developed for other privileged racial groups (e.g., Hispanics) and disfavored racial groups (e.g. Ashkenazi Jews) in Michigan's "holistic" system.

94. But no one can seriously believe that Michigan, which ranks 21st among the nation's schools according to US News and World Report, has somehow cornered the market on talented Black freshmen.

95. For any single university to enroll that many top-performing Black students would require that school to be overwhelmingly more attractive to them than any of the dozens of other elite institutions competing for the same applicants—which Michigan is not.

96. This throws the actual discrimination of high-performing Asian students in sharp relief.  By contrast, Michigan enrolled only about 1.6% of similarly high-scoring Asian American students—despite their significantly larger presence in the national pool of top applicants.

97. There are only two plausible explanations for this disparity. Either (1) Black students are six times more likely than their Asian counterparts to choose Michigan over peer institutions—a statistical impossibility, especially considering that other top universities are also enrolling large numbers of high-achieving Black students, without showing any corresponding shortfall which one could expect only if Michigan were attracting a disproportionate share of high-achieving Black students—an outcome unsupported by the broader admissions data; or (2) Michigan is selectively raising and lowering the bar for admittance based on the applicant's race.

98. The data leaves no serious doubt that it is the latter: Michigan is admitting a disproportionately high number of lower-scoring Black applicants while systematically suppressing the admission of higher-scoring Asian Americans to engineer its desired racial preferences.

99. While distinct from undergraduate admissions, the University of Michigan's faculty hiring practices provide compelling circumstantial evidence of its institutional and systematic race-conscious agenda.

100.   Whistleblower reports and internal data indicate that Michigan has prioritized race in hiring decisions while attempting to preserve plausible deniability—mirroring the "unstated Affirmative Action" strategy candidly

described by UC Berkeley's law dean—is indicative of the entire academic industry.

101. For instance, UM's ostensibly race-neutral Collegiate Fellows program has hired people of color in over 80% of cases—a statistical improbability that strongly suggests racial considerations are at play.

102. Professor Keith Riles, a tenured physicist at UM, provided a sworn affidavit attesting to the use of race in hiring decisions. Even President Santa Ono concedes that Michigan's DEI infrastructure has strayed from its academic mission.

103. These policies reveal a university culture deeply steeped in race-consciousness—one that cannot plausibly separate its hiring practices from its highly suspect admissions outcomes. When university leadership consistently selects and empowers individuals committed to race-based decision-making, it is hardly surprising that those values also shape admissions policy.

104. Faculty widely acknowledge that expressing race-neutral values—such as advocating for merit or equal treatment—in diversity statements is considered "career suicide."

105. These are not incidental expressions of Michigan's values in niche departments or by isolated academics. Such institutional norms make it unsurprising that no whistleblower has emerged from the closely guarded undergraduate admissions office, where there is no tenure protection and ideological conformity is enforced more easily. But Plaintiffs intend to uncover the magnitude of the harm through discovery.

106.    As a result of this unlawful discrimination, Stanley Zhong has suffered

significant harm, including but not limited to the loss of educational opportunities,

reputational damage, and emotional distress. Plaintiffs seek all available legal and

equitable relief to remedy these injuries.

### F. MINOR SON AS A PROSPECTIVE APPLICANT CAN ONLY CONCLUDE THAT HE IS NOT WELCOME AT MICHIGAN

107.    Minor Son is currently a rising junior in high school and anticipates applying

to Michigan for the Fall 2027 enrollment.

108.    Like his brother, Minor Son is talented.  Minor Son already demonstrates the

academic excellence, intellectual curiosity, and extracurricular achievement that

define top college applicants. Although he has not yet taken the PSAT due to his

grade level, he expects to do well, just as his older brother Stanley did, based on

his advanced coursework and consistent academic performance.  Minor Son's

current GPA stands at a perfect 4.0 unweighted, even higher than Stanley's at the

same stage, placing him among the very top of his class.

109.    Outside the classroom, Minor Son exhibits a well-rounded and disciplined

character. He has been a member of his high school's varsity cross country team

since his freshman year, he is a national-level Rubik's Cube competitor capable of

solving the cube in 6.25 seconds during official events, and he has taught himself

to juggle five balls and did so on stage at the second largest annual juggling

festival in North America.

110.    However, based on Stanley's experience, Minor Son has learned of a

consistent pattern in which Michigan discriminates against Asian American

applicants because of their race.

111.    Minor Son is also discouraged and humiliated by repeated and public knowledge of Michigan's discrimination against Asian Americans.

112.    Minor Son has also learned through friendship networks within his community and through publicly available reports that Asian American students who speak up for equal treatment under the law on college campuses and throughout academia are branded "racists" and ostracized on campus —reinforcing that Michigan's bias extends beyond admissions into campus culture.

113.    Minor Son is aware of admissions statistics indicating that—even among the most qualified—Asian Americans face significantly lower admission rates without the 'correct' race for Michigan's race-conscious process.

114.    Both because of hard data indicating that the collective experience of Asian Americans at Michigan is dismal in the admissions pool and also because of his direct experience of his brother's hardship and rejection, Minor Son faces certain harm if he applies to Michigan.  In short, Minor Son has come to view application to Michigan as an Asian American student, no matter how talented, as a fool's errand. He has been concretely deterred from applying, and therefore faces an immediate and continuing injury-in-fact sufficient for standing under *Parents Involved*.

115.    In sum, while Minor Son is positioned to be a highly competitive applicant to any elite university, he confronts a tangible and immediate risk of race-based discrimination at Michigan.

## CAUSES OF ACTION

**COUNT I.**    **Violation of the Equal Protection Clause, U.S. Const. Amend. XIV,**
**via 42 U.S.C. § 1983**
**(Against the Individual Defendants in their Official and Individual Capacities)**

116.    Plaintiffs here incorporate by reference as if fully stated in this paragraph all

preceding paragraphs in this Complaint.

117.    Plaintiffs bring this claim under 42 U.S.C. § 1983 to vindicate rights secured

by the Equal Protection Clause of the Fourteenth Amendment.

118.    The Fourteenth Amendment to the United States Constitution provides in

relevant part:

No State shall make or enforce any law which shall abridge the privileges or
immunities of citizens of the United States . . . nor deny to any person within
its jurisdiction the equal protection of the laws.

119.    The equal protection clause of the Fourteenth Amendment prohibits state

actors from denying individuals equal protection of the laws, including through

the use of race as a motivating factor in government decision-making.

120.    All Defendants here have acted under the color of state law.

121.    Defendants' discriminatory intent may be inferred from a constellation of

evidentiary factors, including: (1) the demonstrable statistical evidence of

disparate impact on Asian Americans in admissions; (2) Michigan's historical

track record of discrimination against Asian Americans and admissions; (3) the

sequence of events demonstrating Michigan's resolute opposition to legal

mandates to evaluate admissions candidates without regard to racial preference;

and (4) Michigan's deviations from regular procedures or substantive norms of

racial equality and evaluation of academic candidates on the basis of merit regardless of race.

122.    Defendants' acts and omissions caused the University of Michigan to intentionally discriminate against Stanley Zhong on the basis of his race.

123.    Defendants' acts and omissions have caused Minor Son to expect certain rejection at the University of Michigan, due to Defendants' intentional discrimination against not only his brother, Stanley Zhong, but also due to their established pattern, practice, and policies of discrimination on the basis of his race.

124.    Michigan's admissions policies have had a disparate impact on Asian American applicants—an impact that cannot be explained by race-neutral factors.

125.    Even as the Asian American population in Michigan surged by over 40% between 2010 and 2020, and continues to rise, Asian American enrollment at the University of Michigan has remained flat or declined. In 2020, Asian American students made up 19.4% of the enrolled undergraduate class at UM Ann Arbor. By 2024, that number had dropped to 18.2%. Meanwhile, Asian American admits fell even more sharply between 2023 and 2024, from 19.0% to just 17.2%. These trends run counter to demographic expectations and suggest the use of racial balancing to suppress Asian representation.

126.    This conclusion is reinforced by national comparisons. In 2023, UM enrolled approximately 9.6% of all African American students nationwide who scored above 1400 on the SAT. For Asian American students, the analogous figure was just 1.6%—a nearly six-fold disparity.

FIRST AMENDED COMPLAINT

127.   Unless Asian American applicants are six times less likely to apply or accept admission to UM than their Black counterparts—a claim for which there is no evidence—these figures raise a strong inference that Asian applicants face significantly higher admissions thresholds.

128.   That inference is only strengthened by the rejection of a student like Stanley Zhong, a National Merit Finalist and internationally recognized programmer who was objectively assessed by Google to be qualified for a Ph.D.-level job.  Due to Michigan and Defendants' policies, practices, and customs of racial engineering, Defendants deemed Stanley unworthy of undergraduate admission to UM.

129.   The historical background of Michigan's admissions program also reveals a longstanding institutional commitment to race-based preferences, which the statistics confirm.

130.   In the 1990s, then-President James Duderstadt introduced the "Michigan Mandate" as a strategy for changing the ethnic composition of the student body. The "Mandate" talked of diversity, talked of culture, but discussed only race.

131.   That policy continues to echo today, with President Santa Ono insisting that "diversity, equity, and inclusion" (meaning race) are inseparable from academic excellence—an ideological stance at odds with UM's admissions pool.  UM thus implicitly justifies racial preferences as ends in themselves.

132.   Then, after the *SFFA* opinion, rather than celebrate the return of constitutional admissions practice and the end of unconstitutional discrimination, President Ono declared himself "deeply disheartened" by the Court's ruling.

133.   Michigan's own Diversity FAQ page flatly declares that "socioeconomic status is not a substitute for race."  This is because the opposite is true at Michigan: race is a substitute for everything else.

134.   The sequence of events leading up to the denial of Stanley Zhong's application and the discouragement of Minor Son's application includes clear signals of Michigan's resistance to race-neutral alternatives.

135.   In its 2023 amicus brief to the Supreme Court, the University lamented that "sustained race-neutral initiatives have not achieved racial diversity in enrollments," and insisted that "socioeconomic status is not a substitute for race."

136.   These statements reveal that Michigan prioritizes racial engineering and preferences above all else—even if that means favoring affluent, privileged non-Asian minority students over disadvantaged white or Asian American applicants.

137.   Michigan's continued use of race under the euphemism of "holistic review" or any other euphemism does not immunize its policies from constitutional scrutiny.

138.   Taken together, these facts form a consistent, disturbing pattern of intentional racial discrimination—one that culminated in the rejection of Stanley Zhong and the discouragement of his brother Minor Son, not because they lack merit, but because they do not fit the racial profile Michigan wants to engineer.

139.   Defendants' conduct was motivated by malicious and oppressive motives, or in deliberate or reckless disregard of the plaintiffs' constitutional rights, namely to discriminate on the basis of race, and involved reckless or callous indifference to Stanley's and Minor Son's constitutionally protected rights. Defendants' conduct

was undertaken in the face of the known, perceived risk that their actions violated federal or state law.

140.    Because of Defendant's illegal discrimination, Stanley and Minor Son suffered direct and indirect damages in an amount to be determined at trial.

**COUNT II.    Violation of Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d) (against the University of Michigan)**

141.    Plaintiffs here incorporate by reference all preceding paragraphs as if fully restated in this paragraph.

142.    Plaintiffs bring this claim under Title VI of the Civil Rights Act of 1964, which prohibits any program or activity receiving federal financial assistance from subjecting individuals to discrimination on the basis of race.

143.    The University of Michigan receives substantial federal funding and is therefore subject to the requirements of Title VI.

144.    Although Title VI does not, by its terms, incorporate constitutional standards, the Supreme Court has made clear that a Title VI claim for racial discrimination in admissions is coextensive with a claim under the Equal Protection Clause.

145.    For the same reasons set forth in Count I, Plaintiffs allege that the University of Michigan intentionally discriminated against Stanley and Minor Son on the basis of race, in direct violation of Title VI.

146.    Because of Defendant University of Michigan's illegal discrimination, Stanley and Minor Son suffered direct and indirect damages in an amount to be determined at trial.

**COUNT III.     Violation of 42 U.S.C. § 1981**
**(Against the Individual Defendants in their Personal Capacities)**

147.    Plaintiffs here incorporate by reference all preceding paragraphs as if fully

restated in this paragraph.

148.    42 USC § 1981(a) of the Civil Rights Act provides:

All persons within the jurisdiction of the United States shall have the same
right in every State and Territory to make and enforce contracts, to sue, be
parties, give evidence, and to the full and equal benefit of all laws and
proceedings for the security of persons and property as is enjoyed by white
citizens, and shall be subject to like punishment, pains, penalties, taxes,
licenses, and exactions of every kind, and to no other.

149.    And 42 USC § 1981(c) provides:

The rights protected by this section are protected against impairment by
nongovernmental discrimination and impairment under color of State law.

150.    42 USC § 1981 guarantees all persons in the United States the right to make

and enforce contracts on equal terms, regardless of race. This includes the right to

enter into contracts for educational services at public universities. The University

of Michigan is a public institution bound by this statutory obligation.

151.    Stanley and Minor Son are members of a protected class, namely Asian

Americans by race and national origin.

152.    Stanley and Minor Son are objectively qualified for admissions to the

University of Michigan.

153.    Stanley was objectively evaluated by Google as possessing Ph.D.-level

qualifications.

154.    Minor Son, though still in high school, has already demonstrated academic

excellence, intellectual maturity, and exceptional extracurricular involvement that

place him on track to be a top-tier college applicant. He maintains a perfect 4.0

GPA, outpacing Stanley at the same stage, and exhibits advanced cognitive abilities—including multiple six-second Rubik's Cube solves in official competition, five ball juggling on stage, varsity athletic performance, and deep engagement with intellectual pursuits.

155.    Stanley was rejected from the University of Michigan despite the fact that his credentials placed him in the top echelon of applicants, not only by Michigan standards but by the highest standards of academic institutions nationwide.

156.    Many similarly situated, non-Asian applicants were accepted despite having inferior credentials whereas Stanley was rejected.

157.    Michigan's race-based admission standards have discouraged and preemptively prevented Minor Son from contracting with Michigan.

158.    Michigan's decision to deny Stanley admission was not made in a vacuum. As detailed in the preceding counts, the University has repeatedly affirmed its commitment to racially balancing its student body, has publicly stated that "socioeconomic status is not a substitute for race," and has continued to rely on "holistic review" as a smokescreen for race-based admissions even after the Supreme Court's ruling in *SFFA v. Harvard*.

159.    The stark statistical disparities in admission rates by race, Michigan's long and well-documented history of defending race-based preferences, and its continued resistance to race-neutral alternatives provide overwhelming circumstantial evidence that Stanley's race was the but-for cause of his rejection. Had he not been Asian American, his application would have received materially different treatment. That is precisely what § 1981 forbids.

160.    Accordingly, Defendants have violated 42 U.S.C. § 1981, and Plaintiffs seek

all appropriate legal and equitable remedies.

**COUNT IV.     Violation of the Michigan Constitution, Article I, § 26 (Proposal 2)
(Against the University of Michigan And All Defendants in Their Official and
Individual Capacities)**

161.    Plaintiffs here incorporate by reference all preceding paragraphs as if fully

restated in this paragraph.

162.    Article I, § 26 of the Michigan Constitution, commonly known as Proposal 2,

provides in relevant part:

(1) The University of Michigan, Michigan State University, Wayne State
University, and any other public college or university, community college, or
school district shall not discriminate against, or grant preferential treatment to,
any individual or group on the basis of race, sex, color, ethnicity, or national
origin in the operation of public employment, public education, or public
contracting.

(2) The state shall not discriminate against, or grant preferential treatment to,
any individual or group on the basis of race, sex, color, ethnicity, or national
origin in the operation of public employment, public education, or public
contracting.

163.    Article I, § 26 categorically prohibits the University of Michigan and all other

public institutions in the state from discriminating against or granting preferential

treatment to any individual or group on the basis of race, sex, color, ethnicity, or

national origin in public education.

164.    All defendants have acted here under color of state law.

165.    Unsurprisingly, the Michigan Supreme Court has interpreted this provision to

mean what it says, It prohibits racial discrimination regardless of whether it is

framed as benefitting one group or disadvantaging another.

166.    The constitutionality of Art. I, § 26 has been affirmed by the Supreme Court

of the United States.

167.    The University of Michigan's continued use of race as a factor in undergraduate admissions, however obscured by euphemism or cloaked in "holistic" rhetoric, is a direct violation of the Michigan Constitution.

168.    The University's own public statements and internal materials confirm that race continues to play a determinative role in its admissions process. Michigan has openly lamented that race-neutral policies "do not help us enroll a student body that is racially or ethnically diverse," and has declared that "socioeconomic status is not a substitute for race."

169.    It has also conceded, in court filings and public commentary, that race-neutral alternatives have not produced the racial outcomes it desires—thereby confirming that race remains a central feature of its admissions design.

170.    Stanley and Minor Son are denied equal consideration for admission to Michigan because of their race.

171.    That is precisely the kind of discriminatory and preferential treatment that Article I, § 26 forbids. The University's conduct constitutes a plain and ongoing violation of the Michigan Constitution.

172.    Accordingly, Defendants have violated Article I, § 26 of the Michigan Constitution. Plaintiffs seek all appropriate legal and equitable remedies.

**COUNT V.    Violation of Michigan's Elliott-Larsen Civil Rights Act (Mich. Comp. Laws § 37.2402)**
**(Against All Defendants)**

173.    Plaintiffs here incorporate by reference all preceding paragraphs as if fully restated in this paragraph.

174.    Plaintiffs bring this claim under the Elliott-Larsen Civil Rights Act ("ELCRA"), Mich. Comp. Laws § 37.2402, which prohibits educational

institutions from denying individuals the full and equal enjoyment of their

services, programs, or facilities on the basis of race.

175.  Plaintiffs Stanley and Minor Son are members of a protected class (Asian

American).

176.  Minor Son will be fully qualified for undergraduate admission to the

University of Michigan when the time comes for him to attend college.  He has

suffered an adverse action by being discouraged by Defendants' pattern, practice,

policies, and customs of discrimination on the basis of race.

177.  Stanley was fully qualified for undergraduate academic admission to the

University of Michigan, applied, and suffered an adverse action when his

application was denied.

178.  Statistical evidence overwhelmingly supports the inference that Stanley was

treated less favorably than similarly situated non-Asian applicants.  The same

evidence supports the inference that Minor Son will be treated less favorably than

similarly situated non-Asian applicants.

179.  As a direct and proximate result of this unlawful discrimination, Stanley and

Minor Son have suffered damages, including but not limited to emotional distress,

reputational harm, and loss of educational and professional opportunities.

180.  Plaintiffs seek all remedies available at equity and at law, including direct and

indirect damages, exemplary damages, injunctive relief, and attorneys' fees.

## V.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, Stanley and Nan, respectfully request that this Court:

i.    Declare the University of Michigan's Admissions Practices Unconstitutional under the Fourteenth Amendment to the U.S. Constitution and  Article I, Section 26 of the Michigan Constitution (Proposal 2);

ii.    Declare the University of Michigan in violation of Title VI of the Civil Rights Act of 1964;

iii.    Declare the individual defendants in violation of 42 U.S.C. § 1981;

iv.    Declare Defendants in violation of Elliott-Larsen Civil Rights Act (Mich. Comp. Laws § 37.2402;

v.    Enjoin all Defendants racially discriminatory admissions and hiring practices;

vi.    Order all Defendants to take all necessary steps to eliminate the effects of past discrimination;

vii.    Order institutional reforms and accountability measures at the University of Michigan including but not limited to an injunction requiring Defendant to dismiss, after a full and fair public hearing, all Admissions Directors and other administrators responsible for the admission cycles determined to be racially discriminatory since 2006 (or alternatively remove any official found to have participated in the discrimination from any role in admissions decisions), an injunction requiring Defendant to dismiss, after a full and fair public hearing, all administrators who knowingly certified compliance with federal anti-discrimination laws while being aware of racial preferences in admissions or hiring; and adoption of express policies endorsing race-neutral, colorblind, merit-based admissions criteria;

viii.    Order Defendants to pay all direct and indirect damages and punitive damages in an amount to be proven at trial in addition to Plaintiffs' reasonable attorney fees and costs;

FIRST AMENDED COMPLAINT

ix.    In the event the Court finds no compensable injury, Plaintiffs respectfully seek nominal

damages as recognition of the violation of their rights;

x.    Grant such other and further relief as this Court deems just and proper.

## JURY DEMAND

## PLAINTIFFS HEREBY DEMAND A TRIAL BY JURY ON ALL ISSUES SO

## TRIABLE

DATE: June 20, 2025                Respectfully submitted,

/s/ Nan Zhong
_____
Nan Zhong as next friend of his Minor Son
(Pro Se)

/s/ Stanley Zhong
_____
Stanley Zhong (Pro Se)

*Plaintiffs*


CERTIFICATE OF SERVICE

I hereby certify that on the date appearing in this document, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system. I certify that the following counsels of record are registered as ECF filers and that they will be served by the CM/ECF system.

Brian M. Schwartz
Miller Canfield
T: +1.313.496.7551
schwartzb@millercanfield.com

Sydney G. Rohlicek
Miller Canfield
T: +1.313.496.7946
Rohlicek@millercanfield.com

/s/ Nan Zhong
_____
Nan Zhong