# *Exhibit 1*

Nos. 20-1199 & 21-707

# In the Supreme Court of the United States

STUDENTS FOR FAIR ADMISSIONS, INC., PETITIONER,

*v.*

PRESIDENT AND FELLOWS OF HARVARD COLLEGE

———————

STUDENTS FOR FAIR ADMISSIONS, INC., PETITIONER,

*v.*

UNIVERSITY OF NORTH CAROLINA ET AL.

———————

*ON WRITS OF CERTIORARI*
*TO THE UNITED STATES COURTS OF APPEALS*
*FOR THE FIRST AND FOURTH CIRCUITS*

———————

**BRIEF FOR THE UNIVERSITY OF MICHIGAN**
**AS *AMICUS CURIAE* IN SUPPORT OF RESPONDENTS**

———————

TIMOTHY G. LYNCH
  *Vice President & General*
  *Counsel*
MAYA R. KOBERSY
  *Associate General Counsel*
UNIVERSITY OF MICHIGAN
  *1109 Geddes Avenue*
  *Ann Arbor, MI 48109*

JOHN P. ELWOOD
  *Counsel of Record*
STEPHEN K. WIRTH
ARNOLD & PORTER
  KAYE SCHOLER LLP
  *601 Massachusetts Ave., NW*
  *Washington, DC 20001*
  *(202) 942-5000*
  *john.elwood@arnoldporter.com*

# TABLE OF CONTENTS

Page

Interest of *Amicus* .................................................................1

Summary of Argument ........................................................4

Argument ...............................................................................6

I.   Universities Have A Compelling Interest In
     Attaining The Educational Benefits Of Racial
     Diversity .......................................................................6

     A.   Research And Experience Confirm That
          Racial Diversity Has Compelling
          Educational Benefits ...........................................7

     B.   Consideration Of Race As One Of Many
          Factors Is Necessary To Evaluate
          Candidates As Individuals .................................10

II.  Despite Extraordinary Efforts, U-M's Race-
     Neutral Recruiting And Admissions Initiatives
     Have Failed To Yield Racial Diversity ...................11

     A.   U-M Has Undertaken Extensive Race-
          Neutral Efforts To Promote Diversity ............12

     B.   U-M's Sustained Race-Neutral Initiatives
          Have Not Achieved Racial Diversity In
          Enrollments .........................................................21

Conclusion .........................................................................29

(I)

II

# TABLE OF AUTHORITIES

**Cases**                                                      Page(s)

*Fisher* v. *Univ. of Tex.*,
   570 U.S. 297 (2013) ..........................................4, 5, 6, 10, 11

*Fisher* v. *Univ. of Tex.*,
   579 U.S. 365 (2016) ...............................................................5

*Gratz* v. *Bollinger*,
   539 U.S. 244 (2003) .........................................................2, 12

*Grutter* v. *Bollinger*,
   539 U.S. 306 (2003) ......................2, 4, 5, 6, 8, 9, 10, 11, 20

*Parents Involved in Cmty. Sch.* v. *Seattle Sch.
   Dist. No. 1*, 551 U.S. 701 (2007) ................................10, 11

*San Francisco NAACP* v. *San Francisco
   Unified Sch. Dist.*,
   413 F. Supp. 2d 1051 (N.D. Cal. 2005) ...........................27

**Constitutional Provisions**

Mich. Const. art. I, §26(1)......................................................3

**Articles & Books**

Elena M. Bernal, Alberto F. Cabrera, & Patrick
   T. Terenzini, *The Relationship Between Race
   and Socioeconomic Status (SES): Implications
   for Institutional Research and Admissions
   Policies* (AIR 2000 Annual Forum Paper) ..................27

William G. Bowen & Derek Bok, *The Shape of
   the River* (2000)................................................................27

Richard H. Fallon, Jr., *Affirmative Action
   Based on Economic Disadvantage*, 43 UCLA
   L. Rev. 1913 (1996) ...........................................................27

Ford Fessenden & Josh Keller, *How Minorities
   Have Fared in States With Affirmative
   Action Bans,* N.Y. Times, June 30, 2015......................22

III

**Articles & Books—Continued**                    Page(s)

Shoham Geva, *University continues to struggle
with minority enrollment*, The Michigan
Daily, Oct. 29, 2014 ....................................... 13, 24

Sylvia Hurtado, *Linking Diversity with the
Educational and Civil Missions of Higher
Education*, 30 Rev. Higher Educ. 185 (2007) ................. 7

Uma M. Jayakumar, *Can Higher Education
Meet the Needs of an Increasingly Diverse
and Global Society? Campus Diversity and
Cross-Cultural Workforce Competencies*, 78
Harv. Educ. Rev. 615 (2008) ........................................ 7, 8

Kim Kozlowski, *Study: Michigan among worst
in black university enrollment*, Detroit News
(Apr. 1, 2019) ...................................................... 22

Kim Kozlowski, *UM enrolls most diverse
freshman class in a decade*, Detroit News,
Oct. 13, 2015 ................................................ 18, 19

Julie J. Park et al., *Does Socioeconomic
Diversity Make a Difference? Examining the
Effects of Racial and Socioeconomic Diversity
on the Campus Climate for Diversity*, 50 Am.
Educ. Res. J. 466 (2013) ........................ 7, 8, 9, 27

Kellie Woodhouse, *University of Michigan
renews decades-long struggle to increase black
enrollment*, mlive.com (Feb. 2, 2014) ........................... 24

**Other Authorities**

*First-Time Freshman Analysis Fall 2012*,
University of Oklahoma .................................. 25

*First-Time Freshman Analysis Fall 2019*,
University of Oklahoma .................................. 25

IV

**Other Authorities—Continued**                    Page(s)

Inst. of Educ. Sciences, Nat'l Ctr. for Educ.
   Statistics, *Changes to Race/Ethnicity
   Reporting to IPEDS* .......................................21

Memorandum from Justice Powell to the
   Conference, *Regents of Univ. of Cal.* v. *Bakke*,
   No. 76-811 (Jan. 5, 1978)............................6, 11

The Ohio State Univ., *The Ohio State
   University Vision*...........................................9

Penn State Univ., *Mission and Character* ........................9

U.S. Census Bureau, *Michigan 2020 Census*..................23

U.S. Dept. of Educ., *Gaining Early Awareness
   and Readiness for Undergraduate Programs*............15

U.S. News & World Report, *Best Colleges:
   University of Michigan–Ann Arbor* ............................24

Univ. of Ill., *Mission & Vision* ............................9

Univ. of Mich., *2018 Annual Report: President's
   Message*.................................................10

Univ. of Mich., Admissions, *HAIL* ....................19

Univ. of Mich., Ctr. for Educ. Outreach, *About
   CEO* ..................................................14

Univ. of Mich., *Diversity Blueprints Final
   Report* (Mar. 15, 2007) ....................................13

Univ. of Mich., Diversity, Equity & Inclusion,
   *About* .................................................15

Univ. of Mich., *Diversity, Equity & Inclusion:
   Proposal 2 FAQs* ..................................7, 17, 18

Univ. of Mich., *Diversity, Equity & Inclusion:
   Resources & Programs*....................................16

Univ. of Mich., Diversity, Equity & Inclusion,
   *Strategic Plan Progress Report: Executive
   Summary* (Oct. 2021)....................................16

V

**Other Authorities—Continued**                     Page(s)

Univ. of Mich., Diversity, Equity & Inclusion,
   *Urban School Initiative* .............................................. 16

Univ. of Mich., *Enrollment Headcounts by
   Academic Level & Citizenship Status* (Nov.
   23, 2021) ..................................................... 22, 23

Univ. of Mich., *FY 2021 Rankings* ..................................... 1

Univ. of Mich., *Go Blue Guarantee* ............................. 16, 19

Univ. of  Mich., Med. Sch., *Diversity & Health
   Equity* ......................................................................... 16

Univ. of Mich., Mich. College Advising Corps,
   *About MCAC* ............................................................ 15

Univ. of Mich., Mich. Law, *Diversity, Equity,
   and Inclusion* .......................................................... 16

Univ. of Mich., *The Michigan Almanac* (18th
   ed. 2022) ................................................. 7, 19, 24

Univ. of Mich., *Mission Statement, Vision
   Statement* .................................................................. 9

Univ. of Mich., Office of Acad. Multicultural
   Initiatives, *About: Diversity, Equity &
   Inclusion* .................................................................. 16

Univ. of Mich., Office of Multi-Ethnic Student
   Affairs, *Core Work* ............................................... 16

Univ. of Mich., Office of the Provost, *Budget
   Presentation to the Board of Regents* (June 20,
   2013) .......................................................................... 19

Univ. of Mich., Office of the Registrar, Report
   837, *Enrollment in Degree Credit Programs
   by Ethnicity 2006* ............................... 21, 22, 23

Univ. of Mich., Rackham Grad. Sch., *Michigan
   Humanities Emerging Research Scholars
   Program* ................................................................... 16

VI

**Other Authorities—Continued**                Page(s)

Univ. of Mich., Rackham Grad. Sch., *Summer Research Opportunity Program* .................................... 16

Univ. of Mich., Rackham Grad. Sch., *Minority Serving Institutions (MSI) Outreach and Collaboration Grants* ........................................ 16

Univ. of Mich., Rackham Grad. Sch., *Rackham Merit Fellowship Program* .............................. 16

Univ. of Mich., Rackham Grad. Sch., *Recruitment of Diverse Graduate Students* ................ 16

Univ. of Mich., *Statement of President Mary Sue Coleman* (Dec. 6, 2006) ............................... 2

Univ. of Mich., Undergraduate Admissions, *Consideration of Socioeconomic Status in the Application Review Process* ........................... 18

Univ. of Mich., Undergraduate Admissions, *Selection Process* ...................................... 17, 18

Univ. of Mich., *Wolverine Pathways* ............................... 16

Univ. of Mich., Youth Hub, *Watson A. Young Scholarship* ...................................... 15

## AMICUS BRIEF IN SUPPORT OF RESPONDENTS

### INTEREST OF *AMICUS*[1]

Established in 1817, the University of Michigan ("the University" or "U-M") is a world-class research institution known for academic excellence, community leadership, and the diversity of its students, faculty, staff, and alumni. The University enrolls more than 62,000 students across 3 campuses and 28 schools and colleges; its students come from all 50 states and 139 countries. During the 2021-2022 academic year alone, the University awarded nearly 15,000 undergraduate, graduate, and professional degrees. U-M's faculty is considered one of the top five in the country. The University has produced and served as the scholarly home for pathbreaking researchers, MacArthur Fellows, Fields Medal winners, astronauts, Pulitzer Prize winners, Nobel Laureates, internationally acclaimed performing artists and composers, a President, three Supreme Court Justices, best-selling novelists, artists, college presidents, military and business leaders, Rhodes Scholars, and filmmakers. The University is world renowned for the strength of its programs; more than 100 U-M graduate programs are ranked in the top ten nationwide.[2]

The University seeks students from diverse socioeconomic, cultural, religious, global, political, and academic backgrounds—from first-generation students to Native Americans to international students from Afghanistan to Zimbabwe—for one crucial reason: Decades of

---

[1] No party or counsel for a party made a monetary contribution to the preparation or submission of this brief. All parties consented to the filing of the brief. No counsel for a party authored this brief in whole or in part.

[2] Univ. of Mich., *FY 2021 Rankings*, https://bit.ly/3yHQWX6.

2

experience, confirmed by overwhelming empirical research, have persuaded the University of the compelling educational benefits of maintaining a broadly diverse student body. As former University President (and current interim President) Mary Sue Coleman has stated:

> Diversity is an essential component of our excellence. The quality of our academic programs is enhanced by the rich and varied contributions of students and faculty who approach problems from different perspectives. * * * The University of Michigan's academic quality will suffer if we cannot recruit and retain faculty, staff and students from a wide range of backgrounds."[3]

To that end, the University for years considered many different diversity factors, including race, in its individualized consideration of applicants. In *Grutter* v. *Bollinger*, 539 U.S. 306 (2003), this Court held that obtaining the educational benefits of "student body diversity is a compelling state interest." *Id.* at 325. The Court upheld the constitutionality of the University of Michigan Law School's admissions policy, which considered "race as one factor among many" as part of a "highly individualized, holistic review of each applicant's file, giving serious consideration to all the ways an applicant might contribute to a diverse educational environment." *Id.* at 337, 340. When this Court held that awarding points to every underrepresented minority applicant to the University's College of Literature, Science and the Arts was "not narrowly tailored to achieve" the University's compelling "interest in educational diversity," *Gratz* v. *Bollinger*, 539 U.S. 244, 270 (2003), the University immediately brought its other

---

[3]  Univ. of Mich., *Statement of President Mary Sue Coleman* (Dec. 6, 2006), https://bit.ly/3Od6RlV.

3

admissions programs into compliance by adopting a holistic and individualized program consistent with *Grutter*.

In November 2006, Michigan voters approved Proposal 2, an amendment to Michigan's Constitution that, in pertinent part, prohibits all state colleges and universities from "discriminat[ing] against, or grant[ing] preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of * * * public education." Mich. Const. art. I, §26(1). Since then, the University has discontinued even the limited consideration of race in holistic admissions programs that *Grutter* approved. The University continues to believe that maintaining a diverse student body has compelling educational benefits; and, as set forth below, since 2006, U-M has made exceptional efforts to attain diversity, broadly defined, without consideration of race. Nevertheless, despite the University's extraordinary efforts, minority enrollment fell sharply in the wake of Proposal 2.

U-M's experience thus represents a "natural experiment" in race-neutral admissions this Court should consider in determining whether alternatives are available to public institutions of higher education. That experience demonstrates that the limited consideration of race, as one factor among many in a holistic and individualized admissions program, is necessary to attain those educational benefits of student-body diversity. And when the Court recently reaffirmed that universities may pursue the educational benefits of diversity by considering race in admissions, the University submitted an *amicus* brief arguing that the limited consideration of race in admissions was not only necessary to achieving those benefits but consistent with equal protection principles. See Br. for University of Michigan as *Amicus Curiae*, *Fisher* v. *Univ. of Tex.*, No. 14-981 (2015). The University continues to believe that is so.

4

## SUMMARY OF ARGUMENT

I. Informed by decades of research and teaching experience, the University of Michigan is firmly convinced of the educational benefits of racial diversity as one component of a broadly diverse student body. That view accords with the overwhelming consensus of American universities, which have concluded that racial diversity benefits the exchange and development of ideas by increasing students' variety of perspectives; promotes cross-racial understanding and dispels racial stereotypes; and helps prepare students to be leaders in a global marketplace and increasingly multicultural society. Indeed, it is particularly important that universities have racially diverse student bodies today in light of the increasing racial isolation in neighborhoods and in primary and secondary schools. Public universities such as U-M and UNC have a special role and responsibility in this regard, because they receive public funding and represent the training ground for a large number of the Nation's leaders.

Admissions officers should be able to consider race, in a narrowly tailored manner, to be attentive to the distinctive characteristics of individual applicants. "Just as growing up in a particular region or having particular professional experiences is likely to affect an individual's views, so too is one's own, unique experience of being a racial minority in [our] society." *Grutter* v. *Bollinger*, 539 U.S. 306, 333 (2003). To identify promising candidates effectively, admissions officers must be able to consider the fullness of each applicant's background and experience, including socioeconomic profile, challenges overcome, cultural background—and also the applicant's race. Fostering the promise of individualism in admissions sometimes requires, rather than forbids, thoughtful attention to facts about race "to ensure that each applicant is evaluated as an individual." *Fisher* v. *Univ. of Tex.*, 570 U.S. 297, 309

5

(2013) (*Fisher I*) (quoting *Grutter*, 539 U.S. at 337); see *Fisher* v. *Univ. of Tex.*, 579 U.S. 365, 386-387 (2016) (*Fisher II*).

II. In *Grutter*, and again in *Fisher I* and *Fisher II*, this Court reaffirmed that universities may lawfully consider race as one factor among many in an individualized admissions program implemented to achieve the compelling state interest in attaining the educational benefits of a diverse student body. *Grutter*, 539 U.S. at 328; *Fisher I*, 570 U.S. at 309; *Fisher II*, 579 U.S. at 376-377. But, this Court held, the consideration of race in admissions must be narrowly tailored, "involv[ing] a careful judicial inquiry into whether a university could achieve sufficient diversity without using racial classifications." *Fisher I*, 570 U.S. at 312.

For more than a decade, the University of Michigan has been actively engaged in precisely the kind of "serious, good faith consideration of * * * race-neutral alternatives" that *Fisher* and *Grutter* contemplated. *Fisher I*, 570 U.S. at 312 (quoting *Grutter*, 539 U.S. at 339-340). Despite persistent, vigorous, and varied efforts to increase student-body racial and ethnic diversity by race-neutral means; despite committed efforts by University faculty, staff, students, and alumni to conduct race-neutral recruiting and admissions programs; and despite admissions consideration and extensive financial aid for socioeconomically disadvantaged students, the admission and enrollment of underrepresented minority students have fallen precipitously in many of U-M's schools and colleges since Proposal 2 was adopted. The University's persistent efforts have not been sufficient to create the racial diversity necessary to provide significant opportunities for personal interaction to dispel stereotypes and to ensure that minority students do not feel isolated or that they must act as spokespersons for their race. *Grutter*, 539 U.S. at

6

318, 319. The University has seen a marked and sustained drop especially among the most-underrepresented groups, Black and Native American students, whose enrollment has fallen by 44% and 90%, respectively, since Proposal 2 was adopted. This reduction in diversity not only denies students the educational benefits of a diverse campus, it negatively affects students' wellbeing: fully one quarter of underrepresented minority students surveyed indicated they felt they did not "belong" at U-M, a 66% increase over the last decade.

Justice Powell wrote, "I can think of no better way to demonstrate [whether] less restrictive alternatives do exist than to re[]ly on the actual experience of these universities." Memorandum from Justice Powell to the Conference at 8, *Regents of Univ. of Cal.* v. *Bakke*, No. 76-811 (Jan. 5, 1978), https://bit.ly/3Q0Nkq7. U-M's more-than-15-year-long experiment in race-neutral admissions helps to establish that racial diversity in student enrollment, and the compelling government interest in the resulting educational benefits, cannot be adequately realized at selective institutions without taking race into account as one factor among many in admissions decisions.

## ARGUMENT

### I. Universities Have A Compelling Interest In Attaining The Educational Benefits Of Racial Diversity

"In *Grutter*, th[is] Court reaffirmed [the] conclusion that obtaining the educational benefits of 'student body diversity is a compelling state interest that can justify the use of race in university admissions.'" *Fisher I*, 570 U.S. at 309 (quoting *Grutter*, 539 U.S. at 325). That holding remains just as true today. And it is supported by decades of research and experience demonstrating that the consideration of race as one of many factors is necessary for

7

public universities to attain the well-recognized educational benefits of a diverse student body.

## A. Research And Experience Confirm That Racial Diversity Has Compelling Educational Benefits

The University of Michigan is a "firm proponent of the educational value provided by a diverse and inclusive campus community."[4] The University "know[s] from research, and from [its] experience as educators, that building a diverse community adds to the quality of [its] teaching and learning, [its] scholarship, and [its] creative endeavors."[5]

Academic research—including research undertaken by U-M's own faculty and students—overwhelmingly confirms the educational value of student-body racial diversity.[6] As this Court recognized in *Grutter*, the exchange of ideas and viewpoints "is livelier, more spirited, and simply more enlightening and interesting when the students

---

[4] Univ. of Mich., *The Michigan Almanac* 87 (18th ed. 2022), https://bit.ly/3ARSlga.

[5] Univ. of Mich., *Diversity, Equity & Inclusion: Proposal 2 FAQs*, https://bit.ly/3Pt0fRp.

[6] See, *e.g.*, Uma M. Jayakumar, *Can Higher Education Meet the Needs of an Increasingly Diverse and Global Society? Campus Diversity and Cross-Cultural Workforce Competencies*, 78 Harv. Educ. Rev. 615, 621-622, 638, 640, 642-643 (2008) (in contrast with pre- and post-college experiences, "*collegia[te]* interactions across race is most influential with regard to developing cross-cultural workforce competencies") (emphasis added); Sylvia Hurtado, *Linking Diversity with the Educational and Civil Missions of Higher Education*, 30 Rev. Higher Educ. 185, 191-192 (2007); Julie J. Park et al., *Does Socioeconomic Diversity Make a Difference? Examining the Effects of Racial and Socioeconomic Diversity on the Campus Climate for Diversity*, 50 Am. Educ. Res. J. 466, 489-490 (2013) (noting that socioeconomic diversity "is not an adequate replacement for the benefits associated with racial diversity").

8

have the greatest possible variety of backgrounds." *Grutter*, 539 U.S. at 330 (internal quotation marks omitted). In addition, it is well recognized that racial diversity promotes "cross-racial understanding, helps break down racial stereotypes, and enables [students] to better understand persons of different races." *Grutter*, 539 U.S. at 330 (internal quotation marks omitted). And perhaps as a consequence, racial diversity helps impart the "skills needed in today's increasingly global marketplace" by "expos[ing] [students] to widely diverse people, cultures, ideas, and viewpoints." *Grutter*, 539 U.S. at 330.[7]

Indeed, diversity in higher education is *especially* important today. Even as the nation grows more diverse, "[m]any students live in racially homogeneous communities prior to college and attend similarly homogeneous high schools," with only "rare opportunit[ies] for students to engage across racial/ethnic lines."[8] "[N]eighborhoods and schools are * * * returning to levels of racial segregation not seen since the 1960s," and "[w]hite students in particular tend to have minimal interaction with people of other racial backgrounds before college."[9]  For many Americans, then, college represents the *first opportunity*

---

[7]  Oklahoma argues that *Grutter*'s rationales are undermined by the fact that "incomes for graduates one and five years after graduation are not meaningfully lower for public universities in states that have prohibited affirmative action than in states in the same region that allow it."  Br. of *Amici Curiae* Okla. & 18 Other States (Okla. Br.) at 16. To be sure, the Court did note that "the skills needed in today's increasingly global marketplace can only be developed through exposure to widely diverse people, cultures, ideas, and viewpoints." 539 U.S. at 330. But the Court did not suggest that *income* is a proper measure for development of those skills. Rather, the Court emphasized "cultivat[ing] a set of leaders with legitimacy in the eyes of the citizenry," *id.* at 332—a goal that income obviously cannot track.

[8]  Park, *supra* n.6, at 467.

[9]  Jayakumar, *supra* n.6, at 615-616.

9

for meaningful interaction with people of other races. Thus, "college plays a unique role in exposing students to new ideas and perspectives through engagement in a racially diverse student body."[10]

U-M is particularly mindful of the special role, and responsibility, of public universities to prepare students to thrive in our increasingly diverse and global society. The University is publicly supported and founded for the express purpose of educating and training the citizenry to "develop[] leaders and citizens who will challenge the present and enrich the future."[11] And because public universities are typically more affordable (particularly to in-state students) than many private universities offering a comparably rigorous education, they make the benefits of higher education more widely available. Indeed, each year, U-M and Michigan State University together educate nearly as many students as does the *entire* Ivy League.

Given the important opportunity that public universities provide, and the special role they serve, it is imperative that "all members of our heterogeneous society may participate in the educational institutions that provide the training and education necessary to succeed in America," such "that the path to leadership be visibly open to talented and qualified individuals of every race and ethnicity." *Grutter*, 539 U.S. at 332-333. U-M's role as a public university gives us a special obligation to ensure that its opportunities are available to "students from all

---

[10] Park, *supra* n.6, at 467.

[11] Univ. of Mich., *Mission Statement, Vision Statement*, https://bit.ly/3uSek2U; see Univ. of Ill., *Mission & Vision*, https://bit.ly/3IP5c4Y; Penn State Univ., *Mission and Character*, https://bit.ly/3o9rYuS; The Ohio State Univ., *The Ohio State University Vision*, https://bit.ly/3AUpyHT.

10

communities and backgrounds" across the full breadth of our society.[12]

## B. Consideration Of Race As One Of Many Factors Is Necessary To Evaluate Candidates As Individuals

There is no question that in making admissions decisions, officials at colleges and universities act properly when they seek "to ensure that each applicant is evaluated as an individual," *Fisher I*, 570 U.S. at 309 (quoting *Grutter*, 539 U.S. at 337)—that is, when they "consider[] the overall individual contribution of each candidate," *id.* at 305. As this Court has observed, race "still matters." *Grutter*, 539 U.S. at 333; accord *Parents Involved in Cmty. Sch.* v. *Seattle Sch. Dist. No. 1*, 551 U.S. 701, 787 (2007) (Kennedy J., concurring in part and concurring in the judgment) ("The enduring hope is that race should not matter; the reality is that too often it does."). It makes little sense to hold that admissions officers categorically cannot consider race, alone among all factors that might shed light on an individual candidate's upbringing, experience, accomplishments, and prospects.

Fostering the promise of individualism in admissions sometimes requires, rather than forbids, thoughtful attention to facts about race.  Admissions officers should be able to consider race in some circumstances in order to be attentive to the distinctive characteristics of individual applicants. "Just as growing up in a particular region or having particular professional experiences is likely to affect an individual's views, so too is one's own, unique experience of being a racial minority in a society, like our own, in which race unfortunately still matters." *Grutter*, 539 U.S. at 333. Common metrics such as test scores, grades,

---

[12] See Univ. of Mich., *2018 Annual Report: President's Message*, https://bit.ly/3ow0LCv.

11

and class rank often fail to fully capture what sort of *individual* the applicant is in terms of talent, industry, grit, and other personal characteristics that make candidates worthy of admission. Getting the *full* view of an individual may even warrant considering the different experiences within racial groups—for example, the experience of living among a Hmong community in Minnesota, or Marshall Islanders in Arkansas, or Filipino immigrants in California.

This sort of personalized, holistic consideration is fully consistent with the principles of individualism this Court has established—and repeatedly reaffirmed—for the consideration of race in admissions. And it is a far cry from "different treatment based on a classification that tells each student he or she is to be defined by race." *Parents Involved*, 551 U.S. at 789 (Kennedy, J., concurring in part and concurring in the judgment). "[E]ach applicant is evaluated as an individual and not in a way that makes an applicant's race or ethnicity the defining feature of his or her application." *Fisher*, 570 U.S. 309 (quoting *Grutter*, 539 U.S. at 337).

## II. Despite Extraordinary Efforts, U-M's Race-Neutral Recruiting And Admissions Initiatives Have Failed To Yield Racial Diversity

As Justice Powell observed, there is "no better way to demonstrate [whether] less restrictive alternatives do exist than * * * the actual experience of these universities." Memorandum from Justice Powell to the Conference at 8, *Regents of Univ. of Cal.* v. *Bakke*, No. 76-811 (Jan. 5, 1978), https://bit.ly/3OanZsw. For nearly two decades, the University of Michigan has been actively engaged in the kind of "serious, good faith consideration of * * * race-neutral alternatives" that *Fisher* and *Grutter* contemplated. *Fisher I*, 570 U.S. at 312 (quoting *Grutter*, 539 U.S. at 339-340). Yet, despite persistent, vigorous, and varied

12

efforts to increase student-body racial and ethnic diversity by race-neutral means, admission and enrollment of underrepresented minority students have fallen precipitously in many of U-M's schools and colleges since Proposal 2 was adopted. U-M's experience thus represents a natural experiment in race-neutral admissions that this Court should consider in determining whether efficacious race-neutral alternatives are in fact available to Harvard, UNC, or other institutions of higher education. U-M's experience underscores that the limited consideration of race is necessary to obtain the educational benefits of racial diversity.

## A. U-M Has Undertaken Extensive Race-Neutral Efforts To Promote Diversity

To achieve a broadly diverse student body while maintaining the University's commitment to academic excellence, U-M has long pursued means besides considering race in admissions. For example, the University has long given weight in admissions to whether a candidate comes from a socioeconomically disadvantaged background or is the first in the candidate's family to attend college. See *Gratz*, 539 U.S. at 255-257; Resp. Br. 9, *Gratz* v. *Bollinger*, No. 02-516 (Feb. 2003) (*Gratz* Resp. Br.); Resp. Br. 36, *Grutter* v. *Bollinger*, No. 02-241 (Feb. 2003). The University's outreach efforts have long included encouraging minority students with competitive academic credentials to apply to U-M. The University has conducted year-round recruiting and outreach campaigns to identify and contact talented students, including minority students, from across the country; attended recruiting fairs in areas with substantial minority populations; hosted workshops for high-school counselors; maintained an office in Detroit to recruit local high school students; coordinated campus visits for high school students; enlisted current students and others to contact admitted

13

minority students, among others, and encourage them to enroll; and hosted events for admitted students. See *Gratz* Resp. Br. 3.

In the wake of Proposal 2's adoption, the University redoubled its efforts to pursue student-body diversity, including racial and ethnic diversity, through race-neutral means. In late 2006, just weeks after Proposal 2's passage, the University convened a 55-person task force to recommend race-neutral means to foster diversity on campus. The Task Force delivered a report detailing recommendations for how the University could continue pursuing the educational benefits of diversity.[13] Since then, the University has adopted or expanded a number of race-neutral programs that seek to address outreach to potential applicants, admission of applicants, and "conversion"—the process of convincing admitted students to enroll.[14] These programs not only bear many similarities to the race-neutral initiatives adopted by UNC, Harvard, and other universities. See UNC Br. 15-19, 50-59; Harvard Br. 17-19, 52-54. They are exactly the kind of efforts petitioner itself argued universities should make to increase enrollment of underrepresented minorities. See Pet. App. 118-122 (No. 21-707).

*1. Outreach and Recruitment.* The University's first efforts after Proposal 2's adoption concerned outreach and recruitment, "focusing on building pipelines from underserved communities to the University."[15] In 2008, the University established the Center for Educational

---

[13] See Univ. of Mich., *Diversity Blueprints Final Report* (Mar. 15, 2007), https://bit.ly/3aIOsj7.

[14] See Shoham Geva, *University continues to struggle with minority enrollment*, The Michigan Daily, Oct. 29, 2014, https://bit.ly/3ARwO7x.

[15] *Ibid.*

14

Outreach ("Center" or "CEO"), which operates a broad range of programs designed to promote academic achievement in Michigan's elementary, middle, and high schools, and to promote interest in higher education.[16] All Michigan schools are eligible to participate; but the Center's principal focus is underserved schools and schools with significant enrollment of underrepresented minorities, because their students are less likely to be prepared for the University, less likely to apply to the University, and—if admitted—more likely to choose to attend another school.[17] Those programs include:

- *Michigan College Advising Corps*—a program that places recent U-M graduates as college advisers in underserved high schools to encourage low-income, first-generation, and other underrepresented students to pursue higher education in Michigan;

- *Wolverine Express*—a school visitation program that brings U-M faculty, staff and students into Michigan high schools to inform students about academic fields, resources, and pathways to college, and seeks to inspire students to pursue a U-M education;

- *Gaining Early Awareness and Readiness for Undergraduate Programs (GEAR UP)*—a federal program that provides grants to states to provide services at high-poverty middle and high schools designed to increase college attendance and raise the educational expectations of low-income students, many of whom may be the first person in their family to graduate from high school or go on to college;

- *Watson A. Young Scholarship Program*—a program that provides scholarships to attend University

---

[16] Univ. of Mich., Ctr. for Educ. Outreach, *About CEO*, https://bit.ly/3aEvyKo.

[17] See *ibid.*

15

summer academic programs and a variety of other summer educational programs to help prepare students for college and promote interest in education.[18]

Building on the Center's work, in the fall of 2016, U-M created a five-year diversity, equity, and inclusion strategic plan; appointed Robert Sellers as the university's inaugural Chief Diversity Officer; and established the Office of Diversity, Equity and Inclusion (DEI).[19] In its first five years, DEI has made substantial efforts to improve campus diversity through the implementation of numerous programs that target underserved primary-school students and low-income families. Just a small sample of those many programs include:

- *Wolverine Pathways*—a college-pipeline initiative for middle- and high-school students in underserved districts that provides free college-preparatory classes, enrichment, and guidance. Students who successfully complete the program and are admitted to U-M are awarded a four-year, full-tuition scholarship;

- *Go Blue Guarantee*—a financial aid program that provides, at minimum, the cost of tuition and mandatory fees for in-state students from families with incomes of $65,000 or less and assets below $50,000; and

- *Urban School Initiative*—a program aimed at overcoming the institutional barriers to encourage outstanding students in diverse and underserved

---

[18] Univ. of Mich., Mich. College Advising Corps, *About MCAC*, https://bit.ly/3cjXxz7; Univ. of Mich., Youth Hub, *Watson A. Young Scholarship*, https://bit.ly/3RIvH02; U.S. Dept. of Educ., *Gaining Early Awareness and Readiness for Undergraduate Programs*, https://bit.ly/3yYMzXt.

[19] Univ. of Mich., Diversity, Equity & Inclusion, *About*, https://bit.ly/3vgupzN.

16

communities to apply to U-M, including by hosting application workshops.[20]

In addition, the University's schools and colleges support a broad range of multicultural initiatives to make the University a welcoming environment for all, including minority students.[21] While the full scope of U-M's efforts are too extensive to catalogue here, further descriptions are available online.[22]

*2. Admissions.* The University's undergraduate admissions program is broadly representative of U-M's admissions policies as a whole. In evaluating undergraduate applications, the University seeks to enroll academically excellent, broadly diverse students who are engaged in

---

[20] Univ. of Mich., Diversity, Equity & Inclusion, *Strategic Plan Progress Report: Executive Summary* 5-6 (Oct. 2021); https://bit.ly/3cjFObj; Univ. of Mich., *Wolverine Pathways*, https://bit.ly/3oj0Jhp; Univ. of Mich., *Go Blue Guarantee*, https://bit.ly/3Pq0zR7; Univ. of Mich., Diversity, Equity & Inclusion, *Urban School Initiative*, https://bit.ly/3ITWClm.

[21] See generally Univ. of Mich., Office of Acad. Multicultural Initiatives, *About: Diversity, Equity & Inclusion*, https://bit.ly/3zbgqxt; Univ. of Mich., Office of Multi-Ethnic Student Affairs, *Core Work*, https://bit.ly/3Oc9mF0.

[22] The University's graduate and professional schools undertake similar race-neutral outreach, preparatory, and recruitment efforts. See, *e.g.*, Univ. of Mich., Rackham Grad. Sch., *Recruitment of Diverse Graduate Students*, https://bit.ly/3o7r55T; Univ. of Mich., Rackham Grad. Sch., *Michigan Humanities Emerging Research Scholars Program*, https://bit.ly/2KT6MVs; Univ. of Mich., Rackham Grad. Sch., *Summer Research Opportunity Program*, https://bit.ly/3z8AiRO; Univ. of Mich., *Diversity, Equity & Inclusion: Resources & Programs*, https://bit.ly/3IIkTKZ; Univ. of Mich. Med. Sch., *Diversity & Health Equity*, https://bit.ly/3yNbXQ8; Univ. of Mich., Mich. Law, *Diversity, Equity, and Inclusion*, https://bit.ly/3cdt99H; Univ. of Mich., Rackham Grad. Sch., *Rackham Merit Fellowship Program*, https://bit.ly/3S3rQL0; Univ. of Mich., Rackham Grad. Sch., *Minority Serving Institutions (MSI) Outreach and Collaboration Grants*, https://bit.ly/3zCOena.

17

extracurricular activities about which they are passionate. To achieve this, the undergraduate admissions program "look[s] at each student as a whole package, a combination of talents, interests, passions, and skills" in an effort to "look beyond grades and test scores to recruit the most dynamic group of students possible."[23]

Recognizing that "there is great variation among our applicants' personal circumstances, home communities, and high schools," the University's "admissions process considers all aspects of [the applicant's] record and experience" and "do[es] not admit applicants solely on the basis of any single criterion."[24] Reviewers consider traditional indicators of academic preparation—grade point average, test scores, class rank, quality of curriculum, recommendations, along with extracurricular activities—in the context of the student's educational environment.[25]

"Based on the student's essays, letters of recommendation, and extra-curricular experiences, we seek a personal understanding of the student as an individual."[26] To understand the applicant's achievements in context, the application inquires:

> What are the student's life experiences, and how might those contribute to the University community? (i.e., Is [the student] first-generation in the family to attend college? Did [the student] achieve excellence despite financial and/or other challenges that made academics and/or extra-curricular involvement more difficult?)[27]

[23] Univ. of Mich., Undergraduate Admissions, *Selection Process*, https://bit.ly/3coO2Py.

[24] *Ibid.*

[25] See *ibid.*

[26] *Proposal 2 FAQs*, *supra* n.5.

[27] *Ibid.*

18

Because "variety in life experience and challenges contributes to the diversity on campus that enriches the learning environment for all students," U-M's admissions process gives "consideration to applicants with particular indicators such as coming from a low socioeconomic status school or household,"[28] by considering whether the applicant is "from a geographic area, socioeconomic profile, neighborhood, or high school that is currently underrepresented in [the] student community."[29] Because students from such backgrounds can contribute different viewpoints, those factors are considered favorably in the University's individualized, holistic admissions process.

In addition, in recent years, the University has begun accepting fewer early applicants in an effort to increase student-body diversity. In part because underrepresented minority students and lower socioeconomic students tend to submit applications later, the University began reducing early enrollment so that admissions officers could consider a larger pool of candidates when making their decisions. That change has helped to increase the diversity, broadly defined, of the freshman class.[30]

*3. Conversion and Yield.* Many of the University's outreach and recruitment programs are designed to help to persuade admitted students to attend the University, and in particular, to make attendance more attractive to socioeconomically disadvantaged and first-generation collegiates. "The ability of admitted students to attend the [U]niversity without regard to family financial circumstances remains a top objective of the University of

---

[28] *Selection Process, supra* n.23.

[29] *Proposal 2 FAQs, supra* n.5.

[30] See, *e.g.*, Kim Kozlowski, *UM enrolls most diverse freshman class in a decade,* Detroit News, Oct. 13, 2015 (quoting university spokesman Rick Fitzgerald), https://bit.ly/3uS4BcV.

19

Michigan."[31] To that end, "[t]he University has worked very hard in recent years to minimize tuition increases" while "increas[ing] the institutional funds allocated to financial aid over the last decade at a pace higher than tuition increases."[32] In 2020-2021, the University "disbursed financial aid to 69.7 percent of in-state and 48.9 percent of out-of-state students."[33]

In 2017, the University launched a scholarship that provides four years of full tuition and required fees, the HAIL (High-Achieving Involved Leader) scholarship, to high-achieving, low-income students.[34] The "Wolverine Pathways" program extends four-year full-tuition scholarships to admitted applicants who have successfully completed that program.[35] And the "Go Blue Guarantee" provides aid that at a minimum covers four years of tuition for any admitted in-state student whose family income is below $65,000 and with assets less than $50,000.[36] The University also has worked to increase diversity by "mak[ing] underrepresented students more aware of financial help that's available after they're accepted."[37]

Critically, unlike some other states (including Texas), U-M has, for several reasons, *not* attempted to achieve racial diversity by using a "percentage plan," admitting a certain percentage of top graduates from each of the State's high schools. U-M academic units seek students with a wide array of interests and experiences because the

---

[31] Univ. of Mich., Office of the Provost, *Budget Presentation to the Board of Regents* (June 20, 2013), https://bit.ly/3cfyf5o.

[32] *The Michigan Almanac*, *supra* n.4, at 27,

[33] *Ibid.*

[34] Univ. of Mich., Admissions, *HAIL*, https://bit.ly/3Obht4D.

[35] See *supra* pp.15, 16 n.20.

[36] *Ibid.*

[37] Kozlowski, *supra* n.30; *Budget Presentation*, *supra* n.31.

20

University believes that those are the "students who will contribute the most to the robust exchange of ideas." *Grutter*, 539 U.S. at 324 (internal quotation marks omitted). Admissions policies that consider only percentages would be antithetical to the University's pedagogical goals by focusing on a single criterion (class rank) instead of seeking out students with a broad range of experiences. Moreover, because of the State's demographics, a percentage plan would not yield a racially and ethnically diverse student pool for U-M. In Michigan, the statewide number of majority-minority schools is dwarfed by the number of schools that are heavily white. Hispanics and Native Americans are not a majority in *any* Michigan county or school district, and African-Americans constitute a majority only in the Detroit area. See *Gratz* Resp. Br. at 48-49. Thus, a percentage plan would have minimal or negative effects on racial diversity. And, of course, a percentage plan would not take into account U-M's large pool of non-Michigan applicants.

U-M's enormous efforts to overcome the effects of Proposal 2 on student-body diversity highlight the strong reliance interests that universities like UNC and Harvard have in this Court's body of precedent repeatedly permitting the individualized consideration of race as one factor among many in a holistic admissions policy. In the wake of Proposal 2, U-M was forced to radically alter its admissions process in order to even approach the diversity levels achieved prior to Proposal 2. That change was so disruptive that the response not only took time—over 15 years and counting—but vast resources and efforts extending far beyond University campuses, as U-M developed extensive new race-neutral initiatives that reached into school districts around the state. Many schools lack the resources that U-M has been able to put into this effort, and would not be able to undertake such a broad

21

array of initiatives to respond to such a disruptive change in the controlling law.

## B. U-M's Sustained Race-Neutral Initiatives Have Not Achieved Racial Diversity In Enrollments

1. Despite U-M's demonstrated commitment to student body diversity, and despite having spent more than a decade successfully enrolling substantially more socio-economically disadvantaged students, race-neutral admissions policies have *not* significantly increased enrollment of underrepresented minorities. In 2006—the last admissions year before Proposal 2 took effect—underrepresented minorities made up 12.9% of U-M under-graduates.[38] By 2014, underrepresented minorities made up only 10.67% of undergraduates.[39] In recent years, underrepresented minority enrollment has recovered modestly from the decade of decline following Proposal 2. But in 2021, underrepresented minorities still represent only 13.46% of undergraduates, a slight (4%) increase from

---

[38] See Univ. of Mich., Office of the Registrar, Report 837, *Enrollment in Degree Credit Programs by Ethnicity 2006*, https://bit.ly/3aKXkF0. The University calculates figures using black, Hispanic, Native American, and Hawaiian students, and uses the total number of U.S. and permanent-resident alien students (rather than *total* number of students, including foreign students) as the denominator because racial and ethnic information is not reliably available for foreign students. The percentage of the student body consisting of underrepresented minorities could be lower still if figures were calculated using the total number of students.

[39] In 2010, Federal Integrated Postsecondary Education Data System ("IPEDS") changed categories for race, as well as the federal reporting guidelines, so pre-2010 figures may not be directly comparable. See Inst. of Educ. Sciences, Nat'l Ctr. for Educ. Statistics, *Changes to Race/Ethnicity Reporting to IPEDS*, https://bit.ly/3ProPSG.

22

2006.[40] And campus-wide numbers (across U-M's under-graduate, graduate, and professional-school populations) have remained essentially flat since Proposal 2 (13.14% in 2006 versus 13.38% today).[41] In other words, despite the University's extensive efforts to increase minority enrollment through race-neutral methods, it has taken over 15 years just to approximate the diversity levels achieved prior to Proposal 2.

But U-M's gross diversity numbers do not capture the full picture. Reductions *within* individual groups have been far more pronounced, to the marked disadvantage of the most-underrepresented groups: Black and Native American students. Black undergraduate enrollment was 7.03% in 2006; it has since declined to 3.92% in 2021, a reduction of 44%.[42] This decrease occurred even as the total percentage of college-aged African Americans in Michigan *increased* from 16 to 19 percent.[43] Native American enrollment plateaued at 1% between 2004 and 2007, and has since plummeted to 0.11% in 2021, a nearly 90% reduction.[44]

---

[40] Compare Report 837, *supra* n.38, with Univ. of Mich., *Enrollment Headcounts by Academic Level & Citizenship Status* (Nov. 23, 2021), https://bit.ly/3yDVE7W.

[41] *Ibid.*

[42] *Ibid.*; see Kim Kozlowski, *Study: Michigan among worst in black university enrollment*, Detroit News (Apr. 1, 2019), https://bit.ly/3O6mtri.

[43] See Ford Fessenden & Josh Keller, *How Minorities Have Fared in States With Affirmative Action Bans,* N.Y. Times, June 30, 2015, https://nyti.ms/3odBAo8.

[44] Compare Report 837, *supra* n.38, with *Enrollment Headcounts*, *supra* n.40.

By contrast, Hispanic undergraduate enrollment percentages have increased with the increase along with Michigan's (and the

23

2. Such reductions in racial diversity have substantial impacts on students' educational experience. The lower enrollment levels of underrepresented minorities significantly reduce the likelihood that students will have meaningful interactions with students of other racial and ethnic groups of the sort that is educationally valuable in dispelling stereotypes and exposing students to new viewpoints.[45] Compared to 2006, today there are 442 fewer black undergraduates at U-M, and 295 fewer Native Americans—even as total undergraduate enrollment increased by more than 25% (from 25,555 to 32,282).[46]

In some instances, students have very little opportunity to interact with classmates of different races and ethnicities. For example, in 2021, there are only 74 Black students among the 2,421 undergraduates enrolled in the Ross Business School; only 8 Black students among the 164 undergraduates majoring in public policy; only *one* Native American student among the 713 undergraduates in nursing; and only 7 Black students among the 208 undergraduates majoring in architecture and urban planning. Some programs have no underrepresented minorities *at all*.[47]

---

United States') growing Hispanic population; undergraduate Hispanic enrollment was 4.89% in 2006, and has ranged between 5.56% and 7.30% in the past 5 years. Compare *Enrollment Headcounts*, *supra* n.40, with U.S. Census Bureau, *Michigan 2020 Census*, https://bit.ly/3zfToVW. Those figures may have been affected by the revision of IPEDS classifications in 2010, however, which generally increased the numbers of reported "Hispanic" students because since that change, students have been reported as "Hispanic" even if they primarily self-identified as another racial group. See *supra* n.39.

[45] See *supra* pp.7-10.

[46] Compare Report 837, *supra* n.38, with *Enrollment Headcounts*, *supra* n.40.

[47] Report 837, *supra* n.38.

24

In addition to reducing opportunities for beneficial interaction, the reduction in numbers undermines the educational benefits of racial diversity by promoting a sense of isolation among minority students and thereby reducing the likelihood that they will actively participate.[48] With only around 5 Black or Hispanic students per 100—and with 57.3% of U-M classes smaller than 20 students[49]—the odds are that few minorities will be in most classes.[50] That affects the educational environment because "there is a relationship between numbers and culture and climate."[51] Low numbers of enrolled minority students makes it harder to recruit; "minorities who get in" may "choose not to attend because UM's environment is perceived as unfriendly toward minorities."[52]   Reduced diversity has a strongly negative effect on the morale of minority students.   In 2019, *one in four* underrepresented minority students surveyed indicated they felt they did not "belong" at U-M, a 66% increase over the last decade.[53]

3. U-M's experience is largely consistent with other schools that do not consider race as a factor in admissions,

---

[48] See Geva, *supra* n.14 (students suggested "low minority enrollment impacted [students'] experiences at the University"); Kellie Woodhouse, *University of Michigan renews decades-long struggle to increase black enrollment*, mlive.com (Feb. 2, 2014) (because "[t]here are fewer minority students on campus," there is a perception that "it's an increasingly lonely place") (quoting University Regent Mark Bernstein), https://bit.ly/3cnU96A.

[49] See U.S. News & World Report, *Best Colleges: University of Michigan–Ann Arbor*, https://bit.ly/3INk2sr.

[50] Woodhouse, *supra* n.48 ("black students at U-M still say that in many of their classes, there are only a handful of students who look like them").

[51] *Ibid.* (quoting E. Royster Harper, then-University Vice President for Student Life).

[52] *Ibid.*

[53] *The Michigan Almanac, supra* n.4, at 93.

25

such as the University of Oklahoma (OU). In 2012, at OU's flagship campus at Norman, freshman enrollment was 5.2% African-American and 3.8% Native American.[54] In 2019—five years after Oklahoma banned the consideration of race as a factor in admissions—freshman enrollment was 3.7% African-American and 3.0% Native American.[55] That represents declines of 29% and 21%, respectively, at OU's most selective and academically rigorous campus. Oklahoma states that OU experienced only a slight drop in Black undergraduates. See Okla. Br. 10 (showing a decline from roughly 6.5-7.0% to 6.0-6.2%, representing an approximately 7-11% decline). Although the brief largely discusses the experience of "flagship public universities," Okla. Br. 11, those numbers appear to aggregate together *all* of the University of Oklahoma's campuses rather than considering the effect on the University's prestigious flagship campus.

Universities that *do* consider race as a factor in admissions are able to achieve comparable or greater diversity even when they have a lower overall acceptance rate. For example, during the same year (2019), the University of Minnesota Twin Cities' campus (UMTC) and UMass Amherst (with 70% and 65% acceptance rates, versus 83% for OU), both had a larger share of African-American students than OU, even though Minnesota and Massachusetts have a smaller percentage of Black residents than Oklahoma does and were more selective than OU in evaluating applicants for admission. Nearly 5% of freshman at UMass Amherst, and nearly 4% at UMTC, identified as Black, compared to 3.7% of OU. See Okla. Br. 12.

---

[54] *First-Time Freshman Analysis Fall 2012*, at 2, University of Oklahoma, https://bit.ly/3PCa0N7.

[55] *First-Time Freshman Analysis Fall 2019*, at 2, University of Oklahoma, https://bit.ly/3IOpbAH.

26

4. The University of Michigan has concluded that while targeted recruiting and outreach efforts, combined with emphasis on socioeconomic factors in admissions, are helpful in increasing attendance by underrepresented minorities, such measures are not themselves sufficient to secure the educational benefits of student-body diversity. While U-M's efforts have attempted to expand the cohort of qualified racially and socioeconomically diverse candidates, the overall pool of potential minority applicants with competitive academic qualifications remains very small—both in absolute terms and relative to the number of qualified non-minority and wealthier applicants. See *Gratz* Resp. Br. 4 (noting that of Michigan high-school students with B grade-point average and 1200 SAT, 5% were African-American). And intense competition with other selective institutions for these highly sought-after students compounds this pool-size problem by depressing the yield. See *ibid.*

Furthermore, while increasing the representation of low-income students remains an important part of the University's goal of increasing campus diversity, it has not succeeded in increasing *racial or ethnic* diversity. That is not surprising: "[T]here are almost six times as many white students as black students who both come from [low socio-economic status] families *and* have test scores that are above the threshold for gaining admission to an academically selective college or university."[56] Pursuing socioeconomic diversity alone is thus not a realistic

---

[56] William G. Bowen & Derek Bok, *The Shape of the River* 51 (2000); see generally *id.* at 46-52.

27

strategy for enrolling an academically talented class that is diverse in many ways, including with respect to race.[57]

Thus, efforts to increase the representation of lower-income students, while worthwhile in their own right for adding "distinctly and uniquely to student experiences with diversity and the behavioral dimension of the campus,"[58] simply are not effective in dissipating racial preconceptions and stereotypes or in providing other benefits resulting from racial diversity. "[M]erely increasing socioeconomic diversity * * * is not an adequate replacement for the benefits associated with racial diversity; all are needed to yield the optimum benefits."[59]

Indeed, making socioeconomically based admissions the sole means of seeking to increase nonwhite enrollment can exacerbate stereotypes rather than alleviating them.

---

[57] See generally Park, *supra* n.6, at 472 ("data indicate that class-based affirmative action would result in substantially lower levels of racial diversity"); *id.* at 490 ("class-based affirmative action does not yield the same amount of racial diversity as race-conscious admissions policies"); *San Francisco NAACP* v. *San Francisco Unified Sch. Dist.*, 413 F. Supp. 2d 1051, 1052, 1058, (N.D. Cal. 2005) (noting "diversity index" that "t[ook] into account socioeconomic status * * * [and] mother's educational background" did "not achieve[] diversity in any meaningful sense" and "has not and will not produce the benefit of diversity"). See also Elena M. Bernal, Alberto F. Cabrera, & Patrick T. Terenzini, *The Relationship Between Race and Socioeconomic Status (SES): Implications for Institutional Research and Admissions Policies* 8-14 (AIR 2000 Annual Forum Paper) (concluding that class-based admissions policies will not maintain or increase racial or ethnic diversity); Richard H. Fallon, Jr., *Affirmative Action Based on Economic Disadvantage*, 43 UCLA L. Rev. 1913, 1947-1948 (1996) (arguing that socioeconomic admissions policies will not produce racial diversity).

[58] Park, *supra* n.6, at 489

[59] *Id.* at 490; see also *ibid.* ("Our findings confirm the importance of recruiting and retaining student bodies that are both racially and socioeconomically diverse, and not one at the exclusion of the other.").

28

Because lower-income students tend to have attended under-resourced high schools and to have had fewer academic opportunities as a result, their comparative lack of academic preparation may ultimately *reinforce* stereotypes, particularly to the extent that those lower-income students are racial or ethnic minorities. By contrast, when race can be considered as one of many factors in individualized admissions determinations, a university can attain greater diversity *within* various racial and ethnic groups and thereby expose students to a broader range of perspectives.

\* \* \* \* \*

The University of Michigan is firmly convinced of the educational benefits of broad student-body diversity, including racial and ethnic diversity; and it has a longstanding commitment to achieving broad-based diversity across the full range of candidates' characteristics and life experiences. But 15 years into the University's involuntary experiment with race-neutral admissions, many U-M colleges and schools have experienced a substantial drop in racial and ethnic diversity, despite persistent and vigorous race-neutral efforts—including extensive efforts to consider socioeconomic status in admission and recruiting. That loss of racial and ethnic diversity undermines the University's efforts to expose students to a broad diversity of perspectives, to dispel racial stereotypes, and to promote broad classroom participation by reducing feelings of racial isolation.

The University's 15-year-long experiment in race-neutral admissions thus is a cautionary tale that underscores the compelling need for selective universities to be able to consider race as one of many background factors about applicants.

29

## CONCLUSION

The judgments should be affirmed.

Respectfully submitted.

TIMOTHY G. LYNCH
  *Vice President & General
  Counsel*
MAYA R. KOBERSY
  *Associate General Counsel*
UNIVERSITY OF MICHIGAN
  *1109 Geddes Avenue
  Ann Arbor, MI 48109*

AUGUST 2022

JOHN P. ELWOOD
  *Counsel of Record*
STEPHEN K. WIRTH
ARNOLD & PORTER
  KAYE SCHOLER LLP
  *601 Massachusetts Ave., NW
  Washington, DC 20001
  (202) 942-5000
  john.elwood@arnoldporter.com*