*Exhibit 2*

2012 WL 3112419
Only the Westlaw citation is currently available.
United States District Court,
E.D. Michigan,
Southern Division.

Carolyn Lee ALI, Plaintiff,
v.
UNIVERSITY OF MICHIGAN HEALTH
SYSTEM–RISK MANAGEMENT,
Defendant.

Civil Action No. 11–13913.
|
May 4, 2012.

**Attorneys and Law Firms**

Carolyn Lee Ali, Hedgesville, WV, pro se.

Nicole L. Proulx, Fraser, Trebilcock, Lansing, MI, for Defendant.

***REPORT AND RECOMMENDATION TO GRANT
DEFENDANT'S MOTION TO DISMISS (DKT.4)***

MARK A. RANDON, United States Magistrate Judge.

**\*1** Carolyn Lee Ali ("Plaintiff") acting *pro se,* brought this suit against the University of Michigan Health System— Risk Management ("Defendant"). Plaintiff alleges, generally, that Defendant unlawfully refused to provide her with continued medical care.

Defendant's motion to dismiss (Dkt.4) is pending. Judge George Caram Steeh referred the motion to this Magistrate Judge for a report and recommendation (Dkt.5). Plaintiff filed a timely response to the motion (Dkt.7); oral argument was held on April 12, 2012. For the reasons set forth below, it is **RECOMMENDED** that Defendant's motion to dismiss be **GRANTED** and that Plaintiff's case be **DISMISSED.**

**I.** *FACTUAL BACKGROUND*

For purposes of Defendant's motion to dismiss, it is assumed that Plaintiff's Complaint allegations are true. Plaintiff's Complaint (Dkt.1) consists of an eighteen page, single-spaced, letter to the Court; it does not list any counts or causes of action, nor does it state what relief Plaintiff seeks. The Complaint is a lengthy narrative discussing Plaintiff's medical aliments and her interactions with physicians and staff employed by the University of Michigan Health System.

During oral argument, Plaintiff attempted to clarify the nature of her claims against Defendant. Plaintiff said that University of Michigan Health System physicians misdiagnosed her as having "Myasthenia Gravis,"[1] when in fact she has "Neuromyotonia"[2] (Dkt. 1 at 1). As a result of this alleged misdiagnosis, Plaintiff said that University of Michigan Health System staff engaged in a cover-up and "black-listed" Plaintiff from receiving future medical care at the University. Plaintiff alleges that a nurse (Sandra Jones–Yapp) and a "risk-management" employee (Juliette Larsen) filed false police reports against Plaintiff. In these reports, Plaintiff was described as verbally abusive, threatening and disruptive to hospital staff. Plaintiff claims that these "trumped-up" police reports (Dkt. 1; Compl. at 17) are preventing her from receiving medical care.

In response to Defendant's motion to dismiss, Plaintiff filed a letter (Dkt.7) with the Court, in which she reiterates her medical travails. Like Plaintiff's Complaint, Plaintiff's response fails to identify any causes of action, or request any relief. Plaintiff did attach several exhibits to her response letter, including: (1) a letter (Dkt. 7 at 16; CM/ECF Pagination) from Ms. Larsen, an employee of Defendant's "risk-management" department, stating that Plaintiff could no longer receive medical care at the University of Michigan due to a "breakdown in the physician-patient relationship;" (2) medical records (Dkt. 7 at 22–29); and (3) the police reports that Plaintiff claims are "fraudulent" (Dkt. 7 at 31–46).

Defendant filed a supplemental brief (Dkt.8) in response to Plaintiff's March 12, 2012 "supplemental letter." However, no such supplemental letter appears on the Court's docket. The only filings from Plaintiff are the Complaint (Dkt.1), a certificate of service (Dkt.2) and a letter filed on February 14, 2012 (Dkt. 7, which is actually a response to Defendant's motion to dismiss). There is no

Case 5:25-cv-10579-JEL-DRG   ECF No. 28-3, PageID.344   Filed 07/11/25   Page 3 of 112

Ali v. University of Michigan Health System-Risk Management, Not Reported in...

letter from Plaintiff filed on March 12, 2012. In any event, according to Defendant's supplemental brief (Dkt.8), Plaintiff's un-docketed supplemental letter attempts to frame her claims as Americans With Disabilities Act ("ADA") violations.

## II. *ANALYSIS*

### A. Applicable Legal Standard

**\*2** The Court may dismiss a complaint for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6). The purpose of a motion under Rule 12(b)(6) is to test the sufficiency of the complaint-not to decide the merits of the case. It is well established that a complaint need not set forth in detail all of the particularities of the plaintiff's claim. Instead, Rule 8(a)(2) of the Federal Rules of Civil Procedure requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." Rule 8 does not, however, "unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Ashcroft v. Iqbal,* 566 U.S. 662, 678–679 (2009). While legal conclusions can provide the framework for a complaint, all claims must be supported by factual allegations. *Id.* The Supreme Court has indicated that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 1949; *see also Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ("[A] formulaic recitation of the elements of a cause of action" is insufficient).

To withstand a motion to dismiss under Rule 12(b)(6), a complaint must plead facts sufficient "to state a claim for relief that is plausible on its face." *Twombly,* 550 U.S. at 570. The requisite facial plausibility exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 566 U.S. at 678. The plausibility requirement is not the same as a "probability requirement" but instead "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* Examining whether a complaint states a plausible claim for relief is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

A *pro se* pleading must be liberally construed and be "held

to less stringent standards than formal pleadings drafted by lawyers ." *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (citing *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). However, *pro se* status does not exempt the plaintiff from the requirement that she comply with relevant rules of procedural and substantive law. *See Hulsey v. Texas,* 929 F.2d 168, 171 (5th Cir.1991); *Birl v. Estelle,* 660 F.2d 592, 593 (5th Cir.1981). *Pro se* plaintiffs must comply with Rule 8 of the Federal Rules of Civil Procedure which provides that a complaint must contain "a short and plain statement of the claim showing the pleader is entitled to relief ..." *LRL Properties v. Portage Metro Housing Authority,* 55 F.3d 1097, 1104 (6th Cir.1995). Although the standard is liberal, it does require more than the bare assertions of legal conclusion. *See Lillard v. Shelby Co. Bd. of Educ.,* 76 F.3d 716, 726 (6th Cir.1996).

### B. Plaintiff Has Sued An Improper Party And Her Claims Are Barred By The Eleventh Amendment

**\*3** Defendant argues that Plaintiff's Complaint should be dismissed because she has sued an improper party ("University of Michigan Health System—Risk Management") and, even if Plaintiff had sued the proper party (the Board of Regents of the University of Michigan), her claims would be barred by Eleventh Amendment immunity. Defendant is correct on both counts.

The only named Defendant is the University of Michigan Health System—Risk Management. It goes without saying that a party not named in a lawsuit is not a party to the lawsuit; indeed, Fed.R.Civ.P. 4(a) requires a plaintiff to "identify ... the parties" to the suit. The University of Michigan hospitals are "an adjunct of the medical department of the University, which is a state educational instrumentality maintained by the public at public expense, controlled and operated by the Board of Regents." *Robinson v. Washtenaw Circuit Judge,* 228 Mich. 225, 230, 199 N.W. 618 (1924). Therefore, any suit intended to be brought against any part of the University of Michigan hospitals or health system must be brought against the Board of Regents of the University of Michigan. *Id.* at 227, 199 N.W. 618; *see also* Mich. Comp. Laws § 390.4 ("The board of regents shall constitute the body corporate, with the right, as such, of suing and being sued, of making and using a common seal, and altering the same."); Estate of Ritter v. University of Michigan, Board of Regents, 851 F.2d 846 (6th Cir.1988) (action against Board of Regents for failure to admit a potential patient into hospital emergency room). At no time did Plaintiff request leave to amend her Complaint to substitute the Board of Regents as

Defendant in this matter. Since Plaintiff has filed suit against an entity that is not subject to suit, Plaintiff's case should be dismissed for this deficiency alone.

Assuming Plaintiff had sued the Board of Regents, this Court would then have to determine whether Eleventh Amendment immunity applied. The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. The Board of Regents of the University of Michigan is a state agency for purposes of the Eleventh Amendment. *See* Mich. Const. Art. 8 § 5; *see also Estate of Ritter by Ritter v. University of Michigan,* 851 F.2d 846, 848 (6th Cir.1988) ( "the Board of Regents unquestionably is a state agency to which the [Eleventh] amendment applies...."). Thus, the Board of Regents is entitled to Eleventh Amendment immunity, unless some recognized exception applies.

"There are ... three qualified exceptions to Eleventh Amendment immunity [.]" *Lawson v. Shelby County, TN,* 211 F.3d 331, 334 (6th Cir.2000). "First, a state may waive the protection of the Amendment by consenting to the suit." *Lawson,* 211 F.3d at 334. "The second exception to the Eleventh Amendment bar is that Congress, under certain provisions of the Constitution, may abrogate the sovereign immunity of the states through statute." *Id.* "Under the third exception, a federal court may enjoin a 'state official' from violating federal law." *Id.* at 335 (citing *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908)). Although Plaintiff's Complaint did not contain any prayer for relief, during oral argument on Defendant's motion to dismiss, Plaintiff stated that she is seeking money damages from Defendant, not injunctive relief. Thus, the third exception does not apply, and Plaintiff's only hope for salvaging the Court's jurisdiction over her claims is if the Board of Regents had consented to the suit or if Congress has abrogated the Board of Regent's immunity; neither event has occurred.

**\*4** Because of the overriding concern for the sanctity of the federalist system, federal courts will find that a state has expressly waived its immunity "only where stated by the most express language or by such overwhelming implication from the text as [will] leave no room for any other reasonable construction." *Port Auth. Trans–Hudson Corp. v. Feeney,* 495 U.S. 299, 305–306, 110 S.Ct. 1868, 109 L.Ed.2d 264 (1990). In this case, Defendant's first responsive pleading was a motion to dismiss (Dkt.4) in which Defendant argued that Plaintiff's Complaint was squarely barred by the Eleventh Amendment. Clearly, Defendant has not consented to this lawsuit. Federal courts can find that a state has implicitly waived its immunity, but

only in very narrow circumstances, such as when a state actor engages in extensive discovery or seeks judgment on the merits without raising the immunity issue. *See, e.g., Ku v. Tennessee,* 322 F.3d 431, 435 (6th Cir.2003) (holding that the defendant waived immunity when, "[i]nstead of asserting its Eleventh Amendment immunity defense, Tennessee engaged in extensive discovery and then invited the district court to enter judgment on the merits"). In this case, Defendant has raised, preserved, and reiterated the affirmative defense of Eleventh Amendment immunity by immediately filing a motion to dismiss. Therefore, Defendant has not waived its Eleventh Amendment immunity.

Concerning abrogation, " '[t]o temper Congress' acknowledged powers of abrogation with due concern for the Eleventh Amendment's role as an essential component of our constitutional structure,' " federal courts apply a two-part test "to determine whether Congress has abrogated the States' sovereign immunity ...." *Seminole Tribe,* 517 U.S. at 55–56 (1995) (quoting *Dellmuth v. Muth,* 491 U.S. 223, 227–28, 109 S.Ct. 2397, 105 L.Ed.2d 181 (1989)). A court must determine "first, whether Congress has 'unequivocally expressed its intent to abrogate the immunity,' ... and second, whether Congress has acted 'pursuant to a valid exercise of power.' " *Id.* (quoting *Green v. Mansour,* 474 U.S. 64, 68, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985)). Plaintiff's Complaint (Dkt.1) and response letter (Dkt.7) do not provide any basis from which to conclude Congress intended to abrogate Michigan's Eleventh Amendment immunity. As such, Plaintiff has failed to demonstrate that immunity does not apply in this case.

### C. Plaintiff Has Failed To State A Claim And This Court Does Not Have Jurisdiction Over Plaintiff's Lawsuit

Plaintiff also failed to properly invoke the jurisdiction of this Court. Where a plaintiff is proceeding without the assistance of counsel, this Court is required to liberally construe the complaint and hold it to a less stringent standard than a similar pleading drafted by an attorney. *See e.g. Simmons v. Caruso,* 2009 WL 2922046 (E.D.Mich.2009), citing, *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972); *Hahn v. Star Bank,* 190 F.3d 708, 715 (6th Cir.1999). Thus, the Court must still read plaintiff's *pro se* complaint indulgently and accept plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez,* 504 U.S. 25, 33, 112 S.Ct. 1728, 118 L.Ed.2d 340 (1992); *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167

Case 5:25-cv-10579-JEL-DRG   ECF No. 28-3, PageID.346   Filed 07/11/25   Page 5 of 112

Ali v. University of Michigan Health System-Risk Management, Not Reported in...

L.Ed.2d 1081 (2007) (The Court of Appeals improperly departed "from the liberal pleading standards set forth by Rule 8(a)(2)" and failed to "liberally construe" the pro se complaint at issue.).

**\*5** At the outset, Plaintiff's Complaint in this case does not meet the pleading requirements of the Fed.R.Civ.P. 8 and does not provide Defendant with proper notice of the claims being asserted. Plaintiff's Complaint was filed in the form of an eighteen-page letter. It contains no caption, is not titled as a Complaint pursuant to Fed.R.Civ.P. 7(a), and does not contain numbered paragraphs that are limited to a single set of circumstances which are capable of being answered. More importantly, Plaintiff's Complaint does not contain a short and plain statement of the grounds for the Court's jurisdiction, does not contain a short and plain statement of the claim(s) she is making pursuant to which she claims she is entitled to relief, and does not contain any demand for relief. In short, the Complaint completely fails to identify or state a claim upon which relief can be granted.

This Magistrate Judge is sensitive to the fact that *pro se* litigants should be given some latitude in presenting claims to the Court. However, Plaintiff's Complaint does not state a claim over which this Court has jurisdiction, even under a very permissive reading. Distilled to its essence, Plaintiff's Complaint alleges that she was wronged by Defendant because Defendant refuses to provide her with ongoing medical care. " ' Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute ... which is not to be expanded by judicial decree.' " *Freeland v. Liberty Mut. Life Ins. Co.,* 632 F.3d 250, 255 (6th Cir.2011) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.,* 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994)). Pursuant to this authority, federal courts have the power to adjudicate claims "arising under the Constitution, laws, or treaties of the United States" or where there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000. *See* 28 U.S.C. §§ 1331, 1332; *see also* U.S. Const. art. III, § 2. This Magistrate Judge is unaware of any federal statute providing a cause of action against a doctor or hospital system for refusal to provide medical care in non-emergency situations.[3] Thus, it does not appear that this Court has federal question jurisdiction over Plaintiff's claims.[4]

That leaves diversity jurisdiction. As far as this Magistrate Judge can ascertain, Plaintiff's claims sound in medical malpractice, or perhaps defamation (against Mss. Jones–Yopp and Larsen); these are state law claims. Although not pled by Plaintiff in the Complaint, the parties' citizenship may be diverse, but this is not certain. According to the docket, Plaintiff appears to currently live in Hedgesville,

West Virginia; the University of Michigan is, of course, located in Ann Arbor, Michigan. However, at some point in time, Plaintiff was a Michigan resident (*see* Dkt. 7 at 16; CM/ECF Pagination) and it is unclear when Plaintiff moved from Michigan to West Virginia. This makes a difference, because "[t]he general rule is that diversity is determined at the time of the filing of a lawsuit." *Curry v. U.S. Bulk Transp., Inc.,* 462 F.3d 536, 540 (6th Cir.2006). Thus, if Plaintiff moved to West Virginia after she filed the Complaint, there would be no diversity of citizenship. More problematic, however, is that diversity jurisdiction requires the amount in controversy to "exceeds the sum or value of $75,000, exclusive of interest and costs." 28 U.S.C. § 1332. Plaintiff's Complaint does not allege what she is seeking in relief, thus it cannot be determined from the face of the pleadings if the amount in controversy is satisfied. In sum, Plaintiff's Complaint does not contain "a short and plain statement of the grounds for the court's jurisdiction," as required by Fed.R.Civ.P. 8(a)(1) and, in any event, it does not appear that this Court has jurisdiction over Plaintiff's claims even under an extremely permissive reading of Plaintiff's Complaint. Thus, Plaintiff's Complaint should be dismissed.

*C. Plaintiff Has Not Properly Served Defendant*

**\*6** Finally, Plaintiff filed this case on September 8, 2011 (Dkt.1). Under Rule 4, Plaintiff had until January 6, 2012 (120 days) to properly serve Defendant with a Summons and Complaint. A Return of Service (Dkt.2)—dated January 5, 2012—indicates that a Summons and Complaint was served upon University of Michigan Health System— Risk Management. Defendant argues in its motion to dismiss (Dkt. 4 at 7–8) that Plaintiff's Summons was deficient because it did not list Plaintiff's name and address (in violation of Fed.R.Civ.P. 4(a)(1)(c)) and because the Summons and Complaint was not served on a person with authority to accept service (such as the University of Michigan's General Counsel's office), but rather was merely dropped off at a University office. During oral argument on Defendant's motion to dismiss, Plaintiff conceded that the purported service on January 5, 2012 was improper.

Fed. R. Civ. P 4(m) provides, in relevant part:

**(m) Time Limit for Service.** If a defendant is not served within 120 days after the complaint is filed, the court— on motion or on its own after notice to the plaintiff— must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

the failure, the court must extend the time for service for an appropriate period.

At no time did Plaintiff request an extension of time to serve the Complaint. Defendant's motion to dismiss served as notice under Fed.R.Civ.P. 4(m) that Defendant was challenging service. Plaintiff has agreed that service was improper in this matter and has not taken any steps to properly service Defendant. As such—even if Plaintiff named a proper defendant, Eleventh Amendment immunity did not apply and Plaintiff stated a legally viable claim which properly invoked this Court's jurisdiction—Plaintiff's claims should still be dismissed without prejudice because she has not properly served Defendant and the deadline for service has expired.

### III. *CONCLUSION*

For the reasons set forth above, it is **RECOMMENDED** the Defendant's motion to dismiss be **GRANTED,** and that Plaintiff's case be **DISMISSED.**

The parties may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters,* 638 F.2d 947, 949–50 (6th Cir.1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir.1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

**\*7** Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be no more than 20 pages in length unless, by motion and order, the page limit is extended by the court. The response shall address each issue contained within the objections specifically and in the same order raised.

### All Citations

Not Reported in F.Supp.2d, 2012 WL 3112419

Footnotes

1    Mysthenia Gravis is "an autoimmune disease of neuromuscular function due to the presence of antibodies to acetylcholine receptors at the neuromuscular junction; characteristics include muscle fatigue and exhaustion that fluctuates in severity." *Dorland's Illustrated Medical Dictionary* (31st Ed.) 1233.

2    Neuromyotonia is a "myotonia [atonic condition of the musculature of the body] caused by electrical activity of a peripheral nerve; characterized by stiffness, delayed relaxation, fasciculations [muscle twitches] and myokymia [muscle quivering]." *Id.* at 71, 1286.

3    In emergency situations, the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd ("EMTALA"), "requires emergency patients, treated in a hospital setting, to be screened and stabilized prior to their release." *Burd ex rel. Burd v. Lebanon HMA, Inc.,* 756 F.Supp.2d 896, 899 (M.D.Tenn.2010) (citations omitted). Plaintiff's claims do not, however, appear to revolve around emergency care. Rather, Plaintiff's claims appear to involve scheduled doctors' office visits. Furthermore, the letter from Defendant to Plaintiff informing Plaintiff that she could no longer receive care at the University of Michigan noted that the "University of Michigan remains available to you in an emergency situation" (Dkt. 7 at 16, CM/ECF pagination).

4    As noted earlier, Defendant filed a supplemental brief (Dkt.8), which counters a purported March 12, 2012 letter from Plaintiff in which she attempted to frame her claims as ADA claims. However, no filing from Plaintiff on the Court's docket (Dkts. 1 & 7) discusses an ADA claim or any other federal statutory claim. Furthermore, Plaintiff's Complaint fails to state a *prima facie* case of discrimination under Title II of the ADA. *See, Jones v. City of Monroe,* 341 F.3d 474,477 (6th Cir.2003) (to establish a *prima facie* case under Title II of the ADA, Plaintiff must allege that (1) she has a disability; (2) she is otherwise qualified; and (3) she is being excluded from participation in, being denied the benefits of, or being subjected to discrimination under the program solely because

of her disability).

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Castillo v. Whitmer, 823 Fed.Appx. 413 (2020)

823 Fed.Appx. 413
This case was not selected for publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also U.S.Ct. of App. 6th Cir. Rule 32.1.
United States Court of Appeals, Sixth Circuit.

Susana CASTILLO, individually and on behalf of all others similarly situated, et al., Plaintiffs-Appellants,
v.
Gretchen WHITMER, in her official capacity as Governor of the State of Michigan, et al., Defendants-Appellants.

No. 20-1815
|
FILED September 02, 2020

**Synopsis**
**Background:** Agricultural business owners and employees challenged enforcement of emergency order by Michigan Department of Health and Human Services, which imposed COVID-19 testing protocols on employers and housing providers in certain agricultural settings. The United States District Court for the Western District of Michigan, Paul L. Maloney, United States District Judge, No. 1:20-cv-751, denied the agricultural plaintiffs' motion for a preliminary injunction. The plaintiffs appealed and moved to expedite, and farmworker advocacy organizations moved for leave to file an amicus brief.

**Holdings:** The Court of Appeals held that:

the plaintiffs were unlikely to succeed on merits of their appeal, as required for grant of a preliminary injunction;

risks of imposing COVID-19 testing in certain agricultural settings were speculative, and thus did not support granting injunction; and

enjoining testing scheme pursuant to the emergency order would pose significant risk of harm.

Motion for preliminary injunction denied.

Motions to expedite and for leave to file an amicus brief granted.

**Procedural Posture(s):** On Appeal; Motion for Preliminary Injunction; Motion for Expedited Appeal; Motion for Leave to File Third Party Complaint.

**Attorneys and Law Firms**

**\*414** Ronald Grant DeWaard, Aaron M. Phelps, Varnum, Grand Rapids, MI, for Plaintiffs-Appellants

Mark G. Sands, Assistant Attorney General, Office of the Attorney General of Michigan, Alcohol & Gambling Enforcement Division, East Lansing, MI, Danielle Rae Allison Yokom, Katherine Jean Bennett, Office of the Attorney General of Michigan, Lansing, MI, for Defendants-Appellees

Diana Marin, Anna Marie Hill, Michigan Immigrant Rights Center, Ypsilanti, MI, Samuel R. Bagenstos, Samuel Bagenstos, Ann Arbor, MI, for Amicui Curiae Michigan Immigrant Rights Center, Maurice & Jane Sugar Law Center for Economic & Social Justice, Advocates for Basic Legal Equality, Inc., Avanti Law Group, PLLC, California Rural Legal Assistance Foundation, Farmworker Justice, Michigan League for Public Policy, North Carolina Justice Center, Northwest Worker's Justice Project, Worksafe, Inc., Farm Labor Organizing Committee, International Union

Before: STRANCH, THAPAR, and READLER, Circuit Judges.

ORDER

Plaintiffs are a group of agricultural business owners and employees who challenge the enforcement of an emergency order issued by the Michigan Department of Health and Human Services imposing COVID-19 testing protocols on employers and housing providers in certain agricultural settings beginning on August 24, 2020 (the "Order"). Plaintiffs claim that requiring them to administer or take COVID-19 tests violates the Equal Protection clause and sought a preliminary injunction barring

Castillo v. Whitmer, 823 Fed.Appx. 413 (2020)

enforcement of the Order. The district court denied the motion for a preliminary injunction and Plaintiffs appeal. **\*415** They also move to expedite the appeal and seek a preliminary injunction while the appeal is pending. Defendants, Michigan's Governor and the Directors of the Department of Health and Human Services and the Department of Agricultural and Rural Development, oppose the motion for a preliminary injunction but do not address the motion to expedite. In addition, fourteen law and justice nonprofits; four labor unions; twelve community organizations who advocate on behalf of farmworkers, low-wage workers, and Latino communities; two public health experts; a public health nonprofit; and a community health interest group move for leave to file an amicus brief in support of Defendants' opposition to an injunction and have tendered their brief.

We may "grant an injunction pending appeal to prevent irreparable harm to the [moving] party." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 572 (6th Cir. 2002). In determining whether to grant an injunction, we examine four factors: (1) the movants' likelihood of success on appeal; (2) whether the movants will suffer irreparable harm in the absence of an injunction; (3) whether issuance of an injunction would cause substantial harm to the other interested parties; and (4) where the public interest lies. *Id.* at 573. "A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Id.*

Plaintiffs are unlikely to succeed on the merits of their appeal. We review the denial of a motion for preliminary injunction for abuse of discretion. *Nat'l Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 717 (6th Cir. 2003); *Taubman Co. v. Webfeats*, 319 F.3d 770, 774 (6th Cir. 2003). Accordingly, "[t]he district court's determination will be disturbed only if the district court relied upon clearly erroneous findings of fact, improperly applied the governing law, or used an erroneous legal standard." *Nat'l Hockey League Players' Ass'n*, 325 F.3d at 717. "Under this standard, [we] must review the district court's legal conclusions de novo and its factual findings for clear error." *Taubman*, 319 F.3d at 774 (quoting *Owner–Operator Indep. Drivers Ass'n v. Bissell*, 210 F.3d 595, 597 (6th Cir. 2000)).

In essence, Plaintiffs argue that the district court applied the wrong legal standard. "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws.'" *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (quoting *U.S. Const. amend. XIV, § 1*). This is "essentially a direction that all persons similarly situated should be treated alike." *Id.* (citing *Plyler v. Doe*, 457 U.S. 202, 216, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982)). Thus, "any official action that treats a person differently on account of his race or ethnic origin is inherently suspect," *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 310, 133 S.Ct. 2411, 186 L.Ed.2d 474 (2013) (quoting *Fullilove v. Klutznick*, 448 U.S. 448, 523, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980) (Stewart, J., dissenting)), and "racial 'classifications are constitutional only if they are narrowly tailored to further compelling governmental interests.'" *Id.* (quoting *Grutter v. Bollinger*, 539 U.S. 306, 326, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003)).

In addition, facially race-neutral actions are also unconstitutional when they disproportionately affect a racial minority and can be traced to a discriminatory purpose. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979). In this case, the district court determined that the Order is **\*416** facially race-neutral, and Plaintiffs do not expressly challenge that determination. Likewise, the district court recognized that the Order does have a disparate impact on Latinos. But the district court rejected Plaintiffs' argument that the Order was motivated by an improper racially motivated purpose. That factual finding was not clearly erroneous.

To establish improper purpose, a plaintiff must show "that the decisionmaker ... selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.* at 279, 99 S.Ct. 2282. Courts may find evidence of improper purpose in the historical background of the decision, "particularly if it reveals a series of official actions taken for invidious purposes." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). "[C]ontemporary statements by members of the decisionmaking body" may also be relevant. *Id.* at 268, 97 S.Ct. 555.

Plaintiffs' proffered evidence is insufficient. They cite to an April publication entitled "COVID-19 Response & Mitigation Strategies For Racial & Ethnic Populations & Marginalized Communities" as proof that racial identity was top-of-mind for Defendants when drafting the Order. Likewise, Plaintiffs point to two earlier executive actions that referenced the disproportionate impact COVID-19 has had on communities of color and the desire to improve racial equity in healthcare, asserting a pattern of official activity with racial motivations. But considering the effects of government action on various racial groups is not evidence of improper purpose: "[i]f consideration of racial data were alone sufficient to trigger strict scrutiny, then legislators and other policymakers would be required to blind themselves to the demographic realities of their jurisdictions and the potential demographic consequences

Castillo v. Whitmer, 823 Fed.Appx. 413 (2020)

of their decisions." *Spurlock v. Fox*, 716 F.3d 383, 394 (6th Cir. 2013).

Nor can Plaintiffs demonstrate invidious purpose based on the statistics referenced in the press release and in the Director's interview. Statements of fact about the high incidence of COVID-19 among the Latino community and throughout the agricultural industry may indicate that the Order will have a significant impact on Latinos, but they do not compel a finding that the impact motivated the Order.

Plaintiffs also argue that the scope of the Order is so inconsistent that the only logical explanation is an attempt to restrict Latinos. They argue that the Order cannot be based on living conditions because it requires testing of seasonal workers who do not stay at migrant camps. They argue that the Order cannot be based on working conditions because it requires testing of employees of meat, poultry, and egg processing facilities but not employees in other similar agricultural settings. They assert that many agricultural employers are exempt from testing requirements unless they hire migrant or seasonal workers, even while the working conditions remain constant. Finally, they assert that Defendants offer no evidence of any COVID-19 outbreak at a greenhouse facility and that several other industrial settings, such as skilled nursing facilities and construction sites, account for significantly greater numbers of outbreaks. Concluding that there is no practical reason for singling out these groups, Plaintiffs argue that the real motivation behind the Order is its negative effects on Latinos.

Plaintiffs' asserted conclusion does not follow from the facts they cite. That most workers subject to the Order's testing requirements are Latino is evidence of disparate impact but does not indicate discriminatory intent. Likewise, Plaintiffs have not **\*417** shown why failing to require testing of similar accommodations and agricultural settings where Latinos are not the majority is proof of improper purpose. They offer no legal authority for the proposition that the State must address all similar situations in unison. In any event, the Order references past outbreaks in migrant housing camps and food processing facilities, justifying the State's focus on those places. And while other settings might also benefit from compulsory testing, or might account for a greater number of outbreaks, that is not evidence that the Order's limited scope is racially motivated.

Put simply, Plaintiffs' argument requires us to view disparate impact as evidence of discriminatory motive. That is inconsistent with longstanding Supreme Court precedent requiring those asserting equal protection violations to show both impact and intent. *Pers. Adm'r of*

*Mass.*, 442 U.S. at 272, 99 S.Ct. 2282; *Washington v. Davis*, 426 U.S. 229, 242, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) ("Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution. Standing alone, it does not trigger [strict scrutiny].") The requirement to show discriminatory impact is a high bar that Plaintiffs have not met.

Because Plaintiffs did not establish that the Order had a discriminatory purpose, the district court correctly determined that the Order is subject to rational basis review, under which the government's action is presumed constitutional and Plaintiffs must "negate 'every conceivable basis which might support' it." *League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer*, 814 F. App'x 125, 128 (6th Cir. 2020) (quoting *Armour v. City of Indianapolis*, 566 U.S. 673, 681, 132 S.Ct. 2073, 182 L.Ed.2d 998 (2012)). Likewise, the district court correctly concluded that Plaintiffs could not disprove all possible permissible justifications for the Order, including Defendants' assertion that the Order is motivated by the State's rational desire to protect migrant workers, their families, their communities, and the food supply chain. Accordingly, Plaintiffs are unlikely to succeed on the merits of their appeal.

In addition, Plaintiffs have not demonstrated that enforcement of the Order will cause them irreparable harm. It is true that irreparable harm is presumed in cases of constitutional violations, but as noted above, the Order is not unconstitutional. *See Am. Civil Liberties Union of Ky. v. McCreary Cnty., Ky.*, 354 F.3d 438, 445 (6th Cir. 2003), *aff'd sub nom. McCreary Cnty., Ky. v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 125 S.Ct. 2722, 162 L.Ed.2d 729 (2005). The risks of a false positive, workers leaving the industry, or lost housing are too speculative to support injunctive relief. *See Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991) (holding that "the harm alleged must be both certain and immediate, rather than speculative or theoretical"). Nor is monetary loss or logistical burden sufficient. *Baker v. Adams Cnty./Ohio Valley Sch. Bd.*, 310 F.3d 927, 930 (6th Cir. 2002) (per curiam) (quoting *Sampson v. Murray*, 415 U.S. 61, 90, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974)) ("Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough.").

Meanwhile, enjoining the testing scheme poses a substantial risk of harm to others given that identifying and isolating COVID-19-positive workers limits the spread of the virus. The virus's effects on individual and community health is well documented; to the extent the Order is motivated by the legitimate government purpose of

protecting migrant workers, **\*418** their families, their communities, and the food supply chain, enforcing it serves the public interest. And interceding in a State's administrative processes is an extreme step the federal judiciary typically avoids, especially as the State attempts to manage a pandemic.

Finally, Plaintiffs' motion to expedite should be granted. "A party may move to expedite an appeal. The motion must show good cause to expedite." 6 Cir. R. 27(f). A party may move to expedite oral argument. 6 Cir. R. 34(c)(1). "[We] may expedite oral argument, even if the time to file briefs has not expired by the date of the expedited hearing." *Id.* If we schedule oral argument on an appeal from the grant or denial of a preliminary injunction, "argument will generally be expedited." 6 Cir. R. 34(c)(2). "When [we]

grant[ ] a motion to expedite, the clerk will schedule oral argument at an early date. A judge may direct an earlier hearing." 6 Cir. R. 34(c)(3).

Defendants do not oppose expediting the case. The parties are cautioned that no extensions of the briefing schedule will issue absent a showing of good cause.

The motion for a preliminary injunction is **DENIED**. The motions to expedite and for leave to file an amicus brief are **GRANTED**.

### All Citations

823 Fed.Appx. 413

---

**End of Document**© 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.                4

2024 WL 2847368
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

John DOE, on behalf of himself and others similarly situated, Plaintiff,
v.
NEW YORK UNIVERSITY, Defendant.

23-CV-10515 (VSB)
|
Signed May 30, 2024

**Attorneys and Law Firms**

Jonathan F. Mitchell, Mitchell Law PLLC, Austin, TX, Ronald A. Berutti, Murray-Nolan Berutti LLC, Clark, NJ, Christopher Ferrer Mills, Spero Law LLC, Charleston, SC, Counsel for Plaintiff.

Joshua Adam Matz, Raymond P. Tolentino, Kaplan Hecker & Fink LLP, Washington, DC, Roberta Ann Kaplan, Gabrielle Tenzer, Amit Jain, Kaplan Hecker & Fink LLP, New York, NY, Counsel for Defendant.

**OPINION & ORDER**

VERNON S. BRODERICK, United States District Judge:

**\*1** Plaintiff John Doe brings this putative class-action lawsuit against Defendant New York University ("NYU"), alleging that the membership-selection process for the NYU Law Review ("Law Review") violates Title VI of the Civil Rights Act of 1964 ("Title VI"), 42 U.S.C. § 2000d, Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681(a), and 42 U.S.C. § 1983 ("Section 1983"), by giving preferential treatment to women, non-Asian, homosexual, and transgender students.[1] Before me is NYU's motion to dismiss under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. Because I lack subject-matter jurisdiction and, in any event, the complaint fails to state a claim, the motion to dismiss is GRANTED. Accordingly, Doe's complaint is DISMISSED without prejudice.

**I. Background**[2]

**A. Factual Background**

The Law Review is a student-run academic journal that publishes legal scholarship. (Compl. ¶ 5.) The students who run the Law Review—commonly referred to as editors—select the articles that the Law Review publishes and the students who are invited to join its ranks. (*Id.*) Before the Supreme Court's decision in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College ("SFFA")*, 600 U.S. 181 (2023), the Law Review would select fifty new editors each year from the rising second-year class. (Compl. ¶ 9.) Of the fifty students, fifteen were selected based on their performance on a writing competition, fifteen were selected based on their first-year grades, and eight were selected based on a combination of their writing-competition scores and first-year grades. (*Id.*) The remaining twelve spots were filled by the Law Review's Diversity Committee ("Diversity Committee"). (*Id.* ¶ 10.)

**\*2** To select students to fill these twelve spots, the Law Review required applicants to draft personal statements and permitted them to submit anonymized résumés. (*Id.* ¶¶ 11–12.) In evaluating personal statements, the Diversity Committee considered factors that included (but were not limited to) the applicant's "race, ethnicity, gender, sexual orientation, national origin, religion, socio-economic background, ideological viewpoint, disability, and age." (*Id.* ¶ 11.) The résumés, meanwhile, were intended to provide the Diversity Committee with "personal and professional information that cannot be easily communicated through a personal statement." (*Id.* ¶ 12.)

In the wake of the Supreme Court's decision in *SFFA*, "the Law Review changed its website in an attempt to obscure the details of its membership-selection process." (*Id.* ¶ 13.) The Law Review's website, for example, "no longer mentions the diversity set-aside" or "the role that grades will play in the selection of law-review members."[3] (*Id.*) It also no longer mentions the Diversity Committee. (Compl., Ex. 1.) Despite these changes, the Law Review continues to emphasize the important role that diversity plays in the selection of its members. (*Id.* ¶ 14.) To that end, the Law Review requires each applicant to submit a statement of interest that provides "a more comprehensive view of [him or her] as an individual." (Compl., Ex. 1 at 2.) Students also

have the option of submitting a résumé, which the Law Review uses to "realize its commitment to staff diversity." (*Id.*) The Law Review "is using these statements of interest and résumés to give preferential treatment to women, non-Asian racial minorities, homosexuals, and transgender people when selecting its members." (Compl. ¶ 15 (internal quotation marks omitted).)) "And the Law Review intends to continue these unlawful and discriminatory practices until it is enjoined from doing so." (*Id.*)

**B.** *Facts Related to Standing*

Doe is a first-year law student at New York University Law School. (*Id.* ¶ 16.) He describes himself as a heterosexual white man, "consistent with his biologically assigned sex." (*Id.* ¶ 18.) Like many first-year law students, Doe aspires to join his school's law review.[4] (*Id.* ¶ 17.) He plans on applying for Law Review in the summer of 2024. (*Id.*) Doe claims, however, that as a heterosexual white man, he "will be subject to race and sex discrimination" and "denied an equal opportunity to compete for membership." (*Id.* ¶ 19.)

## II. Procedural History

On December 1, 2023, Plaintiff filed a complaint using the pseudonym John Doe.[5] Shortly after filing suit, Doe filed a motion to expedite discovery. (Doc. 10.) I subsequently referred this case (and the discovery motion) to Magistrate Judge Sarah Netburn for general pretrial management. (Doc. 11.) On December 7, 2023, Judge Netburn denied the motion without prejudice, providing Doe leave to renew his request after counsel for NYU filed a notice of appearance. (Doc. 13.) Two weeks later, counsel for NYU appeared. (Docs. 15–18.) The next day, Doe filed a renewed motion to expedite discovery. (Doc. 25.) NYU opposed the motion. (Doc. 28.) On January 10, 2024, Judge Netburn held a hearing with the parties, at which she denied the motion without prejudice to refiling after the "Law Review has issued its operative criteria for selection to the Law Review." (Doc. 32.)

**\*3** On January 24, 2024, Doe filed a motion to certify the class under Rule 23 of the Federal Rules of Civil Procedure. (Doc. 36.) Five days later, NYU moved to dismiss the Complaint pursuant to Rules 12(b)(1) and 12(b)(6). (Doc. 42.) On NYU's request, Judge Netburn adjourned briefing on Doe's motion to certify the class pending my decision on the motion to dismiss. (Docs. 45, 47.) Doe filed its opposition to NYU's motion to dismiss

on February 20, 2024. (Doc. 48.) On March 1, 2024, NYU filed a reply in support of its motion to dismiss. (Doc. 50.)

## III. Legal Standards

**A.** *Federal Rule of Civil Procedure 12(b)(1)*

A district court properly dismisses an action under Rule 12(b)(1) if the court "lacks the statutory or constitutional power to adjudicate it." *Garcia v. Lasalle Bank NA.*, No. 16-CV-3485, 2017 WL 253070, at \*3 (S.D.N.Y. Jan. 19, 2017) (quoting *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.A.R.L.*, 790 F.3d 411, 416–17 (2d Cir. 2015)). "The plaintiff bears the burden of proving subject[-]matter jurisdiction by a preponderance of the evidence." *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005). While a district court resolving a motion to dismiss under Rule 12(b)(1) "must take all uncontroverted facts in the complaint ... as true, and draw all reasonable inferences in favor of the party asserting jurisdiction," "where jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits," in which case "the party asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014) (internal quotation marks and alterations omitted); *Ernst v. Gateway Plaza Mgmt. Corp.*, No. 11-CV-1169, 2012 WL 1438347, at \*2 (S.D.N.Y. Mar. 14, 2012) ("In deciding jurisdictional issues, the court may rely on affidavits and other evidence outside the pleadings."), *report and recommendation adopted*, No. 11-CV-1169, 2012 WL 1438263 (S.D.N.Y. Apr. 25, 2012).

**B.** *Federal Rules of Civil Procedure 12(b)(6)*

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed, where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S.

Doe v. New York University, Not Reported in Fed. Supp. (2024)

at 558. Accordingly, a district court must accept as true all well-pleaded factual allegations in the complaint, and draw all inferences in the plaintiff's favor. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). However, that tenet "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.

### IV. Discussion

#### A. *Lack of Subject Matter Jurisdiction*

#### 1. Applicable Law

Article III of the Constitution limits federal-court jurisdiction to "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. The case-or-controversy requirement is enforced through several justiciability doctrines. Among them are the doctrines of ripeness and standing, which are "intended to ensure that the federal courts do not exceed their Constitutional grant of authority." *Benjamin v. Town of Islip*, No. 20-CV-56, 2021 WL 8344132, at *2 (E.D.N.Y. Aug. 12, 2021), *report and recommendation adopted*, No. 20-CV-56, 2022 WL 1090608 (E.D.N.Y. Apr. 12, 2022).

**\*4** To establish standing under Article III, (1) "the plaintiff must have suffered an injury in fact," i.e., "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical"; (2) "there must be a causal connection between the injury and the conduct complained of"; and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up).

Constitutional ripeness is best thought of as a "specific application of the actual injury aspect of Article III standing." *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 688 (2d Cir. 2013). "To say a plaintiff's claim is constitutionally unripe is to say the plaintiff's claimed injury, if any, is not 'actual or imminent,' but instead 'conjectural or hypothetical.' " *Mtume v. Sony Music Ent.*, No. 18-CV-11747, 2020 WL 832814, at *4 (S.D.N.Y. Feb. 20, 2020) (quoting *Nat'l Org. for Marriage*, 714 F.3d at 688). For that reason, where, as here, the first of standing's three elements is at issue, courts often address standing and constitutional ripeness challenges together. *See, e.g.*, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 n.5 (2014); *Nat'l Org. for Marriage*, 714 F.3d at 689 n.6; *N.Y. C.L.*

*Union v. Grandeau*, 528 F.3d 122, 130 n.8 (2d Cir. 2008); *SC Note Acquisitions, LLC v. Wells Fargo Bank, N.A.*, 934 F. Supp. 2d 516, 526 (E.D.N.Y. 2013), *aff'd*, 548 F. App'x 741 (2d Cir. 2014). I will use that approach here.

#### 2. Application

At this time, Doe's case "is riddled with contingencies and speculation that impede judicial review." *Trump v. New York*, 592 U.S. 125, 131 (2020). As an initial matter, the alleged discrimination has not yet occurred and will occur only if (1) Doe applies to the Law Review; (2) students (or, more specifically, women, non-Asian, homosexual, or transgender students) submit statements of interest or résumés that identify their sex, gender, race, or sexuality; (3) the Law Review editors unlawfully select students based on sex, gender, race, or sexuality; and (4) Doe fails to gain admission to the Law Review. Although Doe intends to apply for Law Review, (Compl. ¶ 17), considerable speculation undergirds Doe's belief that students will share their sex, race, gender identity, or sexual orientation in their applications, and that the Law Review editors will select students based on those characteristics. Doe has not alleged, for instance, that the editors overseeing the selection process have drafted the prompts for the statement of interest, or that the prompts will provoke students to discuss these specific characteristics.[6] (*Id.*, Ex. 1 at 2.) Nor has Doe alleged how the Law Review will collect such information from anonymized résumés, especially since that component of the application is entirely optional. (*Id.*) Even if I were to indulge Doe's belief that some students will reveal this information in their application, it is a speculative leap to conclude that the Law Review is flouting its own facially neutral policy for selecting new editors and instead impermissibly relying on the sex, gender, race, or sexuality of applicants. (*Id.* ¶ 15.) Any prediction regarding what information students may share with the Law Review or how that information may be used is therefore "no more than conjecture" at this time. *See Los Angeles v. Lyons*, 461 U.S. 95, 108 (1983).

**\*5** In maintaining that his allegations of harm are "certainly impending," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 & n.5 (2013), Doe points principally to two allegations in his Complaint: that the Law Review (1) "is using ... statements of interest and résumés to give preferential treatment to women, non-Asian racial minorities, homosexuals, and transgender people when selecting its members"; and (2) "intends to continue these unlawful and discriminatory practices until it is enjoined from doing so." (Compl. ¶ 15 (internal quotation marks omitted).) These allegations are speculative, devoid of any factual support,

Doe v. New York University, Not Reported in Fed. Supp. (2024)

and therefore fail to support Doe's argument. *See Menard v. CSX Transp., Inc.*, 698 F.3d 40, 45 (1st Cir. 2012) (disregarding "assertions nominally cast in factual terms but so general and conclusory as to amount merely to an assertion that unspecified facts exist to conform to the legal blueprint"). The Complaint does not plead, in other than a conclusory way, how the Law Review is discriminating now or will discriminate in the future. Doe does not assert, for instance, the nature of the "preferential treatment" the Law Review is giving to women, non-Asian racial minorities, homosexuals, and transgender students. Nor does he allege which editors agreed to disregard the Law Review's announced policy. He also fails to provide any examples of discriminatory acts or statements by the Law Review or its editors. Similarly, Doe never explains the basis for his belief that the facially lawful selection policy is masking an otherwise unlawful selection process. Such an utter lack of specificity is insufficient to confer Doe with standing to bring this suit. *See Baur v. Veneman*, 352 F.3d 625, 636–37 (2d Cir. 2003) ("[A] plaintiff cannot rely solely on conclusory allegations of injury or ask the court to draw unwarranted inferences in order to find standing.").

To be sure, Doe has alleged how the Law Review may come to learn information about the sex, race, gender identity, or sexual orientation of applicants during the editor-selection process. Indeed, the Law Review invites students to submit statements of interest and résumés, (Compl., Ex. 1 at 2), either one of which can be used to highlight one's personal characteristics. However, the fact that the Law Review may ultimately learn an applicant's sex, race, gender identity, or sexual orientation does not suggest that it will turn around and use that information unlawfully. Doe's claim of discrimination is based on nothing more than an assertion that such unlawful conduct is occurring, without explaining how he knows that to be true or alleging instances of past discrimination. Because something more than a bald assertion is required, *see Allen v. Credit Suisse Sec. (USA), LLC*, 895 F.3d 214, 222 (2d Cir. 2018) ("Bald assertions and conclusions of law will not suffice to avoid dismissal, nor will factual allegations that are wholly conclusory." (internal quotation marks, alterations, and citations omitted)), this purported injury cannot confer Doe with standing.

To ameliorate the deficiencies that infect his Complaint, Doe attempts to reframe the nature of his injury as the "deni[al] [of] an equal opportunity to compete for membership on the Law Review." (Compl. ¶ 19.) However, considering the lack of any well-pleaded allegations of a discriminatory selection process, this purported injury likewise rests on nothing more than speculation and conjecture. Moreover, the case on which Doe relies in support of this theory of standing— *Northeastern Florida Chapter of Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656 (1993)—is inapposite. (*Id.*) In *Jacksonville*, the Supreme Court recognized that "in the context of a challenge to a set-aside program, the 'injury in fact' is the inability to compete on an equal footing in the bidding process, not the loss of a contract." 508 U.S. at 666. To establish such an injury, however, there must be a "government-erected barrier," not one established by a private party. *See Comer v. Cisneros*, 37 F.3d 775, 793 (2d Cir. 1994) (applying *Jacksonville* and recognizing that the existence of a "government-erected barrier" is a necessary element for standing); *Roberts v. Bassett*, No. 22-622-CV, 2022 WL 16936210, at *2 (2d Cir. Nov. 15, 2022) (same); *Fac., Alumni, & Students Opposed to Racial Preferences v. N.Y. Univ. L. Rev. ("FASORP II")*, No. 18-CV-9184, 2020 WL 1529311, at *6 (S.D.N.Y. Mar. 31, 2020) (same), *aff'd*, 11 F.4th 68 (2d Cir. 2021). Because the allegedly discriminatory policies here were implemented by the Law Review, which is plainly not a governmental entity, Doe's reliance on *Jacksonville* is misplaced and cannot provide him with a basis for standing to maintain this case.

**B.** *Failure to State a Claim*

**1. Title VI and IX**

**\*6** Even assuming Doe had standing to bring this suit and his claims were ripe, I would still dismiss the Complaint for failure to state a claim under Title VI and IX. *See* 42 U.S.C. § 2000d ("No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."); 20 U.S.C. § 1681(a) ("No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."). "Congress modeled Title IX after Title VI of the Civil Rights Act of 1964, and passed Title IX with the explicit understanding that it would be interpreted as Title VI was." *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 258 (2009) (citation omitted).

As an initial matter, Doe's allegations that the Law Review's membership-selection process is inconsistent with Titles VI and IX are conclusory and undermined by the plain text of the facially neutral policy. Although Doe alleges that the Law Review "is using ... statements of interest and résumés to give preferential treatment to [select minority groups]" and "intends to continue" doing

Doe v. New York University, Not Reported in Fed. Supp. (2024)

so, (Compl. ¶ 15), he offers no factual allegations in support of that assertion, *see Kajoshaj v. N.Y.C. Dep't of Educ.*, 543 F. App'x 11, 14 (2d Cir. 2013) ("[N]aked allegation that [the plaintiffs] were treated differently from non-Muslim, non-Albanians cannot demonstrate a plausible entitlement to Title VI relief." (internal quotation marks omitted)); *Manolov v. Borough of Manhattan Comm. Coll.*, 952 F. Supp. 2d 522, 532–33 (S.D.N.Y. 2013) (dismissing Title VI and IX claims where complaint alleged that professors "intentionally treated all white males ... in an adverse manner" but failed to allege "any facts suggesting that he or other white males were treated differently than other students" (internal quotation marks and emphasis omitted)). It was incumbent upon Doe to include facts supporting his allegation that NYU is giving and intends to give preferential treatment to certain minority groups. *See FASORP II*, 2020 WL 1529311, at *7 ("FASORP fails to proffer any factual allegation describing the [NYU] Law Review's article-selection process other than alleging that the Law Review receives background information of the authors and asserting in a conclusory way that the process is discriminatory, which is fatal to its article selection claim."); *Fac., Alumni, & Students Opposed to Racial Preferences v. Harvard L. Rev. Ass'n*, No. 18-CV-12105, 2019 WL 3754023, at *9 (D. Mass. Aug. 8, 2019) ("The complete absence of 'factual material' ... is fatal to the plaintiffs' claim of discriminatory article selection.").

Although the Law Review considered sex, race, gender identity, or sexual orientation before the Supreme Court's decision in *SFFA*, nothing about this practice was unlawful. *See, e.g.*, *Fisher v. Univ. of Tex. at Austin*, 579 U.S. 365, 381 (2016) (holding that universities "may institute a race-conscious admissions program as a means of obtaining the educational benefits that flow from student body diversity" on campus (internal quotation marks omitted)); *Grutter v. Bollinger*, 539 U.S. 306, 338 (2003) (holding that law school could consider "a personal statement, letters of recommendation, and an essay describing the ways in which the applicant will contribute to the life and diversity of the Law School"). Indeed, in *FASORP II*, Judge Edgardo Ramos came to the same conclusion.[7] *See FASORP II*, 2020 WL 1529311, at *7 (concluding that the plaintiff failed to plausibly allege that the Law Review's "facially holistic [membership-selection] process ... [is an] unlawful quota or set-aside program"). Accordingly, the Law Review's lawful practices of the past do not and cannot give rise to a plausible inference of discrimination today. *See Doe v. Columbia Univ.*, 831 F.3d 46, 55 (2d Cir. 2016) (requiring enough facts to support a "minimal plausible inference"); *Handy-Clay v. City of Memphis*, 695 F.3d 531, 539 (6th Cir. 2012) ("We need not accept as true ... an unwarranted factual inference." (internal quotation marks omitted)).

**\*7** The Law Review's ongoing commitment to diversity does not alter my conclusion. As an initial matter, the revised selection policy does not identify a particular type of applicant diversity. (*See* Compl., Ex. 1 at 2 (describing the statement of interest as "an opportunity for applicants to provide the Selection Committee a more comprehensive view of who [they] are as an individual"); *id.* (explaining that the résumé can be "used to share personal and professional information that cannot be easily communicated through a personal statement").) Among the many aspects of diversity, several do not relate to any legally protected classification, such as life experience, political ideology, academic interests, and socioeconomic background. Considering the lack of any language in the selection policy demonstrating a preference for students of a protected class and the absence of any allegations supporting the inference that the selection policy would result in preferential treatment of such students, I cannot conclude that the Law Review's continued commitment to diversity gives rise to a plausible inference of unlawful conduct.

Finally, the Complaint does not plausibly allege any intentional discrimination by NYU. *See Alexander v. Sandoval*, 532 U.S. 275, 281 (2001) (Title VI); *Doe v. N.Y. Univ.*, 438 F. Supp. 3d 172, 181 (S.D.N.Y. 2020) (Title IX). To the contrary, the Complaint alleges that the Law Review is "operated by students" who both "select and edit the articles that the Law Review will publish" and "the students who serve as members and editors of the Law Review." (Compl. ¶ 5.) Doe does not allege that NYU plays any role in the day-to-day operations of the Law Review or the selection of its new members, let alone its actual knowledge of any covert plans by unidentified editors to give preferential treatment to select students in violation of federal law. Although Doe alleges that NYU is "allowing" the Law Review to discriminate, (*id.* ¶ 21), the Complaint lacks any allegations explaining how it is doing so. Accordingly, the Title VI and IX claims must be dismissed.

## 2. Section 1983

To state a claim under Section 1983, a plaintiff must allege (1) the violation of a right, privilege, or immunity secured by the Constitution or laws of the United States (2) by a person acting under the color of state law. *Annis v. County of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998). This second element "excludes from [Section 1983's] reach merely private conduct, no matter how discriminatory or wrongful." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S.

Doe v. New York University, Not Reported in Fed. Supp. (2024)

40, 50 (1999) (internal quotation marks omitted). A plaintiff may nonetheless maintain a Section 1983 claim against a private actor if the plaintiff sufficiently alleges that the private actor "is a willful participant in joint action with the State or its agents." *Dennis v. Sparks*, 449 U.S. 24, 27–28 (1980). Because the Complaint does not allege that NYU was a "willful participant in joint action with the State or its agents," *id.*, say, through a "plan, prearrangement, conspiracy, custom, or policy," *Forbes v. City of New York*, No. 05-CV-7331, 2008 WL 3539936, at *5 (S.D.N.Y. Aug. 12, 2008) (quoting *Ginsberg v. Healey Car & Truck Leasing, Inc.*, 189 F.3d 268, 272 (2d Cir. 1999)), NYU cannot be liable under Section 1983.[8]

## V. Conclusion

For these reasons, NYU's motion to dismiss is GRANTED without prejudice.[9] Doe's motion to certify the class is DENIED as moot. The Clerk of Court is respectfully directed to terminate the motions pending at Docs. 36 and 42 and close this case.

**\*8** SO ORDERED.

## All Citations

Not Reported in Fed. Supp., 2024 WL 2847368

## Footnotes

1   Although Doe purports to assert a claim under "any other law that might supply a cause of action for the requested relief," (Doc. 1 ("Complaint" or "Compl.") ¶ 26), this catch-all language is plainly inadequate to state a claim under Rule 8 in a counseled case, *see Cortez v. Stillwell Ready-Mix & Bldg. Materials, L.L.C.*, No. 20-CV-7775, 2022 WL 137465, at *2 (S.D.N.Y. Jan. 13, 2022) (concluding that pleading was "woefully inadequate" where it failed to "indicate the purported cause of action"). Therefore, this Opinion & Order addresses only those claims explicitly listed in the Complaint. (Compl. ¶ 26.)

2   The facts in this section are based upon the factual allegations set forth in the Complaint and the documents about "which plaintiffs had knowledge and relied on in bringing suit." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (internal quotation marks omitted). I assume the well-pleaded allegations in the Complaint to be true in considering the motion to dismiss pursuant to Rules 12(b)(1) and 12(b)(6). *See USAA Cas. Ins. v. Permanent Mission of Republic of Namib.*, 681 F.3d 103, 105 n.4 (2d Cir. 2012). My reference to these allegations should not be construed as a finding as to their veracity, and I make no such finding.

3   With respect to grades, the Law Review's website now states: "All interested students are strongly encouraged to apply regardless of GPA; there are no cutoffs, and grades are the least important factor in evaluating applicants." (Compl., Ex. 1 at 2.)

4   In the fall of 2023, there were 430 full-time first-year law students enrolled in NYU Law School. *See* Entering Class Profile and Statistics, NYU | Law, https://www.law_nyu.edu/jdadmissions/applicants/classprofile (last visited May 29, 2024). Of these 430 students, 55 will be invited to join the Law Review. (Compl., Ex. 1 at 2.)

5   Prior to filing this lawsuit, Doe filed a miscellaneous action in which Judge Victor Marrero, sitting as the Part I judge, granted his unopposed motion to proceed under a pseudonym. *See Doe v. N.Y. Univ.*, No. 23-MC-398 (S.D.N.Y. Nov. 21, 2023), Doc. 7. Because NYU has not asked me to address the legal basis for Plaintiff to proceed under a pseudonym, this Opinion & Order does not reach that issue.

6   On this score, I find it relevant that the Law Review's selection policy no longer references any specific form of diversity; it explains that the statement of interest offers students "an opportunity ... to provide the Selection Committee a more comprehensive view of who [they] are as ... individual[s]" and that the "résumés will be used by the Law Review to realize its commitment to staff diversity." (Compl., Ex. 1 at 2.)

7       Although Doe asserts that this practice was unlawful, (Doc. 48 at 18), he does not cite any cases to support this proposition, and, as noted above, such practices were lawful under then-existing Supreme Court precedent.

8       Doe's attempt to skirt Rule 15 by abandoning his Section 1983 claim in his opposition brief and instead asserting a new claim under 42 U.S.C. § 1981 is unavailing. (Doc. 48 at 22–23); *see Santana v. City of New York*, No. 15-CV-6715, 2018 WL 1633563, at *4 (S.D.N.Y. Mar. 29, 2018) (collecting cases where the court concluded that the plaintiff could not amend his complaint to add additional causes of actions in his opposition papers).

9       Although NYU urges me to dismiss the Complaint with prejudice because Doe "has been on notice of the defects in his conclusory pleading since the moment NYU first appeared in this case, if not before," (Doc. 43 at 22 (citation omitted)), I conclude that dismissal without prejudice is appropriate so that Doe can commence a new lawsuit should his claims ever ripen. My ruling that this dismissal is without prejudice should not be read as a finding that Doe's claims will ripen or that any future lawsuit will state a viable claim for relief, and I make no such finding.

**End of Document**                                                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Foster v. Michigan, 573 Fed.Appx. 377 (2014)

573 Fed.Appx. 377
This case was not selected for publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also U.S.Ct. of App. 6th Cir. Rule 32.1.
United States Court of Appeals, Sixth Circuit.

Bellandra FOSTER; BBF Engineering Services, PC, Plaintiffs–Appellants,
v.
State of MICHIGAN; Michigan Department of Transportation, Defendants,
and
Victor Judnic; Mark Steucher; Rick Snyder, Governor of the State of Michigan; Kirk T. Steudle, Director of the Michigan Department of Transportation, Defendants–Appellees.

No. 13–2209
|
July 16, 2014.

**Synopsis**
**Background:** African–American female owner of engineering consulting firm, which was both certified minority contractor and disadvantaged business enterprise (DBE), and firm brought § 1983 action against Governor of Michigan, Director of Michigan Department of Transportation (MDOT), and former MDOT project engineers, alleging that defendants discriminated against owner, based on her gender and race, by not awarding firm various consulting contracts, and also that defendants violated Michigan Whistleblowers' Protection Act (WPA). The United States District Court for the Eastern District of Michigan, 2012 WL 380282, granted in part and denied in part defendants' motion to dismiss and, 963 F.Supp.2d 735, granted defendants' motion for summary judgment. Plaintiffs appealed.

**Holdings:** The Court of Appeals, Bernice B. Donald, Circuit Judge, held that:

Title VI did not provide cause of action for gender-based discrimination;

plaintiffs did not plead any plausible Title VI claims for race-based discrimination, and even if they had they could not establish Title VI liability for MDOT or State of Michigan under theory of respondeat superior;

plaintiffs forfeited appellate review of their Title VI retaliation claims;

Title VI official-capacity claims against former MDOT project engineers were superfluous;

Eleventh Amendment barred § 1983 claims against State of Michigan and MDOT;

Governor and Director of MDOT were entitled to summary judgment on § 1983 claims against them in their official capacities seeking prospective injunctive relief;

§ 1983 equal protection-based claims against former MDOT project engineers failed, absent direct or circumstantial evidence of discrimination;

plaintiffs did not have due process-protected liberty or property interest; and

plaintiffs failed to establish prima facie case under WPA against former MDOT project engineers in their individual capacities, and Eleventh Amendment barred WPA claims against MDOT, State of Michigan, and former project engineers in their official capacities.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion to Dismiss; Motion for Summary Judgment.

**\*379** On Appeal from the United States District Court for the Eastern District of Michigan.

BEFORE: DAUGHTREY, McKEAGUE, and DONALD, Circuit Judges.

OPINION

BERNICE B. DONALD, Circuit Judge.

Bellandra Foster ("Foster") and her company BBF Engineering Services, PC ("BBF") (collectively "Appellants") brought myriad claims against a host of defendants, including Rick Snyder, in his official capacity as the Governor of Michigan; Kirk T. Steudle, in his official capacity as the Director of the Michigan Department of Transportation; and two former Michigan Department of Transportation ("MDOT") employees, Victor Judnic and **\*380** Mark Stuecher[1] (collectively "Appellees"). These claims generally revolve around the theory that certain MDOT employees discriminated against Foster and BBF because she is a black woman and then further retaliated against her when she sought to report their discrimination. On motions from the Appellees, the district court either dismissed or granted summary judgment on all of Appellants' claims. In jumbled filings so replete with errors that they border on being incomprehensible, Foster and BBF now appeal, arguing that the district court should not have granted any of Appellees' dispositive motions and seeking to revive all of their claims. For the following reasons, we **AFFIRM** the district court.

*FACTS*

### I. Background

BBF is a consulting firm that provides professional engineering services to clients including MDOT. BBF is certified as a Disadvantaged Business Enterprise ("DBE"),[2] and in 2008, BBF was MDOT's DBE Contractor of the Year. At its largest, BBF once employed seventeen full- and part-time employees. Bellandra Foster is BBF's president and sole shareholder. According to Foster, BBF began performing contract work for MDOT in 1997.

Rick Snyder is Michigan's Governor, and Kirk Steudle is MDOT's director. Both Victor Judnic and Mark Stuecher are former MDOT project engineers. Judnic was a project engineer at the Detroit Transportation Service Center ("TSC") from 2003 until March 2011, when he left MDOT to work in the private sector. From April 2007 until his departure, Judnic was the senior delivery engineer at the Detroit TSC. Stuecher worked for MDOT from 1984 until he moved to a private construction company in December 2010; from 1990 until his departure, he worked as a resident engineer.

MDOT awards construction contracts through a competitive bidding process, taking price into account. MDOT also contracts with professional engineering firms and consultants, who provide engineering services such as testing, inspection, and project oversight. MDOT selects its engineering consultants pursuant to the Brooks Act, 40 U.S.C. § 1101, and picks based on quality, not price. *See generally* 23 U.S.C. § 112(b)(2)(A). To that end, MDOT circulates a "Selection Guidelines for Service Contracts." To advertise the relevant details and planned scope of proposed contracts, MDOT publishes Requests for Proposals ("RFPs"). Interested firms must submit proposals outlining their qualifications, their personnel, and pertinent information regarding their proposed subconsultants.

When the value of a service contract exceeds $25,000, MDOT uses a selection team to evaluate proposals. The selection team assigns scores to each proposal based on a scoring worksheet, then tallies the scores and forwards them to the Central Selection Review Team in Lansing for final approval. The project manager will then request a "priced proposal" from the highest-scoring firm and start negotiating costs. If these negotiations fall through, **\*381** MDOT will then turn to the firm with the next-highest rating. Once MDOT and the consultant reach an agreement, they enter into a contract for the project. *See generally* 40 U.S.C. §§ 1103(c)–(d), 1104(b). Foster claims that in this process the project engineer "has basically the ultimate power" because, according to her, the project engineer helps draft the RFP and largely picks the selection team. She further alleges that the project engineers often decide on the companies with whom they want to work even before the selection committee meets.

### II. Facts Related to the Allegations Against Judnic

Sometime around 2006, Judnic's secretary, Marilyn Caldwell, heard Judnic say "no woman should be making that kind of money." Caldwell does not recall any details regarding when Judnic made this statement or what she was doing when she heard it. Further, she cannot "say one-hundred percent that it was directed at BBF or at someone else." Caldwell testified that this statement pertained exclusively to sex—not race—and that she cannot recall Judnic ever again making such a statement or any similar statements related to a person's nationality. Although Caldwell explained that she eventually told Foster about this statement, she cannot remember whether she told Foster immediately or even that same year. According to Appellants' theory of the case, this statement clearly

referred to Foster—because BBF is one of the few, if not the only, engineering consulting firm owned by a minority woman—and is the smoking gun that reveals Judnic's race- and sex-based motivation for systematically trying to force BBF out of business.

In 2006, Judnic served as the project manager on an advertised as-needed $4.2 million project, Contract 2006–0490, for which BBF was the highest-scoring consultant. Before contract negotiations moved into the priced-proposal phase, and thus before the contract was actually awarded, Judnic's superiors instructed him to reduce the scope of the proposed work. A $2 million portion of the original project, M–10, was broken off and advertised under a new, separate RFP for which BBF did not submit a proposal. On September 25, 2006, MDOT, through Judnic, awarded the reduced-scope version of Contract 2006–0490, now a roughly $2.2 million project, to BBF. Although Judnic told Foster that the decision to cut the contract came from Lansing, Appellants argue that this reduced contract evinces Judnic's discriminatory intent because no other companies had their contracts cut.

In the evaluation for its work on Contract 2006–0490, BBF received two scores of "7" on a ten-point scale based on a lack of communication and project file deficiencies. Foster believes these scores were based on the performance of Love Charles, a long-time BBF employee who worked as an office-technician on the project. Affidavits in the record from several MDOT employees document the issues with Charles's work. In a later meeting on July 18, 2008, Judnic and another MDOT employee, Jason Voigt, met with Foster to discuss BBF's performance on Contract 2006–0490. They also specifically discussed Charles's performance. Appellants nonetheless allege that BBF undeservedly received these negative evaluations and that these evaluations are indicative of discrimination.

Charles acknowledges that Judnic's team had issues with his not logging his calls and failing to keep files up-to-date, but he counters that Judnic treated him like a child. Charles contends that his level of experience was a boon to BBF when it was submitting RFPs; indeed, he **\*382** told Foster that BBF would be "done" without the added benefits of his experience during the RFP process. Foster testified that she and Charles had spoken about his retirement in late 2007 or early 2008 and that he had informed her of his plans to retire "shortly after" the July 2008 meeting. On October 1, 2008, Foster emailed Judnic notifying him that Charles would retire on December 17, 2008. Charles contends that his retirement was a result of his being forced out of his job by MDOT employees, particularly Judnic, in an attempt to undercut BBF.

In October 2007, MDOT selected BBF for another as-

needed contract at the Detroit TSC, Contract 2008–0044, which was to be managed by Jason Voigt. Voigt contacted Foster to explain that MDOT would be reducing the contract duration from two years to one year. After Foster spoke to Voigt's supervisor, Myron Frierson, however, the contract's duration remained at two years. MDOT awarded BBF the contract on December 11, 2007, and Voigt negotiated the contract's priced proposal with BBF. Although Judnic was neither the original project engineer nor involved in the discussions about reducing the contract's duration, Appellants contend that Judnic somehow played a part in trying to have the contract's scope reduced.

Before the end of Contract 2008–0044, Voigt left MDOT. In his stead, Judnic—with assistance from another MDOT employee, Steve Griffith—assumed the role of project manager. Because she was displeased with the evaluation of her last contract, Foster requested monthly meetings with Judnic to discuss the progress on this contract. Judnic cannot recall holding such monthly meetings with any other consultant, and Foster was unaware of Judnic's regularly meeting with any other consultant. Regardless, because of his workload, Judnic assigned Griffith to attend the meetings and apprise him of any substantial issues that arose. Foster claims that Judnic simply refused to meet with her, that there must be some reason for this refusal, and that—although she has no evidence to substantiate her suspicion—she believes Judnic's refusal was motivated by her race or gender.

Appellants also contend that Judnic discriminatorily prevented Foster from billing in her capacity as a principal officer for Contracts 2006–0490 and 2008–0044. Although this policy was later changed, at the time of those two contracts, MDOT did not permit a consulting firm's principal officer to bill directly to a project. Based on the policy then in effect, the RFPs for 2006–0490 and 2008–0044 provided that principals and officers were considered an overhead expense and were not to be included in the budgeted hours. Indeed, pursuant to the old policy, BBF's proposal for each of these projects listed Foster in a non-billable position with zero projected billable hours.

Appellants further claim that they suffered at Judnic's hand because Foster had to file a Freedom of Information Act ("FOIA") request to get the subconsultant evaluations for a project on which BBF was the prime consultant. Foster contends that she had received these evaluations in the past without needing to request them. Foster argues that her needing to file FOIA requests was a symptom of Judnic's discrimination against her, but she admits that she has no evidence that Judnic refused to provide the subconsultant scores because of either her race or gender.

Foster v. Michigan, 573 Fed.Appx. 377 (2014)

In November 2009, MDOT selected BBF for Contract 2008–0064, for which Tia Klein served as the project manager. Klein requested that one of BBF's employees, Ray Stewart, take a refresher officer-technician training class before working on **\*383** the contract. Although Stewart normally would not have been required to take the class, Klein explained that she made this request for two reasons: (1) the federal government would be reviewing the project records more closely than usual because the contract used American Recovery and Reinvestment Act ("ARRA") funds; and (2) her review of Stewart's work on another project indicated some deficiencies. Klein and Rita Screws, the Detroit TSC Manager and Judnic's supervisor, were the only two MDOT employees involved in the decision to require additional training for Stewart. Nonetheless, because Judnic was Klein's supervisor, Appellants contend this extra training requirement was a part of Judnic's pattern of discrimination against Foster and BBF.

Appellants also allege that Judnic discriminatorily prevented BBF from being paid as a subconsultant. In 2010, BBF was working as a subconsultant for another consulting firm, URS, on the Gateway Project, for which Judnic was the project manager. BBF was not being paid for the services it rendered, and when Foster explored why, she learned that URS had not been submitting BBF's invoices. In their amended complaint and in their responses to Appellees' motions below, Appellants contended that Judnic discriminatorily played a role in BBF's not being paid because, as the project manager, he reviewed all the invoices that were submitted and he did not question URS about the absence of BBF's invoices. Now, although it is not clear based on their filings, Appellants seem to contend that Judnic received BBF's invoices and discriminated against Foster by refusing to approve them. Regardless, BBF eventually received full payment for the services it rendered after Judnic and Cedric Dargin, another MDOT engineer, investigated the issue.

In an attempt to reduce vehicle costs, Judnic—with the approval of MDOT and the Office of Commission Audit—introduced a pilot requirement to a 2010 RFP that required the consultant to have a fleet of five leased vehicles. This requirement involved pass-through leases for the vehicles with MDOT ultimately reimbursing the expenses. Any consultant who was interested in the contract had the opportunity to review the requirement and decide whether to submit a proposal for the contract. Because the program received overwhelmingly negative feedback, MDOT did not include the requirement on future projects. Appellants contend that Judnic designed this requirement in an attempt to ensure that contracts only went to large, majority-white engineering consulting firms and to discriminate against BBF specifically because he knew that the company would

not be able to lease the necessary vehicles. Appellants underscore this claim by pointing out that Judnic began working for HNTB, the company that was ultimately awarded the contract, after he left MDOT and that Judnic drives a company vehicle.

On June 15, 2010, Foster sent a letter to Tony Kratofil of MDOT regarding Contract 2008–0044. In this letter, Foster expressed concern about MDOT's proposal and evaluation process, particularly in light of the fact that MDOT had rated BBF "the lowest of the entire as-needed services team on two consecutive contracts with the same project manager." Foster explained that she was especially disturbed because she had requested meetings regarding Contract 2008–0044 and had never been told that the management had any major issues. She was concerned because these low scores would influence her future ability to secure work.

### III. Facts Related to the Allegations Against Stuecher

In 2009, BBF submitted a proposal in response to an RFP for an ARRA-funded **\*384** project from the Oakland TSC. Because it was an ARRA project, the proposals underwent a modified selection process. First, they went to a selection team, comprised of Stuecher, who served as the project manager, and three other MDOT engineers—Cedric Dargin, Mark Koskinen, and Sean Kerley. The panel would identify the three highest-scoring firms and then move those firms forward for a second round of evaluation. Near the beginning of the selection meeting, Stuecher temporarily left the room. The meeting's attendees differ on the details of what happened next.

According to Dargin, while Stuecher was gone, the panel fully scored all of the proposals, and BBF received the highest score. Dargin claims that when Stuecher returned and saw BBF's score he said, "Oh no, I hate her," and then "unilaterally" reduced BBF's score to prevent BBF from advancing in the selection process. Even after this alleged unilateral change, Dargin nonetheless signed all of the score sheets.

Stuecher claims that he told the other panel members to start reviewing the proposals in his absence with the understanding that the panel would not commence officially scoring until he returned. He testified that when he returned to the selection meeting, the work was partially done and there were some "scratched out numbers" but that the panel then evaluated the proposals for close to another hour. Stuecher claims they completed the score sheets after the panel reached a consensus regarding each proposal.

Stuecher does not remember ever saying, "Oh no, I hate her."

Koskinen's recollection is consistent with Stuecher's. Koskinen remembers the rest of the panel reviewing the proposals after Stuecher left and the entire panel then engaging in discussion after Stuecher returned. Koskinen understood that each panel member's signature on the score sheets indicated that the full panel reached a consensus score.

At the end of this process, BBF was not one of the three highest-scoring firms and therefore did not advance to the next round of consideration. Appellants argue that Stuecher had no basis for personal animus against Foster because Stuecher did not know Foster. From this conclusion, Appellants extrapolate that Stuecher's alleged comment and reduction of BBF's score must have been the result of race- or sex-based discrimination.

### IV. The Federal Highway Administration Investigation

In July 2010, BBF submitted a number of complaints to the Federal Highway Administration ("FHWA") claiming that MDOT's administration and contract procedures were discriminatory and retaliatory; BBF filed two additional complaints in February 2011. After investigating, the FHWA sent MDOT a "Report of Inquiry" dated October 18, 2011. The initial Executive Summary of the FHWA's report explains that the agency applied a preponderance of the evidence standard, which it defined as "just enough evidence to make it more likely than not that the fact the claimant seeks to prove is true." The report then summarizes:

In this inquiry, the preponderance of the evidence showed that an MDOT employee willfully removed BBF Engineering Services P.C. from the top place of a consulting construction award so that Ms. Foster's firm would not be considered.

In addition the evidence shows that based on Ms. Foster's sex (gender) (female) an MDOT employee sent forward her contract to Lansing to have funds removed from it. This resulted in her **385** as-needed service contract being cut in half.

These facts have raised questions in the way service/consulting contracts are awarded at MDOT and the "power" that Project Engineers have in those selections and awards.

It is our belief that MDOT should set up a process improvement team aimed at strengthening MDOT's monitoring of the consulting/service contract award process.

It is our belief that MDOT should meet with Ms. Foster in regards to these issues and reaching a settlement agreement that would be acceptable to both parties.

The report goes on to provide more detailed results of the FHWA's inquiry. It first furnishes the results of investigator Cheryl Hudson's interview with Caldwell, Judnic's former secretary. The report states that, according to Caldwell, Judnic was referring to Foster when he said, "No woman should be making money like that," and that Caldwell did not recall if Judnic said "no Black woman." In her deposition, however, Caldwell explained "that's not how the story goes," that she did not know to whom Judnic had directed his statement, and that she did not think that Judnic made any mention of race or national origin.

The report then notes that, in June 2006, Judnic notified BBF that MDOT was cutting Contract 2006–0940 in half and "rebidding" the M–10 portion of the contract. The report stated that MDOT told Mary Finch, an FHWA investigator, that a committee in Lansing made the decision to "unbundle" larger contracts so that MDOT could create a "viable consultant industry." Finch interviewed Judnic, who, according to the report, told her that, "Lansing wants to provide more opportunities for diverse small consultants[.]" Finch documented her asking Judnic whether he had considered that BBF was a DBE and Judnic's responding that he had not. The report further records MDOT awarded the rebid M–10 portion of the contract to Fishbeck, which at the time was the third-largest consultant doing business with MDOT.

From the investigation, the FHWA concluded that the "preponderance of the evidence" indicated that Judnic "appear[ed] to have taken actions based on Ms. Foster sex (gender) (female)." The FHWA saw a connection between Judnic's stating "[n]o woman should make that amount of money," and his later acting in a way that "suggest[ed]" that BBF's contracts "go forward as contracts that could be cut." The FHWA also concluded that the MDOT offices in Lansing were sending mixed messages about what it wanted to accomplish by re-advertising parts of contracts. The FHWA stated that Judnic "thought he was supposed to be obtaining more diversity in his contracting opportunities and he cho[se] to break out [of] a contract that was already awarded to a DBE," and "[t]he result was that a large white[-] owned firm was awarded the second half of the contract." Judnic, for his part, complained that Finch's questions were vague, that she refused to provide any context or clarification for her questions, and that the

FHWA report bolstered its conclusions using only portions of quotations and quotations taken out of context.

Stuecher was not interviewed during the FHWA investigation. The report nonetheless concludes that "MDOT (Mr. Mark Stuecher) willfully changed the scores on the sheet to remove BBF Engineering from the top three ... It is unclear as to motive." The FHWA requested that MDOT "form a process improvement team aimed at strengthening MDOT's monitoring **386** of the consulting/service contract award process."

### V. MDOT's Audit

During the course of the ensuing litigation, MDOT conducted an audit of BBF. Appellants contend that this audit is retaliation for their filing suit and that the auditing department's exclusive motive was for MDOT to be able to conclude that Appellants were making too much money. MDOT, however, explains that the Office of Commission Audit had planned to audit BBF as a part of its annual audit plan as far back as October 2009, well before Appellants filed suit.

### PROCEDURAL HISTORY

Appellants filed their initial complaint in the United States District Court for the Eastern District of Michigan on November 3, 2011—less than a month after the FHWA issued its October 18, 2011 report. In this complaint, Appellants alleged that Judnic, Stuecher, the State of Michigan, and MDOT had discriminated and retaliated against them in violation of Title VI, 42 U.S.C. § 2000d; 42 U.S.C. §§ 1981 and 1983; and Michigan's Whistleblower Protection Act ("WPA"), Mich. Comp. Laws § 15.362.

All of the defendants filed Fed.R.Civ.P. 12(b)(6) motions to dismiss for failure to state a claim. The district court granted the State of Michigan's and MDOT's motions to dismiss in full, finding that Title VI did not extend to gender discrimination, that BBF had not stated plausible claims of race-based discrimination or retaliation under Title VI, and that Eleventh Amendment immunity precluded the remainder of the claims against them. The district court likewise dismissed the individual-capacity Title VI claims against Judnic and Stuecher because individuals cannot be held liable under Title VI. The district court rejected Appellants' argument for equitable

tolling and concluded that a three-year statute of limitations applied to Appellants' federal claims. Finally, the district court also dismissed the various official-capacity claims against Judnic and Stuecher because either the defendants were immune or the claims were redundant and duplicative. After dismissal of these claims, the only claims that remained were the individual capacity § 1983 and WPA claims against Judnic and Stuecher.

Appellants later moved to amend their complaint to include additional § 1983 claims and to renew their Title VI claims against Michigan and MDOT. The district court granted this motion in part. The district court found that Appellants' new proposed due process claims were futile and denied reinstatement of the Title VI claims. This district court did, however, allow Appellants to add a § 1983 race-discrimination claim under the Fourteenth Amendment's Equal Protection Clause. On reconsideration, the district court again dismissed the equal protection claims against the State of Michigan and MDOT on the grounds of immunity. Instead of those claims, the district court permitted Appellants to sue Governor Rick Snyder and MDOT Director Kirk Steudle in their official capacities for prospective injunctive relief under § 1983. The record indicates, however, that BBF never served either of these new parties with a complaint or summons.

After discovery, the remaining defendants moved for summary judgment. The district court granted this motion, holding that Appellants lacked evidence that BBF was treated differently from similarly situated consulting firms. The district court dismissed the official-capacity claims for prospective relief because Appellants' constitutional rights were not violated and **387** found four separate bases for dismissing the WPA claims. This appeal ensued.

### ANALYSIS

Distilling their arguments down to a more manageable form, Appellants essentially contend that the district court reversibly erred in a six ways: (1) by dismissing their Title VI claims because they did not plausibly state an allegation of race-based discrimination and because Title VI does not apply to gender discrimination or vicarious liability claims; (2) by finding that MDOT and the State of Michigan were entitled to Eleventh Amendment Immunity from Appellants' § 1983 claims; (3) by granting summary judgment to Snyder and Steudle, in their official capacities, because Appellants failed to produce evidence of an ongoing violation such that prospective injunctive relief would be appropriate; (4) by granting summary judgment on Appellants' § 1983 equal protection claims against

Judnic and Stuecher individually because Appellants failed to present facts indicating that Judnic or Stuecher had treated any similarly situated firms differently from BBF; (5) by granting summary judgment to Judnic and Stuecher on Appellants' WPA claims; and (6) by denying Appellants' motion to amend their complaint to add a due process claim as futile because they failed to identify a constitutionally protected liberty or property interest.

We review all of these claims de novo. *See, e.g., Back v. Nestlé USA, Inc.,* 694 F.3d 571, 575 (6th Cir.2012) (stating that we review a district court's grant of summary judgment de novo); *Scott v. Ambani,* 577 F.3d 642, 646 (6th Cir.2009) (noting that we review a district court's dismissal de novo); *Inge v. Rock Fin. Corp.,* 281 F.3d 613, 625 (6th Cir.2002) (explaining that we typically review the denial of a motion to amend for abuse of discretion but that we review de novo a denial on the basis of futility).

### I. Title VI Claims

Appellants contend that the district court erroneously dismissed their sex- and race-based discrimination and retaliation claims under Title VI. To survive a Fed.R.Civ.P. 12(b)(6) motion to dismiss, a claim's "factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the allegations in the complaint are true." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (internal citations and emphasis omitted). This assumption that all the complaint's allegations are true does not, however, apply to legal conclusions or to legal conclusions cloaked as fact. *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Further still, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show [n]'—'that the pleader is entitled to relief.' " *Id.* at 679, 129 S.Ct. 1937 (quoting Fed.R.Civ.P. 8(a)(2)).

#### A. *Gender-based Discrimination under Title VI*

Title VI of the Civil Rights Act of 1964 states: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. As a matter of plain language, Title VI does not address discrimination on the basis of sex or gender. *See id.* "[W]hen the statutory **\*388** language is plain, we must enforce it according to its terms." *Jimenez v. Quarterman,* 555 U.S. 113, 118, 129 S.Ct. 681, 172 L.Ed.2d 475 (2009).

Because it does not say anything about sex or gender, the text of 42 U.S.C. § 2000d itself compels us to conclude that Title VI does not provide a cause of action for gender discrimination. Two of our sister circuits have reached the same conclusion. *See, e.g., Shannon v. Lardizzone,* 334 F. App'x 506, 507 n. 1 (3d Cir.2009); *Davis v. Monroe Cnty. Bd. of Educ.,* 120 F.3d 1390, 1396 (11th Cir.1997), *rev'd on other grounds,* 526 U.S. 629, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999). Moreover, dicta from Supreme Court cases contrasting Title VI with Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681, suggests that Title VI is not applicable to gender discrimination. *See Alexander v. Sandoval,* 532 U.S. 275, 297, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001) (referring to Title IX, which addresses gender discrimination in educational settings, as Title VI's "gender-based twin"); *Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, 286, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998) (stating Title VI is "parallel to Title IX except that it prohibits race discrimination, not sex discrimination"); *N. Haven Bd. of Educ. v. Bell,* 456 U.S. 512, 523 n. 13, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982) (noting that there had been proposed legislation to "extend[ ] the prohibitions of Title VI ... to discrimination based on gender ..." but that this proposal "never emerged [from] the committee").

In the face of this plain language, persuasive authority from our sister circuits, and confirming dicta from the Supreme Court, BBF attempts to read 23 U.S.C. § 324—a wholly separate statute that addresses gender discrimination in federally funded contracts—in a manner that extends Title VI's coverage to prohibit discrimination based on gender, as well as presumably disability, age, and religion. This reading is unpersuasive because nothing in the text of 23 U.S.C. § 324 suggests that it affects the coverage of Title VI. Further, Appellants cite no, and indeed we have not found any, authority supporting this expansive reading of § 324. Appellants also argue that 42 U.S.C. § 2000d–7 provides a cause of action for a gender-based Title VI claim. Again, this argument is unpersuasive. That statute indicates that Congress intended to abrogate states' sovereign immunity and to provide remedies under Title VI, among other civil-rights statutes. *See Alexander,* 532 U.S. at 280, 121 S.Ct. 1511. Section 2000d–7, however, does not affect the substance of Title VI. Because Title VI only applies to discrimination on the basis of race, color, or national origin, the district court properly dismissed

Foster v. Michigan, 573 Fed.Appx. 377 (2014)

Appellants' gender-based Title VI claims.

B. *Race-based Discrimination under Title VI*
Title VI targets intentional discrimination only. *Alexander,* 532 U.S. at 280, 121 S.Ct. 1511. Appellants, however, fail to plead any plausible claims of intentional discrimination. Rather, Appellants' Title VI race-discrimination claims consist of nothing more than legal conclusions such as "Plaintiffs have been denied participation based upon race, color, national origin, and gender." These conclusory allegations of race discrimination are insufficient. "[A] complaint that includes conclusory allegations of discriminatory intent without additional supporting details does not sufficiently show that the pleader is entitled to relief." *Nali v. Ekman,* 355 Fed.Appx. 909, 913 (6th Cir.2009); *see also Iqbal,* 556 U.S. at 680, 129 S.Ct. 1937. Similarly, the Appellants' allegations that Foster belongs to a suspect class and that **389** BBF is owned by a member of a suspect class—while true—do not state a claim of racially motivated discrimination. *See Rondigo, L.L.C. v. Twp. of Richmond,* 641 F.3d 673, 680–81 (6th Cir.2011); *accord Ashcroft,* 556 U.S. at 680, 129 S.Ct. 1937.

Even if Appellants had managed to articulate a plausible claim based on the actions of Judnic or Stuecher, which they have not, Appellants likely would not be able to establish Title VI liability for MDOT or the State of Michigan under a theory of respondeat superior. In *Gebser v. Lago Vista Independent School District,* 524 U.S. 274, 290–91, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998), the Supreme Court held that vicarious liability was not available under Title IX and that a supervisory entity must have had knowledge of and been deliberately indifferent to an employee's discriminatory actions. The *Gebser* court reasoned that Title IX was a conditional statute rather than a prohibitory statute, so primary enforcement rested within the jurisdiction of the funding agency. *Id.* at 286–88, 118 S.Ct. 1989. Title VI contains a similar administrative enforcement provision. *Compare* 20 U.S.C. § 1682 *with* 42 U.S.C. § 2000d–1. Beyond this similar language, the *Gebser* court recognized that Title VI and Title IX "operate in the same manner." 524 U.S. at 286, 118 S.Ct. 1989. Accordingly, *Gebser*'s interpretation that there is no vicariously liability under Title IX supports the notion that there is no vicarious liability under Title VI. *See Zeno v. Pine Plains Cent. Sch. Dist.,* 702 F.3d 655, 665 n. 10 (2d Cir.2012).

Appellant's complaint does not contain any fact-based allegations that either MDOT or the State of Michigan participated in, was aware of, or was deliberately indifferent to any discriminatory acts. Because the complaint fails to offer any plausible race-based Title VI claims, the district court properly dismissed them. *See Iqbal,* 556 U.S. at 680, 129 S.Ct. 1937 (citing *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955).

C. *Title VI Retaliation*
The district court reasoned it was implausible that Appellants' filing Title VI complaints was causally related to BBF's struggling to secure contracts given that BBF's difficulties preceded its complaints by several years, and as such, the district court dismissed Appellants' Title VI retaliation claims. Appellants argue that we may infer that any action after the date of the complaints to the FHWA was retaliatory. Appellants, however, fail to offer any allegations in the original complaint to support a retaliation claim. Instead, they recite the law without any application to the facts and then demand reversal. We are well within our rights to determine that Appellants forfeited appellate review of their retaliation claims by only giving this issue a cursory acknowledgment. *E.g., Williamson v. Recovery Ltd. P'ship,* 731 F.3d 608, 621 (6th Cir.2013) ("Issues adverted to in a perfunctory manner, without some effort to develop an argument, are deemed forfeited").[3]

D. *Official–Capacity Claims Under Title VI*
A plaintiff may only assert Title VI claims against "the entity ... receiving the **390** financial assistance." *Buchanan v. City of Bolivar, Tenn.,* 99 F.3d 1352, 1361 (6th Cir.1996); *see also Shannon,* 334 Fed.Appx. at 508. On appeal, Appellants challenge the dismissal of the official-capacity suits against Judnic and Stuecher. Official-capacity claims are "in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham,* 473 U.S. 159, 165, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). Where the entity is named as a defendant, an official-capacity claim is redundant. *E.g., Faith Baptist Church v. Waterford Twp.,* 522 Fed.Appx. 322, 327 (6th Cir.2013) ("Having sued ... the entity for which [plaintiff] was an agent, the suit against [plaintiff] in his official capacity was superfluous."). Here, because Appellants named MDOT and the State of Michigan as defendants, their official-capacity suits against Judnic and Stuecher are superfluous. Because the Title VI claims against the State and MDOT fail, Appellants' official-capacity claims against Judnic and Stuecher necessarily also fail. *See Jackson v. Wilkins,* 517 Fed.Appx. 311, 321 (6th Cir.2013);

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Foster v. Michigan, 573 Fed.Appx. 377 (2014)

*Chesher v. Neyer,* 477 F.3d 784, 797 (6th Cir.2007).

## II. 42 U.S.C. § 1983 Claims

42 U.S.C. § 1983 provides a civil cause of action for plaintiffs who have been deprived of rights:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.... Injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable....

Appellants brought claims under § 1983—as well as 42 U.S.C. § 1981—against Judnic and Stuecher, both in their official capacities and individually; the State of Michigan; MDOT; and eventually Snyder, in his official capacity as Governor, and Steudle, in his official capacity as the director of MDOT, all of which were resolved in favor of the Appellees either on motions to dismiss or motions for summary judgment. On appeal, Appellants attempt to revive all of these claims.

Although Appellants did not bring a claim under a mixed motive theory below, they now contend that "at best, this is a mixed motive case." We decline to consider this argument. "Plaintiffs must give proper notice when bringing mixed-motive claims." *Spees v. James Marine, Inc.,* 617 F.3d 380, 390 (6th Cir.2010). Because Appellants did not give proper notice or make a mixed-motive argument below, they have forfeited this theory on appeal. *See, e.g., Blackshear v. Interstate Brands Corp.,* 495 Fed.Appx. 613, 617 (6th Cir.2010); *Hashem–Younes v. Danou Enters., Inc.,* 311 Fed.Appx. 777, 779 (6th Cir.2009).

After seemingly casting BBF as in a "class of one" in their opening brief, Appellants now deny characterizing themselves as a "class of one." Accordingly, the question that remains before us is whether Appellants raise a genuine **\*391** issue of material fact indicating that any of the Appellees intentionally discriminated against them on the basis on race or gender in violation of the Equal Protection Clause of the Fourteenth Amendment. *E.g. Horner v. Ky. High Sch. Athletic Ass'n,* 43 F.3d 265, 267 (6th Cir.1994) ( "The Equal Protection Clause forbids only intentional discrimination.").

"The Equal Protection Clause prohibits discrimination by government which either burdens a fundamental right, targets a suspect class, or intentionally treats one differently than others similarly situated without any rational basis for the difference." *Rondigo, L.L.C. v. Township of Richmond,* 641 F.3d 673, 681 (6th Cir.2011) (citations omitted). "[T]o establish an equal protection violation against a public employer in a section 1983 action, a plaintiff must show that the employer made an adverse employment decision 'with a discriminatory intent and purpose.' " *Boger v. Wayne Cnty.,* 950 F.2d 316, 324–25 (6th Cir.1991) (quoting *Charles v. Baesler,* 910 F.2d 1349, 1356–57 (6th Cir.1990)). A plaintiff in a § 1983 equal protection case must demonstrate that the adverse employment decision would not have occurred but for her protected status. *Id.* at 325. A plaintiff "must do more than just introduce evidence of discriminatory intent and suggest that 'such intent could have played a role in an adverse employment decision....' " *Id.* (quoting *Gutzwiller v. Fenik,* 860 F.2d 1317, 1325 (6th Cir.1988)). As a black woman, Foster is a member of a protected class for both race and gender. *See Oliver v. St. Luke's Dialysis LLC,* 491 Fed.Appx. 586, 587 (6th Cir.2012) (citations omitted). At this stage, she must point to evidence that Appellees took adverse actions against her because she was a member of a protected class.

### A. *Section 1983 Claims against the State of Michigan and MDOT*

The district court dismissed Appellants' § 1983 claims against the State and MDOT on the basis of the Supreme Court's holding in *Will v. Michigan Department of State Police,* 491 U.S. 58, 67, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989), that the Eleventh Amendment bars suits against states and state agencies unless a state has waived its immunity or consented to being sued in federal court. Appellants contend that the district court erred in dismissing their § 1983 claims, as well as their attempted direct constitutional claims, against these entities.

To the extent that Appellants attempt to assert direct constitutional claims, they fail; we have long held that § 1983 provides the exclusive remedy for constitutional violations. *Thomas v. Shipka,* 818 F.2d 496, 503 (6th Cir.1987), *vacated on other grounds,* 488 U.S. 1036, 109 S.Ct. 859, 102 L.Ed.2d 984 (1989); *accord Azul–Pacifico, Inc. v. City of Los Angeles,* 973 F.2d 704, 705 (9th Cir.1992) ("[A] litigant complaining of a constitutional right must utilize 42 U.S.C. § 1983."). Appellants' § 1983 claims likewise fail. Section 1983 did not abrogate the

Foster v. Michigan, 573 Fed.Appx. 377 (2014)

sovereign immunity of either the State of Michigan or MDOT. *Quern v. Jordan,* 440 U.S. 332, 345, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979). Furthermore, neither the State nor MDOT qualify as "persons" under § 1983. *Will,* 491 U.S. at 71, 109 S.Ct. 2304. The district court did not err in dismissing the § 1983 claims against MDOT and the State of Michigan.

B. *Section 1983 Claims Against Snyder and Steudle in their Official Capacities*

After dismissing the § 1983 claims against the State of Michigan and MDOT for a second time, the district court permitted **\*392** Appellants to substitute Governor Snyder and Director Steudle in their official capacities and to seek prospective injunctive relief against them under *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). The record does not indicate, however, that Appellants ever served summons on complaints on Snyder or Steudle. Appellants contend that they have constructively served Snyder and Steudle because the Office of the Michigan Attorney General represents all of the defendants. We look askance at this argument. Even presuming that Snyder and Steudle had been properly served, the district court did not err in granting summary judgment on these official-capacity claims. Dismissing the claims against all of the individual defendants necessarily defeats the official-capacity claims against Snyder and Steudle. *See Scott v. Clay Cnty., Tenn.,* 205 F.3d 867, 879 (6th Cir.2000) (explaining that dismissal of all the individual claims a fortiori defeats the claims against the entity) (citations omitted). Even if this were not so, Appellants cannot sustain their § 1983 claims against Snyder and Steudle based on a theory of supervisory liability. *See Moniz v. Cox,* 512 Fed.Appx. 495, 499 (6th Cir.2013) ("General allegations of Cox's failure to supervise and investigate are insufficient to state a claim[.]").

Appellants also fail to indicate how prospective injunctive relief would be appropriate in this case. They have not identified any remediable ongoing violations of law beyond conclusory statements that prospective injunctive relief would be appropriate. *See Terrance v. Northville Reg. Psych. Hosp.,* 286 F.3d 834, 842 (6th Cir.2002) (stating that "violations of constitutional rights cannot be founded upon conclusory, vague or general allegations"). Appellants' inability to point to an impending wrongdoing undercuts their claims against Snyder and Steudle. *See Los Angeles v. Lyons,* 461 U.S. 95, 111, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) (stating that injunctive relief is not justified where "there is no showing of any real or immediate threat that the plaintiff will be wronged again").

Similarly, Appellants fail to explain how prospective relief would remedy any of its alleged injuries beyond speculating that BBF would receive more contracts in the future once MDOT's selection process were changed. *Cf. Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (explaining that a plaintiff must indicate that it is "likely"—as opposed to "merely speculative"—that a favorable decision would redress plaintiff's injury in order to have standing). The district court did not err in granting summary judgment on the official-capacity claims against Snyder and Steudle.

C. *Section 1983 Claims Against Judnic*

A plaintiff may prove a claim of intentional discrimination using either direct or circumstantial evidence. *Jacklyn v. Schering–Plough Healthcare Prods. Sales Corp.,* 176 F.3d 921, 926 (6th Cir.1999). The district court concluded that Appellants could not prove that Judnic violated their equal protection rights using either direct or circumstantial evidence; on appeal, Appellants contend that they have sufficiently pointed to enough both direct or circumstantial evidence to sustain their § 1983 claim against Judnic.

As a preliminary matter, we note that many of Appellants' purported pieces of evidence fall after the limitations date—November 3, 2008—that the district court imposed when it rejected Appellants' request for equitable tolling. Because Appellants did not challenge this holding in their brief, we consider it waived. **\*393** *Marks v. Newcourt Credit Grp., Inc.,* 342 F.3d 444, 462 (6th Cir.2003) ("An appellant waives an issue when he fails to present it in his initial briefs before this court."). Based on this limitations period, several pieces of evidence from Appellants' complaints below and their briefs here are untimely—including the scope and billing of Contract 2006–0490, which was awarded September 25, 2006; the scope and billing of Contract 2008–0044, which was awarded December 11, 2007; and Charles's retirement, which was announced on October 1, 2008. Still, even considering all of this untimely evidence, Appellants' § 1983 claims against Judnic fail.

1. *Direct Evidence of Judnic's Discrimination*

"[D]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn,* 176 F.3d at 926. Direct evidence "does not require

Foster v. Michigan, 573 Fed.Appx. 377 (2014)

a factfinder to draw any inferences." *Johnson v. Kroger Co.,* 319 F.3d 858, 865 (6th Cir.2003).

Appellants contend that Judnic's saying "no woman should be making that kind of money" amounts to direct evidence of sex-based discrimination. This argument has several fatal defects. First, this statement was isolated and ambiguous—particularly given Caldwell's inability to recall its details. As such, it does not constitute direct evidence of discrimination. *See Phelps v. Yale Sec., Inc.,* 986 F.2d 1020, 1025–26 (6th Cir.1993). Nothing in the statement indicates that it was made regarding Foster or BBF. *See Griffin v. Finkbeiner,* 689 F.3d 584, 595 (6th Cir.2012) ("The fact that the statements do not specifically mention [plaintiff] means only that they are not direct evidence of discrimination....").

Also, Judnic did not make this statement in the context of an evaluation or other adverse employment action. "Statements by decision makers unrelated to the decisional process itself can not suffice to satisfy the plaintiff's burden of demonstrating animus." *Bush v. Dictaphone Corp.,* 161 F.3d 363, 369 (6th Cir.1998) (quoting *Price Waterhouse v. Hopkins,* 490 U.S. 228, 277, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (O'Connor, J., concurring)) (internal quotation marks and alterations omitted). If comments suggesting animus were present, we then would consider whether Judnic took an adverse action "because of [his] predisposition to discriminate" against a protected class. *DiCarlo v. Potter,* 358 F.3d 408, 416 (6th Cir.2004). Given that—even in Caldwell's fuzzy recollection—this statement was singular, there is no evidence in the record that Judnic harbored animus. *Compare Hopkins v. Elec. Data Sys. Corp.,* 196 F.3d 655, 661 (6th Cir.1999) (finding that a single slur was not direct evidence of discrimination) *with Talley v. Bravo Pitino Restaurant, Ltd.,* 61 F.3d 1241, 1249 n. 2 (6th Cir.1995) ("[T]he repeated usage of racial slurs in this case cannot be termed isolated or abstract.").

Finally, the timing of the statement—sometime in 2006 and thus roughly three years before the evaluation and two years before a timely claim could have accrued—undercuts finding that it is direct evidence. *See Hein v. All Am. Plywood Co., Inc.,* 232 F.3d 482, 489 (6th Cir.2000) (explaining that comments made five months before an employee's termination were too far removed to be direct evidence); *Phelps,* 986 F.2d at 1026 (stating that comments made "nearly a year" before an adverse action "were made too long before ... to have influenced the ... decision"); *but see DiCarlo,* 358 F.3d at 416 (holding that racial slurs made three weeks before termination constituted direct evidence). The district court did not err in concluding that Appellants' failed to point to direct evidence of Judnic's discrimination.

**\*394** 2. *Circumstantial Evidence of Judnic's Discrimination*

To make a prima facie case of discrimination under *§ 1983, App* ellants must sufficiently indicate that Judnic took an adverse action against them. *See, e.g., Rushton v. City of Warren,* 90 Fed.Appx. 912, 916 (6th Cir.2004); *Policastro v. N.W. Airlines, Inc.,* 297 F.3d 535, 539 n. 1 (6th Cir.2002). An adverse action is "a materially adverse change in the terms and conditions" of Appellants' work; examples include "termination of employment, a demotion ... a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Hollins v. Atl. Co., Inc.,* 188 F.3d 652, 662 (6th Cir.1999). *De minimis* actions are not materially adverse. As we explained fifteen years ago, if every action that made an employee "unhappy or resentful" was materially adverse, then supervisors could be liable for "criticism or even facial expressions indicating displeasure." *Primes v. Reno,* 190 F.3d 765, 766 (6th Cir.1999); *accord Williams v. Bristol–Myers Squibb Co.,* 85 F.3d 270, 274 (7th Cir.1996) ("Otherwise, every trivial personnel action that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit."). Appellants' circumstantial evidence of discrimination fails to indicate that Judnic was "personally involved in the alleged misconduct." *Miller v. Calhoun Cnty.,* 408 F.3d 803, 817 n. 3 (6th Cir.2005).

For example, in 2010 when BBF was not being paid for its work as a subconsultant on the Gateway Project, Appellants do not dispute that the delay in payment was because URS—the prime consultant—initially failed to submit BBF's invoices to Judnic. Appellant's point to this temporary nonpayment as an adverse action, contending that Judnic neglected to investigate this issue promptly or thoroughly. This argument is flawed for several reasons. First, this allegation appears to be less of a claim of intentional discrimination and more of a claim sounding in negligence. Second, this claim appears indistinguishable from *Rasins Landscape & Assocs., Inc. v. MDOT,* 528 Fed.Appx. 441 (6th Cir.2013), where we held that an MDOT subcontractor lacked standing to bring a claim against MDOT for a prime contractor's failure to pay contract proceeds. *Id.* at 444–45.

Appellants' other aspects of circumstantial evidence fail to indicate that Judnic took a materially adverse action against them. Many of Appellants' other pieces of evidence— including having to submit a FOIA request to see subconsultant evaluations, Judnic's holding a telephonic meeting instead of an in-person one, and Judnic's having

Foster v. Michigan, 573 Fed.Appx. 377 (2014)

another engineer meet with Foster—fall into the category of *de minim is* actions that are not materially adverse. *See Primes,* 190 F.3d at 766. Further, Appellants contend that Judnic took a materially adverse action by requiring extra training for Stewart. Unrefuted evidence in the record, however, indicates that Judnic had no hand in this requirement. Appellants also contend that Judnic took a materially adverse action against them by inserting the leased-vehicle requirement into an RFP in 2010. This requirement, however, was not materially adverse because it applied across-the-board to any consultant who wished to submit a proposal for the project.

Appellants' strongest adverse action argument is Judnic's giving BBF two "7 out of 10" scores in his evaluation of BBF's performance on Contract 2006–0490. Indeed, the district court found that this evaluation was materially adverse. To reach this conclusion, the district court **\*395** relied on our decision in *Blizzard v. Marion Technical College,* 698 F.3d 275, 290 (6th Cir.2012), which in turn relies on the Supreme Court's decision in *Burlington Northern & Santa Fe Railway Company v. White,* 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006), to apply a "reasonable worker" standard—that an adverse action is material if it would dissuade a reasonable worker from making or supporting a charge of discrimination.

Appellees, however, contend that the district court relied on the incorrect definition of "adverse action." They assert that *Burlington Northern* established the reasonable worker standard for retaliation but did not relax the standard for disparate-treatment. We agree; although *Burlington Northern* certainly expanded the definition of adverse employment action for the purposes of retaliation, it left the term undisturbed in the discrimination context. *See Tepper v. Potter,* 505 F.3d 508, 515 n. 1 (6th Cir.2007) (explaining that *Burlington Northern* expanded the definition of "adverse employment action for a Title VII retaliation claim" but that "*Burlington Northern* did not expand or alter this Court's formulation of an adverse employment action for purposes of the discrimination claim before us" (internal citations and quotation marks omitted)); *Michael v. Caterpillar Fin. Servs. Corp.,* 496 F.3d 584, 595–96 (6th Cir.2007) (emphasizing the distinction between a prima facie discrimination claim and a prima facie retaliation claim).

For a disparate-treatment discrimination claim, a "mid-range, performance evaluation of 'fully successful' " is not an adverse action sufficient to withstand summary judgment. *Primes,* 190 F.3d at 766; *see also James v. Metro. Gov't of Nashville,* 243 Fed.Appx. 74, 79 (6th Cir.2007) (noting that an adverse evaluation did not constitute a materially adverse action before *Burlington Northern* ). Judnic's assigning BBF two scores of seven on

a one-to-ten scale appears decidedly mid-range. But even if this evaluation did indicate that BBF had not been fully successful, Appellants would still need to indicate that they "suffered, or [are] in jeopardy of suffering," a concrete action "because of the downgraded evaluation." *Morris v. Oldham Cnty. Fiscal Court,* 201 F.3d 784, 789 (6th Cir.2000). Unless this negative evaluation had palpable negative effects, it is not actionable. *See Vaughn v. Louisville Water Co.,* 302 Fed.Appx. 337, 348 (6th Cir.2008); *Morris,* 201 F.3d at 789; *cf. White v. Baxter Healthcare Corp.,* 533 F.3d 381, 403 (6th Cir.2008) ("By receiving a lower salary increase than he would have without the more negative evaluation, White was denied an increase in pay to which he allegedly was entitled.").

Appellants fail to identify any contracts that BBF and Foster were not awarded as a result of either the evaluation for Contract 2006–0490 or Judnic's conduct generally. Foster does offer some highly speculative testimony claiming that BBF was not awarded contracts because of Judnic's actions, but a plaintiff's subjective beliefs are "wholly insufficient evidence to establish a claim of discrimination." *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 584 (6th Cir.1992); *see also Shaheen v. Naughton,* 222 Fed.Appx. 11, 13–14 (2d Cir.2007) (affirming summary judgment where a plaintiff "merely speculates that her failure to secure another residency must have been a result of negative evaluations"). Rather, Appellants acknowledge that BBF struggled to obtain work before Judnic's evaluation and, conversely, that a panel chaired by Judnic selected BBF for a contract after this evaluation. Additionally, "Past Performance" ratings on BBF's pre- and post-evaluation proposals remained largely consistent.

**\*396** Because Appellants do not offer evidence that Judnic's evaluation either was noticeably worse than prior evaluations or that it meaningfully affected BBF's ability to secure future work, this evaluation does not constitute a materially adverse action. Because Appellants do not sufficiently assert that Judnic took a materially adverse action against them, their disparate-treatment-based equal protection claim against Judnic fails.[5]

D. *Section 1983 claims against Stuecher*
Appellants do not appear to challenge the district court's holding that Stuecher's alleged statement—"I hate her"—was not direct evidence of either race or gender discrimination. We therefore only analyze whether the district court erroneously concluded that Appellants did not put forth a prima facie § 1983 disparate-treatment claim using circumstantial evidence. As this claim was resolved

Foster v. Michigan, 573 Fed.Appx. 377 (2014)

at the summary judgment stage, we must draw all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Accordingly, although the record is conflicted regarding whether Stuecher unilaterally changed BBF's evaluation scores during the selection process for the 2009 ARRA contract, we assume that he did at this stage. This modification of BBF's scores such that BBF did not progress to the second round of evaluates constitutes a materially adverse action. To prevail on their § 1983 disparate treatment claim, however, Appellants must also indicate that Stuecher treated BBF differently from other similarly situated consulting firms.

The Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). A prima facie case of discrimination requires a plaintiff to show that she was treated differently than others outside of the protected class. *See, e.g., Younis v. Pinnacle Airlines, Inc.,* 610 F.3d 359, 363 (6th Cir.2010). "[T]o be deemed 'similarly-situated', the [firms] with [which] the plaintiff seeks to compare [her] treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 583 (6th Cir.1992). Appellants "need not demonstrate an exact correlation," but their comparators "must be similar in 'all of the *relevant* aspects.' " *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 352 (6th Cir.1998) (emphasis in original) (quoting *Pierce v. Commonwealth Life Ins. Co.,* 40 F.3d 796, 802 (6th Cir.1994)).

The district court found that Appellants had, at best, identified three alleged comparators—Wade Trim Associates, HNTB, and Great Lakes Engineering—but that Appellants did not provide any factual bases to support a finding that these firms were similarly situated. Appellants now claim both that there are no firms comparable to BBF and that all the "majority" consulting firms—HNTB; Fishbeck, **397** Thompson, Carr & Huber; Great Lakes Engineering; URS Corporation; and Wade Trim Associates—are similarly situated. Moving beyond the inconsistency of this argument, because Appellants did not assert that all of these firms were similarly situated in the district court, we need not consider these new arguments. *See Coach,* 717 F.3d at 502.

We nevertheless note that Appellants have not presented sufficient evidence to indicate that any of these firms are similarly situated. To have a sufficient comparator,

Appellants need to identify a non protected firm that "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish [its] conduct or the employer's treatment of them for it" and was "subject to the same standards." *Mitchell,* 964 F.2d at 577. Appellants offer no evidence regarding the experience, qualifications, or size of these supposedly similarly situated firms beyond conclusory statements that the firms were similarly situated.

Indeed, of all the firms that Appellants attempt to use as comparators, only two—HNTB and URS—submitted proposals for the 2009 ARRA contract. Although HNTB was more highly scored than BBF and did ultimately receive the contract, the record does not support Appellant's contention that BBF and HNTB are similarly situated with regard to the 2009 ARRA contract. Turning to URS, even if it were similarly situated (and nothing in the record indicates that it is), it still would not make for an apt comparator because URS actually received lower scores than BBF.

In sum, Appellants have not satisfied the similarly-situated element for a prima facie case of § 1983 discrimination. They have not offered evidence that Great Lakes, HNTB, Wade Trim, or any other "majority" firm dealt with the same supervisors, offered substantially similar proposals to MDOT, had substantially similar employee teams, or had substantially similar evaluations and scores as they were going into the 2009 ARRA evaluation process. Accordingly, Appellants have not satisfied the elements of a prima facie case, and the district court properly granted summary judgment to Stuecher on this claim.

E. *Due Process Claims under § 1983*

The district court denied Appellants leave to add a § 1983 due process claim regarding Judnic's "low" evaluation to their amended complaint. The district court found that this amendment would be futile because BBF did not have a constitutionally protected liberty or property interest in an evaluation or a protected interest in MDOT's contracting procedures. Giving Appellants every benefit of the doubt, they appear to challenge this ruling on appeal by claiming that BBF was entitled to contracts which were awarded and then wrested away. This cursory argument does not identify any specific contracts that were "wrested away." Based on our best guess, Appellants are referring to the M–10 portion of Contract 2006–0490 that was split away and awarded to another firm. If so, that claim would fail because BBF could not have had a property interest in the contract since it was not yet "actually awarded" when its scope was reduced. *See United of Omaha Life Ins. Co. v.*

Foster v. Michigan, 573 Fed.Appx. 377 (2014)

*Solomon,* 960 F.2d 31, 34 (6th Cir.1992); *see also* 40 U.S.C. § 1104(b). Moreover, this claim from 2006 would fall outside of § 1983's three-year statute of limitations. Accordingly, the district court properly concluded that this claim would be futile.

### III. Claims under the Michigan Whistleblower Protection Act

The district court found four independent grounds on which to grant summary judgment on Appellants' individual-capacity **\*398** WPA claims against Judnic and Stuecher: (1) BBF and Foster were not "employees" of MDOT; (2) Appellants did not identify an adverse action taken within the WPA's ninety-day statute of limitations; (3) Appellants failed to identify any adverse actions taken after Foster engaged in a protected activity; and (4) Appellants did not identify any adverse actions Judnic or Stuecher took after they knew the protected activity. Appellants challenge all of these findings and assert that factual issues preclude summary judgment.

We analyze claims under Michigan's WPA using the burden-shifting framework for retaliatory discharge claims under the Elliot Larsen Civil Rights Act. *See Taylor v. Modern Eng'g, Inc.,* 252 Mich.App. 655, 653 N.W.2d 625, 628 (2002); *accord Pethers v. Metro Lift Propane,* No. 09–CV–10516, 2010 WL 3023887, at *6 (E.D.Mich., July 29, 2010). Under this framework, a plaintiff first must establish a prima facie case under the WPA. *E.g., West v. Gen. Motors Corp.,* 469 Mich. 177, 665 N.W.2d 468, 471–72 (2003). Once a plaintiff has made this showing, the burden of production shifts to the defendant to articulate a legitimate, nonretaliatory explanation for its adverse employment action. *E.g., Roulston v. Tendercare (Michigan), Inc.,* 239 Mich.App. 270, 608 N.W.2d 525, 530 (2000). If the defendant proffers a legitimate, nonretaliatory reason, the plaintiff then has the opportunity to prove that the defendant's purported legitimate reason was merely pretext for the discharge. *Taylor,* 653 N.W.2d at 628 (citing *Roulston,* 608 N.W.2d at 530).

To make a prima facie WPA case, Appellants must show: (1) that they were engaged in a protected activity under the WPA; (2) that they suffered an adverse employment action;

and (3) that there is a causal connection between the protected activity and the adverse action. *West,* 665 N.W.2d at 471–72. Assuming for the sake of argument that Foster and BBF were MDOT employees, Appellants have nonetheless failed to assert a prima facie WPA case against Judnic or Stuecher. Foster's filing complaints with the FHWA satisfies the protected activity prong of a prima facie WPA case. Appellants, however, stumble at the second and third prongs. The WPA has a ninety-day statute of limitations. Mich. Comp. Laws § 15.363(1). Although they claim that there are questions of fact regarding this statute of limitations, Appellants do not identify any adverse actions that Judnic or Stuecher allegedly took after Foster first filed her complaints in June 2010. Accordingly, the district court properly concluded that Appellants have not sufficiently alleged a causal connection between any adverse actions by Judnic and Stuecher and Foster's filing Title VI complaints with the FHWA.

Appellants also challenge the district court's dismissal of their WPA claims against MDOT, the State of Michigan, and Judnic and Stuecher in their official capacities. Appellants acknowledge that the Eleventh Amendment bars suits for damages against a state in federal court but then argue, "However, this does not preclude non-equitable relief. Plaintiffs may proceed against the State and its agencies with their WPA claims." This statement is both befuddling and flatly wrong; under the Eleventh Amendment, "the States' constitutional immunity from suit prohibits all state-law claims filed against a State in federal court, whether those claims are monetary or injunctive in nature." *Ernst v. Rising,* 427 F.3d 351, 368 (6th Cir.2005). The district court properly dismissed these claims.

### **\*399** CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's dismissal of Appellants' claims.

### All Citations

573 Fed.Appx. 377

Footnotes

1        Incorrectly captioned as "Mark Steucher."

Foster v. Michigan, 573 Fed.Appx. 377 (2014)

2    "The U.S. Department of Transportation's DBE (disadvantaged business enterprise) program provides a vehicle for increasing the participation by [Minority Business Enterprises] in state and local procurement." United States Dept. of Trans., *Disadvantaged Business Enterprise (DBE) Program,* http://www.dot.gov/osdbu/disadvantaged-business-enterprise. "To be certified as a DBE, a firm must be a small business owned and controlled by socially and economically disadvantaged individuals." *Id.*

3    Because Appellants did not claim that MDOT's audit of BBF was retaliatory in the district court, we need not rule on this claim. *See Coach, Inc. v. Goodfellow,* 717 F.3d 498, 502 (6th Cir.2013) ( "Ordinarily, we will not address issues raised for the first time on appeal.") (citing *McFarland v. Henderson,* 307 F.3d 402, 407 (6th Cir.2002)). Nonetheless, we note that even if the issue were properly before us, we would find that Appellants still failed to allege a plausible retaliation claim and thus that this claim was properly dismissed.

4    Although Appellants attempted to bring their § 1981 claims as independent actions, 42 U.S.C. § 1981 does not contain a private remedy. Rather, it is essentially part and parcel of Appellants' 1983 claim. *See Thompson v. City of Lansing,* 410 Fed.Appx. 922, 934 (6th Cir.2011) (stating that a § 1981 claim is analyzed using the same framework as a § 1983 discrimination claim); *McCormick v. Miami Univ.,* 693 F.3d 654, 660–61 (6th Cir.2010) (explaining that § 1981 is enforced through § 1983).

5    Based on this holding, we need not examine whether Appellants can point to evidence that Judnic treated any similarly situated consulting firms differently. Nonetheless, we note that Appellants are unable to do so for the reasons explained below in the next section, addressing whether Appellants can identify any similarly situated consulting firms that Stuecher treated differently.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Frazier v. Michigan, 41 Fed.Appx. 762 (2002)

41 Fed.Appx. 762
This case was not selected for publication in the
Federal Reporter.
Not for Publication in West's Federal Reporter See
Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued on or
after Jan. 1, 2007. See also Sixth Circuit Rule 28.
(Find CTA6 Rule 28)
United States Court of Appeals,
Sixth Circuit.

Kenneth Alan FRAZIER, also known as
K. Al Frazier, Plaintiff–Appellant,
v.
State of MICHIGAN, et al., Defendants–
Appellees.

No. 02–1160.
|
July 22, 2002.

**Synopsis**
Michigan prisoner brought action against state officials
under Americans with Disabilities Act (ADA) and §§
1981, 1983, 1985(3), 1986, and 1988. The district
court dismissed the action, and prisoner appealed. The Court of
Appeals held that complaint failed to state a claim.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion to Dismiss.
**\*763** Before MERRITT and DAUGHTREY, Circuit
Judges; and WEBER, District Judge.[*]

*ORDER*

**\*\*1** Kenneth Alan Frazier, also known as K. Al Frazier, a
Michigan prisoner proceeding pro se, appeals a district
court judgment dismissing his civil action filed pursuant to
the Americans with Disabilities Act ("ADA"), 42 U.S.C.
§§ 12131–34, and 42 U.S.C. §§ 1981, 1983, 1985(3), 1986,
and 1988. This case has been referred to a panel of the court
pursuant to Rule 34(j)(1), Rules of the Sixth Circuit. Upon

examination, this panel unanimously agrees that oral
argument is not needed. Fed. R.App. P. 34(a).

On October 11, 2001, Frazier filed a complaint against the
state of Michigan; John Engler, governor of the state of
Michigan; and the following individuals: Bill Martin, Dan
Bolden, Gil Bettinger, Richard B. Stapleton, Thomas
Patten, Michael J. Crowley, George M. Pennell, Dr. Oh
Chung Do, Practioner P. Koskiniemi, "Psych" R.
Marcenino, "Psych" Nannbery, Dr. Richard D. Shaul,
Darlene Edlund, William Luetzow, Sharon Wright, Beth
Smith, "RUO" Heally, "RUO" Jack Jackola, "RUO" Mary
Peterson, and "RUO" Edward Anderson. The complaint
did not indicate the defendants' positions or the capacities
in which the defendants were sued. Although the complaint
stated that such information was included in the "attached
notice pleadings ... and attached exhibits in support," no
such documents were attached to the complaint.

Frazier's complaint, consisting of three paragraphs in its
entirety, alleged in a conclusory manner that he has been
subjected to a wide variety of unconstitutional conditions
of confinement and deprived of his federal rights during his
incarceration. The complaint also referred the court to
"attached notice pleadings for full detailed disclosure,"
however such "notice pleadings" were not attached to the
complaint.

The district court granted Frazier's motion to proceed in
forma pauperis. Despite Frazier's failure to demonstrate
exhaustion of his administrative remedies, the district court
subsequently dismissed the complaint for failure to state a
claim upon which relief may be granted pursuant to 28
U.S.C. §§ 1915(e), 1915A, and 42 U.S.C. § 1997e(c).
Frazier's Fed.R.Civ.P. 59(e) motion to alter or amend the
judgment was denied by the district court. Frazier has filed
a timely appeal.

We review de novo a district court's judgment dismissing
a suit for failure to state a claim upon which relief may be
granted under §§ 1915(e)(2) and 1915A(b). *Brown v.
Bargery,* 207 F.3d 863, 867 (6th Cir.2000). "Dismissal of
a complaint for the failure to state a claim on which relief
may be granted is appropriate only if it appears beyond a
doubt that the plaintiff can prove no set of facts in support
of his claim that would entitle him to relief." *Id.* **\*764** We
also review de novo a district court's judgment dismissing
a prisoner's complaint under § 1997e(c). *Ruiz v. United
States,* 160 F.3d 273, 275 (5th Cir.1998).

A complaint must contain " 'either direct or inferential
allegations respecting all the material elements to sustain a

recovery under *some* viable legal theory.' " *Scheid v. Fanny Farmer Candy Shops, Inc.,* 859 F.2d 434, 436 (6th Cir.1988) (quoting *Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1106 (7th Cir.1984)). The court is not required to accept non-specific factual allegations and inferences or unwarranted legal conclusions. *See Dellis v. Corrs. Corp. of Am.,* 257 F.3d 508, 511 (6th Cir.2001); *Lillard v. Shelby County Bd. of Educ.,* 76 F.3d 716, 726 (6th Cir.1996); *Morgan v. Church's Fried Chicken,* 829 F.2d 10, 12 (6th Cir.1987); *Chapman v. City of Detroit,* 808 F.2d 459, 465 (6th Cir.1986); *Smith v. Rose,* 760 F.2d 102, 106 (6th Cir.1985). Furthermore, a complaint must allege that the defendants were personally involved in the alleged deprivation of federal rights. *Hall v. United States,* 704 F.2d 246, 251 (6th Cir.1983).

**\*\*2** Upon review, we conclude that Frazier's complaint failed to state a claim upon which relief may be granted and was properly dismissed by the district court. Frazier's complaint contained no specific facts in support of his conclusory allegations that the defendants violated his constitutional and statutory rights. Moreover, Frazier failed to allege with any degree of specificity which of the named defendants were personally involved in or responsible for each of the alleged violations of his federal rights. Thus, even under the most liberal construction, Frazier's complaint did not state a claim for relief. The arguments asserted by Frazier in his appellate brief do not compel a different result.

Accordingly, the district court's judgment is affirmed. Rule 34(j)(2)(C), Rules of the Sixth Circuit.

### All Citations

41 Fed.Appx. 762, 2002 WL 1628210

Footnotes

\*      The Honorable Herman J. Weber, United States District Judge for the Southern District of Ohio, sitting by designation.

Gilmore v. Corrections Corp. of America, 92 Fed.Appx. 188 (2004)

92 Fed.Appx. 188
This case was not selected for publication in West's
Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued on or
after Jan. 1, 2007. See also U.S.Ct. of App. 6th Cir.
Rule 32.1.
United States Court of Appeals,
Sixth Circuit.

Eric GILMORE, Plaintiff–Appellant,

v.

CORRECTIONS CORPORATION OF
AMERICA; et al., Defendants–Appellees.

No. 03–5836.
|
Feb. 6, 2004.

Synopsis
**Background:** Pro se state prisoner sued correctional
service center and its supervisory and non-supervisory
personnel, seeking unspecified relief under § 1983 based
on allegations that center denied him medical care,
threatened him when he tried to exercise his First
Amendment free speech rights, deprived him of clothes
and toiletries, assigned him to upper bunk despite medical
directive, and took all the money out of his account. The United
States District Court for the Middle District of Tennessee,
Thomas A. Higgins, J., granted prisoner in forma pauperis
(IFP) status, and dismissed the complaint as frivolous.
Prisoner appealed.

**Holdings:** The Court of Appeals held that:

complaint did not allege how supervisory personnel of
correctional service center were liable under § 1983 for
alleged violations of his constitutional rights, and thus was
properly dismissed as frivolous, and

complaint against center's non-supervisory staff, which
merely listed their names in caption and alleged
constitutional violations in body of complaint, was
insufficient to sustain recovery of unspecified damages
under § 1983, and thus was properly dismissed as
frivolous.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion to Dismiss.

**Attorneys and Law Firms**

***189** Eric Gilmore, Mountain City, TN, Pro se.

Gustavus A. Puryear, IV, Corrections Corporation of
America, Kimberly J. Dean, Asst. Atty. General, Office of
the Attorney General, Nashville, TN, Tom Anderson,
Anderson Law Firm, Jackson, TN, for Defendants–
Appellees.

Before BATCHELDER, GIBBONS, and COOK, Circuit
Judges.

*ORDER*

**\*1** Eric Gilmore, a Tennessee prisoner proceeding pro se,
appeals the district court order that dismissed his civil
rights complaint filed pursuant to 42 U.S.C. § 1983. This
case has been referred to a panel of the court pursuant to
Rule 34(j)(1), Rules of the Sixth Circuit. Upon
examination, this panel unanimously agrees that oral
argument is not needed. Fed. R.App. P. 34(a).

Seeking unspecified relief, Gilmore sued the Corrections
Corporation of America (CCA) and twenty-two
individuals. Gilmore alleged that the South Central
Correctional Center and its staff: (1) denied him medical
care; (2) threatened him when he tried to exercise his First
Amendment right to free speech through the prison
grievance system; (3) deprived him of clothes and
toiletries; (4) assigned him to an upper bunk despite a
medical directive; and (5) took all the money out of his
account. Gilmore did not identify any of the defendants in
the body of his complaint. The district court granted
Gilmore in forma pauperis status, screened the complaint,
and dismissed the complaint as frivolous. *See* 28 U.S.C. §
1915(e)(2). The court held that Gilmore could not sue the
five supervisory personnel named as defendants because
respondeat superior does not apply in § 1983 claims, and
that Gilmore failed to allege how the remaining defendants
violated his constitutional rights.

Gilmore v. Corrections Corp. of America, 92 Fed.Appx. 188 (2004)

On appeal, Gilmore restates his district court claims and argues that the supervisory personnel directly participated in the violation of his rights or acquiesced or authorized the violation of his rights.

We review de novo a district court's decision to dismiss under 28 U.S.C. § 1915(e)(2). *McGore v. Wrigglesworth,* 114 F.3d 601, 604 (6th Cir.1997). The Prison Litigation Reform Act requires district courts to screen and dismiss complaints that are frivolous, fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief, "even before ... the individual has had an opportunity to amend the complaint." *Id.* at 608–09; *accord* 28 U.S.C. § 1915(e)(2). A case is frivolous if it lacks an arguable **\*190** basis either in law or in fact. *Neitzke v. Williams,* 490 U.S. 319, 325, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989).

Upon review, we affirm the district court's decision for the reasons stated by the district court. Gilmore listed the CCA and twenty-two individuals in the caption of his complaint and gave job titles for most of the individuals. In the body of his complaint, however, Gilmore only stated that "South Central Correctional Center and its staff and security" violated his constitutional rights. The district court properly dismissed Gilmore's claims against the five supervisory defendants because § 1983 liability will not be imposed solely upon the basis of respondeat superior. *See Taylor v. Mich. Dep't of Corr.,* 69 F.3d 76, 80–81 (6th

Cir.1995). Gilmore did not allege that these defendants condoned, encouraged, or knowingly acquiesced in the alleged misconduct, so his complaint lacked an arguable basis in law. *See id.*

**\*\*2** As for the remaining defendants, Gilmore did not allege how any of them were involved in the violation of his rights. Courts construe pro se complaints liberally. *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972). However, even pro se complaints must satisfy basic pleading requirements. *See Wells v. Brown,* 891 F.2d 591, 594 (6th Cir.1989). A complaint must contain allegations respecting all the elements to sustain a recovery under some viable legal theory. *Scheid v. Fanny Farmer Candy Shops, Inc.,* 859 F.2d 434, 436 (6th Cir.1988). Merely listing names in the caption of the complaint and alleging constitutional violations in the body of the complaint is not enough to sustain recovery under § 1983. *See Flagg Bros. v. Brooks,* 436 U.S. 149, 155–57, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978).

For the foregoing reasons, we affirm the district court's order. Rule 34(j)(2)(C), Rules of the Sixth Circuit.

**All Citations**

92 Fed.Appx. 188, 2004 WL 237417

Grant v. Metropolitan Government of Nashville and..., 446 Fed.Appx. 737...

113 Fair Empl.Prac.Cas. (BNA) 262

446 Fed.Appx. 737
This case was not selected for publication in West's
Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued on or
after Jan. 1, 2007. See also U.S.Ct. of App. 6th Cir.
Rule 32.1.
United States Court of Appeals, Sixth Circuit.

Claude GRANT; Oralene Day; Princess
Martindale; Faletha B. Reid; Darryl
McKibbens; Darrel Gant; Antonio
McKissack; Pamela Tucker; and Sandra
Derrick, individually and on behalf of all
others similarly situated, Plaintiffs–
Appellees,
v.
METROPOLITAN GOVERNMENT OF
NASHVILLE and DAVIDSON COUNTY,
TENNESSEE, Defendant–Appellant.

Nos. 10–5944, 10–6233
|
Aug. 26, 2011.

**Synopsis**
**Background:** African-American employees brought class
action against public employer, alleging race
discrimination. Following jury verdict in favor of
employer, the United States District Court for the Middle
District of Tennessee, William J. Haynes, Jr., J., granted
employees' motion for new trial. Employer appealed and
petitioned for writ of mandamus to reinstate jury verdict.
The Court of Appeals, Ronald Lee Gilman, Circuit Judge,
606 F.3d 855, granted petition in part, dismissed appeal and
remanded. Following bench trial on remand, the United
States District Court for the Middle District of Tennessee
entered verdict in employees' favor. Employer appealed.

**Holdings:** The Court of Appeals, Alice M. Batchelder,
Chief Judge, held that:

Court of Appeals had jurisdiction to review merits of
district court's order granting injunctive relief, and

employees failed to establish prima facie case of disparate

impact race discrimination.

Reversed.

Clay, Circuit Judge, filed dissenting opinion.

**Procedural Posture(s):** On Appeal.

**\*738** On Appeal from the United States District Court for
the Middle District of Tennessee.

BEFORE: BATCHELDER, Chief Judge; CLAY and
SUTTON, Circuit Judges.

**Opinion**

ALICE M. BATCHELDER, Chief Judge.

In this class action lawsuit alleging racial discrimination,
the district court entered judgment for Plaintiffs after a
bench trial on their disparate impact claims. Because we
find that Plaintiffs failed to establish a prima facie case of
disparate impact liability, we reverse.

**I.**

Nine named plaintiffs filed this class action under Title VII
of the Civil Rights Act of 1964 ("Title VII") against
Defendant–Appellant Metropolitan Government of
Nashville and Davidson County, Tennessee ("Metro"). The
named plaintiffs are current and former employees of
Metro Water Services ("MWS"), a subdivision of Metro.
They alleged various violations of Title VII on behalf of
themselves and all others similarly situated. Specifically,
Plaintiffs claimed that MWS engages in systemic practices
of discrimination against black employees in post-hiring
opportunities, including disparate job assignments,
promotions, pay, accommodations, discipline, and other
terms and conditions of their employment. Plaintiffs
presented disparate treatment and disparate impact theories
of liability.[2]

During the bench trial, Plaintiffs sought to establish their
case through anecdotal evidence and expert testimony.
Plaintiffs' expert, Dr. Moomaw, examined the proportion
of black employees across numerous categories of MWS's
workforce, including FLSA exempt status, salary type, and

Grant v. Metropolitan Government of Nashville and..., 446 Fed.Appx. 737...

113 Fair Empl.Prac.Cas. (BNA) 262

pay grade. He found that black employees at MWS were disproportionately represented in lower-paying positions which had fewer supervisory responsibilities and fewer opportunities for advancement. Dr. Moomaw concluded that black employees' placement into those jobs limited their opportunities for promotions and higher earnings.

Based on Plaintiffs' evidence, the district court held that they had presented a prima facie case of disparate impact discrimination.[3] Upon determining that Plaintiffs **\*739** were entitled to judgment on their disparate impact claims,[4] the district court awarded them back pay, the amount of which would be determined by a Special Master appointed by the court. The court further awarded immediate injunctive relief by prohibiting MWS from conducting oral interviews for MWS promotions, imposing an interview requirement for MWS lateral transfers, and ordering a Special Master to conduct oral interviews and validate all MWS job requirements. Metro filed a timely notice of appeal.

In the meantime, the district court appointed Dr. Kathleen Lundquist as Special Master in the case to conduct oral interviews and oversee the promotions process. Alleging that Dr. Lundquist had a conflict of interest that precluded her from serving as Special Master and that the district court failed to follow Rule 53's procedures, Metro moved the district court to revise its appointment. Although the motion was unopposed, the district court denied Metro's motion. Metro filed a timely supplemental appeal. This Court consolidated the two appeals.

## II.

As an initial matter, we must address Plaintiffs' motion to dismiss this appeal for lack of jurisdiction. Plaintiffs argue that we lack jurisdiction to review the merits of the district court's opinion and that we may only consider the question of whether the district court abused its discretion by granting injunctive relief.

It is well-established that we have jurisdiction over appeals from interlocutory orders that grant or deny injunctive relief. *See* 28 U.S.C. § 1292(a)(1). There is no dispute that some aspects of the district court's order awarded injunctive relief, namely the component which orders Metro Civil Services Commission ("MCSC") to conduct oral interviews and bars MWS from participation.[5] This aspect of the district court's order is directed to Metro and MWS, enforceable by contempt, and designed to provide the relief sought by Plaintiffs in their complaint. Accordingly, this Court has jurisdiction to review the

district court's order. *See* 28 U.S.C. § 1292(a)(1); *Abercrombie & Fitch Co. v. Fed. Ins. Co.,* 370 Fed.Appx. 563, 568 (6th Cir.2010).

As a general matter, we limit our review under § 1292(a)(1) to decide "only whether the district court abused its discretion in ruling on the request for relief." *Jones v. Caruso,* 569 F.3d 258, 269 (6th Cir.2009) (quotation marks omitted). But in making that determination, we also have "jurisdiction to reach the merits, at least where there are no relevant factual disputes and the matters to be decided are closely related to the interlocutory order being appealed." *Id.*; *see also Doe v. Sundquist,* 106 F.3d 702, 707 (6th Cir.1997).

In order to review the district court's decision to grant injunctive relief in this case, we must look at the district court's disparate impact determination—the basis for that injunctive relief. We must determine whether the district court abused its discretion in awarding injunctive relief unless we first determine whether the district court's finding of liability was correct. Accordingly, we will exercise our jurisdiction to review the merits of the district court's legal determination. Plaintiffs' motion to dismiss is DENIED.

## III.

"This Court's standard of review in a Title VII discrimination case is narrow." **\*740** *Dunlap v. Tenn. Valley Auth.,* 519 F.3d 626, 629 (6th Cir.2008) (quotation marks omitted). While we review legal conclusions de novo, *Bailey v. USF Holland, Inc.,* 526 F.3d 880, 885 (6th Cir.2008), we review the district court's findings of fact for clear error, *Dunlap,* 519 F.3d at 629. In reviewing the court's factual findings, "[t]he issue is not whether the district court reached the best conclusion, but whether the evidence before the court supported the district court's findings." *Id.* (citation omitted).

On appeal, Metro argues that Plaintiffs failed to establish their prima facie case of disparate impact discrimination, so we limit our discussion accordingly.[6] A prima facie case of disparate impact discrimination under Title VII requires a plaintiff to (1) identify a specific employment practice and (2) present relevant statistical data that the challenged practice has an adverse impact on a protected group. *Id.*

## A.

Grant v. Metropolitan Government of Nashville and..., 446 Fed.Appx. 737...

113 Fair Empl.Prac.Cas. (BNA) 262

Regarding the first prong of the prima facie case, the Supreme Court has explained that a plaintiff is "responsible for isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities." *Watson v. Ft. Worth Bank & Trust,* 487 U.S. 977, 994, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988); *see also Wal–Mart Stores, Inc. v. Dukes,* — U.S. ——, 131 S.Ct. 2541, 2555–56, 180 L.Ed.2d 374 (2011). However, if a plaintiff demonstrates that "the elements of [an employer's] decisionmaking process are not capable of separation or analysis, [then] the decisionmaking process may be analyzed as one employment practice." 42 U.S.C. § 2000e–2(k)(1)(B)(i); *see also Phillips v. Cohen,* 400 F.3d 388, 398 (6th Cir.2005). Metro claims that Plaintiffs never isolated and identified specific employment practices, and that they failed to demonstrate that the practices are incapable of separation.

Plaintiffs' general claim is that MWS has engaged in "preselection" which caused an adverse, disparate impact on black employees. They allege that this preselection has taken many forms, including tailored job qualifications, selective interviewing, and subjective decisionmaking. The problem, however, is that Plaintiffs make no effort to isolate any of these practices or to examine their individual effects on the promotions process. *See Watson,* 487 U.S. at 994, 108 S.Ct. 2777; *see also* 42 U.S.C. § 2000e–2(k)(1)(B)(i).

Plaintiffs' failure to identify and isolate the effects of each specific employment practice could have been forgiven if they had "demonstrate[d] to the court that the elements of [Metro's] decisionmaking process are not capable of separation for analysis." *See* 42 U.S.C. § 2000e–2(k)(1)(B)(i). But they never made any such showing. Although they purported to challenge the decisionmaking process as a whole, they never attempted to demonstrate that the elements of that process are incapable of separation for analysis.

**\*741** The district court appears to have assumed that merely challenging the promotions process as a whole is sufficient to take advantage of the statutory exception, but that is simply not the law. The law clearly requires plaintiffs to identify and isolate specific employment practices. *See* 42 U.S.C. § 2000e–2(k)(1)(B)(i). A plaintiff may challenge the process as a whole only if he *first* demonstrates that its elements are incapable of separation. *See id.* The district court erred by allowing Plaintiffs to reap the advantages of the statutory exception without first meeting its requirements.

**B.**

Even if Plaintiffs had satisfied the first prong of their prima facie case, their claim would nevertheless fail on the second prong. Plaintiffs simply did not present relevant statistical data that MWS's promotion practices caused an adverse, disparate impact on its black employees.

The Supreme Court has explained that "the plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group." *Watson,* 487 U.S. at 994, 108 S.Ct. 2777. In cases involving promotion policies, "the relevant inquiry is comparing the number of protected group members benefitting from promotions with the number seeking them; this figure is then contrasted with the corresponding ratio for the non-protected group." *Phillips,* 400 F.3d at 399; *see also Phillips v. Gates,* 329 Fed.Appx. 577, 581 (6th Cir.2009). Plaintiffs may rely on this comparison without regard to candidates' qualifications. *See Phillips,* 400 F.3d at 400. In instances where the data regarding qualified or eligible applicants is incomplete or unavailable, plaintiffs may rely on other statistics, "such as measures indicating the racial composition of otherwise-qualified applicants for at-issue jobs." *Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 651, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989) (quotation marks omitted), *superseded by statute on other grounds,* Civil Rights Act of 1991, Pub.L. No. 102–166, 105 Stat. 1071, 42 U.S.C. § 2000e–2(k).[7]

In this case, Plaintiffs' evidence was merely a description of the racial demographics of MWS's workforce. Dr. Moomaw's testimony demonstrated that black employees at MWS were disproportionately concentrated in positions which paid less and had fewer opportunities for advancement. Dr. Moomaw focused specifically on the representation of "blacks in higher level positions compared to the overall black to white ratio at MWS." He did not look at actual promotion rates, nor did he compare the ratios of black and white employees eligible for promotions with those who actually received promotions. He explained that, in light of MWS's alleged practice of altering job qualifications and criteria, it was impossible to determine who was actually eligible for promotions.

Plaintiffs' evidence falls short of the relevant statistical data that the law requires. First, it compares the wrong groups of people. Instead of comparing the employees who actually applied for or were eligible for promotions with those who received them, *see Phillips,* 400 F.3d at 399, Plaintiffs compared the proportion of black employees **\*742** in high-paying positions with the proportion of black employees within the entire MWS workforce. Plaintiffs

allege that it was futile to examine actual applicant data because MWS's allegedly discriminatory practices discouraged black employees from applying for promotions; however, in such cases, a plaintiff is still required to construct a generally qualified applicant pool. *See Wards Cove*, 490 U.S. at 651, 109 S.Ct. 2115. In this case, Plaintiffs constructed a pool consisting of the entire MWS workforce, apparently assuming that custodians, equipment operators, painters, secretaries, and customer service representatives are qualified to work as engineers, biologists, and chemists. The Supreme Court has made clear that this type of analysis is deficient. *See id.* at 653–54, 109 S.Ct. 2115.

Additionally, the district court's determination that each segment of MWS's workforce should mirror the overall racial demographic of MWS amounts to an impermissible quota system. *See id.* at 652, 109 S.Ct. 2115. Essentially, Plaintiffs' evidence shows only that black employees are disproportionately represented in lower-paying jobs that have fewer opportunities for advancement. However, "[r]acial imbalance in one segment of an employer's work force does not, without more, establish a prima facie case of disparate impact with respect to the selection of workers for the employer's other positions, even where workers for the different positions may have somewhat fungible skills...." *See id.* at 653, 109 S.Ct. 2115.

**IV.**

Because we find that Plaintiffs have failed to meet their prima facie case of disparate impact discrimination, we **REVERSE** the district court's order. In light of this holding, we **DISMISS** as moot Metro's appeal as to the order appointing Dr. Kathleen Lundquist as Special Master.

CLAY, Circuit Judge, dissenting.

The decision below was based on the extensive evidentiary record that was developed over nine days of trial. The trial judge heard testimony from more than twenty witnesses, including two expert statisticians, and received hundreds of documents into evidence. In stripping Plaintiffs of their victory, the majority ignores this evidentiary record and relies instead on a series of largely unexplained conclusions. Because the district court committed no error of law, and the factual findings underpinning its decision

are not clearly erroneous, we should affirm. The majority has no legal basis to do otherwise, and therefore I respectfully dissent.

The majority reverses the district court's finding of liability against Defendant Metropolitan Government of Nashville and Davidson County, Tennessee ("Metro") on the basis that "Plaintiffs failed to establish a prima facie case of disparate impact liability." (Maj. Op. at 738.) To make out a prima facie case of disparate impact in violation of Title VII, a plaintiff must "(1) identif[y] a specific employment practice to be challenged; and (2) through relevant statistical analysis prove[ ] that the challenged practice has an adverse impact on a protected group." *Dunlap v. Tenn. Valley Auth.*, 519 F.3d 626 (6th Cir.2008) (citations omitted); *see also Lewis v. City of Chicago*, 560 U.S. 205, 130 S.Ct. 2191, 2197, 176 L.Ed.2d 967 (2010). The district court, sitting as finder of fact, found that Plaintiffs had satisfied their prima facie burden, and as explained below, its conclusion should be upheld as to each element of the prima facie case.

**A. Identification of Specific Employment Practices**

The district court did not err in finding that Plaintiffs' burden of identifying the specific employment practices that are **\*743** challenged "is established by a preponderance of the evidence," through proof of the following: "tailoring job qualifications for promotions, lateral transfers, selective interview processes for promotions, out-of-class assignments and subjective decision-making standards for promotions and discriminatory compensation practices." (Dist. Ct. Op. at 58–59); *see also Phillips v. Gates*, 329 Fed.Appx. 577, 580 (6th Cir.2009) (finding sufficient, as to the first element, a challenge to the "practices and procedures regarding employee promotions"); *Scales v. J.C. Bradford & Co.*, 925 F.2d 901 (6th Cir.1991) (sustaining challenge to promotion practices, specifically: (1) failure to advertise openings; (2) favoritism to friends and associates of supervisors; and (3) use of subjective criteria).

The specific employment practices identified by Plaintiffs as discriminatory are well documented in the record. The district court found that Defendant's posted minimum job qualifications "are frequently tailored or altered from the original job descriptions to fit the person whom [ ] management desires to fill the specific position." (Dist. Ct. Op. at 6.) "As a factual matter", the court explained, "the proof also clearly establishes that [Metro's Water Services

Grant v. Metropolitan Government of Nashville and..., 446 Fed.Appx. 737...

113 Fair Empl.Prac.Cas. (BNA) 262

Department ("MWS") ] distorts educational requirements, seniority, and experience in its promotion decisions of its white employees." (*Id.* at 65.) In one instance, Metro eliminated a bachelor's degree requirement for a director position after a qualified black employee applied, and awarded the position to a white applicant without a degree, even though the previous director had both bachelor and master's degrees. (*Id.* at 12–13.)

With regard to lateral transfers, the district court found that Metro frequently permits white employees to transfer internally, thereby circumventing the competitive employment application process. (*Id.*) To the extent that the competitive application process was utilized, the district court found that Defendant's department managers possess discretion over whom to interview for promotions, and once the relevant employees are identified, the usual practice is that each employee's supervisor will serve on the interview panel. This results in a highly subjective— and problematic—process. *See Wal–Mart Stores, Inc. v. Dukes,* —— U.S. ——, 131 S.Ct. 2541, 2554, 180 L.Ed.2d 374 (2011) ("[A]n employer's undisciplined system of subjective decisionmaking [can have] precisely the same effects as a system pervaded by impermissible intentional discrimination." (internal citation and quotation marks omitted; alteration in original)). The problems of this subjective process are exacerbated by the frequent variations in the size and composition of interview panels, and the heavy (and sometimes controlling) weight accorded the results of an oral interview.

Additionally, the district court found that Metro has a policy whereby an employee may be assigned to fill a temporary vacancy in a higher position—a so-called "out of class assignment"—and that after 100 days, the employee would be promoted into the higher position. (Dist. Ct. Op. at 16–19.) White employees, including six individuals identified at trial, would receive the promotion after 100 days, whereas black employees often would not. (*Id.* at 17.) Additionally, black employees working "out of class" are not always paid at the higher "out of class" rate, even though white employees were. In one situation, as proved at trial, a black employee assumed the duties of a public information officer on an "out-of-class" basis, but was told he was not qualified to fill the position on a permanent basis, even though the position was later filled by a biologist without any public relations background, at a **\*744** higher salary than the temporary employee. (*Id.* at 19.) Situations like these are consistent with black employees, as the district court found, being "concentrated in lower job classifications at lesser compensation levels." (*Id.* at 60.)

The majority does not explain why the specific employment practices proved by Plaintiffs at trial, and

identified by the district court, failed to satisfy Plaintiffs' burden of identification. The majority identifies no factual finding by the district court that is clearly erroneous, and cites no legal authority to support its conclusion. This sort of truncated analysis is particularly troubling in light of the nature and significance of this case—a civil rights class action against a major public employer—and the availability of extensive evidence in the record.

**B. Disparate Impact**

The district court additionally did not err in finding that Plaintiffs carried their burden to establish that the challenged practices have an adverse impact on a protected group. The district court held that "[t]he specific employment practices alone and in combination have had the effect of denying and delaying promotions to black employees [at Metro], as set forth by Dr. [Michael] Moomaw's testimony and analyses and Plaintiffs' other proof." (*Id.* at 59.) The majority offers no reason why this conclusion was clearly erroneous.

As to the statistical proof, the district court concluded based on a binomial distribution analysis that the rate of promotions of black employees, across nearly every job category, was three to four standard deviations lower than would be expected in the absence of discrimination. *See Vogel v. City of Cincinnati,* 959 F.2d 594, 600 (6th Cir.1992); *see also Alexander v. Local 496, Laborers' Int'l Union of N. Am.,* 177 F.3d 394, 419 (6th Cir.1999) (Batchelder, J., concurring in part and dissenting in part) (reasoning that district court did not clearly err in finding disparate impact "[g]iven the extreme statistical disparity" proved at trial). This analysis reflected the report of Dr. Moomaw, who recategorized the MWS workforce and analyzed employment data across four dimensions, finding "stark and significant differences in representation between white and black employees that extend to all categories of MWS' positions." (Dist. Ct. Op. at 33); *see also Phillips,* 329 Fed.Appx. at 581 (stating that " 'sufficiently substantial' statistical disparities raise an inference of disparate impact").

The district court determined that these "widespread statistical imbalances" were a result of the employment practices challenged by Plaintiffs. (Dist. Ct. Op. at 60.) Rather than determining the effect of each challenged practice, which it found were "not capable of separation for analysis," the district court analyzed Metro's promotion practices as "one promotion practice." *See* 42 U.S.C. §

Grant v. Metropolitan Government of Nashville and..., 446 Fed.Appx. 737...

113 Fair Empl.Prac.Cas. (BNA) 262

2000e–2(k)(1)(B)(i) (stating that if a "complaining party can demonstrate to the court that the elements of a respondent's decisionmaking process are not capable of separation for analysis, the decisionmaking process may be analyzed as one employment practice"). The majority disagrees with the district court's decision to treat the promotional process as one practice, because, as it states, Plaintiffs "never attempted to demonstrate that the elements of that process are incapable of separation of analysis." (Maj. Op. at 740.) But the majority offers no legal authority or citation to the record, or elucidates why the district court's finding in that regard is clearly erroneous.

Considering the process as a whole, the district court made the following factual findings as to the cause of the statistical abnormalities, none of which the majority contends is clearly erroneous:

**\*745** MWS's practice of tailoring job descriptions involves removing job requirements for higher positions to favor MWS's white employees. MWS's altered educational requirements for positions that have the actual effect of increasing the number of white employees promoted.

Lateral transfers have the effect of denying MWS's black employees from promotions to higher level positions. MWS used selective oral interviews with open discussion of scoring among panel members, and the results of the oral interview represented from 50% to 80% or 100% of the selection decision, thus undermining the applicant's seniority and experience.

... MWS's misuse of out-of-class assignments resulted in the denial of promotions to black employees that were given to MWS's white employees. MWS also delayed higher compensation paid to black employees who worked six months to two years on an "out-of-class" basis. These black employees were not promoted as white MWS employees were and had to file grievances and objections to receive the higher pay required by the "out-of-class" policy for such work....

MWS's compensation practice ... resulted in compensation levels of black employees who are also concentrated in the lowest grade levels within the same pay ranges for white employees. The statistics also show that black employees at MWS are also concentrated in lower job classifications at lesser compensation levels....
(Dist. Ct. Op. at 59–60.)

The majority overturns the district court's finding because, as it explains, "Plaintiffs simply did not present relevant statistical data that MWS's promotion practices caused an adverse, disparate impact on its black employees." (Maj. Op. at 741.) According to the majority, "Plaintiffs' evidence was merely a description of the racial demographics of MWS's workforce." (*Id.* at 8.) The majority explains that Plaintiffs' statistical evidence "falls short" because, "instead of comparing the employees who actually applied for or were eligible for promotions with those who received them, Plaintiffs compared the promotion of black employees in high-paying positions with the proportion of black employees within the entire MWS workforce." (*Id.* at 9.) Even if the latter comparison was problematic, the majority continues, Plaintiffs were "still required to construct a generally qualified applicant pool" from which to make a comparison. (*Id.*)

As an initial matter, the majority's insistence on a specific form of statistical evidence has no basis in our case law. We have never "limited a plaintiff's choices in Title VII cases involving statistical analysis in any way," *Isabel v. City of Memphis,* 404 F.3d 404, 412 (6th Cir.2005), and, as the Supreme Court recognizes, statistics "come in infinite variety and ... their usefulness depends upon all of the surrounding facts and circumstances." *Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 339–40, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). The statistical evidence relied upon by the district court was relevant, and to the extent it was less than perfect, "such flaws relate to the weight of the [evidence] which is a matter for the trier of fact." *Phillips v. Cohen,* 400 F.3d 388, 401–02 (6th Cir.2005). The majority offers no legal authority to support its argument that the district court's evaluation of the statistical evidence was improper as a matter of law. *See Johnson v. U.S. Dep't of Health and Human Servs.,* 30 F.3d 45, 48 (6th Cir.1994) (holding that the district court's view of the sufficiency of statistical evidence is reviewed for clear error).

**\*746** Moreover, comparing rates of actual promotion would be unhelpful in this case because, as the district court found, that comparison would not capture the reality of the promotions process at MWS. First, it would understate the promotion rate of white employees. Based on the trial record, the district court found that through "lateral transfers" and "out of class" assignments, MWS would frequently promote white employees outside of the normal application process. Second, it would overstate the promotion rate of black employees because, as the district court found, MWS, and its promotion process more generally, discouraged black employees from applying for promotions; this was accomplished by informing potential applications that the position was "not an appropriate fit;" permitting subjective evaluations by hiring managers; and altering job requirements to fit preselected candidates. *See Kreuzer v. Brown,* 128 F.3d 359, 364 n. 2 (6th Cir.1997) (citing *Harless v. Duck,* 619 F.2d 611, 617–18 (6th

Grant v. Metropolitan Government of Nashville and..., 446 Fed.Appx. 737...

113 Fair Empl.Prac.Cas. (BNA) 262

Cir.1980)).

The majority suggests that Plaintiffs' failure to compare actual promotion rates could be excused if Plaintiffs had "construct[ed] a generally qualified applicant pool" and compared the promotion rates within that pool. (Maj. Op. at 742.) Such a statement, however, reflects the majority's fundamental misunderstanding of this case. As the district court found, "the proof ... clearly establishes that MWS distorts educational requirements, seniority, and experience in its promotion decisions of its white employees," and it is therefore not possible to determine the actual qualifications for many positions. (Dist. Ct. Op. at 65.)

Additionally, even if the actual qualifications for each position could be determined, any failure to control for this variable is not fatal under the circumstances of this case, given the extent to which Metro obfuscated and apparently manipulated the promotion process. *See Phillips,* 400 F.3d at 400–02 (reversing district court's dismissal of disparate impact challenge to promotion process, and reasoning that the plaintiff's failure to control for employees' qualifications in statistical data did not render its statistics legally insufficient). The majority's reasoning to the contrary runs counter to well-established case law in this Circuit. *See id.* (citing *Scales,* 925 F.2d at 906 (finding gender discrimination on the basis that it took women longer than men to be promoted to the first managerial level in the company)).

Finally, the majority ignores the non-statistical evidence adduced at trial, thereby ignoring the extensive testimony by individual plaintiffs as to their "personal experiences with promotion decisions at MWS." (Dist. Ct. Op. at 19–25); *see also Int'l Bhd. of Teamsters,* 431 U.S. at 340, 97 S.Ct. 1843 ("The individuals who testified about their personal experiences with the company brought the cold numbers convincingly to life."). Our cases have recognized that "expert statistical evidence in disparate impact cases is not to be considered in a vacuum, as the only evidence permitting plaintiffs to meet their prima facie test; it must be considered in light of all the evidence in the record." *Phillips,* 400 F.3d at 401 (holding that non-statistical evidence of disparate of impact "compensate[ed] to some degree for plaintiffs' failure to demonstrate conclusively that they are promoted at lower rates than white employees." (internal citation and quotation marks omitted)); *see also Wal–Mart Stores,* 131 S.Ct. at 2556 (recognizing the relevance of testimonial evidence apart from statistical evidence in disparate impact cases). This point is lost on the majority.

Accordingly, because the district court committed no error of law, and the findings **\*747** of fact underlying its decision are not clearly erroneous, we should affirm. The majority refuses to do so, and I respectfully dissent.

## All Citations

446 Fed.Appx. 737, 113 Fair Empl.Prac.Cas. (BNA) 262

Footnotes

1    The district court granted Plaintiffs' motion for class certification, certifying as a class "all former, current, and future African–American employees of the Metropolitan Government of Nashville and Davidson County, Metro Water Services from the period January 1, 2000 to the present."

2    After a full trial, a jury ruled in favor of Metro on Plaintiffs' disparate treatment claims. The district court reserved the question of disparate impact liability. Plaintiffs moved for a new trial, and the district court granted the motion. Metro appealed the district court's decision to grant a new trial, and a prior panel of this Court dismissed Metro's appeal, but ordered the district court to rule on the disparate impact claims. *See In re Metro. Gov't of Nashville & Davidson Cnty.,* 606 F.3d 855 (6th Cir.2010). Accordingly, the disparate treatment claims (which are awaiting a new trial) are not before us at this time.

3    Metro also provided expert testimony. Metro's expert, Dr. White, focused on the actual promotions that had occurred within MWS and concluded that there was no statistically significant difference between the promotion rate of black employees as compared to white employees. Indeed, Dr. White found that black employees actually advanced at a rate slightly *greater* than their representation in MWS's workforce. However, the district court determined that Dr. Moomaw's evidence was more persuasive than Dr. White's. The court explained that Dr. Moomaw's analysis, "[w]hile necessarily imperfect," was a better comparison given that it analyzed "blacks in higher level positions compared to the overall black to white ratio at MWS."

Grant v. Metropolitan Government of Nashville and..., 446 Fed.Appx. 737...

113 Fair Empl.Prac.Cas. (BNA) 262

4    The district court held that Metro did not demonstrate that its practices were justified by business necessity. Metro has not challenged that conclusion on appeal.

5    The order does, however, permit MWS to designate a proctor to attend the interviews.

6    Metro also argues that Plaintiffs' claims should not be analyzed under a disparate impact theory at all because they are more amenable to a disparate treatment analysis. However, a Title VII plaintiff is not required to choose one discrimination theory to the exclusion of the other. *See, e.g., Dunlap,* 519 F.3d at 629 (plaintiff relied on both theories to establish discrimination); *Carpenter v. Boeing Co.,* 456 F.3d 1183, 1192–93 (10th Cir.2006) (same); *Acree v. Tyson Bearing Co., Inc.,* 128 Fed.Appx. 419, 426 (6th Cir.2005) (stating that "a plaintiff may rely upon one of two alternate theories of recovery to establish a claim of illegal discrimination"). Further, a plaintiff may rely on the same set of facts to establish liability under either theory. *Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).

7    The 1991 amendments superseded some aspects of *Wards Cove.* They permit a plaintiff to challenge an employer's decisionmaking process as a whole if its elements are not capable of separation; and they also superseded portions of *Wards Cove* pertaining to the "business necessity" defense. *See Phillips,* 400 F.3d at 397–98. The Amendments did not disturb the aspect of *Wards Cove* pertaining to statistical evidence, and its holdings on that issue remain the law. *See id.* at 399.

---

**End of Document**                          © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 950791
Only the Westlaw citation is currently available.
United States District Court,
N.D. Texas,
San Angelo Division.

Antonius HEIJNEN, Plaintiff,
v.
Guadalupe VILLAREAL, et al.,
Defendants.

Civil Action No. 6:12–CV–00036–BL ECF.
|
March 11, 2013.

**Attorneys and Law Firms**

Antonius Heijnen, Eden, TX, pro se.

*MEMORANDUM OPINION AND ORDER*

E. SCOTT FROST, United States Magistrate Judge.

**\*1** Plaintiff Antonius Heijnen, proceeding *pro se* and *in forma pauperis,* has filed a civil rights action pursuant to 42 U.S.C. §§ 1983, 1985. Heijnen was confined at all times relevant to the claims in his complaint at the Eden Detention Center in Eden, Texas.

# I. FACTUAL AND PROCEDURAL BACKGROUND

In his complaint, (Doc. 1), against Defendants Guadalupe Villareal, Phillip Valdez, and Corrections Corporation of America, as developed by his testimony at his evidentiary hearing, (Doc. 16), Heijnen claims that although Defendants Villareal and Valdez have turned a blind eye to businesses operated at the Eden Detention Center by Hispanic inmates, they have chosen to prohibit Heijnen from operating a legal services business due to his non-Hispanic white ethnicity. He claims that this is a violation

of his rights under the Equal Protection Clause of the Fourteenth Amendment. (Doc. 1 at ¶ 39). He further claims that his Fourth Amendment rights were violated by the seizure from him of his clients' legal papers, and that his Fifth Amendment right to Due Process was violated when he was placed in the Segregated Housing Unit (SHU) at the Eden Detention Center. *Id.*

In his affidavit, Heijnen describes a conversation he had with Defendant Villareal in which Villareal told Heijnen that his legal services business should stop because Heijnen's safety might be endangered if one of his inmate clients were to consider Heijnen's work unsatisfactory and seek to harm him. (Doc. 7 at ¶ 6). In Villareal's Administrative Detention Order of May 3, 2012, it is stated that Heijnen is being subjected to administrative detention "pending investigation of a violation of Bureau [of Prisons] Regulations," and that pending said "SIS investigation," it is Villareal's "decision, based on all circumstances, that [Heijnen's] continued presence in The General Population poses a serious threat to Life, Property, Self, Staff, Other Inmates, or the Security of the Orderly Running of the Institution[.]" (Exhibit A, Doc. 1 at 17). Heijnen was advised on May 7, 2012 that he was "placed in SHU, pending investigation for operating a business. (Legal work.). This is not authorized by the facility." (Exhibit B, Doc. 1 at 18; *see also* Doc. 7 at ¶ 3). Heijnen does not dispute that he operated a legal services business for profit. (*See* Complaint at ¶ 12, Affidavit at ¶¶ 1, 5).

Heijnen filed the instant action on May 11, 2012. (Complaint, Doc. 1). He is seeking injunctive relief, attorney's fees, and an award of punitive and nominal damages. He has consented to proceed before the U.S. magistrate judge pursuant to 28 U.S.C. § 636(c). (Doc. 6). This court ordered, (Doc. 14), an evidentiary hearing in this case, at which Heijnen appeared and testified on his own behalf on October, 3, 2012. (Doc. 16). He submitted to this court a Demand for Trial by Jury on October 9, 2012. (Doc. 17.)

Despite Heijnen's consent to trial before the U.S. magistrate judge, this court erroneously entered a Report and Recommendation (rather than a judgment) in this case on January 28, 2013. (Doc. 18). On February 6, 2013, Heijnen filed a Motion to Strike Magistrate's Report, (Doc. 20), a Motion for Disclosure, (Doc. 21), a Motion for Recusal, (Doc. 22), and an Objection to Findings and Recommendations, (Doc. 23). On February 14, 2013, this court entered an order partially granting his Motion to Strike and his Objection insofar as the erroneously entered Report and Recommendation was thereby withdrawn.

(Doc. 24). On February 28, 2013, this court denied, (Doc. 25), his motions for recusal and for disclosure. (Docs.21, 22). The only pending matter before this court is his complaint. (Doc. 1).

## II. ANALYSIS

**\*2** In both proceedings *in forma pauperis* and civil actions brought by a prisoner against a governmental entity, officer, or employee, the court is required under 28 U.S.C. §§ 1915–1915A to dismiss the complaint or any portion of the complaint if the complaint is frivolous or malicious or fails to state a claim on which relief may be granted. These provisions thus apply to this *in forma pauperis* prisoner civil rights action. *Harris v. Hegmann,* 198 F.3d 153, 156 (5th Cir.1999). "An [*in forma pauperis* ] complaint may be dismissed as frivolous pursuant to 28 U.S.C. § 1915(e)(2)(B)(i) if it has no arguable basis in law or in fact." *Ruiz v. United States,* 160 F.3d 273, 274–75 (5th Cir.1998). A claim has no arguable basis in law or fact if it is based on an indisputably meritless legal theory or if, after providing the Plaintiff the opportunity to present additional facts when necessary, the facts alleged are clearly baseless. *Talib v. Gilley,* 138 F.3d 211, 213 (5th Cir.1998). The court is authorized *sua sponte* to test whether the proceeding is frivolous or malicious even before the service of process or before an answer is required to be filed. *Ali v. Higgs,* 892 F.2d 438, 440 (5th Cir.1990); *see also* 42 U.S.C. § 1997e(c)(1). A questionnaire or evidentiary hearing may be used to assist the court in determining whether the case should be dismissed under these provisions. *See Watson v. Ault,* 525 F.2d 886, 892 (5th Cir.1976) (use of questionnaire to develop the factual basis of the plaintiff's complaint); *Spears,* 766 F.2d 179 (use of an evidentiary hearing). Here, an evidentiary hearing has been used to assist the court. (Docs.14, 16).

Whether a complaint should be dismissed pursuant to §§ 1915–1915A for failure to state a claim on which relief may be granted is assessed with the same standard applicable to dismissals pursuant to Federal Rule of Civil Procedure 12(b)(6). *See Black v. Warren,* 134 F.3d 732, 733–34 (5th Cir.1998). That standard is as follows:

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The

plausibility standard is not akin to a probability requirement but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief....

In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

**\*3** *Ashcroft v. Iqbal,* 556 U.S. 662, 678–79, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (internal quotation marks and citation omitted).

In order to state a claim under § 1983, a plaintiff must (1) allege a violation of a right secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law. *Moore v. Willis Indep. Sch. Dist.,* 233 F.3d 871, 874 (5th Cir.2000).

### 1. Fourteenth Amendment Equal Protection Claim

Heijnen claims that Eden Detention Center officials selectively enforced prison regulations against him due to racial animus. However, conclusory allegations and legal conclusions are insufficient to state a cognizable claim under the Civil Rights Act when directed by the Court to state the factual basis of a claim. *See Fernandez–Montes v. Allied Pilots Ass'n,* 987 F.2d 278, 284 (5th Cir.1993) (holding that "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss."); *Van Cleave v. United States,* 854 F.2d 82, 84 (5th Cir.1988) (requiring specific facts and noting that conclusory allegations are insufficient to maintain a claim under § 1983).

"[T]o state a claim of racial discrimination under the Equal Protection Clause and § 1983, a plaintiff must demonstrate that the governmental official was motivated by intentional discrimination on the basis of race." *Coleman v. Houston Indep. Sch. Dist.,* 113 F.3d 528, 533 (5th Cir.1997) (citing *Washington v. Davis,* 426 U.S. 229, 238–42, 96 S.Ct. 2040, 48 L.Ed.2d 597, (1976); *Vera v. Tue,* 73 F.3d 604, 609 (5th Cir.1996)). " 'Proof of racially discriminatory intent or

purpose is required to show a violation of the Equal Protection Clause.' " *Id.* (quoting *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 265, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977)).

Here, Heijnen has not established racially discriminatory intent or purpose; he has merely asserted allegations based on his perception, which are insufficient to support an equal protection claim. Even if his allegations are taken as true pursuant to § 1915, he has failed to state a cognizable claim for relief. In his affidavit, he states that he "is the only one to his knowledge to go to SHU for conducting a business." (Doc. 7 at ¶ 14; *see also id.* at ¶ 9) His mere suspicion or belief that he has suffered some form of discrimination is insufficient to maintain this action. *See Whitley v. Hunt,* 158 F.3d 882, 888–89 (5th Cir.1998) (affirming district court's dismissal of an inmate's complaint where the plaintiff's claim of racial discrimination lacked any factual support).

The facts pleaded by Heijnen in support of his Equal Protection claim do not present a plausible claim for relief. *Iqbal,* 556 U.S. at 678. Further, his claims are conclusory; such claims "are not entitled to the assumption of truth." *Id.,* at 679. Even granting such an assumption *arguendo,* his Equal Protection claim does not "plausibly give rise to an entitlement to relief because he is not entitled to flout prison policy by running a legal services business for profit.

### 2. Fourth Amendment Illegal Seizure Claim

**\*4** Heijnen complains of being denied access to the legal papers of his inmate clients. (Doc. 1 at 8; Doc. 7 at ¶ 2). However, inmates have no constitutionally protected property interest in maintaining possession of the legal materials of other inmates. *See Bulger v. United States Bureau of Prisons,* 65 F.3d 48, 50 (5th Cir.1995) (internal citation omitted) (noting that in order for an inmate to have a property interest, the inmate must have "a legitimate claim of entitlement to it."). Furthermore, when one prisoner helps another with legal work, the relevant constitutional protection accrues to the benefit of the prisoner in whose name the lawsuit is filed, not the inmate who assists in the preparation of that lawsuit. *Johnson v. Rodriguez,* 110 F.3d 299, 310 (1997).

### 3. Fifth Amendment Due Process Claim

Clearly, Heijnen has no protected liberty or property interest in operating an illegal business, therefore his allegations are insufficient to support a due process claim. *See DePree v. Saunders,* 588 F.3d 282, 289 (5th Cir.2009) ( "The threshold requirement of any due process claim is the government's deprivation of a plaintiff's liberty or property interest."). Prisoners generally enjoy a constitutional right of access to the courts, *Johnson,* 110 F.3d 299 at 310 (citing *Johnson v. Avery,* 393 U.S. 483, 483–85, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969); *Ex parte Hull,* 312 U.S. 546, 547–49, 61 S.Ct. 640, 85 L.Ed. 1034 (1941)), yet this right of access is not unlimited and encompasses only "a reasonably adequate opportunity to file nonfrivolous legal claims challenging their convictions or conditions of confinement." *Johnson,* 110 F.3d at 310–11 (citing *Lewis v. Casey,* 518 U.S. 343, 116 S.Ct. 2174, 2182, 135 L.Ed.2d 606 (1996)). An inmate has no constitutional right to provide legal assistance to other inmates. *See Shaw v. Murphy,* 532 U.S. 223, 228, 121 S.Ct. 1475, 149 L.Ed.2d 420 (2001).

With regard to Heijnen's confinement in the SHU, the court notes that the protections afforded by the Due Process Clause do not extend to "every change in the conditions of confinement" which adversely affects prisoners. *Madison v. Parker,* 104 F.3d 765, 767 (5th Cir.1997). Sanctions which may be imposed as a result of disciplinary cases, including various terms of commissary, recreation, and cell restriction, do not implicate concerns that are protected by the Due Process Clause. *Id.* at 486; *Malchi v. Thaler,* 211 F.3d 953, 958 (5th Cir.2000). Moreover, an inmate has neither a protected property nor liberty interest in his custodial classification." *Moody v. Baker,* 857 F.2d 256, 257–58 (5th Cir.1988) (internal citations omitted).

Imprisonment "necessarily entails a loss of manifold rights and liberties...." *Muhammad v. Lynaugh,* 966 F.2d 901, 902 (5th Cir.1992). The Constitution sometimes permits restrictions to be imposed on those rights for prisoners than would be allowed for persons who are not imprisoned. *See, e.g., Turner v. Safley,* 482 U.S. 78, 84–85, 107 S.Ct. 2254, 96 L.Ed.2d 64. A prisoner is not always "free to do that which he might wish to do, nor may he do allowable things at a time and in a manner he might prefer." *Muhammad,* 966 F.2d at 902. In determining prison rules and regulations that may impinge on prisoners' constitutional rights, courts owe "substantial deference to the professional judgment of prison administrators". *Overton v. Bazzetta,* 539 U.S. 126, 132 (2003). A prisoner's constitutional rights may be circumscribed by prison rules when legitimate penological objectives, such as institutional order and security, outweigh the concerns associated with the preservation of the inmate's rights. *See Thornburgh v. Abbott,* 490 U.S. 401, 404, 419, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989); *Turner,* 482 U.S. at 89.

Heijnen v. Villareal, Not Reported in F.Supp.2d (2013)

("[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."). "[G]reat deference" will be accorded the judgment of prison administrators regarding jail security. *Oliver v. Scott,* 276 F.3d 736, 745 (5th Cir.2002).

**\*5** Several factors are relevant in determining whether a prison regulation infringes on an inmate's constitutional rights: (1) is there a valid, rational correlation between the prison regulation and the legitimate governmental interest advanced; (2) are there alternative means of exercising the rights that remain available to the inmates; (3) what is the impact of an accommodation in favor of the inmate on prison staff, other inmates, and the allocation of prison resources generally; and (4) are ready alternatives available for furthering the governmental interest. *Beard v. Banks,* 548 U . S. 521,529(2006).

The Eden Detention Center's official prohibition of inmates' legal services businesses, and its application to Heijnen here, appears to involve: (1) a legitimate penological interest in protecting Heijnen's safety, (2) no abrogation of Heijnen's rights (because there is no constitutionally protected interest in writ-writing for other inmates), (3) a freeing up of prison staff who might otherwise have to guard Heijnen from disgruntled clients for his own safety, and (4) the absence of any ready alternatives for ensuring that violence does not ensue if one of Heijnen's clients becomes dissatisfied with Heijnen's work. *See Beard,* 548 U.S. at 529. In the light of what appear to be legitimate penological concerns, deference is owed to Defendants' professional judgment. *See Overton,* 539 U.S. at 132; *Thornburgh,* 490 U.S. at 404, 419; *Turner,* 482 U.S. at 89; *Oliver,* 276 F.3d at 745.

### III. CONCLUSION

Having carefully considered Plaintiff's factual allegations in his complaint and at his evidentiary hearing, and his claims therein, the court finds that Plaintiff has failed to state cognizable constitutional claims.

**IT IS, THEREFORE, ORDERED** that all of Plaintiff's claims against all Defendants are **DISMISSED WITH PREJUDICE AS FRIVOLOUS.**

Judgment shall be entered accordingly. This dismissal shall count as a qualifying dismissal under 28 U.S.C. § 1915(g) and *Adepegba v. Hammons,* 103 F.3d 383 (5th Cir.1996). Dismissal of this action does not release Plaintiff or the institution where he is incarcerated from the obligation to pay any filing fee previously imposed. *See Williams v. Roberts,* 116 F.3d 1126, 1128 (5th Cir.1997).

Any pending motions are **DENIED.**

A copy of this order shall be sent by first class mail to all parties appearing *pro se* and to any attorney of record by first class mail or electronic notification.

**SO ORDERED.**

### All Citations

Not Reported in F.Supp.2d, 2013 WL 950791

---

End of Document
© 2025 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 1559156
Only the Westlaw citation is currently available.
United States District Court, W.D. Michigan,
Southern Division.

Clarence Watson HERNDON, Plaintiff,
v.
MICHIGAN DEPARTMENT OF
CORRECTIONS et al., Defendants.

Case No. 1:20-cv-1091
|
Signed 04/21/2021

**Attorneys and Law Firms**

Clarence Watson Herndon, Ionia, MI, Pro Se.

**OPINION**

HALA Y. JARBOU, UNITED STATES DISTRICT
JUDGE

**\*1** This is a civil rights action brought by a state prisoner
under 42 U.S.C. § 1983, the Americans with Disabilities
Act (ADA), 42 U.S.C. §§ 12101–12213, the Rehabilitation
Act of 1973 (RA), 29 U.S.C. §§ 701–796*l*, and various
state laws. Under Rule 21 of the Federal Rules of Civil
Procedure, a court may at any time, with or without motion,
add or drop a party for misjoinder or nonjoinder. Fed. R.
Civ. P. 21. Under the Prison Litigation Reform Act, Pub.
L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), the Court
is further required to dismiss any prisoner action brought
under federal law if the complaint is frivolous, malicious,
fails to state a claim upon which relief can be granted, or
seeks monetary relief from a defendant immune from such
relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. §
1997e(c). The Court must read Plaintiff's *pro se* complaint
indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520
(1972), and accept Plaintiff's allegations as true, unless
they are clearly irrational or wholly incredible. *Denton v.
Hernandez*, 504 U.S. 25, 33 (1992). Applying these
standards, the Court will drop Defendants Mental Health
Services, Washington, Bridgford, Davids, Traylor, Yuhas,

Maranka, Bucholtz, Oversmith, Guilford, and Doolittle
under Rule 21 because they are misjoined. The Court will
also dismiss, for failure to state a claim, the Plaintiff's
claims against the MDOC other than his ADA and RA
claims.

**Discussion**

**I. Factual Allegations**
Plaintiff is presently incarcerated with the Michigan
Department of Corrections (MDOC) at the Duane Waters
Health Center in Jackson, Jackson County, Michigan. The
events about which he complains, however, occurred at the
Ionia Correctional Facility (ICF) in Ionia, Ionia County,
Michigan. Plaintiff sues the MDOC, Michigan Health
Service (MHS), and MDOC employees Director Heidi
Washington and Equal Opportunity Employment
Administrator Joanne Bridgford. Plaintiff also sues the
following ICF employees: Warden John Davids; Assistant
Deputy Warden C. Traylor; Grievance Coordinator Adam
Yuhas; Mental Health Unit Chief David Maranka;
Qualified Mental Health Professional Carrie Bucholtz;
Resident Unit Manager Brooke Oversmith; Administrative
Assistant Chad Guilford; and Registered Nurse Nicole
Doolittle.

Plaintiff's complaint covers a series of events spanning
more than three years, from September 2017 to October
2020, and involving the 12 Defendants to varying degrees.
Plaintiff asserts that he has been diagnosed with severe
rheumatoid arthritis and major depression. Due to the
arthritis, "he has difficulty standing, maintaining balance,
walking, gripping objects, extending and raising his arms,
sleeping on a steel frame bed, and [he experiences] period
flare-ups...." (Compl., ECF No. 1, PageID.4.) The major
depression further causes him to have "difficulty sleeping,
focusing, and concentrating" and that he has a "loss of
appetite, high anxiety, and chronic episode[s] of
despondency...." (*Id.*)

Plaintiff alleges that, despite his conditions, the MDOC
denied his requests for various items (e.g., electric
toothbrush, beard trimmer, orthopedic shoes, walker) that
would accommodate his functional limitations. He alleges
that he filed a grievance against the MDOC related to these
requests on September 15, 2017. Over the three years that
followed the first grievance, the MDOC allegedly did or

failed to do the following: denied Plaintiff periodic treatment team reviews; failed to provide an effective grievance mechanism to redress medical accommodations; denied MHS services; refused to modify department policy directives; relegated him back to Stage 1 in the Start unit;¹ failed to modify yard cages so that Plaintiff could exercise outdoors; denied Plaintiff's request for a chair to use during yard time; placed Plaintiff in restraints during non-contact visitation; removed Plaintiff from the Start Unit and placed him back in segregation; failed to supervise its employees; obstructed Plaintiff's attempts to file grievances; did not provide some of Plaintiff's medical records upon request; obstructed Plaintiff's effort to file a complaint with the United States Department of Justice; denied Plaintiff's use of a wheelchair during yard time; excluded Plaintiff from full participation during yard time; required that Plaintiff be placed in restraints during telephone calls with his attorney; and denied Plaintiff's requests for more integrated therapy sessions.

**\*2** Although Plaintiff's earliest factual allegations involving the MDOC describe conduct starting in September 2017, his allegations involving any other Defendant describe conduct that occurred in June 2018 or later.

Plaintiff seeks declaratory relief, injunctive relief, and damages.

## II. Misjoinder

Plaintiff joins 12 Defendants, each sued in both their personal and official capacities, connecting a series of discrete claims. At this juncture, the Court reviews whether Plaintiff's claims are misjoined.

### A. Improper Joinder

Federal Rule of Civil Procedure 20(a) limits the joinder of parties in a single lawsuit, whereas Federal Rule of Civil Procedure 18(a) limits the joinder of claims. Rule 20(a)(2) governs when multiple defendants may be joined in one action: "[p]ersons ... may be joined in one action as defendants if: (A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all defendants will arise in the action." Rule 18(a) states: "A party asserting a claim ... may join,

as independent or alternative claims, as many claims as it has against an opposing party."

Courts have recognized that, where multiple parties are named, in this case, the analysis under Rule 20 precedes that under Rule 18:

> Rule 20 deals solely with joinder of parties and becomes relevant only when there is more than one party on one or both sides of the action. It is not concerned with joinder of claims, which is governed by Rule 18. Therefore, in actions involving multiple defendants Rule 20 operates independently of Rule 18....

> Despite the broad language of Rule 18(a), plaintiff may join multiple defendants in a single action only if plaintiff asserts at least one claim to relief against each of them that arises out of the same transaction or occurrence and presents questions of law or fact common to all.

7 Charles Allen Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1655 (3d ed. 2001), *quoted in* *Proctor v. Applegate*, 661 F. Supp. 2d 743, 778 (E.D. Mich. 2009), *and* *Garcia v. Munoz*, No. 08-1648, 2008 WL 2064476, at \*3 (D.N.J. May 14, 2008); *see also* *United States v. Mississippi*, 380 U.S. 128, 142–43 (1965) (joinder of defendants is permitted by Rule 20 if both commonality and same transaction requirements are satisfied).

Therefore, "a civil plaintiff may not name more than one defendant in his original or amended complaint unless one claim against each additional defendant is transactionally related to the claim against the first defendant and involves a common question of law or fact." *Proctor*, 661 F. Supp. 2d at 778 (internal quotation omitted). When determining if civil rights claims arise from the same transaction or occurrence, a court may consider a variety of factors, including, " 'the time period during which the alleged acts occurred; whether the acts ... are related; whether more than one act ... is alleged; whether the same supervisors were involved, and whether the defendants were at different geographical locations.' " *Id.* (quoting *Nali v. Mich. Dep't of Corr.*, No. 07-10831, 2007 WL 4465247, at \*3 (E.D. Mich. Dec. 18, 2007)).

**\*3** Permitting the improper joinder in a prisoner civil rights action also undermines the purpose of the PLRA, which was to reduce the large number of frivolous prisoner lawsuits that were being filed in the federal courts. *See* *Riley v. Kurtz*, 361 F.3d 906, 917 (6th Cir. 2004). Under the PLRA, a prisoner may not commence an action without prepayment of the filing fee in some form. *See* 28 U.S.C. § 1915(b)(1). These "new fee provisions of the PLRA were designed to deter frivolous prisoner litigation ... 'by making all prisoner [litigants] ... feel the deterrent effect

created by liability for filing fees.' " *Williams v. Roberts*, 116 F.3d 1126, 1127–28 (5th Cir. 1997) (quoting *Jackson v. Stinnett*, 102 F.3d 132, 136–37 (5th Cir. 1996)). The PLRA also contains a "three-strikes" provision requiring the collection of the entire filing fee after the dismissal for frivolousness, etc., of three actions or appeals brought by a prisoner proceeding in forma pauperis, unless the statutory exception is satisfied. 28 U.S.C. § 1915(g). The "three strikes" provision was also an attempt by Congress to curb frivolous prisoner litigation. *See Wilson v. Yaklich*, 148 F.3d 596, 603 (6th Cir. 1998).

The Seventh Circuit has explained that a prisoner like plaintiff may not join in one complaint all of the defendants against whom he may have a claim, unless the prisoner satisfies the dual requirements of Rule 20(a)(2):

> Thus multiple claims against a single party are fine, but Claim A against Defendant 1 should not be joined with unrelated Claim B against Defendant 2. Unrelated claims against different defendants belong in different suits, not only to prevent the sort of morass that [a multi]-claim, [multi]-defendant suit produce[s] but also to ensure that prisoners pay the required filing fees—for the Prison Litigation Reform Act limits to 3 the number of frivolous suits or appeals that any prisoner may file without prepayment of the required fees. 28 U.S.C. § 1915(g) ....

> A buckshot complaint that would be rejected if filed by a free person—say, a suit complaining that A defrauded the plaintiff, B defamed him, C punched him, D failed to pay a debt, and E infringed his copyright, all in different transactions—should be rejected if filed by a prisoner.

*George v. Smith*, 507 F.3d 605, 607 (7th Cir. 2007); *see also Brown v. Blaine*, 185 F. App'x 166, 168–69 (3d Cir. 2006) (allowing an inmate to assert unrelated claims against new defendants based on actions taken after the filing of his original complaint would have defeated the purpose of the three strikes provision of PLRA); *Patton v. Jefferson Corr. Ctr.*, 136 F.3d 458, 464 (5th Cir. 1998) (declining to allow "litigious prisoners to immunize frivolous lawsuits from the 'three strikes' barrier by the simple expedient of pleading unexhausted habeas claims as components of § 1983 suits"); *Shephard v. Edwards*, No. C2-01-563, 2001 WL 1681145, at *1 (S.D. Ohio Aug. 30, 2001) (declining to consolidate prisoner's unrelated various actions so as to allow him to pay one filing fee, because it would improperly circumvent the express language and clear intent of the 'three strikes' provision"); *Scott v. Kelly*, 107 F. Supp. 2d 706, 711 (E.D. Va. 2000) (denying prisoner's request to add new, unrelated claims to an ongoing civil rights action as an improper attempt to circumvent the PLRA's filing fee requirements and an attempt to escape the possibility of obtaining a "strike"

under the "three strikes" rule).

Under these circumstances, to allow Plaintiff to proceed with improperly joined claims and Defendants in a single action would permit him to circumvent the PLRA's filing fee provisions. Furthermore, he would avoid the consequences of filing at least three actions with all claims dismissed as meritless, frivolous, or for failure to state a claim.

Therefore, the Court will look to the first listed Defendant and the first set of clear factual allegations against that Defendant to determine which portion of the action should be considered related. Plaintiff lists the MDOC first in the complaint's caption (Compl., ECF No. 1, PageID.2), list of defendants (*id.*, PageID.3), and body (*id.*, PageID.4). Plaintiff's earliest factual allegations assert that the MDOC had denied his requests for various items to accommodate his functional limitations, and he therefore filed a grievance against the MDOC on September 15, 2017. None of the other Defendants is transactionally related to Plaintiff's first claim involving the MDOC. Moreover, it is clear that no question of law or fact is common to all Defendants. *See* Fed. R. Civ. P. 20(a)(2)(B). Plaintiff has, therefore, improperly joined Defendants Mental Health Services, Washington, Bridgford, Davids, Traylor, Yuhas, Maranka, Bucholtz, Oversmith, Guilford, and Doolittle.

### B. Remedy

**\*4** Under Rule 21 of the Federal Rules of Civil Procedure, "[m]isjoinder of parties is not a ground for dismissing an action." *Id.* Instead, Rule 21 provides two remedial options: (1) misjoined parties may be dropped on such terms as are just; or (2) any claims against misjoined parties may be severed and proceeded with separately. *See Grupo Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567, 572–73 (2004) ("By now, 'it is well settled that Rule 21 invests district courts with authority to allow a dispensable nondiverse party to be dropped at any time....' ") (quoting *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 832 (1989)); *DirecTV, Inc. v. Leto*, 467 F.3d 842, 845 (3d Cir. 2006); *Carney v. Treadeau*, No. 2:07-cv-83, 2008 WL 485204, at *2 (W.D. Mich. Feb. 19, 2008); *Coal. to Defend Affirmative Action v. Regents of Univ. of Mich.*, 539 F. Supp. 2d 924, 940 (E.D. Mich. 2008); *see also Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 682 (6th Cir. 1988) ("[D]ismissal of claims against misjoined parties is appropriate."). "Because a district court's decision to remedy misjoinder by dropping and dismissing a party, rather than severing the relevant claim, may have important and potentially adverse statute-of-limitations

Herndon v. Michigan Department of Corrections, Not Reported in Fed. Supp. (2021)

consequences, the discretion delegated to the trial judge to dismiss under Rule 21 is restricted to what is 'just.' " *DirecTV*, 467 F.3d at 845.

At least three judicial circuits have interpreted "on such terms as are just" to mean without "gratuitous harm to the parties." *Strandlund v. Hawley*, 532 F.3d 741, 745 (8th Cir. 2008) (quoting *Elmore v. Henderson*, 227 F.3d 1009, 1012 (7th Cir. 2000)); *see also DirecTV*, 467 F.3d at 845. Such gratuitous harm exists if the dismissed parties lose the ability to prosecute an otherwise timely claim, such as where the applicable statute of limitations has lapsed, or the dismissal is with prejudice. *Strandlund*, 532 F.3d at 746; *DirecTV*, 467 F.3d at 846–47.

In this case, Plaintiff brings a civil rights action under 42 U.S.C. § 1983 and, purportedly, various other state and federal statutes. For civil rights suits filed in Michigan, the statute of limitations is three years. *See* Mich. Comp. Laws § 600.5805(2); *Carroll v. Wilkerson*, 782 F.2d 44 (6th Cir. 1986) (per curiam); *Stafford v. Vaughn*, No. 97-2239, 1999 WL 96990, at *1 (6th Cir. Feb. 2, 1999). It further appears that all other claims Plaintiff brings in this action would also be subject to the same three-year statute of limitations. *See* Mich. Comp. Laws § 600.5805(2). The statute of limitations begins to run when the aggrieved party knows or has reason to know of the injury that is the basis of his action. *Collyer v. Darling*, 98 F.3d 211, 220 (6th Cir. 1996).

The statute of limitations, however, is subject to tolling. The Sixth Circuit has recognized that, in prisoner civil rights actions, the statute of limitations is tolled for the period during which a plaintiff's available state administrative remedies were being exhausted. *See Brown v. Morgan*, 209 F.3d 595, 596–97 (6th Cir. 2000).

The Prison Litigation Reform Act amended 42 U.S.C. § 1997e to provide: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a) (1999).... This language unambiguously requires exhaustion as a mandatory threshold requirement in prison litigation. Prisoners are therefore prevented from bringing suit in federal court for the period of time required to exhaust "such administrative remedies as are available." For this reason, the statute of limitations which applied to Brown's civil rights action was tolled for the period during which his available state remedies were being exhausted.

**\*5** *Id.* at 596 (citing *Harris v. Hegmann*, 198 F.3d 153, 157–59 (5th Cir. 1999) (per curiam), and *Cooper v. Nielson*, 194

F.3d 1316 (9th Cir. 1999)). The Sixth Circuit noted that, because it could not determine when the period of exhaustion expired, the appropriate remedy was to remand the case to the District Court to "consider and decide the period during which the statute of limitations was tolled and for such other proceedings as may be necessary." *Id.* at 597. Furthermore, "Michigan law provides for tolling of the limitations period while an earlier action was pending which was later dismissed without prejudice." *Kalasho v. City of Eastpointe*, 66 F. App'x 610, 611 (6th Cir. 2003).

Plaintiff's misjoined claims involve conduct that has occurred since June 2018, within the three-year period of limitations. Those claims are not at risk of being time-barred. Accordingly, the Court will exercise its discretion under Rule 21 and drop Plaintiff's claims against Defendants Mental Health Services, Washington, Bridgford, Davids, Traylor, Yuhas, Maranka, Bucholtz, Oversmith, Guilford, and Doolittle because they are misjoined and not at risk of being time-barred. The Court will dismiss without prejudice Plaintiff's complaint against them under Rule 21 of the Federal Rules of Civil Procedure.[2]

### III. Failure to State a Claim

A complaint may be dismissed for failure to state a claim if it fails " 'to give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. Although the plausibility standard is not equivalent to a " 'probability requirement,' ... it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d

468, 470–71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(i)).

## IV. ADA and RA

Plaintiff has alleged that the MDOC has violated rights provided to him under the ADA and RA. Plaintiff presumably claims that the MDOC has violated Title II of the ADA. Title II of the ADA provides, in pertinent part, that no qualified individual with a disability shall, because of that disability, "be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *Mingus v. Butler*, 591 F.3d 474, 481–82 (6th Cir. 2010) (citing 42 U.S.C. § 12132).[3] In order to state a claim under Title II of the ADA, Plaintiff must show: (1) that he is a qualified individual with a disability; (2) that defendants are subject to the ADA; and (3) that he was denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or was otherwise discriminated against by defendants, by reason of plaintiff's disability. *See Tucker v. Tennessee*, 539 F.3d 526, 532 (6th Cir. 2008); *see also Jones v. City of Monroe*, 341 F.3d 474, 477 (6th Cir. 2003). The term "qualified individual with a disability" includes "an individual with a disability who, with or without ... the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

**\*6** The Supreme Court has held that Title II of the ADA applies to state prisons and inmates. *Penn. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210–12 (1998) (noting that the phrase "services, programs, or activities" in § 12132 includes recreational, medical, educational, and vocational prison programs). The proper defendant under a Title II claim is the public entity or an official acting in his official capacity. *Carten v. Kent State Univ.*, 282 F.3d 391, 396–97 (6th Cir. 2002). Plaintiff has named the MDOC as a Defendant.

The State of Michigan (acting through the MDOC) is not necessarily immune from Plaintiff's claims under the ADA. The ADA "validly abrogates state sovereign immunity" for "conduct that *actually* violates the Fourteenth Amendment[.]" *United States v. Georgia*, 546 U.S. 151, 159 (2006); *see also Mingus*, 591 F.3d at 482. If conduct violates the ADA but not the Fourteenth Amendment, then the Court must determine whether the ADA validly abrogates state sovereign immunity. *Id.* At

this stage of the proceedings, the Court will presume that the ADA validly abrogates state sovereign immunity for Plaintiff's ADA claims. Additionally, the Sixth Circuit has determined that a State that accepts relevant federal funds waives sovereign immunity under the RA. *See Nihiser v. Ohio EPA*, 269 F.3d 626, 628–29 (6th Cir. 2001); *see also Carten*, 282 F.3d at 398 (citing cases); 42 U.S.C. § 2000d-7. Therefore, the Court concludes that Plaintiff's allegations are sufficient to state claims brought under the ADA and RA against the MDOC.

## V. Remaining Claims against the MDOC

Plaintiff may not maintain his further claims against the MDOC. Regardless of the form of relief requested, the states and their departments are immune under the Eleventh Amendment from suit in the federal courts, unless the state has waived immunity or Congress has expressly abrogated Eleventh Amendment immunity by statute. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98–101 (1984); *Alabama v. Pugh*, 438 U.S. 781, 782 (1978); *O'Hara v. Wigginton*, 24 F.3d 823, 826 (6th Cir. 1994).

### A. § 1983

Congress has not expressly abrogated Eleventh Amendment immunity by statute in § 1983, *Quern v. Jordan*, 440 U.S. 332, 341 (1979), and the State of Michigan has not consented to civil rights suits in federal court. *Abick v. Michigan*, 803 F.2d 874, 877 (6th Cir. 1986). In numerous opinions, the Sixth Circuit has specifically held that the MDOC is absolutely immune from a § 1983 suit under the Eleventh Amendment. *See, e.g.*, *Harrison v. Michigan*, 722 F.3d 768, 771 (6th Cir. 2013); *Diaz v. Mich. Dep't of Corr.*, 703 F.3d 956, 962 (6th Cir. 2013); *McCoy v. Michigan*, 369 F. App'x 646, 653–54 (6th Cir. 2010). In addition, the State of Michigan (acting through the MDOC) is not a "person" who may be sued under § 1983 for money damages. *See Lapides v. Bd. of Regents*, 535 U.S. 613, 617 (2002) (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989)); *Harrison*, 722 F.3d at 771. Thus, Plaintiff fails to state a § 1983 claim against the MDOC.

### B. State Law Claims

Plaintiff's ability to bring any state law claim against the State—or its departments—depends entirely on whether the State has waived its immunity to suit in federal courts. A waiver must be clearly expressed and cannot be merely implied within the language of the statute. *United States v. King*, 395 U.S. 1, 4 (1969) ("[A] waiver [of sovereign immunity] *cannot be implied but must be unequivocally expressed.*") (emphasis added); *cf. Will*, 491 U.S. at 66–67. The federal courts must strictly construe the scope of any purported waiver in favor of the State. *See Lane v. Pena*, 518 U.S. 187, 192 (1996). When examining the scope of a purported waiver, a federal court must look at the language of the statute to determine not only "*whether* [the State] may be sued, but *where* it may be sued." *Pennhurst*, 465 U.S. at 99. Consequently, a State's willingness to waive its immunity to suit in its own state courts is insufficient on its own to create a waiver of its Eleventh Amendment immunity in the federal courts. *See Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 241 (1985) (citing *Fla. Dep't of Health v. Fla. Nursing Home Ass'n*, 450 U.S. 147, 150 (1981) (per curiam)). Therefore, a plaintiff may bring a state law claim against a State or its departments in the federal courts only if the State clearly expressed that it "inten[ded] to subject itself to suit in *federal court.*" *Atascadero*, 473 U.S. at 234 (citing *Smith v. Reeves*, 178 U.S. 436, 441 (1900)).

**\*7** None of the state laws at issue in Plaintiff's complaint expressly waives the State's sovereign immunity in the federal courts. Michigan has created a limited waiver of its immunity for general tort liability. *See* Mich. Comp. Laws § 691.1407. However, that statute lacks any indication that the State intended to subject itself to litigation in the federal courts. Therefore, the State has not created a blanket waiver of its immunity to suit in federal court. *See Atascadero*, 473 U.S. at 234. Moreover, none of the state laws on which Plaintiff bases his claims indicate that Michigan intended

to subject itself to suit in federal court. *See* Mich. Comp. Laws §§ 37.1101–37.1607 (Persons with Disabilities Civil Rights Act), §§ 37.2101–37.2804 (Elliott-Larsen Civil Rights Act), §§ 333.26261–333.26271 (Medical Records Access Act). Consequently, the State—acting through the MDOC—has not waived its immunity to suit in federal court for any of Plaintiff's state law claims. *See Atascadero*, 473 U.S. at 234. Therefore, Plaintiff fails to state a claim against the MDOC on any state law grounds.

## Conclusion

Having conducted the review required by Rule 21 of the Federal Rules of Civil Procedure, the Court determines that Defendants Mental Health Services, Washington, Bridgford, Davids, Traylor, Yuhas, Maranka, Bucholtz, Oversmith, Guilford, and Doolittle are misjoined in this action. The Court will dismiss Plaintiff's complaint against them without prejudice.

Having conducted the review required by the PLRA, the Court determines that Plaintiff's claims against the MDOC, other than his ADA and RA claims, will be dismissed for failure to state a claim, under 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c). Plaintiff's ADA and RA claims against the MDOC remain in the case.

An order consistent with this opinion will be entered.

## All Citations

Not Reported in Fed. Supp., 2021 WL 1559156

### Footnotes

1    Plaintiff presumably refers to the incentive stages of the Start Unit, a four-stage program designed as an alternative to administrative segregation, encouraging eligible prisoners to achieve progressive improvement and permit them to return to the general population. *See* MDOC Director's Office Memorandum (DOM) 2020-20 (eff. Jan. 1, 2020), available at https://www.michigan.gov/documents/corrections/DOM_2020-20_Start_Unit_Final_675313_7.pdf.

2    As fully discussed in this opinion, Plaintiff is cautioned that he must limit all future actions to Defendants and claims that are transactionally related to one another. The Court may, in its discretion and without further warning, dismiss any future complaint, or part thereof, filed by Plaintiff that contains claims that are misjoined.

3    Similarly, § 504 of the RA provides in pertinent part:

No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination

under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794(a). "Because the ADA sets forth the same remedies, procedures, and rights as the Rehabilitation Act ... claims brought under both statutes may be analyzed together." *Thompson v. Williamson Cnty.*, 219 F.3d 555, 557 n.3 (6th Cir. 2000) (citing *Maddox v. Univ. of Tenn.*, 62 F.3d 843, 846 n.2 (6th Cir. 1995)).

---

**End of Document**            © 2025 Thomson Reuters. No claim to original U.S. Government Works.

186 Fed.Appx. 592
This case was not selected for publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also U.S.Ct. of App. 6th Cir. Rule 32.1.
United States Court of Appeals, Sixth Circuit.

Kevin JOHNSON, Sr.; James E. Cossingham, Sr.; Rev. Jerry Jones, Plaintiffs–Appellants,
v.
CITY OF CLARKSVILLE; Don Trotter, Mayor of the City of Clarksville, Tennessee, individually and in his official capacity; R. Douglas Weiland, Montgomery County Mayor, individually and in his official capacity; Montgomery County, Tennessee, et al., Defendants–Appellees.

No. 05–5924
|
June 21, 2006.

**Synopsis**
**Background:** Two African American plaintiffs and one Native American plaintiff brought Title VI claims against city and county, alleging racially discriminatory denial of their requests to use city and county facilities for a program for at-risk youths, for teaching Native–American culture to children, and for a program for disabled veterans. The United States District Court for the Middle District of Tennessee granted summary judgment for defendants. Plaintiffs appealed.

**Holdings:** The Court of Appeals, Cook, Circuit Judge, held that:

evidence did not show that race was motivating factor with respect to county's denial of requests, and

assuming McDonnell Douglas burden-shifting framework was applicable, plaintiffs did not show they were similarly situated with nonprotected class.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Summary Judgment.

**\*593** On Appeal from the United States District Court for the Middle District of Tennessee.
Before: GIBBONS and COOK, Circuit Judges; SCHWARZER, Senior District Judge.[*]

**Opinion**

COOK, Circuit Judge.

Three minorities, Kevin Johnson, James Cossingham, and Jerry Jones, allege that city and county governments denied them use of certain facilities and funds because of discriminatory animus. The district **\*594** court granted summary judgment for Defendants, holding that Plaintiffs failed to establish a prima facie case of discrimination, and Plaintiffs challenge this holding on appeal. We affirm.

I

Plaintiffs Johnson, Cossingham, and Jones sought use of facilities belonging to Defendants Montgomery County and the City of Clarksville, Tennessee. Johnson, an African American, asked Montgomery County for the use of the Old Cumberland Heights Elementary School and the Southern Guthrie Community Center ("SGCC") in order to implement BEST, his program for at-risk youths. Johnson also requested the use of a number of Clarksville facilities for the same purpose, and he requested funding from Clarksville. Cossingham, a Native American, sought to utilize the SGCC in creating a program to teach Native–American culture to children. Jones, an African American, wanted to use the SGCC in conjunction with a program for disabled veterans. In each case, Defendants denied Plaintiffs' requests, and Plaintiffs attribute the adverse decisions to Defendants' race-based preferences.

Plaintiffs sued the City of Clarksville, Montgomery County, and thirty-five individuals (city council members, county commissioners, and mayors), alleging a violation of Title VI of the Civil Rights Act of 1964. The parties stipulated to the dismissal of the individual defendants,

Johnson v. City of Clarksville, 186 Fed.Appx. 592 (2006)

2006 Fed.App. 0418N

leaving only claims against the city and county. The district court entered summary judgment in favor of Defendants after determining that Plaintiffs could not establish a prima facie case of discrimination. Plaintiffs argue on appeal that they set forth sufficient evidence to state a prima facie case of discrimination and that they also presented direct evidence of discrimination.

## II

We review a grant of summary judgment de novo, accepting the facts in the light most favorable to Plaintiffs and affirming summary judgment only if there is no genuine issue as to any material fact. *Nat'l Solid Wastes Mgmt. Ass'n v. Daviess County,* 434 F.3d 898, 902 (6th Cir.2006). To avoid summary judgment on a Title VI claim, "a plaintiff must create a genuine issue of material fact that the defendant intended to discriminate on the basis of race" by demonstrating that the decision "was motivated by race and that ... race was a determining factor in the exclusion." *Buchanan v. City of Bolivar,* 99 F.3d 1352, 1356 (6th Cir.1996).

## A. Claims Against Montgomery County

Plaintiffs argue that they presented direct evidence of discrimination by Montgomery County. At his deposition, Jones averred that he had a friend who was a police detective and that the detective's supervisor called the detective a "nigger." This allegation, however, lacks any force as to Montgomery County's motivation for its actions concerning these Plaintiffs. Jones also testified that, when he complained to the County Attorney, Roger Maness, about the County's treatment, Maness informed him that "he didn't know if [Jones] had any civil rights or not." Additionally, Plaintiffs contend that the county erected a fence around the SGCC sometime after Plaintiffs sought to use it. But neither Maness's alleged comment nor the fence evinces race-based preference so as to constitute direct evidence of discrimination.

Lacking direct evidence of discrimination to validate their claims, Plaintiffs argue that they established a circumstantial case under the *McDonnell Douglas* **\*595** burden-shifting framework. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). We assume without deciding that this burden-shifting framework

governs Plaintiffs' Title VI claims. *See Paasewe v. Ohio Arts Council,* 74 Fed.Appx. 505, 508 (6th Cir.2003) (applying *McDonnell Douglas* to Title VI claim); *Gazarov ex rel. Gazarov v. Diocese of Erie,* 80 Fed.Appx. 202, 204–05 (3d Cir.2003); *Fuller v. Rayburn,* 161 F.3d 516, 518 (8th Cir.1998). Their claims nevertheless fail.

To establish a prima facie case under *McDonnell Douglas,* Plaintiffs must show that similarly-situated members of the nonprotected class received more favorable treatment than they received. *See Mitchell v. Vanderbilt Univ.,* 389 F.3d 177, 181 (6th Cir.2004); *Noble v. Brinker Int'l, Inc.,* 391 F.3d 715, 731 (6th Cir.2004). Thus, Plaintiffs must point to an organization that is "nearly identical" to Plaintiffs' "in all relevant aspects." *Humenny v. Genex Corp.,* 390 F.3d 901, 906 (6th Cir.2004) (quotations omitted) (discussing employment discrimination); *see Mitchell v. Toledo Hosp.,* 964 F.2d 577, 583 (6th Cir.1992) ("It is fundamental that ... the plaintiff must show that the 'comparables' are similarly situated *in all respects."*). We agree with the district court that they did not do so here.

Plaintiffs offer a host of organizations they claim to be similarly-situated: the YMCA, the 4–H Club, Big Brothers/Big Sisters, the Civitan Club, the Jaycees, the "Library System," the "Recreation Centers," a "Teen Center," a "Ball Field," and a "Golf Course." But Plaintiffs offer this list without explanation as to how these entities are similarly-situated, and the claimed similarity is not self-evident to the court. Plaintiffs note only that the other entities use county facilities or otherwise received favorable treatment and ask us to infer from this that they are similarly-situated. The record does not warrant such an inference, however. Plaintiffs point us to no evidence of the entities' compositions, histories with Defendants, objectives, or other pertinent characteristics. In addition, Plaintiffs offer no comparison between the facilities used by the other entities—or the application process to use those facilities—and those that the Plaintiffs sought to use. Plaintiffs' bare allegations that the organizations are similarly-situated cannot withstand a motion for summary judgment. *Noble,* 391 F.3d at 731 ("Generalized allegations unsupported by evidence are insufficient to meet the plaintiff's burden. [The plaintiff] simply failed to present any evidence of a similarly situated individual outside the protected class who was treated more favorably than he.").

To the extent that Plaintiffs argue that Maness's failure to respond to their complaints constituted racial discrimination, Plaintiffs do not present a prima facie case of disparate treatment—they have neither alleged nor shown that any similarly-situated nonprotected complainant received a more favorable response. Similarly, Plaintiffs summarily argue that the County

Johnson v. City of Clarksville, 186 Fed.Appx. 592 (2006)

2006 Fed.App. 0418N

violated Title VI by having "no Title VI policy and procedures in place pursuant to the State of Tennessee Commission on Title VI Compliance." But Plaintiffs did not plead this in their complaint and, in any event, they neglect to develop the argument on appeal. We will not address this argument because "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *United States v. Layne,* 192 F.3d 556, 566 (6th Cir.1999) (quotation omitted).

**\*596** B. Claims Against the City of Clarksville

Plaintiff Johnson contends that he presented a prima facie case of discrimination by the City of Clarksville, and that the district court erred in granting summary judgment. He suggests that the city effectively denied his requests to use city facilities because city personnel stonewalled his attempts to schedule organizational meetings. He also argues that the city discriminated against him by refusing to grant his requests for funding.

When Johnson submitted a calendar reflecting the dates and times that he wished to use city facilities, a city employee informed him that many of those dates and times conflicted with existing activities. According to Johnson, he then sought meetings with city personnel in order to procure the facilities on available dates, but city personnel "either had meetings of no substance with Mr. Johnson or no meetings at all."

Johnson highlights the Jaycees as a nonprotected group that received preferential treatment. But, other than his allegation, Johnson offers nothing from which this court could conclude that the Jaycees are similarly situated to Johnson. He notes that the Jaycees hold fundraisers at the city's fairgrounds (and pay 6% of their gross income to the city), but he does not suggest that he sought to use the fairgrounds or any other facility on similar terms. Johnson fails to show that the Jaycees are similar in any relevant respect. *See Noble,* 391 F.3d at 731.

Johnson fails to develop any argument on appeal relating to the city's denial of his application for funding. He contends that the city made "unreasonable requests" in relation to the funding, though he does not identify the requests. He also argues that the city "failed to give him an opportunity" to show that he was qualified to receive funds, but again he neglects to provide more detail. And he does not point us to any direct evidence of discrimination or any circumstantial evidence to state a prima facie case. In the absence of such evidence, the district court correctly entered summary judgment in favor of the city.

III

Without either direct evidence of discrimination or a prima facie case of discrimination, Plaintiffs' case cannot survive Defendants' motion for summary judgment. We therefore affirm the district court.

**All Citations**

186 Fed.Appx. 592, 2006 Fed.App. 0418N

Footnotes

\*    The Honorable William W Schwarzer, Senior United States District Judge for the Northern District of California, sitting by designation.

End of Document                                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 5999243
Only the Westlaw citation is currently available.
United States District Court,
E.D. Michigan,
Southern Division.

Sharon D. LEWIS, Plaintiff,
v.
MICHIGAN OCCUPATIONAL SAFETY
AND HEALTH ADMINISTRATION,
Defendant.

No. 13–10889.
|
Nov. 12, 2013.

**Attorneys and Law Firms**

Sharon Lewis, Oak Park, MI, pro se.

Erik A. Grill, Michigan Department of Attorney General, Lansing, MI, for Defendant.

*ORDER OVERRULING PLAINTIFF'S OBJECTIONS TO ORDER DENYING PLAINTIFF'S MOTIONS TO AMEND COMPLAINT AND ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION*

GERALD E. ROSEN, Chief Judge.

**\*1** On August 13, 2013, Magistrate Judge Laurie J. Michelson issued an order denying Plaintiff Sharon D. Lewis's motions to amend her complaint, as well as a report and recommendation ("R & R") recommending that the Court grant Plaintiff's motion in which she seeks the entry of a final order on all issues presented in this litigation. Neither party has lodged any objections to the R & R, and the Court adopts this aspect of the Magistrate Judge's August 13 ruling in its entirety. As for the order denying Plaintiff's motions to amend, Plaintiff filed objections to this order on August 21, 2013. For the reasons stated briefly below, the Court overrules Plaintiff's objections and affirms the Magistrate Judge's denial of

Plaintiff's motions to amend her complaint.

Under the Federal Rule and statutory provision governing objections to a Magistrate Judge's orders, this Court may set aside the Magistrate Judge's August 13 denial of Plaintiff's motions to amend her complaint only if Plaintiff "show[s] that the magistrate judge's order is clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(1)(A); *see also* Fed.R.Civ.P. 72(a). Yet, rather than addressing the legal determinations in the Magistrate Judge's order, Plaintiff's objections consist almost entirely of (i) repeated restatements of the factual allegations and legal theories of recovery advanced in Plaintiff's proposed amended complaint, without any effort to address the specific deficiencies in Plaintiff's proposed claims as identified by the Magistrate Judge, and (ii) references to statutes—*e.g.,* the federal Americans with Disabilities Act and Michigan's Elliott–Larsen Civil Rights Act—and legal authorities and principles that have no bearing upon the claims and allegations actually asserted in Plaintiff's proposed amended complaint.[1]

Simply stated, these "objections" fail to address in any way the salient elements of the Magistrate Judge's order. First and foremost, the Magistrate Judge correctly observes that there are "few substantive differences" between Plaintiff's proposed amended complaint and her initial complaint. (8/13/2013 R & R at 4.) Because the Court previously determined that Plaintiff's initial complaint was "subject to dismissal," (5/14/2013 Order at 2), and because Plaintiff's proposed amended complaint does not cure the deficiencies in this initial pleading, it readily follows, and the Magistrate Judge correctly concludes, that Plaintiff's proposed amendments are futile.

Next, as to the specific federal claims and theories of recovery advanced in Plaintiff's proposed amended complaint, the Magistrate Judge observed in an earlier May 3, 2013 report and recommendation that Plaintiff's Title VII claim of race discrimination fails for lack of allegations of an employment relationship between Plaintiff and Defendant, (*see* 5/3/2013 R & R at 5–6), and Plaintiff's proposed amended complaint does nothing to cure this deficiency. To the extent that Plaintiff seeks to overcome this defect by attempting to pursue claims of race discrimination under 42 U.S.C. §§ 1983 and 1985 rather than Title VII, the Magistrate Judge explains that the Defendant state agency is immune from § 1983 or § 1985 claims for money damages, (*see* 8/13/2013 R & R at 6–7), and Plaintiff has failed to identify any authority to the contrary.[2] Regarding Plaintiff's proposed claim under the Federal Tort Claims Act, the Magistrate Judge correctly

holds that the Defendant state agency is not a federal agency subject to this federal statute, (*see id.* at 5–6), and Plaintiff again has not shown that this ruling is clearly erroneous or contrary to law.

**\*2** This leaves only Plaintiff's proposed state-law theories of recovery. As explained in the Magistrate Judge's May 3, 2013 report and recommendation, because all of the federal claims asserted in Plaintiff's initial and proposed amended complaint are subject to dismissal, it is appropriate for the Court to decline to exercise supplemental jurisdiction over Plaintiff's state-law claims. (*See* 5/3/2013 R & R at 6–7.) Accordingly, to the extent that Plaintiff's objections pertain to any possible state-law theories she might wish to pursue, the Court declines to address these objections.

For these reasons,

NOW, THEREFORE, IT IS HEREBY ORDERED that Plaintiff's August 21, 2013 objections to the Magistrate Judge's August 13, 2013 order denying Plaintiff's motions to amend complaint (docket # 30) are OVERRULED, and that the Magistrate Judge's order is AFFIRMED.

Next, IT IS FURTHER ORDERED that the Magistrate Judge's August 13, 2013 report and recommendation (docket # 30) is ADOPTED as the opinion of this Court. IT IS FURTHER ORDERED, for the reasons set forth in the Magistrate Judge's R & R, that Plaintiff's August 6, 2013 motion for a final order (docket # 29) is GRANTED. The Court will promptly enter a final judgment reflecting its rulings in this case.

Finally, IT IS FURTHER ORDERED that Plaintiff's November 6, 2013 renewed motion for a final order (docket # 34) is DENIED AS MOOT, in light of the Court's grant of Plaintiff's earlier motion seeking the same relief.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 5999243

Footnotes

1    Although Plaintiff's proposed amended complaint references the federal Americans with Disabilities Act at one point, it does not appear that Plaintiff means to assert a claim under this federal statute. Even if she did, she has not alleged that she suffers from a disability within the meaning of this statute, nor do the allegations of her proposed amended complaint give rise to a plausible claim that the Defendant state agency discriminated against her because of a disability. As for Michigan's Elliott–Larsen Act, Plaintiff's proposed amended complaint does not even mention this state statute, and the Court, in any event, would decline to exercise supplemental jurisdiction over any state-law claim that Plaintiff might wish to pursue under this statute.

2    In her objections to the Magistrate Judge's order, Plaintiff seemingly suggests that she might be seeking to pursue a claim against the Defendant state agency under Title VI of the Civil Rights Act of 1964, which prohibits discrimination on account of race, color, or national origin "under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Yet, even assuming such a claim could be discerned from the allegations of Plaintiff's proposed amended complaint, and even assuming that the Defendant state agency is subject to Title VI by virtue of its receipt of federal funds, Plaintiff's bare and conclusory allegations that officials of the Defendant state agency discriminated against her "because she is black," (Plaintiff's Proposed First Amended Complaint at ¶¶ 16, 33), do not give rise to a plausible claim of race discrimination under Title VI, where Plaintiff has offered nothing beyond her own belief that her race was a factor in her unsatisfactory dealings with the Defendant agency. *See HDC, LLC v. City of Ann Arbor,* 675 F.3d 608, 613 (6th Cir.2012) ("A complaint that includes only conclusory allegations of discriminatory intent without supporting factual allegations does not sufficiently show entitlement to relief.").

**End of Document**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Martinson v. Regents of the University of Michigan, Not Reported in Fed. Supp. (2011)

2011 WL 13124122
Only the Westlaw citation is currently available.
United States District Court, E.D. Michigan,
Southern Division.

Linda MARTINSON, Plaintiff,
v.
REGENTS OF THE UNIVERSITY OF
MICHIGAN, a constitutional body
corporate; Carol Loveland-cherry,
individually and in her official capacity;
Judith Lynchsauer, individually and in
her official capacity; and Bonnie Hagerty,
individually and in her official capacity,
Defendants.

Case No. 09-13552
|
Signed 09/28/2011

**Attorneys and Law Firms**

Linda Martinson, Troy, MI, pro se.

Jennifer L. Newby, U.S. Attorney, Timothy H. Howlett, Dickinson Wright, Detroit, MI, for Defendants.

OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS (DKT. NO. 33) AND ORDERING PLAINTIFF TO FILE HER RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON OR BEFORE OCTOBER 21, 2011

PAUL D. BORMAN, UNITED STATES DISTRICT JUDGE

**\*1** This matter is before the Court on Defendants' motion to dismiss Plaintiff's Complaint pursuant to Fed. R. Civ. P. 12(b)(6) and 12(b)(1). (Dkt. No. 33.) Plaintiff filed a response. (Dkt. No. 40.) Defendants filed a reply. (Dkt. No. 41.) The Court held a hearing on August 31, 2011. For the reasons that follow, the Court GRANTS IN PART and

DENIES IN PART Defendants' motion to dismiss.

**INTRODUCTION**

Plaintiff claims that she was denied both substantive and procedural due process in violation of the United States and Michigan Constitutions in her expulsion from the University of Michigan Nursing Program. Plaintiff seeks declaratory and equitable relief, as well as money damages, pursuant to 42 U.S.C. § 1983 for her federal claims and pursuant to the Michigan Constitution for her state claims. Defendants now move to dismiss Plaintiff's Complaint, arguing that certain of Plaintiff's claims are barred by Eleventh Amendment and/or Qualified Immunity and that the remainder of Plaintiff's claims fail to state a claim under Fed. R. Civ. P. 12(b)(6).

For the reasons that follow, the Court GRANTS Defendants' motion to dismiss all of Plaintiff's claims against the University Board of Regents and GRANTS Defendants' motion to dismiss Plaintiff's § 1983 claims for monetary and other retrospective relief against the individual Defendants in their official capacities. The Court GRANTS Defendants' motion to dismiss Plaintiff's Federal and State substantive due process claims. The Court GRANTS Defendants' motion to dismiss Plaintiff's state law procedural due process claims and GRANTS Defendants' motion to dismiss Plaintiff's *respondeat superior* claim. The Court DENIES Defendants' motion to dismiss Plaintiff's procedural due process claim against the individual Defendants in their individual capacities.

**I. BACKGROUND**

Plaintiff was a student at the University of Michigan Nursing School from August, 2007 through her expulsion in November, 2007. (Compl. ¶10.) In September, 2007, Plaintiff began to have clinical performance problems in one of her nursing classes. A variety of factors contributed to these admitted performance problems, including the fact that Plaintiff's daughter had recently received an unexpected medical diagnosis. (*Id.* ¶¶ 13-14.) On September 17, 2007, Plaintiff approached her clinical instructor of the class in which she was having problems, Diane Bohn, who advised her to leave the program because the workload and stress level were only going to increase. (*Id.* ¶ 15.) From this point on, Plaintiff perceived that her

Martinson v. Regents of the University of Michigan, Not Reported in Fed. Supp. (2011)

relationship with Ms. Bohn deteriorated rapidly, as Ms. Bohn began to document alleged problems with Plaintiff's clinical performance. Ms. Bohn involved some of the Defendants in meetings with Plaintiff, during which Plaintiff's performance was criticized, criticism to which Plaintiff "was not receptive." (*Id.* ¶¶ 16-18.) It was Plaintiff's belief that after one such meeting on October 12, 2007, Defendants Lynch-Sauer and Hagerty developed a "strong, personal dislike for Plaintiff, wanted to expel her, and were looking for justification for the same." (*Id.* ¶ 18.)

**\*2** Plaintiff alleges that on or about October 16, 2007, Defendant Bohn filed a report with Defendant Loveland-Cherry detailing a supposed honor code violation by Plaintiff. Plaintiff was asked to attend a meeting on October 17, 2007 with Defendants Hagerty and Loveland-Cherry to discuss the report, at which further criticism of Plaintiff was offered "to which Plaintiff was unresponsive." At the meeting, Loveland-Cherry also informed Plaintiff that there had been reports by other students that Plaintiff had violated the student honor code, but the individuals were not identified by name. Defendant Loveland-Cherry had requested that the University of Michigan Department of Public Safety (DPS) be present at the meeting and, at Loveland-Cherry's request after the meeting, the DPS issued Plaintiff a no-trespass citation barring her from entering the campus. (*Id.* ¶¶ 19-21.)

Following this meeting, Loveland-Cherry submitted a request to the Vice-President of Student Affairs asking that Plaintiff be removed from the School of Nursing based on several reported incidents of Plaintiff's disrupting the educational environment and causing faculty and students to feel threatened and intimidated. Plaintiff alleges that the claimed incidents were overblown and that Plaintiff never threatened anyone with bodily harm. (*Id.* ¶¶ 23-25.) Loveland-Cherry's request was transferred to the Office of Student Conflict Resolution which issued a memorandum on October 22, 2007, indicating that Plaintiff posed no immediate threat to safety and recommended further monitoring of Plaintiff's behavior and referral for counseling. (*Id.* ¶¶ 26-28.)

Loveland-Cherry continued to pursue the matter and on October 22, 2007, scheduled a "preliminary inquiry hearing" for November 5, 2007, the week of Plaintiff's final exams, regarding Bohn's report of honor code violations. The preliminary inquiry hearing was held on November 5, 2007, as scheduled and noticed, but Plaintiff was "unable to attend." (*Id.* ¶¶ 29-32.) On November 7, 2007, pursuant to guidelines in the University of Michigan Handbook, Loveland-Cherry advised in a memorandum that the complaint against Plaintiff, based on behavior with clinical staff, faculty and student peers that was not consistent with the American Nursing Association Code of

Ethics, would proceed to the next hearing level – before the Committee on Academic Admissions and Scholastic Standing ("CAASS") Hearing Panel. (*Id.* ¶¶31, 35-38.) The memorandum requested that the hearing be scheduled on an expedited basis, and the Final Hearing was scheduled for November 9, 2007.

On November 7, 2007, Loveland-Cherry approached Plaintiff and attempted to hand her a packet regarding the scheduled hearing. Plaintiff refused to accept the packet because she "was scared" and was afraid she "was going to be arrested." (*Id.* ¶¶ 39-41.) At 1:48 p.m. on that afternoon, Loveland-Cherry sent Plaintiff an email with the packet material attached, but Plaintiff never opened the attachment. Plaintiff did not attend the November 9, 2007 Final CAASS hearing. The evidence presented before the CAASS panel contained numerous written statements by Plaintiff's peers regarding incidents where Plaintiff allegedly intimidated, threatened or frightened them. (*Id.* ¶¶ 42-46.)

At the Final CAASS Hearing on November 9, 2007, Bohn suggested that Plaintiff not be expelled but be strictly monitored until she addressed some personal issues. Lynch-Sauer and Hagerty recommended expulsion, which the CAASS Committee approved, effective November 16, 2007, immediately and permanently expelling Plaintiff from the School of Nursing.

Plaintiff filed an internal administrative appeal pursuant to University of Michigan internal policies. The appeal panel found that Plaintiff had been given an inadequate amount of time to respond to the charges against her and that less drastic sanctions should have been considered. The panel recommended that a new CAASS hearing panel be convened. (*Id.* ¶¶ 49-56.) The School of Nursing declined to follow the appeal panel's recommendations and advised Plaintiff in writing on August 28, 2008 that she was permanently expelled. (*Id.* ¶ 57.) This lawsuit followed.

## II. STANDARD OF REVIEW

### A. Federal Rule of Civil Procedure 12(b)(6)

**\*3** Fed. R. Civ. P. 12(b)(6) provides for the dismissal of a case where the complaint fails to state a claim upon which relief can be granted. When reviewing a motion to dismiss under Rule 12(b)(6), a court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Direct TV, Inc. v. Treesh*, 487 F.3d

Martinson v. Regents of the University of Michigan, Not Reported in Fed. Supp. (2011)

471, 476 (6th Cir. 2007). But the court "need not accept as true legal conclusions or unwarranted factual inferences." *Id.* (quoting *Gregory v. Shelby County*, 220 F.3d 433, 446 (6th Cir. 2000)). "[L]egal conclusions masquerading as factual allegations will not suffice." *Eidson v. State of Term. Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007).

In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the Supreme Court explained that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level...." *Id.* at 555 (internal citations omitted). Dismissal is only appropriate if the plaintiff has failed to offer sufficient factual allegations that make the asserted claim plausible on its face. *Id.* at 570. The Supreme Court clarified the concept of "plausibilty" in *Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009):

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." [*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556, 570 (2007)]. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* at 556. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid.* Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.' " *Id.*, at 557 [brackets omitted].

*Id.* at 1948-50. A plaintiff's factual allegations, while "assumed to be true, must do more than create speculation or suspicion of a legally cognizable cause of action; they must show *entitlement* to relief." *LULAC v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) (citing *Twombly*, 127 S.Ct. at 1965). Thus, "[t]o state a valid claim, a complaint must contain either direct or inferential allegations respecting all the material elements to sustain recovery under some viable legal theory." *Bredesen*, 500 F.3d at 527 (citing *Twombly*, 127 S.Ct. at 1969).

In addition to the allegations and exhibits of the complaint, a court may consider "public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the [c]omplaint and are central to the claims contained therein." *Bassett v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008) (citing *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001)); *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993)

("[A] court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.") (citations omitted).

**B. Federal Rule of Civil Procedure 12(b)(1)**

**\*4** Where federal subject matter jurisdiction is challenged under Rule 12(b)(1), the plaintiff has the burden of proving jurisdiction exists. *Michigan SRR Co. v. Branch & St. Joseph Counties Rail Users Ass'n Inc.*, 287 F.3d 568, 573 (6th Cir. 2002); *Madison-Hughes v. Shalala*, 80 F.3d 1121, 1130 (6th Cir. 1996) ("When subject matter jurisdiction is challenged under Rule 12(b)(1), the plaintiff has the burden of proving jurisdiction in order to survive the motion.") "The court has wide discretion to consider materials outside the complaint in assessing the validity of its jurisdiction." *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990).

**III. ANALYSIS**

**A. Plaintiff's 42 U.S.C. § 1983 Claims Against the Board of Regents, and the Claims Against the Individual Defendants in Their Official Capacities for Damages or Other Retrospective Relief, Are Dismissed Based on Eleventh Amendment Immunity; Also Dismissed Is Plaintiff's Vicarious Liability Claim Against the University**

It is well established that states, state entities and state officials sued in their official capacities for damages or other retrospective relief are not "persons" subject to liability under 42 U.S.C. § 1983. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the state itself."). The University of Michigan Board of Regents (hereinafter "the University" or the "Board") has long been considered an arm of the state for purposes of Eleventh Amendment immunity. *Estate of Ritter v. University of Michigan, et al.*, 851 F.2d 846, 851 (6th Cir. 1988) (concluding that the University of Michigan Board of Regents is unquestionably a state agency to which the Eleventh Amendment applies absent a waiver of that immunity). *See also Platt v. University of Michigan, et al.*, No. 09-cv-10886, 2010 WL 1286487, at *10 (E.D. Mich.

Case 5:25-cv-10579-JEL-DRG   ECF No. 28-3, PageID.406   Filed 07/11/25   Page 65 of 112

Martinson v. Regents of the University of Michigan, Not Reported in Fed. Supp. (2011)

March 3, 2010) (holding that the University of Michigan and the individual defendant university officials and supervisors were entitled to Eleventh Amendment immunity and dismissing plaintiff's ADEA and ADA claims against them for monetary damages); *Sullivan v. Regents of the University of Michigan*, No. 08-12245, 2009 WL 2915787, at *6 (E.D. Mich. Sept. 8, 2009) (holding that the Eleventh Amendment bars suit against a University of Michigan police officer in his official capacity, citing *Ritter*); *Picozzi v. Sandalow*, 623 F. Supp. 1571, 1573 n. 1 (E.D. Mich. 1986) (dismissing Board of Regents and individual defendants in their official capacities based on Eleventh Amendment immunity); *Ewing v. Bd. of Regents of the Univ. of Michigan*, 552 F. Supp. 881, 883 (E.D. Mich. 1982) (holding that, absent waiver, the University of Michigan is a state instrumentality entitled to Eleventh Amendment immunity).

Similarly, all state law claims against the University and the individual Defendants in their official capacities are barred by the Eleventh Amendment in an action brought in federal court. *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 121 (1984) ("We concluded above that a claim that state officials violated state law in carrying out their official responsibilities is a claim against the State that is protected by the Eleventh Amendment. We now hold that this principle applies as well to state-law claims brought into federal court under pendent jurisdiction."). *See also Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 520-21 (6th Cir. 2007) (citing *Pennhurst, supra*) ("The Supreme Court has squarely held that pendent state law claims against state officials in their official capacity are barred by the Eleventh Amendment."); *Sullivan*, 2009 WL 2915787, at *6 (holding that the Eleventh Amendment also barred plaintiff's pendent state law claims against the university police officer in his official capacity) (citing *Experimental Holdings, supra*)

**\*5** This dismissal of Plaintiff's state law claims applies to all forms of relief sought, including prospective injunctive relief, which may be available to Plaintiff in federal court on her federal claims against the individual Defendants in their official capacities under the doctrine of *Ex Parte Young*. The Supreme Court clearly embraced this conclusion in *Pennhurst*:

This need to reconcile competing interests [recognized in *Ex Parte Young*] is wholly absent, however, when a plaintiff alleges that a state official has violated state law. In such a case the entire basis for the doctrine of *Young* and *Edelman* disappears. A federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law. On the contrary, it is difficult to think of a greater intrusion on state

sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment. We conclude that *Young* and *Edelman* are inapplicable in a suit against state officials on the basis of state law.

*Pennhurst*, 465 U.S. at 106 (internal quotation marks and citations omitted). *See also United States Pipe & Foundry Co. v. Johnson*, 927 F.2d 296, 298-99 (6th Cir. 1991) (recognizing that "[t]he Supreme Court has held that the eleventh amendment prohibits federal courts from ordering state officials to conform their conduct to state law") (citing *Pennhurst, supra*).

Plaintiff does not address Defendants' Eleventh Amendment immunity argument in her response and continues to assert that, as a government entity, the University can be held "vicariously responsible" for "their employees constitutional torts, under *Monell v. Department of Social Services*, 436 U.S. 658 (1978)." As discussed above, the University is absolutely immune from liability for monetary damages or other retrospective relief and *Monell* provides no exception to this immunity. "[I]t does not follow that if municipalities are persons then so are States. States are protected by the Eleventh Amendment while municipalities are not, and we consequently limited our holding in *Monell* 'to local government units which are not considered part of the State for Eleventh Amendment purposes ....' " *Will*, 491 U.S. at 70 (quoting *Monell*, 436 U.S. at 690 n. 54.) Moreover, Plaintiff misperceives the basis of *Monell* liability, which, even when directed at a nonimmune governmental entity, cannot be premised on a theory of vicarious liability. *Monell*, 436 U.S. at 691-695. A municipality cannot be held liable pursuant 42 U.S.C. § 1983 on a theory of *respondeat superior. Monell*, 436 U.S. at 691-95; *Phillips v. Roane County Tenn.*, 534 F.3d 531, 543 (6th Cir. 2008) (holding that § 1983 liability must be based on more than respondeat superior, or the right to control employees) (quoting *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)). Plaintiff's vicarious liability claim (Count VI) is dismissed in its entirety.

Accordingly, the Court GRANTS Defendants' motion to dismiss all of Plaintiff's claims against the University Board of Regents. The Court further GRANTS Defendants' motion to dismiss Plaintiff's state law claims, as well as Plaintiff's claims for retrospective or monetary relief under 42 U.S.C. § 1983, against the individual Defendants in their official capacities. The Court also GRANTS Defendants' motion to dismiss Plaintiff's vicarious liability claim (Count VI).

**B. Plaintiff's 42 U.S.C. § 1983 Substantive Due Process Claim**

**\*6** Plaintiff claims that as "a student at a public university, Plaintiff had a constitutionally protected fundamental right and interest in continuing her education at The University of Michigan School of Nursing." (Compl. ¶ 60.) She further claims that she had "a constitutionally protected property interest in continuing her education at the University of Michigan School of Nursing." (Compl. ¶ 61.) She claims that her expulsion from the School of Nursing was "arbitrary and capricious," was "motivated by bad faith," and "shocks the conscience." (Compl. ¶¶ 63, 66.) These allegations form the basis for Plaintiff's substantive due process claims.

While the waters remain murky on the issue of whether continued enrollment at a public university is a fundamental interest (either property or liberty) protected by substantive due process, the better reasoned view is that it is not and that, even if it is assumed to be, the "avenue of judicial review" of academic decisions claimed to interfere with such a right is extremely "narrow." While sidestepping on more than one occasion the ultimate issue of the true "fundamental" nature of any such right, the Supreme Court has clearly held that such academic decisions will survive any assumed substantive constitutional challenge unless they are manifestly "irrational" and unrelated to any legitimate educational goal, representing "a substantial departure from accepted academic norms as to demonstrate that the faculty did not exercise professional judgment." *Regents of the University of Michigan v. Ewing*, 474 U.S. 214, 227, 228 n. 13 (1985) (noting that the Court had assumed, without deciding, in *Board of Curators, Univ. of Mo. v. Horowitz*, 435 U.S. 78, 91-92 (1978), that federal courts can review academic decisions of a public educational institution under a substantive due process standard, and once again proceeding on that "assumption" in the case before it).

Thus, while the Supreme Court has not expressly held that the right to a continued public university education is a fundamental right protected by substantive due process, it has often enough made such an assumption without deciding otherwise so that there is no clear directive, leading to several inconsistent decisions in this and other circuits. Often prominent in the debate is Justice Powell's impassioned and oft-quoted concurring opinion in *Ewing*, in which he agreed with the Court's ultimate conclusion that Ewing presented "no violation of the substantive due process right that he asserts," but disagreed with the Court's "assumption" that such a right could exist:

Although I join the Court's opinion holding that respondent presents no violation of the substantive due process right that he asserts, I think it unnecessary to assume the existence of such a right on the facts of this case. Respondent alleges that he had a property interest in his continued enrollment in the University's Inteflex program, and that his dismissal was arbitrary and capricious. The dismissal allegedly violated his substantive due process rights guaranteed by the Fourteenth Amendment, providing the basis for his claim under 42 U.S.C. § 1983.

\* \* \*

The interest asserted by respondent—an interest in continued enrollment from which he derives a right to retake the NBME—is essentially a state-law contract right. It bears little resemblance to the fundamental interests that previously have been viewed as implicitly protected by the Constitution. For these reasons, briefly summarized, I do not think the fact that Michigan may have labeled this interest "property" entitles it to join those other, far more important interests that have heretofore been accorded the protection of substantive due process.... Judicial review of academic decisions, including those with respect to the admission or dismissal of students, is rarely appropriate, particularly where orderly administrative procedures are followed—as in this case.

**\*7** 474 U.S. at 228-30 (internal quotation marks and citations omitted). Although there is much intuitive appeal in Justice Powell's concurrence, the wiser course under the present state of the law is to continue to "assume" such a right can be asserted under rare circumstances and to restrict the scope of judicial review of such decisions to the most narrow constitutionally permissible and deferential standard.

In analyzing this issue, the concepts of equal protection and substantive due process, although distinct, necessarily begin to merge at some point in the dialectic. The Supreme Court's conclusion, expressed in *Ewing*, that even assuming the existence of a fundamental right in this educational context, academic decisions impacting such a right will survive a substantive constitutional challenge unless found to be "irrational" and "unrelated to legitimate governmental objectives," terms we typically associate with an equal protection and not a due process analysis, bears this out. This intersecting of the two doctrines was clearly explained by the Sixth Circuit in *Gutzwiller v. Fenik*, 860 F.2d 1317 (6th Cir. 1988):

While the concepts of equal protection and substantive due process are defined differently, they are, in actuality, very similar concepts. Both stem from our American

ideals of fundamental fairness and both enmesh the judiciary in substantive review of governmental action. The spheres of protection offered by the two concepts are not, to be sure, coterminous. However, they will overlap in certain situations so that a violation of one will constitute a violation of the other.... The equal protection clause of the fourteenth amendment requires the government to treat similarly situated individuals in a similar manner.... Substantive due process, a much more ephemeral concept, protects specific fundamental rights of individual freedom and liberty from deprivation at the hands of arbitrary and capricious government action. The fundamental rights protected by substantive due process arise from the Constitution itself and have been defined as those rights which are implicit in the concept of ordered liberty. While this is admittedly a somewhat vague definition, it is generally held that an interest in liberty or property must be impaired before the protections of substantive due process become available. Even if such an interest has been impaired by governmental action, courts will review the challenged decision only for arbitrariness or capriciousness. Indeed, in the academic setting, as the Supreme Court made clear in *Ewing*, courts may override a decision under substantive due process only if that decision is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment.

860 F.2d at 1328-29 (internal quotation marks and citations omitted).

Based on this reasoning, the Sixth Circuit in *Bell v. Ohio State Univ.*, 351 F.3d 240 (6th Cir. 1985), expressly relying in part on *Gutzwiller*, held that substantive due process does not protect a medical student's interest in continuing education, absent evidence of an equal protection violation:

The interests protected by substantive due process are of course much narrower than those protected by procedural due process. Most property interests warranting the protection of procedural due process, for instance, may be substantively modified or abolished by the legislature. Interests protected by substantive due process, which the legislature may not infringe unless supported by sufficiently important state interests, include those protected by specific constitutional guarantees, such as the Equal Protection Clause, freedom from government actions that "shock the conscience," and certain interests that the Supreme Court has found so rooted in the traditions and conscience of our people as to be fundamental.

**\*8** 351 F.3d at 249-50 (internal citations and quotation marks omitted). In *Bell*, the court noted that none of the cases cited by plaintiff had actually found that such an interest exists, each case (including *Ewing* and *Horowitz*)

having assumed such an interest *arguendo* and with great reluctance based on concerns of federalism and academic freedom. The court concluded: "Where ... there is no equal protection violation, we can see no basis for finding that a medical student's interest in continuing her medical education is protected by substantive due process." *Id.* at 251, 251 n.2.

Such a conclusion comports with the Supreme Court's holding in *San Antonio Independent School Dist. v. Rodriguez*, 411 U.S. 1, 29 (1973) that the right to a public education is not a fundamental right, and that government action that denied access to public education did not merit strict scrutiny analysis in an equal protection context and need only be rationally related to a legitimate governmental interest:

The lesson of these cases in addressing the question now before the Court is plain. It is not the province of this Court to create substantive constitutional rights in the name of guaranteeing equal protection of the laws. Thus, the key to discovering whether education is 'fundamental' is not to be found in comparisons of the relative societal significance of education as opposed to subsistence or housing. Nor is it to be found by weighing whether education is as important as the right to travel. Rather, the answer lies in assessing whether there is a right to education explicitly or implicitly guaranteed by the Constitution.... Education, of course, is not among the rights afforded explicit protection under our Federal Constitution. Nor do we find any basis for saying it is implicitly so protected. As we have said, the undisputed importance of education will not alone cause this Court to depart from the usual standard for reviewing a State's social and economic legislation.

411 U.S. at 34-35. *See also Seal v. Morgan*, 229 F.3d 567, 575 (6th Cir. 2000) (relying in part on *San Antonio Independent Schools*, rejecting the argument that suspension of a high school student implicated a fundamental right and concluding that "[i]n the context of school discipline, a substantive due process claim will succeed only in the rare case when there is no rational relationship between the punishment and the offense.") (internal quotation marks and citations omitted). *See also Hill v. Bd. of Trustees of Mich. State Univ.*, 182 F. Supp. 2d 621, 626-27 (W.D. Mich. 2001) (citing *Seal* for the proposition that the right to attend public high school is not a fundamental right protected by due process and noting that the right to a public higher education is even less deserving of such protection).

In analyzing this issue, courts have arrived at similar conclusions, albeit via different analytical paths. *Cf. Ku v. State of Tennessee*, 322 F.3d 431, 435 (6th Cir. 2003) (analyzing a substantive due process challenge to a public

school expulsion, without discussion of the underlying debate over whether such a claim can be stated, citing *Ewing* and *Horowitz*, and finding not "a shred of evidence that the College's actions constitute a substantial departure from accepted academic norms or were otherwise taken in bad faith," finding the decision neither arbitrary nor capricious and entering judgment as a matter of law in favor of the school); *Lee v. University of Michigan-Dearborn*, No. 06-cv-66, 2007 WL 2827828, at *5 (W.D. Mich. Sept. 27, 2007) (holding that plaintiff's expulsion did not implicate substantive due process protections because "a student's right to attend a public high school is not a fundamental right for purposes of substantive due process analysis" and concluding that "a post-secondary student such as plaintiff has even a lesser claim that her attendance at a college or university is a fundamental right"); *Rogers v. Tennessee Board of Regents*, 273 Fed.Appx. 458, 463 (6th Cir. 2008) (finding that plaintiff's interest in her nursing education was not protected by substantive due process, relying on *Bell*, which "rejected the notion that substantive due process protects a medical student's interest in continuing education."); *McGee v. Schoolcraft Community College*, 167 Fed.Appx. 429, 436-37 (6th Cir. 2006) (relying on *Bell* and refusing, in the absence of an alleged equal protection violation, to find a substantive due process right to continued enrollment based on plaintiff's dismissal for poor performance and inappropriate behavior with patients); *Zwick v. Regents of University of Michigan*, No. 06-12639, 2008 WL 1902031, at *6 (E.D. Mich. April 28, 2008) (declining to analyze the substantive due process claim as "unnecessary" based on the court's finding that plaintiff had a protected property interest in her continued university enrollment and concluding, on a procedural due process analysis, that plaintiff had demonstrated a material issue of fact as to whether she received sufficient notice).

**\*9** Based on *Bell*, *McGee* and *Rogers*, Defendants argue that neither Plaintiff's interest in her enrollment in the School of Nursing (property) nor her interest in her reputation (liberty) are fundamental interests protected by substantive due process. (Defs.' Mot. 3-4.) While the Court has doubts, similar to those expressed in Justice Powell's concurrence in *Ewing*, as to whether such interests should ever be protected by substantive due process, the better course based on the current law is to assume *arguendo* that such a claim can be stated and to analyze the facts accordingly.

In the instant case, Plaintiff has not pleaded facts which would indicate conduct on the part of the Defendants that "shocks the conscience" or that amounts to "such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." First,

Plaintiff has not asserted an equal protection violation and the inquiry could end there. *See Bell* and *McGee supra*. Even were the Court to analyze the facts further, it is undisputed that Plaintiff was academically struggling to keep up with her assignments. (Compl. ¶¶ 13-14.) It is also undisputed that multiple students complained to the School of Nursing, in written statements, about various incidents involving Plaintiff's alleged threatening behavior. (Compl. ¶¶ 44-46.) Far from being "arbitrary and capricious," or "irrational," the Defendants' actions in addressing both Plaintiff's poor academic performance and her fellow students' complaints were clearly related to the university's interests in protecting both the quality of the educational program and the safety and well-being of the students. "When judges are asked to review the substance of a genuinely academic decision, such as this one, they should show great respect for the faculty's professional judgment." *Ewing*, 474 U.S. at 225.[2]

Accordingly, the Court GRANTS Defendants' motion to dismiss Plaintiff's substantive due process claims (Counts I and III).

### C. Plaintiff's Procedural Due Process Claim

Plaintiff claims that she was not given constitutionally sufficient notice and an opportunity to be heard before her expulsion for alleged violations of the nursing school code of ethics. In *Flaim v. Medical College of Ohio*, 418 F.3d 629, 633 (6th Cir. 2005), the Sixth Circuit stated: "In this Circuit we have held that the Due Process Clause is implicated by higher education disciplinary decisions." Like Plaintiff, Michael Flaim was a graduate student at a public university, a third-year medical student attending the Medical College of Ohio. Flaim was arrested and convicted of a felony drug charge and ultimately expelled from the college, after a limited hearing and no right to appeal, for violating "institutional standards of conduct." 418 F.3d at 633. The Sixth Circuit began its discussion of Flaim's procedural due process claim, which the district court had dismissed for failure to state a claim, by noting the established proposition that higher education disciplinary decisions implicate the safeguards of procedural due process. *Id.* In fact, the *Flaim* case was about *what* process Flaim was due, and not at all about *whether* any process was due, which was presumed based on existing law:

**\*10** In this Circuit we have held that the Due Process Clause is implicated by higher education disciplinary decisions. *Jaksa v. Regents of Univ. of Mich*, 597 F.Supp. 1245 (E.D. Mich. 1984), *aff'd*, 787 F.2d 590

(6th Cir. 1986) (finding due process clause implicated in suspension from university for cheating); *see also Goss v. Lopez*, 419 U.S. 565, 575, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) (liberty and property interest implicated in high-school suspension); *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Gorman v. Univ. of R.I.*, 837 F.2d 7, 12 (1st Cir. 1988) (a student's interest "in pursuing an education is included within the fourteenth amendment's protection of liberty and property"). "Once it is determined that due process applies, the question remains what process is due." *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). The amount of process due will vary according to the facts of each case and is evaluated largely within the framework laid out by the Supreme Court in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). See also *Gorman*, 837 F.2d at 12 (stating that due process is "not a fixed or rigid concept, but, rather, is a flexible standard which varies depending upon the nature of the interest affected, and the circumstances of the deprivation"). Because Flaim's case is a disciplinary expulsion, rather than an academic one, we conduct a more searching inquiry. *See Missouri v. Horowitz*, 435 U.S. 78, 86, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978) (academic decisions "call[ ] for far less stringent procedural requirements").

418 F.3d at 633-34.

*Goss v. Lopez*, 419 U.S. 565 (1975), relied on by the Sixth Circuit in *Flaim* to support the conclusion that higher education disciplinary decisions implicate due process concerns, involved a challenge to the constitutionality of a high school student's 10-day suspension from school without a hearing. The Court found that Goss had a protectable state-created property interest in continuing his public education, entitling him to certain constitutional protections in the deprivation of that right. "Although Ohio may not be constitutionally obligated to establish and maintain a public school system, having done so it must provide minimum procedures before a deprivation." *Goss* also recognized a liberty interest: "The Due Process Clause also forbids arbitrary deprivations of liberty. 'Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him,' the minimal requirements of the Clause must be satisfied." (citing *Wisconsin v. Constantineau*, 400 U.S. 433, 437(1971) and *Board of Regents v. Roth*, 408 U.S. 564, 573 (1972)). "It is apparent that the claimed right of the State to determine unilaterally and without process whether [ ] misconduct has occurred immediately collides with the requirements of the Constitution." *Goss*, 419 U.S. at 574.

It has long been recognized that state-created property interests may give rise to Fourteenth Amendment due process protections. *Roth*, 408 U.S. at 577 ("The

Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits. These interests-property interests ... are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law ...."). *See also Rogers v. Tennessee Bd. of Regents*, 273 Fed.Appx. 458, 462 (6th Cir. 2008) (analyzing the sufficiency of the process afforded a university nursing student based on a right created by Tennessee law which provided plaintiff with a constitutionally protected interest in her nursing education); *Ku*, 322 F.3d at 435 (assuming a constitutionally protected interest in continuing medical education based on Tennessee law which clearly recognized such a right).

Michigan state courts have recognized that the right to continue a course of higher education warrants constitutional protection. Michigan courts have not distinguished higher public education from high school programs when discussing such procedural protections and have relied on *Goss* in recognizing that public university students have a property interest in their continued education.[3] *See Imtiaz v. Board of Regents of the University of Michigan*, Nos. 253107, 253109, 2006 WL 510057, at *4 (Mich. Ct. App. March 2, 2006) (citing *Goss* for the proposition that the right to a public education has been recognized as a legitimate property or liberty interest protected by due process and relying on the Sixth Circuit's opinion in *Flaim* for the proposition that in the context of higher education disciplinary actions, no greater process is required than notice and an opportunity to be heard). Notably, in *Imtiaz*, the court also discussed the fact that governing boards of Michigan's public universities enjoy a unique constitutional status and that "in educational matters, the independence of Michigan's public universities is well established." 2006 WL 510057 at *6. Notwithstanding this autonomy, the court did not question the fact that the right to higher education is protected by procedural due process and that the Board of Regents was obligated to afford plaintiff notice and an opportunity to be heard. *Id. See also Zwick*, 2008 WL 1902031, at * 5 ("relying on relevant Michigan state court decisions and persuaded by the logic of fellow federal courts," to find "that continued enrollment in a public university amounts to a property interest and a student is thus afforded protection from arbitrary dismissal under the Due Process clause.").

**\*11** Plaintiff has alleged sufficient facts, particularly with regard to the notice that she received and the opportunity that she was given to respond to the charges against her, to state a claim of procedural due process that survives Defendants' motion to dismiss.[4] Accordingly, the Court DENIES Defendants' motion to dismiss Plaintiff's 42

U.S.C. § 1983 claim based on procedural due process against the individual Defendants in their individual capacities.

#### D. Qualified Immunity

Defendants argue that, even assuming the Court finds that Plaintiff had a protected property interest in her nursing education, and therefore was entitled to a certain amount of procedural due process before a deprivation of that right, the law on this issue was not clearly established at the time Plaintiff was expelled in 2007. (Defs.' Mot. 7-8.) In order to assert a violation of a "clearly established" right and defeat a qualified immunity defense, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). " 'A right is clearly established if there is binding precedent from the Supreme Court, the Sixth Circuit, the district court itself, or other circuits thatis directly on point.' " *Holzemer v. City of Memphis*, 621 F.3d 512, 527 (6th Cir. 2009) (quoting *Risbridger v. Connelly*, 275 F.3d 565, 569 (6th Cir. 2002)).

In their motion to dismiss, Defendants maintain that a reasonable university official in 2007 could not have known that Plaintiff was entitled to *any* type of notice or opportunity to be heard before they expelled her from the nursing school based on alleged ethics code violations. The Court disagrees and concludes that Plaintiff's property interest in her continued education, and her related right to procedural due process with respect to any deprivation of that interest, were clearly established in this Circuit in 2007 when Plaintiff was expelled. *Flaim* in particular, and also *Picozzi, supra, Jaksa v. Regents of the University of Michigan*, 787 F.2d 590 (6th Cir. 1986), *Hart v. Ferris State College*, 557 F. Supp. 1379, 1382 (D. Mich. 1983) and other decisions that were published in 2007, stand as precedent clearly establishing that Plaintiff was entitled to some form of due process protection before her expulsion from the nursing school. Indeed, the University's own internal procedures, which Defendants claim to have followed in Plaintiff's case, appear to recognize an obligation in this regard.

Neither of the two unpublished cases, *McGee, supra*, issued in 2006 and *Lee, supra*, issued in 2007, that Defendants cite to support their assertion that "[t]he issue of whether a student's interest in continued enrollment at a post-secondary institution is protected by procedural due process has not been resolved," compels a different conclusion. Significantly, in *Lee*, Magistrate Judge

Brenneman concluded, before embarking on a gratuitous discussion of the clearly established nature of the right Lee asserted, that even if a property interest did exist that entitled Lee to procedural due process protection, it was not implicated in Lee's case because Lee was not actually expelled from the university but was only placed on probation. 2007 WL 2827828, at *6-7. Thus, Magistrate Judge Brenneman's entire discussion of the clearly established nature of the right to procedural due process in the university setting was dicta. Secondly, without significant analysis, Magistrate Judge Brenneman criticized the Sixth Circuit's opinion in *Flaim* for relying on *Jaksa, supra*, dismissing the *Jaksa* decision as a "four-sentence, unpublished affirmance." 2007 WL 2827828, at *8. Magistrate Judge Brenneman then implied that the published decision in *Flaim* was somehow undercut by the unpublished decision in *McGee*, which stated (also in dicta) that the issue of whether a student's interest at a post-secondary school is protected by procedural due process was not resolved, but failed to address or even mention *Flaim*. Magistrate Judge Brenneman then lumped together what he perceived to be a lack of clarity in the law on "procedural or substantive due process rights" to a post-secondary school education, without addressing the important differences in the nature of the "judicial debate" surrounding these very separate and distinct constitutional claims. *Lee* is not only analytically unpersuasive but it is also of no precedential value.[5]

**\*12** In another unpublished decision, *Edmunds v. Bd. of Control of Eastern Mich. Univ.*, No. 09-11648, 2009 WL 5171794, at *5 (ED. Mich. Dec. 23, 2009), not cited by Defendants, the district court relied on *McGee* for the proposition that it remained unresolved in the Sixth Circuit whether a university student even has an interest in continued enrollment, let alone an on-time graduation, which was claimed in *Edmunds*. As in *Lee*, the court's citation to *McGee* in *Edmunds* was in dicta and the court found it unnecessary to decide in that case whether plaintiff had a protectable property interest in a university education because it concluded that any process that was due, assuming such an interest did exist, had been afforded. The court in *Edmunds* never addressed a qualified immunity/clearly established issue and never mentioned or addressed the Sixth Circuit's opinion in *Flaim*.

Other district courts in this circuit have recognized the precedential value of *Flaim* on this issue. In *Nguyen v. University of Louisville*, No. 04-cv-457, 2006 WL 1005152, at *4 (W.D. Ky. April 14, 2006) the Court granted qualified immunity to university officials on a procedural due process claim because "[a]t the time of Nguyen's suspension in 2004, no Sixth Circuit or Supreme Court decision clearly established that a graduate student, such as Nguyen, has a constitutionally protected property

interest in continuing his studies at a public university." The court then noted that such a right became clearly established later, when the Sixth Circuit decided *Flaim* in 2005: "Not until 2005 did the Sixth Circuit Court of Appeals acknowledge that such a property right exists." 2006 WL 1005152, at \*4 (citing *Flaim*, 418 F.3d at 633). *See also Jaber v. Wayne State University Bd. of Governors*, ___ F. Supp. 2d ____, 2011 WL 824644, at \*3 (E.D. Mich. March 7, 2011) (citing *Flaim* and finding that "[i]n the Sixth Circuit, the Due Process Clause is implicated by higher education disciplinary decisions.").

In fact, as early as 1983, a district court in this circuit, in a case involving expulsion from a public university, held that: "It is undisputed that the threat of suspension or expulsion implicates plaintiff's property and liberty interests in public education and reputation, and that such interests are within the purview of the due process clause of the Fourteenth Amendment." *Hart*, 557 F. Supp. at 1382 (citing *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) and *Dixon v. Alabama State Board of Education*, 294 F.2d 150, *cert. denied*, 368 U.S. 930 (1961)).

Again, in 1986, another district court in this circuit, in a case involving a University of Michigan law school student, recognized that public university students have a protected interest in continuing their higher education studies:

> A public university student has a protected interest in continuing his studies. *See Ewing v. Board of Regents of the University of Michigan*, 742 F.2d 913, 915 (6th Cir. 1984), *rev'd* (other grounds), 474 U.S. 214, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985) ("[A]n implied understanding that a student shall not be arbitrarily dismissed from his university is a property interest....."); *Dixon v. Alabama State Board of Education*, 294 F.2d 150, 157 (5th Cir. 1961), *cert. denied*, 368 U.S. 930, 82 S.Ct. 368, 7 L.Ed.2d 193 (1961); *Stoller v. College of Medicine*, 562 F. Supp. 403, 412 (M.D. Pa. 1983), affd (without opinion), 727 F.2d 1101 (3d Cir. 1984) ("[A] graduate student has a 'property' interest in continuing his studies."); *Hall v. University of Minnesota*, 530 F. Supp. 104, 107 (D. Minn. 1982) ("A student's interest in attending a university is a property right protected by due process."). This is as it should be. Education is the key-or at least the prerequisite-to many successful careers, including a career in law. *See Dixon*, 294 F.2d 157. When the government provides professional graduate education, it should do so within the constraints of due process.

\*13 *Picozzi*, 623 F. Supp. at 1576 (holding also that whether the interest is best termed "property" or "liberty" is not material where plaintiff clearly has an interest triggering due process.").

As District Judge Victoria Roberts noted in a recent published opinion, *Flaim* established in this circuit that "the Due Process Clause is implicated by higher education disciplinary decisions." *Jaber*, 2011 WL 824644, at \*3. Contrary to Magistrate Judge Brenneman's assertion otherwise in *Lee*, the decision in *Flaim* provided citation to significant relevant authority in concluding that the Sixth Circuit has "held that the Due Process Clause is implicated by higher education disciplinary decisions." 418 F.3d at 633-34.

The Court concludes that the opinions in *Goss*, *Flaim*, *Jaksa*, *Hart*, *Picozzi*, in addition to others, defeat Defendants' argument that the law was not clearly established in this circuit in 2007 that Plaintiff had a protected property interest in her nursing school education that entitled her to a certain amount of procedural due process.

Defendants do not even attempt to address *Flaim* in either their motion or their reply brief, despite Plaintiff's reliance on *Flaim* in her response. Nor could Defendants adequately distinguish *Flaim* upon questioning by the Court at oral argument. Defendants cannot ignore a published Sixth Circuit decision directly on point and rely instead on dicta from two unpublished opinions that similarly fail to adequately address that precedent, to cast doubt on the clearly established nature of a right that was expressly recognized in a binding Sixth Circuit opinion, and several district court opinions in this circuit, at the time of Plaintiff's expulsion.[6] As in *Dixon*, the "landmark case" in this arena, the question presented by Defendants' motion to dismiss "does not concern the sufficiency of the notice or the adequacy of the hearing, but is whether [Plaintiff] had a right to any notice or hearing whatever before being expelled." *Dixon*, 294 F.2d at 154.

The Court concludes that the right to some degree of notice and an opportunity to be heard before an expulsion from a public university for disciplinary reasons was clearly established at the time of Plaintiff's expulsion in 2007. Plaintiff has thus stated a facially valid claim against the individual Defendants in their individual capacities under 42 U.S.C. § 1983. Accordingly, the Court DENIES Defendants' motion to dismiss this claim. The merits of Plaintiff's contention that she was afforded insufficient process, which Defendants have already challenged in their pending motion for summary judgment, remains to be tested and the Court expresses no opinion on whether Plaintiff received all of the process that she was due when she was expelled from the nursing school in 2007 or whether her right to more process than she received was clearly established at that time.[7]

Martinson v. Regents of the University of Michigan, Not Reported in Fed. Supp. (2011)

## IV. CONCLUSION

**\*14** Accordingly, the Court:

(1) GRANTS Defendants' motion to dismiss all claims against the University of Michigan Board of Regents;

(2) GRANTS Defendants' motion to dismiss Plaintiff's 42 U.S.C. § 1983 claim against the Individual Defendants in their official capacities for monetary or other retrospective relief;

(3) GRANTS Defendants' motion to dismiss Plaintiff's Substantive Due Process Claims (Counts I and III);

(4) GRANTS Defendants' motion to dismiss Plaintiff's Michigan Procedural Due Process Claims (nts' motion to dismiss Plaintiff's Michigan Procedural Due Process Claims (Count IV));

(5) GRANTS Defendants' motion to dismiss Plaintiff's Respondeat Superior claim (Count VI); and

(6) DENIES Defendants' motion to dismiss Plaintiff's Fourteenth Amendment Procedural Due Process Claim against the Individual Defendants (Count II).

IT IS SO ORDERED.

Dated: September 28, 2011.

**All Citations**

Not Reported in Fed. Supp., 2011 WL 13124122

## Footnotes

1    There is some authority for the proposition that an action may lie against the State (or an arm of the State also entitled to Eleventh Amendment immunity) under the Michigan Constitution where no other remedy is available. *Smith v. Dep't of Public Health*, 428 Mich. 540, 544, *aff'd sub nom, Will v. Dep't of State Police*, 491 U.S. 58 (1989). However, Plaintiff has not provided the Court with authority establishing that any such action has ever been expressly recognized by Michigan courts.

2    Even assuming that Plaintiff had pleaded facts which state a claim of substantive due process, as the above discussion makes clear, such a fundamental right was not clearly established at the time of Plaintiff's expulsion and the individual Defendants would be entitled to qualified immunity on any substantive due process claim that did survive Defendants' motion to dismiss the claim as a matter of law. "If judges thus disagree on a constitutional question, it is unfair to subject [government officials] to money damages for picking the losing side of the controversy." *Lee*, 2007 WL 2827828, at \*9 (citing *Wilson v. Layne*, 526 U.S. 603, 618 (1999)). The same cannot be said with respect to Plaintiff's procedural due process claim. As the Court concludes *infra*, with respect to that claim, published Sixth Circuit case law at the time of Plaintiff's expulsion in 2007 clearly established that Plaintiff was entitled to some degree of procedural due process with respect to her property right in her continued nursing school education. *See infra* discussion at 17-19.

3    Indeed, any suggestion that the distinction between a public high school and a public university or college is of constitutional significance is suspect based on the fact that the Supreme Court in *Goss* cited the Fifth Circuit's opinion in *Dixon v. Alabama State Bd.of Education*, 294 F.2d 150, 157 (5th Cir. 1961), *cert. denied*, 368 U.S. 930 (1961), a case that required notice and an opportunity to be heard in connection with a student's expulsion for misconduct from a state tax-supported college, as the "landmark decision" following which "the lower federal courts have uniformly held the Due Process Clause applicable to decisions made by tax-supported educational institutions to remove a student from the institution long enough for the removal to be classified as an expulsion." *Goss*, 419 U.S. at 577 n. 8.

4    The Court expresses no opinion on whether Plaintiff's procedural due process claim can also survive Defendants' already-filed motion for summary judgment.

     Given the Court's instant ruling on Plaintiff's procedural due process claim, the Court Orders Plaintiff to file her response to Defendants' pending motion for summary judgment on or before October 21, 2011.

Martinson v. Regents of the University of Michigan, Not Reported in Fed. Supp. (2011)

5      Interestingly, in an unpublished and unreported "Order" resolved by a panel of three judges and signed by the Clerk of the Court, the Sixth Circuit affirmed the district court's ruling in *Lee* without addressing the "clearly established" issue, agreeing with the district court's conclusion that Lee had received all of the process he was due. The Sixth Circuit "assumed, without deciding, that the Due Process Clause is implicated in Lee's case by the University's disciplinary action." *Lee v. University of Michigan-Dearborn, et al.*, No. 07-2391, Slip Op. at 4 (6th Cir. Aug. 5, 2008). In support of this "assumption," the Sixth Circuit relied on *Goss, Jaksa* and *Gorman v. Univ. of R.I.*, 837 F.2d 7, 12 (1st Cir. 1988), a First Circuit opinion in which the court did not merely "assume" but clearly held that "a student facing expulsion from a public educational institution [in that case a university] is entitled to the protections of due process." Although the Sixth Circuit, in affirming the district court's ruling in *Lee*, relied *on Flaim*, it did so to support its conclusion that Lee received all of the process that he was due. It is unclear why the Order in *Lee* avoided relying on *Flaim* for the established proposition that due process was implicated by the university's actions in that case, perhaps because Lee was not actually expelled. In any event, the Court declines to read the unpublished, unreported Order in *Lee* as undercutting in any way the published opinion of the Sixth Circuit in *Flaim.*

6      It is interesting to note that in *Zwick, supra*, where the defendant Board of Regents was represented by the same counsel representing the Board in the instant case, counsel did not make a qualified immunity argument based on the lack of a clearly established right to due process, despite the fact that both *Lee* and *McGee* were reported decisions at the time.

7      While Plaintiff's federal procedural due process claims against the individual Defendants survive Defendants' motion to dismiss, Plaintiff's state procedural due process claims are dismissed. *See Jones v. Powell*, 462 Mich. 329, 335-37 (2000) (no implied damages remedy exists against governmental employees in their individual capacities for violations of any state constitutional right where other remedies, such as an action under § 1983, are available).

---

End of Document                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

562 Fed.Appx. 365
This case was not selected for publication in West's
Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued on or
after Jan. 1, 2007. See also U.S.Ct. of App. 6th Cir.
Rule 32.1.
United States Court of Appeals, Sixth Circuit.

Linda MARTINSON, Plaintiff–Appellant,

v.

REGENTS OF the UNIVERSITY OF
MICHIGAN, a constitutional body
corporate; Carol Loveland–Cherry,
individually and in her official capacity;
Judith Lynchsauer, individually and in
her official capacity; and Bonnie Hagerty,
individually and in her official capacity,
Defendants–Appellees.

No. 12–2230
|
April 4, 2014.

**Synopsis**
**Background:** Former nursing student brought § 1983
action against state university, alleging, inter alia, her
expulsion from nursing school violated due process. The
United States District Court for the Eastern District of
Michigan granted university's motion to dismiss as to all
but nurse's substantive due process claim, which it denied
on summary judgment. Student appealed.

**Holdings:** The Court of Appeals, Bernice Bouie Donald,
Circuit Judge, held that:

student's failure to respond to university's motion for
summary judgment was adequate ground upon which to
grant motion;

student received constitutionally sufficient notice of
disciplinary proceedings; and

student's expulsion was neither arbitrary nor capricious.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion to Dismiss;
Motion for Summary Judgment.

**\*366** On Appeal from the United States District Court for
the Eastern District of Michigan.

Before: DAUGHTREY, GIBBONS, and DONALD,
Circuit Judges.

OPINION

BERNICE BOUIE DONALD, Circuit Judge.

Linda Martinson was expelled from the School of Nursing
at the University of Michigan ("University") in November
of 2007. After unsuccessfully seeking readmission through
the University's internal review process, Martinson sued
the Board of Regents and several School of Nursing
administrators, relying primarily on 42 U.S.C. § 1983. The
District Court dismissed the vast majority of Martinson's
claims under Federal Rules of Civil Procedure ("Rules")
12(b)(1) and 12(b)(6) but allowed her procedural due
process claim against the administrators in their individual
capacities to proceed to summary judgment. The claim was
then dismissed under Rule 56, the District Court having
determined that Martinson received all the process that she
was due. Martinson now appeals the summary dismissal of
her procedural due process claim and the dismissal of her
substantive due process claim at the pleading stage. For the
reasons below, we AFFIRM the dismissal of both claims.

I.

A. *Factual Background*
In August of 2007, Martinson began an accelerated,
second-career nursing program at the University's School
of Nursing. By her own admission, she began having
performance problems in one of her clinical courses the
next month. Martinson's daughter recently had received an
unexpected diagnosis, and, on September 17, 2007,

Martinson v. Regents of University of Michigan, 562 Fed.Appx. 365 (2014)

306 Ed. Law Rep. 46

Martinson informed the course instructor, Diane Bohn, of her daughter's medical problems. Citing its accelerated pace, Bohn recommended that Martinson consider leaving the nursing program. According to Bohn, the workload and stress level would only increase with time. Martinson decided to stay, however, and she felt that her relationship with Bohn "rapidly deteriorated" from that point forward.

On October 8, 2007, Martinson received a mid-semester warning from Bohn that detailed several deficiencies in her performance, **\*367** including failure to timely complete certain tutorials, general disorganization in planning and implementing patient care, failure to communicate with patients, and failure to meet weekly expectations. Martinson signed the warning but, indicating that it was "factually inaccurate" and contained "glaring omissions," noted that she did so with "severe reservations."

Three days later, Martinson told some fellow students that she was in danger of failing and allegedly demanded that they help her. Several students indicated that Martinson's attitude was hostile, and many expressed feelings of fear and discomfort. Later that same day, Martinson confronted one of the nurses in the locker room about negative comments that she allegedly had communicated to Bohn about Martinson. The nurse reported the incident to Bohn and later testified that Martinson's conduct and demeanor had frightened her.

At various times between September 17, 2007, and October 16, 2007, Bohn communicated with several School of Nursing Administrators—Bonnie Hagerty, Director for Undergraduate Programs and Associate Professor; Judith Lynch–Sauer, Director for the Office of Student Affairs and Clinical Assistant Professor; and Carol Loveland–Cherry, Executive Associate Dean for Academic Affairs and Professor—about Martinson's performance problems and involved them in meetings with Martinson. Martinson was "not receptive" to the criticism offered by the administrators at these meetings. After one such meeting on October 12, 2007, Martinson felt that Lynch–Sauer and Hagerty "had developed a strong, personal dislike for [her], wanted to expel her, and were looking for a justification for the same."

Lynch–Sauer stated that an early October meeting that she and Hagerty had with Martinson "to try to help her do some problem solving and get back on track" was not productive: "Martinson saw only one solution and that was to change clinical instructors as she felt [Bohn] was the cause of her problems." Lynch–Sauer and Hagerty agreed to meet with Martinson again and to include Bohn. In the meantime, they requested that Martinson "look at where she was having difficulty in the course and ... come up with some ideas about how best to address them."

Lynch–Sauer, Hagerty, and Martinson reconvened with Bohn one week later. According to Lynch–Sauer, Martinson had not developed an action plan and "was very adamant that it was up to [Bohn] to do so." Bohn, on the other hand, had developed some guidelines for Martinson, but Martinson would not respond to them, saying "that she had been advised by a friend to say nothing" and that "the only solution was to change instructors." When she was informed that replacing Bohn was not possible, Martinson "became very angry and the tone of her voice became threatening." Martinson said that "something would be happening but wouldn't say what this would be." Both Lynch–Sauer and Hagerty testified that they felt threatened or unnerved by this comment and by Martinson's behavior.

According to Hagerty, several of Martinson's classmates asked to meet with Hagerty and Lynch–Sauer to express concerns about Martinson's behavior, which Hagerty described as "increasingly erratic." Hagerty also stated that patients expressed concerns about Martinson's performance and behavior. One of Martinson's clinical group members stated that she no longer would meet with Martinson in person, "even in public places," requesting transfer to another group if Martinson insisted otherwise. Another complained of an "air of discomfort" in meetings with Martinson, describing a disagreement that resulted in a verbal **\*368** "attack" by Martinson and expressing "a sense of fear" that "similar tirades would result" any time Martinson did not get her way.

On October 16, 2007, Bohn filed a report with Loveland–Cherry in which she alleged that Martinson had violated the student code of conduct. The next day, Loveland–Cherry and Hagerty met with Martinson to discuss the report. At Loveland–Cherry's request, two University public safety officers also attended the meeting.

Martinson was again "unreceptive," and she received a letter and a copy of the code of conduct from Loveland–Cherry at the conclusion of the meeting. The letter advised Martinson that the administration had received reports that she may have violated the code of conduct. The conduct at issue included Martinson's being on unit without faculty supervision, confronting clinical staff in an argumentative manner, and engaging in extended and hostile interactions with fellow students and faculty. The letter also stated that Tara Engholm, Loveland–Cherry's executive secretary, would contact Martinson later that day to schedule a preliminary hearing and that a full hearing by the Committee on Academic Admissions and Scholastic Standing ("CAASS") would follow. Finally, the letter instructed Martinson not to contact program staff, faculty, or students, and not to attend clinical classes or be present on clinical units "[u]ntil the potential Code violation

c[ould] be resolved via established procedure[.]" Martinson also received a no-trespass citation from the public safety officers that subjected her to arrest upon entering any buildings owned or leased by the University.

On October 18, 2007, the day after the meeting, Loveland–Cherry submitted a request to the Vice–President of Student Affairs, Dr. E. Royster Harper, seeking Martinson's immediate removal from the School of Nursing. Dr. Harper concluded that Martinson's conduct did not warrant immediate removal under either the University's emergency mental health policy or its bylaws for behavioral misconduct. He noted, however, that the reports of Martinson's conduct were "indeed troubling," approved of continued monitoring of Martinson, and "highly recommended" that Martinson be referred to campus counseling services for an assessment.

On October 19, 2007, Engholm sent an email to Martinson after making several phone calls to her to schedule the preliminary hearing. Engholm's email informed Martinson that the preliminary hearing had been scheduled for Monday, October 22, 2007, at 9:30 A.M. and requested that Martinson respond immediately by phone or email if she could not attend. Martinson responded that she was not able to attend the preliminary hearing.

On October 22, 2007, Loveland–Cherry sent Martinson a second letter and a summary of the incidents comprising the possible code of conduct violation. The letter explained that Engholm would contact Martinson again to schedule the preliminary hearing and stated that the matter automatically would be forwarded to CAASS if the preliminary hearing could not be scheduled within thirty days. Although the summary of incidents did not name individual students, it detailed in six, single-spaced pages several instances of hostile and intimidating conduct by Martinson that allegedly interfered with "the ability of other students, faculty, and staff ... to participate in the School's educational programs." Additionally, the summary stated the following:

> Based on reports from faculty, students, and staff, a picture emerges of a student whose behavior is unpredictable—ranging from intense controlled quiet to agitated, **\*369** angry [sic] characterized by yelling and encroachment on others [sic] personal space. Ms. Martinson, [sic] consistently challenges others even when they are trying to help her, blames others for her lack of performance, refers to personal stresses that she is experiencing but when offered options for assistance lashes out saying that individuals are being "too personal," and refuses any suggestions for assistance from resources such as [campus counseling services]. In fact, she has become angry whenever [campus

counseling services] are suggested. Her fellow students have indicated to faculty their discomfort and fear with [sic] Linda's behaviors towards them and the clinical faculty member, [Bohn].

Engholm sent Martinson a follow-up email on October 30, 2007. The email's subject line read "RESPONSE REQUIRED—Preliminary Hearing," and its body advised Martinson that the preliminary hearing had been rescheduled for Monday, November 5, 2007, at 8:00 A.M. The email also provided the location of the preliminary hearing and asked Martinson to confirm her attendance before 1:00 P.M. the next day. Martinson did not respond until November 5, 2007, after the preliminary hearing had begun, and she did not attend the hearing. It was determined at the preliminary hearing that Martinson's case should be advanced to CAASS for review on an expedited basis. A hearing before a CAASS panel was scheduled for November 9, 2007.

According to Martinson, her schedule had not permitted her to respond to Engholm's email "in a timely fashion," and she would not have been able to prepare an adequate defense for the preliminary hearing because it was scheduled during the last week of classes, which was "very busy." Martinson also complained that she had not been provided with several documents referenced in the summary of incidents that she had received from Loveland–Cherry on October 22, 2007.

In the days leading up to the November 9 CAASS hearing, several students sent emails to Hagerty and Lynch–Sauer that accused Martinson of hostile and unprofessional conduct. Among other things, the students accused Martinson of putting her head in the windows of people's cars to prevent their driving away from her and expressed concerns about Martinson's "volatility," her "potential for aggression," and their safety. On November 7, 2007, Loveland–Cherry attempted to hand Martinson a packet of information regarding the CAASS hearing, but Martinson would not accept it. Accordingly, Loveland–Cherry sent Martinson an email with the packet of information attached. Martinson never opened the attachment, and she did not attend the CAASS hearing on November 9.

At the CAASS hearing, the evidence included testimony from Bohn, Lynch–Sauer, and Hagerty, as well as several written statements and emails from students. The CAASS panel also noted that Martinson had a criminal record for assault. The panel ultimately found that Martinson had violated the provision of the code of conduct that required nursing students to "maintain compassionate and caring relationship [sic] with colleagues and others with a commitment to the fair treatment of individuals ... [and to avoid] any and all prejudicial actions, any form of

harassment or threatening behavior, or disrespect for effect [sic] of one's actions on others." Bohn suggested that rather than being expelled Martinson should be strictly monitored until she had addressed some personal issues.

A copy of the CAASS panel report was sent to Martinson on November 14, 2007, **\*370** along with exhibits, informing Martinson that a final decision would be rendered on November 16, 2007, and advising her that she could submit a statement to CAASS for consideration before that time. Martinson submitted no statement to CAASS prior to November 16, and CAASS approved her immediate and permanent expulsion from the University on that date.

Martinson submitted a statement to CAASS after her expulsion was approved, detailing facts that she allegedly would have presented at the CAASS hearing "had [she] received sufficient time and opportunity." The statement failed to address any of the allegations regarding Martinson's hostile and threatening behavior. Martinson then appealed her expulsion to the University's Grievance Review Board ("GRB"). The GRB agreed with Martinson, finding that she had not been given adequate time to respond to the charges against her and recommending that a new CAASS panel be convened. But the School of Nursing rejected the GRB's recommendation, Dean Kathleen Potempa having determined that the board failed to "take into account the full history of all attempts to communicate with [Martinson] both for the Preliminary Inquiry and the Hearing."

In a letter dated August 28, 2008, Dean Potempa advised Martinson that she had decided to reject the GRB's recommendation and uphold Martinson's expulsion. According to Dean Potempa, Martinson's "pattern of non-responsiveness to all sources of communication including [her] refusal to accept material from [Loveland–Cherry] regarding the Hearing and refusal to open the attachment to the email from Dr. Loveland–Cherry ... [we]re inexcusable." Dean Potempa also stated that Martinson's "disruptive behavior" and "inappropriate communication style" indicated that Martinson was not capable of satisfying the School of Nursing's requirements.

B. *Procedural History*

Martinson subsequently filed the present action in the District Court under 42 U.S.C. § 1983. Her six-count Complaint named Loveland–Cherry, Lynch–Sauer, and Hagerty as defendants in their official and individual capacities along with the University's Board of Regents,

asserting that they had violated Martinson's right to substantive and procedural due process under the federal and Michigan constitutions. In addition to damages, Martinson sought a declaratory judgment under Rule 57 and 28 U.S.C. § 2201 that would void her expulsion.

Relying on Rules 12(b)(1) and 12(b)(6),[1] the District Court partially granted the defendants' motion to dismiss on September 28, 2011, ruling that Martinson's state-law claims were barred by Eleventh Amendment sovereign immunity and finding that Martinson failed to state a plausible substantive due process claim. The District Court also found, however, that Martinson had alleged sufficient facts to move forward on her procedural due process claim and noted that injunctive relief remained available if the claim proved meritorious.

While their motion to dismiss was pending, the defendants moved for summary judgment. Although Martinson had opposed the motion to dismiss and prematurely had attempted to appeal its partial **\*371** granting,[2] she failed to file a response to the motion for summary judgment despite being afforded extensions of time amounting to three months "to fully devote to ... [it]." Martinson also did not appear at the scheduled hearing on the motion for summary judgment.

On August 16, 2012, the District Court granted summary judgment against Martinson and dismissed her Complaint with prejudice under Rule 56. Martinson timely appealed.

II.

Although she has identified as many as six related issues, Martinson essentially raises only two claims of error on appeal: (1) the dismissal of her substantive due process claim under Rule 12(b)(6) and (2) the dismissal of her procedural due process claim under Rule 56. We begin with Martinson's most promising claim, the alleged deprivation of procedural due process, which survived Appellees' motion to dismiss but failed at the summary judgment stage.

III.

We review de novo the grant of a motion for summary judgment under Rule 56, drawing all reasonable inferences in favor of the non-moving party. *Branham v. Gannett Satellite Info. Network, Inc.,* 619 F.3d 563, 568 (6th

Cir.2010) (citation omitted). "Summary judgment is appropriate when there are no genuine issues of material fact and when the moving party is entitled to judgment as a matter of law." *Id.* (citing Fed.R.Civ.P. 56(c)). The non-moving party "may not rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact," *Alexander v. CareSource,* 576 F.3d 551, 558 (6th Cir.2009) (internal quotation marks and citation omitted), nor will a "mere scintilla of evidence" discharge its burden, *La Quinta Corp. v. Heartland Props. LLC,* 603 F.3d 327, 335 (6th Cir.2010) (internal quotation marks and citation omitted). Instead, to survive a well-supported motion for summary judgment, the non-moving party "must make an affirmative showing" of evidence sufficient to allow a trier of fact to find in its favor. *Alexander,* 576 F.3d at 558 (citation omitted).

These well-settled principles are dispositive here, and we affirm the grant of summary judgment on Martinson's procedural due process claim. There is little question that Appellees' motion for summary judgment was well supported, marshaling more than thirty exhibits—including deposition excerpts, responses to written discovery, and written correspondence—and as many pages of legal authority to secure the dismissal of Martinson's Complaint. Martinson, by contrast, made no showing whatsoever in response to the motion, neither filing a response nor appearing at the motion hearing. On that basis alone, the District Court would have been justified in granting summary judgment against her. *See Alexander,* 576 F.3d at 558 ("[T]he failure to present any evidence to counter a well-supported motion for summary judgment alone is grounds for granting the motion." (citation and internal quotation marks omitted)).

Although Martinson contends that her case is "somewhat unique" because she is *pro se,* she appropriately recognizes that this "status gives her no quarter from her **\*372** requirement to answer the Summary Judgment motion." (Appellant Br. at 32–33); *see also United States v. Ninety–Three Firearms,* 330 F.3d 414, 427 (6th Cir.2003) ("[T]his court clearly has held that no ... rule providing 'special assistance' exists with respect to nonprisoner pro se litigants [on summary judgment].") Nevertheless, the District Court went to great lengths to accommodate Martinson because she was without legal representation.

In its September 28, 2011, opinion and order granting Appellees' motion to dismiss, the District Court ordered Martinson to respond to Appellees' motion for summary judgment no later than October 21, 2011. At the time, the motion had been pending since August 8, 2011. After Martinson requested an extension, the District Court gave her until November 30, 2011, to file a response. The District Court expressly recognized that Martinson had

been without counsel since November 5, 2010, observing that it already had granted her "multiple extensions" and "afforded her great leniency in pressing forward with her claims" as a result. Still, Martinson did not file a response.

On June 5, 2012, the District Court scheduled a hearing on the motion for summary judgment and gave Martinson another two weeks—until June 19, 2012—to respond. Martinson neither responded to the motion nor attended the hearing. Finally, on August 16, 2012, the District Court granted the motion for summary judgment and dismissed Martinson's Complaint with prejudice. Accordingly, Martinson had more than ten months between the filing of the motion for summary judgment and the final extended deadline by which the District Court required her to respond to it. She chose not to do so. As the District Court admonished in dismissing Martinson's Complaint, "the law cannot reward such calculated inaction."

Martinson rejoins, contrary to our precedents, that her failure to respond to the motion for summary judgment was not a sufficient ground upon which to grant it. *But see Alexander,* 576 F.3d at 558. Even so, however, Martinson does not contend that the District Court failed to "look to the facts on record to determine if a factual dispute exists." Instead, she disputes the *conclusions* that the District Court *drew* from those facts. According to Martinson, "[t]he biggest factual question ... is whether [the individual Appellees] were acting out of personal dislike for [her] and a personal desire to remove her from the program." But the individual Appellees' personal feelings about Martinson are entirely irrelevant to the question of whether Martinson received the constitutionally adequate "notice, and ... opportunity to be heard" that procedural due process guarantees. *Flaim v. Med. Coll. of Ohio,* 418 F.3d 629, 634 (6th Cir.2005) (citation omitted).

As the District Court noted at the pleading stage of this matter, this court has determined that "the Due Process Clause is implicated by higher education disciplinary decisions." *Id.* at 633. But, recognizing that "[t]he *amount* of process due will vary according to the facts of each case," *id.* at 634 (emphasis added), the District Court expressly reserved the question of whether Martinson received constitutionally sufficient process for review on summary judgment. At the summary judgement stage, the District Court answered this question in the affirmative: "Plaintiff had both adequate notice and sufficient opportunity to be heard."

With regard to adequacy of notice, the District Court found as follows:

> (1) that the October 8, 2007, mid-semester warning that Martinson received **\*373** from Bohn put her on

notice "that her conduct with patients and her academic performance were matters of concern that [she] needed to address";

(2) that the October 17, 2007, meeting between Loveland–Cherry, Hagerty, and Martinson and the letter from Loveland–Cherry that Martinson received at the meeting's conclusion "describ[ed] several of the behaviors that allegedly were disrupting the teaching environment," including confronting clinical staff in an argumentative manner and engaging in extended and hostile interactions with fellow students and faculty;

(3) that the second letter Loveland–Cherry sent Martinson on October 22, 2007, which included a six-page summary of the incidents comprising the putative honor code violation at issue, gave her "even more specific information regarding ... the basis of the conduct code inquiry"; and

(4) that, on November 7, 2007, two days prior to the CAASS hearing on November 9, 2007, Loveland–Cherry emailed Martinson a packet of information regarding the hearing after Martinson refused to accept the packet when Loveland–Cherry attempted to hand it to her in person.

Regarding Martinson's opportunity to be heard, the District Court found the following:

(1) that, after Martinson stated that she could not attend the preliminary hearing on October 22, 2007, Loveland–Cherry's secretary, Tara Engholm, sent Martinson an email on October 30, 2007, rescheduling the preliminary hearing for November 5, 2007; although Martinson admits having received the email, "she chose not to respond or defend herself until *after* the hearing already was in progress" (emphasis in original);

(2) that, despite receiving the information packet about the CAASS hearing from Loveland–Cherry on November 7, 2009—after refusing to accept it in person—Martinson, again, did not attend the hearing and, again, did not offer any response to the charges against her; and

(3) that, although a copy of the CAASS panel report was sent to Martinson on November 14, 2007, along with exhibits, advising Martinson that she could submit a statement to CAASS for consideration before a final decision was rendered on November 16, 2007, she again made no response until after she was expelled.

To the findings on notice, Martinson has no real answer, relying on the Supreme Court's decision in *Mullane v. Central Hanover Bank & Trust Company,* 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950), for the proposition that Appellees were required to employ notice "reasonably calculated, under all the circumstances," to apprise her of the charges against her. But Martinson does not fare any better under *Mullane* than under the test this court articulated in *Flaim,* 418 F.3d at 634 (relying on *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)), which varies "depending upon the nature of the interest affected, and the circumstances of the deprivation," *id.* (citation and internal quotation marks omitted). Martinson was expelled from the School of Nursing for failing to "maintain compassionate and caring relationship [sic] with colleagues and others with a commitment to the fair treatment of individuals ... [and to avoid] any and all prejudicial actions, any form of harassment **\*374** or threatening behavior, or disrespect for effect [sic] of one's actions on others." Assuming *arguendo* that the mid-semester warning of October 8, 2007, did not apprise Martinson of the alleged conduct that resulted in this failure, there is little question that the letter and meeting of October 17, the second letter and summary of October 22, the information packet of November 7, and the CAASS panel report of November 14 did. Accordingly, the District Court did not err in concluding that Martinson received constitutionally sufficient notice.

On the question of opportunity for hearing, Martinson has a better but equally unavailing argument. Martinson contends, for example, that the seven-day delay between October 30, 2007, and the preliminary hearing on November 5, 2007, "[wa]s not enough for her to prepare an adequate defense." And when she successfully pursued an administrative appeal to the GRB, she contended that the scheduling of the November 9, 2007, CAASS hearing four days after the November 5, 2007, preliminary hearing was unreasonable. The GRB's agreement with Martinson supports this argument.

But as Dean Potempa concluded, the GRB did not "take into account the full history of all attempts to communicate with [Martinson] both for the Preliminary Inquiry and the Hearing." Martinson failed to attend either the November 5, 2007, preliminary hearing or the CAASS hearing on November 9, 2007. She also failed to respond to Engholm's email regarding the scheduling of the preliminary hearing—despite having six days' lead time—until after the hearing already was in progress. She refused even to accept materials from Loveland–Cherry regarding the CAASS hearing when Loveland–Cherry attempted to hand them to her, and she thereafter refused to review the materials when Loveland–Cherry subsequently emailed

Martinson v. Regents of University of Michigan, 562 Fed.Appx. 365 (2014)

306 Ed. Law Rep. 46

them to her. Additionally, Martinson failed to submit a statement to CAASS regarding her potential expulsion—despite being expressly invited to do so-until after the expulsion already had been approved. The post hoc statement that Martinson did submit failed to rebut—or even to address—the conduct on which her expulsion was based. Each these failures was a missed opportunity to be heard.

Such conduct was, as Dean Potempa put it, "inexcusable." Martinson "simply chose not to respond and defend" herself during the administrative proceedings, and she demonstrated similar scorn for the summary judgment proceedings before the District Court. Martinson's procedural due process claim must therefore fail.

## IV.

So, too, must Martinson's substantive due process claim, which did not survive comparatively lenient review under Rule 12(b)(6), fail. *See Tucker v. Union of Needletrades, Indus. & Textile Emps.,* 407 F.3d 784, 788 (6th Cir.2005) ( "Once a case has progressed to the summary judgment stage ... the liberal pleading standards under ... the Federal Rules are inapplicable." (internal quotation marks, citations, and alterations omitted)). We review the dismissal of a claim under Rule 12(b)(6) de novo, *Courie v. Alcoa Wheel & Forged Prods.,* 577 F.3d 625, 629 (6th Cir.2009) (citation omitted), mindful of the Supreme Court's instruction that a claim may only survive a motion to dismiss if "it 'contain[s] sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face,' " *id.* (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)). Although the plausibility standard does not amount to a "probability requirement," it requires **\*375** "more than a sheer possibility that a defendant has acted unlawfully." *Estate of Barney v. PNC Bank,* 714 F.3d 920, 924 (6th Cir.2013) (internal quotation marks and citation omitted). A complaint satisfies this standard when its factual content allows a court reasonably to draw the inference that the relief it requests is warranted against the defendant that it names. *Id.*

As an initial matter, we note that the Supreme Court never has held that the interest in continued education at a public university constitutes a fundamental property or liberty interest that finds refuge in the substantive protections of the Due Process Clause. *See Rogers v. Tenn. Bd. of*

*Regents,* 273 Fed.Appx. 458, 463 (6th Cir.2008) (citing *Regents of the Univ. of Mich. v. Ewing,* 474 U.S. 214, 222–23, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985) and *Bd. of Curators of Univ. of Mo. v. Horowitz,* 435 U.S. 78, 91–92, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978) and noting that the High Court has only assumed, *arguendo,* that such a right exists). Seeking to fill that void, our own precedent suggests that the opposite is true. *See id.* ("[Appellant's] interest in her nursing education is not protected by substantive due process."). Moreover, in *Bell v. Ohio State University* we expressly stated that, in the absence of an equal protection violation, "we c[ould] see no basis for finding that a medical student's interest in continuing her medical school education is protected by substantive due process." 351 F.3d 240, 251 (6th Cir.2003). Martinson alleges no equal protection violation, and her complaint cannot be read to allege facts that could amount to a denial of equal protection.

Martinson acknowledges this precedent but contends that her substantive due process rights were violated through "arbitrary and capricious" government action. But Martinson's expulsion from the School of Nursing was neither arbitrary nor capricious. Each of the individual Appellees had *witnessed* Martinson's failure to "maintain compassionate and caring relationship [sic] with colleagues and others ... [and to avoid] any form of harassment or threatening behavior, or disrespect for effect [sic] of one's actions on others." The decision to expel Martinson could not have been arbitrary or capricious when those personal experiences were reconciled with the similar—and, in some cases, more extreme—reported experiences of Martinson's peers, staff, and patients at the School of Nursing.[3] Therefore, the substantive due process claim that Martinson has alleged is not plausible and, like her procedural due process claim, must fail.

## V.

For these reasons, we AFFIRM the summary dismissal of Martinson's procedural due process claim under Rule 56 as well as the dismissal of her substantive due process claim under Rule 12(b)(6).

## All Citations

562 Fed.Appx. 365, 306 Ed. Law Rep. 46

Footnotes

1    The motion to dismiss expressly invoked only Rule 12(b)(6), but defendants' reply in support of the motion "note[d] that their Eleventh Amendment immunity defense implicate[d] the [c]ourt's subject matter jurisdiction ... under Rule 12(b)(1)." The District Court reviewed Martinson's claims under both Rules.

2    On May 22, 2013, this Court dismissed the attempted appeal, No. 11–2363, because the District Court's order of September 28, 2011, "disposed of fewer than all the claims or parties involved in this action ... did not direct entry of a final, appealable judgment under Federal Rule of Civil Procedure 54(b)[,]" and was not "an immediately appealable 'collateral order.' "

3    Accordingly, Martinson's suggestion that her expulsion reflects "individual animus" implicating equal protection interests is not plausible. Neither does Martinson's reliance on Dr. Harper's determination that her conduct did not require immediate removal under the University's emergency mental health policy or its bylaws for behavioral misconduct salvage her claim. Martinson was expelled for violations of the student code of conduct, not the University's emergency mental health policy or bylaws, and that decision was not arbitrary or capricious for the reasons stated above.

**End of Document**                                      © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 3522320
Only the Westlaw citation is currently available.
United States District Court, E.D. Michigan,
Northern Division.

Robert MATTHEWS, on behalf of himself
and Emari Matthews (minor) and Xavior
Matthews (minor), Plaintiffs,
v.
James CRAIGE, Detroit Police
Department, and Officer John Doe(s),
Defendants.

Civil No. 1:16-CV-11680
|
Signed 06/28/2016

**Attorneys and Law Firms**

Robert Matthews, Carson City, MI, pro se.

E.M., pro se.

X.M., pro se.

**OPINION AND ORDER OF SUMMARY DISMISSAL**

THOMAS L. LUDINGTON, United States District Judge

**\*1** This is a *pro se* civil rights case brought pursuant to 42 U.S.C. § 1983. Michigan prisoner Robert Matthews ("Plaintiff"), currently confined at the Carson City Correctional Facility in Carson City, Michigan, brings suit on behalf of himself and his two minor children alleging that Detroit police officers conducted an illegal, warrantless search of his home on December 23, 2013 thereby violating his rights and the rights of his children. Plaintiff was not present during the search, but his minor children were at the home with an adult woman and other children. Plaintiff alleges violations of his rights under § 1983, the Fourth Amendment, and the Fourteenth Amendment, assault and battery and home invasion under state criminal law, and conspiracy. He names the Chief of the Detroit Police, the Detroit Police Department, and

unidentified police officers as Defendants in this action and sues them in their individual and official capacities. He seeks compensatory and punitive damages. The Court has granted Plaintiff leave to proceed without prepayment of the filing fee. For the reasons that follow, the Court finds that the complaint is subject to dismissal.

**I.**

Under the Prison Litigation Reform Act of 1996 ("PLRA"), the Court is required to *sua sponte* dismiss an *in forma pauperis* complaint before service on a defendant if it determines that the action is frivolous or malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief against a defendant who is immune from such relief. 42 U.S.C. § 1997e(c); 28 U.S.C. § 1915(e)(2)(B). The Court is similarly required to dismiss a complaint seeking redress against government entities, officers, and employees which it finds to be frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915A. A complaint is frivolous if it lacks an arguable basis either in law or in fact. *Denton v. Hernandez*, 504 U.S. 25, 31 (1992); *Neitzke v. Williams*, 490 U.S. 319, 325 (1989).

A pro se civil rights complaint is to be construed liberally. *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972). Nonetheless, Federal Rule of Civil Procedure 8(a) requires that a complaint set forth "a short and plain statement of the claim showing that the pleader is entitled to relief," as well as "a demand for the relief sought." Fed. R. Civ. P. 8(a)(2), (3). The purpose of this rule is to "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). While notice pleading does not require "detailed" factual allegations, it does require more than the bare assertion of legal principles or conclusions. *Id.* Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' " *Id.* (quoting *Twombly*, 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.' " *Id.* (quoting *Twombly*, 550 U.S. at 557).

**\*2** To state a civil rights claim under 42 U.S.C. § 1983, a plaintiff must allege that: (1) he or she was deprived of a

right, privilege, or immunity secured by the Federal Constitution or laws of the United States; and (2) the deprivation was caused by a person acting under color of state law. *Flagg Bros. v. Brooks*, 436 U.S. 149, 155-57 (1978); *Harris v. Circleville*, 583 F.3d 356, 364 (6th Cir. 2009).

## II.

As an initial matter, the claims that Plaintiff seeks to bring on behalf of his minor children will be dismissed. The Federal Rules of Civil Procedure allow a parent to bring suit on behalf of his or her minor children. Fed. R. Civ. P. 17(c). Those rules, however, do not permit a non-attorney parent to represent his or her children in federal court. While an adult who is not an attorney has the right to represent himself or herself in federal court, 28 U.S.C. § 1654, such a *pro se* litigant cannot act as counsel for others or on behalf of minor children. *See Shepherd v. Wellman*, 313 F.3d 963, 970 (6th Cir. 2002) ("parents cannot appear *pro se* on behalf of their minor children because a minor's personal cause of action is her own and does not belong to her parent"); *Lawson v. Edwardsburg Public School*, 751 F. Supp. 1257, 1258-59 (W.D. Mich. 1990); *accord Cheung v. Youth Orchestra Found. of Buffalo, Inc.*, 906 F.2d 59, 61 (2d Cir. 1990); *Meeker v. Kercher*, 782 F.2d 153, 154 (10th Cir. 1986). Only a licensed attorney may represent other people. *Rowland v. California Men's Colony, Unit II Advisory Council*, 506 U.S. 194, 201-03 (1993). Because Plaintiff is proceeding *pro se* in this action and is not a licensed attorney, he may not bring claims on behalf of his minor children. Accordingly, the Court dismisses all of the claims brought on behalf of the minor children. This dismissal is without prejudice to the children filing a new civil rights complaint through counsel on their own behalf.

## III.

Plaintiff names the Detroit Police Department as a defendant in this action. The Detroit Police Department, however, is not an entity subject to suit under § 1983. *See Boykin v. Van Buren Twp.*, 479 F.3d 444, 450 (6th Cir. 2007) (police department is an improper defendant in a § 1983 case); *Rhodes v. McDannel*, 945 F.2d 117, 120 (6th Cir. 1991) (sheriff's department may not be sued under § 1983); *Laise v. City of Utica*, 970 F. Supp. 605, 608 (E.D. Mich. 1997) (city police department is merely an agency of the city and is not a proper defendant in a § 1983 action).

Plaintiff's claims against the Detroit Police Department must therefore be dismissed.

## IV.

Plaintiff names Detroit Police Chief James Craige as a defendant in this action based upon his role as the Chief of the Detroit Police Department. It is well-established that a civil rights plaintiff must allege the personal involvement of a defendant to state a claim under § 1983, and that liability cannot be established based upon a theory of respondeat superior or vicarious liability. *Monell v. Department of Social Svs.*, 436 U.S. 658, 691-92 (1978); *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009); *see also Taylor v. Michigan Dep't. of Corrections*, 69 F.3d 716, 727-28 (6th Cir. 1995) (plaintiff must allege facts showing that defendant participated, condoned, encouraged, or knowingly acquiesced in alleged misconduct to establish liability). A plaintiff "must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676.

**\*3** Plaintiff makes no such factual allegations against Chief Craige. Any assertion that Chief Craige failed to supervise an employee, should be vicariously liable for an employee's conduct, and/or did not properly respond to the situation is insufficient to state a claim under § 1983. *See, e.g., Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999); *see also Martin v. Harvey*, 14 Fed.Appx. 307, 309 (6th Cir. 2001). Plaintiff also does not allege facts showing that any injury he suffered is the result of any policy or regulation, or that any improper conduct arose from the deliberate failure to adequately investigate, train, or supervise employees. *See Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006) (setting forth three-part test for such claims). His claims against Chief Craige are purely conclusory. Conclusory allegations are insufficient to state a civil rights claim. *Crawford-El v. Britton*, 523 U.S. 574, 588 (1998); *Lanier v. Bryant*, 332 F.3d 999, 1007 (6th Cir. 2003). Plaintiff's complaint against the Chief Craige must be dismissed.

## V.

Plaintiff's remaining claims are brought against unidentified John Doe police officers, presumably the ones who conducted the search of his home. As part of those claims, Plaintiff alleges a violation of his rights under 42

U.S.C. § 1983. It is well-established, however, that § 1983 creates no substantive rights but merely provides remedies for deprivations of rights established elsewhere. *See, e.g., Flint ex rel. Flint v. Ky. Dep't of Corr.*, 270 F.3d 340, 351 (6th Cir. 2001). Thus, to the extent that Plaintiff asserts a substantive violation under § 1983, he fails to state a claim upon which relief may be granted in his complaint.

Plaintiff asserts that Defendants violated his Fourth Amendment rights by conducting an illegal search of his home without a warrant. The Fourth Amendment's prohibition against unreasonable searches and seizures is enforceable against the States through the Fourteenth Amendment. *Ker v. California*, 374 U.S. 23, 30 (1963). A claim under § 1983 is an appropriate remedy for a state prisoner challenging a condition of his imprisonment, *Preiser v. Rodriguez*, 411 U.S. 475, 499 (1973), not the validity of continued confinement. *Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994) (holding that a state prisoner does not state a cognizable civil rights claim challenging his or her imprisonment if a ruling on the claim would necessarily render his or her continuing confinement invalid, until and unless the reason for that confinement has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal, or been called into question by a federal court's issuance of a writ of habeas corpus under 28 U.S.C. § 2254). This holds true regardless of the relief sought by the plaintiff. *Id.* at 487-89.

*Heck* and other Supreme Court cases, when "taken together, indicate that a state prisoner's § 1983 action is barred (absent prior invalidation) – no matter the relief sought (damages or equitable relief), no matter the target of the prisoner's suit (state conduct leading to conviction or internal prison proceedings) – if success in that action would necessarily demonstrate the invalidity of confinement or its duration." *Wilkinson v. Dotson*, 544 U.S. 74, 81-82 (2005).

It is unclear from the present complaint whether the search of Plaintiff's residence uncovered evidence that was used to convict him of his current criminal convictions. To the extent that it did, success in this action would demonstrate the invalidity of his confinement and would be barred by *Heck. See Fox v. Michigan State Police Dep't.*, 173 Fed.Appx. 372, 377-78 (6th Cir. 2006); *see also Wallace v. Kato*, 549 U.S. 384, 395 n. 4 (2007). If it did not, then this action would not be barred. *See Heck*, 512 U.S. at 487 n. 7 (noting that a suit for damages based upon an unreasonable search would not necessarily imply the invalidity of conviction when a legal doctrine prevented the evidence from exclusion); *Harper v. Jackson*, 293 Fed.Appx. 389, 392 (6th Cir. 2008) (stating that *Heck* bars Fourth Amendment claims when the search produced evidence supporting the conviction and no legal doctrine could save

the evidence from exclusion).

**\*4** However, in order to recover monetary damages based on allegedly unreasonable search, "a § 1983 plaintiff must prove not only that search or seizure was unlawful, but that it caused him actual, compensable injury, which does not encompass the injury of being convicted and imprisoned (until his conviction has been overturned)." *Heck* at 487, n. 7; *see also Hunt v. Michigan*, 482 Fed.Appx. 20, 22 (6th Cir. 2012) (illegal search claim barred by *Heck* because a conviction resulting from the seizure of incriminating evidence is not a compensable injury). In this case, Plaintiff was not present during the search and he does not allege any personally compensable injury (other than loss of freedom) with respect to this claim. Compl., p. 5. The only potential compensable injury he could have suffered would be property damage. In the body of the complaint, however, he merely alleges that Defendants "ransacked the residence, flipping over beds and pulling out dresser drawers." Compl., p. 4. The United States Supreme Court has recognized that police officers executing searches "on occasion must damage property in order to perform their duty." *Dalia v. United States*, 441 U.S. 238, 258 (1979). Damage which is *de minimis* in nature is not compensable. *Streater v. Cox*, 336 Fed.Appx. 470, 477 (6th Cir. 2009). Such is the case here. Plaintiff, at best, alleges *de minimis* damage to his home. He thus fails to state a claim upon which relief may be granted as to this issue.

Plaintiff also asserts that Defendants violated his rights under the Fourteenth Amendment by conducting an illegal search of his home. "If a constitutional claim is covered by a specific constitutional provision...the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997); *Albright v. Oliver*, 510 U.S. 266, 273 (1994). Thus, when the Fourth Amendment explicitly protects against the conduct at issue, claims based on that conduct should be analyzed under the Fourth Amendment, rather than the more generalized due process provisions of the Fourteenth Amendment. *See Graham v. Connor*, 490 U.S. 386, 395 (1989); *Jackson v. County of Washtenaw*, 310 Fed.Appx. 6, 7 (6th Cir. 2009) (citing *Gregory v. City of Louisville*, 444 F.3d 725, 750 (6th Cir. 2006)). Because Plaintiff's illegal search claim is covered by the Fourth Amendment, he fails to state a claim upon which relief may be granted under the Fourteenth Amendment.

Plaintiff further asserts that Defendants violated his equal protection rights under the Fourteenth Amendment. The linchpin of an equal protection claim is that the government has treated people who are similarly situated in a different manner. *Bannum, Inc. v. City of Louisville*, 958 F.2d 1354, 1359-60 (6th Cir. 1992). Plaintiff's equal protection claim

Matthews v. Craige, Not Reported in Fed. Supp. (2016)

lacks factual support. He fails to indicate with any specificity how he was treated differently from others who are similarly situated. As noted, conclusory allegations are insufficient to state a civil rights claim. Plaintiff thus fails to state an equal protection claim in his complaint.

Plaintiff asserts that Defendants committed an assault and battery in violation of state criminal law during the search of his home. This claim, however, only pertains to the minor children. Plaintiff admits that he was not present during the search of his home. He thus fails to state a claim upon which relief may be granted as to this issue.

Plaintiff also asserts that Defendants committed a home invasion in violation of state criminal law. To state a claim under § 1983, however, a plaintiff must allege a violation of a federal constitutional right or a federal statute. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Flanory v. Dunn*, 604 F.3d 249, 253 (6th Cir. 2010). The purpose of § 1983 is to remedy violations of federal law, not state law. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 924 (1982); *Laney v. Farley*, 501 F.3d 577, 580-81 (6th Cir. 2007). Moreover, criminal statutes do not create private rights of action. Plaintiff does not have standing to file a criminal complaint. A private citizen "lacks a judicially cognizable interest in the prosecution or nonprosecution of another." *Diamond v. Charles*, 476 U.S. 54, 63 (1986). Private citizens, whether or not they are incarcerated, cannot compel the criminal prosecution of another. *Id.* at 64–65. Decisions regarding who to criminally prosecute and what charges to bring rest within a prosecutor's discretion. *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978). Additionally, a private citizen has no constitutional, statutory, or common law right to require a public official to investigate or prosecute a crime. *See, e.g., White v. City of Toledo*, 217 F. Supp. 2d 838, 841 (N.D. Ohio 2002); *Walker v. Schmoke*, 962 F. Supp. 732, 733 (D. Md. 1997); *Fulson v. City of Columbus*, 801 F. Supp. 1, 6 (S.D. Ohio 1992) ("A public official charged with the duty to investigate or prosecute a crime does not owe that duty to any one member of the public, and thus no one member of the public has a right to compel a public official to act."). Plaintiff thus fails to state a claim upon which relief may be granted as to this issue.

**\*5** Lastly, Plaintiff alleges that Defendants conspired against him. To sustain a civil conspiracy claim under §

1983, a plaintiff must allege facts to show: (1) a single plan, (2) that the alleged co-conspirator shared in the general conspiratorial objective, and (3) that an overt act was committed in furtherance of the conspiracy that deprived the plaintiff of his civil rights. *Hooks v. Hooks*, 771 F.2d 935, 943-44 (6th Cir. 1985); *see also Memphis, TN Area Local v. City of Memphis*, 361 F.3d 898, 905 (6th Cir. 2004). A plaintiff must plead the conspiracy with "some degree of specificity." *Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6th Cir. 1987). As with his other claims, however, Plaintiff's allegations of conspiracy are vague, conclusory, and unsupported by material facts. They are thus insufficient to state a conspiracy claim, *see Moldowan*, 578 F.3d at 395 (citing *Gutierrez*, 826 F.2d at 1538); *Horton v. Martin*, 137 Fed.Appx. 773, 776 (6th Cir. 2005), or any civil rights claim under § 1983. Plaintiff fails to state a conspiracy claim in his complaint.

## VI.

For the reasons stated, the Court concludes that Plaintiff, who is proceeding *pro se*, cannot bring suit on behalf of his minor children.

Accordingly, it is **ORDERED** that the claims Plaintiff has attempted to bring on behalf of his minor children are **DISMISSED without prejudice.**

It is further **ORDERED** that, because Plaintiff has failed to state a claim upon which relief may be granted under 42 U.S.C. § 1983 as to his own remaining claims, Plaintiff's civil rights complaint is **DISMISSED with prejudice.**

It is further **ORDERED** that if Plaintiff elects to appeal this decision, he may not proceed without prepayment of fees and costs because any appeal would be frivolous and not in good faith. 28 U.S.C. § 1915(a)(3); *Coppedge v. United States*, 369 U.S. 438, 445 (1962).

### All Citations

Not Reported in Fed. Supp., 2016 WL 3522320

**End of Document**
© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Nali v. Ekman, 355 Fed.Appx. 909 (2009)

355 Fed.Appx. 909
This case was not selected for publication in West's
Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued on or
after Jan. 1, 2007. See also U.S.Ct. of App. 6th Cir.
Rule 32.1.
United States Court of Appeals,
Sixth Circuit.

Frank NALI, Plaintiff–Appellant,
v.
J. EKMAN, et al., Defendants–Appellees.

No. 08–1599.
|
Dec. 9, 2009.

**Synopsis**
**Background:** Prisoner brought § 1983 action against
corrections officials, alleging that they violated his federal
and state civil rights. The United States District Court for
the Western District of Michigan, 2007 WL
3461999,dismissed the action. Prisoner appealed.

**Holdings:** The Court of Appeals, White, Circuit Judge,
held that:

prisoner stated a First Amendment retaliation claim;

major misconduct findings against prisoner did not
implicate a protected liberty interest in support of a federal
due process claim; and

prisoner failed to state a cognizable Equal Protection
Clause claim.

Affirmed in part, vacated in part, and remanded.

Sutton, Circuit Judge, filed a dissenting opinion.

**Procedural Posture(s):** On Appeal; Motion to Dismiss.

**\*910** On Appeal from the United States District Court for
the Western District of Michigan.

Before: KEITH, SUTTON and WHITE, Circuit Judges.

**Opinion**

WHITE, Circuit Judge.

**\*\*1** Plaintiff Frank Nali challenges the district court's
dismissal of his civil rights action for failure to state a claim
on which relief can be granted. We conclude that Nali
stated a claim under the First Amendment, but that the
district court properly dismissed his remaining federal
claims. We therefore affirm in part, vacate in part and
remand for further proceedings.

**I**

Nali was convicted of extortion in 1992 and was
incarcerated at the Ojibway Correctional Facility in
Michigan when he filed the instant suit. *People v. Nali,* No.
247843, 260267, 2005 WL 3556110, at \*1 (Mich.Ct.App.
Dec. 29, 2005). After prison officials cited him for a major
misconduct infraction, Nali sued them and other
corrections officials, alleging that they had violated his
federal and state civil rights. The magistrate judge
recommended that the court dismiss Nali's federal claims
for lack of merit and decline to exercise pendent
jurisdiction over his state law claims. The district court
adopted the magistrate judge's report and
recommendation, over Nali's objections.

**A**

Nali's seventeen claims can be broadly grouped into three
types of federal claims—due process, speech—retaliation
and equal protection—and various state-law claims. We
affirm the dismissal of the due process and equal protection
claims, but reverse as to the speech-retaliation claim.

We do not agree with our dissenting colleague that Nali
waived his First Amendment claim.[1] Neither the magistrate
nor the district court addressed Nali's First Amendment
claim, which alleged that defendant Buda advised
defendant Flahaug to write a misconduct ticket in

Nali v. Ekman, 355 Fed.Appx. 909 (2009)

retaliation for Nali's filing of a grievance against Buda. The magistrate's report and recommendation concluded in relevant part that Nali's claims "regarding the allegedly false misconduct convictions remain noncognizable under § 1983" due to the Supreme Court's holding in *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994). In response, Nali objected to the magistrate's application of *Heck.* The district court rejected Nali's objections. Under the circumstances that it appeared that the report and recommendation **\*911** recommended dismissal of the First Amendment claim under the *Heck* doctrine—since the claim was not otherwise addressed—Nali did not forfeit his argument that the First Amendment claim was dismissed in error by failing to specifically address it. Further, "[w]hen a district court fails to rule on a claim, we usually remand for consideration below." *United States v. Kennedy,* 220 Fed.Appx. 407, 409 (6th Cir.2007) (unpublished disposition); *cf. Nemir v. Mitsubishi Motors Corp.,* 381 F.3d 540, 552 (6th Cir.2004) ( "The district court's failure to rule on the motion requires that we remand for consideration anew.").

**B**

Nali's allegations appear to state a First Amendment retaliation claim. As this court explained in *Smith v. Campbell,* 250 F.3d 1032, 1036–37 (6th Cir.2001):

> A prisoner retains First Amendment rights that are not inconsistent with his status as a prisoner or with legitimate penological objectives of the corrections system. *See Pell v. Procunier,* 417 U.S. 817[ 94 S.Ct. 2800, 41 L.Ed.2d 495] (1974). Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution. *See Thaddeus–X v. Blatter,* 175 F.3d 378, 394 (6th Cir.1999). To establish a First Amendment retaliation claim, the plaintiff must prove that: 1) the plaintiff engaged in activities protected by the Constitution or statute; 2) the defendant took an adverse action that would deter a person of ordinary firmness from continuing to engage in that conduct; and 3) that this adverse action was taken at least in part because of the exercise of the protected conduct.

**\*\*2** This court has held that a *pro se* plaintiff's complaint should only be dismissed for failure to state a claim if it appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Herron v. Harrison,* 203 F.3d 410, 414 (6th Cir.2000) (quoting *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). In this light, Nali's

allegation that defendants Buda and Flahaug initiated the March 21, 2007 misconduct citation in retaliation for Nali's non-frivolous grievance against Buda may entitle him to relief on remand. *See Thomas v. Eby,* 481 F.3d 434, 440 (6th Cir.2007) (recognizing an inmate's undisputed First Amendment right to file grievances against prison officials on his own behalf); *see also Thaddeus–X v. Blatter,* 175 F.3d 378, 394 (6th Cir.1999); *Noble v. Schmitt,* 87 F.3d 157, 162 (6th Cir.1996).

Under the *Heck* doctrine, when success in a prisoner's § 1983 action would necessarily implicate the lawfulness of the prisoner's conviction or duration of sentence, "a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." *Heck,* 512 U.S. at 486–87, 114 S.Ct. 2364. However, in *Wilkinson v. Dotson,* 544 U.S. 74, 82, 125 S.Ct. 1242, 161 L.Ed.2d 253 (2005), the Supreme Court clarified that if success on a § 1983 claim "does not mean immediate release from confinement or a shorter stay in prison," but instead "means at most new eligibility review, which at most will speed *consideration* of a new parole application," the habeas exception to § 1983 does not apply. Two years later, this court concluded that under Michigan's disciplinary credit program, a prisoner's success on a "§ 1983 claim would not necessarily affect the duration of his sentence because prison officials would retain discretion regarding whether to grant him parole." *Eby,* 481 F.3d at 439–40 (citing Mich. Comp. Laws § 800.33(3), (5), and the **\*912** Michigan Court of Appeals' interpretation of the disciplinary credit program). As a result, the court held that the habeas exception did not apply to the prisoner's § 1983 claim. *Id.* at 440.

During the pendency of the instant appeal, Nali's conviction was vacated and his petition for writ of habeas corpus unconditionally granted. *See Nali v. Phillips,* 630 F.Supp.2d 807 (E.D.Mich.2009). On July 8, 2009, the district court in that case denied respondent's motion to stay and granted Nali's motion for immediate release. *Nali v. Phillips,* No. 07–CV–15487 (E.D. Mich. filed July 8, 2009), 2009 WL 1956946, at \*3. We thus need not address the district court's conclusion that *Heck* applies to Nali's claims, except to note that the court failed to distinguish between Michigan's good time credit program, available to prisoners "serving a sentence for a crime committed before April 1, 1987" and Michigan's disciplinary credit program, available to prisoners "serving a sentence for a crime that was committed on or after April 1, 1987." *Compare* Mich. Comp. Laws § 800.33(2), *with* Mich. Comp. Laws § 800.33(3), (5). *See also* Mich. Comp. Laws § 800.34.

Nali v. Ekman, 355 Fed.Appx. 909 (2009)

**C**

**\*3** Regarding Nali's remaining claims, *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), bars his federal due process claims. As *Sandin* makes clear, "finding[s] of misconduct," even findings that could lengthen a prison sentence, do not implicate a protected liberty interest so long as the parole board retains discretion to release a prisoner based on a "myriad of considerations" and so long as the prisoner may "explain the circumstances behind his misconduct record" to the board. 515 U.S. at 487, 115 S.Ct. 2293. In this instance, the major misconduct findings resulted in the accumulation of "disciplinary time" to Nali's sentence, a factor submitted to the parole board as one among many other considerations they may account for in deciding whether to grant early release. Mich. Adm.Code R. 791.5515(2), 791.7715. Because these findings represent just one among many factors that could affect the length of Nali's indeterminate sentence and because no one denies that Nali has the right to explain the circumstances of the misconduct charge, the findings do not inevitably affect the duration of Nali's sentence and do not effect an "atypical and significant hardship on [Nali] in relation to the ordinary incidents of prison life." *Sandin,* 515 U.S. at 483, 484, 115 S.Ct. 2293; *see also Thompson v. Mich. Dept. of Corrs.,* 25 Fed.Appx. 357, 358 (6th Cir.2002) (unpublished disposition) (concluding that a misconduct citation in the Michigan correctional system did not affect the prisoner's constitutional liberty interests).

Nali's federal Equal Protection Clause claim—that defendants "conspir [ed]" to issue the two major misconduct infractions for racially discriminatory reasons, also fails. Although Nali is correct that the magistrate (and district court) misunderstood the statutory basis for his discrimination claims, believing that he had premised the claim on § 1983, as opposed to § 1985, Nali has not shown that they erred in concluding that the claims still fail as a matter of law.

In order to plead a cognizable § 1985 claim, Nali must allege specific facts that, taken together, plausibly suggest that (1) two or more individuals "conspire[d] ... for the purpose of depriving [him] of the equal protection of the laws," (2) they acted to further that conspiracy and (3) he was injured as a result. *Center for Bio–Ethical Reform, Inc. v. City of Springboro,* 477 F.3d 807, 832 (6th Cir.2007); *see also Chapman v. City of Detroit,* 808 F.2d 459, 465 (6th Cir.1986). As the magistrate and district court recognized, Nali failed to **\*913** plead sufficient facts to state a

cognizable Equal Protection Clause claim. In connection with this requirement, he alleged that "[d]efendants' motives were racially based [and] supported by animosity towards plaintiff." But, as the Supreme Court recently held, a complaint that includes conclusory allegations of discriminatory intent without additional supporting details does not sufficiently show that the pleader is entitled to relief. *See Ashcroft v. Iqbal,* ––– U.S. ––––, 129 S.Ct. 1937, 1950–51, 173 L.Ed.2d 868 (2009). Nali's claim can survive only if he pleaded facts supporting that conclusion. He has not done so. The fact that "defendants are caucasian" and that Nali "is non-caucasian" does not by itself show that defendants were motivated to discriminate against him on the basis of his race or ethnicity. Although Nali adds that "no one else was ticketed" for similar conduct (being in the chow hall at the wrong time), that fact does not show discrimination unless accompanied by some evidence that the people *not* disciplined were similarly situated and of a different race, *see Coker v. Summit County Sheriff's Dept.,* 90 Fed.Appx. 782, 790 (6th Cir.2003) (unpublished disposition)—facts he does not allege in his complaint. The district court properly dismissed this claim.

**\*4** Nali asserted state law claims for negligence, defamation, and intentional infliction of emotional distress. The district court declined to exercise pendent jurisdiction over these claims on the ground that Nali failed to state a federal claim. Because Nali stated a claim under the First Amendment, the district court should revisit whether to exercise pendent jurisdiction over the state law claims. *See e.g., Voyticky v. Village of Timberlake, Ohio,* 412 F.3d 669, 675 (6th Cir.2005).

We affirm the dismissal order in part, vacate in part and remand for further consideration of the First Amendment and state law claims.

SUTTON, Circuit Judge, dissenting.

**\*4** An appellant, whether represented by counsel or not, should not be able to obtain a reversal of a district court judgment without offering any reason in his brief why the lower court erred. Yet that is what Mr. Nali has managed to do here, and accordingly I respectfully dissent.

Nali's four-page brief does not develop a single argument or point to a single mistake that the district court made. If you doubt me, check it out for yourself. As the attached appendix shows, Nali's brief contains a one-sentence (all-encompassing) description of the issue presented: "Whether The Trial Court Should Have Dismissed

Plaintiff's Claims Against The Defendants." It then contains a one-paragraph (half-page) "Law and Argument" section, which in sum and substance says this: "his submissions in the district court and this court sufficiently addressed the issue." *See* Appendix. It then incorporates by reference "all his exhibits in the appendices"—his district court filings and the district court's opinion—"as an integral part of this argument and his appeal." *Id.* Even the most *pro se* of *pro se* briefs must do more than that.

Rule 28 of the Federal Rules of Appellate Procedure says that the brief of an appellant—any appellant—"must" include his "contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies." Fed. R.App. P. 28(a)(9)(A); *see Fitts v. Sicker,* 232 Fed.Appx. 436, 441–42 (6th Cir.2007) (applying Rule 28 to *pro se* appellant). No doubt, we expect less of *pro se* litigants than we do of counseled litigants—and appropriately so. But those modest expectations are not non-existent. "[P]ro se parties must still brief the issues advanced with some effort at developed argumentation." *Coleman v. Shoney's, Inc.,* 79 Fed.Appx. 155, 157 (6th Cir.2003) *\*914* (quotation marks omitted). That is why the Sixth Circuit's form for *pro se* briefs asks appellants to specify "what facts," "what law" and "what specific issues" they want the court to review. *See Pro Se Brief,* http://www.ca6.uscourts.gov/internet/forms/briefs_appen dices/ prose_brief.pdf. When, as here, a *pro se* appellant's brief "has not suggested any defects in the district court's ruling, "much less advanced any sort of argument," we should dismiss the appeal—as we have before. *Geboy v. Brigano,* 489 F.3d 752, 766–67 (6th Cir.2007); *see also Jenkins v. Widnall,* No. 99–3918, 2000 WL 553957, at *3 (6th Cir. Apr. 28, 2000) (declining to address district court order *pro se* litigant did not specify in her brief); *Anderson v. Hardman,* 241 F.3d 544, 545 (7th Cir.2001) (dismissing *pro se* appellant's claim for failing to comply with Rule 28).

**\*\*5** Even the most lenient reading of Rule 28 does not allow an appellant to satisfy its requirements solely by incorporating his arguments below. *See Yohey v. Collins,* 985 F.2d 222, 224–25 (5th Cir.1993) (denying *pro se* litigant's request to incorporate "his objections to the magistrate judge's report and in various state court pleadings"). "[S]uch a practice has been consistently and roundly condemned, and any incorporated argument is ordinarily deemed forfeited, even when advanced by a pro se litigant." *United States v. Orrego–Martinez,* 575 F.3d 1, 8 (1st Cir.2009) (internal quotation marks and citations omitted).

This is hardly the technical enforcement of a rule for its own nit-picking sake. Had Nali's only briefing omission been the failure to include a "summary of the argument,"

as indeed he failed to provide and as the Appellate Rules also require, *see* Fed. R.App. P. 28(a)(8), I would not have a problem with overlooking the error. But when the litigant offers no argument to summarize and nothing more than an invitation to rummage through the district court pleadings to identify any mistake loosely connected with a broadly defined issue (*viz.,* "Should I have lost below?"), he is not asking us to overlook the understandable mistake of a lay-person advocate. He is asking us to be a judge *and* advocate in the case, a division of responsibilities we should try to preserve rather than blur.

What is more, when a *pro se* litigant asks us to identify any potentially winning arguments in his lower court pleadings, he is asking us to create, not correct, potential disparities in the legal system. Excusing a complete lack of appellate briefing does not level the playing field between an uncounselled litigant and his adversary; it gives the *pro se* litigant a distinct advantage. How can an appellee respond to arguments the appellant never articulates? And how can we tether the appellee to the applicable page-limit requirements, when the appellant's brief includes everything in a potentially voluminous lower-court record?

This case, indeed, illustrates the problem with this approach. The claim Nali prevails on today—his speech-retaliation claim—is one that he not only failed to develop on appeal but also failed to complain about in his objections to the magistrate's report and recommendation. *See* Nali App. D. As a result, the first notice that the appellee—and the district court—will receive of the appellant's winning "argument" is when they read the court of appeals decision reversing the district court's judgment. That is no way to run a court system. Breathing new life into this doubly forfeited claim both undermines our adversarial system and oversteps the appropriate constraints on our powers of appellate review. *Cf. Carducci v. Regan,* 714 F.2d 171, 177 (D.C.Cir.1983) ("The **\*915** premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry....")

**\*\*6** Such a lax, indeed non-existent, briefing requirement does not just create inequities between litigants in any one case. If we confer on some *pro se* litigants the benefit of crafting their arguments for them, I see no reason why we should not do so for all *pro se* litigants, or even for all parties. Because *pro se* appellants, like all other appellants, must make some effort to explain why the lower court erred, and because Nali has made no such effort, I would affirm. The majority seeing the issue differently, I respectfully dissent.

Appendix to Opinion of Sutton, Circuit Judge.

Nali's handwritten brief contains a table of contents, a one-and-a-half page statement of facts, a one-sentence jurisdictional statement and a "Relief Sought" section requesting the court to reverse the district court's decision. The rest of his brief, in its entirety, reads as follows:

ISSUES PRESENTED

Whether the Trial Court Should Have Dismissed Plaintiff's Claims Against The Defendants.

LAW AND ARGUMENT

Plaintiff filed a 115 item complaint against 6 MDOC

employees, actually 5 MDOC employees and a CMS employee. See appendix A. The complaint was based upon three major misconduct tickets. See appendix B.

The district court entered a report and recommendation to dismiss plaintiff's case for failure to state a claim pursuant to 28 U.S.C. § 1915(e)(2), 1915A(b) and 42 U.S.C. § 1997e(c). See App. C.

Plaintiff filed objections to the report and recommendations. See appendix D. The district court adopted the magistrate's report and recommendation. See appendix E.

Plaintiff request[s] leave to appeal in this court. See appendix F.

Plaintiff contends that his submissions in the district court and this court sufficiently addressed the issue, and includes all his exhibits in the appendices as an integral part of this argument, and his appeal.

**All Citations**

355 Fed.Appx. 909, 2009 WL 4641737

Footnotes

1    As mentioned, in the instant case the magistrate judge wrote a report and recommendation to which Nali objected. The district court then adopted the report and recommendation. In such a situation, though it is not ideal, we do not think it is unreasonable for a pro se appellant to cite his objections to the report and recommendation, note the district court's adoption of the report over his objections, refer the appellate court to the relevant submissions, and attach those submissions as appendices to the appeal. *See Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) ("A document filed *pro se* is 'to be liberally construed,' *Estelle [v. Gamble],* 429 U.S. [97], at 106, 97 S.Ct. 285 [1976], and 'a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers,' *ibid.*"); *cf. Banks v. Jackson,* 149 Fed.Appx. 414, 422 n. 7 (6th Cir.2005) (unpublished disposition) (holding a *pro se* habeas petitioner did not forfeit his argument for a stay despite failing to request the stay at the district court or in his brief on appeal).

End of Document    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

709 Fed.Appx. 779
This case was not selected for publication in West's
Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued on or
after Jan. 1, 2007. See also U.S.Ct. of App. 6th Cir.
Rule 32.1.
United States Court of Appeals, Sixth Circuit.

IN RE: OHIO EXECUTION PROTOCOL
LITIGATION
Gary Otte; Raymond Tibbetts; and Alva
Campbell, Jr., Plaintiffs–Appellants,
v.
John Kasich, Governor, State of Ohio;
Gary C. Mohr, Director, ODRC; Donald
Morgan, Warden, Southern Ohio
Correctional Facility; Anonymous
Execution Team Members 1–50, c/o
Southern Ohio Correctional Facility;
Warden, Franklin Medical Center;
Stephen Gray, Chief Counsel, ODRC;
Charlotte Jenkins; Warden, Ohio State
Penitentiary; Richard Theodore,
Pharmacist, c/o ODRC; Edwin C.
Voorhies, Jr., Managing Director of
Operations, ODRC, Defendants–
Appellees.

Nos. 17–3800/3834
|
FILED September 07, 2017

**Synopsis**
**Background:** Ohio death-penalty inmates brought § 1983
action in federal court and added pendent state-law claims
seeking monetary, declaratory, and injunctive relief against
pharmacist and execution team members in their individual
capacities on the grounds that pharmacist and members'
participation in their executions would violate the Ohio
Corrupt Practices Act. After the federal constitutional
challenge to the protocol was rejected, 860 F.3d 881, the
United States District Court for the Southern District of
Ohio, Michael R. Merz, United States Magistrate Judge,
2017 WL 3167650, dismissed the pendent claims for lack
of jurisdiction and failure to state a claim. Inmates
appealed.

**Holdings:** The Court of Appeals held that:

injunction and declaratory judgment claims were barred by
sovereign immunity;

money-damages claim was barred by Ohio law; and

even if the claims were not barred, courts were not required
to exercise jurisdiction over the claims.

Affirmed.

Sutton, Circuit Judge, filed a concurring opinion.

**Procedural Posture(s):** On Appeal; Motion to Dismiss.

**\*780** ON APPEAL FROM THE UNITED STATES
DISTRICT COURT FOR THE SOUTHERN DISTRICT
OF OHIO

Before: COLE, Chief Judge; SUTTON and GRIFFIN,
Circuit Judges.

**Opinion**

PER CURIAM.

*Introduction.* In this § 1983 action, three death-penalty
inmates challenged Ohio's execution protocol under the
Eighth and Fourteenth Amendments and added a pendent
state-law claim alleging that the **\*781** five defendants (all
involved in implementing Ohio's capital-punishment
system) will violate the Ohio Corrupt Practices Act by
using controlled substances without a prescription in the
next execution. This court, sitting en banc, recently
rejected the federal constitutional challenge to the protocol.
*See* In re: Ohio Execution Protocol, 860 F.3d 881 (6th Cir.)
(en banc), *cert denied*, ––– U.S. ––––, 137 S.Ct. 2238, 198
L.Ed.2d 761 (2017).

At issue today is the state law claim. The district court did
not reach the merits of this claim and dismissed it for lack
of jurisdiction and failure to state a claim, leaving the
plaintiffs free to pursue relief under state law in the state
courts. We agree and affirm the dismissal of the claim.

The first reason for not exercising jurisdiction over this

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.                    1

In re Ohio Execution Protocol Litigation, 709 Fed.Appx. 779 (2017)

state law claim is sovereign immunity. "[A] claim that state officials violated state law in carrying out their official responsibilities is a claim against the [s]tate that is protected by the Eleventh Amendment." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 121, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). That is today's claim. Plaintiffs argue that individuals employed or hired by the state will violate state law in carrying out core responsibilities on behalf of the state, namely the implementation of Ohio's system of capital punishment. In word and deed, *Pennhurst* bars the claim, as the district court correctly held.

Nor do any of the exceptions to the states' sovereign immunity apply here. The states, like the federal government, are free to set their own terms for suing and being sued. To preserve the supremacy of federal law, however, the United States Supreme Court has created two pertinent exceptions to these principles (and without regard to any waiver of immunity) for cases involving state action, most notably by allowing injunction actions against state officials, *see Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), and by allowing money-damages against state officials for violating clearly established principles of federal law, *see Monroe v. Pape*, 365 U.S. 167, 172, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); *cf. Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). But these exceptions to the normal rules—that the states and federal government may set their own terms for being sued—do not apply to a *federal court* action to vindicate *state law*. The plaintiffs cite no waiver of Ohio's immunity from suit that would allow this action in federal court, and Supreme Court precedents do not create one.

The plaintiffs' claim for money damages comes with its own limitation—that any such claim must first proceed through the state court of claims. The plaintiffs have filed no such action. All of this requires the dismissal of the case.

Even if all of this were not true, 28 U.S.C. § 1367 does not *require* federal courts to hear pendent state law claims. For many of the reasons just given and many others elaborated below, this is an appropriate setting for dismissing the state law claim (without prejudice) and permitting the plaintiffs to refile it in state court.

*Background.* Plaintiffs Gary Otte, Raymond Tibbetts, and Alva Campbell, Jr., are Ohio death-penalty inmates. Otte has an execution date set for September 13, 2017. Campbell has an execution date of November 15, 2017. And Tibbetts's execution is scheduled for February 13, 2018.

These appeals are the latest in a series of challenges to Ohio's lethal injection protocol. Most recently, this court

rejected an Eighth Amendment challenge to the current version of the protocol. *See* **\*782** *In re: Ohio Execution Protocol*, 860 F.3d 881. In 2016, Otte and Tibbetts each filed Fourth Amended Complaints and a Joint Supplement to the Fourth Amended Complaints, which raised a claim under the Ohio Corrupt Practices Act, the Forty–Ninth Cause of Action. The district court subsequently dismissed a number of claims from these complaints, including this state law claim, for lack of subject matter jurisdiction and failure to state a claim. *In re: Ohio Execution Protocol Litigation*, No. 2:11–cv–1016, 2017 WL 2964901 (S.D. Ohio July 12, 2017). Otte and Tibbetts moved the court to reconsider its dismissal of the state law claim, but the court denied their motion. *In re: Ohio Execution Protocol Litigation*, No. 2:11–cv–1016, 2017 WL 3027956 (S.D. Ohio July 17, 2017). Otte and Tibbetts moved the court to reconsider its decision a second time. The court again denied their motion to reconsider but granted their request to enter its final judgment regarding the state law claim, thereby allowing their current appeal (No. 17–3800). *In re: Ohio Execution Protocol Litigation*, No. 2:11–cv–1016, 2017 WL 3167650 (S.D. Ohio July 25, 2017).

In a separate Fourth Amended Complaint, Campbell raised a similar state law claim as his Forty–Sixth Cause of Action. Relying on the same reasoning that formed the basis of its dismissal of Otte and Tibbetts's state law claims, the district court dismissed Campbell's similar claim. *In re: Ohio Execution Protocol Litigation*, No. 2:11–cv–1016 (S.D. Ohio Aug. 2, 2017). As with Otte and Tibbetts's case, the court entered final judgment for this claim, and Campbell has filed a timely appeal (No. 17–3834). We consolidated the appeals.

*Discussion.* Seeking monetary, declaratory, and injunctive relief, the plaintiffs sued Richard Theodore (a pharmacist who will release the lethal injection drugs to the Execution Team) and Execution Team Members 17, 21, 31, and 32 (who are paramedics or EMTs) in their individual capacities. The plaintiffs alleged that the defendants' participation in their executions would violate the Ohio Corrupt Practices Act. The district court concluded that the plaintiffs' injunction and declaratory claims were barred by the Eleventh Amendment and that the money-damages claim had to be presented in the first instance to the Ohio Court of Claims.

The district court properly determined that the plaintiffs' claims for declaratory and injunctive relief were barred by the Eleventh Amendment. That Amendment prohibits suits naming the state or one of its agencies or departments as the defendant, regardless of the nature of the relief sought. *Pennhurst*, 465 U.S. at 100, 104 S.Ct. 900. This immunity from suit extends to state officials when the lawsuit is in fact against the state. *Will*, 491 U.S. at 71, 109 S.Ct. 2304;

*Pennhurst*, 465 U.S. at 101–02, 104 S.Ct. 900. Under *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), a federal court may issue prospective injunctive and declaratory relief compelling a state official to comply with federal law. *See Edelman v. Jordan*, 415 U.S. 651, 664, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). But that exception does not extend to prospective injunctive or declaratory relief based on alleged violations of state law. As the Court observed in *Pennhurst*, 465 U.S. at 106, 104 S.Ct. 900:

> A federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law. On the contrary, it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles **\*783** of federalism that underlie the Eleventh Amendment. We conclude that *Young* and *Edelman* are inapplicable in a suit against state officials on the basis of state law.

*See also Ernst v. Rising*, 427 F.3d 351, 368 (6th Cir. 2005) (en banc) ("[T]he states' constitutional immunity from suit prohibits *all* state-law claims filed against a [s]tate in federal court, whether those claims are monetary or injunctive in nature."); *Turker v. Ohio Dep't of Rehab. & Corr.*, 157 F.3d 453, 456–57 (6th Cir. 1998) ("It is ... well-established that a federal court cannot entertain a lawsuit against state officials for violations of state law unless the state has waived its immunity under the Eleventh Amendment. Ohio has not waived that immunity." (internal citations omitted)). This conclusion applies even if, as in the present case, supplemental jurisdiction otherwise exists. *McNeilus Truck & Mfg., Inc. v. Ohio ex rel. Montgomery*, 226 F.3d 429, 438 (6th Cir. 2000). Because the plaintiffs sought to obtain injunctive and declaratory relief based on the Ohio Corrupt Practices Act, a state law, the district court properly concluded that sovereign immunity barred their claims.

The plaintiffs try to distinguish *Pennhurst* on the ground that they are suing the defendants in their individual, not official, capacities. But *Pennhurst* explained that, when plaintiffs sue state officials for violations of state law, "relief sought nominally against an officer is in fact against the sovereign if the decree would operate against the latter" and when "the state is the real, substantial party in interest." 465 U.S. at 101, 104 S.Ct. 900 (citations omitted). This is also the case when the plaintiffs "claim that state officials violated state law in carrying out their official responsibilities." *Id.* at 121, 104 S.Ct. 900. Sovereign immunity thus bars a plaintiff from using state law to enjoin state officials from carrying out official responsibilities even when the officials are sued in their

individual capacities. *Williams v. Kentucky*, 24 F.3d 1526, 1531, 1543 (6th Cir. 1994).

The plaintiffs do not contend that the officials committed any wrong against the plaintiffs independent of their implementation of state law. Their requested relief as a practical matter would prohibit the state from carrying out its execution procedures by prohibiting its employees from administering the execution drugs. Where, as here, "the relief sought ... has an impact directly on the [s]tate itself," the plaintiffs' lawsuit against the state officers should be treated as a suit against the state. *Pennhurst*, 465 U.S. at 117, 104 S.Ct. 900.

Under the plaintiffs' theory—that the Eleventh Amendment does not apply so long as plaintiffs sue state officials in their individual capacity—"the Eleventh Amendment would have force only in the rare case in which a plaintiff foolishly attempts to sue the [s]tate in its own name" or state officials in their "official" capacity. *Pennhurst*, 465 U.S. at 116, 104 S.Ct. 900. The plaintiffs' "exception ... would swallow the general rule that a suit is against the [s]tate if the relief will run against it." *Id.* The Court rejected a similar end run in *Pennhurst. Id.*

The plaintiffs argue that *Pennhurst* distinguished between individual and official capacity suits. That is true but not helpful. *Pennhurst* "distinguished ... cases seeking money damages against the individual officer in tort, and those seeking injunctive relief against the officer in his official capacity." 465 U.S. at 111 n.21, 104 S.Ct. 900. The latter "sought relief against the sovereign, while the former might not." *Id.* Whether one seeks relief against the officer in his official capacity (and hence the sovereign), the Court explained, "turns on whether the defendant state official was **\*784** empowered to do what he did, *i.e.*, whether, ... [the challenged action] was action within the scope of his authority." *Id.* at 112 n.22, 104 S.Ct. 900. The opinion shows that immunity turns on functional reality, not labels, and thus does not turn on whether the plaintiffs label their claim as an official-capacity or individual-capacity suit.

The plaintiffs demur. *Hafer v. Melo*, 502 U.S. 21, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991), they say, explained that the phrase " 'acting in their official capacities' is best understood as a reference to the capacity in which the state officer is sued, not the capacity in which the officer inflicts the alleged injury." *Id.* at 26, 112 S.Ct. 358. But *Hafer* addressed whether officers sued in their individual capacities are "persons" subject to suit under § 1983. It did not mention *Pennhurst* or for that matter address when a state-law action against a state official is functionally an action against the state.

The plaintiffs claim that several circuit court cases lead to

In re Ohio Execution Protocol Litigation, 709 Fed.Appx. 779 (2017)

a different conclusion. But none is on point. Some deal with violations of federal law. See *Spruytte v. Walters*, 753 F.2d 498, 511–14 (6th Cir. 1985); *Ying Jing Gan v. City of New York*, 996 F.2d 522, 529 (2d Cir. 1993). Others deal with damages. See *Guillemard–Ginorio v. Contreras–Gomez*, 585 F.3d 508, 532 (1st Cir. 2009); *Pena v. Gardner*, 976 F.2d 469, 473 (9th Cir. 1992). None of these cases holds that federal courts may enjoin state officials for violating state law while carrying out official state law duties.

The plaintiffs' separate request for monetary relief under state law does not fix these problems or otherwise allow the action to proceed. When faced with a claim of immunity to a supplemental state claim, a federal court must look to the appropriate state law to ascertain the nature of the immunity. *Cullinan v. Abramson*, 128 F.3d 301, 312 (6th Cir. 1997). And Ohio has not consented to state law actions against the State of Ohio and state officials outside of its own courts. See *Jones v. Hamilton Cty. Sheriff*, 838 F.3d 782, 786 (6th Cir. 2016). Ohio Rev. Code § 9.86 provides that no "employee shall be liable in any civil action that arises under the law of this state for damage or injury caused in the performance of his duties, unless the ... employee's actions were manifestly outside the scope of his employment or official responsibilities, or unless the officer or employee acted with malicious purpose, in bad faith, or in a wanton or reckless manner." Ohio Revised Code § 2743.02(F), in turn, establishes that lawsuits alleging damages against state employees "shall first be filed against the state in the court of claims that has exclusive, original jurisdiction to determine, initially, whether the officer or employee is entitled to personal immunity under section 9.86." Thus, "Ohio law requires that, as a condition precedent to asserting a cause of action against a state employee in his individual capacity, the Court of Claims must first determine that the employee is not entitled to the immunity provided for in Revised Code section 9.86." *Haynes v. Marshall*, 887 F.2d 700, 704 (6th Cir. 1989); *see also McCormick v. Miami Univ.*, 693 F.3d 654, 665 (6th Cir. 2012).

The plaintiffs counter that some of the defendants are not entitled to immunity under Ohio law because they do not qualify as state employees. While the plaintiffs acknowledge that defendants Theodore and Execution Team Member 17 are state employees, they maintain that Team Members 21, 31, and 32 do not have the same status. Not so. Under Ohio Revised Code § 109.36(A)(1)(b), a "person that, at the time a cause of action against the person ... arises, is rendering medical ... services pursuant to a personal services **\*785** contract or purchased service contract with a department, agency, or institution of the state" is an "employee." The defendants qualify as "employees" under § 109.36(A)(1)(b) because they render

medical services. Section 109.36 does not define the term "medical," but the services that the defendants provide as EMTs and paramedics qualify as "medical" under any reasonable sense of the term. The defendants, for example, are responsible for "the establishing and maintenance of an intravenous line and the administration of drugs through that line." And Ohio law considers the administration of drugs and intravenous fluids "emergency medical services." See Ohio Rev. Code. § 4765.39.

The plaintiffs also invoke the general proposition that a state cannot hinder a federal court's jurisdiction over a cause of action that otherwise restricts jurisdiction to a specialized state court. See *Marshall v. Marshall*, 547 U.S. 293, 314, 126 S.Ct. 1735, 164 L.Ed.2d 480 (2006); *Williams v. Duke Energy Int'l, Inc.*, 681 F.3d 788, 798 (6th Cir. 2012); *Davet v. City of Cleveland*, 456 F.3d 549, 554 (6th Cir. 2006); *Superior Beverage Co. v. Schiefelin & Co.*, 448 F.3d 910, 917 (6th Cir. 2006). But none of these cases involved a state's invocation of its sovereign immunity. Ohio has not attempted (by statute, court decision, or otherwise) to restrict the ability of federal courts to hear certain types of cases. It has just set forth the terms for its limited waiver of immunity for actions by its employees.

Last but not least, we are free to affirm the district court's decision on alternative grounds. Much of what we have said so far explains why it makes little sense for the federal courts to entertain this state law claim concerning a core matter of state law. Section 1367 permits federal courts to entertain jurisdiction over pendent state law claims. But it does not require them to do so, least of all after the core federal claim already has been rejected on the merits. See 28 U.S.C. § 1367(c). Even if sovereign immunity and Ohio law did not bar the plaintiffs' claim, we would decline to exercise supplemental jurisdiction over the claim. See *Doe v. Sundquist*, 106 F.3d 702, 708 (6th Cir. 1997).

For these reasons, we affirm the dismissal of the plaintiffs' state law claim without prejudice, permitting them to refile the claim in state court.

SUTTON, Circuit Judge, concurring.

I concur in full in the per curiam opinion, but write separately to make one point.

*Williams v. Kentucky*, 24 F.3d 1526, 1543 (6th Cir. 1994), seems to say that federal courts may order state officials to conform to state law through a lawsuit for money damages if the lawsuit names the state employees in their individual

In re Ohio Execution Protocol Litigation, 709 Fed.Appx. 779 (2017)

capacities and without regard to whether the State has consented to the lawsuit. I say "seems" because it is not clear from the rest of *Williams* that the plaintiffs sought money damages, as opposed to injunctive relief, under state law. I am skeptical about this statement in *Williams*, whether *dictum* or not, and skeptical of the statements of a few other courts of appeals to the same effect, *see, e.g., Guillemard–Ginorio v. Contreras–Gomez*, 585 F.3d 508 (1st Cir. 2009); *Wilson v. UT Health Center*, 973 F.2d 1263 (5th Cir. 1992); *Pena v. Gardner*, 976 F.2d 469 (9th Cir. 1992).

A core feature of sovereignty is the state's authority to decide when and where it can be sued. *Alden v. Maine*, 527 U.S. 706, 713, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999). Ohio has not consented to allow its employees to be sued in federal court for actions taken in the scope of their employment. We know that a claimant cannot **\*786** evade that bar by seeking injunctive or declaratory relief against a state official acting within the scope of his authority, whether the action names the state employee in their individual or official capacity. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984).

*Pennhurst*, it's true, did not address today's setting: an individual capacity money damages action. But I see no reason why the rationale of the decision does not apply equally, if not more forcefully, to a state law money damages action against a state employee. The essential insight of the decision is that federal courts do not have authority to command the States to follow their own laws. *Id.* at 100, 104 S.Ct. 900. "When a suit is brought only against state officials," it says, we apply a functional test to see whether "the state is the real, substantial party in interest." *Id.* at 101, 104 S.Ct. 900 (quotation omitted). That functional test covers today's case. The plaintiffs have not sued these individuals for causing a car accident on their way to fetching a gallon of milk. They have sued them for actions taken under state law, which is why the Ohio Attorney General represents them. When it comes to the comity and sovereignty considerations of *Pennhurst*, the State surely is the real party in interest when the plaintiff sues the state official for actions taken within the scope of his authority. *Id.* at 121, 104 S.Ct. 900.

When a federal court enjoins a state official from doing his job, *Pennhurst* says that the State is the real party in interest because the lawsuit will prevent the state employees from performing their official duties. The same principle applies when a federal court tells a state official that he owes *damages* under state law for doing his job. Doctrines that turn on "individual capacity" and "official capacity" make sense in the context of actions designed to require the States and their employees to comply with federal law. *See,*

*e.g., Kentucky v. Graham*, 473 U.S. 159, 167–68, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); *Hafer v. Melo*, 502 U.S. 21, 30, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991). But they make far less sense, indeed little sense, in the context of federal-court actions designed to bring States to heel under their *own* law.

A state official who violates the United States Constitution, *Ex parte Young* says, is not acting on behalf of the State because States cannot authorize unconstitutional action. 209 U.S. 123, 160, 28 S.Ct. 441, 52 L.Ed. 714 (1908). For that reason, an official who acts unconstitutionally is "stripped of his official or representative character and is subjected in *his person* to the consequences of his individual conduct." *Id.* (emphasis added). But *Pennhurst* explains that the "entire basis" for the *Ex parte Young* fiction "disappears" when a plaintiff alleges that a state official has violated *state* (rather than federal) law. 465 U.S. at 106, 104 S.Ct. 900. "Entire basis" exactly. That's because the *Ex parte Young* fiction serves only to "vindicate *federal* rights and hold state officials responsible to 'the supreme authority of the United States.' " *Id.* at 105, 104 S.Ct. 900 (emphasis added). In marked contrast, the "need to reconcile competing [federal and state] interests is wholly absent ... when a plaintiff alleges that a state official has violated *state* law." *Id.* at 106, 104 S.Ct. 900.

Accordingly, when a plaintiff alleges that a state official has violated state law, there's no reason to assume (as we do when a plaintiff alleges that a state official has violated federal law) that an "individual capacity" suit is one against the official in his person rather than one against the State. As in *Pennhurst*, then, so too here: **\*787** When a state employee acts within the scope of his authority, a state-law suit against him in federal court is functionally a lawsuit against the State for sovereign immunity purposes, regardless of whether the suit seeks damages or injunctive relief.

This straightforward approach leads to a straightforward rule and exception. The rule: If the plaintiff sues a state official under state law in federal court for actions taken within the scope of his authority, sovereign immunity bars the lawsuit regardless of whether the action seeks monetary or injunctive or declaratory relief. The exception: If the plaintiff sues the official for actions beyond the official's authority, the State's sovereign immunity does not apply. The rule, not the exception, applies here.

### All Citations

709 Fed.Appx. 779

In re Ohio Execution Protocol Litigation, 709 Fed.Appx. 779 (2017)

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 4059559
Only the Westlaw citation is currently available.
United States District Court, E.D. Kentucky,
Central Division at Lexington.

Kayla SHEPHERD, Plaintiff,
v.
UNIVERSITY OF KENTUCKY,
Defendant.

CIVIL ACTION NO. 5:16-005-KKC
|
Signed 07/28/2016

**Attorneys and Law Firms**

Edward E. Dove, Lexington, KY, for Plaintiff.

Barbara A. Kriz, Kriz, Jenkins, Prewitt & Jones, PSC, William Eugene Thro, University of Kentucky, Lexington, KY, for Defendant.

**OPINION AND ORDER**

KAREN K. CALDWELL, CHIEF JUDGE

**\*1** This matter is before the Court on Defendant University of Kentucky's Motion to Dismiss [DE 5] and Plaintiff Kayla Shepherd's Motion for Leave to File a Second Amended Complaint [DE 6.] For the reasons stated herein, the Court will deny Shepherd's Motion for Leave to File a Second Amended Complaint and grant the University's Motion to Dismiss.

**BACKGROUND**

Shepherd brought this action after she was expelled from the University of Kentucky's Physician Assistant Program. *See generally* [DE 1-1, First Amended Complaint at 16-20.] She alleges that the University violated her right to procedural due process under the Fourteenth Amendment to the United States Constitution and Article II of the

Kentucky Constitution when it failed to provide her adequate notice of an appeal hearing, which prevented her from attending the hearing. [DE 1-1 at 20-22.] Shepherd is seeking reinstatement into the Physician Assistant Program, an award of "compensatory damages and damages for embarrassment and humiliation," and attorney's fees and costs. [DE 1-1 at 22.]

Shepherd admits that after completing a dermatology rotation, instead of providing an evaluation form to the supervising physician, she completed the evaluation herself and signed the supervising physician's name. [DE 1-1 at 18.] Shepherd then submitted the altered evaluation to the Academic Coordinator for Physician Studies. [DE 1-1 at 18.] Eventually, Shepherd came forward and admitted to Dr. David Fahringer, a professor, that she forged the evaluation and signature. [DE 1-1 at 19.] Thereafter, Shepherd was informed via email that she could attend a June 2, 2015, meeting of the Standard and Progression Committee, which was comprised of Dr. Fahringer and three other individuals, to discuss the evaluation. [DE 1-1 at 19.] Shepherd attended the meeting and explained the circumstances surrounding the evaluation. [DE 1-1 at 19.]

Following the June 2nd meeting, Dr. Scott Lephart, Dean of the College of Health Sciences, contacted Shepherd and directed her to appear for a meeting in his office on June 9, 2015. [DE 1-1 at 19; Exhibit 1.] After the June 9th meeting, Plaintiff received a letter from Dean Lephart informing her that she was terminated from the Physician Assistant Program. [DE 1-1 at 19; Exhibit 2.] Shepherd timely appealed the decision when her attorney mailed a letter to the chair of the appeals board, Dr. Julia Costich. [DE 1-1 at 19; Exhibit 3.]

Plaintiff alleges that she did not receive any correspondence regarding her appeal until August 15, 2015, when she was informed that a hearing had been held on August 13, 2015, to review her appeal and that the hearing panel decided to uphold the sanction imposed by Dean Lephart. [DE 1-1 at 20.] On August 23, 2015, Shepherd met with Denise Simpson, Dead of Students at the University of Kentucky, who was "confused" as to why Shepherd had not received notice of the appeal hearing. [DE 1-1 at 20.] Shepherd also discussed her lack of notice with Dr. Randa Remer, Assistant Dean of Students in the College of Health Sciences. [DE 1-1 at 20.]

**\*2** On September 23, 2015, Shepherd received an email from the University of Kentucky's counsel stating that "since the Plaintiff admitted guilt, a hearing was not necessary." [DE 1-1 at 20.] Shepherd then filed the present

action in Fayette Circuit Court, naming the University of Kentucky as the sole defendant. [DE 1-1 at 2.] Plaintiff filed her First Amended Complaint in state court, adding only a request for a jury trial, which had been inadvertently omitted. [DE 7 at 1.] Shepherd alleges two causes of action: (1) a 42 U.S.C. § 1983 claim for violation of procedural due process rights protected by the Fourteenth Amendment; and (2) a claim that her expulsion was an arbitrary and capricious act in violation of Article II of the Kentucky Constitution. [DE 1-1 at 20-22.]

On January 6, 2016, the University of Kentucky removed this case to federal court. [DE 1, Notice of Removal.] It then filed the present Motion to Dismiss. [DE 5.] In its motion, the University asserts that this case should be dismissed because it is has Eleventh Amendment immunity from Shepherd's § 1983 claim, it is not a person subject to suit under § 1983, it is entitled to governmental immunity from Shepherd's state law claim, and finally because Kentucky does not recognize a private right of action for alleged violations of the state constitution. [DE 5.]

In her response, Shepherd conceded that "[t]he Defendant's Motion to Dismiss correctly states that the Plaintiff has only named the University of Kentucky as a party. The Defendant is also correct that as an arm of the state, UK enjoys immunity from the Plaintiff's lawsuit." [DE 7 at 1.] Thus, Shepherd admits that her claims against the University of Kentucky are barred by sovereign immunity.

However, Shepherd attempts to avoid dismissal by moving to file a Second Amended Complaint in which she seeks to add Dr. Eli Capilouto, in his official capacity as President of the University of Kentucky, as a defendant. [DE 6; 6-2.] In her proposed Second Amended Complaint, Shepherd alleges that "Dr. Eli Capilouto is the President of the University of Kentucky. As President, Defendant Capilouto is to ensure that all students are provided procedural due process when enrolled in the University of Kentucky." [DE 6-2 at 1.] The University of Kentucky opposed Shepherd's motion, arguing that the Second Amended Complaint should be denied as futile because even as amended it could not withstand a motion to dismiss. [DE 8; 9.] Thus, the central question presented to the Court is whether Shepherd's addition of Dr. Capilouto as a Defendant via the proposed Second Amended Complaint is futile.

## ANALYSIS

Shepherd's Second Amended Complaint could not

withstand a motion to dismiss, so the proposed amendment adding Dr. Capilouto as a defendant is futile. The Court will therefore deny Shepherd's Motion for Leave to File a Second Amended Complaint, which leaves the University of Kentucky as the sole named defendant. As Shepherd herself acknowledges, the University of Kentucky has immunity from Shepherd's claims, so the Court will grant the University's Motion to Dismiss.

"It is well settled that [a] district court may deny a motion for leave to amend a complaint if such complaint, as amended, could not withstand a motion to dismiss." *Neighborhood Dev. Corp. v. Advisory Council on Historic Pres., Dep't of Hous. & Urban Dev., City of Louisville*, 632 F.2d 21, 23 (6th Cir. 1980) (citing *Bacon v. California*, 438 F.2d 637 (9th Cir. 1971)). To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory. *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir. 1988).

**\*3** The Second Amended Complaint could not withstand a motion to dismiss because Shepherd failed to state a claim against Dr. Capilouto on which relief can be granted. First, Shepherd's § 1983 claim cannot succeed against Dr. Capilouto because Shepherd has not alleged that he bears a sufficient connection to her expulsion so as to bring her case within the *Ex Parte Young* exception to sovereign immunity. Second, Shepherd cannot maintain her claim under Section II of the Kentucky Constitution against Dr. Capilouto because Kentucky does not recognize a private right of action for alleged violations of the state Constitution.

Beginning with the § 1983 claim, Shepherd seeks to name Dr. Capilouto as a defendant in order to bring this case within the *Ex Parte Young* exception to sovereign immunity. *See* [DE 7 at 2.] Under the doctrine of *Ex Parte Young*, a state official sued in their official capacity may be enjoined from taking action that violates federal law. *Diaz v. Michigan Dept. of Corrections*, 703 F.3d 956, 964 (2013). However, an *Ex Parte Young* action is available only when the state official being sued has taken, or is about to take, an action. *Children's Healthcare is a Legal Duty, Inc. v. Deters*, 92 F.3d 1412, 1414-1416 (6th Cir. 1996) ("*Young* abrogates a state official's Eleventh Amendment immunity when a suit challenges the constitutionality of a state official's action."). The state official sued in an *Ex Parte Young* action must bear a "sufficient connection" to the challenged act, and it is not enough to simply claim that by virtue of their office they have the general authority to take the allegedly illegal action. *Coyle v. University of Kentucky*, 2 F. Supp. 3d 1014, 1020 (2014). "[G]eneral authority to take illegal action is

not sufficient to make government officials the proper parties to litigation challenging the law." *Id.* (citing *Children's Healthcare,* 92 F.3d at 1416) (internal quotations omitted).

In *Coyle,* a professional photographer sued the University of Kentucky and two University officials—the Director of Athletics and Executive Vice President for Finance and Administration—alleging copyright infringement. 2 F. Supp. 3d at 1016. The plaintiff in *Coyle* similarly attempted to avoid sovereign immunity under the *Ex Parte Young* doctrine by naming the University officials as defendants. *Id.* at 1019-21. This Court rejected the plaintiff's attempt, finding:

> In this case, [the plaintiff] claims that [the University officials], by virtue of their office, "approved of, condoned, or acquiesced in the" alleged copyright infringement described in the complaint ... But in the amended complaint, Coyle does not allege a single "affirmative act" that [the University officials] "took ... through their respective positions."

*Id.* at 1020. The plaintiff alleged only that the University officials had general duties that *might* require approving of, condoning, or acquiescing to acts constituting copyright infringement, but did not identify any actions that the University officials *actually took* that brought about the alleged infringement. *Id.* at 1020-21. Therefore, this Court held that the plaintiff failed to make out a viable claim under *Ex Parte Young.*

Shepherd has likewise failed to state a viable claim under *Ex Parte Young* because she does not allege that Dr. Capilouto actually took any action in furtherance of her expulsion. In her tendered Second Amended Complaint, Shepherd merely alleges that "[a]s President, Defendant Capilouto is to ensure that all students are provided procedural due process when enrolled in the University of Kentucky." [DE 6-2 at 1.] Shepherd clearly fails to allege that Dr. Capilouto took any action related to her expulsion whatsoever. In fact, Dr. Capilouto's alleged involvement in this matter is even more hypothetical and remote than that alleged by the plaintiff in *Coyle. See* 2 F. Supp. at 1020. In this case, Shepherd could have named any of the host of University officials who were directly involved in her expulsion, but instead made only a vague reference to Dr. Capilouto's general duty to protect students' due process. Shepherd failed to allege a single affirmative action that Dr. Capilouto took through his position as President of the University that deprived her of due process, so she cannot maintain a claim against Dr. Capilouto in his official capacity under *Ex Parte Young.*

**\*4** Shepherd's second cause of action also fails against Dr. Capilouto because no private right of action exists for alleged violations of Article II of the Kentucky Constitution. *Tallman v. Elizabeth Police Dep't,* 344 F. Supp. 2d 992, 997 (W.D. Ky. 2004), *aff'd sub nom. Tallman v. Elizabethtown Police Dep't,* 167 Fed.Appx. 459 (6th Cir. 2006). "Section 1983 applies only to deprivations of federal constitutional and statutory rights," and there is no analogous state statute or other authority that enables her to pursue a civil claim for an alleged violation of the Kentucky Constitution. *Id.; see also Smith v. Flinkfelt,* 2014 WL 1331182, at \*13 (E.D. Ky. Mar. 13, 2014); *Jackson v. Murray States Univ.,* 834 F. Supp. 2d 609, 615 (W.D. Ky. 2011). For this reason, Shepherd's second cause of action, if asserted against Dr. Capilouto, would fail.

Neither of Shepherd's causes of action can proceed against Dr. Capilouto, so her proposed amendment is futile. The Complaint, as amended, could not withstand a motion to dismiss because it contains no viable claims. Therefore, the Court will deny Shepherd's Motion for Leave to File a Second Amended Complaint.

Having denied Shepherd's proposed amendment, the only named Defendant in this action is the University of Kentucky. Shepherd agrees that the University enjoys immunity from her claims. [DE 7 at 1.]; *see also Coyle* 2 F. Supp. at 1016-1019 (finding that sovereign immunity under the Eleventh Amendment precluded suit against the University of Kentucky); *Furtula v. Univ. of Kentucky,* 438 S.W.3d 303, 305, fn.1 (Ky. 2014) ("The state universities of this Commonwealth, including the University of Kentucky, are state agencies that enjoy the benefits and protection of governmental immunity" while performing a governmental function.). Furthermore, the University is not a "person" subject to suit under § 1983. *Campbell v. University of Louisville,* 862 F. Supp. 2d 578, 582 (W.D. Ky. 2012). Lastly, as noted above, Kentucky has no statute comparable to 42 U.S.C. § 1983, so Shepherd cannot maintain a civil action for an alleged violation of the Kentucky constitution. *Tallman,* 344 F. Supp. 2d at 997. Accordingly, the Court will grant the University of Kentucky's Motion to Dismiss.

## CONCLUSION

For the reasons stated herein, the Court **HEREBY ORDERS** as follows:

> 1. Shepherd's Motion for Leave to File a Second Amended Complaint [DE 6] is **DENIED**;

> 2. The University of Kentucky's Motion to Dismiss [DE 5] is **GRANTED**; and

3. This matter is **DISMISSED WITH PREJUDICE** and **STRICKEN** from this Court's active docket.

Dated July 28, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 4059559

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 1819117
Only the Westlaw citation is currently available.
United States District Court, S.D. Ohio, Western
Division.

Sharon STANFORD, et al., Plaintiffs,

v.

NORTHMONT CITY SCHOOL
DISTRICT, et al., Defendants.

Case No. 3:19-cv-399
|
Signed February 8, 2023

**Attorneys and Law Firms**

Christine Baker, Dayton, OH, for Plaintiffs.

Tabitha Dee Justice, Subashi & Wildermuth, Dayton, OH,
for Defendants Northmont City School District, James
Chad Kaltenbach, Linda Blum, Tony Thomas, Michael
Barrow.

**ORDER: (1) GRANTING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT ON ALL FEDERAL
CLAIMS; (2) DISMISSING WITHOUT PREJUDICE
PLAINTIFFS' REMAINING STATE LAW CLAIM
FOR LACK OF SUPPLEMENTAL JURISDICTION;
AND (3) TERMINATING THIS CASE ON THE
DOCKET**

Michael J. Newman, United States District Judge

**\*1** This 42 U.S.C. § 1983 civil rights case concerns two
local high school students suspended for ten days (but not
expelled) by Northmont High School for violating the
school's marijuana policy.[1] The two high school students—
both of whom are African American, minors, and referred
to here by their initials, J.S. and J.E.—claim, *inter alia*, that
they were unconstitutionally searched in violation of the
Fourth Amendment and on account of their race, and
wrongly suspended. J.S., J.E., and their parents—also
named as Plaintiffs in this lawsuit—name as Defendants
the Northmont City School District ("School District"),

and Northmont High School's Assistant Principal James
Chad Kaltenbach ("Kaltenbach"). Now before the Court is
Defendants' motion for summary judgment. Doc. No. 99.
Plaintiffs, through counsel, responded in opposition. Doc.
No. 102. Defendants replied, Doc. No. 103, and this matter
is ripe for review. For the reasons that follow, the Court,
having carefully reviewed the undisputed facts of this
matter, finds in favor of Defendants on the federal claims
pled here, and dismisses without prejudice the sole
remaining state law claim.

**I.**

**A. Undisputed Facts**

**1. J.S.'s Suspension**

The School District, in its student handbook for Northmont
High School, forbids students from "com[ing] to school ...
with the smell of ... marijuana on his/her breath/person."
Doc. No. 99-1 at PageID 2519. The punishment for
violating this provision is a ten-day suspension.[2] *Id.*

J.S. was in ninth grade at Northmont High School on
February 19, 2019. Doc. No. 61 at PageID 1473. That day,
he missed the bus and rode to school in a car with friends,
all Northmont High School students. *Id.* Once J.S. arrived
at Northmont High School, Kaltenbach received a report
from a secretary that he and his friends smelled like
marijuana. Doc. No. 91 at PageID 2089; Doc. No. 99-2 at
PageID 2522.

Kaltenbach—right after a second teacher told him that J.S.
smelled like marijuana—went to J.S.'s classroom and
called him into his office. Doc. No. 61 at PageID 1475;
Doc. No. 91 at PageID 2089–90; Doc. No. 98 at PageID
2244. In his office, Kaltenbach explained to J.S. the
allegations and then told him to empty his backpack and
pockets. Doc. No. 91 at PageID 2091. Kaltenbach testified
at his deposition that he "clearly" smelled marijuana on J.S.
before he began the search. *Id.* He sniffed J.S.'s left hand
and found that it smelled like marijuana; he further called
a school resource officer into the office to sniff J.S.'s hand.
Doc. No. 61 at PageID 1476, 1477; Doc. No. 89 at PageID
2041; Doc. No. 98 at PageID 2226. That officer agreed.
Doc. No. 98 at PageID 2226.

**\*2** Kaltenbach next asked J.S. to explain why he smelled like marijuana. *Id.* at PageID 2225. J.S. refused to speak with him. *Id.* Kaltenbach then called J.S.'s father, explained the situation, and had J.S. wait in his office until J.S.'s father arrived. *Id.*; Doc. No. 61 at PageID 1477; Doc. No. 99-1 at PageID 2518, 2521.

Once J.S.'s father arrived, Kaltenbach informed J.S. that he was suspended for ten days for violating Northmont High School's marijuana policy. Doc. No. 98 at PageID 2226; Doc. No. 99-1 at PageID 2518, 2521. J.S.'s suspension paperwork, as Kaltenbach explained to him, listed his right to appeal the suspension to the School District's Board of Education. Doc. No. 98 at PageID 2226; Doc. No. 99-1 at PageID 2521.

### 2. J.E.'s Suspension

J.E. was in tenth grade at Northmont High School on January 22, 2020. Doc. No. 85 at PageID 1871.[3] That day, Assistant Principal Teresa Dillon ("Dillon") received a call from two teachers who, after receiving comments from other students, told her that J.E. smelled like marijuana. Doc. No. 85 at PageID 1873–74; Doc. No. 90 at PageID 2060; Doc. No. 98 at PageID 2265. She called him to her office. Doc. No. 90 at PageID 2060. Once J.E. arrived at Dillon's office, she determined he smelled like marijuana. *Id.*; Doc. No. 98 at PageID 2265–66.

She began to search J.E.'s belongings—asking him to empty his backpack and pockets; lift up his pant legs; and take his shoes and socks off. Doc. No. 90 at PageID 2060. Like Kaltenbach, Dillon called over a school resource officer—along with Eric Hughes, a school administrator—who corroborated the smell. *Id.* Dillon called Kaltenbach to her office and he, too, noted that J.E. smelled like marijuana. *Id.* at PageID 2069; Doc. No. 98 at PageID 2268. Kaltenbach also noted that J.E. was glassy-eyed. Doc. No. 90 at PageID 2069; Doc. No. 98 at PageID 2268. J.E. protested that he only smelled like marijuana because his stepfather smoked and alleged that his hand lotion was the source of the odor. Doc. No. 85 at PageID 1874. However, everyone in the office confirmed that J.E. smelled like marijuana, and Dillon would later testify that the "slight" smell of lotion did not overcome the marijuana smell nor his "glassy eye[d]" appearance. Doc. No. 90 at PageID 2060.

Dillon gave J.E. a ten-day suspension notice. *Id.* at PageID 2060–61. She offered J.E. a chance to explain his "side of the story." Doc. No. 98 at PageID 2263. Then, she called

J.E.'s mother, and, after she arrived, explained to her the suspension and how J.E. could make up any missed assignments. Doc. No. 90 at PageID 2061.[4]

### B. Procedural History

J.S. and J.E. appealed their suspensions in formal hearings, represented by counsel, to the Board of Education. *See id.* at PageID 2223, 2259. Both lost their appeals, so they appealed those decisions to the Montgomery County, Ohio Common Pleas Court. *See* Doc. Nos. 99-2, 99-3. The state trial court found that neither suspension violated the two students' constitutional rights, but found the cases moot. *See* Doc. No. 99-2 at PageID 2529–32; Doc. No. 99-3 at PageID 2541–42. When J.S. appealed (but J.E. did not), the Second District Court of Appeals affirmed on mootness alone. *See Stanford v. Northmont City Schs.*, No. 28884, 2021 WL 1054123, at \*4 (Ohio Ct. App. Mar. 19, 2021).

**\*3** J.S. and his parents filed suit here on December 23, 2019. Doc. No. 1. They added J.E. and his mother as plaintiffs in their second amended complaint, filed on November 25, 2020. *See* Doc. No. 23. Their second amended complaint alleged state law claims against the City of Clayton, Ohio, but this Court recently dismissed those claims with prejudice. *See* Doc. Nos. 23, 83. Now pending are Plaintiffs' remaining claims against Kaltenbach and the School District: (1) a § 1983 claim alleging the School District deprived J.S. and J.E. of their federal right to education through searching and suspending them; (2) Fourth Amendment claims, under the federal and Ohio constitutions, challenging the searches of J.S. and J.E.; (3) Due Process Clause claims challenging how J.S. and J.E. were suspended; (4) Title VI claims alleging racial discrimination in suspending J.S. and J.E. in comparison to white students—claims which rely on statistics, several incidents outside of the suspensions, and two potential comparators; (5) Equal Protection Clause claims, relying on the same allegations of race discrimination as the Title VI claims; and (6) a state law negligent supervision claim against the School District for mishandling its supervision of Kaltenbach in a manner that caused J.S. and J.E. harm. Doc. No. 23 at PageID 617–30.

### II.

"Summary judgment is only appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is

Stanford v. Northmont City School District, Not Reported in Fed. Supp. (2023)

no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *Keweenaw Bay Indian Cmty. v. Rising*, 477 F.3d 881, 886 (6th Cir. 2007) (quoting *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005)). Once "a motion for summary judgment is properly made and supported, an opposing party[.]" *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (quoting Fed. R. Civ. P. 56(e)). Instead, the party opposing summary judgment has a shifting burden and "must—by affidavits or as otherwise provided in [Fed. R. Civ. P. 56]—set out specific facts showing a genuine issue for trial." *Id.* The Court does not have to "search the entire record to establish that it is bereft of a genuine issue of material fact." *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 404 (6th Cir. 1992) (citations omitted).

42 U.S.C. § 1983 allows citizens to sue for constitutional violations. *See Wurzelbacher v. Jones-Kelley*, 675 F.3d 580, 583 (6th Cir. 2012). To state a § 1983 claim, a plaintiff must: (1) allege the violation of a constitutional or federal right; and (2) show that the alleged deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988).

"[Q]ualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). It shields "all but the plainly incompetent or those who knowingly violate the law." *District of Columbia v. Wesby*, ––– U.S. ––––, 138 S. Ct. 577, 589, 199 L.Ed.2d 453 (2018). To defeat qualified immunity, a plaintiff must show "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011) (quoting *Harlow*, 457 U.S. at 818, 102 S.Ct. 2727). The Court may "address these requirements in either order[.]" and "[i]f one is lacking, [the Court] need not address the other." *Crawford v. Tilley*, 15 F.4th 752, 760 (6th Cir. 2021) (citation omitted) (citing *Pearson*, 555 U.S. at 236, 129 S.Ct. 808).

## III.

**\*4** Summary judgment is warranted for multiple reasons. First, regarding § 1983, Plaintiffs' constitutional rights were not violated, so Defendants are entitled to qualified immunity.[5] J.S.'s parents and J.E.'s mother are not proper § 1983 plaintiffs, and there is no federal right to receive a public education. Plaintiffs' Fourth Amendment claims fail, as the School District's agents had more than reasonable suspicion to perform these minimally intrusive searches.[6] The School District also comported with due process, through its agents, by explaining the charges—and the evidence proving that they violated the marijuana policy—before giving the two students an opportunity to tell their side of the story. Second, Plaintiffs' Title VI claims also fall short as a matter of law—Kaltenbach cannot be sued under Title VI; Plaintiffs identify no relevant comparators; and there is no evidence of intentional discrimination. Third, Plaintiffs' equal protection claims fail because, again, they cannot identify comparators or evidence of intentional discrimination. Finally, the Court declines to exercise supplemental jurisdiction over the remaining state law claim.

### A. The Parents' § 1983 Claims

"In the Sixth Circuit, a section 1983 cause of action is entirely personal to the direct victim of the alleged constitutional tort." *Claybrook v. Birchwell*, 199 F.3d 350, 357 (6th Cir. 2000) (citations omitted). Thus, "only the purported victim, or his [or her] estate's representative(s), may prosecute a section 1983 claim." *Id.* J.S.'s and J.E.'s parents are named as plaintiffs, along with J.S. and J.E., alleging constitutional claims under § 1983 against the School District and Kaltenbach based solely on J.S.'s and J.E.'s harms. Doc. No. 23 at PageID 603, 617–25. They cannot. *See Claybrook*, 199 F.3d at 357; *Foos v. City of Delaware*, 492 F. App'x 582, 592–93 (6th Cir. 2012). Defendants are, thus, entitled to summary judgment on J.S.'s and J.E.'s parents' § 1983 claims.[7]

### B. Federal Right to Access Public Education

**\*5** J.S. and J.E. claim an "infringement" of "the right to access public education" under § 1983. Doc. No. 23 at PageID 618. "Education, of course, is not among the rights afforded explicit protection under [the] Federal Constitution. Nor [is there] any basis for saying it is implicitly so protected." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973); *see also, e.g., Gary B. v. Whitmer*, 957 F.3d 616, 648–49 (6th Cir. 2020), *reh'g en banc granted, vacated by*, 958 F.3d 1216 (mem.) (6th Cir. 2020) (vacating decision that found a federal right to a minimum public education

only insofar as it gave access to literacy). Accordingly, Defendants are entitled to summary judgment on this claim.

### C. Fourth Amendment Claims

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. It "extends this constitutional guarantee to searches and seizures by state officers, including public school officials." *Vernonia Sch. Dist. 47 v. Acton*, 515 U.S. 646, 652, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) (citations omitted). But there is "a relaxed standard for searches in the school setting[.]" *G.C. v. Owensboro Pub. Schs.*, 711 F.3d 623, 632 (6th Cir. 2013). Indeed, the Court need not strictly adhere "to the requirement that searches be based on probable cause to believe that the subject of the search has violated or is violating the law. Rather, the legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search." *New Jersey v. T.L.O.*, 469 U.S. 325, 341, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985). This inquiry employs a two-part test. The Court: (1) asks "whether the ... action was justified at its inception"; and (2) "determine[s] whether the search as actually conducted 'was reasonably related in scope to the circumstances which justified the interference in the first place[.]' " *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). "A student search is justified in its inception when there are reasonable grounds for suspecting that the search will garner evidence that a student has violated or is violating the law or the rules of the school, or is in imminent danger of injury on school premises." *Brannum v. Overton Cnty. Sch. Bd.*, 516 F.3d 489, 495–96 (6th Cir. 2008). A search is "permissible in scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *T.L.O.*, 469 U.S. at 342, 105 S.Ct. 733. "In determining whether a search is excessive in its scope, the nature and immediacy of the governmental concern that prompted the search is considered." *G.C.*, 711 F.3d at 632 (quoting *Brannum*, 516 F.3d at 497).

It is beyond genuine dispute that J.S., by smelling strongly of marijuana while on school grounds, "violat[ed]" the School District's rules. *Brannum*, 516 F.3d at 495; Doc. No. 61 at PageID 1476, 1477; Doc. No. 89 at PageID 2041; Doc. No. 98 at PageID 2225–26. Normally, the smell of marijuana establishes probable cause to search for evidence of that drug. *See, e.g.*, *United States v. Garza*, 10 F.3d 1241, 1246 (6th Cir. 1993); *United States v. Vaughn*,

429 F. Supp. 3d 499, 511–12 (E.D. Tenn. 2019) (collecting cases). Considering the scent here would meet that heightened standard, Kaltenbach's limited search through J.S.'s pockets, backpack, and shoes— even if that search did not reveal marijuana—"was reasonably related" to J.S.'s odor and the School District's goal of eliminating contraband from Northmont High School. *T.L.O.*, 469 U.S. at 341, 105 S.Ct. 733; *see also, e.g.*, *Rinker v. Sipler*, 264 F. Supp. 2d 181, 187–90 (M.D. Pa. 2003) (individualized suspicion existed to search student's locker, belongings, and person where he smelled like marijuana and exhibited signs of marijuana use).

**\*6** The same applies to J.E. He, too, smelled strongly of marijuana. Doc. No. 90 at PageID 2069; Doc. No. 98 at PageID 2268. His glassy-eyed appearance added further suspicion that he used—and possibly possessed—marijuana. Doc. No. 90 at PageID 2060. Thus, the School District's officials could search him for marijuana. *See, e.g.*, *Garza*, 10 F.3d at 1246; *Bridgman v. New Trier High Sch. Dist. No. 203*, 128 F.3d 1146, 1149–50 (7th Cir. 1997) (school could drug test student with bloodshot eyes, red pupils, and odd demeanor).

J.S. alleges that Kaltenbach patted down his pants and pockets, but no evidence in the record supports this assertion. *See* Doc. No. 23-2 at PageID 848; Doc. No. 61 at PageID 1475–76; Doc. No. 99-1 at PageID 2526–27. Even if Kaltenbach did so, several individuals detected a strong odor of marijuana emanating from J.S. A pat down would, thus, be reasonably related to the School District's prevailing interest in removing narcotics from school grounds. *See, e.g.*, *Widener v. Frye*, 809 F. Supp. 35, 37–38 (S.D. Ohio 1992) (upholding search and seizure of student for smelling like marijuana where the search involved taking off his pants in front of security guards away from his classmates), *aff'd*, 12 F.3d 215 (6th Cir. 1993) (unpublished table decision).

J.S. and J.E. contend that "[g]iven the legality and widespread prevalence of marijuana, simply smelling like it does not give rise to reasonable suspicion that a student possesses contraband." Doc. No. 102 at PageID 2641. The Court disagrees. First, marijuana is illegal to possess in Ohio. Ohio Rev. Code § 2925.11(C)(3).[8] Second, just because an illegal substance is widespread does not mean that any officer, investigating potential violations of criminal law, lacks probable cause to search for it if he or she observes signs that it is nearby. *See, e.g.*, *United States v. Fieck*, 54 F. Supp. 3d 841, 843–44 (W.D. Mich. 2014) (finding that, even though medical marijuana was legal in Michigan, scent of marijuana provided probable cause to search). Whether marijuana is widespread still does not matter to schools, which have an interest in eradicating narcotics from their halls, so the Court will not carve out

Stanford v. Northmont City School District, Not Reported in Fed. Supp. (2023)

an exception to the rule that the scent of marijuana provides probable cause to search. *See Garza*, 10 F.3d at 1246; *Vaughn*, 429 F. Supp. 3d at 511–12; *cf. Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls*, 536 U.S. 822, 839, 122 S.Ct. 2559, 153 L.Ed.2d 735 (2002) (Breyer, J., concurring) ("[T]he drug problem in our Nation's schools is serious in terms of size, the kinds of drugs being used, and the consequences of that use both for our children and the rest of us"). Accordingly, the searches were constitutional, and Defendants are entitled to qualified immunity. *See, e.g., Crawford*, 15 F.4th at 760.[9]

**D. Fourteenth Amendment Claims**
**\*7** "[S]tudents facing suspensions of ten days or fewer have a property interest in educational benefits and a liberty interest in their reputations to qualify them for protection against arbitrary suspensions under the Due Process Clause." *Heyne v. Metro. Nashville Pub. Schs.*, 655 F.3d 556, 564 (6th Cir. 2011) (citing *Goss v. Lopez*, 419 U.S. 565, 576, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975)). "[O]nce school administrators tell a student what they heard or saw, ask why they heard or saw it, and allow a brief response, a student has received all the process that the Fourteenth Amendment demands." *Buchanan v. City of Bolivar*, 99 F.3d 1352, 1359 (6th Cir. 1996) (quoting *C.B. v. Driscoll*, 82 F.3d 383, 386 (11th Cir. 1996)). In sum, "all that a school official must do is give (1) adequate notice of the charge against the student, (2) an explanation of the evidence supporting the charge and (3) an opportunity for the student to respond." *Williams ex rel. Allen v. Cambridge Bd. of Educ.*, 370 F.3d 630, 639 (6th Cir. 2004) (citations omitted). However, the school must follow "fundamentally fair procedures" before suspension, meaning "school officials responsible for deciding whether to exclude a student from school must be impartial." *Heyne*, 655 F.3d at 567 (citations omitted).

It is undisputed that J.S. and J.E. received due process. The record shows that Kaltenbach and Dillon told J.S. and J.E., respectively, that they smelled like marijuana, in violation of the School District's policy; informed them that multiple individuals corroborated this fact; and gave them a chance to respond before explaining their suspensions, giving them "all the process that the Fourteenth Amendment demands." *Buchanan*, 99 F.3d at 1359; Doc. No. 61 at PageID 1477; Doc. No. 85 at PageID 1874; Doc. No. 90 at PageID 2261; Doc. No. 98 at PageID 2225, 2263; Doc. No. 99-1 at PageID 2518, 2521; *see also Granger v. Klein*, 197 F. Supp. 2d 851, 875–76 (E.D. Mich. 2002) (granting summary judgment on student's due process claim where he was told twice that he was being suspended for violating

the school's sexual harassment policy).

J.S. and J.E. nonetheless argue the following actions, in their view, violated due process: (1) Defendants did not stay the suspensions pending appeal; (2) they issued notices to suspend without further factual inquiry; (3) they unconstitutionally searched J.E. and J.S.; (4) they ignored Kaltenbach's alleged misconduct in cases unrelated to J.E.'s or J.S.'s suspensions; (5) they ignored Kaltenbach's alleged bias against the J.S. over a controversy involving J.S.'s sister and her participation in gym class; (6) J.S. and J.E. were unaware "that smelling like marijuana would be deemed illegal behavior"; (7) "no administrator has ever disagreed that a student smells like marijuana"; (8) the School District purportedly violated Ohio law by not "act[ing] on suspensions in [an] open hearing"; and (9) other alleged misconduct that occurred during the suspension appeals. Doc. No. 102 at PageID 2636–37. None of these arguments are persuasive. The School District's actions after imposing the ten-day suspensions are irrelevant to J.S.'s and J.E.'s due process claims. *See, e.g., Heyne*, 655 F.3d at 569–70 (reversing denial of qualified immunity on due process claim where alleged misconduct occurred after the student was suspended). Indeed, the Due Process Clause does not require "truncated trial type-procedures" for ten-day suspensions, *Goss*, 419 U.S. at 583, 95 S.Ct. 729, so offering J.S. and J.E. full explanations and a chance to respond gave them "all the process" they were due. *Buchanan*, 99 F.3d at 1359; *see also Smart v. Clifton*, No. C-3-96-389, 1997 WL 1774874, at \*15–16 (S.D. Ohio Feb. 10, 1997) (school was not required to allow right to appeal prior to imposing suspension).

Furthermore, the record reveals no bias from Kaltenbach. Granted, "[p]rocedural due process is not satisfied when a person has a protected interest under the Due Process Clause and the individual responsible for deciding whether to deprive that person of his interest is biased." *Heyne*, 655 F.3d at 566 (citations omitted). But J.S. and J.E. merely state—without any support in the record—that Kaltenbach held a bias against them because he participated in a decision denying J.S.'s sister the ability to wear certain pants during gym class. Doc. No. 63 at PageID 1547. Because "[a]ny alleged prejudice on part of the [decisionmaker] must be evident from the record and cannot be based in speculation or inference[,]" they have not demonstrated there is a genuine issue of material fact as to Kaltenbach's impartiality based on alleged unrelated misconduct and incidents. *Doe v. Cummins*, 662 F. App'x 437, 450 (6th Cir. 2016) (quoting *Nash v. Auburn Univ.*, 812 F.2d 655, 665 (11th Cir. 1987)); *see also, e.g., Doe v. Univ. of Cincinnati*, 173 F. Supp. 3d 586, 602 (S.D. Ohio 2016) (noting that "Plaintiffs' mere belief that Defendants' acted with ulterior motives" in suspending them from

school did not state bias, considering school officials receive "a presumption of honesty and impartiality" (citation omitted)). Considering this, Defendants shall receive summary judgment on this claim, and they are entitled to qualified immunity. *See, e.g.*, *Crawford*, 15 F.4th at 760.

### E. Title VI Claims

**\*8** Under Title VI, "[n]o person in the United States shall, on the ground of race ... be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000(d). Title VI applies to a "recipient" of federal funding, which includes a public educational entity. *See* 34 C.F.R. §§ 100.13(i), 100.3(b); *Zeno v. Pine Planes Cent. Sch. Dist.*, 702 F.3d 655, 664 (2d Cir. 2012).

Plaintiffs[10] claim that the School District violated Title VI in suspending and searching J.S. and J.E., and they raise several allegations to indirectly demonstrate the School District's racial discrimination against them:

• Allegations that two other Caucasian students—one who was caught owning a marijuana vape pen, the other who allegedly smoked marijuana at school—were not suspended or punished as harshly (Doc. No. 102 at PageID 2644–45);

• An allegation from an African American student, a non-party, that Kaltenbach did not punish a student who made a harassing statement to her (Doc. 92 at PageID 2147–48; Doc. No. 102 at PageID 2625–27);

• Statistical evidence purportedly showing that Northmont High School suspends black students for marijuana more often than white students (*See* Doc. No. 101-1); and

• An allegation that the School District acted in a discriminatory manner because someone placed an inappropriate display of a brown mask on a pole in the high school's parking lot, and Northmont High School officials did not remove it (Doc. No. 102 at PageID 2645–46).

The Court considers these in turn, with reference to each Defendant.

### 1. Title VI Claims Against Kaltenbach

"In a title VI case, the proper defendant 'is the entity rather than an individual.' " *Brooks v. Skinner*, 139 F. Supp. 3d 869, 881 (S.D. Ohio 2015); *see also, e.g.*, *Buchanan*, 99 F.3d at 1356. Because "it is beyond question" that Plaintiffs cannot sue Kaltenbach under Title VI, he is entitled to judgment as a matter of law on that claim. *Shotz v. City of Plantation*, 344 F.3d 1161, 1171 (11th Cir. 2003); *see also, e.g.*, *Davis v. Flexman*, 109 F. Supp. 2d 776, 793–94 (S.D. Ohio 1999).[11]

### 2. Title VI Claims Against the School District

**\*9** Title VI "prohibits only intentional discrimination." *Alexander v. Sandoval*, 532 U.S. 275, 280, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001). Evidence of intentional discrimination under Title VI is either direct or indirect. *See Paasewe v. Ohio Arts Council*, 74 F. App'x 505, 506–07 (6th Cir. 2003). Direct evidence is rare, *see, e.g.*, *Smith v. Chrysler Corp.*, 155 F.3d 799, 805 (6th Cir. 1998), so the Sixth Circuit—and this Court—permit a plaintiff to use indirect evidence to prove discriminatory intent. *See, e.g.*, *Johnson v. City of Clarksville*, 186 F. App'x 592, 595 (6th Cir. 2006); *Paasewe*, 74 F. App'x at 506–07; *Saqr v. Univ. of Cincinnati*, No. 1:18-cv-542, 2021 WL 6064354, at \*4 (S.D. Ohio Dec. 22, 2021). This employs the *McDonell-Douglas* burden shifting framework. *See McDonell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Johnson*, 186 F. App'x at 595; *Paasewe*, 74 F. App'x at 507. Plaintiffs first must show: (1) they belonged to a protected class; (2) they suffered adverse action from defendants in pursuing their education; (3) they were qualified to continue pursuing their education; and (4) they were treated differently from similarly situated students outside the protected class. *See Bell v. Ohio State Univ.*, 351 F.3d 240, 253 (6th Cir 2003) (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992)). Once a plaintiff meets that threshold, the burden of production shifts to the defendant to show a legitimate, non-discriminatory reason for the adverse action. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. If the defendant can, then the plaintiff must show that this reason is pretextual. *See Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 703 (6th Cir. 2007). "[A] plaintiff can show pretext in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Id.* (citing *Hedrick v. W. Res. Care Sys.*, 355 F.3d 444, 460 (6th Cir. 2004)).

Plaintiffs lack direct evidence of intentional discrimination, so—although their arguments are

Stanford v. Northmont City School District, Not Reported in Fed. Supp. (2023)

unclear—they seemingly opt for the *McDonnell-Douglas* burden-shifting analysis. *See* Doc. No. 102 at PageID 2643–45. However, Plaintiffs cannot identify any relevant comparators. One that they offer, "G.M.," was in Northmont Middle School when suspended for having a marijuana vape pen. Doc. No 98 at PageID 2219–20. He chose an alternative program available to the students at Northmont Middle School and received a three-day suspension. *Id.* at PageID 2219–20; Doc. No. 99-1 at PageID 2519. A plaintiff "need not demonstrate an exact correlation," but his or her "comparators 'must be similar in all of the *relevant* aspects.' " *Foster*, 573 F. App'x at 396 (emphasis in original) (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)). Since G.M. was a middle schooler when suspended, subject to different standards than high schoolers, that alone means that he is not an adequate comparator. *See, e.g.*, *Rowles v. Curators of Univ. of Mo.*, 983 F.3d 345, 355–56 (8th Cir. 2020) (summary judgment was appropriate on graduate student's discrimination claim where the record did not show that the comparators were also graduate students). Even assuming, *arguendo*, that G.M. is an adequate comparator, Defendants note that G.M. only received a lesser punishment because he opted for the alternative program, and the School District has a legitimate justification to offer this option to middle schoolers based on the age difference between middle school and high school students. *See* Doc. No. 98 at PageID 2220; *cf. Palmer v. Potter*, 97 F. App'x 522, 525 (6th Cir. 2004) (noting that employer could treat "veteran" employees harsher "than their junior colleagues"). Plaintiffs do not respond to this reason, further entitling Defendants to summary judgment. *See Paasewe*, 74 F. App'x at 508; *see also, e.g.*, *Alexander*, 576 F.3d 558–65.

Nor is the other student, whom Plaintiffs contend smoked marijuana on school grounds without receiving discipline, a relevant comparator. Plaintiffs offer no evidence that Northmont High School suspended him and gave him a lesser punishment, or that Defendants were aware that this student smoked, possessed, or smelled like marijuana and chose to allot him different treatment, so he is not "similar in all of the *relevant* aspects." *Ercegovich*, 154 F.3d at 352 (emphasis in original); *cf. Rallins v. Ohio State Univ.*, 191 F. Supp. 2d 920, 929–30 (S.D. Ohio 2002) (granting summary judgment where female plaintiff offered no evidence that male coaches had comparable employment situations).

**\*10** Plaintiffs' remaining instances—involving a non-party, statistics, and a display—also do not withstand scrutiny.[12] First, actions "by decision makers unrelated to the decisional process itself [cannot] suffice to satisfy the plaintiff's burden of demonstrating animus[,]" so Kaltenbach's actions with the non-party that occurred

outside of, and independent from, J.S.'s and J.E.'s suspensions remain irrelevant. *Foster*, 573 F. App'x at 393 (quoting *Bush v. Dictaphone Corp.*, 161 F.3d 363, 369 (6th Cir. 1998)). Second, Title VI "doesn't prohibit disparate-impact discrimination." *Doe v. BlueCross BlueShield of Tenn.*, 926 F.3d 235, 240 (6th Cir. 2019) (citing *Alexander*, 532 U.S. at 240, 121 S.Ct. 1452). That forecloses Plaintiff's reliance on suspension statistics purporting to show a disparate impact on African American students. *See Alexander*, 532 U.S. at 240, 121 S.Ct. 1452; *Wilson v. Collins*, 517 F.3d 421, 431–32 (6th Cir. 2008); *Thompson v. Ohio State Univ.*, 639 F. App'x 333, 341–42 (6th Cir. 2016). Finally, a plaintiff may not raise new theories "in response to summary judgment" that are not implicated in the complaint. *Bridgeport Music, Inc. v. WM Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007) (citations omitted); *see also Desparois v. Perrysburg Exempted Vill. Sch. Dist.*, 455 F. App'x 659, 660 (6th Cir. 2012). This prevents Plaintiffs from raising the parking lot display, or the student who reported harassment to Kaltenbach, as instances of intentional discrimination—theories that are meritless anyway because Plaintiffs cannot establish that these show "intentional discrimination *by school officials*[,]" *M.J. v. Akron City Sch. Dist. Bd. of Educ.*, 1 F.4th 436, 454 (6th Cir. 2021) (emphasis in original), or relate "to the decisional process" at issue in the present case. *Foster*, 573 F. App'x at 393 (quoting *Bush*, 161 F.3d at 369). Therefore, on every theory, their Title VI claims fail as a matter of law.[13]

### F. Equal Protection Clause Claims

"The Equal Protection Clause prohibits discrimination ... which either burdens a fundamental right, targets a suspect class, or intentionally treats one differently than others similarly situated without any rational basis for the difference." *Rondigo, LLC v. Township of Richmond*, 641 F.3d 673, 681–82 (6th Cir. 2011) (citation omitted). Like Title VI, it "forbids only intentional discrimination[,]" *Horner v. Ky. High Sch. Athletics Ass'n*, 43 F.3d 265, 267 (6th Cir. 1994), and uses the *McDonnell-Douglas* burden-shifting framework, *see Lautermilk v. Findlay City Schs.*, 314 F.3d 271, 275 (6th Cir. 2003).

**\*11** J.S. and J.E., in conjunction with their Title VI claims, bring claims of racial discrimination under the Equal Protection Clause. They cite incidents involving the non-party, statistics, and the parking lot display, as well as their searches and suspensions, as evidence of the School District's allegedly unconstitutional, and racially discriminatory, treatment. *See* Doc. No. 102 at PageID 2633, 2643–47. For the reasons stated above, *see supra*

Section III(E), these claims fail as a matter of law because J.S. and J.E. cannot identify comparators and lack evidence of intentional discrimination. Notably, they emphasize an alleged disparate impact in suspension length for African American students compared to white students. Doc. No. 102 at PageID 2643. But conduct with a "disproportionately adverse effect upon a racial minority" is unconstitutional "only if that impact can be traced to a discriminatory purpose." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979); *see also Ricci v. DeStefano*, 557 U.S. 557, 627, 129 S.Ct. 2658, 174 L.Ed.2d 490 (2009) (Ginsburg, J., dissenting) ("The Equal Protection Clause ... prohibits only intentional discrimination; it does not have a disparate-impact component" (citations omitted)). Assuming, *arguendo*, that a disparate impact can be shown here, no such discriminatory purpose has been shown—on summary judgment—to exist here. Thus, the Court shall grant summary judgment to Defendants.

### G. Supplemental Jurisdiction Over Plaintiffs' State Law Claim

A district court "may decline to exercise supplemental jurisdiction" over claims if it "has dismissed all claims over which it has original jurisdiction[.]" 28 U.S.C. § 1367(c)(3). When "the federal claims are dismissed before trial, the state claims generally should be dismissed as well." *Brooks v. Rothe*, 577 F.3d 701, 709 (6th Cir. 2009) (quoting *Wojnicz v. Davis*, 80 F. App'x 382, 384–85 (6th Cir. 2003)). "In determining whether to retain jurisdiction over state-law claims, a district court should consider and weigh several factors, including the 'values of judicial economy, convenience, fairness, and comity.' " *Gamel v.*

*City of Cincinnati*, 625 F.3d 949, 951 (6th Cir. 2010) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988)) (citing *Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1182 (6th Cir. 1993)).

Only the negligent supervision claim remains. *See* Doc. No. 23 at PageID 628–30. On balance, the § 1367 factors support declining supplemental jurisdiction over this claim. All the federal claims here have been dismissed before trial. *See Brooks*, 577 F.3d at 709. In the interest of fairness, "[a] state court should have the opportunity to consider the merits of Plaintiff[s'] state law claim." *Aquilina v. Wrigglesworth*, 759 F. App'x 340, 348 (6th Cir. 2018) (citation omitted). Accordingly, Plaintiffs' remaining state law negligent supervision claim shall be dismissed without prejudice.

### IV.

For the reasons stated, the Court (1) **GRANTS** Defendants' motion for summary judgment (Doc. No. 99) on all federal claims; (2) **DISMISSES WITHOUT PREJUDICE** Plaintiffs' remaining state law claim for lack of supplemental jurisdiction; and (3) **TERMINATES** this case on the docket.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2023 WL 1819117

Footnotes

1   Northmont High School is in Clayton, Ohio, near Dayton.

2   Students violating this provision are recommended to the superintendent for expulsion, too. *See* Doc. No. 98 at PageID 2519. However, neither J.S. nor J.E. were expelled, as the School District found that expulsion was not warranted here. *Id.* at PageID 2368–69; Doc. No. 61 at PageID 1479. Thus, this provision is irrelevant to Plaintiffs' claims, and it is not implicated here.

3   Although this lawsuit was filed in 2019, Plaintiffs filed an amended complaint—adding J.E. and his mother as Plaintiffs—on November 25, 2020. *See* Doc. No. 23. Thus, those events are properly before this Court.

4   It is unclear if either J.S. or J.E. received prior discipline for a marijuana-related offense, but they received discipline in the past for

violating school policy. *See* Doc. No. 61 at PageID 1486; Doc. No. 98 at PageID 2370–90.

5    Two things are worth noting. First, Plaintiffs seemingly allege *Monell* liability claims about the School District's high school student handbook in their amended complaint, and they renew these claims at summary judgment. *See* Doc. No. 23 at PageID 618; Doc. No. 102 at PageID 2638. Because Defendants did not violate Plaintiffs' constitutional rights, the *Monell* claims fail as a matter of law. *See Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014). Second, Plaintiffs do not indicate whether they sue Kaltenbach in his individual or official capacity. *See, e.g.*, Doc. No. 23. This proves unremarkable, however, because he is entitled to summary judgment on Plaintiffs' constitutional claims.

6    One might wonder whether *res judicata*, under Ohio law, would bar the constitutional claims. It remains unclear whether it would, because Plaintiffs' suspension appeals were ultimately dismissed as moot, even though the state trial court also found no constitutional violation. *See, e.g.*, *Remus Joint Venture v. McNally*, 116 F.3d 180, 184 n.5 (6th Cir. 1997) ("If a first decision is supported both by findings that deny the power of the court to decide the case on the merits and by findings that go to the merits, preclusion is inappropriate as to the findings on the merits" (quotation omitted)). Ohio follows the Second Restatement of Judgments, which forbids *res judicata* where a decision rests both on the merits and a jurisdictional ground, like mootness. *See State ex rel. Davis v. Pub. Emps. Ret. Bd.*, 120 Ohio St.3d 386, 899 N.E.2d 975, 983 (Ohio 2008); Restatement (Second) of Judgments § 27 cmt. o (Am. Law. Inst. 1982); *see also, e.g.*, *Croce v. N.Y. Times Co.*, 930 F.3d 787, 792 (6th Cir. 2019) ("If the Ohio Supreme Court has not provided guidance on the issue at hand, we may consider ... other sources such as 'restatements of law[.]' " (quoting *Mazur v. Young*, 507 F.3d 1013, 1016–17 (6th Cir. 2007))). While "conflicting judgments might undermine notions of federalism and comity[,]" *Remus*, 116 F.3d at 186–87 (Wellford, J., concurring), this proves inconsequential because Plaintiffs were not deprived of their constitutional rights. Accordingly, the Court need not wade into this thicket today.

7    To be fair, Plaintiffs could seek to amend the complaint to clarify that the parents are only named as parties so that their minor children's claims could be brought through them. However, that amendment would be futile for two reasons. First, "parents cannot appear ... on behalf of their minor children" for a § 1983 claim "because a minor's personal cause of action is her own and does not belong to her parent or representative." *Shepherd v. Wellman*, 313 F.3d 963, 971 (6th Cir. 2002) (citing *Cheung v. Youth Orchestra Found. of Buffalo, Inc.*, 906 F.2d 59, 61 (2d Cir. 1990)); *see also B.A.P. v. Overton Cnty. Bd. of Ed.*, 600 F. Supp. 3d 839, 845 (M.D. Tenn. 2022). Second, any such amendment would be futile because, as discussed herein, the School District and Kaltenbach did not violate J.S.'s or J.E.'s constitutional rights.

8    It is legal medicinally when authorized, *see* Ohio Rev. Code § 2925.11(B)(1)(d), but there is no evidence that either J.S. or J.E. were authorized to possess medical marijuana, and that would not affect the School District's authority to search either student. *See, e.g.*, *United States v. Fieck*, 54 F. Supp. 3d 841, 843–44 (W.D. Mich. 2014).

9    Plaintiffs cannot maintain their claim under Ohio's constitution because § 1983 "does not cover conduct that allegedly violates state law." *Neinast v. Bd. of Trs. of Columbus Metro. Library*, 346 F.3d 585, 597 (6th Cir. 2003) (quoting *Huron Valley Hosp., Inc. v. City of Pontiac*, 887 F.2d 710, 714 (6th Cir. 1989)).

10    It is unclear whether only J.S. and J.E. raise these Title VI claims, or if their parents also bring claims under this provision, because Plaintiffs only raise allegations with reference to J.S. and J.E. Generally, parents lack standing to sue under Title VI in their own right because they are not the intended beneficiaries of a federally funded education program. *See, e.g.*, *Tinney v. City of Detroit*, 188 F.3d 509 (Table), No. 98-1510, 1999 WL 685921, at *7 (6th Cir. Aug. 26, 1999); *Jackson v. Katy Indep. Sch. Dist.*, 951 F. Supp. 1293, 1298 (S.D. Tex. 1996); *Wheatley v. Boardman Loc. Schs.*, No. 4:21-cv-1831, 2022 WL 2291703, at *6 (N.D. Ohio June 24, 2022). Even assuming, *arguendo*, that the parents have standing to sue under Title VI on behalf of their minor children, as discussed above, Plaintiffs cannot satisfy their burden at this stage to demonstrate a triable issue on this claim. Thus, the Court uses "Plaintiffs" in the Title VI section to encapsulate any possible argument that J.S., J.E., or their parents may raise.

Stanford v. Northmont City School District, Not Reported in Fed. Supp. (2023)

11        This also applies to the extent Plaintiffs assert Title VI claims through *respondeat superior*. *See Jones v. City of Detroit*, 20 F.4th 1117, 1121 (6th Cir. 2021).

12        During his deposition, J.S. testified about an incident where a white student who instigated an altercation with J.S. was not punished, despite J.S. reporting it to Kaltenbach. Doc. No. 61 at PageID 1482. Plaintiffs' complaint further mentioned some allegedly discriminatory incidents occurring while J.S. was in middle school. *See* Doc. No. 23 at PageID 613. However, Plaintiffs do not revisit these allegations in their opposition to summary judgment. *See* Doc. No. 102. "Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *El-Moussa v. Holder*, 569 F.3d 250, 257 (6th Cir. 2009) (quoting *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997)). Moreover, Plaintiffs "may not rely merely on allegations or denials in [their] own pleading" to resist summary judgment. *Alexander*, 576 F.3d at 558. Thus, for these additional reasons, summary judgment for Defendants is warranted here to the extent Plaintiffs rely on these allegations.

13        Plaintiffs ambiguously reference the Title VI deliberate indifference standard in their opposition to summary judgment. *Id.* at PageID 2642–43. They refer to alleged misconduct from the City of Clayton and its police officers—individuals and entities, as Plaintiffs acknowledge, dismissed from this case. *Id.* at PageID 2624–25. This "perfunctory" argument is so unclear that the Court cannot speculate what alleged harassment the School District was deliberately indifferent to. *El-Moussa*, 569 F.3d at 257. Regardless, nothing in the record indicates that J.S. and J.E. were treated harsher than other students, or that the School District turned a blind eye to mistreatment at its high school. *See, e.g.*, *Thompson*, 639 F. App'x at 342– 44; *Foster*, 573 F. App'x at 388–89.

---

**End of Document**                        © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Turnboe v. Gundy, 25 Fed.Appx. 292 (2001)

25 Fed.Appx. 292
This case was not selected for publication in the
Federal Reporter.
Not for Publication in West's Federal Reporter See
Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued on or
after Jan. 1, 2007. See also Sixth Circuit Rule 28.
(Find CTA6 Rule 28)
United States Court of Appeals,
Sixth Circuit.

Johnny Darryl TURNBOE, Plaintiff–
Appellant,
v.
Dave GUNDY, Defendant–Appellee.

No. 01–1622.
|
Dec. 12, 2001.

**Synopsis**
State prisoner brought a § 1983 action against warden,
alleging violations of due process and equal protection
when he was placed on a "food loaf" diet. The United
States District Court for the Eastern District of Michigan,
Steeh, J., dismissed the action, and prisoner appealed. The
Court of Appeals held that: (1) prisoner's being fed food
loaf does not implicate a due process liberty interest, and
(2) conclusory allegation that prisoner was put on food loaf
because of the color of his skin failed to state an equal
protection claim.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion to Dismiss.

**\*293** Before NORRIS, SILER, and BATCHELDER,
Circuit Judges.

*ORDER*

**\*\*1** Johnny Darryl Turnboe, a Michigan prisoner
proceeding pro se, appeals the district court order

dismissing his civil rights action filed pursuant to 42 U.S.C.
§ 1983. This case has been referred to a panel of the court
pursuant to Rule 34(j)(1), Rules of the Sixth Circuit. Upon
examination, this panel unanimously agrees that oral
argument is not needed. Fed. R.App. P. 34(a).

Seeking monetary and injunctive relief, Turnboe sued
Dave Gundy, Warden of Oaks Correctional Facility where
Turnboe is incarcerated. Turnboe alleged that: (1) his due
process rights were violated when he was placed on a "food
loaf" diet without a misconduct charge, a hearing, or
review; and (2) his equal protection rights were violated
when he was punished because of his skin color. The
district court granted Turnboe in forma pauperis status,
screened the complaint, and dismissed the case for failure
to state a claim. *See* 28 U.S.C. § 1915A(b)(1).

In his timely appeal, Turnboe argues that: (1) the
corrections officers who gave him food loaf knew they had
no authority to do so; and (2) the officers punished him
because of his race.

Upon de novo review, we conclude that the district court
properly dismissed Turnboe's complaint for failure to state
a claim. *See McGore v. Wrigglesworth,* 114 F.3d 601, 604
(6th Cir.1997). We disagree with part of the district court's
reasoning, however, and affirm the district court's decision
on grounds other than those relied upon by the district
court. *See City Mgmt. Corp. v. U.S. Chem. Co.,* 43 F.3d
244, 251 (6th Cir.1994).

We first conclude that Turnboe's complaint failed to state
a due process claim because being fed food loaf does not
implicate a due process liberty interest. A restraint imposed
in prison does not give rise to a protected liberty interest
unless the restriction constitutes an "atypical and
significant hardship on the inmate in relation to the
ordinary incidents of prison life." *Sandin v. Conner,* 515
U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).
The district court held that prisoners have a liberty interest
in not being placed on food loaf without cause, but that
there was no due process violation because Turnboe was
removed from the food loaf diet and compensated for the
meals he missed. In *Sandin,* the Court cited with
disapproval a case suggesting that a prisoner has a due
process right not to be served food loaf. *Id.* at 482–83, 115
S.Ct. 2293 (citing *United States v. Michigan,* 680 F.Supp.
270, 277 (W.D.Mich.1988)). Thus, a due process claim
based upon being fed food loaf is no longer viable.

We agree with the district court that Turnboe's complaint
did not state an equal protection claim. "It is not enough for

**Turnboe v. Gundy, 25 Fed.Appx. 292 (2001)**

a complaint under § 1983 to contain mere conclusory allegations of unconstitutional conduct by persons acting under color of state law. Some factual basis for such claims must be set forth in the pleadings." *Chapman v. City of Detroit,* 808 F.2d 459, 465 (6th Cir.1986). Turnboe merely alleged that he was put on food loaf because of the color of his skin. His conclusory allegation without any factual support failed to state an equal protection claim.

**\*\*2** For the foregoing reasons, we affirm the district court's order. Rule 34(j)(2)(C), Rules of the Sixth Circuit.

**All Citations**

25 Fed.Appx. 292, 2001 WL 1609898

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2025 Thomson Reuters. No claim to original U.S. Government Works.                    2