# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

STANLEY ZHONG and NAN ZHONG,
*on behalf of his* MINOR SON,

Plaintiffs,

v.

THE BOARD OF REGENTS OF THE
UNIVERSITY OF MICHIGAN, SANTA
ONO, Former President of the University
of Michigan*, in his personal capacity*,
STEVEN L. CECCIO*,* Former Interim
Dean of the University of Michigan
College of Engineering, *in his personal
capacity*, KAREN THOLE*,* Dean of the
University of Michigan College of
Engineering, *in her official capacity*,
LAURIE MCCAULEY*,* Provost of the
University of Michigan, *in her personal
and official capacities*, ERICA L.
SANDERS, Assistant Vice Provost and
Executive Director of Undergraduate
Admissions for the of the University of
Michigan, *in her personal and official
capacities*,

Defendants.

Case No.: 25-cv-10579

Judge Judith E. Levy
Mag. Judge David R. Grand

| | |
|---|---|
| David Nacht (P47034) | Brian M. Schwartz (P69018) |
| Fabiola A. Galguera (P84212) | Sydney G. Rohlicek (P85655) |
| NACHTLAW, P.C. | MILLER, CANFIELD, PADDOCK |
| *Attorneys for Plaintiff* | AND STONE, P.L.C. |
| 501 Avis Drive, Suite 3 | *Attorneys for University Defendants* |
| Ann Arbor, MI 48108 | 150 W. Jefferson Ave., Suite 2500 |
| (734) 663-7550 | Detroit, MI 48226 |
| dnacht@nachtlaw.com | (313) 963-6420 |
| fgalguera@nachtlaw.com | schwartzb@millercanfield.com |
| | rohlicek@millercanfield.com |

## SECOND AMENDED COMPLAINT AND JURY DEMAND

NOW COME Plaintiffs Stanley Zhong ("Stanley") and Nan Zhong ("Nan"), acting on behalf of his Minor Son, by and through their attorneys, NACHTLAW, P.C., and hereby allege as follows:

### INTRODUCTION

1.      Plaintiffs allege that the University of Michigan discriminated against Stanley based on race, and it discriminates generally against Asian Americans, causing his brother, the Minor Son, to fear that any application will subject him to rejection and humiliation on the basis of his race.

2.      This case is about the most basic of American promises: to give meaning to the Declaration of Independence's assertion that all human beings are created equal. Especially over the past half-century, the nation has made a concerted effort to transform this ideal from a lofty aspiration to enforceable guarantee. At the heart is the simple but profound rule: that racial discrimination is more than unfair— it is illegal and, indeed, unconstitutional.

3.      And yet, in one of the most competitive and consequential domains of American life, college admissions, our elite public universities like the University of Michigan ("U-M" or the "University")—and the government actors who fund and partner with them—proudly discriminate against Asian American applicants based on their race and have done so for decades. U-M operates as though anti-

discrimination law protects only their preferred minorities. Under this conception, Asian Americans are treated not as beneficiaries of civil rights, but as exceptions to them.

4.      U-M does not openly call these policies what they are—racial discrimination. Instead, U-M uses euphemistic language like "affirmative action." Under this logic, racial favoritism is rebranded as "progress," and U-M reframes race preferences as positive. But discrimination by another name is still discrimination. Focusing on the benefit to some rather than the burden on others is a rhetorical sleight of hand, as in a zero-sum admissions process, selecting winners based on race necessarily predetermines losers. U-M's rhetoric obscures this harm; it does not erase it.

5.      The results speak for themselves. For years, U-M's college admissions process has systemically penalized hard-working Asian American students—not because they lack merit, but because U-M has decided there are already enough of them on campus. In the name of vague notions of restitution for past racial injustice, universities like U-M have simply created new victims.

6.      The use of "holistic review" as a smokescreen for intentional discrimination is exactly what the United States Supreme Court struck down in *Students for Fair Admissions v. Harvard*, 600 U.S. 181 (2023) ("*SFFA*").

7.      Stanley and the Minor Son of Nan Zhong do not ask for special

3

treatment. They ask only for what the Constitution guarantees: an equal shot; a chance to be evaluated on the strength of their character, their intellect, and their achievements, without penalty for race. The Constitution demands nothing less.

8.     Plaintiffs seek declaratory relief holding that U-M's admissions process is unlawful, as well as injunctive relief preventing any use of race in U-M admissions, in order to allow Asian American applicants like Stanley Zhong and the Minor Son an equal opportunity to compete for admission based on merit, free from discrimination, as is required by federal law.

9.     Plaintiffs also seek damages and other appropriate relief for the injuries suffered to their civil rights.

10.     Plaintiffs bring this action against Defendants for violation of: (1) the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, pursuant to 42 U.S.C. § 1983; (2) 42 U.S.C. § 1981 pursuant to 42 U.S.C. § 1983; and (3) Title VI of the Civil Rights Act of 1964.

## PARTIES, JURISDICTION, AND VENUE

11.     Plaintiff Stanley Zhong is a second-generation Asian American student who at all relevant times was a resident of the state of California. Stanley was denied admission to U-M despite his extraordinary academic credentials.

12.     Plaintiff Nan Zhong proceeds on behalf of and as next friend of his Minor Son pursuant to Fed. R. Civ. P. 17(c); he is a first-generation immigrant from

China and a permanent resident of California. He is also the father of Stanley Zhong. Like his older brother, Nan Zhong's Minor Son is an Asian American student and a minor child with strong academic ambitions and performance to match. He intends to apply to U-M and because he faces a credible and imminent risk of harm from the same discriminatory admissions policies, the Minor Son has standing to seek prospective relief.

13.    Defendant University of Michigan Board of Regents is the publicly elected governing body of U-M, a publicly funded and state-operated university located in Ann Arbor, Michigan. U-M receives state and federal funding for the provision of higher education.

14.    Defendant Santa Ono is the former President of U-M, held this position at the time of Stanley's rejection, and is sued in his personal capacity.

15.    Defendant Steven L. Ceccio is the former Interim Dean of the U-M College of Engineering, held this position in 2023 at the time of Stanley's rejection, and is sued in his personal capacity.

16.    Defendant Karen Thole is the current Dean of the U-M College of Engineering and is sued in her official capacity.

17.    Defendant Laurie McCauley is the Provost of U-M, also held this position in 2023, and is sued in her personal and official capacities.

5

18.     Defendant Erica L. Sanders is the U-M Assistant Vice Provost and Executive Director of Undergraduate Admissions, also held this position in 2023, and is sued in her personal and official capacities.

19.     The events underlying this Complaint occurred in Ann Arbor, Michigan, within the Eastern District of Michigan.

20.     This Court has federal subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

## FACTUAL ALLEGATIONS

### The Legacy of Anti-Asian Discrimination

21.     The Zhongs belong to an oppressed minority because Asian Americans have long faced systemic exclusion and discrimination in the United States. The Chinese Exclusion Act of 1882 barred Chinese immigrants from entering the country—a policy so discriminatory that Congress formally apologized in 2012. Other Asian communities have faced similar patterns of xenophobia, violence, and exclusion throughout U.S. history. During World War II, over 120,000 Japanese Americans were forcibly incarcerated based solely on their ancestry.

22.     In recent decades, this sad history has continued among the nation's most elite educational institutions. These institutions of higher education, including U-M, subject Asian Americans to a quiet but no less insidious form of

6

discrimination—cloaked in the language of "affirmative action" and "holistic review."

23.     U-M, like other institutions of higher education, holds Asian American applicants to higher standards than applicants of other races, penalizing Asian applicants specifically because they were born with the wrong skin color.

24.     Although across the country, defenders of race-conscious admissions have downplayed or outright denied the existence of anti–Asian American discrimination, such discrimination has become the worst-kept secret of the college admissions process.  Admissions officers, consultants, and students alike understand that being Asian is a major disadvantage because these institutions discriminate on the basis of race behind closed doors.

25.     In this, Michigan simply follows an industry-wide pattern.

26.     Pulitzer Prize–winning journalist Daniel Golden documented this ubiquitous nationwide trend in his book titled The Price of Admission, exposing how elite universities like U-M routinely pass over Asian American applicants with exceptional qualifications in favor of far less qualified candidates from preferred racial groups.

27.     A 2016 national survey revealed that 42% of private college admissions officers and 39% of their public counterparts acknowledged that Asian American applicants are held to higher standards than students of other races.

28.    Studies suggest that privileged, wealthy African American applicants are admitted at significantly higher rates than low-income, underprivileged Asian American applicants with identical academic credentials. If affirmative action were truly about leveling the playing field, this outcome is indefensible.

29.    Discriminating against disadvantaged Asian students in favor of affluent Black or Hispanic applicants does not advance equality of opportunity; it betrays it.

30.    U-M and other elite institutions' policies reveal that the goal was never fairness— it is about achieving predetermined racial preferences, no matter whose rights are trampled.

31.    Asian American students like Stanley and prospective applicants like the Minor Son have long internalized the unspoken rules of this deeply unjust admissions process. They resort to downplaying their achievements and interests in math and science. They avoid mention of bilingual households and omit involvement in Asian cultural organizations when listing extracurricular activities. They seek to appear "less Asian" to escape the penalty for their racial identity.

32.    These learned behaviors are passed down from older students, for example from Stanley to Minor Son. Guidance counselors and even college admissions consultants also communicate to Stanley, Minor Son, and other Asian American students the harsh reality that Asian identity is treated as a liability. This

8

racial double standard is common knowledge, a moral stain on our educational institutions, and a direct violation of the American compact that all Americans are entitled to their civil rights.

33.     Plaintiffs and similarly situated Asian American students have felt compelled to obscure their heritage or downplay their authentic achievements out of fear that their racial identity will count against them.

34.     Asian Americans who challenge this discrimination do so at great personal risk. On campus, advocating for equal treatment under the law has been perversely rebranded as an attack on civil rights—an Orwellian inversion that suggests those rights belong only to the "right kind" of minority.

35.     Under this system at U-M and throughout the body of American academic institutions, Asian Americans endure a dual-indignity: first, they are subjected to systemic discrimination in the admissions process; then, should they be lucky enough to reach campus and object to that injustice, they are vilified as opponents of "equity" or "allies" of the oppressors, or branded "racist."

**U-M's Enduring Commitment to Racial Engineering**

36.     U-M has a long and well-documented history of promoting racial preferences in its admissions practices. In the early 1990s, then-President James Duderstadt unveiled the "Michigan Mandate, A Strategic Linking of Academic

Excellence and Social Diversity," calling it "a blueprint for fundamental change in the ethnic composition of the university community."

37.     To the extent that President Duderstadt celebrated the dismantling of older systems of racial exclusion and worked to ensure that students of all backgrounds had access to U-M based on merit, he deserves credit.

38.     However, despite lofty rhetoric of "cultural diversity," the Mandate's focus was unambiguously on race. Tellingly, President Duderstadt specifically emphasized "76 new minority faculty"; mentioning only "African-American Faculty Hires" and "new Hispanic American faculty … added."

39.     The "Mandate" reveals that whatever Michigan says about "diversity" and "culture," what Michigan actually means is "race."

40.     Two decades later, then-President Santa Ono reaffirmed the same ideology, declaring: "At the University of Michigan, we are convinced that academic excellence goes hand-in-hand with diversity, inclusion and equity."

41.     At U-M, "diversity" remains a euphemism for racial engineering— now used not to open the door to talented candidates who may otherwise have been excluded from higher education, but instead to justify denying opportunity to students who failed to meet the University's preferred demographic profile.

42.     Even when race-based admissions policies drew public scrutiny, meaningful reform has been elusive. For example, in 1989, UC Berkeley's

10

Chancellor issued a public apology for admissions practices that had suppressed Asian enrollment. Yet the same issues persisted: in 2003, the chairman of the UC Board of Regents openly accused the university of "blatantly" discriminating against Asian Americans, and studies in 2012 and 2014 by sociology professor Robert Mare confirmed a consistent pattern of anti-Asian bias in admissions.

43. This cycle—public contrition followed by quiet continuation of race-based admissions — is a defining feature of how elite universities respond to allegations of anti-Asian discrimination, with U-M being one of the worst offenders.

44. U-M has represented its industry in higher education in this regard, spending decades fighting to preserve discrimination based on race. That commitment was on full display in *Grutter v. Bollinger*, 539 U.S. 306 (2003) and *Gratz v. Bollinger*, 539 US 244 (2003), two cases in which U-M vigorously defended its use of race as an admissions factor.

45. After the Supreme Court struck down U-M's mechanical, point-based racial preferences in *Gratz*, the University simply rebranded its race-conscious policies as "holistic"—a transparent attempt to evade judicial scrutiny.

46. In the wake of the State of Michigan's 2006 ban on explicitly race-based decision making in college admissions, U-M adopted admissions procedures that have allowed it to continue to employ what amount to race-based criteria – under the pretextual guise of a "holistic review" – knowing that these procedures would

11

discriminate against Asian American applicants and thus reduce their representation within the student body, which was—and is—U-M's intent.

47. Nearly twenty years later, however, little had changed at U-M; on August 26, 2022, the New York Times reported that U-M administrators were openly frustrated that "Despite persistent, vigorous and varied efforts to increase student body racial and ethnic diversity by race-neutral means . . . the admission and enrollment of underrepresented minority students have fallen precipitously in many of U-M's schools and colleges."

48. By contrast, Asian Americans enrollees remained flat between 2020 and 2024.[1] Asian Americans of sufficient caliber were available but looked over in admissions because "ethnic diversity" did not include Asians. They were disproportionately excluded.

49. U-M's Diversity, Equity, and Inclusion Strategic Plan 2016-2021[2] states that "[i]n 2003, the university took on the mantle of leadership for all of higher education and successfully fought before the U.S. Supreme Court for the right to consider race as one factor in admissions decisions in pursuit of the educational benefits of diversity."

---

[1] https://obp.umich.edu/wp-content/uploads/pubdata/factsfigures/firstyearsprofile_umaa_2024_10-22-24.pdf.

[2] https://year5report.dei.umich.edu/wp-content/uploads/2021/10/2021_DEI_StrategicPlan.pdf.

50.     The Strategic Plan further states the U-M is committed "to increasing diversity, which is expressed in myriad forms, including race and ethnicity..." and that U-M would "track—over time—metrics that represent important factors in assessing progress toward our goals... Longer-term measures ... will include trends in the demographic composition..."

51.     According to U-M Vice Provost for Equity & Inclusion and Chief Diversity Officer Tabbye Chavous in January of 2019, "diversity, equity, and inclusion underpins [U-M's] institutional educational mission," and "applicants' DEI commitments should be one criterion because DEI is central to higher education's mission. In our center's work with various academic institutions and departments, we see indicators that DEI-demonstrated commitments (not just values) are playing a bigger part in the way departments evaluate applicants."[3]

52.     According to Defendant Ono in U-M's "DEI 2.0" Year 1 Progress Report,[4] "inclusion and equity, respect, diversity and integrity – these are core values of our university. They must be at the heart of everything we do."

53.     The same report states that U-M "[s]trategies for improving racial/ethnic diversity in student enrollment are coming to fruition, increasing

---

[3] https://lsa.umich.edu/lsa/news-events/all-news/search-news/diversity-statements.html.

[4] https://cdn.sanity.io/files/vzsgyiag/production/67c2d29d2adb48898fa8a13db86bf66b631ea1c3.pdf.

13

representation of students of color at U-M across all groups, with marked improvements for our most underrepresented groups" because the University's "DEI 1.0 evaluation data showed a need for focused attention to Black student and Native American student representation and experience."

54.    The U-M Computer Science and Engineering Climate, Diversity, Equity, and Inclusion Report for Academic Year 2022-23,[5] which explicitly references Article I, Section 26 of the Michigan Constitution, identifies "growth in the number of members of underrepresented groups amongst undergraduate and graduate students, faculty, and staff" as one of the goals of U-M's Computer Science and Engineering programs ("CSE").

55.    The report states that the "CSE Enrollment and Admissions Team (EAT) has identified new admissions pathways, including considerations for increasing the diversity of our undergraduate population" and that U-M CSE aims to "create a new multi-pathway admissions model that caps the number of CS majors but allows for control over class composition and promotion of more diversity."

56.    The report further states that "CSE's undergraduate enrollment of Black students continues to be significantly below the national average and percentage of the population in the state. CSE Hispanic undergraduate enrollment increased over the past year (although rates stayed about equal) and continues to fall

---

[5] https://cse.engin.umich.edu/wp-content/uploads/sites/3/2025/03/Climate-Report-22-23.pdf.

below both the percentage of the population in the state and the national average," indicating the school's intent to orchestrate a particular demographic makeup for the student body.

57.    Finally, the report itself mentions the harm these strategies are producing, noting that "there appears to be a change in self-reporting patterns this year which resulted in substantially fewer applicants identifying as male and Asian, without a corresponding increase in other categories. While we do not have data to point to particular reasons for this change, there may be a perception that applicants are disadvantaged by revealing that they are members of majority groups (among applicants to CSE)."

58.    Then, in the lead-up to *Students for Fair Admissions v. Harvard*, 600 U.S. 181 (2023) ("*SFFA*"), U-M once again fought tooth-and-nail to preserve its ability to discriminate against Asian American students.

59.    U-M submitted an amicus brief to the Supreme Court in which it acknowledged that it had considered race "for years" in admissions decisions.

60.    The brief also rationalized U-M's rejection of a percentage plan because "a percentage plan would have minimal or negative effects on racial diversity." This further exemplifies U-M's intent and desire to racially engineer its student body.

15

61.    The brief vigorously argued for the revival of race-based admissions policies by lamenting how "race-neutral admissions policies have not significantly increased enrollment of underrepresented minorities"—meaning minorities exclusive of Asian Americans who would achieve admission on a merit basis alone. In plain terms, U-M admitted that it cannot achieve its preferred racial composition without relying on race-conscious decision-making.

62.    When confronted with a choice—between advancing "diversity" (i.e. race-based admission) goals or upholding equal treatment for high-achieving groups like Asian Americans—U-M sides with "diversity," even if doing so necessitates racial discrimination. In practice, this results in academically superlative Asian American applicants being systematically disadvantaged to make room for less qualified candidates from other racial groups.

63.    U-M also admits that "fostering the promise of individualism in admissions sometimes requires … attention to facts about race." In other words, U-M contradictorily argues that to treat applicants as individuals, they must first classify them by race. The one, true measure of individualism that matters, individual merit, is discounted, so that Asian Americans may be excluded.

64.     In October of 2024, U-M Vice Provost for Equity & Inclusion and Chief Diversity Officer Chavous posted that U-M "can't minimize the need to continue to pay attention to race" publicly on LinkedIn.[6]

65.     The above paragraphs represent just a selection of relevant evidence in the public record explicitly demonstrating the unwavering commitment of Defendants to engineering their desired result of a specific racial makeup of the U-M student body, both before and after *SFFA*.

66.     By defending its continued use of racial criteria, openly expressing dissatisfaction with the racial composition of its student body, and framing race-conscious admissions as a permanent institutional value, Michigan has revealed its intent and confirmed its ongoing use of unconstitutional and discriminatory practices. This discriminates against Asian Americans like Stanley and the Minor Son because, by virtue of merit, their "race" would be overrepresented according to U-M's preferences.

## SFFA Reshaped the Law of Affirmative Action

67.     In *SFFA*, the Supreme Court held unequivocally that race-based admissions policies violate the Equal Protection Clause.

---

[6] https://www.linkedin.com/pulse/battle-truth-setting-record-straight-dei-u-m-tabbye-chavous-5psoe/.

68.     Two years later, in *Ames v. Ohio Department of Youth Services*, 605 U.S. ___ (2025), the Court reaffirmed that constitutional protections against racial discrimination apply equally to all racial groups—including those not labeled "underrepresented."

69.     In *SFFA*, the Supreme Court relied on statistical analysis to find that Harvard and the University of North Carolina ("UNC") had engaged in impermissible intentional discrimination prohibited by the Equal Protection Clause and Title VI.

70.     The SFFA plaintiffs submitted expert evidence involving mathematical modeling to predict whether admissions would go up if race were not a factor for Asian American applicants; Plaintiffs in this matter have identified experts who will perform the same kind of analysis to demonstrate – with the benefit of discovery – that U-M is engaged in the same "holistic review" process the Supreme Court invalidated in *SFFA*.

71.     The only difference between the defendant universities in SFFA and U-M is that Harvard and UNC admitted their process was race-conscious, while U-M is trying to obscure the role of race in its own "holistic review."

**U-M's "Holistic Review" Intentionally Masks Ongoing Discrimination**

72.     In the wake of *SFFA*, the percentage of Asian American students at top universities surged, validating what had long been suspected: elite schools would

admit more qualified Asian students once merit was considered instead of race —
they had simply chosen not to. It was only under legal scrutiny that these institutions
retreated from race-based practices they could no longer justify or conceal.

73.     Particularly instructive are statistical analyses that were run using the
data that became publicly available through the *SFFA* case, since – Plaintiffs posit
not-so-coincidentally – the details of actual admissions processes are tightly
safeguarded by universities.

74.     Using the data collected, it became evident to statisticians that at
Harvard, "the number of Asian Americans admitted would increase from 2,013 to
2,812, an increase of over 37%" for the classes of 2014-2019, had race not played a
role in admissions. The same analysis yields a 20% increase in Asian Americans
admitted to UNC.[7]

75.     The same cannot be said for U-M, which responded with defiance even
after *SFFA* made clear that racial balancing violates both the Equal Protection Clause
and Title VI.

---

[7] *See* Peter Arcidacono, Josh Kinsler, & Tyler Ranson, What the Students for Fair Admissions
Cases Reveal About Racial Preferences, 1(4) J. Pol. Econ. Micro. 615 (2023).

76.    In fact, between 2020 and 2024, the number of Asian Americans enrolling at U-M remained remarkably constant each year, ranging between 1,322 and 1,511, with the lowest number enrolling in 2024.[8]

77.    As noted, U-M's currently preferred end-run around anti-discrimination law is called the "holistic review." Though couched as a commitment to individualized consideration, the term "holistic" as used in U-M's admissions is a euphemism for unconstitutional race-balancing.

78.    Even the euphemism "holistic" suggests a thorough and individualized evaluation process. But on information and belief, based on available data regarding admissions practices in higher education, U-M admissions officers are expected to review at least 8.75 applications per hour—or less than seven minutes per applicant. U-M's application readers must evaluate each applicant's transcript, extracurricular activities, essays, recommendation letters, and other application documents. A typical college application has about 3000 words. Even if we assume a reader doesn't have to look up anything mentioned in the application, pause to reflect, or compare across applications, a reader needs to read over 437 words per minute, far above the average college graduate reading speed of 235 words per minute. This breakneck pace is entirely incompatible with any genuine notion of "holistic" review.

---

[8] https://obp.umich.edu/wp-content/uploads/pubdata/factsfigures/firstyearsprofile_umaa_2024_10-22-24.pdf.

79.     The challenge is only compounded by the sheer volume of applications Michigan receives—more than 115,000 for its 2025 undergraduate admissions cycle.

80.     Maintaining any meaningful level of consistency across such a vast pool while under severe time constraints necessarily forces readers to rely heavily on easily digestible, quantifiable metrics such as SAT scores and GPA.

81.     Yet when it comes to subjective criteria like "fit" or "contribution to campus culture," Michigan's reliance on quantifiable proxies becomes more troubling. On information and belief, U-M uses race—or more accurately, self-reported racial identity—as a crude analog for a candidate's value on the University's diversity balance-sheet. Rather than consider a candidate's individual merit, U-M's "holistic review" process allows U-M's analysis to be quite literally skin-deep.

82.     Universities, including U-M, continue to engineer racial outcomes under the cover of subjective judgment and plausible deniability. This change in terminology—from "race-based" and "affirmative action" to "holistic" and "individualized"—is merely cosmetic; the discriminatory intent—and effect—remain.

83.     For example, as documented by Professor Tim Groseclose in a detailed study of UCLA admissions, the switch to "holistic review" was adopted explicitly

21

to increase enrollment of so-called "underrepresented minorities," at the expense of more qualified Asian American applicants. He found that, even among applicants with identical reader scores, acceptance rates varied dramatically by race.

84.   On May 25, 2016, a former Dartmouth admissions officer revealed how "holistic review" allowed committees to mask racial bias behind vague, subjective criteria—often resorting to stereotypes to dismiss Asian American candidates as "yet another textureless math grind." These dehumanizing stereotypes reflect not genuine individual assessment, but racial generalizations disguised as discretion.

85.   Tellingly, "holistic review" is a legal term of art long used by universities openly engaged in race conscious admissions, a vestige of pre-*SFFA* Supreme Court jurisprudence which permitted the use of race in college admissions *only* in the context of a "holistic review."

86.   U-M continues to use "holistic review" in its admissions process in the same way, in conformity with practices documented throughout higher education.

87.   Both U-M and the University of California are constitutionally prohibited from using racial preferences in student admissions. Nevertheless, both institutions have demonstrated a clear desire to circumvent these bans. After Michigan's Proposal 2 passed in 2006, U-M hosted a 2-day workshop featuring University of California administrators, who shared their strategies for "navigating"

– i.e. working around – the California equivalent to Michigan's Proposal 2, California's Proposition 209, enacted in 1996.

88.    In an extraordinary public admission during a Spring 2023 constitutional law class, UC Berkeley Law Dean Erwin Chemerinsky described how universities practice "unstated Affirmative Action," advising that schools not "say" race. "You can think it. You can vote it… Don't ever articulate that is what you are doing." He also said, "If I'm ever deposed, I'm going to deny I said this to you." These comments—caught on video—confirm that elite institutions cling to racial preferences but have evolved ever more elusive ways of doing so.

89.    U-M is an enthusiastic participant in this racial doublespeak; in August of 2023 after the Supreme Court's decision in *SFFA*, U-M's general counsel emphasized the importance of U-M and other universities maintaining plausible deniability about their use of race in admissions, cautioning: "You should be aware right now of the record you're creating ... What are your faculty saying in emails? What are they saying in public? … The key question in terms of creating the record is what can you say right now is the race-neutral explanation for doing it, and how do you avoid having your faculty colleagues muddy the record."

90.    Rather than celebrating when the Supreme Court ultimately held that considering race in admissions violates the constitution and Title VI, then-University of Michigan President Santa Ono publicly lamented the outcome in *SFFA*, declaring

that he was "deeply disheartened by the Court's ruling." That statement, from the university's highest official at the time, is an admission that U-M prefers the racially discriminatory academic status quo, suggesting the University would continue to pursue it by other means.

91.     The result is a process that is neither "holistic" nor "individualized." It is a rushed, inconsistent system that relies on superficial and impermissible self-reported racial categorization to evaluate subjective traits.

92.     The discriminatory purpose behind U-M's policies is further laid bare by its own public statements. On its "Diversity FAQ" webpage, the University flatly declares that "socioeconomic status is not a substitute for race or ethnicity" and has gone so far as to claim that truly treating an applicant as an individual requires considering their race.

93.     If the goal were truly to level the playing field and expand opportunity for the disadvantaged, socioeconomic status might be a logical and equitable focus that would avoid running afoul of the law's prohibition on racial discrimination—a method already in use in other states.

94.     Instead, U-M explicitly rejects this approach precisely because it would not produce its desired demographic results.

95.     The implication is unmistakable: U-M's priority is not to uplift the underserved, but to engineer a specific racial composition, even if that means favoring affluent non-Asian minority applicants over low-income Asian students.

96.     In doing so, U-M betrays the professed moral foundation of affirmative action and reveals its true purpose—not equality of opportunity, but as a backdoor for invidious racial discrimination.

### The Extraordinary Qualifications of Stanley Zhong

97.     It is against this backdrop that Stanley faced the admissions process. Stanley is not merely a qualified applicant—he is, by any objective measure, among the top college applicants in the country.

98.     Stanley attended Henry M. Gunn High School, ranked #14 in California by U.S. News & World Report and the #1 best public high school in the San Francisco Bay Area according to Niche.

99.     Within this elite setting, Stanley still stood head and shoulders above his peers. He distinguished himself as a National Merit Scholarship finalist and earned a place in at least the top 9% of his class—qualifying for the University of California's "Eligibility in the Local Context" program.

100.    Stanley's high school grade point average ("GPA") was 3.97 out of 4.00 without weighting to account for course difficulty, and 4.42 out of 4.0 when weighting was accounted for.

101.   Stanley achieved a perfect PSAT score without any preparation and went on to score 1590 out of 1600 on the SAT, after just a few nights of self-study and without any paid tutoring or test prep – well above the 75th percentile of SAT scores for the 2023 freshman class at U-M, which was 1530.[9]

102.   Stanley's excellence extended well beyond the classroom. While still in high school, he co-founded OpenBrackets, a nonprofit that delivered free coding lessons to more than 500 students in underserved communities across California, Washington, and Texas. For this work, Stanley was awarded the President's Volunteer Service Award at its highest level.

103.   He also founded and led his school's competitive programming club and took on leadership roles in a variety of academic and volunteer organizations.

104.   Stanley is a self-taught programmer whose extraordinary talent has earned him top honors in some of the world's most competitive coding contests— often outperforming professional engineers.

105.   Stanley placed 2nd in Carnegie Mellon's picoCTF cybersecurity challenge and was invited to CMU with expenses paid, took 6th in Stanford's ProCo, and reached the elite Platinum Division of the USA Computing Olympiad.

---

[9] https://obp.umich.edu/wp-content/uploads/pubdata/factsfigures/firstyearsprofile_umaa_2024_10-22-24.pdf.

106.   Twice, Stanley placed 2nd globally (2nd and 1st in the U.S., respectively) in MIT's Battlecode high school division, qualifying for invitations to MIT with expenses paid.

107.   Stanley also ranked among the top 500 worldwide in both Google's Code Jam (427th) and Meta's Hacker Cup (329th)—competitions dominated by seasoned professionals.

108.   Stanley's skill was so advanced that in 2019, Google invited him for a full-time software engineering interview, unaware that he was only 13 years old; the interview was canceled only after his age came to light.

109.   After reading an NPR story in April 2020 about state unemployment systems buckling under COVID-related demand due to outdated COBOL infrastructure, Stanley independently taught himself COBOL, published sample code to GitHub, and volunteered his help to the "COBOL Cowboys" featured in the article—earning a personal phone call and words of encouragement from their CEO.

110.   A year later, frustrated by the lack of affordable e-signature tools during the pandemic, Stanley launched RabbitSign, the world's only unlimited free HIPAA-compliant e-signing platform. Built on Amazon Web Services, RabbitSign was so secure and well-constructed that AWS named it one of the best-engineered applications they had reviewed and decided to feature it in a case study.

111. Stanley's innovation drew national attention: RabbitSign was spotlighted on Viewpoint with Dennis Quaid—a program that has previously interviewed Fortune 500 CEOs and U.S. presidents—for its potential to help reduce healthcare costs through accessible, secure digital tools.

112. Just before he turned 18, Stanley underwent one of the most rigorous and objective evaluations in the modern labor market: Google's full-time software engineering interview process. Five randomly assigned Google engineers, each professionally trained and authorized to assess candidates, devoted over ten hours to evaluating Stanley's technical skills, communication abilities, and teamwork—precisely the traits elite universities purport to assess through "holistic" admissions.

113. Importantly, the structure of Google's process eliminates any risk of favoritism: interviewers are randomly assigned, shielded from outside influence, and incentivized to avoid inflating evaluations, as doing so could lead to internal compensation disparities.

114. Based solely on their independent assessments, the engineers recommended Stanley for an L4 software engineering role, a position typically reserved for candidates with a Ph.D. or equivalent industry experience.

115. Google made the offer in September 2023, just after Stanley's 18th birthday, and his full-year job performance evaluation in January 2025 confirmed

the wisdom of that decision: he met all expectations and demonstrated strong potential for continued growth.

116.   That Google—an employer with far more applicants than even the most competitive universities—recognized Stanley as qualified for a postdoctoral-level role, while U-M deemed him unworthy of undergraduate admission, speaks volumes about the discriminatory standards U-M applies to Asian American applicants.

117.   To the extent that Defendants attempt to explain their "holistic review" as accounting for likelihood of success, there is no question that Stanley should have been immediately accepted to U-M's College of Engineering on this basis as well.

118.   According to U-M's own data, in 2022 64.79% of students were employed upon graduating with their Bachelor's; in 2023 59.24% of students were employed; and in 2024 53.99% of students were so employed.[10]

119.   On the other hand, Plaintiff was able to secure a job with Google shortly after being rejected by U-M, which has seen a dramatic decrease in graduate hires by Google at the same time.

120.   According to the school's public data, Google went from hiring 118 U-M graduates in 2022 to just 30 in 2024, with only three hires specifically for Computer Engineering.

---

[10] https://career.engin.umich.edu/students/michigan-engineering-student-salary-information/.

121.    Whereas U-M Computer Engineering students made a median average salary of $29.00 an hour and Computer Science students made a median $35.00 an hour at their internships, Plaintiff had a six-figure salary.

122.    Despite Plaintiff's unique situation, however, there is no question that a degree from a high-level university is necessary for long-term success in his field. While some companies are willing to consider practical experience, nearly every job application for software engineering calls for – at minimum – a bachelor's degree.

### Stanley Applied on Merit – U-M Rejected on Race

123.    For enrollment in the Fall of 2023, Stanley applied to the Computer Science program in the College of Engineering at U-M in Ann Arbor.

124.    Like many Asian American candidates for admission, Stanley naively hoped that, despite the well-known barriers facing applicants who look like him, his individual merit might still prevail.

125.    Unfortunately, like too many Asian American students, he learned that it would not. Despite extraordinary academic credentials and nationally recognized accomplishments, his application was rejected in January of 2023.

126.    Stanley's story was reported in national news in October of 2023 and cited in a congressional hearing in September of 2023, and multiple independent college admissions experts and counselors (unconnected to U-M) reviewed Stanley's application materials at the family's request.

127.   Tellingly, not one of these experts could identify a legitimate, performance-based reason why Stanley would have been rejected by a school of U-M's caliber. By all objective indicators, Stanley appeared to be the kind of candidate any top university would eagerly admit. The absence of any apparent, merit-based explanation for this "bizarre" result raises a strong inference that Stanley's race played a role in U-M's decision.

128.   The statistical evidence further reveals the extent of anti-Asian discrimination in Michigan's decision to deny Stanley's application.

129.   As reported in the Chronicle of Higher Education's August 2025 report "The DEI Dilemma," Defendant Acker told the Chronicle that U-M "want[s] to be sure the proportion of African American enrollees matches or is closer to that of the state demographics."

130.   Meanwhile, the Asian American population in Michigan grew by over 40% from 2010 to 2020 and likely continued rising thereafter, while the percentage of Asian American students admitted to U-M has remained flat or declined.

131.   Between 2020 and 2024, Asian American enrollment at U-M dropped from 19.4% to 18.2%, despite explosive growth in the state's Asian population.

132.   U-M's own admissions data reveals how its racially engineered outcomes disproportionately disadvantage Asian American applicants.

133.   In 2023, U-M enrolled approximately 432 African American students compared to 1511 Asian Americans.[11] But admitting approximately 3 Asian American students to every one Black American student does not tell the whole story of exclusion based on race.

134.   U-M's own publicly available statistics demonstrate that the middle 50% of SAT scores for admitted freshmen range between 1350 and 1530, suggesting a median SAT score of approximately 1440 for all students; well above the national average of 1024.

135.   For reference, national statistics show that 225,954 African American students took the SAT in 2023. Approximately 1% of these students (roughly 2,259) scored in the top range, i.e. 1400–1600.

136.   Therefore, U-M's 432 African American enrollees at Ann Arbor alone would be expected to reflect approximately 9.6% of the nation's top African American SAT performers if the admissions criteria were based on merit rather than race, and the students were evenly distributed.

137.   However, U-M's freshman class at Ann Arbor constitutes only a tiny portion of the nation's total entering freshmen (estimated at over 2 million students),

---

[11] https://obp.umich.edu/wp-content/uploads/pubdata/factsfigures/firstyearsprofile_umaa_2024_10-22-24.pdf.

and even if one narrows this to only the top 50 schools, Michigan's share is far, far less than 10% of all students.

138.   Similar statistics can be developed for other racial groups advantaged in admissions (e.g., Hispanics) and racial groups disadvantaged in admissions (e.g. Ashkenazi Jews) in U-M's "holistic" system.

139.   Ranked at 21st among the nation's schools according to US News and World Report, it stretches credulity to believe that U-M has somehow cornered the market on talented Black freshmen.

140.   For any single university to enroll that many top-performing Black students would require that school to be overwhelmingly more attractive to them than any of the dozens of other elite institutions competing for the same applicants— which U-M is not.

141.   This throws the actual discrimination against high-performing Asian students in sharp relief. By contrast, U-M enrolled less than one sixth, or about 1.6% of similarly high-scoring Asian American students.

142.   There are only two plausible explanations for this disparity: either (1) Black students are six times more likely than their Asian counterparts to choose Michigan over peer institutions—a statistical impossibility, especially considering that other top universities are also enrolling large numbers of high-achieving Black

students—or (2) U-M is selectively raising and lowering the bar for admittance based on an applicant's race.

143.   The data leaves no serious doubt that it is the latter: U-M is admitting a disproportionately high number of lower-scoring Black applicants while systematically suppressing the admission of higher-scoring Asian Americans to engineer its desired racial preferences.

144.   U-M further relies on the subjective components of an application – such as essays and recommendations – as a useful pretext for its intentional racial discrimination.

145.   While distinct from undergraduate admissions, U-M's faculty hiring practices also provide compelling circumstantial evidence of its institutional and systematic race-conscious agenda.

146.   Whistleblower reports and internal data indicate that U-M has prioritized race in hiring decisions while attempting to preserve plausible deniability—mirroring the "unstated Affirmative Action" strategy candidly described by UC Berkeley's law dean.

147.   For instance, U-M's ostensibly race-neutral Collegiate Fellows program has hired people of color in over 80% of cases—a statistical improbability that strongly suggests racial considerations are at play.

148.   Professor Keith Riles, a tenured physicist at U-M, provided a sworn affidavit attesting to the use of race in hiring decisions, and even Defendant Ono concedes that U-M's DEI infrastructure has strayed from its academic mission.

149.   These policies reveal a university culture deeply steeped in race-consciousness—one that cannot plausibly separate its hiring practices from its highly suspect admissions outcomes. When university leadership consistently selects and empowers individuals committed to race-based decision-making, it is hardly surprising that those values also shape admissions policy.

150.   Faculty widely acknowledge that expressing race-neutral values in diversity statements—such as advocating for merit or equal treatment—is considered "career suicide."

151.   These are not incidental expressions of U-M's values in niche departments or by isolated academics. Such institutional norms make it unsurprising that no whistleblower has emerged from the closely guarded undergraduate admissions office, where there is no tenure protection and ideological conformity is enforced more easily – but Plaintiffs intend to uncover the magnitude of the harm through discovery.

152.   As a result of this unlawful discrimination, Plaintiffs have suffered or are in imminent danger of suffering significant harm, including but not limited to the loss of educational opportunities, reputational damage, and emotional distress.

Plaintiffs seek all available legal and equitable relief to remedy and/or prevent these injuries.

### As a Prospective Applicant, the Minor Son Can Only Conclude he is Not Welcome at U-M

153.   The Minor Son is currently a junior in high school and has concrete plans to apply to U-M for enrollment in the Fall of 2027.

154.   Like his brother, the Minor Son is talented. The Minor Son already demonstrates the academic excellence, intellectual curiosity, and extracurricular achievement that define top college applicants. Although he has not yet taken the PSAT due to his grade level, he expects to do well, just as his older brother Stanley did, based on his advanced coursework and consistent academic performance. The Minor Son's current GPA stands at a perfect 4.0 unweighted, even higher than Stanley's at the same stage, placing him among the very top of his class.

155.   Outside the classroom, the Minor Son exhibits a well-rounded and disciplined character. He has been a member of his high school's varsity cross country team since his freshman year, he is a national-level Rubik's Cube competitor capable of solving the cube in 6.25 seconds during official events, and he has taught himself to juggle five balls and did so on stage at the second largest annual juggling festival in North America.

156. However, based on Stanley's experience, the Minor Son has learned of the consistent pattern by which U-M discriminates against Asian American applicants because of their race.

157. The Minor Son is also discouraged and humiliated by repeated and public knowledge of Michigan's discrimination against Asian Americans.

158. The Minor Son has also learned through friendship networks within his community and through publicly available reports that Asian American students who speak up for equal treatment under the law on college campuses and throughout academia are branded "racists" and ostracized on campus—reinforcing that U-M's bias extends beyond admissions into campus culture.

159. The Minor Son is aware of admissions statistics indicating that—even among the most qualified candidates—Asian Americans face significantly lower admission rates, as they lack the "correct" race for U-M's race-conscious process.

160. The Minor Son has concrete plans to apply to U-M, but the evidence shows that should he do so, he faces an immediate and continuing injury-in-fact sufficient for standing – both because of hard data indicating that the collective experience of Asian Americans at U-M is dismal and based on his direct experience with his brother's hardship and rejection.

161.   In sum, while the Minor Son is positioned to be a highly competitive applicant to any elite university including U-M, he confronts a tangible and immediate risk of race-based discrimination at U-M.

## COUNT I
### Violation of the Equal Protection Clause of the
### Fourteenth Amendment to the U.S. Constitution
### Pursuant to 42 U.S.C. § 1983
*(against the individual defendants for money damages in their personal capacities and declaratory and injunctive relief in their official capacities)*

162.   Plaintiff incorporates the preceding allegations as if fully restated herein.

163.   The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution provides that "no state shall… deny to any person within its jurisdiction the equal protection of the laws."

164.   Section 1983 protects against the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" by persons acting under the color of law.

165.   Defendants acted under the color of state law in taking the actions described *supra*.

166.   A reasonable person or public official should have known that it is a violation of a person's clearly established constitutional rights to discriminate against him based on race.

167. In fact, Defendants have publicly demonstrated their specific awareness of the Supreme Court's decision in *SFFA*.

168. Accordingly, Defendants' actions outlined *supra* violated Plaintiff's clearly established constitutional rights, of which any reasonable person in their position would have known; Defendants are therefore not entitled to qualified immunity.

169. Plaintiffs are entitled to punitive damages because Defendants engaged in the above-described conduct with malicious and evil intent, in callous disregard of Plaintiffs' federally protected rights.

170. As a direct and proximate result of Defendants' unlawful actions, Plaintiffs have suffered or are at immediate risk of significant harm, injury, and damages, including, but not limited to, loss of career opportunities and earning capacity; mental and emotional distress; humiliation and embarrassment; and loss of personal and professional reputation, and will continue to so suffer in the future.

171. As a direct and proximate result of Defendants' unlawful actions, Plaintiffs have had to retain the services of an attorney and will continue to so suffer in the future.

**COUNT II**
**Violation of 42 U.S.C. § 1981**
**Pursuant to 42 U.S.C. § 1983**
*(against the individual defendants for money damages in their personal capacities and declaratory and injunctive relief in their official capacities)*

39

172.   Plaintiff incorporates the preceding allegations as if fully restated herein.

173.   Section 1981 provides:

Equal Rights Under the Law. All persons in the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts to sue, be parties, give evidence, and to the full and equal benefit of all of laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses and exactions of every kind, and to no other.

174.   Under the 14th Amendment, Plaintiff has the guaranteed right to make and enforce contracts free from discrimination.

175.   Section 1981 prohibits intentional discrimination in the making and enforcement of contracts involving both public and private actors.

176.   Section 1983 protects against the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws," including Section 1981, by persons acting under the color of law.

177.   Defendants have discriminated against Plaintiffs in violation of Section 1981 and deprived them of their civil right to make and enforce contracts free from racial discrimination by the conduct described herein, including but not limited to denying Stanley admission to the University.

178.   Defendants acted under the color of state law in taking the actions described *supra*.

179.   A reasonable person or public official should have known that it is a violation of a person's clearly established constitutional rights to discriminate against him on the basis of race.

180.   In fact, Defendants have publicly demonstrated their specific awareness of the Supreme Court's decision in *SFFA*.

181.   Accordingly, Defendants' actions outlined *supra* violated Plaintiff's clearly established constitutional rights, of which any reasonable person in their position would have known; Defendants are therefore not entitled to qualified immunity.

182.   Plaintiffs are entitled to punitive damages because Defendants engaged in the above-described conduct with malicious and evil intent, in callous disregard of Plaintiffs' federally protected rights.

183.   As a direct and proximate result of Defendants' unlawful actions, Plaintiffs have suffered or are at immediate risk of significant harm, injury, and damages, including, but not limited to, loss of career opportunities and earning capacity; mental and emotional distress; humiliation and embarrassment; and loss of personal and professional reputation, and will continue to so suffer in the future.

184.   As a direct and proximate result of Defendants' unlawful actions, Plaintiffs have had to retain the services of an attorney and will continue to so suffer in the future.

## COUNT III
**Violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d**
*(against Defendant the Board of Regents of the University of Michigan)*

185.   Plaintiff incorporates the preceding allegations as if fully restated herein.

186.   Title VI of the Civil Rights Act of 1964 provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

187.   As a public university, Defendant U-M received and continues to receive federal financial assistance.

188.   Defendant U-M subjected Plaintiffs to intentional discrimination, excluded them from participation in, and denied them the benefits offered by U-M by their conduct described herein, including but not limited to denying Stanley admission to the University.

189.   As a direct and proximate result of Defendants' unlawful actions, Plaintiffs have suffered or are at immediate risk of significant harm, injury, and damages, including, but not limited to, loss of career opportunities and earning capacity; mental and emotional distress; humiliation and embarrassment; and loss of personal and professional reputation, and will continue to so suffer in the future.

190.   As a direct and proximate result of Defendants' unlawful actions, Plaintiffs have had to retain the services of an attorney and will continue to so suffer in the future.

## RELIEF REQUESTED

For all the foregoing reasons, Plaintiffs demand judgment against Defendants as follows:

a.   A declaration that the practices and actions of Defendants are unlawful practices in violation of the U.S. Constitution, 42 U.S.C. § 1983, 42 U.S.C. § 1981, and Title VI;

b.   Compensatory damages in whatever amount they are found to be entitled;

c.   Punitive damages in whatever amount they are found to be entitled;

d.   Nominal damages in whatever amount they are found to be entitled;

e.   Interest, costs, reasonable attorney fees, and expert witness fees;

f.   All appropriate equitable and/or injunctive relief; and

g.   Whatever other relief this Court finds appropriate.

Respectfully Submitted,

**NACHTLAW, P.C.**

*/s/ David A. Nacht*
David A. Nacht (P47034)
Attorneys for Plaintiff
501 Avis Dr, Ste. 3
Ann Arbor, MI 48108
(734) 663-7550

Dated: September 24, 2025

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiffs, by and through their attorneys, NACHTLAW, P.C., hereby demand

a trial by jury of the issues in the above-captioned cause of action.

Respectfully submitted,

**NACHTLAW, P.C.**

*/s/ David A. Nacht*
David A. Nacht (P47034)
Attorneys for Plaintiff
501 Avis Dr, Ste. 3
Ann Arbor, MI 48108
(734) 663-7550
dnacht@nachtlaw.com

Dated: September 24, 2025