*Exhibit 2*

823 Fed.Appx. 413
This case was not selected for publication in West's
Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued on or
after Jan. 1, 2007. See also U.S.Ct. of App. 6th Cir.
Rule 32.1.
United States Court of Appeals, Sixth Circuit.

Susana CASTILLO, individually and on
behalf of all others similarly situated, et
al., Plaintiffs-Appellants,

v.

Gretchen WHITMER, in her official
capacity as Governor of the State of
Michigan, et al., Defendants-Appellants.

No. 20-1815
|
FILED September 02, 2020

**Synopsis**
**Background:** Agricultural business owners and
employees challenged enforcement of emergency order by
Michigan Department of Health and Human Services,
which imposed COVID-19 testing protocols on employers
and housing providers in certain agricultural settings. The
United States District Court for the Western District of
Michigan, Paul L. Maloney, United States District Judge,
No. 1:20-cv-751, denied the agricultural plaintiffs' motion
for a preliminary injunction. The plaintiffs appealed and
moved to expedite, and farmworker advocacy
organizations moved for leave to file an amicus brief.

**Holdings:** The Court of Appeals held that:

the plaintiffs were unlikely to succeed on merits of their
appeal, as required for grant of a preliminary injunction;

risks of imposing COVID-19 testing in certain agricultural
settings were speculative, and thus did not support granting
injunction; and

enjoining testing scheme pursuant to the emergency order
would pose significant risk of harm.

Motion for preliminary injunction denied.

Motions to expedite and for leave to file an amicus brief
granted.

**Procedural Posture(s):** On Appeal; Motion for
Preliminary Injunction; Motion for Expedited Appeal;
Motion for Leave to File Third Party Complaint.

**Attorneys and Law Firms**

**\*414** Ronald Grant DeWaard, Aaron M. Phelps, Varnum,
Grand Rapids, MI, for Plaintiffs-Appellants

Mark G. Sands, Assistant Attorney General, Office of the
Attorney General of Michigan, Alcohol & Gambling
Enforcement Division, East Lansing, MI, Danielle Rae
Allison Yokom, Katherine Jean Bennett, Office of the
Attorney General of Michigan, Lansing, MI, for
Defendants-Appellees

Diana Marin, Anna Marie Hill, Michigan Immigrant
Rights Center, Ypsilanti, MI, Samuel R. Bagenstos,
Samuel Bagenstos, Ann Arbor, MI, for Amicui Curiae
Michigan Immigrant Rights Center, Maurice & Jane Sugar
Law Center for Economic & Social Justice, Advocates for
Basic Legal Equality, Inc., Avanti Law Group, PLLC,
California Rural Legal Assistance Foundation,
Farmworker Justice, Michigan League for Public Policy,
North Carolina Justice Center, Northwest Worker's Justice
Project, Worksafe, Inc., Farm Labor Organizing
Committee, International Union

Before: STRANCH, THAPAR, and READLER, Circuit
Judges.

<u>ORDER</u>

Plaintiffs are a group of agricultural business owners and
employees who challenge the enforcement of an
emergency order issued by the Michigan Department of
Health and Human Services imposing COVID-19 testing
protocols on employers and housing providers in certain
agricultural settings beginning on August 24, 2020 (the
"Order"). Plaintiffs claim that requiring them to administer
or take COVID-19 tests violates the Equal Protection
clause and sought a preliminary injunction barring
enforcement of the Order. The district court denied the
motion for a preliminary injunction and Plaintiffs appeal.
**\*415** They also move to expedite the appeal and seek a
preliminary injunction while the appeal is pending.
Defendants, Michigan's Governor and the Directors of the
Department of Health and Human Services and the
Department of Agricultural and Rural Development,

oppose the motion for a preliminary injunction but do not address the motion to expedite. In addition, fourteen law and justice nonprofits; four labor unions; twelve community organizations who advocate on behalf of farmworkers, low-wage workers, and Latino communities; two public health experts; a public health nonprofit; and a community health interest group move for leave to file an amicus brief in support of Defendants' opposition to an injunction and have tendered their brief.

We may "grant an injunction pending appeal to prevent irreparable harm to the [moving] party." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 572 (6th Cir. 2002). In determining whether to grant an injunction, we examine four factors: (1) the movants' likelihood of success on appeal; (2) whether the movants will suffer irreparable harm in the absence of an injunction; (3) whether issuance of an injunction would cause substantial harm to the other interested parties; and (4) where the public interest lies. *Id.* at 573. "A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Id.*

Plaintiffs are unlikely to succeed on the merits of their appeal. We review the denial of a motion for preliminary injunction for abuse of discretion. *Nat'l Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 717 (6th Cir. 2003); *Tauban Co. v. Webfeats*, 319 F.3d 770, 774 (6th Cir. 2003). Accordingly, "[t]he district court's determination will be disturbed only if the district court relied upon clearly erroneous findings of fact, improperly applied the governing law, or used an erroneous legal standard." *Nat'l Hockey League Players' Ass'n*, 325 F.3d at 717. "Under this standard, [we] must review the district court's legal conclusions de novo and its factual findings for clear error." *Tauban*, 319 F.3d at 774 (quoting *Owner–Operator Indep. Drivers Ass'n v. Bissell*, 210 F.3d 595, 597 (6th Cir. 2000)).

In essence, Plaintiffs argue that the district court applied the wrong legal standard. "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws.' " *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (quoting U.S. Const. amend. XIV, § 1). This is "essentially a direction that all persons similarly situated should be treated alike." *Id.* (citing *Plyler v. Doe*, 457 U.S. 202, 216, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982)). Thus, "any official action that treats a person differently on account of his race or ethnic origin is inherently suspect," *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 310, 133 S.Ct. 2411, 186 L.Ed.2d 474 (2013) (quoting *Fullilove v. Klutznick*, 448 U.S. 448, 523, 100 S.Ct. 2758, 65 L.Ed.2d

902 (1980) (Stewart, J., dissenting)), and "racial 'classifications are constitutional only if they are narrowly tailored to further compelling governmental interests.' " *Id.* (quoting *Grutter v. Bollinger*, 539 U.S. 306, 326, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003)).

In addition, facially race-neutral actions are also unconstitutional when they disproportionately affect a racial minority and can be traced to a discriminatory purpose. *Pers. Adm'r v. Feeney*, 442 U.S. 256, 272, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979). In this case, the district court determined that the Order is **\*416** facially race-neutral, and Plaintiffs do not expressly challenge that determination. Likewise, the district court recognized that the Order does have a disparate impact on Latinos. But the district court rejected Plaintiffs' argument that the Order was motivated by an improper racially motivated purpose. That factual finding was not clearly erroneous.

To establish improper purpose, a plaintiff must show "that the decisionmaker ... selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.* at 279, 99 S.Ct. 2282. Courts may find evidence of improper purpose in the historical background of the decision, "particularly if it reveals a series of official actions taken for invidious purposes." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). "[C]ontemporary statements by members of the decisionmaking body" may also be relevant. *Id.* at 268, 97 S.Ct. 555.

Plaintiffs' proffered evidence is insufficient. They cite to an April publication entitled "COVID-19 Response & Mitigation Strategies For Racial & Ethnic Populations & Marginalized Communities" as proof that racial identity was top-of-mind for Defendants when drafting the Order. Likewise, Plaintiffs point to two earlier executive actions that referenced the disproportionate impact COVID-19 has had on communities of color and the desire to improve racial equity in healthcare, asserting a pattern of official activity with racial motivations. But considering the effects of government action on various racial groups is not evidence of improper purpose: "[i]f consideration of racial data were alone sufficient to trigger strict scrutiny, then legislators and other policymakers would be required to blind themselves to the demographic realities of their jurisdictions and the potential demographic consequences of their decisions." *Spurlock v. Fox*, 716 F.3d 383, 394 (6th Cir. 2013).

Nor can Plaintiffs demonstrate invidious purpose based on the statistics referenced in the press release and in the Director's interview. Statements of fact about the high incidence of COVID-19 among the Latino community and

throughout the agricultural industry may indicate that the Order will have a significant impact on Latinos, but they do not compel a finding that the impact motivated the Order.

Plaintiffs also argue that the scope of the Order is so inconsistent that the only logical explanation is an attempt to restrict Latinos. They argue that the Order cannot be based on living conditions because it requires testing of seasonal workers who do not stay at migrant camps. They argue that the Order cannot be based on working conditions because it requires testing of employees of meat, poultry, and egg processing facilities but not employees in other similar agricultural settings. They assert that many agricultural employers are exempt from testing requirements unless they hire migrant or seasonal workers, even while the working conditions remain constant. Finally, they assert that Defendants offer no evidence of any COVID-19 outbreak at a greenhouse facility and that several other industrial settings, such as skilled nursing facilities and construction sites, account for significantly greater numbers of outbreaks. Concluding that there is no practical reason for singling out these groups, Plaintiffs argue that the real motivation behind the Order is its negative effects on Latinos.

Plaintiffs' asserted conclusion does not follow from the facts they cite. That most workers subject to the Order's testing requirements are Latino is evidence of disparate impact but does not indicate discriminatory intent. Likewise, Plaintiffs have not **\*417** shown why failing to require testing of similar accommodations and agricultural settings where Latinos are not the majority is proof of improper purpose. They offer no legal authority for the proposition that the State must address all similar situations in unison. In any event, the Order references past outbreaks in migrant housing camps and food processing facilities, justifying the State's focus on those places. And while other settings might also benefit from compulsory testing, or might account for a greater number of outbreaks, that is not evidence that the Order's limited scope is racially motivated.

Put simply, Plaintiffs' argument requires us to view disparate impact as evidence of discriminatory motive. That is inconsistent with longstanding Supreme Court precedent requiring those asserting equal protection violations to show both impact and intent. *Pers. Adm'r of Mass.*, 442 U.S. at 272, 99 S.Ct. 2282; *Washington v. Davis*, 426 U.S. 229, 242, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) ("Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution. Standing alone, it does not trigger [strict scrutiny].") The requirement to show discriminatory impact is a high bar

that Plaintiffs have not met.

Because Plaintiffs did not establish that the Order had a discriminatory purpose, the district court correctly determined that the Order is subject to rational basis review, under which the government's action is presumed constitutional and Plaintiffs must "negate 'every conceivable basis which might support' it." *League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer*, 814 F. App'x 125, 128 (6th Cir. 2020) (quoting *Armour v. City of Indianapolis*, 566 U.S. 673, 681, 132 S.Ct. 2073, 182 L.Ed.2d 998 (2012)). Likewise, the district court correctly concluded that Plaintiffs could not disprove all possible permissible justifications for the Order, including Defendants' assertion that the Order is motivated by the State's rational desire to protect migrant workers, their families, their communities, and the food supply chain. Accordingly, Plaintiffs are unlikely to succeed on the merits of their appeal.

In addition, Plaintiffs have not demonstrated that enforcement of the Order will cause them irreparable harm. It is true that irreparable harm is presumed in cases of constitutional violations, but as noted above, the Order is not unconstitutional. *See Am. Civil Liberties Union of Ky. v. McCreary Cnty., Ky.*, 354 F.3d 438, 445 (6th Cir. 2003), *aff'd sub nom. McCreary Cnty., Ky. v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 125 S.Ct. 2722, 162 L.Ed.2d 729 (2005). The risks of a false positive, workers leaving the industry, or lost housing are too speculative to support injunctive relief. *See Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991) (holding that "the harm alleged must be both certain and immediate, rather than speculative or theoretical"). Nor is monetary loss or logistical burden sufficient. *Baker v. Adams Cnty./Ohio Valley Sch. Bd.*, 310 F.3d 927, 930 (6th Cir. 2002) (per curiam) (quoting *Sampson v. Murray*, 415 U.S. 61, 90, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974)) ("Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough.").

Meanwhile, enjoining the testing scheme poses a substantial risk of harm to others given that identifying and isolating COVID-19-positive workers limits the spread of the virus. The virus's effects on individual and community health is well documented; to the extent the Order is motivated by the legitimate government purpose of protecting migrant workers, **\*418** their families, their communities, and the food supply chain, enforcing it serves the public interest. And interceding in a State's administrative processes is an extreme step the federal judiciary typically avoids, especially as the State attempts to manage a pandemic.

Castillo v. Whitmer, 823 Fed.Appx. 413 (2020)

Finally, Plaintiffs' motion to expedite should be granted. "A party may move to expedite an appeal. The motion must show good cause to expedite." 6 Cir. R. 27(f). A party may move to expedite oral argument. 6 Cir. R. 34(c)(1). "[We] may expedite oral argument, even if the time to file briefs has not expired by the date of the expedited hearing." *Id.* If we schedule oral argument on an appeal from the grant or denial of a preliminary injunction, "argument will generally be expedited." 6 Cir. R. 34(c)(2). "When [we] grant[ ] a motion to expedite, the clerk will schedule oral argument at an early date. A judge may direct an earlier hearing." 6 Cir. R. 34(c)(3).

Defendants do not oppose expediting the case. The parties are cautioned that no extensions of the briefing schedule will issue absent a showing of good cause.

The motion for a preliminary injunction is **DENIED**. The motions to expedite and for leave to file an amicus brief are **GRANTED**.

**All Citations**

823 Fed.Appx. 413

---

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

820 Fed.Appx. 417
This case was not selected for publication in West's
Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued on or
after Jan. 1, 2007. See also U.S.Ct. of App. 6th Cir.
Rule 32.1.
United States Court of Appeals, Sixth Circuit.

DIRECT CONSTRUCTION SERVICES,
LLC; Timothy Drakeford, Plaintiffs-
Appellants,
v.
CITY OF DETROIT, MICHIGAN; Detroit
Land Bank Authority; Detroit Building
Authority; Tammy Daniels; Irene Tucker;
Boysie Jackson; Ron Crawford; Timothy
Palazzolo; Brian Farkas; Michael Edward
Duggan, Defendants-Appellees.

No. 19-1808
|
FILED July 23, 2020

**Synopsis**
**Background:** African American contractor and his
company brought §§ 1981 and 1983 action against city,
city building authority and city land bank authority, both
public-private corporations, and individuals in their official
capacities, alleging they were suspended and debarred
from demolition work under federally-funded program on
the basis of race, in retaliation for cooperating with the FBI,
and without due process. The United States District Court
for the Eastern District of Michigan, Paul D. Borman, J.,
2019 WL 1897128, dismissed action and denied plaintiffs'
motion for reconsideration, 2019 WL 2743533. Plaintiffs
appealed.

**Holdings:** The Court of Appeals, Merritt, Senior Circuit
Judge, held that:

complaints against individual defendants were properly
dismissed;

contractor failed to state a claim for municipal liability
under Monell;

contractor's allegations of due process deprivation were
insufficient to state a claim under § 1983;

contractor's allegations of retaliation were insufficient to

state a claim under § 1983;

contractor could not maintain § 1981 action; and

district court properly denied contractor's motion for
reconsideration.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion to Dismiss for
Failure to State a Claim; Motion for Reconsideration.

**\*419** ON APPEAL FROM THE UNITED STATES
DISTRICT COURT FOR THE EASTERN DISTRICT OF
MICHIGAN

**Attorneys and Law Firms**

Vanessa G. Fluker, Law Office, Detroit, MI, for Plaintiffs-
Appellants

James D. Noseda, City Of Detroit, Detroit, MI, for
Defendant-Appellee City of Detroit, MI, Boysie Jackson

David H. Fink, Fink Bressack, Bloomfield Hills, MI,
Nathan Joshua Fink, Fink & Associates Law, Bloomfield
Hills, MI, for Defendant-Appellee Detroit Land Bank
Authority

Kevin Joseph Campbell, Monica NaSha Hunt, The Allen
Law Group, Detroit, MI, for Defendants-appellees Detroit
Building Authority, Tammy Daniels, Irene Tucker, Ron
Crawford, Timothy M. Palazzolo, Brian Farkas

Before: MERRITT, GUY, and STRANCH, Circuit Judges.

**Opinion**

MERRITT, Circuit Judge.

This is an appeal from the dismissal, pursuant to Federal
Rule of Civil Procedure 12(b)(6), of a civil rights action
bringing claims under federal and state law. Plaintiffs
are an African-American individual, Timothy Drakeford, and
his company, Direct Construction Services. Defendants are
the City of Detroit, a municipal entity, the Detroit Building
Authority, a public-private corporation, and the Detroit
Land Bank Authority, also a public-private corporation.
Multiple individuals employed by these entities were also
sued exclusively in their official capacities.

**\*420** The Land Bank administers and oversees a program
that distributes federal funds to demolish and clean up
abandoned properties in Detroit. Plaintiffs participated in
this program by bidding on and being awarded a number of

demolition contracts by the Land Bank. The Office of the Inspector General for the City of Detroit determined that plaintiffs had altered photographs of properties they demolished in breach of the terms of their contracts. The crux of plaintiffs' complaint stems from the fact that the Land Bank barred plaintiffs from continued participation in the demolition program.

Plaintiffs allege that they were suspended and later barred from further demolition work, and did not receive payment for completed work, on the basis of race. They also claim that defendants retaliated against them because plaintiff Drakeford refused to alter bid numbers for the demolition work, and because Drakeford allegedly cooperated with the FBI during a federal investigation into the Land Bank's administration of the demolition program. Plaintiffs provide neither dates nor identities of individuals that would support these allegations, and plaintiffs fail to connect Drakeford's alleged actions to the claimed retaliation. The complaint relies on speculation and legal conclusions framed as "allegations." Plaintiffs' complaint fails adequately to allege facts supporting any cognizable constitutional violations, and fails to allege facts that, if proved, would show that any similarly situated company was treated differently. The claims against the individuals sued exclusively in their official capacities were properly dismissed because they are duplicative of the claims against the entities for which the individuals work. The district court did not exercise supplemental jurisdiction over the state-law claims, including breach of contract, and it dismissed those claims without prejudice.

Plaintiffs argue on appeal that if they were able to conduct discovery they would find factual support for their claims of race discrimination, retaliation, or other unjust treatment. But even with a generous reading of the complaint and its many attachments, plaintiffs have not set forth allegations sufficient to raise their claims of race discrimination and retaliation above a speculative level. We therefore affirm the judgment of the district court.

## I. Facts and Procedural History

The facts related below are taken from the complaint and its attached exhibits.[1] Plaintiff Timothy Drakeford and his company, plaintiff Direct Construction Services, participated in a program in Detroit called "Hardest Hit Funds," which permitted local municipalities to receive and distribute funding from the U.S. Treasury pursuant to the Emergency Economic Stabilization Act of 2008. A number of state, federal, municipal and quasi-public organizations and agencies are involved in the program.

The Detroit Land Bank Authority, a quasi-governmental entity, was formed to administer federal funds from the Hardest Hit program in Detroit. As part of the Hardest Hit program, the Land Bank may utilize federal funds for the demolition of residential housing that poses a safety and/or health risk. Complaint ¶ 21; Ex. 1. The Detroit Building Authority, also a quasi-public entity, contracted with the City of Detroit to coordinate and **\*421** implement a demolition program, which terms are set forth in the Demolition Management Agreement. Complaint at Ex. 2. The Land Bank, as the distributor of the federal funds, is the entity that contracts with the demolition companies. *See Id.* ¶¶ 22; Ex. 11. Minority contractors were solicited and encouraged to bid on demolition contracts. Direct Construction, a licensed and certified residential builder, bid on and was awarded contracts for demolition work on approximately 48 properties. Complaint Ex. 11. Plaintiffs allege that the demolition contracts were not awarded and administered in a fair and nondiscriminatory manner, "as reflected in the numerous news articles as well as personal experiences of many minority contractors." *Id.* ¶ 23. None of the "numerous news articles" or "many minority contractors" are specifically identified in the complaint.

Plaintiffs also claim that "some contractors including Plaintiffs were asked to change bidding and cost numbers after the initial invoicing to reflect compliance under the Hardest Hit Homeowners guidelines." *Id.* ¶ 24. This allegation apparently relates to an interview Drakeford gave to the Detroit News where he said he was approached and refused to "change numbers." *Id.* ¶ 25; Ex. 3 (news article dated Nov. 3, 2016). The date of the request and the individual who asked Drakeford to change bid numbers are not identified. The news article explains that the Land Bank and the Detroit Building Authority "commissioned an independent audit of the federally funded program" in the summer of 2016. The audit revealed that certain demolition costs had exceeded the federal cap, and that a former Building Authority employee, Aradondo Haskins, had improperly asked some of the demolition contractors to change their bid sheets after the work had been completed and invoiced in order to redistribute the excessive costs. *Id.* Ex. 3.[2] The news article concludes by saying that, in light of the audit, the Land Bank and the U.S Treasury came up with new procedures that went into effect in October 2016. Neither the Land Bank nor Direct Construction were accused of wrongdoing arising from the audit.

The complaint then alleges that plaintiffs "notice[d] that its payments were delayed and much more difficult to obtain from the [Land Bank] than larger white companies, such as Adamo and Homrich." Complaint ¶ 35. Plaintiffs also allege that minority contractors like them were "forced to do work outside the scope of the contract including cleaning trash from previous [sic] cleared properties." *Id.*

Plaintiffs allege that this "unfair treatment" became "very noticeable" and "an investigation into the hefty payments to white companies began." This allegation lacks basic information, including which contracts resulted in delayed payments, who "forced" plaintiffs to clean trash from properties, and when the incidents occurred.

Plaintiffs then allege that they received an immediate "Stop Work Order" in a letter from the Land Bank dated December 19, 2016. *Id.* ¶ 37. Plaintiffs allege that the letter contained no explanation for the Stop Work Order, but the letter itself, which is attached to the complaint, states that it is being issued due to "an ongoing investigation by the Office of the Inspector General of the City of Detroit into work performed by Direct Construction Services, **\*422** LLC." *Id.* Ex. 12.[3] An investigation by the third Inspector General into plaintiffs' performance of its contract began on December 1, 2016, and arose from routine monitoring of the contracts receiving federal funding. Contrary to their allegation, plaintiffs knew the reason for the Inspector General's investigation into their contract performance on December 19 when they received the stop-work letter because plaintiff Drakeford had been interviewed by the Inspector General on December 8. Because the Report is attached to the complaint, and was issued by a governmental agency, we may consider the facts in the Report.

According to the Report, the Inspector General received a complaint from the Land Bank on December 1, 2016, pursuant to routine monitoring of its demolition contracts. The Land Bank told the Inspector General that it suspected that plaintiffs had submitted altered photographs of the sidewalks adjacent to five of the properties plaintiffs had demolished. *See* Complaint ¶ 44; Ex. 21.[4]

According to the Inspector General's Report, one of its investigators interviewed plaintiff Drakeford on December 8, 2016, and Drakeford explained that he takes before and after photographs with his phone and that his company, Direct Construction, hires subcontractors to repair sidewalks. Drakeford subsequently identified the subcontractor as a Dan Daville or Dan Danville. On January 5, 2017, Drakeford provided the investigator with a photocopy of a cancelled check from May 2016 made out to a Dan Danvillarreal [sic] for $ 2,200 with a notation that it was for "Refund/Sidewalk Repair." Report at 4. The Inspector General contacted Dan Villarreal, who said he had not done any work for plaintiffs recently and had never altered photographs. Villarreal said the May 2016 check was a refund from plaintiffs for a demolition job plaintiffs were supposed to do for a private customer of Villarreal's. Report at 5. Drakeford stated that he did not verify that the subcontractor repaired the sidewalks on the five properties at issue, relying instead on the fact that the subcontractor

had pulled the sidewalk permits. Drakeford was unable to provide evidence of the permits to the investigator.

According to the Inspector General Report, Drakeford was shown the photographs of the five properties and agreed that they looked altered but stated that the subcontractor took the photographs and was responsible for forwarding the photos to Drakeford. Drakeford explained to the investigator that he broke his phone and was unable to produce the photographs he received from the subcontractor. Drakeford admitted to adding some "green spots" to at least one of the photographs in an effort to conceal tires that were on the property. Drakeford justified the alterations by stating that contractors were told to "brush out the tires" at a meeting with the Michigan State Housing Development Authority in the spring of 2016. *Id.* Plaintiffs also allege that a Land Bank employee advised Drakeford that if he had problems "cropping" the photos of the sites, **\*423** she would assist him. Complaint ¶ 43. In emails attached to the complaint, the instruction by the Land Bank related only to cropping photos in order to fit the site within the photograph. The emails do not instruct contractors to alter photographs to erase tires. *See* Complaint Ex. 20.

The Inspector General's forensic analysis of the photographs determined that plaintiffs had submitted falsified photographs for payment, that Drakeford admitted to altering at least one of the photographs, and that he tried to shift blame to a subcontractor who could not corroborate Drakeford's version of events. The Report concluded that all the falsified photographs were taken with a Samsung phone like the one owned by Drakeford. Report at 8. The Inspector General's "Conclusion" in the Report states:

> The [Land Bank] should be credited with discovering issues with the five properties in question through its normal review process. The [Inspector General] is aware that Direct Construction has demolished other properties for [the Land Bank]. Neither the [Land Bank] nor [the Inspector General] have specific information at this point indicating that Direct Construction failed to perform its work on other projects in a manner consistent with its contractual obligation. No issues were detected in earlier reviews. But given the false information submitted regarding the five properties, the [Inspector General] is concerned about the accuracy of all of the information submitted by Direct Construction. Direct Construction should not be paid for completed work until [the Land Bank] verifies through appropriate means that the work has in fact been done satisfactorily. Once the [Land Bank] is satisfied that all work has been completed as contractually specified, the [Land Bank] should evaluate whether payment is warranted.

...

The[Land Bank] should reevaluate its relationship with Direct Construction moving forward. Direct Construction submitted falsified photo for payment. Mr. Drakeford admitted to removing tires and other debris out of a photo ... because he knew the property in its current condition would not be acceptable to [the Michigan State Housing Development Authority.] However, he did not take responsibility for the other four properties [where falsified photos were submitted]. Instead, Mr. Drakeford blamed a subcontractor. The [Inspector General] attempted to verify Mr. Drakeford's assertion but the subcontractor denied ever doing work for Direct Construction.... [T]he City of Detroit Department of Public Works ... indicated that no sidewalk permits existed for the 5 properties. Additionally, Mr. Drakeford was unable to provide documentation to suggest that a subcontractor was indeed responsible.

...

Based on Mr. Drakeford's actions, the [Land Bank] should not allow Direct Construction to do work for the City of Detroit's demolition program.... At best, Direct Construction was negligent.... At worst, the firm acted in a purposely deceitful manner. In the future, the [Land Bank] and the City of Detroit should not continue its relationship with such contractors.

*Id.* at 7-8 (footnotes omitted).

The complaint narrative omits most of the information from the Inspector General's Report. Instead, plaintiffs allege simply that they received a letter from the Land Bank dated February 17, 2017, refusing to pay plaintiffs for work at five properties based on the Inspector General's Report. Complaint ¶ 38; Ex. 14. Plaintiffs **\*424** then allege that instead of being allowed to complete the work, plaintiff Drakeford was called into a meeting with the Land Bank and told he was indefinitely suspended. *Id.* ¶ 39; Exs. 15, 16. Plaintiffs try to frame the suspension as retaliatory by alleging that Drakeford was questioned by the FBI regarding "issues" at the Land Bank, but the complaint gives no indication of the subject matter or the timeframe of any FBI questioning of Drakeford. *Id.* ¶ 40. Plaintiffs were later removed from the list of suspended contractors. *Id.* ¶ 41; Ex. 17.

Plaintiffs allege that they were unable to get paid by the Land Bank during this time, causing several vendors to call in their bonds. *Id.* ¶ 42; Ex. 19. Plaintiffs allege that the Land Bank, "through Tammy Daniels, Irene Tucker, Boysie Jackson, Ron Crawford, Timothy Palazzolo, and Brian Farkas," acted in concert to allege and create a bogus picture of fraud by plaintiffs. Plaintiffs allege that this was "outrageous" because the conduct that Drakeford was accused of, and his company suspended for—altering photos of sidewalks—was directed by the Land Bank and the Building Authority. *Id.* ¶ 43. Plaintiffs continued to try to get paid for work already performed, but were unsuccessful. *Id.* ¶¶ 45-46; Exs. 24-27. Plaintiffs allege that the Land Bank, the Building Authority and the City of Detroit "collude[d] and retaliate[d] against contractors such as Plaintiffs." *Id.* ¶ 47. Plaintiffs allege that they were "suspended not because of work quality but because of a refusal to change numbers in bid packages." *Id.* Plaintiffs also allege that defendants Ron Crawford, Tim Palazzolo, and Tammy Daniels suspended plaintiffs without due process and created a disciplinary policy that they applied retroactively. *Id.*

In Count I, plaintiffs claim violations of 42 U.S.C. § 1981. They allege that "defendants"—no specific defendant is mentioned in Count I—discriminated against them on the grounds of race or color, and denied plaintiffs the rights and privileges that white citizens enjoy. They also claim that they have performed under their contracts but have not been paid in the same way that "white counterparts" have been paid. Complaint ¶¶ 50-53.

Count II claims due-process violations under 42 U.S.C. § 1983. Plaintiffs allege that defendants Ron Crawford, Tim Palazzolo and Tammy Daniels "violated Plaintiffs due process rights by suspending Plaintiff [sic] for violating a policy that had not been created ... and failed to apprise Plaintiffs of any appeal process...." Complaint ¶ 57. Plaintiffs further claim that the same three defendants violated due process "by improperly suspending Plaintiff Drak[e]ford, and even more outrageous, create [sic] a disciplinary policy after the discipline, and in violation of location ordnances [sic] and City of Detroit Charter." *Id.* ¶ 58.

In Count III, captioned "Retaliation," plaintiffs claim that "defendants" and specifically Brian Farkas, retaliated against plaintiffs because "Plaintiff refused to change numbers in a bid package. Defendant Brian Farkas open [sic] and publicly stated that plaintiffs would never work for the [Land Bank] or [Building Authority] again and within 60 days, Plaintiffs' [sic] were suspended and under a stop work order under [sic], although white counterparts were not suspended or subjected to retaliation." *Id.* ¶ 60. Plaintiffs further allege that "Plaintiff was singled out with retaliation after refusing to change numbers and for cooperating with the FBI during their investigation in the Detroit area after Plaintiff Timothy Drakeford." [sic] *Id.* ¶ 61.

The remaining three counts bring claims under state law:

**Direct Construction Services, LLC v. City of Detroit, Michigan, 820 Fed.Appx. 417 (2020)**

Count IV alleges a violation **\*425** of Elliot Larsen Civil Rights Act; Count V alleges breach of contract against the Detroit Land Bank and "all Defendants in their official capacity" for breach of the agreement by failing to perform; and Count VI alleges a claim for "Concert of Action."

Defendants moved to dismiss under Rule 12(b)(6). The district court granted the motions on the federal claims as to all defendants, and it declined to exercise supplemental jurisdiction over the state claims, dismissing them without prejudice. *Direct Constr. Servs., LLC, v. City of Detroit*, No. 18-cv-12356, 2019 WL 1897128 (E.D. Mich. Apr. 29, 2019). Plaintiffs filed a motion for reconsideration, which was denied. *Direct Constr. Servs., LLC, v. City of Detroit*, No. 18-cv-12356, 2019 WL 2743533 (E.D. Mich. July 1, 2019). This appeal followed.

## II. Discussion

### A. Legal Standard for Reviewing Grant of Motion to Dismiss

This court reviews *de novo* a district court's grant of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *Jones v. City of Cincinnati*, 521 F.3d 555, 559 (6th Cir. 2008). Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." It will survive a motion to dismiss if the plaintiff alleges facts that "state a claim to relief that is plausible on its face" and that, if accepted as true, are sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). The complaint must "contain either direct or inferential allegations respecting all material elements to sustain a recovery under some viable legal theory." *Eidson v. Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007) (citing *Mezibov v. Allen*, 411 F.3d 712, 716 (6th Cir. 2005)).

When reviewing a motion to dismiss under Rule 12(b)(6), we must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Handy-Clay v. City of Memphis*, 695 F.3d 531, 538 (6th Cir. 2012). We need not accept as true "a legal conclusion couched as a factual allegation," *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955 (citation and internal quotation marks

omitted), or an "unwarranted factual inference." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007) (citation and internal quotation marks omitted). We have reiterated that "[t]o survive a motion to dismiss, a litigant must allege enough facts to make it plausible that the defendant bears legal liability. The facts cannot make it merely possible that the defendant is liable; they must make it plausible." *Agema v. City of Allegan*, 826 F.3d 326, 331 (6th Cir. 2016) (citing *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937) (internal citation omitted); *see League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) ("The factual allegations, assumed to be true, must do more than create speculation or suspicion of a legally cognizable cause of action; they must show *entitlement* to relief.") (emphasis in original).

### B. The Individual Defendants Are Named Only in Their Official Capacities

"An individual-capacity claim is distinct from a claim against a defendant in his official capacity. The former claim may attach personal liability to the government official, whereas the latter may attach liability only to the governmental entity." **\*426** *Essex v. Cty. of Livingston*, 518 F. App'x 351, 354 (6th Cir. 2013) (citing *Kentucky v. Graham*, 473 U.S. 159, 165–67, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985)) (internal citation omitted). "In other words, an official-capacity claim is merely another name for a claim against the municipality." *Id*. (citing *Cady v. Arenac Cty.*, 574 F.3d 334, 342 (6th Cir. 2009)); *see also Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) (An action premised on an official-capacity claim "is not a suit against the official but rather is a suit against the official's office.").

Plaintiffs sued three entities, the City of Detroit, the Detroit Building Authority, and the Detroit Land Bank Authority, along with multiple officers and employees of those entities expressly in their official capacities only. The caption of the complaint expressly designates that each of the individual defendants is being sued "in his [or her] official capacity," and the allegations in the complaint defining these individuals reiterates that each is named "in his [or her] official capacity." Complaint ¶¶ 7-12. Nothing in the complaint suggests individual capacity claims against any of the individual defendants. Given plaintiffs' unambiguous reference to the individual defendants only in their official capacities, the plaintiffs' claims against each individual defendant were properly dismissed.

Direct Construction Services, LLC v. City of Detroit, Michigan, 820 Fed.Appx. 417 (2020)

**C. Plaintiffs Fail to State a Municipal Liability Claim Under § 1983 Against the City of Detroit, the Detroit Building Authority, and the Detroit Land Bank**

To succeed on their § 1983 federal constitutional claims in Count II (due process) and Count III (retaliation), plaintiffs must allege that a policy or custom of the entity is responsible for their injuries. A local government violates § 1983 when an official policy or custom deprives an individual of her constitutional rights. *Monell v. New York Dept. of Soc. Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Leach v. Shelby Cty. Sheriff*, 891 F.2d 1241, 1245 (6th Cir. 1989) ("[B]efore a local government can be held liable for injuries under section 1983, whether the suit is pleaded as an official capacity suit or a suit against the local government, a plaintiff must show that his injuries were the result of some 'policy or custom' attributable to the governmental entity."). A municipality "may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Monell*, 436 U.S. at 694, 98 S.Ct. 2018. We have recognized specific parameters for establishing a *Monell* claim. A plaintiff can make a showing of an illegal policy or custom by demonstrating one of the following: (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations. *See Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005).

In its order denying plaintiffs' motion for reconsideration, the district court succinctly summed up the problem with plaintiffs' § 1983 claims and the reason they could not survive a motion to dismiss:

> Plaintiffs' claims in this case have been a moving target of confusingly articulated theories of liability. The Plaintiffs expressly sued only municipal Defendants and individual Defendants in their official capacities, yet the Complaint did not assert any type of policy claim under *Monell v. Department of Social Servs.*, 436 U.S. 658 [98 S.Ct. 2018, 56 L.Ed.2d 611] (1978), and did not identify any policy, custom, or practice as the basis for such a claim. Nor did Plaintiffs reference **\*427** or discuss any such policy, custom, or practice in their briefing on the motions to dismiss. The Complaint contained no factual content plausibly suggesting a *Monell* claim....

2019 WL 2743533, at \*2. Plaintiffs argue on appeal, as they did in their motion for reconsideration below, that the "policy" basis for their *Monell* claims is tolerance of or acquiescence in federal-rights violations. This claim was not timely raised below, and, in any event, plaintiffs have not identified facts supporting a pattern of racial intolerance or acquiescence by any of the three entity defendants. The complaint does not distinguish the conduct

of one entity from another, let alone allege a plausible policy claim against each one of them.

Count II alleges that plaintiffs were deprived of due process because Drakeford was improperly suspended from the contractor list based on "a disciplinary policy" that was instituted after the suspension had been imposed. Complaint ¶ 58; Plaintiffs' Response to the Detroit Land Bank's Motion to Dismiss at 3 ("the policy Plaintiff was suspended under was not created until after he was disciplined."). As the alleged policy, which plaintiffs do not articulate, was created after the suspension, it could not have caused the Inspector General's investigation into Direct Construction or the issuance of the stop work order to the company. Count II was properly dismissed.

In Count III, the retaliation claim, plaintiffs allege that the motivating force behind the suspension was either race discrimination or retaliation for plaintiffs' cooperation with the FBI. However, there are no dates or other facts temporally relating plaintiffs' suspension to anything he may have said to the FBI. Plaintiffs include no facts as to the nature of their "cooperat[ion] with the FBI." Plaintiffs' complaint fails to set forth facts that, if proven, demonstrate that plaintiffs were suspended from the demolition program in retaliation rather than as a legitimate response to their own conduct in falsifying photographs.

As for any retaliation on the basis of race, other than invoking his African-American ethnicity and the fact that Direct Construction is minority owned, plaintiffs offer no facts demonstrating any discriminatory policies or customs other than a bald allegation that "white counterparts were not suspended or subjected to retaliation." Plaintiffs plead no facts plausibly suggesting that the "white contractors" referred to in the complaint, "Adamo" and "Homrich," were "similarly situated" to the plaintiffs or were treated differently. There is no allegation or evidence that either company submitted altered photographs pursuant to their demolition contracts but had not been disciplined or suspended. The conclusory allegations that plaintiffs were treated differently from two white contractors fail to state a retaliation claim "that is plausible on its face." *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955.

Plaintiffs fail to meet the threshold pleading standard as to a *Monell* claim against the City of Detroit, the Detroit Building Authority, or the Detroit Land Bank. None of the allegations in the complaint plausibly suggest how any policy, custom, or practice of any of the three municipal or quasi-municipal entity defendants could support a claim of municipal liability.

**D. Plaintiffs Fail to State a Claim Under § 1981**

Enacted as part of the Civil Rights Act of 1866, 42 U.S.C. § 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in **\*428** every State and Territory to make and enforce contracts" without regard to race. The statute defines the phrase "make and enforce contracts" to include the "making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). However, "§ 1983 provides the exclusive remedy for constitutional violations." *Foster v. Michigan*, 573 F. App'x 377, 391 (6th Cir. 2014). We have held that a "plaintiff cannot use § 1981 to sue a state actor in his or her official capacity." *McCormick v. Miami Univ.*, 693 F.3d 654, 660 (6th Cir. 2012) (citing *Grinter v. Knight*, 532 F.3d 567, 577 (6th Cir. 2008) ("§ 1983 provides an exclusive remedy for violations against state actors sued in their official capacities. An official capacity lawsuit against ... a state actor[ ] for constitutional violations, such as race discrimination, cannot be brought under § 1981.") (alterations in original)). As the Supreme Court explained in *Jett v. Dallas Independent School District*, 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989):

> Given our repeated recognition that the Fourteenth Amendment was intended in large part to embody and expand the protections of the 1866 Act as against state actors, we believe that the logic of these decisions applies with equal force to petitioner's invitation to this Court to create a damages remedy broader than § 1983 from the declaration of rights now found in § 1981. We hold that the express "action at law" provided by § 1983 for the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws," provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor. Thus to prevail on his claim for damages against the school district, petitioner must show that the violation of his "right to make contracts" protected by § 1981 was caused by a custom or policy within the meaning of *Monell* and subsequent cases.

*Id.* at 735-36, 109 S.Ct. 2702. Accordingly, § 1983 is the sole vehicle for plaintiffs' damage claim, and, as described above, plaintiffs fail to state a policy claim against the entity defendants under § 1983. Plaintiffs' § 1981 claim is not saved because they request injunctive relief. The remedy for past discrimination, which is all that plaintiffs plead, is monetary damages. We affirm the dismissal of plaintiffs' claim under 42 U.S.C. § 1981.

**E. Supplemental Jurisdiction Over Plaintiffs' State Law Claims**

Given the absence of a viable federal claim, the district court declined to exercise supplemental jurisdiction over plaintiffs' state law claims against all defendants under the Elliot-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2501, *et seq.*, for breach of contract, and for concert of action. It dismissed them without prejudice, and plaintiffs are free to file these claims in state court.

**F. Denial of Motion for Reconsideration**

The district court properly denied plaintiffs' motion for reconsideration. Under Rule 59(e), parties cannot use a motion for reconsideration to raise new legal arguments that could have been raised before a judgment was issued. *Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 374 (6th Cir. 1998) (stating that "[a] motion under Rule 59(e) is not an opportunity to re-argue a case"). Rather, a motion under Rule 59(e) must either clearly establish a manifest error of law or must present newly discovered evidence. **\*429** *Roger Miller Music, Inc. v. Sony/ATV Publ'g, LLC*, 477 F.3d 383, 395 (6th Cir. 2007); *see also Walker v. Mich. Dep't of Corr.*, 128 F. App'x 441, 447 (6th Cir. 2005).

Plaintiffs based their motion for reconsideration on two exhibits attached to the motion. The first was a Detroit Office of the Inspector General Report from December 2018 issued after an investigation into "large-unit" contractor meeting. Plaintiffs were not involved in the large-unit contractor meeting or the Inspector General's investigation in any way. In any event, the Report concluded, "[b]ased on our review of documents and interviews conducted for this particular matter, we conclude the large-unit contractor meeting did not violate any existing [Land Bank] policies pertaining to the use of the Hardest Hit Funds." The other exhibit is an article from the Detroit News dated April 8, 2019. It reports on the filing of federal embezzlement charges against two men, one of whom is Aradondo Haskins, the former Detroit Building Authority employee who was involved in the bid-altering issue. Plaintiffs do not explain how the indictment of Haskins affects their claims. A federal audit cleared the Land Bank of any wrongdoing related to Haskins' misconduct while he was an employee of the Detroit Building Authority. There is no information in either exhibit that has any bearing on plaintiffs' claims.

For the foregoing reasons, we affirm the judgment of the district court.

Direct Construction Services, LLC v. City of Detroit, Michigan, 820 Fed.Appx. 417 (2020)

**All Citations**                                          820 Fed.Appx. 417

Footnotes

1       In ruling on a motion to dismiss, the court may consider the complaint as well as (1) documents that are referenced in the plaintiff's
        complaint and that are central to plaintiff's claims, (2) matters of which a court may take judicial notice, (3) documents that are a
        matter of public record, and (4) letters that constitute decisions of a governmental agency. *Thomas v. Noder-Love*, 621 F. App'x 825,
        829 (6th Cir. 2015).

2       According to a separate news article submitted by plaintiffs as an exhibit to their motion for reconsideration of the order granting the
        motion to dismiss, Haskins was later indicted by federal authorities for unauthorized use of federal funds.

3       The complaint omits many facts concerning the investigation into plaintiffs' performance under its contracts. A full recitation of the
        facts can be found in the Inspector General's Report, which was issued on February 1, 2017, and is attached to the complaint. Ex.
        21.

4       The demolition contractors are required by the terms of their contracts with the Land Bank to submit "before and after" photographs
        of sidewalks, drive approaches, neighboring residences and/or structures, near properties to be demolished. The contractors are
        required to protect sidewalks from damage or pay to repair or replace any damage resulting from the demolition work.

---

**End of Document**                                 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.                                          7

2024 WL 2847368
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

John DOE, on behalf of himself and
others similarly situated, Plaintiff,
v.
NEW YORK UNIVERSITY, Defendant.

23-CV-10515 (VSB)
|
Signed May 30, 2024

**Attorneys and Law Firms**

Jonathan F. Mitchell, Mitchell Law PLLC, Austin, TX, Ronald A. Berutti, Murray-Nolan Berutti LLC, Clark, NJ, Christopher Ernest Mills, Spero Law LLC, Charleston, SC, Counsel for Plaintiff.

Joshua Adam Matz, Raymond P. Tolentino, Kaplan Hecker & Fink LLP, Washington, DC, Roberta Ann Kaplan, Gabrielle Tenzer, Amit Jain, Kaplan Hecker & Fink LLP, New York, NY, Counsel for Defendant.

**OPINION & ORDER**

VERNON S. BRODERICK, United States District Judge:

**\*1** Plaintiff John Doe brings this putative class-action lawsuit against Defendant New York University ("NYU"), alleging that the membership-selection process for the NYU Law Review ("Law Review") violates Title VI of the Civil Rights Act of 1964 ("Title VI"), 42 U.S.C. § 2000d, Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681(a), and 42 U.S.C. § 1983 ("Section 1983"), by giving preferential treatment to women, non-Asian, homosexual, and transgender students.[1] Before me is NYU's motion to dismiss under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. Because I lack subject-matter jurisdiction and, in any event, the complaint fails to state a claim, the motion to dismiss is GRANTED. Accordingly, Doe's complaint is DISMISSED without prejudice.

**I. Background**[2]

**A.** *Factual Background*

The Law Review is a student-run academic journal that publishes legal scholarship. (Compl. ¶ 5.) The students who run the Law Review—commonly referred to as editors—select the articles that the Law Review publishes and the students who are invited to join its ranks. (*Id.*) Before the Supreme Court's decision in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College ("SFFA"),* 600 U.S. 181 (2023), the Law Review would select fifty new editors each year from the rising second-year class. (Compl. ¶ 9.) Of the fifty students, fifteen were selected based on their performance on a writing competition, fifteen were selected based on their first-year grades, and eight were selected based on a combination of their writing-competition scores and first-year grades. (*Id.*) The remaining twelve spots were filled by the Law Review's Diversity Committee ("Diversity Committee"). (*Id.* ¶ 10.)

**\*2** To select students to fill these twelve spots, the Law Review required applicants to draft personal statements and permitted them to submit anonymized résumés. (*Id.* ¶¶ 11–12.) In evaluating personal statements, the Diversity Committee considered factors that included (but were not limited to) the applicant's "race, ethnicity, gender, sexual orientation, national origin, religion, socio-economic background, ideological viewpoint, disability, and age." (*Id.* ¶ 11.) The résumés, meanwhile, were intended to provide the Diversity Committee with "personal and professional information that cannot be easily communicated through a personal statement." (*Id.* ¶ 12.)

In the wake of the Supreme Court's decision in *SFFA*, "the Law Review changed its website in an attempt to obscure the details of its membership-selection process." (*Id.* ¶ 13.) The Law Review's website, for example, "no longer mentions the diversity set-aside" or "the role that grades will play in the selection of law-review members."[3] (*Id.*) It also no longer mentions the Diversity Committee. (Compl., Ex. 1.) Despite these changes, the Law Review continues to emphasize the important role that diversity plays in the selection of its members. (*Id.* ¶ 14.) To that end, the Law Review requires each applicant to submit a statement of interest that provides "a more comprehensive view of [him or her] as an individual." (Compl., Ex. 1 at 2.) Students also have the option of submitting a résumé, which the Law Review uses to "realize its commitment to staff diversity." (*Id.*) The Law Review "is using these statements of interest and résumés to give preferential treatment to women, non-Asian racial minorities, homosexuals, and transgender people when selecting its members." (Compl. ¶ 15 (internal quotation marks omitted).) "And the Law Review intends to continue these unlawful and discriminatory practices until it is enjoined from doing so." (*Id.*)

Doe v. New York University, Not Reported in Fed. Supp. (2024)

**B.** *Facts Related to Standing*

Doe is a first-year law student at New York University Law School. (*Id.* ¶ 16.) He describes himself as a heterosexual white man, "consistent with his biologically assigned sex." (*Id.* ¶ 18.) Like many first-year law students, Doe aspires to join his school's law review.[4] (*Id.* ¶ 17.) He plans on applying for Law Review in the summer of 2024. (*Id.*) Doe claims, however, that as a heterosexual white man, he "will be subject to race and sex discrimination" and "denied an equal opportunity to compete for membership." (*Id.* ¶ 19.)

## II. Procedural History

On December 1, 2023, Plaintiff filed a complaint using the pseudonym John Doe.[5] Shortly after filing suit, Doe filed a motion to expedite discovery. (Doc. 10.) I subsequently referred this case (and the discovery motion) to Magistrate Judge Sarah Netburn for general pretrial management. (Doc. 11.) On December 7, 2023, Judge Netburn denied the motion without prejudice, providing Doe leave to renew his request after counsel for NYU filed a notice of appearance. (Doc. 13.) Two weeks later, counsel for NYU appeared. (Docs. 15–18.) The next day, Doe filed a renewed motion to expedite discovery. (Doc. 25.) NYU opposed the motion. (Doc. 28.) On January 10, 2024, Judge Netburn held a hearing with the parties, at which she denied the motion without prejudice to refiling after the "Law Review has issued its operative criteria for selection to the Law Review." (Doc. 32.)

**\*3** On January 24, 2024, Doe filed a motion to certify the class under Rule 23 of the Federal Rules of Civil Procedure. (Doc. 36.) Five days later, NYU moved to dismiss the Complaint pursuant to Rules 12(b)(1) and 12(b)(6). (Doc. 42.) On NYU's request, Judge Netburn adjourned briefing on Doe's motion to certify the class pending my decision on the motion to dismiss. (Docs. 45, 47.) Doe filed its opposition to NYU's motion to dismiss on February 20, 2024. (Doc. 48.) On March 1, 2024, NYU filed a reply in support of its motion to dismiss. (Doc. 50.)

## III. Legal Standards

**A.** *Federal Rule of Civil Procedure 12(b)(1)*

A district court properly dismisses an action under Rule 12(b)(1) if the court "lacks the statutory or constitutional power to adjudicate it." *Garcia v. Lasalle Bank NA.*, No. 16-CV-3485, 2017 WL 253070, at \*3 (S.D.N.Y. Jan. 19, 2017) (quoting *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.A.R.L.*, 790 F.3d 411, 416–17 (2d Cir. 2015)). "The plaintiff bears the burden of proving subject[-]matter jurisdiction by a preponderance of the evidence." *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005). While a court resolving a motion to dismiss under Rule 12(b)(1) "must take all uncontroverted facts in the complaint ... as true, and draw all reasonable inferences in favor of the party asserting jurisdiction," "where jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits," in which case "the party asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014) (internal quotation marks and alterations omitted); *Ernst v. Gateway Plaza Mgmt. Corp.*, No. 11-CV-1169, 2012 WL 1438347, at \*2 (S.D.N.Y. Mar. 14, 2012) ("In deciding jurisdictional issues, the court may rely on affidavits and other evidence outside the pleadings."), *report and recommendation adopted*, No. 11-CV-1169, 2012 WL 1438263 (S.D.N.Y. Apr. 25, 2012).

**B.** *Federal Rules of Civil Procedure 12(b)(6)*

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed, where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. Accordingly, a district court must accept as true all well-pleaded factual allegations in the complaint, and draw all inferences in the plaintiff's favor. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). However, that tenet "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.

Doe v. New York University, Not Reported in Fed. Supp. (2024)

**IV. Discussion**

**A. *Lack of Subject Matter Jurisdiction***

**1. Applicable Law**

Article III of the Constitution limits federal-court jurisdiction to "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. The case-or-controversy requirement is enforced through several justiciability doctrines. Among them are the doctrines of ripeness and standing, which are "intended to ensure that the federal courts do not exceed their Constitutional grant of authority." *Benjamin v. Town of Islip*, No. 20-CV-56, 2021 WL 8344132, at *2 (E.D.N.Y. Aug. 12, 2021), *report and recommendation adopted*, No. 20-CV-56, 2022 WL 1090608 (E.D.N.Y. Apr. 12, 2022).

**\*4** To establish standing under Article III, (1) "the plaintiff must have suffered an injury in fact," i.e., "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical"; (2) "there must be a causal connection between the injury and the conduct complained of"; and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up).

Constitutional ripeness is best thought of as a "specific application of the actual injury aspect of Article III standing." *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 688 (2d Cir. 2013). "To say a plaintiff's claim is constitutionally unripe is to say the plaintiff's claimed injury, if any, is not 'actual or imminent,' but instead 'conjectural or hypothetical.' " *Mtume v. Sony Music Ent.*, No. 18-CV-11747, 2020 WL 832814, at *4 (S.D.N.Y. Feb. 20, 2020) (quoting *Nat'l Org. for Marriage*, 714 F.3d at 688). For that reason, where, as here, the first of standing's three elements is at issue, courts often address standing and constitutional ripeness challenges together. *See, e.g.*, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 n.5 (2014); *Nat'l Org. for Marriage*, 714 F.3d at 689 n.6; *N.Y. C.L. Union v. Grandeau*, 528 F.3d 122, 130 n.8 (2d Cir. 2008); *SC Note Acquisitions, LLC v. Wells Fargo Bank, N.A.*, 934 F. Supp. 2d 516, 526 (E.D.N.Y. 2013), *aff'd*, 548 F. App'x 741 (2d Cir. 2014). I will use that approach here.

**2. Application**

At this time, Doe's case "is riddled with contingencies and speculation that impede judicial review." *Trump v. New York*, 592 U.S. 125, 131 (2020). As an initial matter, the alleged discrimination has not yet occurred and will occur only if (1) Doe applies to the Law Review; (2) students (or, more specifically, women, non-Asian, homosexual, or transgender students) submit statements of interest or résumés that identify their sex, gender, race, or sexuality; (3) the Law Review editors unlawfully select students based on sex, gender, race, or sexuality; and (4) Doe fails to gain admission to the Law Review. Although Doe intends to apply for Law Review, (Compl. ¶ 17), considerable speculation undergirds Doe's belief that students will share their sex, race, gender identity, or sexual orientation in their applications, and that the Law Review editors will select students based on those characteristics. Doe has not alleged, for instance, that the editors overseeing the selection process have drafted the prompts for the statement of interest, or that the prompts will provoke students to discuss these specific characteristics.[6] (*Id.*, Ex. 1 at 2.) Nor has Doe alleged how the Law Review will collect such information from anonymized résumés, especially since that component of the application is entirely optional. (*Id.*) Even if I were to indulge Doe's belief that some students will reveal this information in their application, it is a speculative leap to conclude that the Law Review is flouting its own facially neutral policy for selecting new editors and instead impermissibly relying on the sex, gender, race, or sexuality of applicants. (*Id.* ¶ 15.) Any prediction regarding what information students may share with the Law Review or how that information may be used is therefore "no more than conjecture" at this time. *See Los Angeles v. Lyons*, 461 U.S. 95, 108 (1983).

**\*5** In maintaining that his allegations of harm are "certainly impending," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 & n.5 (2013), Doe points principally to two allegations in his Complaint: that the Law Review (1) "is using ... statements of interest and résumés to give preferential treatment to women, non-Asian racial minorities, homosexuals, and transgender people when selecting its members"; and (2) "intends to continue these unlawful and discriminatory practices until it is enjoined from doing so." (Compl. ¶ 15 (internal quotation marks omitted).) These allegations are speculative, devoid of any factual support, and therefore fail to support Doe's argument. *See Menard v. CSX Transp., Inc.*, 698 F.3d 40, 45 (1st Cir. 2012) (disregarding "assertions nominally cast in factual terms but so general and conclusory as to amount merely to an assertion that unspecified facts exist to conform to the legal blueprint"). The Complaint does not plead, in other than a conclusory way, how the Law Review is discriminating now or will discriminate in the future. Doe does not assert, for instance, the nature of the "preferential treatment" the Law Review is giving to women, non-Asian racial minorities, homosexuals, and transgender students. Nor

Doe v. New York University, Not Reported in Fed. Supp. (2024)

does he allege which editors agreed to disregard the Law Review's announced policy. He also fails to provide any examples of discriminatory acts or statements by the Law Review or its editors. Similarly, Doe never explains the basis for his belief that the facially lawful selection policy is masking an otherwise unlawful selection process. Such an utter lack of specificity is insufficient to confer Doe with standing to bring this suit. *See Baur v. Veneman*, 352 F.3d 625, 636–37 (2d Cir. 2003) ("[A] plaintiff cannot rely solely on conclusory allegations of injury or ask the court to draw unwarranted inferences in order to find standing.").

To be sure, Doe has alleged how the Law Review may come to learn information about the sex, race, gender identity, or sexual orientation of applicants during the editor-selection process. Indeed, the Law Review invites students to submit statements of interest and résumés, (Compl., Ex. 1 at 2), either one of which can be used to highlight one's personal characteristics. However, the fact that the Law Review may ultimately learn an applicant's sex, race, gender identity, or sexual orientation does not suggest that it will turn around and use that information unlawfully. Doe's claim of discrimination is based on nothing more than an assertion that such unlawful conduct is occurring, without explaining how he knows that to be true or alleging instances of past discrimination. Because something more than a bald assertion is required, *see Allen v. Credit Suisse Sec. (USA), LLC*, 895 F.3d 214, 222 (2d Cir. 2018) ("Bald assertions and conclusions of law will not suffice to avoid dismissal, nor will factual allegations that are wholly conclusory." (internal quotation marks, alterations, and citations omitted)), this purported injury cannot confer Doe with standing.

To ameliorate the deficiencies that infect his Complaint, Doe attempts to reframe the nature of his injury as the "deni[al] [of] an equal opportunity to compete for membership on the Law Review." (Compl. ¶ 19.) However, considering the lack of any well-pleaded allegations of a discriminatory selection process, this purported injury likewise rests on nothing more than speculation and conjecture. Moreover, the case on which Doe relies in support of this theory of standing— *Northeastern Florida Chapter of Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656 (1993)—is inapposite. (*Id.*) In *Jacksonville*, the Supreme Court recognized that "in the context of a challenge to a set-aside program, the 'injury in fact' is the inability to compete on an equal footing in the bidding process, not the loss of a contract." 508 U.S. at 666. To establish such an injury, however, there must be a "government-erected barrier," not one established by a private party. *See Comer v. Cisneros*, 37 F.3d 775, 793 (2d Cir. 1994) (applying *Jacksonville* and recognizing that the existence of a "government-erected barrier" is a necessary

element for standing); *Roberts v. Bassett*, No. 22-622-CV, 2022 WL 16936210, at *2 (2d Cir. Nov. 15, 2022) (same); *Fac., Alumni, & Students Opposed to Racial Preferences v. N.Y. Univ. L. Rev. ("FASORP II")*, No. 18-CV-9184, 2020 WL 1529311, at *6 (S.D.N.Y. Mar. 31, 2020) (same), *aff'd*, 11 F.4th 68 (2d Cir. 2021). Because the allegedly discriminatory policies here were implemented by the Law Review, which is plainly not a governmental entity, Doe's reliance on *Jacksonville* is misplaced and cannot provide him with a basis for standing to maintain this case.

**B. *Failure to State a Claim***

**1. Title VI and IX**

**\*6** Even assuming Doe had standing to bring this suit and his claims were ripe, I would still dismiss the Complaint for failure to state a claim under Title VI and IX. *See* 42 U.S.C. § 2000d ("No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."); 20 U.S.C. § 1681(a) ("No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."). "Congress modeled Title IX after Title VI of the Civil Rights Act of 1964, and passed Title IX with the explicit understanding that it would be interpreted as Title VI was." *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 258 (2009) (citation omitted).

As an initial matter, Doe's allegations that the Law Review's membership-selection process is inconsistent with Titles VI and IX are conclusory and undermined by the plain text of the facially neutral policy. Although Doe alleges that the Law Review "is using ... statements of interest and résumés to give preferential treatment to [select minority groups]" and "intends to continue" doing so, (Compl. ¶ 15), he offers no factual allegations in support of that assertion, *see Kajoshaj v. N.Y.C. Dep't of Educ.*, 543 F. App'x 11, 14 (2d Cir. 2013) ("[N]aked allegation that [the plaintiffs] were treated differently from non-Muslim, non-Albanians cannot demonstrate a plausible entitlement to Title VI relief." (internal quotation marks omitted)); *Manolov v. Borough of Manhattan Comm. Coll.*, 952 F. Supp. 2d 522, 532–33 (S.D.N.Y. 2013) (dismissing Title VI and IX claims where complaint alleged that professors "intentionally treated all white males ... in an adverse manner" but failed to allege "any

facts suggesting that he or other white males were treated differently than other students" (internal quotation marks and emphasis omitted)). It was incumbent upon Doe to include facts supporting his allegation that NYU is giving and intends to give preferential treatment to certain minority groups. *See FASORP II*, 2020 WL 1529311, at \*7 ("FASORP fails to proffer any factual allegation describing the [NYU] Law Review's article-selection process other than alleging that the Law Review receives background information of the authors and asserting in a conclusory way that the process is discriminatory, which is fatal to its article selection claim."); *Fac., Alumni, & Students Opposed to Racial Preferences v. Harvard L. Rev. Ass'n*, No. 18-CV-12105, 2019 WL 3754023, at \*9 (D. Mass. Aug. 8, 2019) ("The complete absence of 'factual material' ... is fatal to the plaintiffs' claim of discriminatory article selection.").

Although the Law Review considered sex, race, gender identity, or sexual orientation before the Supreme Court's decision in *SFFA*, nothing about this practice was unlawful. *See, e.g.*, *Fisher v. Univ. of Tex. at Austin*, 579 U.S. 365, 381 (2016) (holding that universities "may institute a race-conscious admissions program as a means of obtaining the educational benefits that flow from student body diversity" on campus (internal quotation marks omitted)); *Grutter v. Bollinger*, 539 U.S. 306, 338 (2003) (holding that law school could consider "a personal statement, letters of recommendation, and an essay describing the ways in which the applicant will contribute to the life and diversity of the Law School"). Indeed, in *FASORP II*, Judge Edgardo Ramos came to the same conclusion.[7] *See FASORP II*, 2020 WL 1529311, at \*7 (concluding that the plaintiff failed to plausibly allege that the Law Review's "facially holistic [membership-selection] process ... [is an] unlawful quota or set-aside program"). Accordingly, the Law Review's lawful practices of the past do not and cannot give rise to a plausible inference of discrimination today. *See Doe v. Columbia Univ.*, 831 F.3d 46, 55 (2d Cir. 2016) (requiring enough facts to support a "minimal plausible inference"); *Handy-Clay v. City of Memphis*, 695 F.3d 531, 539 (6th Cir. 2012) ("We need not accept as true ... an unwarranted factual inference." (internal quotation marks omitted)).

**\*7** The Law Review's ongoing commitment to diversity does not alter my conclusion. As an initial matter, the revised selection policy does not identify a particular type of applicant diversity. (*See* Compl., Ex. 1 at 2 (describing the statement of interest as "an opportunity for applicants to provide the Selection Committee a more comprehensive view of who [they] are as an individual"); *id.* (explaining that the résumé can be "used to share personal and professional information that cannot be easily communicated through a personal statement").) Among the

many aspects of diversity, several do not relate to any legally protected classification, such as life experience, political ideology, academic interests, and socioeconomic background. Considering the lack of any language in the selection policy demonstrating a preference for students of a protected class and the absence of any allegations supporting the inference that the selection policy would result in preferential treatment of such students, I cannot conclude that the Law Review's continued commitment to diversity gives rise to a plausible inference of unlawful conduct.

Finally, the Complaint does not plausibly allege any intentional discrimination by NYU. *See Alexander v. Sandoval*, 532 U.S. 275, 281 (2001) (Title VI); *Doe v. N.Y. Univ.*, 438 F. Supp. 3d 172, 181 (S.D.N.Y. 2020) (Title IX). To the contrary, the Complaint alleges that the Law Review is "operated by students" who both "select and edit the articles that the Law Review will publish" and "the students who serve as members and editors of the Law Review." (Compl. ¶ 5.) Doe does not allege that NYU plays any role in the day-to-day operations of the Law Review or the selection of its new members, let alone its actual knowledge of any covert plans by unidentified editors to give preferential treatment to select students in violation of federal law. Although Doe alleges that NYU is "allowing" the Law Review to discriminate, (*id.* ¶ 21), the Complaint lacks any allegations explaining how it is doing so. Accordingly, the Title VI and IX claims must be dismissed.

### 2. Section 1983

To state a claim under Section 1983, a plaintiff must allege (1) the violation of a right, privilege, or immunity secured by the Constitution or laws of the United States (2) by a person acting under the color of state law. *Annis v. County of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998). This second element "excludes from [Section 1983's] reach merely private conduct, no matter how discriminatory or wrongful." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) (internal quotation marks omitted). A plaintiff may nonetheless maintain a Section 1983 claim against a private actor if the plaintiff sufficiently alleges that the private actor "is a willful participant in joint action with the State or its agents." *Dennis v. Sparks*, 449 U.S. 24, 27–28 (1980). Because the Complaint does not allege that NYU was a "willful participant in joint action with the State or its agents," *id.*, say, through a "plan, prearrangement, conspiracy, custom, or policy," *Forbes v. City of New York*, No. 05-CV-7331, 2008 WL 3539936, at \*5 (S.D.N.Y. Aug. 12, 2008) (quoting *Ginsberg v. Healey*

Doe v. New York University, Not Reported in Fed. Supp. (2024)

*Car & Truck Leasing, Inc.*, 189 F.3d 268, 272 (2d Cir. 1999)), NYU cannot be liable under Section 1983.[8]

**V. Conclusion**

For these reasons, NYU's motion to dismiss is GRANTED without prejudice.[9] Doe's motion to certify the class is DENIED as moot. The Clerk of Court is respectfully directed to terminate the motions pending at Docs. 36 and 42 and close this case.

**\*8** SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2024 WL 2847368

Footnotes

1       Although Doe purports to assert a claim under "any other law that might supply a cause of action for the requested relief," (Doc. 1 ("Complaint" or "Compl.") ¶ 26), this catch-all language is plainly inadequate to state a claim under Rule 8 in a counseled case, *see Cortez v. Stillwell Ready-Mix & Bldg. Materials, L.L.C.*, No. 20-CV-7775, 2022 WL 137465, at *2 (S.D.N.Y. Jan. 13, 2022) (concluding that pleading was "woefully inadequate" where it failed to "indicate the purported cause of action"). Therefore, this Opinion & Order addresses only those claims explicitly listed in the Complaint. (Compl. ¶ 26.)

2       The facts in this section are based upon the factual allegations set forth in the Complaint and the documents about "which plaintiffs had knowledge and relied on in bringing suit." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (internal quotation marks omitted). I assume the well-pleaded allegations in the Complaint to be true in considering the motion to dismiss pursuant to Rules 12(b)(1) and 12(b)(6). *See USAA Cas. Ins. v. Permanent Mission of Republic of Namib.*, 681 F.3d 103, 105 n.4 (2d Cir. 2012). My reference to these allegations should not be construed as a finding as to their veracity, and I make no such finding.

3       With respect to grades, the Law Review's website now states: "All interested students are strongly encouraged to apply regardless of GPA; there are no cutoffs, and grades are the least important factor in evaluating applicants." (Compl., Ex. 1 at 2.)

4       In the fall of 2023, there were 430 full-time first-year law students enrolled in NYU Law School. *See* Entering Class Profile and Statistics, NYU | Law, https://www.law_nyu.edu/jdadmissions/applicants/classprofile (last visited May 29, 2024). Of these 430 students, 55 will be invited to join the Law Review. (Compl., Ex. 1 at 2.)

5       Prior to filing this lawsuit, Doe filed a miscellaneous action in which Judge Victor Marrero, sitting as the Part I judge, granted his unopposed motion to proceed under a pseudonym. *See Doe v. N.Y. Univ.*, No. 23-MC-398 (S.D.N.Y. Nov. 21, 2023), Doc. 7. Because NYU has not asked me to address the legal basis for Plaintiff to proceed under a pseudonym, this Opinion & Order does not reach that issue.

6       On this score, I find it relevant that the Law Review's selection policy no longer references any specific form of diversity; it explains that the statement of interest offers students "an opportunity ... to provide the Selection Committee a more comprehensive view of who [they] are as ... individual[s]" and that the "résumés will be used by the Law Review to realize its commitment to staff diversity." (Compl., Ex. 1 at 2.)

7       Although Doe asserts that this practice was unlawful, (Doc. 48 at 18), he does not cite any cases to support this proposition, and, as noted above, such practices were lawful under then-existing Supreme Court precedent.

8        Doe's attempt to skirt Rule 15 by abandoning his Section 1983 claim in his opposition brief and instead asserting a new claim under
         42 U.S.C. § 1981 is unavailing. (Doc. 48 at 22–23); *see Santana v. City of New York*, No. 15-CV-6715, 2018 WL 1633563, at *4
         (S.D.N.Y. Mar. 29, 2018) (collecting cases where the court concluded that the plaintiff could not amend his complaint to add
         additional causes of actions in his opposition papers).

9        Although NYU urges me to dismiss the Complaint with prejudice because Doe "has been on notice of the defects in his conclusory
         pleading since the moment NYU first appeared in this case, if not before," (Doc. 43 at 22 (citation omitted)), I conclude that dismissal
         without prejudice is appropriate so that Doe can commence a new lawsuit should his claims ever ripen. My ruling that this dismissal
         is without prejudice should not be read as a finding that Doe's claims will ripen or that any future lawsuit will state a viable claim
         for relief, and I make no such finding.

---

**End of Document**                                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.

522 Fed.Appx. 322
This case was not selected for publication in West's
Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued on or
after Jan. 1, 2007. See also U.S.Ct. of App. 6th Cir.
Rule 32.1.
United States Court of Appeals, Sixth Circuit.

FAITH BAPTIST CHURCH, et al.,
Plaintiffs–Appellants,
v.
WATERFORD TOWNSHIP, et al.,
Defendants–Appellees.

No. 10–1406
|
April 11, 2013.

**Synopsis**
**Background:** Church and its pastor filed § 1983 action
alleging that township and its officials violated their
constitutional rights by threatening to prosecute church
members for disturbing peace following complaints about
loud music. The United States District Court for the
Eastern District of Michigan entered partial judgment on
pleadings, 2008 WL 4378074, and entered summary
judgment in officials' favor on remaining claims, 2010 WL
746362. Plaintiffs appealed.

**Holdings:** The Court of Appeals, Mays, District Judge,
sitting by designation, held that:

prosecutor was not entitled to absolute prosecutorial
immunity;

prosecutor's qualified immunity did not extend to church's
claims for injunctive and declaratory relief;

plaintiffs waived their claim that prosecutor was not
entitled to qualified immunity;

plaintiffs failed to state plausible claim for § 1983
conspiracy;

township's enforcement of its disturbing-the-peace
ordinance against church and church members did not
violate Equal Protection Clause;

church and pastor had standing to assert claim that
township's threats to enforce ordinance against them
violated their First Amendment rights; and

church and pastor lacked standing to assert individual
Fourth Amendment rights of other church members.

Affirmed in part and reversed in part.

**Procedural Posture(s):** On Appeal; Motion for Summary
Judgment; Motion for Judgment on the Pleadings.

**\*323** On Appeal from the United States District Court for
the Eastern District of Michigan.
BEFORE: MERRITT and MOORE, Circuit Judges; and
MAYS, District Judge.*

**Opinion**

MAYS, District Judge.

Plaintiffs Faith Baptist Church and Pastor James Combs
appeal the judgment of the district court denying their
claims against Waterford Township, Carl Solden,
individually and in his official capacity as Waterford
Township Supervisor, Daniel T. McCaw, individually and
in his official capacity as Chief of the Waterford Township
Police Department, Jeffrey James, individually and in his
official capacity as Deputy Chief of the Waterford
Township Police Department, and Walter Bedell,
individually and in his official capacity as Prosecuting
Attorney for Waterford Township.[1] Plaintiffs seek relief
under 42 U.S.C. § 1983 for Defendants' violation of
Plaintiffs' rights under the First, Fourth, and Fourteenth
Amendments.[2] They pray for **\*324** monetary damages,
injunctive relief, and a declaration that Defendants' actions
are unconstitutional.

This case arose when residents in Waterford complained to
the Waterford Police Department that the music at Faith
Baptist Church was too loud. Officers responded and
questioned several worshipers and pastors at the church
about the volume of the music. Bedell threatened to
prosecute church members for disturbing the peace. No
charges were ever filed.

On March 10, 2008, Plaintiffs filed suit. The relevant
allegations for purposes of this appeal are that Defendants:
1) violated Plaintiffs' First Amendment right to free
exercise of religion; 2) violated their First Amendment
right to freedom of speech; 3) violated their First
Amendment right to freedom of association; 4) conspired
to deprive Plaintiffs of their First Amendment rights; 5)
violated their Fourth Amendment rights; 6) conspired to
deprive Plaintiffs of their Fourth Amendment rights; and 7)
violated Plaintiffs' right to Equal Protection under the
Fourteenth Amendment.

The district court granted partial judgment on the pleadings, dismissing Plaintiffs' claims of conspiracy to violate their First and Fourth Amendment rights and violation of their equal protection rights under the Fourteenth Amendment, and all claims against Bedell on qualified immunity grounds.[3] On summary judgment, the district court dismissed all of Plaintiffs' First Amendment claims for lack of standing. The district court also concluded that Waterford police officers did not violate the Fourth Amendment when they questioned church members or when they entered the church.

For the following reasons, we AFFIRM in part and REVERSE in part the district court's judgment.

# I.

Faith Baptist Church is a non-denominational church in Waterford, Michigan. On Wednesday evenings, it holds youth services where Christian musicians play contemporary religious music. On or about September 11, 2007, Timothy Carlson, a neighbor, complained to the Waterford Township Police Department about loud music at the church. Carlson had lived across the street since 2004. He said he had complained in 2006, but the church was unresponsive. On September 26, 2007, police officers were dispatched to Carlson's home after he complained that the church was disturbing the peace. Because no music was playing when the officers arrived, they did not visit the church. On October 7, 2007, Carlson complained again. When the officers arrived, the music was so loud they could hear it in Carlson's home. The officers went to the church and spoke with Pastor Mark Kerr, who said the band in the auditorium was practicing for the evening service. Kerr said the officers "talked for a bit ... and they asked to see my driver's license." The police did not tell Kerr or the musicians that they had to turn the music down.

On October 10, 2007, the police were called to Faith Baptist Church again. No music was playing when they arrived. Bedell, in his capacity as Waterford's Prosecuting Attorney, had arrived before them, and found the noise excessive. When he arrived, the music was so loud that the windows at Carlson's residence were rattling, and Bedell could not use a normal **\*325** speaking tone. Before leaving the church, Bedell advised Combs, the youth pastor, that Bedell would obtain misdemeanor warrants for the members of the band. Bedell also dropped off copies of twelve noise complaints about the church's music. Bedell had been in the church on unrelated matters twelve to fifteen times before, and no one had told him he was

unwelcome.

On October 11, 2007, Bedell spoke with Pastor Martin Woody about the noise complaint. Bedell told Woody "the church should not be playing rock music," and Bedell "[was] going to continue to issue tickets until it's stopped." On October 15, 2007, Bedell sent letters to three members of the band notifying them that the prosecutor's office had received complaints against them and that they had to make an appointment with Bedell to discuss the complaints. Bedell took no further action, and no one was charged with a misdemeanor.

On October 28, 2007, police officers were again dispatched to Carlson's home because of a noise complaint. When the officers arrived, the music coming from the church had already stopped. The officers went to the church, identified the band members, and left. The officers did not order the band to stop playing, and the band members did not receive tickets. An unidentified church member videotaped the police. The police did not visit Faith Baptist Church again.

# II.

The issues on appeal were decided in two separate orders: a judgment on the pleadings and a summary judgment. Although the district court decided the question of qualified immunity in its judgment on the pleadings, we address qualified immunity separately.

"Qualified immunity is a question of law ... to be reviewed *de novo* by this Court." *Flint v. Kentucky Dep't of Corr.,* 270 F.3d 340, 346 (6th Cir.2001); *see also Holzemer v. City of Memphis,* 621 F.3d 512, 519 (6th Cir.2010). A court need not accept unwarranted factual inferences as true. *Kottmyer v. Maas,* 436 F.3d 684, 689 (6th Cir.2006). When considering qualified immunity on appeal from a motion to dismiss, the court must "treat [ ] all allegations in the complaint as true and draw[ ] all inferences in favor of the non-moving party." *Cockrell v. City of Cincinnati,* 468 Fed.Appx. 491, 494 (6th Cir.2012). The court " 'review[s] an assertion of qualified immunity to determine only whether the complaint adequately alleges the commission of acts that violated clearly established law.' " *Heyne v. Metro. Nashville Pub. Schools,* 655 F.3d 556, 562 (6th Cir.2011) (quoting *Back v. Hall,* 537 F.3d 552, 555 (6th Cir.2008) (internal quotations omitted)). The test on appeal is "whether, reading the complaint in the light most favorable to the plaintiff, it is plausible that an official's acts violated the plaintiff's clearly established constitutional right." *Id.* at 562–63. If the court determines that the conduct of a government official violated a

Faith Baptist Church v. Waterford Tp., 522 Fed.Appx. 322 (2013)

statutory or constitutional right of a plaintiff, the court must decide "whether the right was clearly established in light of the specific context of the case." *Marvin v. City of Taylor,* 509 F.3d 234, 244 (6th Cir.2007) (internal quotation marks and citation omitted). A right is clearly established if "the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Binay v. Bettendorf,* 601 F.3d 640, 651 (6th Cir.2010) (internal quotation marks omitted).

This Court reviews a district court's grant of judgment on the pleadings under Fed.R.Civ.P. 12(c) de novo. *Vickers v. Fairfield Med. Ctr.,* 453 F.3d 757, 761 (6th Cir.2006). The manner of review is the **\*326** same as a motion under Fed.R.Civ.P. 12(b)(6). *Id.; see also Smith v. City of Salem,* 378 F.3d 566, 570 (6th Cir.2004). The court must "construe the complaint in the light most favorable to the plaintiff, accept all of the complaint's factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of the claims that would entitle [it to] relief." *Grindstaff v. Green,* 133 F.3d 416, 421 (6th Cir.1998); *see also JPMorgan Chase Bank, N.A. v. Winget,* 510 F.3d 577, 581 (6th Cir.2007). The "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 677, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (internal quotation marks omitted). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

This Court reviews a district court's grant of summary judgment de novo. *See Gen. Motors Corp. v. Lanard Toys, Inc.,* 468 F.3d 405, 412 (6th Cir.2006). The evidence and the reasonable inferences therefrom are considered in the light most favorable to the non-moving party. *Binay,* 601 F.3d at 646; *Evans v. Vinson,* 427 Fed.Appx. 437, 441 (6th Cir.2011). This Court "must view the evidence in the light most favorable to Plaintiffs to determine whether a genuine issue of material fact exists." *Binay,* 601 F.3d at 646. "The central issue is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *In re Calumet Farm, Inc.,* 398 F.3d 555, 558 (6th Cir.2005) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). When considering First Amendment claims on summary judgment, appellate courts must "conduct an independent examination of the whole record so as to assure [ ] that this judgment does not constitute a forbidden intrusion on the field of free expression." *Hurley v. Irish–American Gay, Lesbian & Bisexual Group of Boston,* 515 U.S. 557, 567–

68, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995) (internal quotation marks and alteration omitted); *see also United Food & Commer. Workers Union, Local 1099 v. Southwest Ohio Regional Transit Auth.,* 163 F.3d 341, 357 (6th Cir.1998) (recognizing duty to engage in independent examination of the record in First Amendment cases).

## III.

### A.

In their Motion for Judgment on the Pleadings, Defendants moved to dismiss Bedell on the ground of qualified immunity. Qualified immunity is an affirmative defense that government officials may raise to shield themselves from liability for civil damages when their conduct does not violate clearly established statutory or constitutional rights. *Flint,* 270 F.3d at 346–47. Defendants did not move to dismiss any other Township official on the ground of qualified immunity. The district court concluded that Bedell was not entitled to absolute prosecutorial immunity but was entitled to qualified immunity and dismissed all claims against him.

Plaintiffs challenge the district court's conclusion that Bedell was entitled to qualified immunity from monetary, injunctive, and declaratory relief in his individual capacity[4] and its dismissal of the suit against **\*327** Bedell in his official capacity.[5] Defendants contend on appeal that Bedell was entitled to absolute immunity because he was a prosecutor and his investigation was in preparation for the initiation of a prosecution. They contend, in the alternative, that Bedell was entitled to qualified immunity because his actions did not violate any clearly established statutory or constitutional right.

The district court's denial of absolute immunity was proper. The Supreme Court has decided that "[a] prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution are not entitled to absolute immunity." *Buckley v. Fitzsimmons,* 509 U.S. 259, 273, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993). "When a prosecutor performs the investigative functions normally performed by a detective or police officer, it is 'neither appropriate nor justifiable that, for the same act, immunity should protect one and not the other.' " *Id.* (quoting *Hampton v. Chicago,* 484 F.2d 602, 608 (7th Cir.1973)). Here, Bedell was conducting the sort of preliminary investigation routinely performed by law enforcement officers. As the district court concluded, he was not entitled

Faith Baptist Church v. Waterford Tp., 522 Fed.Appx. 322 (2013)

to absolute immunity.

Plaintiffs' objection to the district court's ruling on Bedell's qualified immunity in his official capacity is a pure question of law. Plaintiffs' claim that the district court improperly applied the controlling law in a manner independent of the facts of the case is sufficient to bring this question before us. *Cf. United States v. Kelso,* 468 Fed.Appx. 551, 556–57 (6th Cir.2012). Plaintiffs' suit names Bedell and the other individual Defendants in both their individual and official capacities. Qualified immunity protects officials from monetary damages in their individual capacities only and cannot be the basis for dismissal of an official capacity suit. *See Garcia v. Dykstra,* 260 Fed.Appx. 887, 895 (6th Cir.2008). However, we "may affirm on any grounds supported by the record even if different from the reasons of the district court." *Dixon v. Clem,* 492 F.3d 665, 673 (6th Cir.2007) (internal quotation marks omitted). Here, Plaintiffs' suit against Bedell in his official capacity was properly dismissed. " 'Official-capacity suits represent only another way of pleading an action against an entity of which an officer is an agent.' " *Everson v. Leis,* 556 F.3d 484, 493–94 n. 3 (6th Cir.2009) (*quoting Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (alterations omitted)). "An official capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Briner v. City of Ontario,* 370 Fed.Appx. 682, 699 (6th Cir.2010) (internal quotation marks and alterations omitted). Having sued Waterford Township, the entity for which Bedell was an agent, the suit against Bedell in his official capacity was superfluous.

Plaintiffs' objection to the district court's ruling on Bedell's qualified immunity for injunctive and declaratory relief is a pure question of law. Plaintiffs' claim that the district court improperly applied the controlling law in a manner independent of the facts of the case is sufficient to bring **\*328** this question before us. *Cf. Kelso,* 468 Fed.Appx. at 556–57. The district court improperly dismissed Plaintiffs' claims for declaratory and injunctive relief against Bedell on the ground of qualified immunity. An official's qualified immunity does not preclude injunctive or declaratory relief. *See Smith v. Leis,* 407 Fed.Appx. 918, 930 (6th Cir.2011) ("[A] court could award both declaratory and injunctive relief in an action against a defendant protected by qualified immunity."); *Collyer v. Darling,* 98 F.3d 211, 222 (6th Cir.1996) ("[I]mmunity only precludes claims for monetary damages against officials in their individual capacities, and not claims for injunctive or declaratory relief.").

Bedell's qualified immunity for damages in his individual capacity is a mixed question of law and fact. On appeal, "[i]ssues adverted to in a perfunctory manner,

unaccompanied by some effort at developed argumentation, are deemed waived." *McPherson v. Kelsey,* 125 F.3d 989, 995 (6th Cir.1997). A bare recitation of the legal standard and the elements necessary to meet it is insufficient to trigger review of a mixed question. *See Clanton v. Comm'r,* 491 Fed.Appx. 610, 611 (6th Cir.2012) (plaintiff "has waived review of nearly every argument he raises on appeal because his pleadings are entirely conclusory, lack factual specificity, and do not clearly explain the basis of his claims."). When a party in its brief on appeal "merely set[s] out the standard of review and the elements of the claim" and "[does] not argue or explain how that standard or those elements were satisfied in [the instant] case," the claim is considered waived. *Kelso,* 468 Fed.Appx. at 556–57. Plaintiffs describe the qualified immunity standard at length, but do not present any allegations that might satisfy the standard. They offer only the conclusory statement that, "[i]n this case, it was clearly established that government officials may not abuse their authority in an effort to suppress speech that they disfavor." Appellants' Brief at 35. Because Plaintiffs have not sufficiently addressed Bedell's qualified immunity from damages in his individual capacity, that issue is deemed waived.

Plaintiffs' claims against Bedell in his official capacity were properly dismissed because they were in actuality claims against the Township of Waterford, which is itself a defendant. Plaintiffs' objection to the district court's dismissal of their claims for monetary damages against Bedell in his individual capacity on the ground of qualified immunity is waived. Plaintiffs' claims against Bedell in his individual capacity for injunctive and declaratory relief were improperly dismissed by the district court on the ground of qualified immunity and are remanded to the district court.


**B.**

In its judgment on the pleadings, the district court dismissed Plaintiffs' civil conspiracy claims because Defendants acted within the scope of their employment and the intra-corporate conspiracy doctrine applied. The district court also dismissed Plaintiffs' Equal Protection claim under the Fourteenth Amendment.

The district court dismissed Plaintiffs' First and Fourth Amendment conspiracy claims on the ground that the intra-corporate conspiracy doctrine applied under Michigan law and prevented Defendants, as members of a single corporate entity, from conspiring with one another. We need not address the application of the intra-corporate

conspiracy doctrine. We may affirm the district court's determination on any ground supported by the record. *Dixon,* 492 F.3d at 673. Defendants moved to dismiss Plaintiffs' conspiracy claims in their Motion for Judgment on the **\*329** Pleadings under Federal Rule of Civil Procedure 12(c). Plaintiffs' conspiracy claims can survive a Rule 12(c) motion only if their Complaint alleges sufficient facts, accepted as true, to state a claim of entitlement to relief that is plausible on its face. *Iqbal,* 556 U.S. at 677, 129 S.Ct. 1937. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678, 129 S.Ct. 1937. To plead a § 1983 conspiracy successfully, Plaintiffs must allege sufficient facts to state a claim that "(1) a single plan existed, (2) the conspirators shared a conspiratorial objective to deprive the plaintiffs of their constitutional rights, and (3) an overt act was committed." *Revis v. Meldrum,* 489 F.3d 273, 290 (6th Cir.2007).

Plaintiffs do not allege any facts to support their claim that Defendants engaged in a conspiracy to violate Plaintiffs' First or Fourth Amendment Rights. Plaintiffs merely make the conclusory statements that, by "acts and omissions, and policies, practices, and/or customs, engaged in under the color of state law, Defendants have conspired to unconstitutionally deprive Plaintiffs of their rights[s] ... guaranteed under the First Amendment," and "that Defendants agreed to and engaged in overt acts that did unlawfully and unreasonably threaten Plaintiffs with criminal action ... because of their First Amendment activities." Compl. ¶ 47. Plaintiffs make the same bare assertions to support their Fourth Amendment conspiracy claims. Compl. ¶ 53. Plaintiffs' conclusory allegations are insufficient to state a plausible claim that Defendants conspired to deprive them of their constitutional rights in violation of 42 U.S.C. § 1983. The district court's dismissal of Plaintiffs' conspiracy claims is affirmed.

Plaintiffs also allege that they were discriminated against because their religious beliefs were treated on "less than equal terms," and that they were targeted for "discriminatory and arbitrary enforcement of the laws on account of Plaintiffs['] religious practices." The district court dismissed Plaintiffs' Fourteenth Amendment claim because they did not allege they were treated differently from any other religious group in Waterford.

Plaintiffs' argument can best be read as a claim that Waterford is selectively enforcing its disturbing-the-peace ordinance and that they are being singled out for playing rock music. "Selective enforcement claims are judged according to ordinary Equal Protection standards, which require a petitioner to show both a discriminatory purpose and a discriminatory effect." *Gardenhire v. Schubert,* 205 F.3d 303, 318 (6th Cir.2000). Nonetheless, "[t]he threshold element of an equal protection claim is disparate treatment; once disparate treatment is shown, the equal protection analysis to be applied is determined by the classification used by the government decision-makers." *Satawa v. Macomb Cnty. Road Comm'n,* 689 F.3d 506, 528 (6th Cir.2012) (internal quotation marks omitted). Plaintiffs allege no facts that allow a reasonable inference that the ordinance was not enforced against other persons or groups in similar situations and have thus failed to state a claim.

## C.

In its summary judgment order, the district court dismissed Plaintiffs' First Amendment claims for lack of standing and concluded that there had been no Fourth Amendment violation because there was no concrete or particularized injury.

We review dismissal for lack of standing de novo because it is a question of law. **\*330** *United Steelworkers of Am. v. Cooper Tire & Rubber Co.,* 474 F.3d 271, 277 (6th Cir.2007). On summary judgment, when First Amendment violations are at issue, this Court must "conduct an independent examination of the whole record so as to assure [ ] that this judgment does not constitute a forbidden intrusion on the field of free expression." *Hurley,* 515 U.S. at 567, 115 S.Ct. 2338.

Standing is fundamental to determining "federal jurisdiction over a 'case' or 'controversy' as set forth in Article III of the Constitution." *Morrison v. Bd. Of Educ.,* 521 F.3d 602, 608 (6th Cir.2008). "No principle is more fundamental to the judiciary's proper role." *Raines v. Byrd,* 521 U.S. 811, 818, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997) (internal quotation marks omitted). "[It] is axiomatic that a litigant demonstrates Article III standing by tracing a concrete and particularized injury to the defendant['s actions] ... and establishing that a favorable judgment would provide redress." *Morrison,* 521 F.3d at 608.

To establish standing a plaintiff must show that 1) it has suffered an actual or imminent injury in fact that is concrete and particularized; 2) the injury is fairly traceable to the challenged action of the defendant; and 3) the injury is redressable. *Fieger v. Michigan Supreme Court,* 553 F.3d 955, 962 (6th Cir.2009); *Fieger v. Ferry,* 471 F.3d 637, 643 (6th Cir.2006). Standing is relaxed in the First Amendment context " 'because of a judicial prediction or assumption that the policy's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.' " *Berner v. Delahanty,* 129 F.3d 20, 24 (1st Cir.1997) (quoting *Broadrick v. Oklahoma,* 413 U.S. 601,

Faith Baptist Church v. Waterford Tp., 522 Fed.Appx. 322 (2013)

612, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973)). If a plaintiff can "objectively establish an imminent threat that chills protected activity," that chill alone is a cognizable injury-in-fact. *Grendell v. Ohio Supreme Court,* 252 F.3d 828, 832, 834 (6th Cir.2001).

Plaintiffs have shown they have a reasonable fear that their speech, free exercise of religion, and freedom of association will be chilled. "In dealing with the chilling effect criminal statutes have on First Amendment expression, the Supreme Court has previously noted that it is not necessary that a plaintiff first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." *Grendell,* 252 F.3d at 834 (internal quotation marks and alterations omitted).

Defendants contend that Plaintiffs lack standing because no members of the Faith Baptist Church were ultimately charged. That is not the test. This Court has found numerous government actions sufficient to turn "an otherwise-subjective allegation of chill" into "a proper injury-in-fact" that creates standing. *Morrison,* 521 F.3d at 609. A "non-exhaustive list" includes: "the issuance of a temporary restraining order, an eight-month investigation into the activities and beliefs of the plaintiffs by Department of Housing and Urban Development officials, and numerous alleged seizures of membership lists." *Id.* (internal quotation marks and citations omitted). In this case, Defendants admit Plaintiffs were threatened with prosecution. Bedell wanted the band members and church leaders "to be on notice that there was an investigation, and that they could possibly be subject to a misdemeanor charge if the violations continued." The threat of criminal prosecution is precisely "the exercise of governmental power that is regulatory, proscriptive, or compulsory in nature" that this Court has found necessary to support an injury in fact based on chill. *ACLU v. NSA,* 493 F.3d 644, 663 (6th Cir.2007). Waterford's actions were designed to "regulate[ ], proscribe[ ], or **331 compel[ ] the plaintiffs." *Id.* Although Defendants did not actually enforce the ordinance, they credibly threatened to do so. As a result, Plaintiffs sustained a concrete and particularized injury. *See Morrison,* 521 F.3d at 609 ("[F]or purposes of standing, subjective chill requires some specific action on the part of the defendant in order for the litigant to demonstrate an injury-in-fact.").

Defendants also argue that there has been no harm because Faith Baptist Church has not shown it has changed its conduct. Defendants' argument gives them sole discretion about the future of this matter. Nothing would stop them from filing charges. A "voluntary cessation of the allegedly unlawful behavior is generally insufficient to moot a case determining the legality of that behavior." *Am. Canoe*

*Ass'n v. City of Louisa Water & Sewer Comm'n,* 389 F.3d 536, 543 (6th Cir.2004) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. Inc.,* 528 U.S. 167, 189, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000)). A defendant may not eliminate standing at will by ceasing to enforce a statute whenever it pleases. Dismissing Plaintiffs' case would leave them in a legal penumbra, uncertain of the legality of their actions and afraid that Waterford might enforce its ordinance at any time.

The second requirement of standing is met because Plaintiffs' injury is traceable to Defendants' conduct. There is no dispute that Bedell threatened criminal prosecution. The injury "can be traced to the challenged action of the defendant." *Simon v. E. Ky. Welfare Rights Org.,* 426 U.S. 26, 41–42, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976).

The third requirement of standing is met because Plaintiffs' claim is redressable. Plaintiffs seek injunctive and declaratory relief. If Defendants were enjoined from enforcing Waterford's ordinance against Faith Baptist Church, Waterford would not be able to threaten Plaintiffs with criminal charges for playing religious music. "It can scarcely be doubted that, for a plaintiff who is injured or faces the threat of future injury ... a sanction that effectively abates that conduct and prevents its reoccurrence provides a form of redress." *Laidlaw,* 528 U.S. at 185–86, 120 S.Ct. 693. Plaintiffs have standing to bring their First Amendment claims.

The district court dismissed Plaintiffs' Fourth Amendment claims on summary judgment because there was no seizure and because Plaintiffs had no reasonable expectation of privacy in Faith Baptist Church during worship services open to the public.

Plaintiffs' Fourth Amendment claims are not properly before us. Plaintiffs claim that Defendants violated their Fourth Amendment rights by detaining them and seizing their identification information. When the case was before the district court, the Plaintiffs on appeal, Faith Baptist Church and Pastor James Combs, were joined by five others, the band members and the youth pastor, who were allegedly detained by the police. Those five plaintiffs were dismissed by stipulation and are not parties to the appeal. Combs was not present during any of the alleged violations and does not allege that his individual Fourth Amendment rights were violated. Combs is not entitled to assert the individual Fourth Amendment rights of the other members of the Church. *United States v. Pearce,* 531 F.3d 374, 381 (6th Cir.2008) ("The Supreme Court has found that Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted.... In order to qualify as a person aggrieved by an unlawful search and seizure one must have been a victim

Faith Baptist Church v. Waterford Tp., 522 Fed.Appx. 322 (2013)

of a search or seizure, one against whom the search was directed....") (internal quotations **332** omitted). Faith Baptist Church does not assert that any violations of its Fourth Amendment rights occurred. All plaintiffs entitled to assert the Fourth Amendment rights at issue, and all of their claims, were dismissed without prejudice pursuant to the Stipulation and Order entered by the district court on March 25, 2009. (R. 27.)

## IV.

The district court's decision on Plaintiffs' Fourth Amendment and Fourteenth Amendment claims and on Plaintiffs' § 1983 conspiracy claims is AFFIRMED. The district court's dismissal of Plaintiffs' suit against Bedell in his official capacity and for monetary damages in his individual capacity is AFFIRMED. The district court's dismissal of Plaintiffs' suit against Bedell in his individual capacity for injunctive and declaratory relief and of Plaintiffs' First Amendment claims based on lack of standing is REVERSED.

## All Citations

522 Fed.Appx. 322

Footnotes

\*       The Honorable Samuel H. Mays, Jr., United States District Judge for the Western District of Tennessee, sitting by designation.

1       In the district court, the initial plaintiffs included Martin Woody, Jeffrey Johnson, Andrew Olafsson, and two minors, K.H. and E.H. Their claims were dismissed without prejudice below, and they are not parties to this appeal.

2       The district court declined to exercise jurisdiction over Plaintiffs' claims for violation of the Michigan constitution. Plaintiffs do not appeal that decision.

3       Defendants asserted qualified immunity on behalf of Bedell only; the district court never decided, and neither party addresses, whether Solden, McCaw, or James is entitled to qualified immunity.

4       Defendants moved only to dismiss Bedell on the ground of qualified immunity. They did not move to dismiss Plaintiffs' claims for violation of the Fourth Amendment. The district court decided Plaintiffs' Fourth Amendment claims against the other defendants on summary judgment using the summary judgment standard and the more developed record available at that stage of the case.

5       The district court dismissed Bedell from the suit entirely without addressing the suit against Bedell in his official capacity and did not discuss Plaintiffs' request for declaratory or injunctive relief. (J. On Pleadings 7.)

**End of Document**                                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.

573 Fed.Appx. 377
This case was not selected for publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also U.S.Ct. of App. 6th Cir. Rule 32.1.
United States Court of Appeals, Sixth Circuit.

Bellandra FOSTER; BBF Engineering Services, PC, Plaintiffs–Appellants,
v.
State of MICHIGAN; Michigan Department of Transportation, Defendants,
and
Victor Judnic; Mark Steucher; Rick Snyder, Governor of the State of Michigan; Kirk T. Steudle, Director of the Michigan Department of Transportation, Defendants–Appellees.

No. 13–2209
|
July 16, 2014.

**Synopsis**
**Background:** African–American female owner of engineering consulting firm, which was both certified minority contractor and disadvantaged business enterprise (DBE), and firm brought § 1983 action against Governor of Michigan, Director of Michigan Department of Transportation (MDOT), and former MDOT project engineers, alleging that defendants discriminated against owner, based on her gender and race, by not awarding firm various consulting contracts, and also that defendants violated Michigan Whistleblowers' Protection Act (WPA). The United States District Court for the Eastern District of Michigan, 2012 WL 380282, granted in part and denied in part defendants' motion to dismiss and, 963 F.Supp.2d 735, granted defendants' motion for summary judgment. Plaintiffs appealed.

**Holdings:** The Court of Appeals, Bernice B. Donald, Circuit Judge, held that:

Title VI did not provide cause of action for gender-based discrimination;

plaintiffs did not plead any plausible Title VI claims for

race-based discrimination, and even if they had they could not establish Title VI liability for MDOT or State of Michigan under theory of respondeat superior;

plaintiffs forfeited appellate review of their Title VI retaliation claims;

Title VI official-capacity claims against former MDOT project engineers were superfluous;

Eleventh Amendment barred § 1983 claims against State of Michigan and MDOT;

Governor and Director of MDOT were entitled to summary judgment on § 1983 claims against them in their official capacities seeking prospective injunctive relief;

§ 1983 equal protection-based claims against former MDOT project engineers failed, absent direct or circumstantial evidence of discrimination;

plaintiffs did not have due process-protected liberty or property interest; and

plaintiffs failed to establish prima facie case under WPA against former MDOT project engineers in their individual capacities, and Eleventh Amendment barred WPA claims against MDOT, State of Michigan, and former project engineers in their official capacities.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion to Dismiss; Motion for Summary Judgment.

**\*379** On Appeal from the United States District Court for the Eastern District of Michigan.

BEFORE: DAUGHTREY, McKEAGUE, and DONALD, Circuit Judges.

OPINION

BERNICE B. DONALD, Circuit Judge.

Bellandra Foster ("Foster") and her company BBF Engineering Services, PC ("BBF") (collectively "Appellants") brought myriad claims against a host of defendants, including Rick Snyder, in his official capacity as the Governor of Michigan; Kirk T. Steudle, in his

official capacity as the Director of the Michigan Department of Transportation; and two former Michigan Department of Transportation ("MDOT") employees, Victor Judnic and **\*380** Mark Stuecher[1] (collectively "Appellees"). These claims generally revolve around the theory that certain MDOT employees discriminated against Foster and BBF because she is a black woman and then further retaliated against her when she sought to report their discrimination. On motions from the Appellees, the district court either dismissed or granted summary judgment on all of Appellants' claims. In jumbled filings so replete with errors that they border on being incomprehensible, Foster and BBF now appeal, arguing that the district court should not have granted any of Appellees' dispositive motions and seeking to revive all of their claims. For the following reasons, we **AFFIRM** the district court.

*FACTS*

### I. Background

BBF is a consulting firm that provides professional engineering services to clients including MDOT. BBF is certified as a Disadvantaged Business Enterprise ("DBE"),[2] and in 2008, BBF was MDOT's DBE Contractor of the Year. At its largest, BBF once employed seventeen full- and part-time employees. Bellandra Foster is BBF's president and sole shareholder. According to Foster, BBF began performing contract work for MDOT in 1997.

Rick Snyder is Michigan's Governor, and Kirk Steudle is MDOT's director. Both Victor Judnic and Mark Stuecher are former MDOT project engineers. Judnic was a project engineer at the Detroit Transportation Service Center ("TSC") from 2003 until March 2011, when he left MDOT to work in the private sector. From April 2007 until his departure, Judnic was the senior delivery engineer at the Detroit TSC. Stuecher worked for MDOT from 1984 until he moved to a private construction company in December 2010; from 1990 until his departure, he worked as a resident engineer.

MDOT awards construction contracts through a competitive bidding process, taking price into account. MDOT also contracts with professional engineering firms and consultants, who provide engineering services such as testing, inspection, and project oversight. MDOT selects its engineering consultants pursuant to the Brooks Act, 40 U.S.C. § 1101, and picks based on quality, not price. *See*

*generally* 23 U.S.C. § 112(b)(2)(A). To that end, MDOT circulates a "Selection Guidelines for Service Contracts." To advertise the relevant details and planned scope of proposed contracts, MDOT publishes Requests for Proposals ("RFPs"). Interested firms must submit proposals outlining their qualifications, their personnel, and pertinent information regarding their proposed subconsultants.

When the value of a service contract exceeds $25,000, MDOT uses a selection team to evaluate proposals. The selection team assigns scores to each proposal based on a scoring worksheet, then tallies the scores and forwards them to the Central Selection Review Team in Lansing for final approval. The project manager will then request a "priced proposal" from the highest-scoring firm and start negotiating costs. If these negotiations fall through, **\*381** MDOT will then turn to the firm with the next-highest rating. Once MDOT and the consultant reach an agreement, they enter into a contract for the project. *See generally* 40 U.S.C. §§ 1103(c)–(d), 1104(b). Foster claims that in this process the project engineer "has basically the ultimate power" because, according to her, the project engineer helps draft the RFP and largely picks the selection team. She further alleges that the project engineers often decide on the companies with whom they want to work even before the selection committee meets.

### II. Facts Related to the Allegations Against Judnic

Sometime around 2006, Judnic's secretary, Marilyn Caldwell, heard Judnic say "no woman should be making that kind of money." Caldwell does not recall any details regarding when Judnic made this statement or what she was doing when she heard it. Further, she cannot "say one-hundred percent that it was directed at BBF or at someone else." Caldwell testified that this statement pertained exclusively to sex—not race—and that she cannot recall Judnic ever again making such a statement or any similar statements related to a person's nationality. Although Caldwell explained that she eventually told Foster about this statement, she cannot remember whether she told Foster immediately or even that same year. According to Appellants' theory of the case, this statement clearly referred to Foster—because BBF is one of the few, if not the only, engineering consulting firm owned by a minority woman—and is the smoking gun that reveals Judnic's race- and sex-based motivation for systematically trying to force BBF out of business.

In 2006, Judnic served as the project manager on an advertised as-needed $4.2 million project, Contract 2006–

Foster v. Michigan, 573 Fed.Appx. 377 (2014)

0490, for which BBF was the highest-scoring consultant. Before contract negotiations moved into the priced-proposal phase, and thus before the contract was actually awarded, Judnic's superiors instructed him to reduce the scope of the proposed work. A $2 million portion of the original project, M–10, was broken off and advertised under a new, separate RFP for which BBF did not submit a proposal. On September 25, 2006, MDOT, through Judnic, awarded the reduced-scope version of Contract 2006–0490, now a roughly $2.2 million project, to BBF. Although Judnic told Foster that the decision to cut the contract came from Lansing, Appellants argue that this reduced contract evinces Judnic's discriminatory intent because no other companies had their contracts cut.

In the evaluation for its work on Contract 2006–0490, BBF received two scores of "7" on a ten-point scale based on a lack of communication and project file deficiencies. Foster believes these scores were based on the performance of Love Charles, a long-time BBF employee who worked as an office-technician on the project. Affidavits in the record from several MDOT employees document the issues with Charles's work. In a later meeting on July 18, 2008, Judnic and another MDOT employee, Jason Voigt, met with Foster to discuss BBF's performance on Contract 2006–0490. They also specifically discussed Charles's performance. Appellants nonetheless allege that BBF undeservedly received these negative evaluations and that these evaluations are indicative of discrimination.

Charles acknowledges that Judnic's team had issues with his not logging his calls and failing to keep files up-to-date, but he counters that Judnic treated him like a child. Charles contends that his level of experience was a boon to BBF when it was submitting RFPs; indeed, he **\*382** told Foster that BBF would be "done" without the added benefits of his experience during the RFP process. Foster testified that she and Charles had spoken about his retirement in late 2007 or early 2008 and that he had informed her of his plans to retire "shortly after" the July 2008 meeting. On October 1, 2008, Foster emailed Judnic notifying him that Charles would retire on December 17, 2008. Charles contends that his retirement was a result of his being forced out of his job by MDOT employees, particularly Judnic, in an attempt to undercut BBF.

In October 2007, MDOT selected BBF for another as-needed contract at the Detroit TSC, Contract 2008–0044, which was to be managed by Jason Voigt. Voigt contacted Foster to explain that MDOT would be reducing the contract duration from two years to one year. After Foster spoke to Voigt's supervisor, Myron Frierson, however, the contract's duration remained at two years. MDOT awarded BBF the contract on December 11, 2007, and Voigt negotiated the contract's priced proposal with BBF.

Although Judnic was neither the original project engineer nor involved in the discussions about reducing the contract's duration, Appellants contend that Judnic somehow played a part in trying to have the contract's scope reduced.

Before the end of Contract 2008–0044, Voigt left MDOT. In his stead, Judnic—with assistance from another MDOT employee, Steve Griffith—assumed the role of project manager. Because she was displeased with the evaluation of her last contract, Foster requested monthly meetings with Judnic to discuss the progress on this contract. Judnic cannot recall holding such monthly meetings with any other consultant, and Foster was unaware of Judnic's regularly meeting with any other consultant. Regardless, because of his workload, Judnic assigned Griffith to attend the meetings and apprise him of any substantial issues that arose. Foster claims that Judnic simply refused to meet with her, that there must be some reason for this refusal, and that—although she has no evidence to substantiate her suspicion—she believes Judnic's refusal was motivated by her race or gender.

Appellants also contend that Judnic discriminatorily prevented Foster from billing in her capacity as a principal officer for Contracts 2006–0490 and 2008–0044. Although this policy was later changed, at the time of those two contracts, MDOT did not permit a consulting firm's principal officer to bill directly to a project. Based on the policy then in effect, the RFPs for 2006–0490 and 2008–0044 provided that principals and officers were considered an overhead expense and were not to be included in the budgeted hours. Indeed, pursuant to the old policy, BBF's proposal for each of these projects listed Foster in a non-billable position with zero projected billable hours.

Appellants further claim that they suffered at Judnic's hand because Foster had to file a Freedom of Information Act ("FOIA") request to get the subconsultant evaluations for a project on which BBF was the prime consultant. Foster contends that she had received these evaluations in the past without needing to request them. Foster argues that her needing to file FOIA requests was a symptom of Judnic's discrimination against her, but she admits that she has no evidence that Judnic refused to provide the subconsultant scores because of either her race or gender.

In November 2009, MDOT selected BBF for Contract 2008–0064, for which Tia Klein served as the project manager. Klein requested that one of BBF's employees, Ray Stewart, take a refresher officer-technician training class before working on **\*383** the contract. Although Stewart normally would not have been required to take the class, Klein explained that she made this request for two reasons: (1) the federal government would be reviewing the

Foster v. Michigan, 573 Fed.Appx. 377 (2014)

project records more closely than usual because the contract used American Recovery and Reinvestment Act ("ARRA") funds; and (2) her review of Stewart's work on another project indicated some deficiencies. Klein and Rita Screws, the Detroit TSC Manager and Judnic's supervisor, were the only two MDOT employees involved in the decision to require additional training for Stewart. Nonetheless, because Judnic was Klein's supervisor, Appellants contend this extra training requirement was a part of Judnic's pattern of discrimination against Foster and BBF.

Appellants also allege that Judnic discriminatorily prevented BBF from being paid as a subconsultant. In 2010, BBF was working as a subconsultant for another consulting firm, URS, on the Gateway Project, for which Judnic was the project manager. BBF was not being paid for the services it rendered, and when Foster explored why, she learned that URS had not been submitting BBF's invoices. In their amended complaint and in their responses to Appellees' motions below, Appellants contended that Judnic discriminatorily played a role in BBF's not being paid because, as the project manager, he reviewed all the invoices that were submitted and he did not question URS about the absence of BBF's invoices. Now, although it is not clear based on their filings, Appellants seem to contend that Judnic received BBF's invoices and discriminated against Foster by refusing to approve them. Regardless, BBF eventually received full payment for the services it rendered after Judnic and Cedric Dargin, another MDOT engineer, investigated the issue.

In an attempt to reduce vehicle costs, Judnic—with the approval of MDOT and the Office of Commission Audit—introduced a pilot requirement to a 2010 RFP that required the consultant to have a fleet of five leased vehicles. This requirement involved pass-through leases for the vehicles with MDOT ultimately reimbursing the expenses. Any consultant who was interested in the contract had the opportunity to review the requirement and decide whether to submit a proposal for the contract. Because the program received overwhelmingly negative feedback, MDOT did not include the requirement on future projects. Appellants contend that Judnic designed this requirement in an attempt to ensure that contracts only went to large, majority-white engineering consulting firms and to discriminate against BBF specifically because he knew that the company would not be able to lease the necessary vehicles. Appellants underscore this claim by pointing out that Judnic began working for HNTB, the company that was ultimately awarded the contract, after he left MDOT and that Judnic drives a company vehicle.

On June 15, 2010, Foster sent a letter to Tony Kratofil of MDOT regarding Contract 2008–0044. In this letter, Foster

expressed concern about MDOT's proposal and evaluation process, particularly in light of the fact that MDOT had rated BBF "the lowest of the entire as-needed services team on two consecutive contracts with the same project manager." Foster explained that she was especially disturbed because she had requested meetings regarding Contract 2008–0044 and had never been told that the management had any major issues. She was concerned because these low scores would influence her future ability to secure work.

### III. Facts Related to the Allegations Against Stuecher

In 2009, BBF submitted a proposal in response to an RFP for an ARRA-funded **\*384** project from the Oakland TSC. Because it was an ARRA project, the proposals underwent a modified selection process. First, they went to a selection team, comprised of Stuecher, who served as the project manager, and three other MDOT engineers—Cedric Dargin, Mark Koskinen, and Sean Kerley. The panel would identify the three highest-scoring firms and then move those firms forward for a second round of evaluation. Near the beginning of the selection meeting, Stuecher temporarily left the room. The meeting's attendees differ on the details of what happened next.

According to Dargin, while Stuecher was gone, the panel fully scored all of the proposals, and BBF received the highest score. Dargin claims that when Stuecher returned and saw BBF's score he said, "Oh no, I hate her," and then "unilaterally" reduced BBF's score to prevent BBF from advancing in the selection process. Even after this alleged unilateral change, Dargin nonetheless signed all of the score sheets.

Stuecher claims that he told the other panel members to start reviewing the proposals in his absence with the understanding that the panel would not commence officially scoring until he returned. He testified that when he returned to the selection meeting, the work was partially done and there were some "scratched out numbers" but that the panel then evaluated the proposals for close to another hour. Stuecher claims they completed the score sheets after the panel reached a consensus regarding each proposal. Stuecher does not remember ever saying, "Oh no, I hate her."

Koskinen's recollection is consistent with Stuecher's. Koskinen remembers the rest of the panel reviewing the proposals after Stuecher left and the entire panel then engaging in discussion after Stuecher returned. Koskinen understood that each panel member's signature on the

Foster v. Michigan, 573 Fed.Appx. 377 (2014)

score sheets indicated that the full panel reached a consensus score.

At the end of this process, BBF was not one of the three highest-scoring firms and therefore did not advance to the next round of consideration. Appellants argue that Stuecher had no basis for personal animus against Foster because Stuecher did not know Foster. From this conclusion, Appellants extrapolate that Stuecher's alleged comment and reduction of BBF's score must have been the result of race- or sex-based discrimination.

### IV.  The Federal Highway Administration Investigation

In July 2010, BBF submitted a number of complaints to the Federal Highway Administration ("FHWA") claiming that MDOT's administration and contract procedures were discriminatory and retaliatory; BBF filed two additional complaints in February 2011. After investigating, the FHWA sent MDOT a "Report of Inquiry" dated October 18, 2011. The initial Executive Summary of the FHWA's report explains that the agency applied a preponderance of the evidence standard, which it defined as "just enough evidence to make it more likely than not that the fact the claimant seeks to prove is true." The report then summarizes:

In this inquiry, the preponderance of the evidence showed that an MDOT employee willfully removed BBF Engineering Services P.C. from the top place of a consulting construction award so that Ms. Foster's firm would not be considered.

In addition the evidence shows that based on Ms. Foster's sex (gender) (female) an MDOT employee sent forward her contract to Lansing to have funds removed from it. This resulted in her **385** as-needed service contract being cut in half.

These facts have raised questions in the way service/consulting contracts are awarded at MDOT and the "power" that Project Engineers have in those selections and awards.

It is our belief that MDOT should set up a process improvement team aimed at strengthening MDOT's monitoring of the consulting/service contract award process.

It is our belief that MDOT should meet with Ms. Foster in regards to these issues and reaching a settlement agreement that would be acceptable to both parties.

The report goes on to provide more detailed results of the FHWA's inquiry. It first furnishes the results of investigator Cheryl Hudson's interview with Caldwell, Judnic's former secretary. The report states that, according to Caldwell, Judnic was referring to Foster when he said, "No woman should be making money like that," and that Caldwell did not recall if Judnic said "no Black woman." In her deposition, however, Caldwell explained "that's not how the story goes," that she did not know to whom Judnic had directed his statement, and that she did not think that Judnic made any mention of race or national origin.

The report then notes that, in June 2006, Judnic notified BBF that MDOT was cutting Contract 2006–0940 in half and "rebidding" the M–10 portion of the contract. The report stated that MDOT told Mary Finch, an FHWA investigator, that a committee in Lansing made the decision to "unbundle" larger contracts so that MDOT could create a "viable consultant industry." Finch interviewed Judnic, who, according to the report, told her that, "Lansing wants to provide more opportunities for diverse small consultants[.]" Finch documented her asking Judnic whether he had considered that BBF was a DBE and Judnic's responding that he had not. The report further records MDOT awarded the rebid M–10 portion of the contract to Fishbeck, which at the time was the third-largest consultant doing business with MDOT.

From the investigation, the FHWA concluded that the "preponderance of the evidence" indicated that Judnic "appear[ed] to have taken actions against Ms. Foster sex (gender) (female)." The FHWA saw a connection between Judnic's stating "[n]o woman should make that amount of money," and his later acting in a way that "suggest[ed]" that BBF's contracts "go forward as contracts that could be cut." The FHWA also concluded that the MDOT offices in Lansing were sending mixed messages about what it wanted to accomplish by re-advertising parts of contracts. The FHWA stated that Judnic "thought he was supposed to be obtaining more diversity in his contracting opportunities and he cho[se] to break out [of] a contract that was already awarded to a DBE," and "[t]he result was that a large white[-] owned firm was awarded the second half of the contract." Judnic, for his part, complained that Finch's questions were vague, that she refused to provide any context or clarification for her questions, and that the FHWA report bolstered its conclusions using only portions of quotations and quotations taken out of context.

Stuecher was not interviewed during the FHWA investigation. The report nonetheless concludes that "MDOT (Mr. Mark Stuecher) willfully changed the scores on the sheet to remove BBF Engineering from the top three ... It is unclear as to motive." The FHWA requested that

Foster v. Michigan, 573 Fed.Appx. 377 (2014)

MDOT "form a process improvement team aimed at strengthening MDOT's monitoring **386** of the consulting/service contract award process."

**V. MDOT's Audit**

During the course of the ensuing litigation, MDOT conducted an audit of BBF. Appellants contend that this audit is retaliation for their filing suit and that the auditing department's exclusive motive was for MDOT to be able to conclude that Appellants were making too much money. MDOT, however, explains that the Office of Commission Audit had planned to audit BBF as a part of its annual audit plan as far back as October 2009, well before Appellants filed suit.

**PROCEDURAL HISTORY**

Appellants filed their initial complaint in the United States District Court for the Eastern District of Michigan on November 3, 2011—less than a month after the FHWA issued its October 18, 2011 report. In this complaint, Appellants alleged that Judnic, Stuecher, the State of Michigan, and MDOT had discriminated and retaliated against them in violation of Title VI, 42 U.S.C. § 2000d; 42 U.S.C. §§ 1981 and 1983; and Michigan's Whistleblower Protection Act ("WPA"), Mich. Comp. Laws § 15.362.

All of the defendants filed Fed.R.Civ.P. 12(b)(6) motions to dismiss for failure to state a claim. The district court granted the State of Michigan's and MDOT's motions to dismiss in full, finding that Title VI did not extend to gender discrimination, that BBF had not stated plausible claims of race-based discrimination or retaliation under Title VI, and that Eleventh Amendment immunity precluded the remainder of the claims against them. The district court likewise dismissed the individual-capacity Title VI claims against Judnic and Stuecher because individuals cannot be held liable under Title VI. The district court rejected Appellants' argument for equitable tolling and concluded that a three-year statute of limitations applied to Appellants' federal claims. Finally, the district court also dismissed the various official-capacity claims against Judnic and Stuecher because either the defendants were immune or the claims were redundant and duplicative. After dismissal of these claims, the only claims that remained were the individual capacity § 1983 and WPA claims against Judnic and Stuecher.

Appellants later moved to amend their complaint to include additional § 1983 claims and to renew their Title VI claims against Michigan and MDOT. The district court granted this motion in part. The district court found that Appellants' new proposed due process claims were futile and denied reinstatement of the Title VI claims. This district court did, however, allow Appellants to add a § 1983 race-discrimination claim under the Fourteenth Amendment's Equal Protection Clause. On reconsideration, the district court again dismissed the equal protection claims against the State of Michigan and MDOT on the grounds of immunity. Instead of those claims, the district court permitted Appellants to sue Governor Rick Snyder and MDOT Director Kirk Steudle in their official capacities for prospective injunctive relief under § 1983. The record indicates, however, that BBF never served either of these new parties with a complaint or summons.

After discovery, the remaining defendants moved for summary judgment. The district court granted this motion, holding that Appellants lacked evidence that BBF was treated differently from similarly situated consulting firms. The district court dismissed the official-capacity claims for prospective relief because Appellants' constitutional rights were not violated and **387** found four separate bases for dismissing the WPA claims. This appeal ensued.

**ANALYSIS**

Distilling their arguments down to a more manageable form, Appellants essentially contend that the district court reversibly erred in a six ways: (1) by dismissing their Title VI claims because they did not plausibly state an allegation of race-based discrimination and because Title VI does not apply to gender discrimination or vicarious liability claims; (2) by finding that MDOT and the State of Michigan were entitled to Eleventh Amendment Immunity from Appellants' § 1983 claims; (3) by granting summary judgment to Snyder and Steudle, in their official capacities, because Appellants failed to produce evidence of an ongoing violation such that prospective injunctive relief would be appropriate; (4) by granting summary judgment on Appellants' § 1983 equal protection claims against Judnic and Stuecher individually because Appellants failed to present facts indicating that Judnic or Stuecher had treated any similarly situated firms differently from BBF; (5) by granting summary judgment to Judnic and Stuecher on Appellants' WPA claims; and (6) by denying Appellants' motion to amend their complaint to add a due process claim as futile because they failed to identify a constitutionally protected liberty or property interest.

We review all of these claims de novo. *See, e.g., Back v. Nestlé USA, Inc.,* 694 F.3d 571, 575 (6th Cir.2012) (stating that we review a district court's grant of summary judgment de novo); *Scott v. Ambani,* 577 F.3d 642, 646 (6th Cir.2009) (noting that we review a district court's dismissal de novo); *Inge v. Rock Fin. Corp.,* 281 F.3d 613, 625 (6th Cir.2002) (explaining that we typically review the denial of a motion to amend for abuse of discretion but that we review de novo a denial on the basis of futility).

## I. Title VI Claims

Appellants contend that the district court erroneously dismissed their sex- and race-based discrimination and retaliation claims under Title VI. To survive a Fed.R.Civ.P. 12(b)(6) motion to dismiss, a claim's "factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the allegations in the complaint are true." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (internal citations and emphasis omitted). This assumption that all the complaint's allegations are true does not, however, apply to legal conclusions or to legal conclusions cloaked as fact. *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Further still, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show [n]'—'that the pleader is entitled to relief.' " *Id.* at 679, 129 S.Ct. 1937 (quoting Fed.R.Civ.P. 8(a)(2)).

### A. *Gender-based Discrimination under Title VI*

Title VI of the Civil Rights Act of 1964 states: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. As a matter of plain language, Title VI does not address discrimination on the basis of sex or gender. *See id.* "[W]hen the statutory **\*388** language is plain, we must enforce it according to its terms." *Jimenez v. Quarterman,* 555 U.S. 113, 118, 129 S.Ct. 681, 172 L.Ed.2d 475 (2009).

Because it does not say anything about sex or gender, the text of 42 U.S.C. § 2000d itself compels us to conclude that Title VI does not provide a cause of action for gender discrimination. Two of our sister circuits have reached the same conclusion. *See, e.g., Shannon v. Lardizzone,* 334 F. App'x 506, 507 n. 1 (3d Cir.2009); *Davis v. Monroe Cnty. Bd. of Educ.,* 120 F.3d 1390, 1396 (11th Cir.1997), *rev'd on other grounds,* 526 U.S. 629, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999). Moreover, dicta from Supreme Court cases contrasting Title VI with Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681, suggests that Title VI is not applicable to gender discrimination. *See Alexander v. Sandoval,* 532 U.S. 275, 297, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001) (referring to Title IX, which addresses gender discrimination in educational settings, as Title VI's "gender-based twin"); *Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, 286, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998) (stating Title VI is "parallel to Title IX except that it prohibits race discrimination, not sex discrimination"); *N. Haven Bd. of Educ. v. Bell,* 456 U.S. 512, 523 n. 13, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982) (noting that there had been proposed legislation to "extend[ ] the prohibitions of Title VI ... to discrimination based on gender ..." but that this proposal "never emerged [from] the committee").

In the face of this plain language, persuasive authority from our sister circuits, and confirming dicta from the Supreme Court, BBF attempts to read 23 U.S.C. § 324—a wholly separate statute that addresses gender discrimination in federally funded contracts—in a manner that extends Title VI's coverage to prohibit discrimination based on gender, as well as presumably disability, age, and religion. This reading is unpersuasive because nothing in the text of 23 U.S.C. § 324 suggests that it affects the coverage of Title VI. Further, Appellants cite no, and indeed we have not found any, authority supporting this expansive reading of § 324. Appellants also argue that 42 U.S.C. § 2000d–7 provides a cause of action for a gender-based Title VI claim. Again, this argument is unpersuasive. That statute indicates that Congress intended to abrogate states' sovereign immunity and to provide remedies under Title VI, among other civil-rights statutes. *See Alexander,* 532 U.S. at 280, 121 S.Ct. 1511. Section 2000d–7, however, does not affect the substance of Title VI. Because Title VI only applies to discrimination on the basis of race, color, or national origin, the district court properly dismissed Appellants' gender-based Title VI claims.

### B. *Race-based Discrimination under Title VI*

Title VI targets intentional discrimination only. *Alexander,*

Foster v. Michigan, 573 Fed.Appx. 377 (2014)

532 U.S. at 280, 121 S.Ct. 1511. Appellants, however, fail to plead any plausible claims of intentional discrimination. Rather, Appellants' Title VI race-discrimination claims consist of nothing more than legal conclusions such as "Plaintiffs have been denied participation based upon race, color, national origin, and gender." These conclusory allegations of race discrimination are insufficient. "[A] complaint that includes conclusory allegations of discriminatory intent without additional supporting details does not sufficiently show that the pleader is entitled to relief." *Nali v. Ekman,* 355 Fed.Appx. 909, 913 (6th Cir.2009); *see also Iqbal,* 556 U.S. at 680, 129 S.Ct. 1937. Similarly, the Appellants' allegations that Foster belongs to a suspect class and that **\*389** BBF is owned by a member of a suspect class—while true—do not state a claim of racially motivated discrimination. *See Rondigo, L.L.C. v. Twp. of Richmond,* 641 F.3d 673, 680–81 (6th Cir.2011); *accord Ashcroft,* 556 U.S. at 680, 129 S.Ct. 1937.

Even if Appellants had managed to articulate a plausible claim based on the actions of Judnic or Stuecher, which they have not, Appellants likely would not be able to establish Title VI liability for MDOT or the State of Michigan under a theory of respondeat superior. In *Gebser v. Lago Vista Independent School District,* 524 U.S. 274, 290–91, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998), the Supreme Court held that vicarious liability was not available under Title IX and that a supervisory entity must have had knowledge of and been deliberately indifferent to an employee's discriminatory actions. The *Gebser* court reasoned that Title IX was a conditional statute rather than a prohibitory statute, so primary enforcement rested within the jurisdiction of the funding agency. *Id.* at 286–88, 118 S.Ct. 1989. Title VI contains a similar administrative enforcement provision. *Compare* 20 U.S.C. § 1682 *with* 42 U.S.C. § 2000d–1. Beyond this similar language, the *Gebser* court recognized that Title VI and Title IX "operate in the same manner." 524 U.S. at 286, 118 S.Ct. 1989. Accordingly, *Gebser*'s interpretation that there is no vicariously liability under Title IX supports the notion that there is no vicarious liability under Title VI. *See Zeno v. Pine Plains Cent. Sch. Dist.,* 702 F.3d 655, 665 n. 10 (2d Cir.2012).

Appellant's complaint does not contain any fact-based allegations that either MDOT or the State of Michigan participated in, was aware of, or was deliberately indifferent to any discriminatory acts. Because the complaint fails to offer any plausible race-based Title VI claims, the district court properly dismissed them. *See Iqbal,* 556 U.S. at 680, 129 S.Ct. 1937 (citing *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955).

### C. *Title VI Retaliation*
The district court reasoned it was implausible that Appellants' filing Title VI complaints was causally related to BBF's struggling to secure contracts given that BBF's difficulties preceded its complaints by several years, and as such, the district court dismissed Appellants' Title VI retaliation claims. Appellants argue that we may infer that any action after the date of the complaints to the FHWA was retaliatory. Appellants, however, fail to offer any allegations in the original complaint to support a retaliation claim. Instead, they recite the law without any application to the facts and then demand reversal. We are well within our rights to determine that Appellants forfeited appellate review of their retaliation claims by only giving this issue a cursory acknowledgment. *E.g., Williamson v. Recovery Ltd. P'ship,* 731 F.3d 608, 621 (6th Cir.2013) ("Issues adverted to in a perfunctory manner, without some effort to develop an argument, are deemed forfeited").[3]

### D. *Official–Capacity Claims Under Title VI*
A plaintiff may only assert Title VI claims against "the entity ... receiving the **\*390** financial assistance." *Buchanan v. City of Bolivar, Tenn.,* 99 F.3d 1352, 1357 (6th Cir.1996); *see also Shannon,* 334 Fed.Appx. at 508. On appeal, Appellants challenge the dismissal of the official capacity suits against Judnic and Stuecher. Official-capacity claims are "in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham,* 473 U.S. 159, 165, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). Where the entity is named as a defendant, an official-capacity claim is redundant. *E.g., Faith Baptist Church v. Waterford Twp.,* 522 Fed.Appx. 322, 327 (6th Cir.2013) ("Having sued ... the entity for which [plaintiff] was an agent, the suit against [plaintiff] in his official capacity was superfluous."). Here, because Appellants named MDOT and the State of Michigan as defendants, their official-capacity suits against Judnic and Stuecher are superfluous. Because the Title VI claims against the State and MDOT fail, Appellants' official-capacity claims against Judnic and Stuecher necessarily also fail. *See Jackson v. Wilkins,* 517 Fed.Appx. 311, 321 (6th Cir.2013); *Chesher v. Neyer,* 477 F.3d 784, 797 (6th Cir.2007).

### II. 42 U.S.C. § 1983 Claims
42 U.S.C. § 1983 provides a civil cause of action for plaintiffs who have been deprived of rights:

Foster v. Michigan, 573 Fed.Appx. 377 (2014)

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.... Injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable....

Appellants brought claims under § 1983—as well as 42 U.S.C. § 1981[1]—against Judnic and Stuecher, both in their official capacities and individually, the State of Michigan; MDOT; and eventually Snyder, in his official capacity as Governor, and Steudle, in his official capacity as the director of MDOT, all of which were resolved in favor of the Appellees either on motions to dismiss or motions for summary judgment. On appeal, Appellants attempt to revive all of these claims.

Although Appellants did not bring a claim under a mixed motive theory below, they now contend that "at best, this is a mixed motive case." We decline to consider this argument. "Plaintiffs must give proper notice when bringing mixed-motive claims." *Spees v. James Marine, Inc.,* 617 F.3d 380, 390 (6th Cir.2010). Because Appellants did not give proper notice or make a mixed-motive argument below, they have forfeited this theory on appeal. *See, e.g., Blackshear v. Interstate Brands Corp.,* 495 Fed.Appx. 613, 617 (6th Cir.2010); *Hashem–Younes v. Danou Enters., Inc.,* 311 Fed.Appx. 777, 779 (6th Cir.2009).

After seemingly casting BBF as in a "class of one" in their opening brief, Appellants now deny characterizing themselves as a "class of one." Accordingly, the question that remains before us is whether Appellants raise a genuine **\*391** issue of material fact indicating that any of the Appellees intentionally discriminated against them on the basis on race or gender in violation of the Equal Protection Clause of the Fourteenth Amendment. *E.g. Horner v. Ky. High Sch. Athletic Ass'n,* 43 F.3d 265, 267 (6th Cir.1994) ( "The Equal Protection Clause forbids only intentional discrimination.").

"The Equal Protection Clause prohibits discrimination by government which either burdens a fundamental right, targets a suspect class, or intentionally treats one differently than others similarly situated without any rational basis for the difference." *Rondigo, L.L.C. v. Township of Richmond,* 641 F.3d 673, 681 (6th Cir.2011) (citations omitted). "[T]o establish an equal protection violation against a public employer in a section 1983 action, a plaintiff must show that the employer made an adverse employment decision 'with a discriminatory intent and purpose.' " *Boger v. Wayne Cnty.,* 950 F.2d 316, 324–25 (6th Cir.1991) (quoting *Charles v. Baesler,* 910 F.2d 1349, 1356–57 (6th Cir.1990)). A plaintiff in a § 1983 equal protection case must demonstrate that the adverse employment decision would not have occurred but for her protected status. *Id.* at 325. A plaintiff "must do more than just introduce evidence of discriminatory intent and suggest that 'such intent could have played a role in an adverse employment decision....' " *Id.* (quoting *Gutzwiller v. Fenik,* 860 F.2d 1317, 1325 (6th Cir.1988)). As a black woman, Foster is a member of a protected class for both race and gender. *See Oliver v. St. Luke's Dialysis LLC,* 491 Fed.Appx. 586, 587 (6th Cir.2012) (citations omitted). At this stage, she must point to evidence that Appellees took adverse actions against her because she was a member of a protected class.

A. *Section 1983 Claims against the State of Michigan and MDOT*

The district court dismissed Appellants' § 1983 claims against the State and MDOT on the basis of the Supreme Court's holding in *Will v. Michigan Department of State Police,* 491 U.S. 58, 67, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989), that the Eleventh Amendment bars suits against states and state agencies unless a state has waived its immunity or consented to being sued in federal court. Appellants contend that the district court erred in dismissing their § 1983 claims, as well as their attempted direct constitutional claims, against these entities.

To the extent that Appellants attempt to assert direct constitutional claims, they fail; we have long held that § 1983 provides the exclusive remedy for constitutional violations. *Thomas v. Shipka,* 818 F.2d 496, 503 (6th Cir.1987), *vacated on other grounds,* 488 U.S. 1036, 109 S.Ct. 859, 102 L.Ed.2d 984 (1989); *accord Azul–Pacifico, Inc. v. City of Los Angeles,* 973 F.2d 704, 705 (9th Cir.1992) ("[A] litigant complaining of a constitutional right must utilize 42 U.S.C. § 1983."). Appellants' § 1983 claims likewise fail. Section 1983 did not abrogate the sovereign immunity of either the State of Michigan or MDOT. *Quern v. Jordan,* 440 U.S. 332, 345, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979). Furthermore, neither the State nor MDOT qualify as "persons" under § 1983. *Will,* 491 U.S. at 71, 109 S.Ct. 2304. The district court did not err in dismissing the § 1983 claims against MDOT and the State of Michigan.

Foster v. Michigan, 573 Fed.Appx. 377 (2014)

B. *Section 1983 Claims Against Snyder and Steudle in their Official Capacities*

After dismissing the § 1983 claims against the State of Michigan and MDOT for a second time, the district court permitted **\*392** Appellants to substitute Governor Snyder and Director Steudle in their official capacities and to seek prospective injunctive relief against them under *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). The record does not indicate, however, that Appellants ever served summons on complaints on Snyder or Steudle. Appellants contend that they have constructively served Snyder and Steudle because the Office of the Michigan Attorney General represents all of the defendants. We look askance at this argument. Even presuming that Snyder and Steudle had been properly served, the district court did not err in granting summary judgment on these official-capacity claims. Dismissing the claims against all of the individual defendants necessarily defeats the official-capacity claims against Snyder and Steudle. *See Scott v. Clay Cnty., Tenn.,* 205 F.3d 867, 879 (6th Cir.2000) (explaining that dismissal of all the individual claims a fortiori defeats the claims against the entity) (citations omitted). Even if this were not so, Appellants cannot sustain their § 1983 claims against Snyder and Steudle based on a theory of supervisory liability. *See Moniz v. Cox,* 512 Fed.Appx. 495, 499 (6th Cir.2013) ("General allegations of Cox's failure to supervise and investigate are insufficient to state a claim[.]").

Appellants also fail to indicate how prospective injunctive relief would be appropriate in this case. They have not identified any remediable ongoing violations of law beyond conclusory statements that prospective injunctive relief would be appropriate. *See Terrance v. Northville Reg. Psych. Hosp.,* 286 F.3d 834, 842 (6th Cir.2002) (stating that "violations of constitutional rights cannot be founded upon conclusory, vague or general allegations"). Appellants' inability to point to an impending wrongdoing undercuts their claims against Snyder and Steudle. *See Los Angeles v. Lyons,* 461 U.S. 95, 111, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) (stating that injunctive relief is not justified where "there is no showing of any real or immediate threat that the plaintiff will be wronged again"). Similarly, Appellants fail to explain how prospective relief would remedy any of its alleged injuries beyond speculating that BBF would receive more contracts in the future once MDOT's selection process were changed. *Cf. Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (explaining that a plaintiff must indicate that it is "likely"—as opposed to "merely speculative"—that a favorable decision would redress plaintiff's injury in order to have standing). The district court did not err in granting summary judgment on the official-capacity claims against Snyder and Steudle.

C. *Section 1983 Claims Against Judnic*

A plaintiff may prove a claim of intentional discrimination using either direct or circumstantial evidence. *Jacklyn v. Schering–Plough Healthcare Prods. Sales Corp.,* 176 F.3d 921, 926 (6th Cir.1999). The district court concluded that Appellants could not prove that Judnic violated their equal protection rights using either direct or circumstantial evidence; on appeal, Appellants contend that they have sufficiently pointed to enough both direct or circumstantial evidence to sustain their § 1983 claim against Judnic.

As a preliminary matter, we note that many of Appellants' purported pieces of evidence fall after the limitations date—November 3, 2008—that the district court imposed when it rejected Appellants' request for equitable tolling. Because Appellants did not challenge this holding in their brief, we consider it waived. **\*393** *Marks v. Newcourt Credit Grp., Inc.,* 342 F.3d 444, 462 (6th Cir.2003) ("An appellant waives an issue when he fails to present it in his initial briefs before this court."). Based on this limitations period, several pieces of evidence from Appellants' complaints below and their briefs here are untimely—including the scope and billing of Contract 2006–0490, which was awarded September 25, 2006; the scope and billing of Contract 2008–0044, which was awarded December 11, 2007; and Charles's retirement, which was announced on October 1, 2008. Still, even considering all of this untimely evidence, Appellants' § 1983 claims against Judnic fail.

1. *Direct Evidence of Judnic's Discrimination*

"[D]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn,* 176 F.3d at 926. Direct evidence "does not require a factfinder to draw any inferences." *Johnson v. Kroger Co.,* 319 F.3d 858, 865 (6th Cir.2003).

Appellants contend that Judnic's saying "no woman should be making that kind of money" amounts to direct evidence of sex-based discrimination. This argument has several fatal defects. First, this statement was isolated and ambiguous—particularly given Caldwell's inability to recall its details. As such, it does not constitute direct evidence of discrimination. *See Phelps v. Yale Sec., Inc.,* 986 F.2d 1020, 1025–26 (6th Cir.1993). Nothing in the statement indicates that it was made regarding Foster or

Foster v. Michigan, 573 Fed.Appx. 377 (2014)

BBF. *See Griffin v. Finkbeiner,* 689 F.3d 584, 595 (6th Cir.2012) ("The fact that the statements do not specifically mention [plaintiff] means only that they are not direct evidence of discrimination....").

Also, Judnic did not make this statement in the context of an evaluation or other adverse employment action. "Statements by decision makers unrelated to the decisional process itself can not suffice to satisfy the plaintiff's burden of demonstrating animus." *Bush v. Dictaphone Corp.,* 161 F.3d 363, 369 (6th Cir.1998) (quoting *Price Waterhouse v. Hopkins,* 490 U.S. 228, 277, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (O'Connor, J., concurring)) (internal quotation marks and alterations omitted). If comments suggesting animus were present, we then would consider whether Judnic took an adverse action "because of [his] predisposition to discriminate" against a protected class. *DiCarlo v. Potter,* 358 F.3d 408, 416 (6th Cir.2004). Given that—even in Caldwell's fuzzy recollection—this statement was singular, there is no evidence in the record that Judnic harbored animus. *Compare Hopkins v. Elec. Data Sys. Corp.,* 196 F.3d 655, 661 (6th Cir.1999) (finding that a single slur was not direct evidence of discrimination) *with Talley v. Bravo Pitino Restaurant, Ltd.,* 61 F.3d 1241, 1249 n. 2 (6th Cir.1995) ("[T]he repeated usage of racial slurs in this case cannot be termed isolated or abstract.").

Finally, the timing of the statement—sometime in 2006 and thus roughly three years before the evaluation and two years before a timely claim could have accrued—undercuts finding that it is direct evidence. *See Hein v. All Am. Plywood Co., Inc.,* 232 F.3d 482, 489 (6th Cir.2000) (explaining that comments made five months before an employee's termination were too far removed to be direct evidence); *Phelps,* 986 F.2d at 1026 (stating that comments made "nearly a year" before an adverse action "were made too long before ... to have influenced the ... decision"); *but see DiCarlo,* 358 F.3d at 416 (holding that racial slurs made three weeks before termination constituted direct evidence). The district court did not err in concluding that Appellants' failed to point to direct evidence of Judnic's discrimination.

**\*394**  *2. Circumstantial Evidence of Judnic's Discrimination*

To make a prima facie case of discrimination under § 1983, App ellants must sufficiently indicate that Judnic took an adverse action against them. *See, e.g., Rushton v. City of Warren,* 90 Fed.Appx. 912, 916 (6th Cir.2004); *Policastro v. N.W. Airlines, Inc.,* 297 F.3d 535, 539 n. 1 (6th Cir.2002). An adverse action is "a materially adverse

change in the terms and conditions" of Appellants' work; examples include "termination of employment, a demotion ... a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Hollins v. Atl. Co., Inc.,* 188 F.3d 652, 662 (6th Cir.1999). *De minimis* actions are not materially adverse. As we explained fifteen years ago, if every action that made an employee "unhappy or resentful" was materially adverse, then supervisors could be liable for "criticism or even facial expressions indicating displeasure." *Primes v. Reno,* 190 F.3d 765, 766 (6th Cir.1999); *accord Williams v. Bristol–Myers Squibb Co.,* 85 F.3d 270, 274 (7th Cir.1996) ("Otherwise, every trivial personnel action that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit."). Appellants' circumstantial evidence of discrimination fails to indicate that Judnic was "personally involved in the alleged misconduct." *Miller v. Calhoun Cnty.,* 408 F.3d 803, 817 n. 3 (6th Cir.2005).

For example, in 2010 when BBF was not being paid for its work as a subconsultant on the Gateway Project, Appellants do not dispute that the delay in payment was because URS—the prime consultant—initially failed to submit BBF's invoices to Judnic. Appellant's point to this temporary nonpayment as an adverse action, contending that Judnic neglected to investigate this issue promptly or thoroughly. This argument is flawed for several reasons. First, this allegation appears to be less of a claim of intentional discrimination and more of a claim sounding in negligence. Second, this claim appears indistinguishable from *Rasins Landscape & Assocs., Inc. v. MDOT,* 528 Fed.Appx. 441 (6th Cir.2013), where we held that an MDOT subcontractor lacked standing to bring a claim against MDOT for a prime contractor's failure to pay contract proceeds. *Id.* at 444–45.

Appellants' other aspects of circumstantial evidence fail to indicate that Judnic took a materially adverse action against them. Many of Appellants' other pieces of evidence—including having to submit a FOIA request to see subconsultant evaluations, Judnic's holding a telephonic meeting instead of an in-person one, and Judnic's having another engineer meet with Foster—fall into the category of *de minim is* actions that are not materially adverse. *See Primes,* 190 F.3d at 766. Further, Appellants contend that Judnic took a materially adverse action by requiring extra training for Stewart. Unrefuted evidence in the record, however, indicates that Judnic had no hand in this requirement. Appellants also contend that Judnic took a materially adverse action against them by inserting the leased-vehicle requirement into an RFP in 2010. This requirement, however, was not materially adverse because it applied across-the-board to any consultant who wished to submit a proposal for the project.

Foster v. Michigan, 573 Fed.Appx. 377 (2014)

Appellants' strongest adverse action argument is Judnic's giving BBF two "7 out of 10" scores in his evaluation of BBF's performance on Contract 2006–0490. Indeed, the district court found that this evaluation was materially adverse. To reach this conclusion, the district court **\*395** relied on our decision in *Blizzard v. Marion Technical College,* 698 F.3d 275, 290 (6th Cir.2012), which in turn relies on the Supreme Court's decision in *Burlington Northern & Santa Fe Railway Company v. White,* 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006), to apply a "reasonable worker" standard—that an adverse action is material if it would dissuade a reasonable worker from making or supporting a charge of discrimination.

Appellees, however, contend that the district court relied on the incorrect definition of "adverse action." They assert that *Burlington Northern* established the reasonable worker standard for retaliation but did not relax the standard for disparate-treatment. We agree; although *Burlington Northern* certainly expanded the definition of adverse employment action for the purposes of retaliation, it left the term undisturbed in the discrimination context. *See Tepper v. Potter,* 505 F.3d 508, 515 n. 1 (6th Cir.2007) (explaining that *Burlington Northern* expanded the definition of "adverse employment action for a Title VII retaliation claim" but that "*Burlington Northern* did not expand or alter this Court's formulation of an adverse employment action for purposes of the discrimination claim before us" (internal citations and quotation marks omitted)); *Michael v. Caterpillar Fin. Servs. Corp.,* 496 F.3d 584, 595–96 (6th Cir.2007) (emphasizing the distinction between a prima facie discrimination claim and a prima facie retaliation claim).

For a disparate-treatment discrimination claim, a "mid-range, performance evaluation of 'fully successful' " is not an adverse action sufficient to withstand summary judgment. *Primes,* 190 F.3d at 766; *see also James v. Metro. Gov't of Nashville,* 243 Fed.Appx. 74, 79 (6th Cir.2007) (noting that an adverse evaluation did not constitute a materially adverse action before *Burlington Northern* ). Judnic's assigning BBF two scores of mid-range on a one-to-ten scale appears decidedly mid-range. But even if this evaluation did indicate that BBF had not been fully successful, Appellants would still need to indicate that they "suffered, or [are] in jeopardy of suffering," a concrete action "because of the downgraded evaluation." *Morris v. Oldham Cnty. Fiscal Court,* 201 F.3d 784, 789 (6th Cir.2000). Unless this negative evaluation had palpable negative effects, it is not actionable. *See Vaughn v. Louisville Water Co.,* 302 Fed.Appx. 337, 348 (6th Cir.2008); *Morris,* 201 F.3d at 789; *cf. White v. Baxter Healthcare Corp.,* 533 F.3d 381, 403 (6th Cir.2008) ("By receiving a lower salary increase than he would have

without the more negative evaluation, White was denied an increase in pay to which he allegedly was entitled.").

Appellants fail to identify any contracts that BBF and Foster were not awarded as a result of either the evaluation for Contract 2006–0490 or Judnic's conduct generally. Foster does offer some highly speculative testimony claiming that BBF was not awarded contracts because of Judnic's actions, but a plaintiff's subjective beliefs are "wholly insufficient evidence to establish a claim of discrimination." *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 584 (6th Cir.1992); *see also Shaheen v. Naughton,* 222 Fed.Appx. 11, 13–14 (2d Cir.2007) (affirming summary judgment where a plaintiff "merely speculates that her failure to secure another residency must have been a result of negative evaluations"). Rather, Appellants acknowledge that BBF struggled to obtain work before Judnic's evaluation and, conversely, that a panel chaired by Judnic selected BBF for a contract after this evaluation. Additionally, "Past Performance" ratings on BBF's pre- and post-evaluation proposals remained largely consistent.

**\*396** Because Appellants do not offer evidence that Judnic's evaluation either was noticeably worse than prior evaluations or that it meaningfully affected BBF's ability to secure future work, this evaluation does not constitute a materially adverse action. Because Appellants do not sufficiently assert that Judnic took a materially adverse action against them, their disparate-treatment-based equal protection claim against Judnic fails.[5]

D. *Section 1983 claims against Stuecher*

Appellants do not appear to challenge the district court's holding that Stuecher's alleged statement—"I hate her"—was not direct evidence of either race or gender discrimination. We therefore only analyze whether the district court erroneously concluded that Appellants did not put forth a prima facie § 1983 disparate-treatment claim using circumstantial evidence. As this claim was resolved at the summary judgment stage, we must draw all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Accordingly, although the record is conflicted regarding whether Stuecher unilaterally changed BBF's evaluation scores during the selection process for the 2009 ARRA contract, we assume that he did at this stage. This modification of BBF's scores such that BBF did not progress to the second round of evaluation constitutes a materially adverse action. To prevail on their § 1983 disparate treatment claim, however, Appellants must also

indicate that Stuecher treated BBF differently from other similarly situated consulting firms.

The Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985).* A prima facie case of discrimination requires a plaintiff to show that she was treated differently than others outside of the protected class. *See, e.g., Younis v. Pinnacle Airlines, Inc., 610 F.3d 359, 363 (6th Cir.2010).* "[T]o be deemed 'similarly-situated', the [firms] with [which] the plaintiff seeks to compare [her] treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir.1992).* Appellants "need not demonstrate an exact correlation," but their comparators "must be similar in 'all of the *relevant* aspects.' " *Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir.1998)* (emphasis in original) (quoting *Pierce v. Commonwealth Life Ins. Co., 40 F.3d 796, 802 (6th Cir.1994)*).

The district court found that Appellants had, at best, identified three alleged comparators—Wade Trim Associates, HNTB, and Great Lakes Engineering—but that Appellants did not provide any factual bases to support a finding that these firms were similarly situated. Appellants now claim both that there are no firms comparable to BBF and that all the "majority" consulting firms—HNTB; Fishbeck, **397** Thompson, Carr & Huber; Great Lakes Engineering; URS Corporation; and Wade Trim Associates—are similarly situated. Moving beyond the inconsistency of this argument, because Appellants did not assert that all of these firms were similarly situated in the district court, we need not consider these new arguments. *See Coach,* 717 F.3d at 502.

We nevertheless note that Appellants have not presented sufficient evidence to indicate that any of these firms are similarly situated. To have a sufficient comparator, Appellants need to identify a non protected firm that "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish [its] conduct or the employer's treatment of them for it" and was "subject to the same standards." *Mitchell,* 964 F.2d at 577. Appellants offer no evidence regarding the experience, qualifications, or size of these supposedly similarly situated firms beyond conclusory statements that the firms were similarly situated.

Indeed, of all the firms that Appellants attempt to use as comparators, only two—HNTB and URS—submitted proposals for the 2009 ARRA contract. Although HNTB was more highly scored than BBF and did ultimately receive the contract, the record does not support Appellant's contention that BBF and HNTB are similarly situated with regard to the 2009 ARRA contract. Turning to URS, even if it were similarly situated (and nothing in the record indicates that it is), it still would not make for an apt comparator because URS actually received lower scores than BBF.

In sum, Appellants have not satisfied the similarly-situated element for a prima facie case of § 1983 discrimination. They have not offered evidence that Great Lakes, HNTB, Wade Trim, or any other "majority" firm dealt with the same supervisors, offered substantially similar proposals to MDOT, had substantially similar employee teams, or had substantially similar evaluations and scores as they were going into the 2009 ARRA evaluation process. Accordingly, Appellants have not satisfied the elements of a prima facie case, and the district court properly granted summary judgment to Stuecher on this claim.

### E. *Due Process Claims under § 1983*

The district court denied Appellants leave to add a § 1983 due process claim regarding Judnic's "low" evaluation to their amended complaint. The district court found that this amendment would be futile because BBF did not have a constitutionally protected liberty or property interest in an evaluation or a protected interest in MDOT's contracting procedures. Giving Appellants every benefit of the doubt, they appear to challenge this ruling on appeal by claiming that BBF was entitled to contracts which were awarded and then wrested away. This cursory argument does not identify any specific contracts that were "wrested away." Based on our best guess, Appellants are referring to the M–10 portion of Contract 2006–0490 that was split away and awarded to another firm. If so, that claim would fail because BBF could not have had a property interest in the contract since it was not yet "actually awarded" when its scope was reduced. *See United of Omaha Life Ins. Co. v. Solomon, 960 F.2d 31, 34 (6th Cir.1992); see also 40 U.S.C. § 1104(b).* Moreover, this claim from 2006 would fall outside of § 1983's three-year statute of limitations. Accordingly, the district court properly concluded that this claim would be futile.

### III. Claims under the Michigan Whistleblower Protection Act

Foster v. Michigan, 573 Fed.Appx. 377 (2014)

The district court found four independent grounds on which to grant summary judgment on Appellants' individual-capacity *398 WPA claims against Judnic and Stuecher: (1) BBF and Foster were not "employees" of MDOT; (2) Appellants did not identify an adverse action taken within the WPA's ninety-day statute of limitations; (3) Appellants failed to identify any adverse actions after Foster engaged in a protected activity; and (4) Appellants did not identify any adverse actions Judnic or Stuecher took after they knew the protected activity. Appellants challenge all of these findings and assert that factual issues preclude summary judgment.

We analyze claims under Michigan's WPA using the burden-shifting framework for retaliatory discharge claims under the Elliot Larsen Civil Rights Act. *See Taylor v. Modern Eng'g, Inc.,* 252 Mich.App. 655, 653 N.W.2d 625, 628 (2002); *accord Pethers v. Metro Lift Propane,* No. 09–CV–10516, 2010 WL 3023887, at *6 (E.D.Mich., July 29, 2010). Under this framework, a plaintiff first must establish a prima facie case under the WPA. *E.g., West v. Gen. Motors Corp.,* 469 Mich. 177, 665 N.W.2d 468, 471–72 (2003). Once a plaintiff has made this showing, the burden of production shifts to the defendant to articulate a legitimate, nonretaliatory explanation for its adverse employment action. *E.g., Roulston v. Tendercare (Michigan), Inc.,* 239 Mich.App. 270, 608 N.W.2d 525, 530 (2000). If the defendant proffers a legitimate, nonretaliatory reason, the plaintiff then has the opportunity to prove that the defendant's purported legitimate reason was merely pretext for the discharge. *Taylor,* 653 N.W.2d at 628 (citing *Roulston,* 608 N.W.2d at 530).

To make a prima facie WPA case, Appellants must show: (1) that they were engaged in a protected activity under the WPA; (2) that they suffered an adverse employment action; and (3) that there is a causal connection between the protected activity and the adverse action. *West,* 665 N.W.2d at 471–72. Assuming for the sake of argument that Foster and BBF were MDOT employees, Appellants have nonetheless failed to assert a prima facie WPA case against Judnic or Stuecher. Foster's filing complaints with the FHWA satisfies the protected activity prong of a prima facie WPA case. Appellants, however, stumble at the second and third prongs. The WPA has a ninety-day statute of limitations. Mich. Comp. Laws § 15.363(1). Although they claim that there are questions of fact regarding this statute of limitations, Appellants do not identify any adverse actions that Judnic or Stuecher allegedly took after Foster first filed her complaints in June 2010. Accordingly, the district court properly concluded that Appellants have not sufficiently alleged a causal connection between any adverse actions by Judnic and Stuecher and Foster's filing Title VI complaints with the FHWA.

Appellants also challenge the district court's dismissal of their WPA claims against MDOT, the State of Michigan, and Judnic and Stuecher in their official capacities. Appellants acknowledge that the Eleventh Amendment bars suits for damages against a state in federal court but then argue, "However, this does not preclude non-equitable relief. Plaintiffs may proceed against the State and its agencies with their WPA claims." This statement is both befuddling and flatly wrong; under the Eleventh Amendment, "the States' constitutional immunity from suit prohibits all state-law claims filed against a State in federal court, whether those claims are monetary or injunctive in nature." *Ernst v. Rising,* 427 F.3d 351, 368 (6th Cir.2005). The district court properly dismissed these claims.

*399 *CONCLUSION*

For the foregoing reasons, we **AFFIRM** the district court's dismissal of Appellants' claims.

**All Citations**

573 Fed.Appx. 377

Footnotes

1    Incorrectly captioned as "Mark Steucher."

2    "The U.S. Department of Transportation's DBE (disadvantaged business enterprise) program provides a vehicle for increasing the participation by [Minority Business Enterprises] in state and local procurement." United States Dept. of Trans., *Disadvantaged Business Enterprise (DBE) Program,* http://www.dot.gov/osdbu/disadvantaged-business-enterprise. "To be certified as a DBE, a firm must be a small business owned and controlled by socially and economically disadvantaged individuals." *Id.*

Foster v. Michigan, 573 Fed.Appx. 377 (2014)

3    Because Appellants did not claim that MDOT's audit of BBF was retaliatory in the district court, we need not rule on this claim. *See Coach, Inc. v. Goodfellow,* 717 F.3d 498, 502 (6th Cir.2013) ( "Ordinarily, we will not address issues raised for the first time on appeal.") (citing *McFarland v. Henderson,* 307 F.3d 402, 407 (6th Cir.2002)). Nonetheless, we note that even if the issue were properly before us, we would find that Appellants still failed to allege a plausible retaliation claim and thus that this claim was properly dismissed.

4    Although Appellants attempted to bring their § 1981 claims as independent actions, 42 U.S.C. § 1981 does not contain a private remedy. Rather, it is essentially part and parcel of Appellants' 1983 claim. *See Thompson v. City of Lansing,* 410 Fed.Appx. 922, 934 (6th Cir.2011) (stating that a § 1981 claim is analyzed using the same framework as a § 1983 discrimination claim); *McCormick v. Miami Univ.,* 693 F.3d 654, 660–61 (6th Cir.2010) (explaining that § 1981 is enforced through § 1983).

5    Based on this holding, we need not examine whether Appellants can point to evidence that Judnic treated any similarly situated consulting firms differently. Nonetheless, we note that Appellants are unable to do so for the reasons explained below in the next section, addressing whether Appellants can identify any similarly situated consulting firms that Stuecher treated differently.

---

**End of Document**                     © 2025 Thomson Reuters. No claim to original U.S. Government Works.

41 Fed.Appx. 762
This case was not selected for publication in the
Federal Reporter.
Not for Publication in West's Federal Reporter See
Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued on or
after Jan. 1, 2007. See also Sixth Circuit Rule 28.
(Find CTA6 Rule 28)
United States Court of Appeals,
Sixth Circuit.

Kenneth Alan FRAZIER, also known as
K. Al Frazier, Plaintiff–Appellant,

v.

State of MICHIGAN, et al., Defendants–
Appellees.

No. 02–1160.
|
July 22, 2002.

**Synopsis**

Michigan prisoner brought action against state officials
under Americans with Disabilities Act (ADA) and §§
1981, 1983, 1985(3), 1986, and 1988. The district court
dismissed the action, and prisoner appealed. The Court of
Appeals held that complaint failed to state a claim.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion to Dismiss.
**\*763** Before MERRITT and DAUGHTREY, Circuit
Judges; and WEBER, District Judge.\*

*ORDER*

**\*\*1** Kenneth Alan Frazier, also known as K. Al Frazier, a
Michigan prisoner proceeding pro se, appeals a district
court judgment dismissing his civil action filed pursuant to
the Americans with Disabilities Act ("ADA"), 42 U.S.C.
§§ 12131–34, and 42 U.S.C. §§ 1981, 1983, 1985(3), 1986,
and 1988. This case has been referred to a panel of the court
pursuant to Rule 34(j)(1), Rules of the Sixth Circuit. Upon
examination, this panel unanimously agrees that oral
argument is not needed. Fed. R.App. P. 34(a).

On October 11, 2001, Frazier filed a complaint against the
state of Michigan; John Engler, governor of the state of
Michigan; and the following individuals: Bill Martin, Dan
Bolden, Gil Bettinger, Richard B. Stapleton, Thomas
Patten, Michael J. Crowley, George M. Pennell, Dr. Oh
Chung Do, Practioner P. Koskiniemi, "Psych" R.
Marcenino, "Psych" Nannbery, Dr. Richard D. Shaul,
Darlene Edlund, William Luetzow, Sharon Wright, Beth
Smith, "RUO" Heally, "RUO" Jack Jackola, "RUO" Mary
Peterson, and "RUO" Edward Anderson. The complaint
did not indicate the defendants' positions or the capacities
in which the defendants were sued. Although the complaint
stated that such information was included in the "attached
notice pleadings ... and attached exhibits in support," no
such documents were attached to the complaint.

Frazier's complaint, consisting of three paragraphs in its
entirety, alleged in a conclusory manner that he has been
subjected to a wide variety of unconstitutional conditions
of confinement and deprived of his federal rights during his
incarceration. The complaint also referred the court to
"attached notice pleadings for full detailed disclosure,"
however such "notice pleadings" were not attached to the
complaint.

The district court granted Frazier's motion to proceed in
forma pauperis. Despite Frazier's failure to demonstrate
exhaustion of his administrative remedies, the district court
subsequently dismissed the complaint for failure to state a
claim upon which relief may be granted pursuant to 28
U.S.C. §§ 1915(e), 1915A, and 42 U.S.C. § 1997c(c).
Frazier's Fed.R.Civ.P. 59(e) motion to alter or amend the
judgment was denied by the district court. Frazier has filed
a timely appeal.

We review de novo a district court's judgment dismissing
a suit for failure to state a claim upon which relief may be
granted under §§ 1915(e)(2) and 1915A(b). *Brown v.
Bargery,* 207 F.3d 863, 867 (6th Cir.2000). "Dismissal of
a complaint for the failure to state a claim on which relief
may be granted is appropriate only if it appears beyond a
doubt that the plaintiff can prove no set of facts in support
of his claim that would entitle him to relief." *Id.* **\*764** We
also review de novo a district court's judgment dismissing
a prisoner's complaint under § 1997c(c). *Ruiz v. United
States,* 160 F.3d 273, 275 (5th Cir.1998).

A complaint must contain " 'either direct or inferential
allegations respecting all the material elements to sustain a
recovery under *some* viable legal theory.' " *Scheid v. Fanny
Farmer Candy Shops, Inc.,* 859 F.2d 434, 436 (6th
Cir.1988) (quoting *Car Carriers, Inc. v. Ford Motor Co.,*
745 F.2d 1101, 1106 (7th Cir.1984)). The court is not
required to accept non-specific factual allegations and
inferences or unwarranted legal conclusions. *See Dellis v.
Corrs. Corp. of Am.,* 257 F.3d 508, 511 (6th Cir.2001);
*Lillard v. Shelby County Bd. of Educ.,* 76 F.3d 716, 726
(6th Cir.1996); *Morgan v. Church's Fried Chicken,* 829

Frazier v. Michigan, 41 Fed.Appx. 762 (2002)

F.2d 10, 12 (6th Cir.1987); *Chapman v. City of Detroit,* 808 F.2d 459, 465 (6th Cir.1986); *Smith v. Rose,* 760 F.2d 102, 106 (6th Cir.1985). Furthermore, a complaint must allege that the defendants were personally involved in the alleged deprivation of federal rights. *Hall v. United States,* 704 F.2d 246, 251 (6th Cir.1983).

**\*\*2** Upon review, we conclude that Frazier's complaint failed to state a claim upon which relief may be granted and was properly dismissed by the district court. Frazier's complaint contained no specific facts in support of his conclusory allegations that the defendants violated his constitutional and statutory rights. Moreover, Frazier failed to allege with any degree of specificity which of the named defendants were personally involved in or responsible for each of the alleged violations of his federal rights. Thus, even under the most liberal construction, Frazier's complaint did not state a claim for relief. The arguments asserted by Frazier in his appellate brief do not compel a different result.

Accordingly, the district court's judgment is affirmed. Rule 34(j)(2)(C), Rules of the Sixth Circuit.

**All Citations**

41 Fed.Appx. 762, 2002 WL 1628210

Footnotes

\*       The Honorable Herman J. Weber, United States District Judge for the Southern District of Ohio, sitting by designation.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

92 Fed.Appx. 188
This case was not selected for publication in West's
Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued on or
after Jan. 1, 2007. See also U.S.Ct. of App. 6th Cir.
Rule 32.1.
United States Court of Appeals,
Sixth Circuit.

Eric GILMORE, Plaintiff–Appellant,

v.

CORRECTIONS CORPORATION OF
AMERICA; et al., Defendants–Appellees.

No. 03–5836.
|
Feb. 6, 2004.

**Synopsis**
**Background:** Pro se state prisoner sued correctional
service center and its supervisory and non-supervisory
personnel, seeking unspecified relief under § 1983 based
on allegations that center denied him medical care,
threatened him when he tried to exercise his First
Amendment free speech rights, deprived him of clothes
and toiletries, assigned him to upper bunk despite medical
directive, and took money out of his account. The United
States District Court for the Middle District of Tennessee,
Thomas A. Higgins, J., granted prisoner in forma pauperis
(IFP) status, and dismissed the complaint as frivolous.
Prisoner appealed.

**Holdings:** The Court of Appeals held that:

complaint did not allege how supervisory personnel of
correctional service center were liable under § 1983 for
alleged violations of his constitutional rights, and thus was
properly dismissed as frivolous, and

complaint against center's non-supervisory staff, which
merely listed their names in caption and alleged
constitutional violations in body of complaint, was
insufficient to sustain recovery of unspecified damages
under § 1983, and thus was properly dismissed as
frivolous.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion to Dismiss.

**Attorneys and Law Firms**

**\*189** Eric Gilmore, Mountain City, TN, Pro se.

Gustavus A. Puryear, IV, Corrections Corporation of
America, Kimberly J. Dean, Asst. Atty. General, Office of
the Attorney General, Nashville, TN, Tom Anderson,
Anderson Law Firm, Jackson, TN, for Defendants–
Appellees.

Before BATCHELDER, GIBBONS, and COOK, Circuit
Judges.

*ORDER*

**\*\*1** Eric Gilmore, a Tennessee prisoner proceeding pro se,
appeals the district court order that dismissed his civil
rights complaint filed pursuant to 42 U.S.C. § 1983. This
case has been referred to a panel of the court pursuant to
Rule 34(j)(1), Rules of the Sixth Circuit. Upon
examination, this panel unanimously agrees that oral
argument is not needed. Fed. R.App. P. 34(a).

Seeking unspecified relief, Gilmore sued the Corrections
Corporation of America (CCA) and twenty-two
individuals. Gilmore alleged that the South Central
Correctional Center and its staff: (1) denied him medical
care; (2) threatened him when he tried to exercise his First
Amendment right to free speech through the prison
grievance system; (3) deprived him of clothes and
toiletries; (4) assigned him to an upper bunk despite a
medical directive; and (5) took all the money out of his
account. Gilmore did not identify any of the defendants in
the body of his complaint. The district court granted
Gilmore in forma pauperis status, screened the complaint,
and dismissed the complaint as frivolous. *See* 28 U.S.C. §
1915(e)(2). The court held that Gilmore could not sue the
five supervisory personnel named as defendants because
respondeat superior does not apply in § 1983 claims, and
that Gilmore failed to allege how the remaining defendants
violated his constitutional rights.

On appeal, Gilmore restates his district court claims and
argues that the supervisory personnel directly participated
in the violation of his rights or acquiesced or authorized the
violation of his rights.

We review de novo a district court's decision to dismiss
under 28 U.S.C. § 1915(e)(2). *McGore v. Wrigglesworth,*
114 F.3d 601, 604 (6th Cir.1997). The Prison Litigation

Gilmore v. Corrections Corp. of America, 92 Fed.Appx. 188 (2004)

Reform Act requires district courts to screen and dismiss complaints that are frivolous, fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief, "even before ... the individual had an opportunity to amend the complaint." *Id.* at 608–09; *accord* 28 U.S.C. § 1915(e)(2). A case is frivolous if it lacks an arguable **\*190** basis either in law or in fact. *Neitzke v. Williams,* 490 U.S. 319, 325, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989).

Upon review, we affirm the district court's decision for the reasons stated by the district court. Gilmore listed the CCA and twenty-two individuals in the caption of his complaint and gave job titles for most of the individuals. In the body of his complaint, however, Gilmore only stated that "South Central Correctional Center and its staff and security" violated his constitutional rights. The district court properly dismissed Gilmore's claims against the five supervisory defendants because § 1983 liability will not be imposed solely upon the basis of respondeat superior. *See Taylor v. Mich. Dep't of Corr.,* 69 F.3d 76, 80–81 (6th Cir.1995). Gilmore did not allege that these defendants condoned, encouraged, or knowingly acquiesced in the alleged misconduct, so his complaint lacked an arguable basis in law. *See id.*

**\*\*2** As for the remaining defendants, Gilmore did not allege how any of them were involved in the violation of his rights. Courts construe pro se complaints liberally. *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972). However, even pro se complaints must satisfy basic pleading requirements. *See Wells v. Brown,* 891 F.2d 591, 594 (6th Cir.1989). A complaint must contain allegations respecting all the elements to sustain a recovery under some viable legal theory. *Scheid v. Fanny Farmer Candy Shops, Inc.,* 859 F.2d 434, 436 (6th Cir.1988). Merely listing names in the caption of the complaint and alleging constitutional violations in the body of the complaint is not enough to sustain recovery under § 1983. *See Flagg Bros. v. Brooks,* 436 U.S. 149, 155–57, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978).

For the foregoing reasons, we affirm the district court's order. Rule 34(j)(2)(C), Rules of the Sixth Circuit.

### All Citations

92 Fed.Appx. 188, 2004 WL 237417

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

446 Fed.Appx. 737
This case was not selected for publication in West's
Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued on or
after Jan. 1, 2007. See also U.S.Ct. of App. 6th Cir.
Rule 32.1.
United States Court of Appeals, Sixth Circuit.

Claude GRANT; Oralene Day; Princess
Martindale; Faletha B. Reid; Darryl
McKibbens; Darrel Gant; Antonio
McKissack; Pamela Tucker; and Sandra
Derrick, individually and on behalf of all
others similarly situated, Plaintiffs–
Appellees,
v.
METROPOLITAN GOVERNMENT OF
NASHVILLE and DAVIDSON COUNTY,
TENNESSEE, Defendant–Appellant.

Nos. 10–5944, 10–6233
|
Aug. 26, 2011.

**Synopsis**
**Background:** African-American employees brought class
action against public employer, alleging race
discrimination. Following jury verdict in favor of
employer, the United States District Court for the Middle
District of Tennessee, William J. Haynes, Jr., J., granted
employees' motion for new trial. Employer appealed and
petitioned for writ of mandamus to reinstate jury verdict.
The Court of Appeals, Ronald Lee Gilman, Circuit Judge,
606 F.3d 855, granted petition in part, dismissed appeal and
remanded. Following bench trial on remand, the United
States District Court for the Middle District of Tennessee
entered verdict in employees' favor. Employer appealed.

**Holdings:** The Court of Appeals, Alice M. Batchelder,
Chief Judge, held that:

Court of Appeals had jurisdiction to review merits of
district court's order granting injunctive relief, and

employees failed to establish prima facie case of disparate
impact race discrimination.

Reversed.

Clay, Circuit Judge, filed dissenting opinion.

**Procedural Posture(s):** On Appeal.

**\*738** On Appeal from the United States District Court for
the Middle District of Tennessee.

BEFORE: BATCHELDER, Chief Judge; CLAY and
SUTTON, Circuit Judges.

**Opinion**

ALICE M. BATCHELDER, Chief Judge.

In this class action lawsuit alleging racial discrimination,
the district court entered judgment for Plaintiffs after a
bench trial on their disparate impact claims. Because we
find that Plaintiffs failed to establish a prima facie case of
disparate impact liability, we reverse.

**I.**

Nine named plaintiffs filed this class action under Title VII
of the Civil Rights Act of 1964 ("Title VII") against
Defendant–Appellant Metropolitan Government of
Nashville and Davidson County, Tennessee ("Metro"). The
named plaintiffs are current and former employees of
Metro Water Services ("MWS"), a subdivision of Metro.
They alleged various violations of Title VII on behalf of
themselves and all others similarly situated.[1] Specifically,
Plaintiffs claimed that MWS engages in systemic practices
of discrimination against black employees in post-hiring
opportunities, including disparate job assignments,
promotions, pay, accommodations, discipline, and other
terms and conditions of their employment. Plaintiffs
presented disparate treatment and disparate impact theories
of liability.[2]

During the bench trial, Plaintiffs sought to establish their
case through anecdotal evidence and expert testimony.
Plaintiffs' expert, Dr. Moomaw, examined the proportion
of black employees across numerous categories of MWS's
workforce, including FLSA exempt status, salary type, and
pay grade. He found that black employees at MWS were
disproportionately represented in lower-paying positions
which had fewer supervisory responsibilities and fewer
opportunities for advancement. Dr. Moomaw concluded
that black employees' placement into those jobs limited
their opportunities for promotions and higher earnings.

Based on Plaintiffs' evidence, the district court held that
they had presented a prima facie case of disparate impact
discrimination.[3] Upon determining that Plaintiffs **\*739**

Grant v. Metropolitan Government of Nashville and..., 446 Fed.Appx. 737...

113 Fair Empl.Prac.Cas. (BNA) 262

were entitled to judgment on their disparate impact claims,[4] the district court awarded them back pay, the amount of which would be determined by a Special Master appointed by the court. The court further awarded immediate injunctive relief by prohibiting MWS from conducting oral interviews for MWS promotions, imposing an interview requirement for MWS lateral transfers, and ordering a Special Master to conduct oral interviews and validate all MWS job requirements. Metro filed a timely notice of appeal.

In the meantime, the district court appointed Dr. Kathleen Lundquist as Special Master in the case to conduct oral interviews and oversee the promotions process. Alleging that Dr. Lundquist had a conflict of interest that precluded her from serving as Special Master and that the district court failed to follow Rule 53's procedures, Metro moved the district court to revise its appointment. Although the motion was unopposed, the district court denied Metro's motion. Metro filed a timely supplemental appeal. This Court consolidated the two appeals.

## II.

As an initial matter, we must address Plaintiffs' motion to dismiss this appeal for lack of jurisdiction. Plaintiffs argue that we lack jurisdiction to review the merits of the district court's opinion and that we may only consider the question of whether the district court abused its discretion by granting injunctive relief.

It is well-established that we have jurisdiction over appeals from interlocutory orders that grant or deny injunctive relief. *See* 28 U.S.C. § 1292(a)(1). There is no dispute that some aspects of the district court's order awarded injunctive relief, namely the component which orders Metro Civil Services Commission ("MCSC") to conduct oral interviews and bars MWS from participation.[5] This aspect of the district court's order is directed to Metro and MWS, enforceable by contempt, and designed to provide the relief sought by Plaintiffs in their complaint. Accordingly, this Court has jurisdiction to review the district court's order. *See* 28 U.S.C. § 1292(a)(1); *Abercrombie & Fitch Co. v. Fed. Ins. Co.,* 370 Fed.Appx. 563, 568 (6th Cir.2010).

As a general matter, we limit our review under § 1292(a)(1) to decide "only whether the district court abused its discretion in ruling on the request for relief." *Jones v. Caruso,* 569 F.3d 258, 269 (6th Cir.2009) (quotation marks omitted). But in making that determination, we also have "jurisdiction to reach the merits, at least where there are no

relevant factual disputes and the matters to be decided are closely related to the interlocutory order being appealed." *Id.*; *see also Doe v. Sundquist,* 106 F.3d 702, 707 (6th Cir.1997).

In order to review the district court's decision to grant injunctive relief in this case, we must look at the district court's disparate impact determination—the basis for that injunctive relief. We cannot determine whether the district court abused its discretion in awarding injunctive relief unless we first determine whether the district court's finding of liability was correct. Accordingly, we will exercise our jurisdiction to review the merits of the district court's legal determination. Plaintiffs' motion to dismiss is DENIED.

## III.

"This Court's standard of review in a Title VII discrimination case is narrow." **\*740** *Dunlap v. Tenn. Valley Auth.,* 519 F.3d 626, 629 (6th Cir.2008) (quotation marks omitted). While we review legal conclusions de novo, *Bailey v. USF Holland, Inc.,* 526 F.3d 880, 885 (6th Cir.2008), we review the district court's findings of fact for clear error, *Dunlap,* 519 F.3d at 629. In reviewing the court's factual findings, "[t]he issue is not whether the district court reached the best conclusion, but whether the evidence before the court supported the district court's findings." *Id.* (citation omitted).

On appeal, Metro argues that Plaintiffs failed to establish their prima facie case of disparate impact discrimination, so we limit our discussion accordingly.[6] A prima facie case of disparate impact discrimination under Title VII requires a plaintiff to (1) identify a specific employment practice and (2) present relevant statistical data that the challenged practice has an adverse impact on a protected group. *Id.*

## A.

Regarding the first prong of the prima facie case, the Supreme Court has explained that a plaintiff is "responsible for isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities." *Watson v. Ft. Worth Bank & Trust,* 487 U.S. 977, 994, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988); *see also Wal–Mart Stores, Inc. v. Dukes,* ––– U.S. ––––, 131 S.Ct. 2541, 2555–56, 180 L.Ed.2d 374 (2011). However, if a plaintiff demonstrates that "the elements of

[an employer's] decisionmaking process are not capable of separation or analysis, [then] the decisionmaking process may be analyzed as one employment practice." 42 U.S.C. § 2000e–2(k)(1)(B)(i); *see also Phillips v. Cohen,* 400 F.3d 388, 398 (6th Cir.2005). Metro claims that Plaintiffs never isolated and identified specific employment practices, and that they failed to demonstrate that the practices are incapable of separation.

Plaintiffs' general claim is that MWS has engaged in "preselection" which caused an adverse, disparate impact on black employees. They allege that this preselection has taken many forms, including tailored job qualifications, selective interviewing, and subjective decisionmaking. The problem, however, is that Plaintiffs make no effort to isolate any of these practices or to examine their individual effects on the promotions process. *See Watson,* 487 U.S. at 994, 108 S.Ct. 2777; *see also* 42 U.S.C. § 2000e–2(k)(1)(B)(i).

Plaintiffs' failure to identify and isolate the effects of each specific employment practice could have been forgiven if they had "demonstrate[d] to the court that the elements of [Metro's] decisionmaking process are not capable of separation for analysis." *See* 42 U.S.C. § 2000e–2(k)(1)(B)(i). But they never made any such showing. Although they purported to challenge the decisionmaking process as a whole, they never attempted to demonstrate that the elements of that process are incapable of separation for analysis.

**\*741** The district court appears to have assumed that merely challenging the promotions process as a whole is sufficient to take advantage of the statutory exception, but that is simply not the law. The law clearly requires plaintiffs to identify and isolate specific employment practices. *See* 42 U.S.C. § 2000e–2(k)(1)(B)(i). A plaintiff may challenge the process as a whole only if he *first* demonstrates that its elements are incapable of separation. *See id.* The district court erred by allowing Plaintiffs to reap the advantages of the statutory exception without first meeting its requirements.

**B.**

Even if Plaintiffs had satisfied the first prong of their prima facie case, their claim would nevertheless fail on the second prong. Plaintiffs simply did not present relevant statistical data that MWS's promotion practices caused an adverse, disparate impact on its black employees.

The Supreme Court has explained that "the plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group." *Watson,* 487 U.S. at 994, 108 S.Ct. 2777. In cases involving promotion policies, "the relevant inquiry is comparing the number of protected group members benefitting from promotions with the number seeking them; this figure is then contrasted with the corresponding ratio for the non-protected group." *Phillips,* 400 F.3d at 399; *see also Phillips v. Gates,* 329 Fed.Appx. 577, 581 (6th Cir.2009). Plaintiffs may rely on this comparison without regard to candidates' qualifications. *See Phillips,* 400 F.3d at 400. In instances where the data regarding qualified or eligible applicants is incomplete or unavailable, plaintiffs may rely on other statistics, "such as measures indicating the racial composition of otherwise-qualified applicants for at-issue jobs." *Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 651, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989) (quotation marks omitted), *superseded by statute on other grounds,* Civil Rights Act of 1991, Pub.L. No. 102–166, 105 Stat. 1071, 42 U.S.C. § 2000e–2(k).[7]

In this case, Plaintiffs' evidence was merely a description of the racial demographics of MWS's workforce. Dr. Moomaw's testimony demonstrated that black employees at MWS were disproportionately concentrated in positions which paid less and had fewer opportunities for advancement. Dr. Moomaw focused specifically on the representation of "blacks in higher level positions compared to the overall black to white ratio at MWS." He did not look at actual promotion rates, nor did he compare the ratios of black and white employees eligible for promotions with those who actually received promotions. He explained that, in light of MWS's alleged practice of altering job qualifications and criteria, it was impossible to determine who was actually eligible for promotions.

Plaintiffs' evidence falls short of the relevant statistical data that the law requires. First, it compares the wrong groups of people. Instead of comparing the employees who actually applied for or were eligible for promotions with those who received them, *see Phillips,* 400 F.3d at 399, Plaintiffs compared the proportion of black employees **\*742** in high-paying positions with the proportion of black employees within the entire MWS workforce. Plaintiffs allege that it was futile to examine actual applicant data because MWS's allegedly discriminatory practices discouraged black employees from applying for promotions; however, in such cases, a plaintiff is still required to construct a generally qualified applicant pool. *See Wards Cove,* 490 U.S. at 651, 109 S.Ct. 2115. In this case, Plaintiffs constructed a pool consisting of the entire MWS workforce, apparently assuming that custodians, equipment operators, painters, secretaries, and customer

Grant v. Metropolitan Government of Nashville and..., 446 Fed.Appx. 737...

113 Fair Empl.Prac.Cas. (BNA) 262

service representatives are qualified to work as engineers, biologists, and chemists. The Supreme Court has made clear that this type of analysis is deficient. *See id.* at 653–54, 109 S.Ct. 2115.

Additionally, the district court's determination that each segment of MWS's workforce should mirror the overall racial demographic of MWS amounts to an impermissible quota system. *See id.* at 652, 109 S.Ct. 2115. Essentially, Plaintiffs' evidence shows only that black employees are disproportionately represented in lower-paying jobs that have fewer opportunities for advancement. However, "[r]acial imbalance in one segment of an employer's work force does not, without more, establish a prima facie case of disparate impact with respect to the selection of workers for the employer's other positions, even where workers for the different positions may have somewhat fungible skills...." *See id.* at 653, 109 S.Ct. 2115.

## IV.

Because we find that Plaintiffs have failed to meet their prima facie case of disparate impact discrimination, we **REVERSE** the district court's order. In light of this holding, we **DISMISS** as moot Metro's appeal as to the order appointing Dr. Kathleen Lundquist as Special Master.

CLAY, Circuit Judge, dissenting.

The decision below was based on the extensive evidentiary record that was developed over nine days of trial. The trial judge heard testimony from more than twenty witnesses, including two expert statisticians, and received hundreds of documents into evidence. In stripping Plaintiffs of their victory, the majority ignores this evidentiary record and relies instead on a series of largely unexplained conclusions. Because the district court committed no error of law, and the factual findings underpinning its decision are not clearly erroneous, we should affirm. The majority has no legal basis to do otherwise, and therefore I respectfully dissent.

The majority reverses the district court's finding of liability against Defendant Metropolitan Government of Nashville and Davidson County, Tennessee ("Metro") on the basis that "Plaintiffs failed to establish a prima facie case of disparate impact liability." (Maj. Op. at 738.) To make out

a prima facie case of disparate impact in violation of Title VII, a plaintiff must "(1) identif[y] a specific employment practice to be challenged; and (2) through relevant statistical analysis prove[ ] that the challenged practice has an adverse impact on a protected group." *Dunlap v. Tenn. Valley Auth.,* 519 F.3d 626 (6th Cir.2008) (citations omitted); *see also Lewis v. City of Chicago,* 560 U.S. 205, 130 S.Ct. 2191, 2197, 176 L.Ed.2d 967 (2010). The district court, sitting as finder of fact, found that Plaintiffs had satisfied their prima facie burden, and as explained below, its conclusion should be upheld as to each element of the prima facie case.

### A. Identification of Specific Employment Practices

The district court did not err in finding that Plaintiffs' burden of identifying the specific employment practices that are **\*743** challenged "is established by a preponderance of the evidence," through proof of the following: "tailoring job qualifications for promotions, lateral transfers, selective interview processes for promotions, out-of-class assignments and subjective decision-making standards for promotions and discriminatory compensation practices." (Dist. Ct. Op. at 58–59); *see also Phillips v. Gates,* 329 Fed.Appx. 577, 580 (6th Cir.2009) (finding sufficient, as to the first element, a challenge to the "practices and procedures regarding employee promotions"); *Scales v. J.C. Bradford & Co.,* 925 F.2d 901 (6th Cir.1991) (sustaining challenge to promotion practices, specifically: (1) failure to advertise openings; (2) favoritism to friends and associates of supervisors; and (3) use of subjective criteria).

The specific employment practices identified by Plaintiffs as discriminatory are well documented in the record. The district court found that Defendant's posted minimum job qualifications "are frequently tailored or altered from the original job descriptions to fit the person whom [ ] management desires to fill the specific position." (Dist. Ct. Op. at 6.) "As a factual matter", the court explained, "the proof also clearly establishes that [Metro's Water Services Department ("MWS")] distorts educational requirements, seniority, and experience in its promotion decisions of its white employees." (*Id.* at 65.) In one instance, Metro eliminated a bachelor's degree requirement for a director position after a qualified black employee applied, and awarded the position to a white applicant without a degree, even though the previous director had both bachelor and master's degrees. (*Id.* at 12–13.)

Grant v. Metropolitan Government of Nashville and..., 446 Fed.Appx. 737...

113 Fair Empl.Prac.Cas. (BNA) 262

With regard to lateral transfers, the district court found that Metro frequently permits white employees to transfer internally, thereby circumventing the competitive employment application process. (*Id.*) To the extent that the competitive application process was utilized, the district court found that Defendant's department managers possess discretion over whom to interview for promotions, and once the relevant employees are identified, the usual practice is that each employee's supervisor will serve on the interview panel. This results in a highly subjective—and problematic—process. *See Wal–Mart Stores, Inc. v. Dukes,* —— U.S. ——, 131 S.Ct. 2541, 2554, 180 L.Ed.2d 374 (2011) ("[A]n employer's undisciplined system of subjective decisionmaking [can have] precisely the same effects as a system pervaded by impermissible intentional discrimination." (internal citation and quotation marks omitted; alteration in original)). The problems of this subjective process are exacerbated by the frequent variations in the size and composition of interview panels, and the heavy (and sometimes controlling) weight accorded the results of an oral interview.

Additionally, the district court found that Metro has a policy whereby an employee may be assigned to fill a temporary vacancy in a higher position—a so-called "out of class assignment"—and that after 100 days, the employee would be promoted into the higher position. (Dist. Ct. Op. at 16–19.) White employees, including six individuals identified at trial, would receive the promotion after 100 days, whereas black employees often would not. (*Id.* at 17.) Additionally, black employees working "out of class" are not always paid at the higher "out of class" rate, even though white employees were. In one situation, as proved at trial, a black employee assumed the duties of a public information officer on an "out-of-class" basis, but was told he was not qualified to fill the position on a permanent basis, even though the position was later filled by a biologist without any public relations background, at a **744** higher salary than the temporary employee. (*Id.* at 19.) Situations like these are consistent with black employees, as the district court found, being "concentrated in lower job classifications at lesser compensation levels." (*Id.* at 60.)

The majority does not explain why the specific employment practices proved by Plaintiffs at trial, and identified by the district court, failed to satisfy Plaintiffs' burden of identification. The majority identifies no factual finding that the district court is clearly erroneous, and cites no legal authority to support its conclusion. This sort of truncated analysis is particularly troubling in light of the nature and significance of this case—a civil rights class action against a major public employer—and the availability of extensive evidence in the record.

**B. Disparate Impact**

The district court additionally did not err in finding that Plaintiffs carried their burden to establish that the challenged practices have an adverse impact on a protected group. The district court held that "[t]he specific employment practices alone and in combination have had the effect of denying and delaying promotions to black employees [at Metro], as set forth by Dr. [Michael] Moomaw's testimony and analyses and Plaintiffs' other proof." (*Id.* at 59.) The majority offers no reason why this conclusion was clearly erroneous.

As to the statistical proof, the district court concluded based on a binomial distribution analysis that the rate of promotions of black employees, across nearly every job category, was three to four standard deviations lower than would be expected in the absence of discrimination. *See Vogel v. City of Cincinnati,* 959 F.2d 594, 600 (6th Cir.1992); *see also Alexander v. Local 496, Laborers' Int'l Union of N. Am.,* 177 F.3d 394, 419 (6th Cir.1999) (Batchelder, J., concurring in part and dissenting in part) (reasoning that district court did not clearly err in finding disparate impact "[g]iven the extreme statistical disparity" proved at trial). This analysis reflected the report of Dr. Moomaw, who recategorized the MWS workforce and analyzed employment data across four dimensions, finding "stark and significant differences in representation between white and black employees that extend to all categories of MWS' positions." (Dist. Ct. Op. at 33); *see also Phillips,* 329 Fed.Appx. at 581 (stating that " 'sufficiently substantial' statistical disparities raise an inference of disparate impact").

The district court determined that these "widespread statistical imbalances" were a result of the employment practices challenged by Plaintiffs. (Dist. Ct. Op. at 60.) Rather than determining the effect of each challenged practice, which it found were "not capable of separation for analysis," the district court analyzed Metro's promotion practices as "one promotion practice." *See* 42 U.S.C. § 2000e–2(k)(1)(B)(i) (stating that if a "complaining party can demonstrate to the court that the elements of a respondent's decisionmaking process are not capable of separation for analysis, the decisionmaking process may be analyzed as one employment practice"). The majority disagrees with the district court's decision to treat the promotional process as one practice, because, as it states, Plaintiffs "never attempted to demonstrate that the elements of that process are incapable of separation of

analysis." (Maj. Op. at 740.) But the majority offers no legal authority or citation to the record, or elucidates why the district court's finding in that regard is clearly erroneous.

Considering the process as a whole, the district court made the following factual findings as to the cause of the statistical abnormalities, none of which the majority contends is clearly erroneous:

**\*745** MWS's practice of tailoring job descriptions involves removing job requirements for higher positions to favor MWS's white employees. MWS's altered educational requirements for positions that have the actual effect of increasing the number of white employees promoted.

Lateral transfers have the effect of denying MWS's black employees from promotions to higher level positions. MWS used selective oral interviews with open discussion of scoring among panel members, and the results of the oral interview represented from 50% to 80% or 100% of the selection decision, thus undermining the applicant's seniority and experience.

... MWS's misuse of out-of-class assignments resulted in the denial of promotions to black employees that were given to MWS's white employees. MWS also delayed higher compensation paid to black employees who worked six months to two years on an "out-of-class" basis. These black employees were not promoted as white MWS employees were and had to file grievances and objections to receive the higher pay required by the "out-of-class" policy for such work....

MWS's compensation practice ... resulted in compensation levels of black employees who are also concentrated in the lowest grade levels within the same pay ranges for white employees. The statistics also show that black employees at MWS are also concentrated in lower job classifications at lesser compensation levels.... (Dist. Ct. Op. at 59–60.)

The majority overturns the district court's finding because, as it explains, "Plaintiffs simply did not present relevant statistical data that MWS's promotion practices caused an adverse, disparate impact on its black employees." (Maj. Op. at 741.) According to the majority, "Plaintiffs' evidence was merely a description of the racial demographics of MWS's workforce." (*Id.* at 8.) The majority explains that Plaintiffs' statistical evidence "falls short" because, "instead of comparing the employees who actually applied for or were eligible for promotions with those who received them, Plaintiffs compared the promotion of black employees in high-paying positions

with the proportion of black employees within the entire MWS workforce." (*Id.* at 9.) Even if the latter comparison was problematic, the majority continues, Plaintiffs were "still required to construct a generally qualified applicant pool" from which to make a comparison. (*Id.*)

As an initial matter, the majority's insistence on a specific form of statistical evidence has no basis in our case law. We have never "limited a plaintiff's choices in Title VII cases involving statistical analysis in any way," *Isabel v. City of Memphis,* 404 F.3d 404, 412 (6th Cir.2005), and, as the Supreme Court recognizes, statistics "come in infinite variety and ... their usefulness depends upon all of the surrounding facts and circumstances." *Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 339–40, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). The statistical evidence relied upon by the district court was relevant, and to the extent it was less than perfect, "such flaws relate to the weight of the [evidence] which is a matter for the trier of fact." *Phillips v. Cohen,* 400 F.3d 388, 401–02 (6th Cir.2005). The majority offers no legal authority to support its argument that the district court's evaluation of the statistical evidence was improper as a matter of law. *See Johnson v. U.S. Dep't of Health and Human Servs.,* 30 F.3d 45, 48 (6th Cir.1994) (holding that the district court's view of the sufficiency of statistical evidence is reviewed for clear error).

**\*746** Moreover, comparing rates of actual promotion would be unhelpful in this case because, as the district court found, that comparison would not capture the reality of the promotions process at MWS. First, it would understate the promotion rate of white employees. Based on the trial record, the district court found that through "lateral transfers" and "out of class" assignments, MWS would frequently promote white employees outside of the normal application process. Second, it would overstate the promotion rate of black employees because, as the district court found, MWS, and its promotion process more generally, discouraged black employees from applying for promotions; this was accomplished by informing potential applications that the position was "not an appropriate fit;" permitting subjective evaluations by hiring managers; and altering job requirements to fit preselected candidates. *See Kreuzer v. Brown,* 128 F.3d 359, 364 n. 2 (6th Cir.1997) (citing *Harless v. Duck,* 619 F.2d 611, 617–18 (6th Cir.1980)).

The majority suggests that Plaintiffs' failure to compare actual promotion rates could be excused if Plaintiffs had "construct[ed] a generally qualified applicant pool" and compared the promotion rates within that pool. (Maj. Op. at 742.) Such a statement, however, reflects the majority's fundamental misunderstanding of this case. As the district court found, "the proof ... clearly establishes that MWS

Case 5:25-cv-10579-JEL-DRG   ECF No. 41-3, PageID.776   Filed 10/22/25   Page 53 of 97

Grant v. Metropolitan Government of Nashville and..., 446 Fed.Appx. 737...

113 Fair Empl.Prac.Cas. (BNA) 262

distorts educational requirements, seniority, and experience in its promotion decisions of its white employees," and it is therefore not possible to determine the actual qualifications for many positions. (Dist. Ct. Op. at 65.)

Additionally, even if the actual qualifications for each position could be determined, any failure to control for this variable is not fatal under the circumstances of this case, given the extent to which Metro obfuscated and apparently manipulated the promotion process. See *Phillips,* 400 F.3d at 400–02 (reversing district court's dismissal of disparate impact challenge to promotion process, and reasoning that the plaintiff's failure to control for employees' qualifications in statistical data did not render its statistics legally insufficient). The majority's reasoning to the contrary runs counter to well-established case law in this Circuit. *See id.* (citing *Scales,* 925 F.2d at 906 (finding gender discrimination on the basis that it took women longer than men to be promoted to the first managerial level in the company)).

Finally, the majority ignores the non-statistical evidence adduced at trial, thereby ignoring the extensive testimony by individual plaintiffs as to their "personal experiences with promotion decisions at MWS." (Dist. Ct. Op. at 19–25); *see also Int'l Bhd. of Teamsters,* 431 U.S. at 340, 97 S.Ct. 1843 ("The individuals who testified about their personal experiences with the company brought the cold numbers convincingly to life."). Our cases have recognized that "expert statistical evidence in disparate impact cases is not to be considered in a vacuum, as the only evidence permitting plaintiffs to meet their prima facie test; it must be considered in light of all the evidence in the record." *Phillips,* 400 F.3d at 401 (holding that non-statistical evidence of disparate of impact "compensate[ed] to some degree for plaintiffs' failure to demonstrate conclusively that they are promoted at lower rates than white employees." (internal citation and quotation marks omitted)); *see also Wal–Mart Stores,* 131 S.Ct. at 2556 (recognizing the relevance of testimonial evidence apart from statistical evidence in disparate impact cases). This point is lost on the majority.

Accordingly, because the district court committed no error of law, and the findings **\*747** of fact underlying its decision are not clearly erroneous, we should affirm. The majority refuses to do so, and I respectfully dissent.

### All Citations

446 Fed.Appx. 737, 113 Fair Empl.Prac.Cas. (BNA) 262

Footnotes

1   The district court granted Plaintiffs' motion for class certification, certifying as a class "all former, current, and future African–American employees of the Metropolitan Government of Nashville and Davidson County, Metro Water Services from the period January 1, 2000 to the present."

2   After a full trial, a jury ruled in favor of Metro on Plaintiffs' disparate treatment claims. The district court reserved the question of disparate impact liability. Plaintiffs moved for a new trial, and the district court granted the motion. Metro appealed the district court's decision to grant a new trial, and a prior panel of this Court dismissed Metro's appeal, but ordered the district court to rule on the disparate impact claims. *See In re Metro. Gov't of Nashville & Davidson Cnty.,* 606 F.3d 855 (6th Cir.2010). Accordingly, the disparate treatment claims (which are awaiting a new trial) are not before us at this time.

3   Metro also provided expert testimony. Metro's expert, Dr. White, focused on the actual promotions that had occurred within MWS and concluded that there was no statistically significant difference between the promotion rate of black employees as compared to white employees. Indeed, Dr. White found that black employees actually advanced at a rate slightly *greater* than their representation in MWS's workforce. However, the district court determined that Dr. Moomaw's evidence was more persuasive than Dr. White's. The court explained that Dr. Moomaw's analysis, "[w]hile necessarily imperfect," was a better comparison given that it analyzed "blacks in higher level positions compared to the overall black to white ratio at MWS."

4   The district court held that Metro did not demonstrate that its practices were justified by business necessity. Metro has not challenged that conclusion on appeal.

Grant v. Metropolitan Government of Nashville and..., 446 Fed.Appx. 737...

113 Fair Empl.Prac.Cas. (BNA) 262

5    The order does, however, permit MWS to designate a proctor to attend the interviews.

6    Metro also argues that Plaintiffs' claims should not be analyzed under a disparate impact theory at all because they are more amenable to a disparate treatment analysis. However, a Title VII plaintiff is not required to choose one discrimination theory to the exclusion of the other. *See, e.g., Dunlap,* 519 F.3d at 629 (plaintiff relied on both theories to establish discrimination); *Carpenter v. Boeing Co.,* 456 F.3d 1183, 1192–93 (10th Cir.2006) (same); *Acree v. Tyson Bearing Co., Inc.,* 128 Fed.Appx. 419, 426 (6th Cir.2005) (stating that "a plaintiff may rely upon one of two alternate theories of recovery to establish a claim of illegal discrimination"). Further, a plaintiff may rely on the same set of facts to establish liability under either theory. *Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).

7    The 1991 amendments superseded some aspects of *Wards Cove.* They permit a plaintiff to challenge an employer's decisionmaking process as a whole if its elements are not capable of separation; and they also superseded portions of *Wards Cove* pertaining to the "business necessity" defense. *See Phillips,* 400 F.3d at 397–98. The Amendments did not disturb the aspect of *Wards Cove* pertaining to statistical evidence, and its holdings on that issue remain the law. *See id.* at 399.

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

816 Fed.Appx. 892
This case was not selected for publication in West's
Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued on or
after Jan. 1, 2007. See also U.S.Ct. of App. 5th Cir.
Rules 28.7 and 47.5.
United States Court of Appeals, Fifth Circuit.

UNITED STATES of America, EX REL.,
INTEGRA MED ANALYTICS, L.L.C.,
Plaintiff–Appellant,

v.

BAYLOR SCOTT & WHITE HEALTH;
Baylor University Medical Center—Dallas;
Hillcrest Baptist Medical Center; Scott &
White Hospital—Round Rock; Scott &
White Memorial Hospital Temple,
Defendants—Appellees.

No. 19-50818
|
FILED May 28, 2020

**Synopsis**
**Background:** Relator brought False Claims Act (FCA)
action against health system and system affiliates for
allegedly using inflated codes to bill Medicare. The United
States District Court for the Western District of Texas,
David A. Ezra, Senior District Judge, 2019 WL 3713756,
dismissed complaint for failure to state claim. Relator
appealed.

**Holdings:** The Court of Appeals held that:

relator failed to plead false statement or fraudulent course
of conduct with particularity based on statistical data;

relator failed to plead false statement or fraudulent course
of conduct with particularity based on health system
documents;

relator failed to plead false statement or fraudulent course
of conduct with particularity based on statements by former
health system medical coder; and

relator failed to plead false statement or fraudulent course
of conduct with particularity based on allegation that health
system provided unnecessary medical care.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion to Dismiss for
Failure to State a Claim.

**\*894** Appeal from the United States District Court for the
Western District of Texas, USDC No. 5:17-CV-886

**Attorneys and Law Firms**

Phillip Jason Collins, Esq., Jeremy Hubner Wells, Reid
Collins & Tsai, L.L.P., Austin, TX, for Plaintiff - Appellant

Robert Jeffrey Layne, Attorney, Reed Smith, L.L.P.,
Austin, TX, James F. Segroves, Reed Smith, L.L.P.,
Washington, DC, for Defendants - Appellees Baylor Scott
& White Health, Baylor University Medical Center -
Dallas, Hillcrest Baptist Medical Center, Scott & White
Hospital - Round Rock

Robert Jeffrey Layne, Attorney, Reed Smith, L.L.P.,
Austin, TX, for Defendant - Appellee Scott & White
Memorial Hospital Temple

Jeffrey Stuart Bucholtz, Esq., King & Spalding, L.L.P.,
Washington, DC, for Amici Curiae Chamber of Commerce
of the United States of America, American Hospital
Association

Before OWEN, Chief Judge, and HIGGINBOTHAM and
WILLETT, Circuit Judges.

**Opinion**

PER CURIAM:[*]

Integra Med Analytics, L.L.C., filed a qui tam suit[1] on
behalf of the United States against Baylor Scott & White
Health system and its affiliates under the False Claims Act
for allegedly using inflated codes to bill Medicare. The
district court dismissed Integra Med's claims. We affirm.

**I**

The Baylor Scott & White Health system and its affiliates
(Baylor) operate a network consisting of around twenty
inpatient short-term acute care hospitals in Texas. A
significant number of patients served by Baylor are
covered by Medicare. Thus, Baylor regularly submits
reimbursement claims to Medicare. In this case, Integra
Med Analytics, L.L.C. (Integra Med) alleges that Baylor
submitted $61.8 million in fraudulent claims to Medicare,
in violation of the False Claims Act (FCA).[2]

United States ex rel. Integra Med Analytics, L.L.C. v...., 816 Fed.Appx. 892...

Med & Med GD (CCH) P 306,792

Medicare reimburses hospitals like Baylor on a per-discharge basis, which means Baylor gets paid each time a patient stays at the hospital. The exact amount that Medicare reimburses primarily depends on a hospital's diagnoses of Medicare-covered patients. Medicare classifies similar diagnoses by putting them into a diagnosis related group (DRG). Each DRG is determined by several kinds of codes, including the principal diagnosis code and secondary diagnosis codes. The principal diagnosis code is for the "condition established after study to be chiefly responsible for occasioning the admission of the patient to the hospital for care."[3] Secondary diagnosis **895** codes are for "all conditions that coexist at the time of admission, that develop subsequently, or that affect the treatment received and/or length of stay."[4] Reimbursement can also be affected, to a lesser extent, by other hospital-specific factors, such as market conditions in the hospital's city.

Integra Med's allegations specifically concern Baylor's use of secondary diagnosis codes. The Centers for Medicare and Medicaid Services (CMS) publishes a list of secondary codes each year that can modify a claim to include a complication or comorbidity (CC) or a major complication or comorbidity (MCC). The inclusion of CCs and MCCs can add thousands of dollars to a Medicare reimbursement claim. Integra Med alleges that Baylor, led by its clinical documentation improvement (CDI) program, fraudulently used higher-value CCs and MCCs than were justified by actual medical diagnoses to increase its revenues. Integra Med contends that Baylor's scheme had three main components.

First, Integra Med contends that Baylor trained its physicians and CDI employees to "upcode" MCCs. According to Integra Med, Baylor trained its physicians to focus on key words, provided lists of high-value MCCs to physicians to reinforce that training, and emphasized that using certain terms would increase their performance pay. Integra Med also contends that Baylor had its CDI employees seek opportunities to use higher-value secondary codes.

Second, Integra Med alleges that Baylor pressured physicians to alter their original diagnoses by providing documents and asking them to "specify" or change their diagnosis if the diagnosis did not include CCs or MCCs. According to Integra Med, these clarification documents that requested physicians to "specify" their diagnoses would often "suggest either specific revenue-increasing CCs or MCCs or provide options listing several possible CCs and MCCs." Integra Med contends these clarification documents "reveal a clear intent towards influencing doctors to code higher-paying CCs and MCCs."

Third, Integra Med alleges that Baylor provided unnecessary treatment in order to code high-value MCCs. Specifically, Integra Med contends that "Baylor purposefully placed and kept post-operative patients on ventilator support" when it was medically unnecessary. Integra Med bases this allegation on the fact "that Baylor patients undergoing major heart surgery were placed on mechanical ventilation [at rates] over twice the national average."

Integra Med analyzed inpatient claims data for the 2011-2017 period from CMS to discover that Baylor had been claiming certain MCCs significantly above the national average for other hospitals. Specifically, Integra Med found that Baylor coded for the MCCs of encephalopathy, respiratory failure, and severe malnutrition at much higher rates than other hospitals. Integra Med contends that its statistical analyses show that Baylor's higher rate of coding cannot be explained by patient characteristics, county demographic data, the patient's attending physician, or regional differences. According to Integra Med, its "analyses prove that the excessive rates of [certain] MCCs can be directly attributed to [Baylor's] fraudulent activity as opposed to external factors, indicating that the fraud was **896** known by the system and was intentional."

Besides statistical data, Integra Med also relied on several statements from a former Baylor medical coder in concluding that Baylor had defrauded Medicare. According to Integra Med, this medical coder recalled a then-Baylor executive "telling CDIs things that were totally not true" as a part of a "deliberate effort to promote the coding of MCCs." This medical coder also allegedly received specific instructions on how to code. Integra Med claims that this medical coder quit her job with Baylor because she was unable to work where she "was continually getting directives to compromise her integrity." Integra Med also relied on certain statements about increasing hospital revenues from a former Baylor executive's social media.

Based on these statistics and statements, Integra Med sued Baylor under the FCA in federal district court in April 2018. After Integra Med amended its complaint twice, Baylor moved under Federal Rule of Civil Procedure Rule 12(b)(6) to dismiss Integra Med's complaint. The district court granted Baylor's motion to dismiss, holding that Integra Med's complaint failed to state a particularized claim for which relief could be granted as required by Federal Rules of Civil Procedure 8(a) and 9(b). This appeal followed.

United States ex rel. Integra Med Analytics, L.L.C. v...., 816 Fed.Appx. 892...

Med & Med GD (CCH) P 306,792

## II

To survive a motion to dismiss an FCA claim, Integra Med must plead the following four elements: (1) "a false statement or fraudulent course of conduct;" (2) that was "made or carried out with the requisite scienter;" (3) "that was material;" and (4) "that caused the government to pay out money or to forfeit moneys due (i.e., that involved a claim)."[5] Integra Med's case on appeal hinges on whether Integra Med sufficiently pleaded facts showing that Baylor's claims were fraudulent. Thus, we will examine each of Integra Med's bases for its claims, including its statistical data generally, the documents it has gathered from Baylor, statements by a former Baylor medical coder, and the claim that Baylor provided unnecessary medical care to boost its Medicare reimbursements.

## A

We first examine the statistical data presented by Integra Med, reviewing whether it sufficiently shows that Baylor's Medicare reimbursement claims were fraudulent. "[A] complaint filed under the False Claims Act must meet the heightened pleading standard of Rule of 9(b)."[6] Federal Rule of Civil Procedure 9(b) provides, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."[7] Although the particularity Rule 9(b) demands "differs with the facts of each case,"[8] it does generally require that **\*897** a complaint detail "the who, what, when, and where ... before access to the discovery process is granted."[9] Rule 9(b)'s particularity requirement supplements Rule 8(a)'s demand that "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' "[10] Rule 8(a) prohibits any claims that are merely conceivable rather than plausible.[11] A claim is merely conceivable and not plausible if the facts pleaded are consistent with both the claimed misconduct and a legal and "obvious alternative explanation."[12]

Here, Integra Med's statistical analysis is consistent with both Baylor having submitted fraudulent Medicare reimbursement claims to the government and with Baylor being ahead of most healthcare providers in following new guidelines from CMS. In 2007, CMS reduced the standardized amount paid out to hospitals for Medicare reimbursement claims but increased the number of secondary diagnoses identified as CCs and MCCs, and coding more CCs and MCCs can increase hospital reimbursements.[13] In response to public comments expressing concern that the new rules would lower reimbursements, CMS stated that it expected reimbursements to increase under the system.[14] CMS believed it was "clear" that hospitals would "change their documentation and coding practices and increase case mix consistent with the payment incentives that are provided by the" then new coding system.[15] In fact, CMS encouraged hospitals to adopt CDI programs "in order to increase reimbursement" and highlighted an article touting the effectiveness of CDI programs at increasing Medicare reimbursement rates.[16] CMS unequivocally stated in its guidelines that, "[w]e do not believe there is anything inappropriate, unethical or otherwise wrong with hospitals taking full advantage of coding opportunities to maximize Medicare payment that is supported by documentation in the medical record."[17]

The conclusion that Baylor was simply ahead of the healthcare industry in following CMS guidelines is supported by the data in Integra Med's own complaint. Integra Med's complaint shows that the rate at which non-Baylor hospitals were using the MCCs for encephalopathy, respiratory failure, and severe malnutrition was increasing every year. These increases were causing the MCC usage rates of both Baylor and non-Baylor hospitals to converge. Moreover, for severe malnutrition, non-Baylor hospitals were coding it at a higher rate in 2017 than Baylor was in 2015. Similarly, for respiratory failure, non-Baylor hospitals were coding it at a higher **\*898** rate in 2017 than Baylor was in 2011. These show that the healthcare industry as a whole was following Baylor in its trajectory and by 2017, other hospitals' coding was within a few percentage points of Baylor's.

These facts strongly indicate that a legal and "obvious alternative explanation" for the statistical data presented by Integra Med is that Baylor was simply ahead of the healthcare industry at implementing the Medicare reimbursement guidelines supplied by CMS.[18] We note that this conclusion does not exclude statistical data from being used to meet the pleading requirements of Federal Rule of Civil Procedure 8(a) and, when paired with particular details, Rule 9(b).[19] Our conclusion merely means that statistical data cannot meet those pleading requirements if, among other possible issues, it is also consistent with a legal and obvious alternative explanation.[20]

Insofar as Integra Med purports to give specific examples of fraudulent claims, it also fails to meet the pleading requirements of Rules 8(a) and 9(b). Integra Med's examples simply give some identifying patient information and pair it with a diagnosis. No example gives any indication about what makes it a false claim. The claims of falsity are simply conclusory.[21]

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 5:25-cv-10579-JEL-DRG   ECF No. 41-3, PageID.781   Filed 10/22/25   Page 58 of 97

United States ex rel. Integra Med Analytics, L.L.C. v...., 816 Fed.Appx. 892...

Med & Med GD (CCH) P 306,792

## B

### 1

We next examine whether Integra Med's allegations that Baylor trained and pressured its physicians and CDI employees to "upcode" MCCs are sufficient to establish that Baylor was engaging in a scheme to submit fraudulent claims to Medicare. We conclude that they are not. In publishing the new DRG coding rules, CMS explicitly expected hospitals to work with their physicians and medical coders, including through training, to "focus on understanding the impact of the revised CC list."[22] According to Integra Med, Baylor trained physicians to focus on keywords, provided tip sheets reminding physicians of how to report high-value MCCs, had CDI employees look for opportunities where high-value MCCs might be present, **\*899** and would sometimes send physicians documents asking them to clarify their diagnoses. Integra Med argues that these practices show Baylor was involved in a scheme to defraud Medicare. But CMS encouraged hospitals to employ practices like these after it implemented the new DRG rules.[23] Far from a fraudulent scheme, Baylor's implementation of such practices is entirely consistent with the new DRG rules.[24]

For example, Baylor's use of tip sheets is consistent with the fact that coding and clinic terminology are often different. Tip sheets help hospitals align the two. Likewise, non-leading documents asking physicians to clarify their diagnoses are also consistent with implementing the new DRG rules since the new DRG rules moved hospitals away from focusing on general diagnoses and codes to frequently using more specific diagnoses and codes.[25] Physicians were likely still accustomed to the old, more general system. These clarification documents had numerous suggestions, a simple box to check to decline clarification, and a disclaimer not to take implications from the fact clarification was asked for. Additionally, some of the clarification documents provided by Integra Med in its complaint show that clarification was requested in instances in which physicians wrote down symptoms but failed to provide a diagnosis for the cause of those symptoms. These clarification documents also did not ask leading questions. Considering diagnoses are critical for Medicare reimbursements and these specific clarification documents were not leading, they are consistent with Baylor engaging in legal activity.

Therefore, we conclude that these allegations are also consistent with a legal and "obvious alternative explanation."[26]

### 2

In its complaint, Integra Med also cites the statements of a medical coder who said that a then-Baylor executive told "CDIs things that were totally not true" as a part of a "deliberate effort to promote the coding of MCCs." According to Integra Med, this medical coder said she was given specific instructions on how to code, and that medical coders "receive[d] pressure directly from ... leadership to code unethically." This medical coder also allegedly quit her job because she "was continually getting directives to compromise her integrity." But these allegations fail to satisfy the heightened pleading standards required by Federal Rule of Civil Procedure 9(b) because they fail to state the content of these allegedly unethical and fraudulent directives, trainings, and guidance.[27] Thus, **\*900** the district court correctly dismissed the claim based on these conclusory allegations.

## C

We next look at Integra Med's allegations that Baylor provided unnecessary treatment to patients in order to use higher-value MCCs. Specifically, Integra Med contends that "Baylor purposefully placed and kept post-operative patients on ventilator support" when it was medically unnecessary. The allegations here are based solely on the fact "that Baylor patients undergoing major heart surgery were placed on mechanical ventilation over twice the national average." These allegations do not withstand the heightened pleading requirements for fraud under Rule 9(b).

Integra Med fails to plead particular details of a scheme to defraud Medicare. Even when plaintiffs in an FCA case use statistics, which can be reliable indicia of fraud, they must still plead particular details of a fraudulent scheme for each claim.[28] Here, Integra Med's complaint contains a conclusory allegation that Baylor was providing unnecessary treatment to its patients and supports it with a single statistic—that Baylor patients undergoing major heart surgery were put on a mechanical ventilator at a rate over twice the national average. Integra Med does not present sufficient particular details of this alleged fraud claim. The district court correctly dismissed the FCA claim based on Integra Med's allegation that Baylor provided unnecessary treatment to patients to increase its Medicare reimbursements.

In conclusion, Integra Med has failed to meet its pleading requirements under Rules 8(a) and 9(b). The district court did not, as Integra Med contends, view the complaint in the

United States ex rel. Integra Med Analytics, L.L.C. v...., 816 Fed.Appx. 892...

Med & Med GD (CCH) P 306,792

light most favorable to Baylor—it simply correctly held Integra Med to the higher pleading standard required for an FCA claim.

## III

Integra Med contends that the district court improperly held its allegations to a more rigorous scienter requirement than was required by the FCA. But we need not address scienter because the district court correctly dismissed Integra Med's claims for failing to meet the pleading requirements required by Rules 8(a) and 9(b) for pleading the FCA's element that there be "a false statement or fraudulent course of conduct."[29]

**\*901** Integra Med also contends that the district court improperly applied a probability standard at the pleadings

stage instead of a plausibility standard. But regardless of whether the district court mistakenly applied a probability standard rather than a plausibility standard, our conclusion is the same.[30] Since "[we] may affirm the district court on any grounds supported by the record and argued in the court below," any misapplication that might have occurred here would not require us to vacate or reverse the district court's judgment.[31]

* * *

For these reasons, the district court's judgment is AFFIRMED.

## All Citations

816 Fed.Appx. 892, Med & Med GD (CCH) P 306,792

Footnotes

\*   Pursuant to 5th Cir. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Cir. R. 47.5.4.

1   At the federal level, qui tam suits are those that are filed "for the person and for the United States Government" and "brought in the name of the Government." 31 U.S.C. § 3730(b)(1). Thus, in qui tam suits, the government is the real party in interest. *United States v. Tex. Tech Univ.*, 171 F.3d 279, 289 (5th Cir. 1999).

2   31 U.S.C. § 3729.

3   *See* Centers for Disease Control, *ICD-9-CM Official Guidelines for Coding and Reporting*, Oct. 1, 2011 at 88, available at https://goo.gl/DC55Wx.

4   *See* Centers for Disease Control, *ICD-9-CM Official Guidelines for Coding and Reporting*, Oct. 1, 2011 at 91, available at https://goo.gl/DC55Wx.

5   *United States ex rel. King v. Solvay Pharm., Inc.*, 871 F.3d 318, 324 (5th Cir. 2017) (quoting *United States ex rel. Longhi v. United States*, 575 F.3d 458, 467 (5th Cir. 2009)).

6   *See, e.g., United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185 (5th Cir. 2009) (first citing *United States ex rel. Russell v. Epic Healthcare Mgmt. Grp.*, 193 F.3d 304, 308-09 (5th Cir. 1999), *abrogated on other grounds by United States ex rel. Eisenstein v. City of New York*, 556 U.S. 928, 129 S.Ct. 2230, 173 L.Ed.2d 1255 (2009); and then citing *United States ex rel. Karvelas v. Melrose–Wakefield Hosp.*, 360 F.3d 220, 228 (1st Cir. 2004), *abrogated on other grounds by Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 128 S.Ct. 2123, 170 L.Ed.2d 1030 (2008)).

United States ex rel. Integra Med Analytics, L.L.C. v...., 816 Fed.Appx. 892...

Med & Med GD (CCH) P 306,792

7       FED. R. CIV. P. 9(b); *see also Kanneganti*, 565 F.3d at 185-86.

8       *Hart v. Bayer Corp.*, 199 F.3d 239, 247 n.6 (5th Cir. 2000) (citing *Guidry v. Bank of LaPlace*, 954 F.2d 278, 288 (5th Cir. 1992)).

9       *Id.* (alteration in original) (quoting *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 178 (5th Cir. 1997)).

10      *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)); *see also Kanneganti*, 565 F.3d at 185.

11      *Iqbal*, 556 U.S. at 680, 129 S.Ct. 1937 (quoting *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955).

12      *Id.* at 682, 129 S.Ct. 1937 (quoting *Twombly*, 550 U.S. at 567, 127 S.Ct. 1955).

13      *See Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2008 Rates*, 72 Fed. Reg. 47,130, 47,135-39 (Aug. 22, 2007) (final rule).

14      *See Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2008 Rates*, 72 Fed. Reg. at 47,180-82.

15      *Id.* at 47,182.

16      *Id.*

17      *Id.* at 47,180.

18      *See Ashcroft v. Iqbal*, 556 U.S. 662, 682, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 567, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

19      *See, e.g., United States ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.*, 839 F.3d 242, 247-48, 258 (3d Cir. 2016) (concluding, in the Rule 8(a) and 9(b) context, that statistical data about the lack of markings on a company's pipe fittings was sufficient to state an FCA claim for avoiding import duties when paired with an expert's declaration analyzing the facts of that case, specific examples of unmarked pipes with photographs, a witness statement about receiving improperly marked pipes, and detailed records about the shipments at issue); *Boykin v. Georgia-Pac. Corp.*, 706 F.2d 1384, 1390-94 (5th Cir. 1983) (concluding, in the Rule 8(a) context, that plaintiff's presentation of statistical data successfully stated a prima facie case of racial discrimination).

United States ex rel. Integra Med Analytics, L.L.C. v...., 816 Fed.Appx. 892...

Med & Med GD (CCH) P 306,792

20    See *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937.

21    See *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378 (5th Cir. 2002) ("[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." (quoting *S. Christian Leadership Conference v. Supreme Court of the State of La.*, 252 F.3d 781, 786 (5th Cir. 2001))).

22    See *Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2008 Rates*, 72 Fed. Reg. at 47,182 ("[H]ospitals may focus on understanding the impact of the revised CC list, training and educating their coders, and working with their physicians for any documentation improvements required to allow the reporting of more specific codes where applicable.").

23    See *id.*

24    *Id.*

25    See *id.* at 47,130-82 (Aug. 22, 2007) (final rule).

26    See *Ashcroft v. Iqbal*, 556 U.S. 662, 682, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 567, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

27    See *Hart v. Bayer Corp.*, 199 F.3d 239, 247 n.6 (5th Cir. 2000) (concluding that to meet the pleading requirements of Rule 9(b) a complaint must state "the who, what, when, and where" of a claim. (quoting *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 178 (5th Cir. 1997))). Integra Med claims that the situation here is "strikingly similar" to the situation in *United States ex rel. Integra Med Analytics, LLC v. Creative Solutions in Healthcare, Inc.*, No. SA-17-CV-1249-XR, 2019 WL 5970283 (W.D. Tex. Nov. 13, 2019). We disagree. In *Creative Solutions*, the employee witness interviews actually revealed the contents of a specific fraudulent scheme. *Id.* at *4. That opinion notes, "a physical therapist at Fairfield recalled being instructed to allot 15 minutes for evaluation, even though it required 45 minutes, with the rest of the evaluation session charged at therapy rates." *Id.* (internal quotation omitted). The interview responses given by Integra Med here, while alleging a vague scheme to "promote the coding of MCCs," do not provide the who, what, when, and where of such scheme as required by Rule 9(b). The vague allegation here contrasts with the *Creative Solutions* interview responses, which included the requisite particularity and specificity.

28    *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009) ("We hold that to plead with particularity the circumstances constituting fraud for a False Claims Act § 3729(a)(1) claim, a relator's complaint, if it cannot allege the details of an actually submitted false claim, may nevertheless survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted."); *see also United States ex rel. Nunnally v. W. Calcasieu Cameron Hosp.*, 519 F. App'x 890, 893 (5th Cir. 2013) ("We established that a relator could, in some circumstances, satisfy Rule 9(b) by providing factual or statistical evidence to strengthen the inference of fraud beyond mere possibility, without necessarily providing details as to each false claim. This standard nonetheless requires the relator to provide other reliable indications of fraud and to plead a level of detail that demonstrates that an alleged scheme likely resulted in bills submitted for government payment." (emphasis and citations omitted)).

29    *United States ex rel. King v. Solvay Pharm., Inc.*, 871 F.3d 318, 324 (5th Cir. 2017) (quoting *United States ex rel. Longhi v. United States*, 575 F.3d 458, 467 (5th Cir. 2009)).

United States ex rel. Integra Med Analytics, L.L.C. v...., 816 Fed.Appx. 892...

Med & Med GD (CCH) P 306,792

30    *See Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) ("Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief." ' " (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007))).

31    *Maria S. ex rel. E.H.F. v. Garza*, 912 F.3d 778, 783 (5th Cir. 2019) (citing *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*, 123 F.3d 301, 307 (5th Cir. 1997)).

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

186 Fed.Appx. 592
This case was not selected for publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also U.S.Ct. of App. 6th Cir. Rule 32.1.
United States Court of Appeals, Sixth Circuit.

Kevin JOHNSON, Sr.; James E. Cossingham, Sr.; Rev. Jerry Jones, Plaintiffs–Appellants,
v.
CITY OF CLARKSVILLE; Don Trotter, Mayor of the City of Clarksville, Tennessee, individually and in his official capacity; R. Douglas Weiland, Montgomery County Mayor, individually and in his official capacity; Montgomery County, Tennessee, et al., Defendants–Appellees.

No. 05–5924
|
June 21, 2006.

**Synopsis**
**Background:** Two African American plaintiffs and one Native American plaintiff brought Title VI claims against city and county, alleging racially discriminatory denial of their requests to use city and county facilities for a program for at-risk youths, for teaching Native–American culture to children, and for a program for disabled veterans. The United States District Court for the Middle District of Tennessee granted summary judgment for defendants. Plaintiffs appealed.

**Holdings:** The Court of Appeals, Cook, Circuit Judge, held that:

evidence did not show that race was motivating factor with respect to county's denial of requests, and

assuming McDonnell Douglas burden-shifting framework was applicable, plaintiffs did not show they were similarly situated with nonprotected class.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Summary Judgment.

**\*593** On Appeal from the United States District Court for the Middle District of Tennessee.
Before: GIBBONS and COOK, Circuit Judges; SCHWARZER, Senior District Judge.[*]

**Opinion**

COOK, Circuit Judge.

Three minorities, Kevin Johnson, James Cossingham, and Jerry Jones, allege that city and county governments denied them use of certain facilities and funds because of discriminatory animus. The district **\*594** court granted summary judgment for Defendants, holding that Plaintiffs failed to establish a prima facie case of discrimination, and Plaintiffs challenge this holding on appeal. We affirm.

I

Plaintiffs Johnson, Cossingham, and Jones sought use of facilities belonging to Defendants Montgomery County and the City of Clarksville, Tennessee. Johnson, an African American, asked Montgomery County for the use of the Old Cumberland Heights Elementary School and the Southern Guthrie Community Center ("SGCC") in order to implement BEST, his program for at-risk youths. Johnson also requested the use of a number of Clarksville facilities for the same purpose, and he requested funding from Clarksville. Cossingham, a Native American, sought to utilize the SGCC in creating a program to teach Native–American culture to children. Jones, an African American, wanted to use the SGCC in conjunction with a program for disabled veterans. In each case, Defendants denied Plaintiffs' requests, and Plaintiffs attribute the adverse decisions to Defendants' race-based preferences.

Plaintiffs sued the City of Clarksville, Montgomery County, and thirty-five individuals (city council members, county commissioners, and mayors), alleging a violation of Title VI of the Civil Rights Act of 1964. The parties stipulated to the dismissal of the individual defendants, leaving only claims against the city and county. The district court entered summary judgment in favor of Defendants after determining that Plaintiffs could not establish a prima facie case of discrimination. Plaintiffs argue on appeal that they set forth sufficient evidence to state a prima facie case of discrimination and that they also presented direct evidence of discrimination.

Johnson v. City of Clarksville, 186 Fed.Appx. 592 (2006)

2006 Fed.App. 0418N

II

We review a grant of summary judgment de novo, accepting the facts in the light most favorable to Plaintiffs and affirming summary judgment only if there is no genuine issue as to any material fact. *Nat'l Solid Wastes Mgmt. Ass'n v. Daviess County,* 434 F.3d 898, 902 (6th Cir.2006). To avoid summary judgment on a Title VI claim, "a plaintiff must create a genuine issue of material fact that the defendant intended to discriminate on the basis of race" by demonstrating that the decision "was motivated by race and that ... race was a determining factor in the exclusion." *Buchanan v. City of Bolivar,* 99 F.3d 1352, 1356 (6th Cir.1996).

A. Claims Against Montgomery County

Plaintiffs argue that they presented direct evidence of discrimination by Montgomery County. At his deposition, Jones averred that he had a friend who was a police detective and that the detective's supervisor called the detective a "nigger." This allegation, however, lacks any force as to Montgomery County's motivation for its actions concerning these Plaintiffs. Jones also testified that, when he complained to the County Attorney, Roger Maness, about the County's treatment, Maness informed him that "he didn't know if [Jones] had any civil rights or not." Additionally, Plaintiffs contend that the county erected a fence around the SGCC sometime after Plaintiffs sought to use it. But neither Maness's alleged comment nor the fence evinces race-based preference so as to constitute direct evidence of discrimination.

Lacking direct evidence of discrimination to validate their claims, Plaintiffs argue that they established a circumstantial case under the *McDonnell Douglas* **\*595** burden-shifting framework. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). We assume without deciding that this burden-shifting framework governs Plaintiffs' Title VI claims. *See Paasewe v. Ohio Arts Council,* 74 Fed.Appx. 505, 508 (6th Cir.2003) (applying *McDonnell Douglas* to Title VI claim); *Gazarov ex rel. Gazarov v. Diocese of Erie,* 80 Fed.Appx. 204–05 (3d Cir.2003); *Fuller v. Rayburn,* 161 F.3d 516, 518 (8th Cir.1998). Their claims nevertheless fail.

To establish a prima facie case under *McDonnell Douglas,* Plaintiffs must show that similarly-situated members of the nonprotected class received more favorable treatment than they received. *See Mitchell v. Vanderbilt Univ.,* 389 F.3d 177, 181 (6th Cir.2004); *Noble v. Brinker Int'l, Inc.,* 391 F.3d 715, 731 (6th Cir.2004). Thus, Plaintiffs must point to an organization that is "nearly identical" to Plaintiffs' "in all relevant aspects." *Humenny v. Genex Corp.,* 390 F.3d 901, 906 (6th Cir.2004) (quotations omitted) (discussing employment discrimination); *see Mitchell v. Toledo Hosp.,* 964 F.2d 577, 583 (6th Cir.1992) ("It is fundamental that ... the plaintiff must show that the 'comparables' are similarly situated *in all respects.*"). We agree with the district court that they did not do so here.

Plaintiffs offer a host of organizations they claim to be similarly-situated: the YMCA, the 4–H Club, Big Brothers/Big Sisters, the Civitan Club, the Jaycees, the "Library System," the "Recreation Centers," a "Teen Center," a "Ball Field," and a "Golf Course." But Plaintiffs offer this list without explanation as to how these entities are similarly-situated, and the claimed similarity is not self-evident to the court. Plaintiffs note only that the other entities use county facilities or otherwise received favorable treatment and ask us to infer from this that they are similarly-situated. The record does not warrant such an inference, however. Plaintiffs point us to no evidence of the entities' compositions, histories with Defendants, objectives, or other pertinent characteristics. In addition, Plaintiffs offer no comparison between the facilities used by the other entities—or the application process to use those facilities—and those that the Plaintiffs sought to use. Plaintiffs' bare allegations that the organizations are similarly-situated cannot withstand a motion for summary judgment. *Noble,* 391 F.3d at 731 ("Generalized allegations unsupported by evidence are insufficient to meet the plaintiff's burden. [The plaintiff] simply failed to present any evidence of a similarly situated individual outside the protected class who was treated more favorably than he.").

To the extent that Plaintiffs argue that Maness's failure to respond to their complaints constituted racial discrimination, Plaintiffs do not present a prima facie case of disparate treatment—they have neither alleged nor shown that any similarly-situated nonprotected complainant received a more favorable response. Similarly, Plaintiffs summarily argue that the County violated Title VI by having "no Title VI policy and procedures in place pursuant to the State of Tennessee Commission on Title VI Compliance." But Plaintiffs did not plead this in their complaint and, in any event, they neglect to develop the argument on appeal. We will not address this argument because "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *United States v. Layne,* 192 F.3d 556, 566 (6th Cir.1999) (quotation omitted).

Johnson v. City of Clarksville, 186 Fed.Appx. 592 (2006)

2006 Fed.App. 0418N

**\*596** B. Claims Against the City of Clarksville

Plaintiff Johnson contends that he presented a prima facie case of discrimination by the City of Clarksville, and that the district court erred in granting summary judgment. He suggests that the city effectively denied his requests to use city facilities because city personnel stonewalled his attempts to schedule organizational meetings. He also argues that the city discriminated against him by refusing to grant his requests for funding.

When Johnson submitted a calendar reflecting the dates and times that he wished to use city facilities, a city employee informed him that many of those dates and times conflicted with existing activities. According to Johnson, he then sought meetings with city personnel in order to procure the facilities on available dates, but city personnel "either had meetings of no substance with Mr. Johnson or no meetings at all."

Johnson highlights the Jaycees as a nonprotected group that received preferential treatment. But, other than his allegation, Johnson offers nothing from which this court could conclude that the Jaycees are similarly situated to Johnson. He notes that the Jaycees hold fundraisers at the city's fairgrounds (and pay 6% of their gross income to the city), but he does not suggest that he sought to use the fairgrounds or any other facility on similar terms. Johnson fails to show that the Jaycees are similar in any relevant respect. *See* Noble, 391 F.3d at 731.

Johnson fails to develop any argument on appeal relating to the city's denial of his application for funding. He contends that the city made "unreasonable requests" in relation to the funding, though he does not identify the requests. He also argues that the city "failed to give him an opportunity" to show that he was qualified to receive funds, but again he neglects to provide more detail. And he does not point us to any direct evidence of discrimination or any circumstantial evidence to state a prima facie case. In the absence of such evidence, the district court correctly entered summary judgment in favor of the city.

III

Without either direct evidence of discrimination or a prima facie case of discrimination, Plaintiffs' case cannot survive Defendants' motion for summary judgment. We therefore affirm the district court.

**All Citations**

186 Fed.Appx. 592, 2006 Fed.App. 0418N

Footnotes

\*       The Honorable William W Schwarzer, Senior United States District Judge for the Northern District of California, sitting by designation.

End of Document                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 5999243
Only the Westlaw citation is currently available.
United States District Court,
E.D. Michigan,
Southern Division.

Sharon D. LEWIS, Plaintiff,

v.

MICHIGAN OCCUPATIONAL SAFETY
AND HEALTH ADMINISTRATION,
Defendant.

No. 13–10889.
|
Nov. 12, 2013.

**Attorneys and Law Firms**

Sharon Lewis, Oak Park, MI, pro se.

Erik A. Grill, Michigan Department of Attorney General, Lansing, MI, for Defendant.

*ORDER OVERRULING PLAINTIFF'S OBJECTIONS TO ORDER DENYING PLAINTIFF'S MOTIONS TO AMEND COMPLAINT AND ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION*

GERALD E. ROSEN, Chief Judge.

**\*1** On August 13, 2013, Magistrate Judge Laurie J. Michelson issued an order denying Plaintiff Sharon D. Lewis's motions to amend her complaint, as well as a report and recommendation ("R & R") recommending that the Court grant Plaintiff's motion in which she seeks the entry of a final order on all issues presented in this litigation. Neither party has lodged any objections to the R & R, and the Court adopts this aspect of the Magistrate Judge's August 13 ruling in its entirety. As for the order denying Plaintiff's motions to amend, Plaintiff filed objections to this order on August 21, 2013. For the reasons stated briefly below, the Court overrules Plaintiff's objections and affirms the Magistrate Judge's denial of Plaintiff's motions to amend her complaint.

Under the Federal Rule and statutory provision governing objections to a Magistrate Judge's orders, this Court may set aside the Magistrate Judge's August 13 denial of Plaintiff's motions to amend her complaint only if Plaintiff "show[s] that the magistrate judge's order is clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(1)(A); *see also* Fed.R.Civ.P. 72(a). Yet, rather than addressing the legal determinations in the Magistrate Judge's order, Plaintiff's objections consist almost entirely of (i) repeated restatements of the factual allegations and legal theories of recovery advanced in Plaintiff's proposed amended complaint, without any effort to address the specific deficiencies in Plaintiff's proposed claims as identified by the Magistrate Judge, and (ii) references to statutes—*e.g.*, the federal Americans with Disabilities Act and Michigan's Elliott–Larsen Civil Rights Act—and legal authorities and principles that have no bearing upon the claims and allegations actually asserted in Plaintiff's proposed amended complaint.[1]

Simply stated, these "objections" fail to address in any way the salient elements of the Magistrate Judge's order. First and foremost, the Magistrate Judge correctly observes that there are "few substantive differences" between Plaintiff's proposed amended complaint and her initial complaint. (8/13/2013 R & R at 4.) Because the Court previously determined that Plaintiff's initial complaint was "subject to dismissal," (5/14/2013 Order at 2), and because Plaintiff's proposed amended complaint does not cure the deficiencies in this initial pleading, it readily follows, and the Magistrate Judge correctly concludes, that Plaintiff's proposed amendments are futile.

Next, as to the specific federal claims and theories of recovery advanced in Plaintiff's proposed amended complaint, the Magistrate Judge observed in an earlier May 3, 2013 report and recommendation that Plaintiff's Title VII claim of race discrimination fails for lack of allegations of an employment relationship between Plaintiff and Defendant, (*see* 5/3/2013 R & R at 5–6), and Plaintiff's proposed amended complaint does nothing to cure this deficiency. To the extent that Plaintiff seeks to overcome this defect by attempting to pursue claims of race discrimination under 42 U.S.C. §§ 1983 and 1985 rather than Title VII, the Magistrate Judge explains that the Defendant state agency is immune from § 1983 or § 1985 claims for money damages, (*see* 8/13/2013 R & R at 6–7), and Plaintiff has failed to identify any authority to the contrary.[2] Regarding Plaintiff's proposed claim under the Federal Tort Claims Act, the Magistrate Judge correctly holds that the Defendant state agency is not a federal agency subject to this federal statute, (*see id.* at 5–6), and Plaintiff again has not shown that this ruling is clearly erroneous or contrary to law.

**\*2** This leaves only Plaintiff's proposed state-law theories of recovery. As explained in the Magistrate Judge's May 3, 2013 report and recommendation, because all of the federal claims asserted in Plaintiff's initial and proposed amended

complaint are subject to dismissal, it is appropriate for the Court to decline to exercise supplemental jurisdiction over Plaintiff's state-law claims. (*See* 5/3/2013 R & R at 6–7.) Accordingly, to the extent that Plaintiff's objections pertain to any possible state-law theories she might wish to pursue, the Court declines to address these objections.

For these reasons,

NOW, THEREFORE, IT IS HEREBY ORDERED that Plaintiff's August 21, 2013 objections to the Magistrate Judge's August 13, 2013 order denying Plaintiff's motions to amend complaint (docket # 30) are OVERRULED, and that the Magistrate Judge's order is AFFIRMED.

Next, IT IS FURTHER ORDERED that the Magistrate Judge's August 13, 2013 report and recommendation (docket # 30) is ADOPTED as the opinion of this Court. IT IS FURTHER ORDERED, for the reasons set forth in the Magistrate Judge's R & R, that Plaintiff's August 6, 2013 motion for a final order (docket # 29) is GRANTED. The Court will promptly enter a final judgment reflecting its rulings in this case.

Finally, IT IS FURTHER ORDERED that Plaintiff's November 6, 2013 renewed motion for a final order (docket # 34) is DENIED AS MOOT, in light of the Court's grant of Plaintiff's earlier motion seeking the same relief.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 5999243

Footnotes

1    Although Plaintiff's proposed amended complaint references the federal Americans with Disabilities Act at one point, it does not appear that Plaintiff means to assert a claim under this federal statute. Even if she did, she has not alleged that she suffers from a disability within the meaning of this statute, nor do the allegations of her proposed amended complaint give rise to a plausible claim that the Defendant state agency discriminated against her because of a disability. As for Michigan's Elliott–Larsen Act, Plaintiff's proposed amended complaint does not even mention this state statute, and the Court, in any event, would decline to exercise supplemental jurisdiction over any state-law claim that Plaintiff might wish to pursue under this statute.

2    In her objections to the Magistrate Judge's order, Plaintiff seemingly suggests that she might be seeking to pursue a claim against the Defendant state agency under Title VI of the Civil Rights Act of 1964, which prohibits discrimination on account of race, color, or national origin "under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Yet, even assuming such a claim could be discerned from the allegations of Plaintiff's proposed amended complaint, and even assuming that the Defendant state agency is subject to Title VI by virtue of its receipt of federal funds, Plaintiff's bare and conclusory allegations that officials of the Defendant state agency discriminated against her "because she is black," (Plaintiff's Proposed First Amended Complaint at ¶¶ 16, 33), do not give rise to a plausible claim of race discrimination under Title VI, where Plaintiff has offered nothing beyond her own belief that her race was a factor in her unsatisfactory dealings with the Defendant agency. *See HDC, LLC v. City of Ann Arbor,* 675 F.3d 608, 613 (6th Cir.2012) ("A complaint that includes only conclusory allegations of discriminatory intent without supporting factual allegations does not sufficiently show entitlement to relief.").

---

    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

406 Fed.Appx. 972
This case was not selected for publication in West's
Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued on or
after Jan. 1, 2007. See also U.S.Ct. of App. 6th Cir.
Rule 32.1.
United States Court of Appeals, Sixth Circuit.

Timothy D. MURPHY, Petitioner–
Appellant,

v.

Carla GRENIER, et al., Defendants–
Appellees.

No. 09–2132
|
Jan. 19, 2011.

**Synopsis**
**Background:** State prison inmate brought § 1983 action
against prison officials, alleging that officials opened his
legal mail outside his presence, retaliated against him for
filing grievances and legal proceedings, failed to promptly
treat his back pain, and prevented him from sending a letter
to the news media. Parties moved for summary judgment.
The United States District Court for the Eastern District of
Michigan, Bernard A. Friedman, Senior District Judge,
2009 WL 1044832, granted officials' motion and denied
inmate's motion, and inmate appealed.

**Holdings:** The Court of Appeals, Boyce F. Martin, Jr.,
Circuit Judge, held that:

officials were not personally involved in opening inmate's
legal mail, as required for § 1983 liability on legal mail
claim;

there was no causal connection between inmate's
grievances against unidentified prison personnel and
official's allegedly retaliatory actions;

officials did not act with deliberate indifference to inmate's
back pain; and

district court acted within its discretion in denying inmate's
motion to amend.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Summary

Judgment.

**\*973** On Appeal from the United States District Court for
the Eastern District of Michigan.

Before: BATCHELDER, Chief Judge; MARTIN and
SUTTON, Circuit Judges.

**Opinion**

BOYCE F. MARTIN, JR., Circuit Judge.

Timothy D. Murphy, a Michigan prisoner proceeding pro
se, appeals the district court's decision granting the
defendants summary judgment as to his civil rights action
filed pursuant to 42 U.S.C. § 1983. We **AFFIRM** the
decision of the district court.

**I. BACKGROUND**

Murphy sued fourteen prison officials at three Michigan
prisons where he was incarcerated from 2004 to 2007. At
Standish Maximum Facility, he sued T. Valone, librarian;
Mr. McIntire and Mr. Urban, property room workers;
Frederick Winn, nurse; D. Svensen, nurse; and C. Berry
and C. Sellers, mailroom clerks/general office assistants.
At Kinross Correctional Facility, he sued Carla Grenier,
mailroom clerk; Brenda Bonnee and W. Hodges, mailroom
clerks/general office assistants; and Gordon Newland,
inspector. At the Chippewa Correctional Facility, Murphy
sued Cheryl Soeltner, Richard Cottle, and Randall Masker,
mailroom clerks/general office assistants.

Murphy claims that the defendants opened his legal mail
outside his presence, retaliated against him for filing
grievances and legal proceedings, failed to promptly treat
his back pain, and prevented him from sending a letter to
the news media. A full recounting of the factual
background is available in the magistrate judge's Report
and Recommendation. After a de novo review, the district
court accepted it in part and rejected it in part, and granted
summary judgment for the defendants.

In this appeal, Murphy claims that the district court erred
by granting summary judgment to the defendants regarding
his legal mail claim, retaliation claim, medical claim, and
news media mail claim. In addition, he claims that the
district court abused its discretion by granting summary
judgment to the defendants before he could engage in
discovery, and by denying his motion to amend his
complaint. Murphy has also moved for the appointment of
counsel.

Murphy v. Grenier, 406 Fed.Appx. 972 (2011)

**\*974 II. ANALYSIS**

**A. Motion for summary judgment**

We review the district court's grant of summary judgment de novo. *Ciminillo v. Streicher,* 434 F.3d 461, 464 (6th Cir.2006). Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a).

**1. Legal mail claim**

Murphy claims that the district court erred in granting summary judgment to Grenier, Bonnee, and Hodges regarding his legal mail claim on the ground that he did not allege sufficient facts to establish their personal involvement in unlawfully opening his mail. Personal involvement is necessary to establish section 1983 liability. *See, e.g., Gibson v. Matthews,* 926 F.2d 532, 535 (6th Cir.1991) (noting that personal liability "must be based on the actions of that defendant in the situation that the defendant faced, and not based on any problems caused by the errors of others"). Murphy's complaint alleges only that Grenier, Bonnee, and Hodges were employed as mailroom staff at two of the prisons where he was incarcerated and that mailroom staff at those prisons opened his legal mail on four occasions. In his Affidavit in Support of Plaintiff's Opposition to Defendant's Motion to Dismiss and/or for Summary Judgment, Murphy alleges that Grenier, Bonnee, or Hodges opened, inspected, or read outside his presence his legal mail. Grenier, Bonnee and Hodges submitted affidavits stating that they did not do so or that they do not recall doing so, and Murphy failed to rebut these affidavits with any specific facts. Furthermore, as discussed below, Murphy did not make a proper request for discovery under Rule 56(d). It was proper for the district court to grant summary judgment when Murphy's opposing affidavit merely stated that someone had opened his mail, and concluded that it must have been Grenier, Bonnee, or Hodges. *See Lewis v. Philip Morris Inc.,* 355 F.3d 515, 533 (6th Cir.2004) (stating that "conclusory statements" unsupported by specific facts will not permit a party to survive summary judgment).

In *Berndt v. Tennessee,* 796 F.2d 879, 882–83 (6th Cir.1986), we remanded a case to permit a pro se plaintiff to amend his civil rights complaint to name as defendants staff and authorities of a state mental health institution, even though he had originally named only the state and the institution and alleged that unnamed individuals had violated his rights. We noted that the plaintiff had raised substantially cognizable claims in his complaint, and stated that the district court should closely scrutinize it before dismissing it in the pleading stage. *Id.* at 883. However, this case is at the summary judgment stage rather than the pleading stage. Additionally, Murphy named specific individuals, but those individuals demonstrated that they were not involved. Thus, we **AFFIRM** the district court's decision granting summary judgment to the defendants regarding Murphy's legal mail claims.

**2. Retaliation Claim**

To state a claim of retaliation, a plaintiff must establish that: (1) he engaged in protected conduct; (2) he suffered an adverse action that would deter a person of ordinary firmness from continuing to engage in the protected conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct. *Thaddeus–X v. Blatter,* 175 F.3d 378, 394 (6th Cir.1999) (en banc). Murphy claims that the district court erred in granting summary judgment to McIntire and Berry on his retaliation claim on the ground that he failed to establish a causal connection **\*975** between his protected conduct and the adverse actions of the defendants.

Murphy claims that McIntire retaliated against him by depriving him of his television and typewriter because Murphy filed grievances and a lawsuit against other unidentified prison employees. He claims that Berry retaliated against him by preventing him from sending uncensored mail to the news media because Murphy informally complained about undelivered newspapers. Murphy's allegations against McIntire fail to satisfy the third prong of a retaliation claim because he does not allege specific facts linking the prior grievances against other unidentified prison personnel with McIntire's alleged actions. Furthermore, he concedes that he has offered no direct evidence of Berry's retaliatory motives and that his allegations are speculative. Bare allegations are insufficient to establish a retaliation claim. *See id.* at 399. Thus, we **AFFIRM** the district court's grant of summary judgment to McIntire and Berry on Murphy's retaliation claim.

**3. Medical Claim**

Murphy v. Grenier, 406 Fed.Appx. 972 (2011)

Murphy claims that the district court erred in granting the defendants summary judgment on his Eighth Amendment claim. The Supreme Court has held that deliberate indifference to serious medical needs of prisoners states a cause of action under section 1983. *Estelle v. Gamble,* 429 U.S. 97, 104–05, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). However, an inmate states a cognizable constitutional claim only if he makes a two-part showing including both an objective component and a subjective component. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Under the objective element, a plaintiff must show that a prison official denied him "the minimal civilized measure of life's necessities." *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). Under the subjective element, a plaintiff must show that a prison official acted with "deliberate indifference" to inmate health or safety. *Farmer,* 511 U.S. at 834, 114 S.Ct. 1970.

Murphy claims that the district court erred in holding that, under the objective prong, his back pain was not a serious medical need as a matter of law. Murphy alleges in his complaint and states in his affidavit that he was in extreme pain due to his back condition and that the defendants ignored his complaints for forty-five days. Under *Estelle,* which also involved inadequate treatment of a back injury, 429 U.S. at 99, 97 S.Ct. 285, Murphy presented sufficient evidence of an objectively serious medical condition to survive summary judgment.

Murphy claims that the district court erred in holding that he failed to establish deliberate indifference on the part of the defendants under the subjective prong. An examination of the medical records reveals that defendants responded to Murphy's complaint by examining him, giving him Ibuprofen, giving him written information about caring for his back, and scheduling an appointment with the prison physician. Thus, the medical staff accorded Murphy adequate attention in the time frame of his complaint. Because Murphy failed to raise a genuine issue of material fact as to whether the defendants acted with deliberate indifference, we **AFFIRM** the district court's decision granting summary judgment to defendants on Murphy's medical claim.

**4. News Media Mail Claim**

Murphy claims that the district court erred in granting summary judgment to Berry and Seller on his claim that they violated his First Amendment rights by not allowing him to send confidential uncensored letters to the news media. There **\*976** is a division of authority over whether an inmate has a constitutional right to send unmonitored letters to the news media. Compare *Smith v. Delo,* 995 F.2d 827, 831–32 (8th Cir.1993) (inmates have no right to unmonitored communication with the news media), *and Gaines v. Lane,* 790 F.2d 1299, 1307 (7th Cir.1986) (same), *with Burton v. Foltz,* 599 F.Supp. 114, 117 (E.D.Mich.1984) (inmates have a constitutional right to have mail to members of the news media sent unopened). However, it is unnecessary for us to resolve this issue because even if this right exists, Murphy has failed to raise a genuine issue of material fact as to whether Berry and Seller interfered with his right to send the letter with the requisite state of mind.

Negligent interference with legal mail is not actionable under section 1983. *See, e.g., Gardner v. Howard,* 109 F.3d 427, 431 (8th Cir.1997). Murphy's letter was rejected the first time that he presented it due to lack of postage, then rejected a second time as improperly sealed segregation inmate mail. Murphy filed a grievance, and the Record Office Supervisor responded that the mail should have been sent out if addressed to the newspaper and that the mailroom staff should be more careful in the future. Because Murphy has not raised a genuine issue of material fact as to whether Berry and Seller interfered with his right to send the letter with the requisite state of mind, we **AFFIRM** the district court's decision granting Berry and Sellers summary judgment on Murphy's news media mail claim.

**B. Claim That The District Court Prematurely Granted Summary Judgment**

Murphy argues that the district court erred by granting summary judgment before he could engage in discovery. We review for abuse of discretion the claim that the district court prematurely entered summary judgment because Murphy needed additional discovery. *Abercrombie & Fitch Stores, Inc. v. American Eagle Outfitters, Inc.,* 280 F.3d 619, 627 (6th Cir.2002). Rule 56(d) provides that a party may oppose a motion for summary judgment by submitting an affidavit explaining why it cannot present facts essential to justify its opposition. Fed.R.Civ.P. 56(d). The non-movant, however, has the burden of informing the district court of his need for discovery. *Vance v. United States,* 90 F.3d 1145, 1149 (6th Cir.1996). Before the district court decides a summary judgment motion, "the non-movant must file an affidavit pursuant to Fed.R.Civ.P. 56(f)[1] that details the discovery needed, or file a motion for additional discovery. If he does neither, this court will not normally address whether there was adequate time for discovery." *Abercrombie,* 280 F.3d at 627 (internal

quotation marks and citation omitted). Here, although Murphy sent a signed document to the district court requesting an extension of time within which to respond to the defendants' motion for summary judgment, this document failed to meet the requirements of Rule 56(d) even under the more lenient standards applied to pro se litigants. Thus, we hold that the district court did not grant the defendants' summary judgment motion prematurely.

**C. Motion for Leave to Amend**
Murphy claims that the district court erred in denying his motion for leave to amend. We review the district court's denial of a motion to amend for abuse of discretion. *Greenberg v. Life Ins. Co. of Va.,* 177 F.3d 507, 522 (6th Cir.1999). Ordinarily, leave to amend a complaint or **\*977** other pleading shall be freely granted "when justice so requires." Fed.R.Civ.P. 15(a). However, leave to amend should be denied if "the amendment is brought in bad faith, for dilatory purposes, results in undue delay or prejudice to the opposing party, or would be futile." *Crawford v. Roane,* 53 F.3d 750, 753 (6th Cir.1995). The defendants moved for summary judgment on June 2, 2008. Murphy filed his response on August 1, 2008, and did not seek leave to amend his complaint until January 20, 2009, over seven

months after the defendants filed their dispositive motion. Thus, granting the motion to amend would have resulted in undue delay and prejudice. Numerous defendants would have been required to file answers to the amendment and resubmit their summary judgment motion in light of the amendment. Thus, we cannot say that the district court abused its discretion by denying Murphy's motion to amend his complaint.

**D. Motion for Appointment of Counsel**
Because an appointment of appellate counsel is not necessary, we **DENY** the motion.

**III. CONCLUSION**

We **AFFIRM** the decision of the district court.

**All Citations**

406 Fed.Appx. 972

Footnotes

1    Recent amendments to the rules moved the provisions formerly found in subdivision (f) to subdivision (d). Fed.R.Civ.P. 56 advisory committee's note (2010).

**End of Document**                         © 2025 Thomson Reuters. No claim to original U.S. Government Works.

355 Fed.Appx. 909
This case was not selected for publication in West's
Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued on or
after Jan. 1, 2007. See also U.S.Ct. of App. 6th Cir.
Rule 32.1.
United States Court of Appeals,
Sixth Circuit.

Frank NALI, Plaintiff–Appellant,
v.
J. EKMAN, et al., Defendants–Appellees.

No. 08–1599.
|
Dec. 9, 2009.

**Synopsis**

**Background:** Prisoner brought § 1983 action against
corrections officials, alleging that they violated his federal
and state civil rights. The United States District Court for
the Western District of Michigan, 2007 WL
3461999,dismissed the action. Prisoner appealed.

**Holdings:** The Court of Appeals, White, Circuit Judge,
held that:

prisoner stated a First Amendment retaliation claim;

major misconduct findings against prisoner did not
implicate a protected liberty interest in support of a federal
due process claim; and

prisoner failed to state a cognizable Equal Protection
Clause claim.

Affirmed in part, vacated in part, and remanded.

Sutton, Circuit Judge, filed a dissenting opinion.

**Procedural Posture(s):** On Appeal; Motion to Dismiss.

**\*910** On Appeal from the United States District Court for
the Western District of Michigan.

Before: KEITH, SUTTON and WHITE, Circuit Judges.

**Opinion**

WHITE, Circuit Judge.

**\*\*1** Plaintiff Frank Nali challenges the district court's
dismissal of his civil rights action for failure to state a claim
on which relief can be granted. We conclude that Nali
stated a claim under the First Amendment, but that the
district court properly dismissed his remaining federal
claims. We therefore affirm in part, vacate in part and
remand for further proceedings.

**I**

Nali was convicted of extortion in 1992 and was
incarcerated at the Ojibway Correctional Facility in
Michigan when he filed the instant suit. *People v. Nali,* No.
247843, 260267, 2005 WL 3556110, at \*1 (Mich.Ct.App.
Dec. 29, 2005). After prison officials cited him for a major
misconduct infraction, Nali sued them and other
corrections officials, alleging that they had violated his
federal and state civil rights. The magistrate judge
recommended that the court dismiss Nali's federal claims
for lack of merit and decline to exercise pendent
jurisdiction over his state law claims. The district court
adopted the magistrate judge's report and
recommendation, over Nali's objections.

**A**

Nali's seventeen claims can be broadly grouped into three
types of federal claims—due process, speech—retaliation
and equal protection—and various state-law claims. We
affirm the dismissal of the due process and equal protection
claims, but reverse as to the speech-retaliation claim.

We do not agree with our dissenting colleague that Nali
waived his First Amendment claim.[1] Neither the magistrate
nor the district court addressed Nali's First Amendment
claim, which alleged that defendant Buda advised
defendant Flahaug to write a misconduct ticket in
retaliation for Nali's filing of a grievance against Buda. The
magistrate's report and recommendation concluded in
relevant part that Nali's claims "regarding the allegedly
false misconduct convictions remain noncognizable under
§ 1983" due to the Supreme Court's holding in *Heck v.
Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383
(1994). In response, Nali objected to the magistrate's
application of *Heck.* The district court rejected Nali's
objections. Under the circumstances that it appeared that
the report and recommendation **\*911** recommended

dismissal of the First Amendment claim under the *Heck* doctrine—since the claim was not otherwise addressed—Nali did not forfeit his argument that the First Amendment claim was dismissed in error by failing to specifically address it. Further, "[w]hen a district court fails to rule on a claim, we usually remand for consideration below." *United States v. Kennedy,* 220 Fed.Appx. 407, 409 (6th Cir.2007) (unpublished disposition); *cf. Nemir v. Mitsubishi Motors Corp.,* 381 F.3d 540, 552 (6th Cir.2004) ( "The district court's failure to rule on the motion requires that we remand for consideration anew.").

## B

Nali's allegations appear to state a First Amendment retaliation claim. As this court explained in *Smith v. Campbell,* 250 F.3d 1032, 1036–37 (6th Cir.2001):

> A prisoner retains First Amendment rights that are not inconsistent with his status as a prisoner or with legitimate penological objectives of the corrections system. *See Pell v. Procunier,* 417 U.S. 817[ 94 S.Ct. 2800, 41 L.Ed.2d 495] (1974). Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution. *See Thaddeus–X v. Blatter,* 175 F.3d 378, 394 (6th Cir.1999). To establish a First Amendment retaliation claim, the plaintiff must prove that: 1) the plaintiff engaged in activities protected by the Constitution or statute; 2) the defendant took an adverse action that would deter a person of ordinary firmness from continuing to engage in that conduct; and 3) that this adverse action was taken at least in part because of the exercise of the protected conduct.

**\*\*2** This court has held that a *pro se* plaintiff's complaint should only be dismissed for failure to state a claim if it appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Herron v. Harrison,* 203 F.3d 410, 414 (6th Cir.2000) (quoting *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). In this light, Nali's allegation that defendants Buda and Flahaug initiated the March 21, 2007 misconduct citation in retaliation for Nali's non-frivolous grievance against Buda may entitle him to relief on remand. *See Thomas v. Eby,* 481 F.3d 434, 440 (6th Cir.2007) (recognizing an inmate's undisputed First Amendment right to file grievances against prison officials on his own behalf); *see also Thaddeus–X v. Blatter,* 175 F.3d 378, 394 (6th Cir.1999); *Noble v. Schmitt,* 87 F.3d 157, 162 (6th Cir.1996).

Under the *Heck* doctrine, when success in a prisoner's § 1983 action would necessarily implicate the lawfulness of the prisoner's conviction or duration of sentence, "a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." *Heck,* 512 U.S. at 486–87, 114 S.Ct. 2364. However, in *Wilkinson v. Dotson,* 544 U.S. 74, 82, 125 S.Ct. 1242, 161 L.Ed.2d 253 (2005), the Supreme Court clarified that if success on a § 1983 claim "does not mean immediate release from confinement or a shorter stay in prison," but instead "means at most new eligibility review, which at most will speed *consideration* of a new parole application," the habeas exception to § 1983 does not apply. Two years later, this court concluded that under Michigan's disciplinary credit program, a prisoner's success on a "§ 1983 claim would not necessarily affect the duration of his sentence because prison officials would retain discretion regarding whether to grant him parole." *Eby,* 481 F.3d at 439–40 (citing Mich. Comp. Laws § 800.33(3), (5), and the **\*912** Michigan Court of Appeals' interpretation of the disciplinary credit program). As a result, the court held that the habeas exception did not apply to the prisoner's § 1983 claim. *Id.* at 440.

During the pendency of the instant appeal, Nali's conviction was vacated and his petition for writ of habeas corpus unconditionally granted. *See Nali v. Phillips,* 630 F.Supp.2d 807 (E.D.Mich.2009). On July 8, 2009, the district court in that case denied respondent's motion to stay and granted Nali's motion for immediate release. *Nali v. Phillips,* No. 07–CV–15487 (E.D. Mich. filed July 8, 2009), 2009 WL 1956946, at \*3. We thus need not address the district court's conclusion that *Heck* applies to Nali's claims, except to note that the court failed to distinguish between Michigan's good time credit program, available to prisoners "serving a sentence for a crime committed before April 1, 1987" and Michigan's disciplinary credit program, available to prisoners "serving a sentence for a crime that was committed on or after April 1, 1987." *Compare* Mich. Comp. Laws § 800.33(2), *with* Mich. Comp. Laws § 800.33(3), (5). *See also* Mich. Comp. Laws. § 800.34.

## C

**\*\*3** Regarding Nali's remaining claims, *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), bars his federal due process claims. As *Sandin* makes clear,

"finding[s] of misconduct," even findings that could lengthen a prison sentence, do not implicate a protected liberty interest so long as the parole board retains discretion to release a prisoner based on a "myriad of considerations" and so long as the prisoner may "explain the circumstances behind his misconduct record" to the board. 515 U.S. at 487, 115 S.Ct. 2293. In this instance, the major misconduct findings resulted in the accumulation of "disciplinary time" to Nali's sentence, a factor submitted to the parole board as one among many other considerations they may account for in deciding whether to grant early release. Mich. Adm.Code R. 791.5515(2), 791.7715. Because these findings represent just one among many factors that could affect the length of Nali's indeterminate sentence and because no one denies that Nali has the right to explain the circumstances of the misconduct charge, the findings do not inevitably affect the duration of Nali's sentence and do not effect an "atypical and significant hardship on [Nali] in relation to the ordinary incidents of prison life." *Sandin,* 515 U.S. at 483, 484, 115 S.Ct. 2293; *see also Thompson v. Mich. Dept. of Corrs.,* 25 Fed.Appx. 357, 358 (6th Cir.2002) (unpublished disposition) (concluding that a misconduct citation in the Michigan correctional system did not affect the prisoner's constitutional liberty interests).

Nali's federal Equal Protection Clause claim—that defendants "conspir [ed]" to issue the two major misconduct infractions for racially discriminatory reasons, also fails. Although Nali is correct that the magistrate (and district court) misunderstood the statutory basis for his discrimination claims, believing that he had premised the claim on § 1983, as opposed to § 1985, Nali has not shown that they erred in concluding that the claims still fail as a matter of law.

In order to plead a cognizable § 1985 claim, Nali must allege specific facts that, taken together, plausibly suggest that (1) two or more individuals "conspire[d] ... for the purpose of depriving [him] of the equal protection of the laws," (2) they acted to further that conspiracy and (3) he was injured as a result. *Center for Bio–Ethical Reform, Inc. v. City of Springboro,* 477 F.3d 807, 832 (6th Cir.2007); *see also Chapman v. City of Detroit,* 808 F.2d 459, 465 (6th Cir.1986). As the magistrate and district court recognized, Nali failed to **\*913** plead sufficient facts to state a cognizable Equal Protection Clause claim. In connection with this requirement, he alleged that "[d]efendants' motives were racially based [and] supported by animosity towards plaintiff." But, as the Supreme Court recently held, a complaint that includes conclusory allegations of discriminatory intent without additional supporting details does not sufficiently show that the pleader is entitled to relief. *See Ashcroft v. Iqbal,* ––– U.S. ––––, 129 S.Ct. 1937, 1950–51, 173 L.Ed.2d 868 (2009). Nali's claim can survive only if he pleaded facts supporting that conclusion. He has

not done so. The fact that "defendants are caucasian" and that Nali "is non-caucasian" does not by itself show that defendants were motivated to discriminate against him on the basis of his race or ethnicity. Although Nali adds that "no one else was ticketed" for similar conduct (being in the chow hall at the wrong time), that fact does not show discrimination unless accompanied by some evidence that the people *not* disciplined were similarly situated and of a different race, *see Coker v. Summit County Sheriff's Dept.,* 90 Fed.Appx. 782, 790 (6th Cir.2003) (unpublished disposition)—facts he does not allege in his complaint. The district court properly dismissed this claim.

**\*\*4** Nali asserted state law claims for negligence, defamation, and intentional infliction of emotional distress. The district court declined to exercise pendent jurisdiction over these claims on the ground that Nali failed to state a federal claim. Because Nali stated a claim under the First Amendment, the district court should revisit whether to exercise pendent jurisdiction over the state law claims. *See e.g., Voyticky v. Village of Timberlake, Ohio,* 412 F.3d 669, 675 (6th Cir.2005).

We affirm the dismissal order in part, vacate in part and remand for further consideration of the First Amendment and state law claims.

SUTTON, Circuit Judge, dissenting.

**\*\*4** An appellant, whether represented by counsel or not, should not be able to obtain a reversal of a district court judgment without offering any reason in his brief why the lower court erred. Yet that is what Mr. Nali has managed to do here, and accordingly I respectfully dissent.

Nali's four-page brief does not develop a single argument or point to a single mistake that the district court made. If you doubt me, check it out for yourself. As the attached appendix shows, Nali's brief contains a one-sentence (all-encompassing) description of the issue presented: "Whether The Trial Court Should Have Dismissed Plaintiff's Claims Against The Defendants." It then contains a one-paragraph (half-page) "Law and Argument" section, which in sum and substance says this: "his submissions in the district court and this court sufficiently addressed the issue." *See* Appendix. It then incorporates by reference "all his exhibits in the appendices"—his district court filings and the district court's opinion—"as an integral part of this argument and his appeal." *Id.* Even the most *pro se* of *pro se* briefs must do more than that.

Nali v. Ekman, 355 Fed.Appx. 909 (2009)

Rule 28 of the Federal Rules of Appellate Procedure says that the brief of an appellant—any appellant—"must" include his "contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies." Fed. R.App. P. 28(a)(9)(A); *see Fitts v. Sicker,* 232 Fed.Appx. 436, 441–42 (6th Cir.2007) (applying Rule 28 to *pro se* appellant). No doubt, we expect less of *pro se* litigants than we do of counseled litigants—and appropriately so. But those modest expectations are not non-existent. "[P]ro se parties must still brief the issues advanced with some effort at developed argumentation." *Coleman v. Shoney's, Inc.,* 79 Fed.Appx. 155, 157 (6th Cir.2003) **\*914** (quotation marks omitted). That is why the Sixth Circuit's form for *pro se* briefs asks appellants to specify "what facts," "what law" and "what specific issues" they want the court to review. *See Pro Se Brief,* http://www.ca6.uscourts.gov/internet/forms/briefs_appen dices/ prose_brief.pdf. When, as here, a *pro se* appellant's brief "has not suggested any defects in the district court's" ruling, "much less advanced any sort of argument," we should dismiss the appeal—as we have before. *Geboy v. Brigano,* 489 F.3d 752, 766–67 (6th Cir.2007); *see also Jenkins v. Widnall,* No. 99–3918, 2000 WL 553957, at \*3 (6th Cir. Apr. 28, 2000) (declining to address district court order *pro se* litigant did not specify in her notice of appeal); *Anderson v. Hardman,* 241 F.3d 544, 545 (7th Cir.2001) (dismissing *pro se* appellant's claim for failing to comply with Rule 28).

**\*\*5** Even the most lenient reading of Rule 28 does not allow an appellant to satisfy its requirements solely by incorporating his arguments below. *See Yohey v. Collins,* 985 F.2d 222, 224–25 (5th Cir.1993) (denying *pro se* litigant's request to incorporate "his objections to the magistrate judge's report and in various state court pleadings"). "[S]uch a practice has been consistently and roundly condemned, and any incorporated argument is ordinarily deemed forfeited, even when advanced by a pro se litigant." *United States v. Orrego–Martinez,* 575 F.3d 1, 8 (1st Cir.2009) (internal quotation marks and citations omitted).

This is hardly the technical enforcement of a rule for its own nit-picking sake. Had Nali's only briefing omission been the failure to include a "summary of the argument," as indeed he failed to provide and as the Appellate Rules also require, *see* Fed. R.App. P. 28(a)(8), I would not have a problem with overlooking the error. But when the litigant offers no argument to summarize and nothing more than an invitation to rummage through the district court pleadings to identify any mistake loosely connected with a broadly defined issue (*viz.,* "Should I have lost below?"), he is not asking us to overlook the understandable mistake of a layperson advocate. He is asking us to be a judge *and* advocate in the case, a division of responsibilities we should try to

preserve rather than blur.

What is more, when a *pro se* litigant asks us to identify any potentially winning arguments in his lower court pleadings, he is asking us to create, not correct, potential disparities in the legal system. Excusing a complete lack of appellate briefing does not level the playing field between an uncounseled litigant and his adversary; it gives the *pro se* litigant a distinct advantage. How can an appellee respond to arguments the appellant never articulates? And how can we tether the appellee to the applicable page-limit requirements, when the appellant's brief includes everything in a potentially voluminous lower-court record?

This case, indeed, illustrates the problem with this approach. The claim Nali prevails on today—his speech-retaliation claim—is one that he not only failed to develop on appeal but also failed to complain about in his objections to the magistrate's report and recommendation. *See* Nali App. D. As a result, the first notice that the appellee—and the district court—will receive of the appellant's winning "argument" is when they read the court of appeals decision reversing the district court's judgment. That is no way to run a court system. Breathing new life into this doubly forfeited claim both undermines our adversarial system and oversteps the appropriate constraints on our powers of appellate review. *Cf. Carducci v. Regan,* 714 F.2d 171, 177 (D.C.Cir.1983) ("The **\*915** premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry....")

**\*\*6** Such a lax, indeed non-existent, briefing requirement does not just create inequities between litigants in any one case. If we confer on some *pro se* litigants the benefit of crafting their arguments for them, I see no reason why we should not do so for all *pro se* litigants, or even for all parties. Because *pro se* appellants, like all other appellants, must make some effort to explain why the lower court erred, and because Nali has made no such effort, I would affirm. The majority seeing the issue differently, I respectfully dissent.

Appendix to Opinion of Sutton, Circuit Judge.

Nali's handwritten brief contains a table of contents, a one-and-a-half page statement of facts, a one-sentence jurisdictional statement and a "Relief Sought" section requesting the court to reverse the district court's decision. The rest of his brief, in its entirety, reads as follows:

Nali v. Ekman, 355 Fed.Appx. 909 (2009)

ISSUES PRESENTED

Whether the Trial Court Should Have Dismissed Plaintiff's Claims Against The Defendants.

LAW AND ARGUMENT

Plaintiff filed a 115 item complaint against 6 MDOC employees, actually 5 MDOC employees and a CMS employee. See appendix A. The complaint was based upon three major misconduct tickets. See appendix B.

The district court entered a report and recommendation to dismiss plaintiff's case for failure to state a claim pursuant to 28 U.S.C. § 1915(e)(2), 1915A(b) and 42 U.S.C. § 1997e(c). See App. C.

Plaintiff filed objections to the report and recommendations. See appendix D. The district court adopted the magistrate's report and recommendation. See appendix E.

Plaintiff request[s] leave to appeal in this court. See appendix F.

Plaintiff contends that his submissions in the district court and this court sufficiently addressed the issue, and includes all his exhibits in the appendices as an integral part of this argument, and his appeal.

**All Citations**

355 Fed.Appx. 909, 2009 WL 4641737

Footnotes

1    As mentioned, in the instant case the magistrate judge wrote a report and recommendation to which Nali objected. The district court then adopted the report and recommendation. In such a situation, though it is not ideal, we do not think it is unreasonable for a pro se appellant to cite his objections to the report and recommendation, note the district court's adoption of the report over his objections, refer the appellate court to the relevant submissions, and attach those submissions as appendices to the appeal. *See Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) ("A document filed *pro se* is 'to be liberally construed,' *Estelle [v. Gamble],* 429 U.S. [97], at 106, 97 S.Ct. 285 [1976], and 'a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers,' *ibid.*"); *cf. Banks v. Jackson,* 149 Fed.Appx. 414, 422 n. 7 (6th Cir.2005) (unpublished disposition) (holding a *pro se* habeas petitioner did not forfeit his argument for a stay despite failing to request the stay at the district court or in his brief on appeal).

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 4059559
Only the Westlaw citation is currently available.
United States District Court, E.D. Kentucky,
Central Division at Lexington.

Kayla SHEPHERD, Plaintiff,
v.
UNIVERSITY OF KENTUCKY,
Defendant.

CIVIL ACTION NO. 5:16-005-KKC
|
Signed 07/28/2016

**Attorneys and Law Firms**

Edward E. Dove, Lexington, KY, for Plaintiff.

Barbara A. Kriz, Kriz, Jenkins, Prewitt & Jones, PSC, William Eugene Thro, University of Kentucky, Lexington, KY, for Defendant.

**OPINION AND ORDER**

KAREN K. CALDWELL, CHIEF JUDGE

**\*1** This matter is before the Court on Defendant University of Kentucky's Motion to Dismiss [DE 5] and Plaintiff Kayla Shepherd's Motion for Leave to File a Second Amended Complaint [DE 6.] For the reasons stated herein, the Court will deny Shepherd's Motion for Leave to File a Second Amended Complaint and grant the University's Motion to Dismiss.

**BACKGROUND**

Shepherd brought this action after she was expelled from the University of Kentucky's Physician Assistant Program. *See generally* [DE 1-1, First Amended Complaint at 16-20.] She alleges that the University violated her right to procedural due process under the Fourteenth Amendment to the United States Constitution and Article II of the Kentucky Constitution when it failed to provide her adequate notice of an appeal hearing, which prevented her from attending the hearing. [DE 1-1 at 20-22.] Shepherd is seeking reinstatement into the Physician Assistant

Program, an award of "compensatory damages and damages for embarrassment and humiliation," and attorney's fees and costs. [DE 1-1 at 22.]

Shepherd admits that after completing a dermatology rotation, instead of providing an evaluation form to the supervising physician, she completed the evaluation herself and signed the supervising physician's name. [DE 1-1 at 18.] Shepherd then submitted the altered evaluation to the Academic Coordinator for Physician Studies. [DE 1-1 at 18.] Eventually, Shepherd came forward and admitted to Dr. David Fahringer, a professor, that she forged the evaluation and signature. [DE 1-1 at 19.] Thereafter, Shepherd was informed via email that she could attend a June 2, 2015, meeting of the Standard and Progression Committee, which was comprised of Dr. Fahringer and three other individuals, to discuss the evaluation. [DE 1-1 at 19.] Shepherd attended the meeting and explained the circumstances surrounding the evaluation. [DE 1-1 at 19.]

Following the June 2nd meeting, Dr. Scott Lephart, Dean of the College of Health Sciences, contacted Shepherd and directed her to appear for a meeting in his office on June 9, 2015. [DE 1-1 at 19; Exhibit 1.] After the June 9th meeting, Plaintiff received a letter from Dean Lephart informing her that she was terminated from the Physician Assistant Program. [DE 1-1 at 19; Exhibit 2.] Shepherd timely appealed the decision when her attorney mailed a letter to the chair of the appeals board, Dr. Julia Costich. [DE 1-1 at 19; Exhibit 3.]

Plaintiff alleges that she did not receive any correspondence regarding her appeal until August 15, 2015, when she was informed that a hearing had been held on August 13, 2015, to review her appeal and that the hearing panel decided to uphold the sanction imposed by Dean Lephart. [DE 1-1 at 20.] On August 23, 2015, Shepherd met with Denise Simpson, Dead of Students at the University of Kentucky, who was "confused" as to why Shepherd had not received notice of the appeal hearing. [DE 1-1 at 20.] Shepherd also discussed her lack of notice with Dr. Randa Remer, Assistant Dean of Students in the College of Health Sciences. [DE 1-1 at 20.]

**\*2** On September 23, 2015, Shepherd received an email from the University of Kentucky's counsel stating that "since the Plaintiff admitted guilt, a hearing was not necessary." [DE 1-1 at 20.] Shepherd then filed the present action in Fayette Circuit Court, naming the University of Kentucky as the sole defendant. [DE 1-1 at 2.] Plaintiff filed her First Amended Complaint in state court, adding only a request for a jury trial, which had been inadvertently omitted. [DE 7 at 1.] Shepherd alleges two causes of action: (1) a 42 U.S.C. § 1983 claim for violation of procedural due process rights protected by the Fourteenth Amendment; and (2) a claim that her expulsion was an arbitrary and capricious act in violation of Article II of the

Shepherd v. University of Kentucky, Not Reported in Fed. Supp. (2016)

Kentucky Constitution. [DE 1-1 at 20-22.]

On January 6, 2016, the University of Kentucky removed this case to federal court. [DE 1, Notice of Removal.] It then filed the present Motion to Dismiss. [DE 5.] In its motion, the University asserts that this case should be dismissed because it is has Eleventh Amendment immunity from Shepherd's § 1983 claim, it is not a person subject to suit under § 1983, it is entitled to governmental immunity from Shepherd's state law claim, and finally because Kentucky does not recognize a private right of action for alleged violations of the state constitution. [DE 5.]

In her response, Shepherd conceded that "[t]he Defendant's Motion to Dismiss correctly states that the Plaintiff has only named the University of Kentucky as a party. The Defendant is also correct that as an arm of the state, UK enjoys immunity from the Plaintiff's lawsuit." [DE 7 at 1.] Thus, Shepherd admits that her claims against the University of Kentucky are barred by sovereign immunity.

However, Shepherd attempts to avoid dismissal by moving to file a Second Amended Complaint in which she seeks to add Dr. Eli Capilouto, in his official capacity as President of the University of Kentucky, as a defendant. [DE 6; 6-2.] In her proposed Second Amended Complaint, Shepherd alleges that "Dr. Eli Capilouto is the President of the University of Kentucky. As President, Defendant Capilouto is to ensure that all students are provided procedural due process when enrolled in the University of Kentucky." [DE 6-2 at 1.] The University of Kentucky opposed Shepherd's motion, arguing that the Second Amended Complaint should be denied as futile because even as amended it could not withstand a motion to dismiss. [DE 8; 9.] Thus, the central question presented to the Court is whether Shepherd's addition of Dr. Capilouto as a Defendant via the proposed Second Amended Complaint is futile.

## ANALYSIS

Shepherd's Second Amended Complaint could not withstand a motion to dismiss, so the proposed amendment adding Dr. Capilouto as a defendant is futile. The Court will therefore deny Shepherd's Motion for Leave to File a Second Amended Complaint, which leaves the University of Kentucky as the sole named defendant. As Shepherd herself acknowledges, the University of Kentucky has immunity from Shepherd's claims, so the Court will grant the University's Motion to Dismiss.

"It is well settled that [a] district court may deny a motion for leave to amend a complaint if such complaint, as amended, could not withstand a motion to dismiss." *Neighborhood Dev. Corp. v. Advisory Council on Historic Pres., Dep't of Hous. & Urban Dev., City of Louisville*, 632 F.2d 21, 23 (6th Cir. 1980) (citing *Bacon v. California*, 438 F.2d 637 (9th Cir. 1971)). To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory. *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir. 1988).

**\*3** The Second Amended Complaint could not withstand a motion to dismiss because Shepherd failed to state a claim against Dr. Capilouto on which relief can be granted. First, Shepherd's § 1983 claim cannot succeed against Dr. Capilouto because Shepherd has not alleged that he bears a sufficient connection to her expulsion so as to bring her case within the *Ex Parte Young* exception to sovereign immunity. Second, Shepherd cannot maintain her claim under Section II of the Kentucky Constitution against Dr. Capilouto because Kentucky does not recognize a private right of action for alleged violations of the state Constitution.

Beginning with the § 1983 claim, Shepherd seeks to name Dr. Capilouto as a defendant in order to bring this case within the *Ex Parte Young* exception to sovereign immunity. *See* [DE 7 at 2.] Under the doctrine of *Ex Parte Young*, a state official sued in their official capacity may be enjoined from taking action that violates federal law. *Diaz v. Michigan Dept. of Corrections*, 703 F.3d 956, 964 (2013). However, an *Ex Parte Young* action is available only when the state official being sued has taken, or is about to take, an action. *Children's Healthcare is a Legal Duty, Inc. v. Deters,* 92 F.3d 1412, 1414-1416 (6th Cir. 1996) ("*Young* abrogates a state official's Eleventh Amendment immunity when a suit challenges the constitutionality of a state official's action."). The state official sued in an *Ex Parte Young* action must bear a "sufficient connection" to the challenged act, and it is not enough to simply claim that by virtue of their office they have the general authority to take the allegedly illegal action. *Coyle v. University of Kentucky,* 2 F. Supp. 3d 1014, 1020 (2014). "[G]eneral authority to take illegal action is not sufficient to make government officials the proper parties to litigation challenging the law." *Id.* (citing *Children's Healthcare,* 92 F.3d at 1416) (internal quotations omitted).

In *Coyle,* a professional photographer sued the University of Kentucky and two University officials—the Director of Athletics and Executive Vice President for Finance and Administration—alleging copyright infringement. 2 F.

Shepherd v. University of Kentucky, Not Reported in Fed. Supp. (2016)

Supp. 3d at 1016. The plaintiff in *Coyle* similarly attempted to avoid sovereign immunity under the *Ex Parte Young* doctrine by naming the University officials as defendants. *Id.* at 1019-21. This Court rejected the plaintiff's attempt, finding:

> In this case, [the plaintiff] claims that [the University officials], by virtue of their office, "approved of, condoned, or acquiesced in the" alleged copyright infringement described in the complaint ... But in the amended complaint, Coyle does not allege a single "affirmative act" that [the University officials] "took ... through their respective positions."

*Id.* at 1020. The plaintiff alleged only that the University officials had general duties that *might* require approving of, condoning, or acquiescing to acts constituting copyright infringement, but did not identify any actions that the University officials *actually took* that brought about the alleged infringement. *Id.* at 1020-21. Therefore, this Court held that the plaintiff failed to make out a viable claim under *Ex Parte Young.*

Shepherd has likewise failed to state a viable claim under *Ex Parte Young* because she does not allege that Dr. Capilouto actually took any action in furtherance of her expulsion. In her tendered Second Amendment Complaint, Shepherd merely alleges that "[a]s President, Defendant Capilouto is to ensure that all students are provided procedural due process when enrolled in the University of Kentucky." [DE 6-2 at 1.] Shepherd clearly fails to allege that Dr. Capilouto took any action related to her expulsion whatsoever. In fact, Dr. Capilouto's alleged involvement in this matter is even more hypothetical and remote than that alleged by the plaintiff in *Coyle. See* 2 F. Supp. at 1020. In this case, Shepherd could have named any of the host of University officials who were directly involved in her expulsion, but instead made only a vague reference to Dr. Capilouto's general duty to protect students' due process. Shepherd failed to allege a single affirmative action that Dr. Capilouto took through his position as President of the University that deprived her of due process, so she cannot maintain a claim against Dr. Capilouto in his official capacity under *Ex Parte Young.*

**\*4** Shepherd's second cause of action also fails against Dr. Capilouto because no private right of action exists for alleged violations of Article II of the Kentucky Constitution. *Tallman v. Elizabeth Police Dep't*, 344 F. Supp. 2d 992, 997 (W.D. Ky. 2004), *aff'd sub nom. Tallman v. Elizabethtown Police Dep't*, 167 Fed.Appx. 459 (6th Cir. 2006). "Section 1983 applies only to deprivations of federal constitutional and statutory rights," and there is no analogous state statute or other authority that enables her to pursue a civil claim for an alleged violation of the Kentucky Constitution. *Id.; see also Smith v. Flinkfelt,*

2014 WL 1331182, at \*13 (E.D. Ky. Mar. 31, 2014); *Jackson v. Murray States Univ.*, 834 F. Supp. 2d 609, 615 (W.D. Ky. 2011). For this reason, Shepherd's second cause of action, if asserted against Dr. Capilouto, would fail.

Neither of Shepherd's causes of action can proceed against Dr. Capilouto, so her proposed amendment is futile. The Complaint, as amended, could not withstand a motion to dismiss because it contains no viable claims. Therefore, the Court will deny Shepherd's Motion for Leave to File a Second Amended Complaint.

Having denied Shepherd's proposed amendment, the only named Defendant in this action is the University of Kentucky. Shepherd agrees that the University enjoys immunity from her claims. [DE 7 at 1.]; *see also Coyle* 2 F. Supp. at 1016-1019 (finding that sovereign immunity under the Eleventh Amendment precluded suit against the University of Kentucky); *Furtula v. Univ. of Kentucky*, 438 S.W.3d 303, 305, fn.1 (Ky. 2014) ("The state universities of this Commonwealth, including the University of Kentucky, are state agencies that enjoy the benefits and protection of governmental immunity" while performing a governmental function.). Furthermore, the University is not a "person" subject to suit under § 1983. *Campbell v. University of Louisville*, 862 F. Supp. 2d 578, 582 (W.D. Ky. 2012). Lastly, as noted above, Kentucky has no statute comparable to 42 U.S.C. § 1983, so Shepherd cannot maintain a civil action for an alleged violation of the Kentucky constitution. *Tallman*, 344 F. Supp. 2d at 997. Accordingly, the Court will grant the University of Kentucky's Motion to Dismiss.

**CONCLUSION**

For the reasons stated herein, the Court **HEREBY ORDERS** as follows:

> 1. Shepherd's Motion for Leave to File a Second Amended Complaint [DE 6] is **DENIED**;

> 2. The University of Kentucky's Motion to Dismiss [DE 5] is **GRANTED**; and

> 3. This matter is **DISMISSED WITH PREJUDICE** and **STRICKEN** from this Court's active docket.

Dated July 28, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 4059559

Shepherd v. University of Kentucky, Not Reported in Fed. Supp. (2016)

**End of Document**                                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 1819117
Only the Westlaw citation is currently available.
United States District Court, S.D. Ohio, Western
Division.

Sharon STANFORD, et al., Plaintiffs,
v.
NORTHMONT CITY SCHOOL
DISTRICT, et al., Defendants.

Case No. 3:19-cv-399
|
Signed February 8, 2023

**Attorneys and Law Firms**

Christine Baker, Dayton, OH, for Plaintiffs.

Tabitha Dee Justice, Subashi & Wildermuth, Dayton, OH,
for Defendants Northmont City School District, James
Chad Kaltenbach, Linda Blum, Tony Thomas, Michael
Barrow.

**ORDER: (1) GRANTING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT ON ALL FEDERAL
CLAIMS; (2) DISMISSING WITHOUT PREJUDICE
PLAINTIFFS' REMAINING STATE LAW CLAIM
FOR LACK OF SUPPLEMENTAL JURISDICTION;
AND (3) TERMINATING THIS CASE ON THE
DOCKET**

Michael J. Newman, United States District Judge

**\*1** This 42 U.S.C. § 1983 civil rights case concerns two
local high school students suspended for ten days (but not
expelled) by Northmont High School for violating the
school's marijuana policy.[1] The two high school students—
both of whom are African American, minors, and referred
to here by their initials, J.S. and J.E.—claim, *inter alia*, that
they were unconstitutionally searched in violation of the
Fourth Amendment and on account of their race, and
wrongly suspended. J.S., J.E., and their parents—also
named as Plaintiffs in this lawsuit—name as Defendants
the Northmont City School District ("School District"),
and Northmont High School's Assistant Principal James
Chad Kaltenbach ("Kaltenbach"). Now before the Court is
Defendants' motion for summary judgment. Doc. No. 99.
Plaintiffs, through counsel, responded in opposition. Doc.
No. 102. Defendants replied, Doc. No. 103, and this matter

is ripe for review. For the reasons that follow, the Court,
having carefully reviewed the undisputed facts of this
matter, finds in favor of Defendants on the federal claims
pled here, and dismisses without prejudice the sole
remaining state law claim.

**I.**

**A. Undisputed Facts**

**1. J.S.'s Suspension**

The School District, in its student handbook for Northmont
High School, forbids students from "com[ing] to school ...
with the smell of ... marijuana on his/her breath/person."
Doc. No. 99-1 at PageID 2519. The punishment for
violating this provision is a ten-day suspension.[2] *Id.*

J.S. was in ninth grade at Northmont High School on
February 19, 2019. Doc. No. 61 at PageID 1473. That day,
he missed the bus and rode to school in a car with friends,
all Northmont High School students. *Id.* Once J.S. arrived
at Northmont High School, Kaltenbach received a report
from a secretary that he and his friends smelled like
marijuana. Doc. No. 91 at PageID 2089; Doc. No. 99-2 at
PageID 2522.

Kaltenbach—right after a second teacher told him that J.S.
smelled like marijuana—went to J.S.'s classroom and
called him into his office. Doc. No. 61 at PageID 1475;
Doc. No. 91 at PageID 2089–90; Doc. No. 98 at PageID
2244. In his office, Kaltenbach explained to J.S. the
allegations and then told him to empty his backpack and
pockets. Doc. No. 91 at PageID 2091. Kaltenbach testified
at his deposition that he "clearly" smelled marijuana on J.S.
before he began the search. *Id.* He sniffed J.S.'s left hand
and found that it smelled like marijuana; he further called
a school resource officer into the office to sniff J.S.'s hand.
Doc. No. 61 at PageID 1476, 1477; Doc. No. 89 at PageID
2041; Doc. No. 98 at PageID 2226. That officer agreed.
Doc. No. 98 at PageID 2226.

**\*2** Kaltenbach next asked J.S. to explain why he smelled
like marijuana. *Id.* at PageID 2225. J.S. refused to speak
with him. *Id.* Kaltenbach then called J.S.'s father,
explained the situation, and had J.S. wait in his office until
J.S.'s father arrived. *Id.*; Doc. No. 61 at PageID 1477; Doc.
No. 99-1 at PageID 2518, 2521.

Once J.S.'s father arrived, Kaltenbach informed J.S. that he
was suspended for ten days for violating Northmont High

Stanford v. Northmont City School District, Not Reported in Fed. Supp. (2023)

School's marijuana policy. Doc. No. 98 at PageID 2226; Doc. No. 99-1 at PageID 2518, 2521. J.S.'s suspension paperwork, as Kaltenbach explained to him, listed his right to appeal the suspension to the School District's Board of Education. Doc. No. 98 at PageID 2226; Doc. No. 99-1 at PageID 2521.

## 2. J.E.'s Suspension

J.E. was in tenth grade at Northmont High School on January 22, 2020. Doc. No. 85 at PageID 1871.[3] That day, Assistant Principal Teresa Dillon ("Dillon") received a call from two teachers who, after receiving comments from other students, told her that J.E. smelled like marijuana. Doc. No. 85 at PageID 1873–74; Doc. No. 90 at PageID 2060; Doc. No. 98 at PageID 2265. She called him to her office. Doc. No. 90 at PageID 2060. Once J.E. arrived at Dillon's office, she determined he smelled like marijuana. *Id.*; Doc. No. 98 at PageID 2265–66.

She began to search J.E.'s belongings—asking him to empty his backpack and pockets; lift up his pant legs; and take his shoes and socks off. Doc. No. 90 at PageID 2060. Like Kaltenbach, Dillon called over a school resource officer—along with Eric Hughes, a school administrator—who corroborated the smell. *Id.* Dillon called Kaltenbach to her office and he, too, noted that J.E. smelled like marijuana. *Id.* at PageID 2069; Doc. No. 98 at PageID 2268. Kaltenbach also noted that J.E. was glassy-eyed. Doc. No. 90 at PageID 2069; Doc. No. 98 at PageID 2268. J.E. protested that he only smelled like marijuana because his stepfather smoked and alleged that his hand lotion was the source of the odor. Doc. No. 85 at PageID 1874. However, everyone in the office confirmed that J.E. smelled like marijuana, and Dillon would later testify that the "slight" smell of lotion did not overcome the marijuana smell nor his "glassy eye[d]" appearance. Doc. No. 90 at PageID 2060.

Dillon gave J.E. a ten-day suspension notice. *Id.* at PageID 2060–61. She offered J.E. a chance to explain his "side of the story." Doc. No. 98 at PageID 2263. Then, she called J.E.'s mother, and, after she arrived, explained to her the suspension and how J.E. could make up any missed assignments. Doc. No. 90 at PageID 2061.[4]

### B. Procedural History

J.S. and J.E. appealed their suspensions in formal hearings,

represented by counsel, to the Board of Education. *See id.* at PageID 2223, 2259. Both lost their appeals, so they appealed those decisions to the Montgomery County, Ohio Common Pleas Court. *See* Doc. Nos. 99-2, 99-3. The state trial court found that neither suspension violated the two students' constitutional rights, but found the cases moot. *See* Doc. No. 99-2 at PageID 2529–32; Doc. No. 99-3 at PageID 2541–42. When J.S. appealed (but J.E. did not), the Second District Court of Appeals affirmed on mootness alone. *See Stanford v. Northmont City Schs.*, No. 28884, 2021 WL 1054123, at \*4 (Ohio Ct. App. Mar. 19, 2021).

**\*3** J.S. and his parents filed suit here on December 23, 2019. Doc. No. 1. They added J.E. and his mother as plaintiffs in their second amended complaint, filed on November 25, 2020. *See* Doc. No. 23. Their second amended complaint alleged state law claims against the City of Clayton, Ohio, but this Court recently dismissed those claims with prejudice. Doc. Nos. 23, 83. Now pending are Plaintiffs' remaining claims against Kaltenbach and the School District: (1) a § 1983 claim alleging the School District deprived J.S. and J.E. of their federal right to education through searching and suspending them; (2) Fourth Amendment claims, under the federal and Ohio constitutions, challenging the searches of J.S. and J.E.; (3) Due Process Clause claims challenging how J.S. and J.E. were suspended; (4) Title VI claims alleging racial discrimination in suspending J.S. and J.E. in comparison to white students—claims which rely on statistics, several incidents outside of the suspensions, and two potential comparators; (5) Equal Protection Clause claims, relying on the same allegations of race discrimination as the Title VI claims; and (6) a state law negligent supervision claim against the School District for mishandling its supervision of Kaltenbach in a manner that caused J.S. and J.E. harm. Doc. No. 23 at PageID 617–30.

## II.

"Summary judgment is only appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *Keweenaw Bay Indian Cmty. v. Rising*, 477 F.3d 881, 886 (6th Cir. 2007) (quoting *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005)). Once "a motion for summary judgment is properly made and supported, an opposing party[.]" *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (quoting Fed. R. Civ. P. 56(e)). Instead, the party opposing summary judgment has a shifting burden and "must—by affidavits or as otherwise provided

in [Fed. R. Civ. P. 56]—set out specific facts showing a genuine issue for trial." *Id.* The Court does not have to "search the entire record to establish that it is bereft of a genuine issue of material fact." *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 404 (6th Cir. 1992) (citations omitted).

42 U.S.C. § 1983 allows citizens to sue for constitutional violations. *See Wurzelbacher v. Jones-Kelley*, 675 F.3d 580, 583 (6th Cir. 2012). To state a § 1983 claim, a plaintiff must: (1) allege the violation of a constitutional or federal right; and (2) show that the alleged deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988).

"[Q]ualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). It shields "all but the plainly incompetent or those who knowingly violate the law." *District of Columbia v. Wesby*, —— U.S. ——, 138 S. Ct. 577, 589, 199 L.Ed.2d 453 (2018). To defeat qualified immunity, a plaintiff must show "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011) (quoting *Harlow*, 457 U.S. at 818, 102 S.Ct. 2727). The Court may "address these requirements in either order[,]" and "[i]f one is lacking, [the Court] need not address the other." *Crawford v. Tilley*, 15 F.4th 752, 760 (6th Cir. 2021) (citation omitted) (citing *Pearson*, 555 U.S. at 236, 129 S.Ct. 808).

## III.

**\*4** Summary judgment is warranted for multiple reasons. First, regarding § 1983, Plaintiffs' constitutional rights were not violated, so Defendants are entitled to qualified immunity.[5] J.S.'s parents and J.E.'s mother are not proper § 1983 plaintiffs, and there is no federal right to receive a public education. Plaintiffs' Fourth Amendment claims fail, as the School District's agents had more than reasonable suspicion to perform these minimally intrusive searches.[6] The School District also comported with due process, through its agents, by explaining the charges—and the evidence proving that they violated the marijuana policy—before giving the two students an opportunity to tell their side of the story. Second, Plaintiffs' Title VI

claims also fall short as a matter of law—Kaltenbach cannot be sued under Title VI; Plaintiffs identify no relevant comparators; and there is no evidence of intentional discrimination. Third, Plaintiffs' equal protection claims fail because, again, they cannot identify comparators or evidence of intentional discrimination. Finally, the Court declines to exercise supplemental jurisdiction over the remaining state law claim.

### A. The Parents' § 1983 Claims

"In the Sixth Circuit, a section 1983 cause of action is entirely personal to the direct victim of the alleged constitutional tort." *Claybrook v. Birchwell*, 199 F.3d 350, 357 (6th Cir. 2000) (citations omitted). Thus, "only the purported victim, or his [or her] estate's representative(s), may prosecute a section 1983 claim." *Id.* J.S.'s and J.E.'s parents are named as plaintiffs, along with J.S. and J.E., alleging constitutional claims under § 1983 against the School District and Kaltenbach based solely on J.S.'s and J.E.'s harms. Doc. No. 23 at PageID 603, 617–25. They cannot. *See Claybrook*, 199 F.3d at 357; *Foos v. City of Delaware*, 492 F. App'x 582, 592–93 (6th Cir. 2012). Defendants are, thus, entitled to summary judgment on J.S.'s and J.E.'s parents' § 1983 claims.[7]

### B. Federal Right to Access Public Education

**\*5** J.S. and J.E. claim an "infringement" of "the right to access public education" under § 1983. Doc. No. 23 at PageID 618. "Education, of course, is not among the rights afforded explicit protection under [the] Federal Constitution. Nor [is there] any basis for saying it is implicitly so protected." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973); *see also, e.g.*, *Gary B. v. Whitmer*, 957 F.3d 616, 648–49 (6th Cir. 2020), *reh'g en banc granted, vacated by*, 958 F.3d 1216 (mem.) (6th Cir. 2020) (vacating decision that found a federal right to a minimum public education only insofar as it gave access to literacy). Accordingly, Defendants are entitled to summary judgment on this claim.

### C. Fourth Amendment Claims

The Fourth Amendment protects "[t]he right of the people

Stanford v. Northmont City School District, Not Reported in Fed. Supp. (2023)

to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. It "extends this constitutional guarantee to searches and seizures by state officers, including public school officials." *Vernonia Sch. Dist. 47 v. Acton*, 515 U.S. 646, 652, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) (citations omitted). But there is "a relaxed standard for searches in the school setting[.]" *G.C. v. Owensboro Pub. Schs.*, 711 F.3d 623, 632 (6th Cir. 2013). Indeed, the Court need not strictly adhere "to the requirement that searches be based on probable cause to believe that the subject of the search has violated or is violating the law. Rather, the legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search." *New Jersey v. T.L.O.*, 469 U.S. 325, 341, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985). This inquiry employs a two-part test. The Court: (1) asks "whether the ... action was justified at its inception"; and (2) "determine[s] whether the search as actually conducted 'was reasonably related in scope to the circumstances which justified the interference in the first place[.]' " *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). "A student search is justified in its inception when there are reasonable grounds for suspecting that the search will garner evidence that a student has violated or is violating the law or the rules of the school, or is in imminent danger of injury on school premises." *Brannum v. Overton Cnty. Sch. Bd.*, 516 F.3d 489, 495–96 (6th Cir. 2008). A search is "permissible in scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *T.L.O.*, 469 U.S. at 342, 105 S.Ct. 733. "In determining whether a search is excessive in its scope, the nature and immediacy of the governmental concern that prompted the search is considered." *G.C.*, 711 F.3d at 632 (quoting *Brannum*, 516 F.3d at 497).

It is beyond genuine dispute that J.S., by smelling strongly of marijuana while on school grounds, "violat[ed]" the School District's rules. *Brannum*, 516 F.3d at 495; Doc. No. 61 at PageID 1476, 1477; Doc. No. 89 at PageID 2041; Doc. No. 98 at PageID 2225–26. Normally, the smell of marijuana establishes probable cause to search for evidence of that drug. *See, e.g.*, *United States v. Garza*, 10 F.3d 1241, 1246 (6th Cir. 1993); *United States v. Vaughn*, 429 F. Supp. 3d 499, 511–12 (E.D. Tenn. 2019) (collecting cases). Considering the scent here would meet that heightened standard, Kaltenbach's limited search through J.S.'s pockets, backpack, and shoes— even if that search did not reveal marijuana—"was reasonably related" to J.S.'s odor and the School District's goal of eliminating contraband from Northmont High School. *T.L.O.*, 469 U.S. at 341, 105 S.Ct. 733; *see also, e.g.*, *Rinker v. Sipler*, 264 F. Supp. 2d 181, 187–90 (M.D. Pa. 2003) (individualized suspicion existed to search student's locker, belongings,

and person where he smelled like marijuana and exhibited signs of marijuana use).

**\*6** The same applies to J.E. He, too, smelled strongly of marijuana. Doc. No. 90 at PageID 2069; Doc. No. 98 at PageID 2268. His glassy-eyed appearance added further suspicion that he used—and possibly possessed—marijuana. Doc. No. 90 at PageID 2060. Thus, the School District's officials could search him for marijuana. *See, e.g.*, *Garza*, 10 F.3d at 1246; *Bridgman v. New Trier High Sch. Dist. No. 203*, 128 F.3d 1146, 1149–50 (7th Cir. 1997) (school could drug test student with bloodshot eyes, red pupils, and odd demeanor).

J.S. alleges that Kaltenbach patted down his pants and pockets, but no evidence in the record supports this assertion. *See* Doc. No. 23-2 at PageID 848; Doc. No. 61 at PageID 1475–76; Doc. No. 99-1 at PageID 2526–27. Even if Kaltenbach did so, several individuals detected a strong odor of marijuana emanating from J.S. A pat down would, thus, be reasonably related to the School District's prevailing interest in removing narcotics from school grounds. *See, e.g.*, *Widener v. Frye*, 809 F. Supp. 35, 37–38 (S.D. Ohio 1992) (upholding search and seizure of student for smelling like marijuana where the search involved taking off his pants in front of security guards away from his classmates), *aff'd*, 12 F.3d 215 (6th Cir. 1993) (unpublished table decision).

J.S. and J.E. contend that "[g]iven the legality and widespread prevalence of marijuana, simply smelling like it does not give rise to reasonable suspicion that a student possesses contraband." Doc. No. 102 at PageID 2641. The Court disagrees. First, marijuana is illegal to possess in Ohio. Ohio Rev. Code § 2925.11(C)(3).[8] Second, just because an illegal substance is widespread does not mean that any officer, investigating potential violations of criminal law, lacks probable cause to search for it if he or she observes signs that it is nearby. *See, e.g.*, *United States v. Fieck*, 54 F. Supp. 3d 841, 843–44 (W.D. Mich. 2014) (finding that, even though medical marijuana was legal in Michigan, scent of marijuana provided probable cause to search). Whether marijuana is widespread still does not matter to schools, which have an interest in eradicating narcotics from their halls, so the Court will not carve out an exception to the rule that the scent of marijuana provides probable cause to search. *See Garza*, 10 F.3d at 1246; *Vaughn*, 429 F. Supp. 3d at 511–12; *cf. Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls*, 536 U.S. 822, 839, 122 S.Ct. 2559, 153 L.Ed.2d 735 (2002) (Breyer, J., concurring) ("[T]he drug problem in our Nation's schools is serious in terms of size, the kinds of drugs being used, and the consequences of that use both for our children and the rest of us"). Accordingly, the searches were constitutional, and Defendants are entitled to

qualified immunity. *See, e.g.*, *Crawford*, 15 F.4th at 760.[9]

#### D. Fourteenth Amendment Claims

**\*7** "[S]tudents facing suspensions of ten days or fewer have a property interest in educational benefits and a liberty interest in their reputations to qualify them for protection against arbitrary suspensions under the Due Process Clause." *Heyne v. Metro. Nashville Pub. Schs.*, 655 F.3d 556, 564 (6th Cir. 2011) (citing *Goss v. Lopez*, 419 U.S. 565, 576, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975)). "[O]nce school administrators tell a student what they heard or saw, ask why they heard or saw it, and allow a brief response, a student has received all the process that the Fourteenth Amendment demands." *Buchanan v. City of Bolivar*, 99 F.3d 1352, 1359 (6th Cir. 1996) (quoting *C.B. v. Driscoll*, 82 F.3d 383, 386 (11th Cir. 1996)). In sum, "all that a school official must do is give (1) adequate notice of the charge against the student, (2) an explanation of the evidence supporting the charge and (3) an opportunity for the student to respond." *Williams ex rel. Allen v. Cambridge Bd. of Educ.*, 370 F.3d 630, 639 (6th Cir. 2004) (citations omitted). However, the school must follow "fundamentally fair procedures" before suspension, meaning "school officials responsible for deciding whether to exclude a student from school must be impartial." *Heyne*, 655 F.3d at 567 (citations omitted).

It is undisputed that J.S. and J.E. received due process. The record shows that Kaltenbach and Dillon told J.S. and J.E., respectively, that they smelled like marijuana, in violation of the School District's policy; informed them that multiple individuals corroborated this fact; and gave them a chance to respond before explaining their suspensions, giving them "all the process that the Fourteenth Amendment demands." *Buchanan*, 99 F.3d at 1359; Doc. No. 61 at PageID 1477; Doc. No. 85 at PageID 1874; Doc. No. 90 at PageID 2261; Doc. No. 98 at PageID 2225, 2263; Doc. No. 99-1 at PageID 2518, 2521; *see also Granger v. Klein*, 197 F. Supp. 2d 851, 875–76 (E.D. Mich. 2002) (granting summary judgment on student's due process claim where he was told twice that he was being suspended for violating the school's sexual harassment policy).

J.S. and J.E. nonetheless argue the following actions, in their view, violated due process: (1) Defendants did not stay the suspensions pending appeal; (2) they issued notices to suspend without further factual inquiry; (3) they unconstitutionally searched J.E. and J.S.; (4) they ignored Kaltenbach's alleged misconduct in cases unrelated to J.E.'s or J.S.'s suspensions; (5) they ignored Kaltenbach's alleged bias against the J.S. over a controversy involving

J.S.'s sister and her participation in gym class; (6) J.S. and J.E. were unaware "that smelling like marijuana would be deemed illegal behavior"; (7) "no administrator has ever disagreed that a student smells like marijuana"; (8) the School District purportedly violated Ohio law by not "act[ing] on suspensions in [an] open hearing"; and (9) other alleged misconduct that occurred during the suspension appeals. Doc. No. 102 at PageID 2636–37. None of these arguments are persuasive. The School District's actions after imposing the ten-day suspensions are irrelevant to J.S.'s and J.E.'s due process claims. *See, e.g.*, *Heyne*, 655 F.3d at 569–70 (reversing denial of qualified immunity on due process claim where alleged misconduct occurred after the student was suspended). Indeed, the Due Process Clause does not require "truncated trial type-procedures" for ten-day suspensions, *Goss*, 419 U.S. at 583, 95 S.Ct. 729, so offering J.S. and J.E. full explanations and a chance to respond gave them "all the process" they were due. *Buchanan*, 99 F.3d at 1359; *see also Smartt v. Clifton*, No. C-3-96-389, 1997 WL 1774874, at \*15–16 (S.D. Ohio Feb. 10, 1997) (school was not required to allow right to appeal prior to imposing suspension).

Furthermore, the record reveals no bias from Kaltenbach. Granted, "[p]rocedural due process is not satisfied when a person has a protected interest under the Due Process Clause and the individual responsible for deciding whether to deprive that person of his interest is biased." *Heyne*, 655 F.3d at 566 (citations omitted). But J.S. and J.E. merely state—without any support in the record—that Kaltenbach held a bias against them because he participated in a decision denying J.S.'s sister the ability to wear certain pants during gym class. Doc. No. 63 at PageID 1547. Because "[a]ny alleged prejudice on part of the [decisionmaker] must be evident from the record and cannot be based on speculation or inference[,]" they have not demonstrated there is a genuine issue of material fact as to Kaltenbach's impartiality based on alleged unrelated misconduct and incidents. *Doe v. Cummins*, 662 F. App'x 437, 450 (6th Cir. 2016) (quoting *Nash v. Auburn Univ.*, 812 F.2d 655, 665 (11th Cir. 1987)); *see also, e.g.*, *Doe v. Univ. of Cincinnati*, 173 F. Supp. 3d 586, 602 (S.D. Ohio 2016) (noting that "Plaintiffs' mere belief that Defendants' acted with ulterior motives" in suspending them from school did not state bias, considering school officials receive "a presumption of honesty and impartiality" (citation omitted)). Considering this, Defendants shall receive summary judgment on this claim, and they are entitled to qualified immunity. *See, e.g.*, *Crawford*, 15 F.4th at 760.

### E. Title VI Claims

**\*8** Under Title VI, "[n]o person in the United States shall, on the ground of race ... be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000(d). Title VI applies to a "recipient" of federal funding, which includes a public educational entity. *See* 34 C.F.R. §§ 100.13(i), 100.3(b); *Zeno v. Pine Planes Cent. Sch. Dist.*, 702 F.3d 655, 664 (2d Cir. 2012).

Plaintiffs[10] claim that the School District violated Title VI in suspending and searching J.S. and J.E., and they raise several allegations to indirectly demonstrate the School District's racial discrimination against them:

- Allegations that two other Caucasian students—one who was caught owning a marijuana vape pen, the other who allegedly smoked marijuana at school—were not suspended or punished as harshly (Doc. No. 102 at PageID 2644–45);

- An allegation from an African American student, a non-party, that Kaltenbach did not punish a student who made a harassing statement to her (Doc. 92 at PageID 2147–48; Doc. No. 102 at PageID 2625–27);

- Statistical evidence purportedly showing that Northmont High School suspends black students for marijuana more often than white students (*See* Doc. No. 101-1); and

- An allegation that the School District acted in a discriminatory manner because someone placed an inappropriate display of a brown mask on a pole in the high school's parking lot, and Northmont High School officials did not remove it (Doc. No. 102 at PageID 2645–46).

The Court considers these in turn, with reference to each Defendant.

### 1. Title VI Claims Against Kaltenbach

"In a title VI case, the proper defendant 'is the entity rather than an individual.' " *Brooks v. Skinner*, 139 F. Supp. 3d 869, 881 (S.D. Ohio 2015); *see also, e.g.*, *Buchanan*, 99 F.3d at 1356. Because "it is beyond question" that Plaintiffs cannot sue Kaltenbach under Title VI, he is entitled to judgment as a matter of law on that claim. *Shotz v. City of Plantation*, 344 F.3d 1161, 1171 (11th Cir. 2003); *see also, e.g.*, *Davis v. Flexman*, 109 F. Supp. 2d 776, 793–94 (S.D. Ohio 1999).[11]

### 2. Title VI Claims Against the School District

**\*9** Title VI "prohibits only intentional discrimination." *Alexander v. Sandoval*, 532 U.S. 275, 280, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001). Evidence of intentional discrimination under Title VI is either direct or indirect. *See Paasewe v. Ohio Arts Council*, 74 F. App'x 505, 506–07 (6th Cir. 2003). Direct evidence is rare, *see, e.g.*, *Smith v. Chrysler Corp.*, 155 F.3d 799, 805 (6th Cir. 1998), so the Sixth Circuit—and this Court—permit a plaintiff to use indirect evidence to prove discriminatory intent. *See, e.g.*, *Johnson v. City of Clarksville*, 186 F. App'x 592, 595 (6th Cir. 2006); *Paasewe*, 74 F. App'x at 506–07; *Saqr v. Univ. of Cincinnati*, No. 1:18-cv-542, 2021 WL 6064354, at \*4 (S.D. Ohio Dec. 22, 2021). This employs the *McDonnell-Douglas* burden shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Johnson*, 186 F. App'x at 595; *Paasewe*, 74 F. App'x at 507. Plaintiffs first must show: (1) they belonged to a protected class; (2) they suffered adverse action from defendants in pursuing their education; (3) they were qualified to continue pursuing their education; and (4) they were treated differently from similarly situated students outside the protected class. *See Bell v. Ohio State Univ.*, 351 F.3d 240, 253 (6th Cir. 2003) (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992)). Once a plaintiff meets that threshold, the burden of production shifts to the defendant to show a legitimate, non-discriminatory reason for the adverse action. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. If the defendant can, then the plaintiff must show that this reason is pretextual. *See Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 703 (6th Cir. 2007). "[A] plaintiff can show pretext in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Id.* (citing *Hedrick v. W. Res. Care Sys.*, 355 F.3d 444, 460 (6th Cir. 2004)).

Plaintiffs lack direct evidence of intentional discrimination, so—although their arguments are unclear—they seemingly opt for the *McDonnell-Douglas* burden-shifting analysis. *See* Doc. No. 102 at PageID 2643–45. However, Plaintiffs cannot identify any relevant comparators. One that they offer, "G.M.," was in Northmont Middle School when suspended for having a marijuana vape pen. Doc. No. 98 at PageID 2219–20. He chose an alternative program available to the students at Northmont Middle School and received a three-day suspension. *Id.* at PageID 2219–20; Doc. No. 99-1 at PageID 2519. A plaintiff "need not demonstrate an exact

Stanford v. Northmont City School District, Not Reported in Fed. Supp. (2023)

correlation," but his or her "comparators 'must be similar in all of the *relevant* aspects.' " *Foster*, 573 F. App'x at 396 (emphasis in original) (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)). Since G.M. was a middle schooler when suspended, subject to different standards than high schoolers, that alone means that he is not an adequate comparator. *See, e.g.*, *Rowles v. Curators of Univ. of Mo.*, 983 F.3d 345, 355–56 (8th Cir. 2020) (summary judgment was appropriate on graduate student's discrimination claim where the record did not show that the comparators were also graduate students). Even assuming, *arguendo*, that G.M. is an adequate comparator, Defendants note that G.M. only received a lesser punishment because he opted for the alternative program, and the School District has a legitimate justification to offer this option to middle schoolers based on the age difference between middle school and high school students. *See* Doc. No. 98 at PageID 2220; *cf. Palmer v. Potter*, 97 F. App'x 522, 525 (6th Cir. 2004) (noting that employer could treat "veteran" employees harsher "than their junior colleagues"). Plaintiffs do not respond to this reason, further entitling Defendants to summary judgment. *See Paasewe*, 74 F. App'x at 508; *see also, e.g.*, *Alexander*, 576 F.3d 558–65.

Nor is the other student, whom Plaintiffs contend smoked marijuana on school grounds without receiving discipline, a relevant comparator. Plaintiffs offer no evidence that Northmont High School suspended him and gave him a lesser punishment, or that Defendants were aware that this student smoked, possessed, or smelled like marijuana and chose to allot him different treatment, so he is not "similar in all of the *relevant* aspects." *Ercegovich*, 154 F.3d at 352 (emphasis in original); *cf. Rallins v. Ohio State Univ.*, 191 F. Supp. 2d 920, 929–30 (S.D. Ohio 2002) (granting summary judgment where female plaintiff offered no evidence that male coaches had comparable employment situations).

**\*10** Plaintiffs' remaining instances—involving a nonparty, statistics, and a display—also do not withstand scrutiny.[12] First, actions "by decision makers unrelated to the decisional process itself [cannot] suffice to satisfy the plaintiff's burden of demonstrating animus[,]" so Kaltenbach's actions with the non-party that occurred outside of, and independent from, J.S.'s and J.E.'s suspensions remain irrelevant. *Foster*, 573 F. App'x at 393 (quoting *Bush v. Dictaphone Corp.*, 161 F.3d 363, 369 (6th Cir. 1998)). Second, Title VI "doesn't prohibit disparate-impact discrimination." *Doe v. BlueCross BlueShield of Tenn.*, 926 F.3d 235, 240 (6th Cir. 2019) (citing *Alexander*, 532 U.S. at 240, 121 S.Ct. 1452). That forecloses Plaintiff's reliance on suspension statistics purporting to show a disparate impact on African American students. *See Alexander*, 532 U.S. at 240, 121 S.Ct. 1452; *Wilson v.*

*Collins*, 517 F.3d 421, 431–32 (6th Cir. 2008); *Thompson v. Ohio State Univ.*, 639 F. App'x 333, 341–42 (6th Cir. 2016). Finally, a plaintiff may not raise new theories "in response to summary judgment" that are not implicated in the complaint. *Bridgeport Music, Inc. v. WM Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007) (citations omitted); *see also Desparois v. Perrysburg Exempted Vill. Sch. Dist.*, 455 F. App'x 659, 660 (6th Cir. 2012). This prevents Plaintiffs from raising the parking lot display, or the student who reported harassment to Kaltenbach, as instances of intentional discrimination—theories that are meritless anyway because Plaintiffs cannot establish that these show "intentional discrimination *by school officials*[,]" *M.J. v. Akron City Sch. Dist. Bd. of Educ.*, 1 F.4th 436, 454 (6th Cir. 2021) (emphasis in original), or relate "to the decisional process" at issue in the present case. *Foster*, 573 F. App'x at 393 (quoting *Bush*, 161 F.3d at 369). Therefore, on every theory, their Title VI claims fail as a matter of law.[13]

## F. Equal Protection Clause Claims

"The Equal Protection Clause prohibits discrimination ... which either burdens a fundamental right, targets a suspect class, or intentionally treats one differently than others similarly situated without any rational basis for the difference." *Rondigo, LLC v. Township of Richmond*, 641 F.3d 673, 681–82 (6th Cir. 2011) (citation omitted). Like Title VI, it "forbids only intentional discrimination[,]" *Horner v. Ky. High Sch. Athletics Ass'n*, 43 F.3d 265, 267 (6th Cir. 1994), and uses the *McDonnell-Douglas* burden-shifting framework, *see Lautermilk v. Findlay City Schs.*, 314 F.3d 271, 275 (6th Cir. 2003).

**\*11** J.S. and J.E., in conjunction with their Title VI claims, bring claims of racial discrimination under the Equal Protection Clause. They cite incidents involving the non-party, statistics, and the parking lot display, as well as their searches and suspensions, as evidence of the School District's allegedly unconstitutional, and racially discriminatory, treatment. *See* Doc. No. 102 at PageID 2633, 2643–47. For the reasons stated above, *see supra* Section III(E), these claims fail as a matter of law because J.S. and J.E. cannot identify comparators and lack evidence of intentional discrimination. Notably, they emphasize an alleged disparate impact in suspension length for African American students compared to white students. Doc. No. 102 at PageID 2643. But conduct with a "disproportionately adverse effect upon a racial minority" is unconstitutional "only if that impact can be traced to a discriminatory purpose." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979);

*see also Ricci v. DeStefano*, 557 U.S. 557, 627, 129 S.Ct. 2658, 174 L.Ed.2d 490 (2009) (Ginsburg, J., dissenting) ("The Equal Protection Clause ... prohibits only intentional discrimination; it does not have a disparate-impact component" (citations omitted)). Assuming, *arguendo*, that a disparate impact can be shown here, no such discriminatory purpose has been shown—on summary judgment—to exist here. Thus, the Court shall grant summary judgment to Defendants.

**G. Supplemental Jurisdiction Over Plaintiffs' State Law Claim**

A district court "may decline to exercise supplemental jurisdiction" over claims if it "has dismissed all claims over which it has original jurisdiction[.]" 28 U.S.C. § 1367(c)(3). When "the federal claims are dismissed before trial, the state claims generally should be dismissed as well." *Brooks v. Rothe*, 577 F.3d 701, 709 (6th Cir. 2009) (quoting *Wojnicz v. Davis*, 80 F. App'x 382, 384–85 (6th Cir. 2003)). "In determining whether to retain jurisdiction over state-law claims, a district court should consider and weigh several factors, including the 'values of judicial economy, convenience, fairness, and comity.' " *Gamel v. City of Cincinnati*, 625 F.3d 949, 951 (6th Cir. 2010) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988)) (citing *Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1182 (6th Cir. 1993)).

Only the negligent supervision claim remains. *See* Doc. No. 23 at PageID 628–30. On balance, the § 1367 factors support declining supplemental jurisdiction over this claim. All the federal claims here have been dismissed before trial. *See Brooks*, 577 F.3d at 709. In the interest of fairness, "[a] state court should have the opportunity to consider the merits of Plaintiff[s'] state law claim." *Aquilina v. Wrigglesworth*, 759 F. App'x 340, 348 (6th Cir. 2018) (citation omitted). Accordingly, Plaintiffs' remaining state law negligent supervision claim shall be dismissed without prejudice.

**IV.**

For the reasons stated, the Court (1) **GRANTS** Defendants' motion for summary judgment (Doc. No. 99) on all federal claims; (2) **DISMISSES WITHOUT PREJUDICE** Plaintiffs' remaining state law claim for lack of supplemental jurisdiction; and (3) **TERMINATES** this case on the docket.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2023 WL 1819117

Footnotes

1    Northmont High School is in Clayton, Ohio, near Dayton.

2    Students violating this provision are recommended to the superintendent for expulsion, too. *See* Doc. No. 98 at PageID 2519. However, neither J.S. nor J.E. were expelled, as the School District found that expulsion was not warranted here. *Id.* at PageID 2368–69; Doc. No. 61 at PageID 1479. Thus, this provision is irrelevant to Plaintiffs' claims, and it is not implicated here.

3    Although this lawsuit was filed in 2019, Plaintiffs filed an amended complaint—adding J.E. and his mother as Plaintiffs—on November 25, 2020. *See* Doc. No. 23. Thus, those events are properly before this Court.

4    It is unclear if either J.S. or J.E. received prior discipline for a marijuana-related offense, but they received discipline in the past for violating school policy. *See* Doc. No. 61 at PageID 1486; Doc. No. 98 at PageID 2370–90.

5    Two things are worth noting. First, Plaintiffs seemingly allege *Monell* liability claims about the School District's high school student handbook in their amended complaint, and they renew these claims at summary judgment. *See* Doc. No. 23 at PageID 618; Doc. No. 102 at PageID 2638. Because Defendants did not violate Plaintiffs' constitutional rights, the *Monell* claims fail as a matter of law.

Stanford v. Northmont City School District, Not Reported in Fed. Supp. (2023)

*See Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014). Second, Plaintiffs do not indicate whether they sue Kaltenbach in his individual or official capacity. *See, e.g.*, Doc. No. 23. This proves unremarkable, however, because he is entitled to summary judgment on Plaintiffs' constitutional claims.

6    One might wonder whether *res judicata*, under Ohio law, would bar the constitutional claims. It remains unclear whether it would, because Plaintiffs' suspension appeals were ultimately dismissed as moot, even though the state trial court also found no constitutional violation. *See, e.g.*, *Remus Joint Venture v. McNally*, 116 F.3d 180, 184 n.5 (6th Cir. 1997) ("If a first decision is supported both by findings that deny the power of the court to decide the case on the merits and by findings that go to the merits, preclusion is inappropriate as to the findings on the merits" (quotation omitted)). Ohio follows the Second Restatement of Judgments, which forbids *res judicata* where a decision rests both on the merits and a jurisdictional ground, like mootness. *See State ex rel. Davis v. Pub. Emps. Ret. Bd.*, 120 Ohio St.3d 386, 899 N.E.2d 975, 983 (Ohio 2008); Restatement (Second) of Judgments § 27 cmt. o (Am. Law. Inst. 1982); *see also, e.g.*, *Croce v. N.Y. Times Co.*, 930 F.3d 787, 792 (6th Cir. 2019) ("If the Ohio Supreme Court has not provided guidance on the issue at hand, we may consider ... other sources such as 'restatements of law[.]'" (quoting *Mazur v. Young*, 507 F.3d 1013, 1016–17 (6th Cir. 2007))). While "conflicting judgments might undermine notions of federalism and comity[,]" *Remus*, 116 F.3d at 186–87 (Wellford, J., concurring), this proves inconsequential because Plaintiffs were not deprived of their constitutional rights. Accordingly, the Court need not wade into this thicket today.

7    To be fair, Plaintiffs could seek to amend the complaint to clarify that the parents are only named as parties so that their minor children's claims could be brought through them. However, that amendment would be futile for two reasons. First, "parents cannot appear ... on behalf of their minor children" for a § 1983 claim "because a minor's personal cause of action is her own and does not belong to her parent or representative." *Shepherd v. Wellman*, 313 F.3d 963, 971 (6th Cir. 2002) (citing *Cheung v. Youth Orchestra Found. of Buffalo, Inc.*, 906 F.2d 59, 61 (2d Cir. 1990)); *see also B.A.P. v. Overton Cnty. Bd. of Ed.*, 600 F. Supp. 3d 839, 845 (M.D. Tenn. 2022). Second, any such amendment would be futile because, as discussed herein, the School District and Kaltenbach did not violate J.S.'s or J.E.'s constitutional rights.

8    It is legal medicinally when authorized, *see* Ohio Rev. Code § 2925.11(B)(1)(d), but there is no evidence that either J.S. or J.E. were authorized to possess medical marijuana, and that would not affect the School District's authority to search either student. *See, e.g.*, *United States v. Fieck*, 54 F. Supp. 3d 841, 843–44 (W.D. Mich. 2014).

9    Plaintiffs cannot maintain their claim under Ohio's constitution because § 1983 "does not cover conduct that allegedly violates state law." *Neinast v. Bd. of Trs. of Columbus Metro. Library*, 346 F.3d 585, 597 (6th Cir. 2003) (quoting *Huron Valley Hosp., Inc. v. City of Pontiac*, 887 F.2d 710, 714 (6th Cir. 1989)).

10    It is unclear whether only J.S. and J.E. raise these Title VI claims, or if their parents also bring claims under this provision, because Plaintiffs only raise allegations with reference to J.S. and J.E. Generally, parents lack standing to sue under Title VI in their own right because they are not the intended beneficiaries of a federally funded education program. *See, e.g.*, *Tinney v. City of Detroit*, 188 F.3d 509 (Table), No. 98-1510, 1999 WL 685921, at *7 (6th Cir. Aug. 26, 1999); *Jackson v. Katy Indep. Sch. Dist.*, 951 F. Supp. 1293, 1298 (S.D. Tex. 1996); *Wheatley v. Boardman Loc. Schs.*, No. 4:21-cv-1831, 2022 WL 2291703, at *6 (N.D. Ohio June 24, 2022). Even assuming, *arguendo*, that the parents have standing to sue under Title VI on behalf of their minor children, as discussed above, Plaintiffs cannot satisfy their burden at this stage to demonstrate a triable issue on this claim. Thus, the Court uses "Plaintiffs" in the Title VI section to encapsulate any possible argument that J.S., J.E., or their parents may raise.

11    This also applies to the extent Plaintiffs assert Title VI claims through *respondeat superior*. *See Jones v. City of Detroit*, 20 F.4th 1117, 1121 (6th Cir. 2021).

12    During his deposition, J.S. testified about an incident where a white student who instigated an altercation with J.S. was not punished, despite J.S. reporting it to Kaltenbach. Doc. No. 61 at PageID 1482. Plaintiffs' complaint further mentioned some allegedly

discriminatory incidents occurring while J.S. was in middle school. *See* Doc. No. 23 at PageID 613. However, Plaintiffs do not revisit these allegations in their opposition to summary judgment. *See* Doc. No. 102. "Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *El-Moussa v. Holder*, 569 F.3d 250, 257 (6th Cir. 2009) (quoting *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997)). Moreover, Plaintiffs "may not rely merely on allegations or denials in [their] own pleading" to resist summary judgment. *Alexander*, 576 F.3d at 558. Thus, for these additional reasons, summary judgment for Defendants is warranted here to the extent Plaintiffs rely on these allegations.

13      Plaintiffs ambiguously reference the Title VI deliberate indifference standard in their opposition to summary judgment. *Id.* at PageID 2642–43. They refer to alleged misconduct from the City of Clayton and its police officers—individuals and entities, as Plaintiffs acknowledge, dismissed from this case. *Id.* at PageID 2624–25. This "perfunctory" argument is so unclear that the Court cannot speculate what alleged harassment the School District was deliberately indifferent to. *El-Moussa*, 569 F.3d at 257. Regardless, nothing in the record indicates that J.S. and J.E. were treated harsher than other students, or that the School District turned a blind eye to mistreatment at its high school. *See, e.g.*, *Thompson*, 639 F. App'x at 342– 44; *Foster*, 573 F. App'x at 388–89.

---

**End of Document**                                      © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 6389624
Only the Westlaw citation is currently available.
United States Court of Appeals, Sixth Circuit.

Sharon STANFORD; Katina Cottrell; J.S.;
J.E., Plaintiffs-Appellants,

v.

NORTHMONT CITY SCHOOL
DISTRICT; James Chad Kaltenbach, in
his official capacity of Vice Principal at
Northmont City Schools, Defendants-
Appellees.

Case No. 23-3203
|
FILED October 2, 2023

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE SOUTHERN DISTRICT OF OHIO

**Attorneys and Law Firms**

Christine Marie Baker, Law Office of Christine Baker,
Dayton, OH, for Plaintiffs-Appellants.

Tabitha D. Justice, Subashi & Wildermuth, Dayton, OH,
for Defendants-Appellees.

Before: SUTTON, Chief Judge; COLE and THAPAR,
Circuit Judges.

OPINION

THAPAR, Circuit Judge.

**\*1** A school district suspended two students for smelling
like marijuana on campus. The students and their parents
sued, arguing the school district's marijuana policy
discriminated against racial minorities. The district court
granted summary judgment against them. We affirm.

I.

After arriving late to school, J.S. and three other students
signed in and went to class. The secretary at the front desk

told Vice Principal Chad Kaltenbach that J.S. and his
friends smelled like marijuana. Minutes later, J.S.'s teacher
told Kaltenbach he smelled the same thing when J.S.
walked into class.

The Northmont City School District prohibits students
from smelling like marijuana on campus. So, Kaltenbach
called J.S. to his office. Kaltenbach told J.S. about the
reports, notified him that he could be suspended, and asked
him to explain the smell. J.S. didn't. Kaltenbach asked J.S.
to empty his backpack and pockets, patted the outside of
his pockets, and sniffed his hand. It smelled like marijuana.
Kaltenbach then called in two school resource officers and
another administrator, and each confirmed the smell. In
line with district policy, Kaltenbach suspended J.S. for ten
days.

Nearly a year later, J.E. was in school when two of his
teachers reported that he smelled like marijuana. Assistant
Principal Teresa Dillon called J.E. into her office. Noticing
the smell, Dillon explained the teachers' report and told
J.E. that he could be suspended. Then, she searched J.E.,
asking him to empty his backpack and pockets and remove
his shoes and socks. Dillon called in a school resource
officer, Kaltenbach, and another administrator, who each
smelled the same thing. After giving J.E. an opportunity to
explain the smell, Dillon suspended J.E. for ten days.

J.S. and J.E. argue they were suspended because they are
Black. They and their parents sued Kaltenbach and the
school district, raising claims under state law, the Fourth
Amendment, Title VI, the Equal Protection Clause, and the
Due Process Clause. The district court dismissed the
federal claims on summary judgment and declined to retain
jurisdiction over the state-law claims. Plaintiffs appeal the
dismissal of the Fourth Amendment, due process, and
equal protection claims. We affirm.

II.

All the plaintiffs—J.S., his parents, J.E., and his mom—
sue under 42 U.S.C. § 1983 to vindicate J.S. and J.E.'s
Fourth Amendment, equal protection, and due process
rights. But the cause of action created by § 1983 "is entirely
personal to the direct victim of the alleged constitutional
tort." *Claybrook v. Birchwell*, 199 F.3d 350, 357 (6th Cir.
2000). That means the parents can't bring claims in their
own capacities based on violations of J.S. and J.E.'s rights.
*Jaco v. Bloechle*, 739 F.2d 239, 240–41, 243 (6th Cir.
1984). The parents try to do just that. The district court thus
properly dismissed their claims.

On appeal, the parents suggest they have an equal
protection claim based on their own parental right to direct

their children's education. But they didn't raise this claim before the district court. The complaint didn't mention it, and plaintiffs' summary-judgment brief referenced the right only once—in a fact section, without tying it to an equal protection claim. Because the parents didn't properly raise the claim before the district court, they forfeited the right to pursue it on appeal. *See Bridgeport Music, Inc. v. WM Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007); *Wright v. City of Euclid*, 962 F.3d 852, 879 (6th Cir. 2020). Thus, we focus on J.S. and J.E.'s claims alone.

III.

A.

**\*2** J.S. and J.E. argue that they were searched in violation of the Fourth Amendment. The Fourth Amendment imposes two requirements on public-school officials who search students. First, officials must have "reasonable grounds" to believe they'll find evidence that the student violated school rules. *New Jersey v. T.L.O.*, 469 U.S. 325, 342 (1985). Second, the scope of the search must be "reasonably related" to its objectives and not "excessively intrusive" in light of the student's age and the suspected infraction. *Id.*

The searches of J.S. and J.E. met both requirements. First, Kaltenbach searched J.S. after receiving reports from a teacher and a secretary that J.S. smelled like marijuana. Similarly, Dillon searched J.E. after two teachers reported—and Dillon herself noticed—the smell on J.E. These reports gave Kaltenbach and Dillon reasonable grounds to search for drugs. Indeed, we've repeatedly held that officers have probable cause to search for drugs when they smell marijuana. *E.g., United States v. Garza*, 10 F.3d 1241, 1246 (6th Cir. 1993). Probable cause is a higher bar than "reasonable grounds." *See T.L.O.*, 469 U.S. at 341. So, if the smell of marijuana gives officials probable cause to search for drugs, then it certainly gave Kaltenbach and Dillon "reasonable grounds" to do so. *See id.* at 342.

Second, the searches were reasonable in scope. The district has an "important interest" in keeping drugs out of school, so officials have more leeway in searching for drugs than in searching for evidence of less serious violations. *Bd. of Educ. of Indep. Sch. Dist. No. 92 v. Earls*, 536 U.S. 822, 838 (2002); *see Beard v. Whitmore Lake Sch. Dist.*, 402 F.3d 598, 605 (6th Cir. 2005). Recognizing this, we've upheld drug searches that were much more intrusive than those at issue here. *See, e.g., Williams ex rel. Williams v. Ellington*, 936 F.2d 881, 883, 887 (6th Cir. 1991); *Tarter v. Raybuck*, 742 F.2d 977, 979, 983 (6th Cir. 1984). For example, after school officials thought they saw a student holding drugs, they searched the student's purse and locker; asked the student to empty her pockets; and requested that the student remove her shoes and socks, take off her t-shirt, and lower her jeans. *Williams*, 936 F.2d at 883, 887. Given the school's strong interest in keeping drugs out of school, we held the search was reasonable. *Id.* at 887; *see also Tarter*, 742 F.2d at 979 (requiring a student to empty pockets and remove shoes and shirt).

Here, school officials didn't see J.S. and J.E. with drugs. *Cf. Williams*, 936 F.2d at 883. But they did smell marijuana on them. And the searches were much narrower here than in *Williams*. Kaltenbach and Dillon checked the students' backpacks and asked them to empty their pockets. Kaltenbach patted J.S.'s pockets and legs, and J.E. removed his shoes and socks. Both students remained clothed. *Cf. id.*; *Tarter*, 742 F.2d at 979, 983. And the district didn't search their lockers. *Cf. Williams*, 936 F.2d at 883. These minimally intrusive searches were reasonably related to the district's interest in confiscating drugs and were appropriate in light of the students' age, sex, and suspected violation. The searches didn't violate the Fourth Amendment.

J.S. and J.E. raise three arguments in response. None moves the needle.

First, J.S. argues that Kaltenbach lacked individualized suspicion. It's true that J.S. was around three other students when the secretary smelled him. But that gave Kaltenbach reason to suspect J.S. "*and the others in the group.*" *See United States v. McCallister*, 39 F.4th 368, 376 (6th Cir. 2022) (emphasis added). Moreover, J.S.'s teacher told Kaltenbach that J.S. specifically smelled like marijuana. Kaltenbach thus had reasonable grounds to suspect J.S. individually.

**\*3** J.E. raises the same argument, with the same result. Two teachers reported that J.E. specifically smelled like marijuana, and Dillon noticed the smell when J.E. entered her office. Dillon had reasonable grounds to suspect J.E. had violated school rules.

Second, J.S. and J.E. argue that three officials— Kaltenbach, one of the school resource officers who confirmed J.S.'s smell, and J.S.'s teacher—aren't credible. Plaintiffs argue that, because a jury might disbelieve these officials when they testify about the smell, the district court should have allowed their Fourth Amendment claims to go to trial.

This argument faces an initial hurdle: an official's subjective intentions "play no role in ordinary ... Fourth

Case 5:25-cv-10579-JEL-DRG   ECF No. 41-3, PageID.816   Filed 10/22/25   Page 93 of 97

Stanford v. Northmont City School District, Not Reported in Fed. Rptr. (2023)

Amendment analysis." *Wren v. United States*, 517 U.S. 806, 813 (1996). To determine whether the searches violated J.S. and J.E.'s Fourth Amendment rights, we ask whether a *reasonable official* would have had grounds to perform the searches based on the information available "at [the] inception" of the search. *See T.L.O.*, 469 U.S. at 341 (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968)). Thus, we don't ask, for example, whether Kaltenbach subjectively believed that J.S. smelled like marijuana. *See Wren*, 517 U.S. at 812–13.

This dooms plaintiffs' credibility argument. To avoid summary judgment, plaintiffs must identify a "material" fact in dispute. Fed. R. Civ. P. 56(a). A fact is "material" if it would entitle plaintiffs to relief on their Fourth Amendment claims. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Here, because we focus on the hypothetical reasonable official, it doesn't matter whether Kaltenbach subjectively believed there were grounds to search J.S. *See Wren*, 517 U.S. at 812–13. Accordingly, it doesn't matter whether a jury would believe Kaltenbach's testimony that those grounds existed. *See generally id.* Kaltenbach's credibility isn't material.

The same is true of the officer's credibility. Because we focus on the evidence available to Kaltenbach "at [the] inception" of the search, it doesn't matter whether a jury would believe the officer who smelled J.S. *after* the search was completed. *See T.L.O.*, 469 U.S. at 341.

That leaves the credibility of J.S.'s teacher, who reported J.S.'s smell before Kaltenbach began the search. This credibility evidence could be relevant, but only to show that a reasonable official wouldn't have believed the report. *See generally id.* at 342. Even if plaintiffs' credibility evidence showed as much, the teacher's credibility still isn't material. A secretary told Kaltenbach that J.S. and his friends smelled like marijuana, and J.S. hasn't challenged the secretary's credibility. Regardless of the teacher's credibility, Kaltenbach had reasonable grounds to search J.S.

Third, J.S. argues that marijuana is harmless, so the school shouldn't suspend students who smell like it. But the legality of a search doesn't depend on "a judge's evaluation of the relative importance of various school rules." *Id.* at 342 n.9. The district has a strong interest in keeping drugs out of school. *Beard*, 402 F.3d at 605. And the district could reasonably decide that the smell of marijuana on campus encourages drug use or distracts from education. We won't second-guess that decision. *See T.L.O.*, 469 U.S. at 342 n.9.

Kaltenbach and Dillon had reasonable grounds to search J.S. and J.E., and their searches were reasonable in scope.

Their searches didn't violate the Fourth Amendment.

B.

**\*4** Turning to equal protection, J.S. argues that Kaltenbach suspended him because of his race, and both students argue that the district's marijuana policy is racially discriminatory. On this record, the district court properly dismissed both claims.

The Equal Protection Clause prohibits only intentional discrimination. *Washington v. Davis*, 426 U.S. 229, 239 (1976). So, J.S. must show that Kaltenbach treated him differently from similarly situated students because he is Black. *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011). And to succeed against the district, J.S. and J.E. must show that the district enforces the marijuana policy "because of" its disproportionate impact on Black students. *Pers. Adm'r v. Feeney*, 442 U.S. 256, 279 (1979); *see also Monell v. Dep't of Social Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978) (noting an official policy must be "the moving force" of the violation).

There are multiple ways to show intentional discrimination. The most straightforward is direct evidence—for example, a statement that the students were suspended out of racial animus. *See Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 548 (6th Cir. 2004). More common is circumstantial evidence: a plaintiff can show that other, non-Black students (called comparators) were treated differently despite violating the same school rule. *Green Genie, Inc. v. City of Detroit*, 63 F.4th 521, 528 (6th Cir. 2023). But these comparators must be similarly situated "in all relevant respects" to the plaintiffs. *Rondigo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673, 682 (6th Cir. 2011). Otherwise, a factor other than racial animus could explain the difference in treatment.

J.S. and J.E. can't show intentional discrimination. Begin with J.S.'s claim against Kaltenbach. There's no direct evidence that Kaltenbach suspended J.S. because of his race. Nor has J.S. pointed to any similarly situated non-Black students whom Kaltenbach treated differently. Indeed, Kaltenbach enforced the marijuana policy against White and Black students and, on average, gave about the same punishment to both.

Without comparators or direct evidence of animus, J.S. turns to two other incidents. First, about a year before J.S.'s suspension, his sister asked for an accommodation in gym class, and Kaltenbach required that she submit a doctor's note first. After she submitted the note, J.S.'s sister got an

accommodation, but she felt that Kaltenbach watched her more closely after that. Second, a Black peer testified that Kaltenbach refused to punish a student who made harassing comments about her.

Accepting these incidents as true, they don't show that Kaltenbach suspended J.S. because of his race. Nothing in the record indicates that Kaltenbach treated these other students differently *because of* their race. At most, these anecdotes show that some students had poor interactions with Kaltenbach and that those students happened to be Black. Moreover, J.S. hasn't "tie[d]" these other instances "to [the] adverse decision" affecting him. *Rowan*, 360 F.3d at 551. Kaltenbach's "statements or actions outside of the decisionmaking process" can't by themselves prove that Kaltenbach suspended J.S. because of his race. *EEOC v. Ford Motor Co.*, 782 F.3d 753, 768 (6th Cir. 2015) (en banc); *see Rowan*, 360 F.3d at 550. That's especially true here, where there's no evidence indicating that Kaltenbach's other decisions reflected racial animus.

**\*5** The claim against the district also fails. To support this claim, J.S. and J.E. argue (1) two other students smelled like marijuana on campus but were treated better, (2) someone left a tribal face mask in the high-school parking lot, and (3) statistics show that the district punishes Black students at a disproportionate rate. But plaintiffs forfeited the comparator and face-mask arguments. And the statistics can't support an equal protection claim by themselves.

When plaintiffs presented the comparator and face-mask evidence to the district court, the court rejected it. It held that the comparators weren't similarly situated "in all relevant respects" to J.S. and J.E. *See Rondigo*, 641 F.3d at 682. Unlike J.S. and J.E., one comparator was a middle schooler who, to reduce his suspension, participated in the school's drug diversion program. And school officials weren't aware that the other comparator smelled like marijuana. As for the face-mask evidence, the district court held that it was both beyond the scope of the complaint and irrelevant: there wasn't any evidence indicating that the face mask had been displayed or left by school officials. *See M.J. ex rel. S.J. v. Akron City Sch. Dist. Bd. of Educ.*, 1 F.4th 436, 454 (6th Cir. 2021) (noting the discriminatory act must be done "by a public official").

On appeal, plaintiffs briefly state that they disagree with these holdings, but they don't address the district court's reasoning or explain why the district court was wrong. Having "fail[ed] to address the district court's reason[s]" for rejecting the comparators and mask display, plaintiffs forfeited the arguments. *Scott v. First S. Nat'l Bank*, 936 F.3d 509, 522 (6th Cir. 2019) (quotation omitted).

That leaves the statistics. The statistics show that the district suspends Black students at a disproportionate rate. But the Equal Protection Clause prohibits only intentional discrimination. *Davis*, 426 U.S. at 239. So, J.S. and J.E. must do more than argue that the policy has a disproportionate impact on Black students. *See, e.g.*, *Feeney*, 442 U.S. at 272; *Wilson v. Collins*, 517 F.3d 421, 432 (6th Cir. 2008). In other words, they must do more than point to statistics: they must introduce evidence showing the district enacted the marijuana policy "because of," not "in spite of," the disproportionate impact. *Feeney*, 442 U.S. at 279. J.S. and J.E. haven't properly presented any evidence, other than the statistics, to make that showing.

Defendants are thus entitled to summary judgment on the equal protection claims.

## C.

Finally, the district court properly dismissed the due process claim. Under the Due Process Clause, when a public-school official suspends a student for ten days or fewer, the official must give the student notice of the charge, explain the evidence supporting the charge, and give the student an opportunity to respond. *Williams ex rel. Allen v. Cambridge Bd. of Educ.*, 370 F.3d 630, 639 (6th Cir. 2004). Nobody disputes that J.S. and J.E. received this process.

Before the district court, plaintiffs raised nine other due process violations. The district court rejected each on the merits. On appeal, plaintiffs make a single argument for why the district court erred: on summary judgment, "[t]here is no mandate to persuade the District Court that the [nine] contentions are winning ones." Appellant Br. 20. But plaintiffs don't address the district court's reasoning. Nor do they address the merits of the alleged violations or identify a disputed fact that, if true, would establish a due process violation. Indeed, they don't identify any of the nine alleged violations in their appellate briefing. By raising the issues "in a perfunctory manner" and without responding to the district court's reasoning, plaintiffs forfeited the arguments. *Wright*, 962 F.3d at 878 (quotation omitted); *see Scott*, 936 F.3d at 522.

**\*6**
* * *

We affirm.

**All Citations**

**Stanford v. Northmont City School District, Not Reported in Fed. Rptr. (2023)**

Not Reported in Fed. Rptr., 2023 WL 6389624

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

25 Fed.Appx. 292
This case was not selected for publication in the
Federal Reporter.
Not for Publication in West's Federal Reporter See
Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued on or
after Jan. 1, 2007. See also Sixth Circuit Rule 28.
(Find CTA6 Rule 28)
United States Court of Appeals,
Sixth Circuit.

Johnny Darryl TURNBOE, Plaintiff—
Appellant,
v.
Dave GUNDY, Defendant—Appellee.

No. 01–1622.
|
Dec. 12, 2001.

**Synopsis**

State prisoner brought a § 1983 action against warden, alleging violations of due process and equal protection when he was placed on a "food loaf" diet. The United States District Court for the Eastern District of Michigan, Steeh, J., dismissed the action, and prisoner appealed. The Court of Appeals held that: (1) prisoner's being fed food loaf does not implicate a due process liberty interest, and (2) conclusory allegation that prisoner was put on food loaf because of the color of his skin failed to state an equal protection claim.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion to Dismiss.

**\*293** Before NORRIS, SILER, and BATCHELDER, Circuit Judges.

*ORDER*

**\*\*1** Johnny Darryl Turnboe, a Michigan prisoner proceeding pro se, appeals the district court order dismissing his civil rights action filed pursuant to 42 U.S.C. § 1983. This case has been referred to a panel of the court pursuant to Rule 34(j)(1), Rules of the Sixth Circuit. Upon examination, this panel unanimously agrees that oral argument is not needed. Fed. R.App. P. 34(a).

Seeking monetary and injunctive relief, Turnboe sued Dave Gundy, Warden of Oaks Correctional Facility where Turnboe is incarcerated. Turnboe alleged that: (1) his due process rights were violated when he was placed on a "food loaf" diet without a misconduct charge, a hearing, or review; and (2) his equal protection rights were violated when he was punished because of his skin color. The district court granted Turnboe in forma pauperis status, screened the complaint, and dismissed the case for failure to state a claim. *See* 28 U.S.C. § 1915A(b)(1).

In his timely appeal, Turnboe argues that: (1) the corrections officers who gave him food loaf knew they had no authority to do so; and (2) the officers punished him because of his race.

Upon de novo review, we conclude that the district court properly dismissed Turnboe's complaint for failure to state a claim. *See McGore v. Wrigglesworth,* 114 F.3d 601, 604 (6th Cir.1997). We disagree with part of the district court's reasoning, however, and affirm the district court's decision on grounds other than those relied upon by the district court. *See City Mgmt. Corp. v. U.S. Chem. Co.,* 43 F.3d 244, 251 (6th Cir.1994).

We first conclude that Turnboe's complaint failed to state a due process claim because being fed food loaf does not implicate a due process liberty interest. A restraint imposed in prison does not give rise to a protected liberty interest unless the restriction constitutes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). The district court held that prisoners have a liberty interest in not being placed on food loaf without cause, but that there was no due process violation because Turnboe was removed from the food loaf diet and compensated for the meals he missed. In *Sandin,* the Court cited with disapproval a case suggesting that a prisoner has a due process right not to be served food loaf. *Id.* at 482–83, 115 S.Ct. 2293 (citing *United States v. Michigan,* 680 F.Supp. 270, 277 (W.D.Mich.1988)). Thus, a due process claim based upon being fed food loaf is no longer viable.

We agree with the district court that Turnboe's complaint did not state an equal protection claim. "It is not enough for a complaint under § 1983 to contain mere conclusory allegations of unconstitutional conduct by persons acting under color of state law. Some factual basis for such claims must be set forth in the pleadings." *Chapman v. City of Detroit,* 808 F.2d 459, 465 (6th Cir.1986). Turnboe merely alleged that he was put on food loaf because of the color of his skin. His conclusory allegation without any factual support failed to state an equal protection claim.

**\*\*2** For the foregoing reasons, we affirm the district court's

order. Rule 34(j)(2)(C), Rules of the Sixth Circuit.

**All Citations**

25 Fed.Appx. 292, 2001 WL 1609898

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.