## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

STANLEY ZHONG and NAN ZHONG,
*on behalf of his* MINOR SON,

         Plaintiffs,

v.

THE BOARD OF REGENTS OF THE
UNIVERSITY OF MICHIGAN, SANTA
ONO, Former President of the University
of Michigan*, in his personal capacity*,
STEVEN L. CECCIO*,* Former Interim
Dean of the University of Michigan
College of Engineering, *in his personal
capacity*, KAREN THOLE*,* Dean of the
University of Michigan College of
Engineering, *in her official capacity*,
LAURIE MCCAULEY*,* Provost of the
University of Michigan, *in her personal
and official capacities*, ERICA L.
SANDERS, Assistant Vice Provost and
Executive Director of Undergraduate
Admissions for the of the University of
Michigan, *in her personal and official
capacities*,

         Defendants.

Case No.: 25-cv-10579

Judge Judith E. Levy
Mag. Judge David R. Grand

| | |
|---|---|
| David Nacht (P47034) | Brian M. Schwartz (P69018) |
| Fabiola A. Galguera (P84212) | Sydney G. Rohlicek (P85655) |
| NACHTLAW, P.C. | MILLER, CANFIELD, PADDOCK |
| *Attorneys for Plaintiff* | AND STONE, P.L.C. |
| 501 Avis Drive, Suite 3 | *Attorneys for University Defendants* |
| Ann Arbor, MI 48108 | 150 W. Jefferson Ave., Suite 2500 |
| (734) 663-7550 | Detroit, MI 48226 |
| dnacht@nachtlaw.com | (313) 963-6420 |
| fgalguera@nachtlaw.com | schwartzb@millercanfield.com |
| | rohlicek@millercanfield.com |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION
TO DISMISS SECOND AMENDED COMPLAINT**

NOW COME Plaintiffs Stanley Zhong ("Stanley") and Nan Zhong ("Nan"),

acting on behalf of his Minor Son, by and through their attorneys, NACHTLAW,

P.C., hereby submit the following Response to Defendants' Motion to Dismiss their

Second Amended Complaint ("SAC").

Respectfully Submitted,

**NACHTLAW, P.C.**

*/s/ David A. Nacht*
David A. Nacht (P47034)
Fabiola A. Galguera (P84212)
*Attorneys for Plaintiff*
501 Avis Drive, Suite 3
Ann Arbor, MI 48108
(734) 663-7550
dnacht@nachtlaw.com
fgalguera@nachtlaw.com

Dated: November 12, 2025

## <u>STATEMENT OF ISSUES PRESENTED</u>

I.    Are Plaintiffs' official-capacity 42 U.S.C. § 1983 claims barred by Eleventh Amendment sovereign immunity?

II.    Have Plaintiffs adequately alleged intentional discrimination for purposes of their claims under 42 U.S.C. § 1983 for violation of the Equal Protection Clause of the United States Constitution and 42 U.S.C. § 1981?

III.    Have Plaintiffs adequately alleged intentional discrimination for purposes of their claims under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq*.?

IV.    Are the allegations in the Second Amended Complaint adequate to establish standing on behalf of Plaintiff Nan Zhong's Minor Son?

## **CONTROLLING OR MOST APPROPRIATE AUTHORITY**

*Students for Fair Admissions v. Harvard*, 600 U.S. 181 (2023)

*Ex parte Young*, 209 U.S. 123 (1908)

*Will v. Mich. Dep't of State Police*, 491 U.S. 58 (1989)

*Pearson v. Callahan*, 555 U.S. 223 (2009)

*McCleskey v. Kemp*, 481 U.S. 279 (1987)

*Zamlen v. Cleveland*, 906 F.2d 209 (6th Cir. 1990)

*Inner City Contracting*, *LLC v. Charter Twp. of Northville*, 87 F.4th 743 (6th Cir. 2023)

*Binno v. ABA*, 826 F.3d 338 (6th Cir. 2016)

**BRIEF IN SUPPORT OF PLAINTIFFS' RESPONSE TO DEFENDANTS'
MOTION TO DISMISS SECOND AMENDED COMPLAINT**

## I.   INTRODUCTION

Plaintiffs brought suit on the basis that the University of Michigan ("U-M") discriminated against Stanley based on race when it rejected his application for admission, and that it discriminates generally against Asian Americans, causing his brother, the Minor Son, to believe that any application he submits to U-M will result in his rejection and humiliation on the same basis. Plaintiffs allege that in one of the most competitive and consequential domains of American life, college admissions, our elite public universities like U-M—and the government actors who fund and partner with them—proudly discriminate against Asian American applicants based on race, and have done so for decades. U-M operates as though anti-discrimination law protects only their preferred minorities, treating Asian Americans not as beneficiaries of civil rights laws, but as exceptions to them.

Using euphemistic language like "affirmative action" and "holistic review," U-M rebrands racial favoritism as progress, but discrimination by another name is still discrimination. Framing it as a benefit to some, rather than the burden on all that it truly is, is a dangerous sleight of hand in a zero-sum admissions process, where selecting winners based on race necessarily determines losers on the same basis. U-M's rhetoric obscures this harm; it does not erase it. In the nominal pursuit of vague

notions of restitution for past injustice, schools like U-M have just created new victims. Though U-M uses terms like "holistic review" to describe its admissions policies, the unavoidable reality is that such terms are just a smokescreen for exactly the sort of intentional discrimination that the United States Supreme Court struck down in *Students for Fair Admissions v. Harvard*, 600 U.S. 181 (2023) ("*SFFA*").

Plaintiffs do not ask for special treatment. They ask only for what the Constitution guarantees: an equal shot; the opportunity to be evaluated on the strength of their character, their intellect, and their achievements, without penalty for their race. The Constitution demands nothing less.

## II.   RELEVANT FACTS

### a.  Race-based university admissions in the United States

Like many other institutions of higher learning, U-M holds Asian American applicants to higher standards than applicants of other races, penalizing Asian applicants specifically based on their race. (ECF No. 35 at ¶ 23). While defenders of race-conscious admissions across the country's institutions of higher education have downplayed or outright denied its existence, the fact of anti–Asian American discrimination has become the worst-kept secret of the college admissions process. (*Id.* at ¶ 24).  A 2016 national survey revealed that 42% of private college admissions officers and 39% of their public counterparts acknowledged that Asian American applicants are held to higher standards than students of other races. (*Id.* at ¶ 27).

Other studies have suggested that wealthy African American applicants are admitted at significantly higher rates than low-income, underprivileged Asian American applicants with identical academic credentials. (*Id.* at ¶ 28).

Asian American applicants have long internalized the unspoken rules of this deeply unjust system and now often resort to downplaying their achievements and interests in math and science. (*Id.* at ¶ 31). They avoid mention of bilingual households, omit their involvement in Asian cultural organizations, and seek to appear "less Asian" to escape the penalty for their racial identity. (*Id.*). Plaintiffs and similarly situated Asian American students have felt compelled to obscure their heritage or downplay their authentic achievements out of fear that their racial identity will count against them. (*Id.*).

### b.  The history of race-based admissions at U-M

At U-M specifically, there is a long and well-documented history of racial preference in admissions. In the early 1990s, then-President James Duderstadt unveiled the "Michigan Mandate, A Strategic Linking of Academic Excellence and Social Diversity," calling it "a blueprint for fundamental change in the ethnic composition of the university community." (*Id.* at ¶ 36). Despite this lofty rhetoric of "cultural diversity," the Mandate's focus was unambiguously on race, and President Duderstadt emphasized "76 new minority faculty," mentioning only "African-American Faculty Hires" and "new Hispanic American faculty … added."

3

(*Id.* at ¶ 38). This demonstrates that from the start, when U-M has spoken about "diversity" and "culture," what it actually means is "race." (*Id.* at ¶ 39).

U-M also put its money where its proverbial mouth is, spending decades fighting to preserve its ability to discriminate based on race. That commitment was on display in *Grutter v. Bollinger*, 539 U.S. 306 (2003) and *Gratz v. Bollinger*, 539 US 244 (2003), two cases in which U-M vigorously defended its use of race as an admissions factor. (*Id.* at ¶ 44). In the wake of Michigan's 2006 ban on race-based decision making in college admissions, U-M adopted admissions procedures that have allowed it to continue to employ what amount to race-based criteria—under the pretextual guise of a "holistic review"—knowing that these procedures would discriminate against Asian American applicants and thus reduce their representation within the student body. (*Id.* at ¶ 46). In fact, after Michigan's ban on race-conscious admissions, U-M hosted a 2-day workshop featuring University of California administrators, who shared their strategies for "navigating" – i.e. working around – California's comparable Proposition 209, enacted in 1996. (*Id.* at ¶ 87).

### c. Consequences of *SFFA*

As a result of *SFFA*, the percentage of Asian American students at top universities surged, validating what had long been suspected: elite schools would admit more qualified Asian students once merit was considered instead of race. (*Id.* at ¶ 72). Particularly instructive are statistical analyses that were run using the data

that became publicly available through the *SFFA* case, since—Plaintiffs posit not-so-coincidentally—the details of actual admissions processes are tightly safeguarded by universities. Using the data collected, it became evident to statisticians that at Harvard, "the number of Asian Americans admitted would increase from 2,013 to 2,812, an increase of over 37%" for the classes of 2014-2019, had race not played a role in admissions. (*Id.* at ¶ 74).[1] The same analysis yields a 20% increase in Asian Americans admitted to UNC. (*Id.*). Not so U-M, however, which simply continued using the euphemism it had instituted after the State of Michigan banned consideration of race in college admissions: "holistic review." Under cover of this vague term, supposed "subjective judgment," and plausible deniability, U-M continues to engineer racial outcomes in its student body in direct contravention of decades of Supreme Court jurisprudence. (*Id.* at ¶ 82).

### d. The SAC's allegations of U-M's continued commitment to intentional racial balancing, resulting in Stanley's rejection

Plaintiffs allege in the SAC that Defendants have continued to rely on "'holistic review' as a smokescreen for intentional discrimination," which is "exactly what the United States Supreme Court struck down in" *SFFA*, (*id.* at ¶ 6), that Defendants intentionally discriminate against Asian Americans by using euphemisms like "affirmative action" and "holistic review" to obscure the fact that

---

[1] Peter Arcidacono, Josh Kinsler, & Tyler Ranson, What the Students for Fair Admissions Cases Reveal About Racial Preferences, 1(4) J. Pol. Econ. Micro. 615 (2023).

they knowingly subject "Asian American applicants to higher standards than applicants of other races," (*id.* at ¶¶ 22-23), and that according to Defendant Ono, Defendants "are convinced that academic excellence goes hand-in-hand with diversity, inclusion and equity" and "'diversity' remains a euphemism for racial engineering—now used… to justify denying opportunity to students who failed to meet the University's preferred demographic profile." (*Id.* at ¶¶ 40-41). Plaintiffs further allege that Defendants "simply rebranded [their] race-conscious policies" as "holistic" in "a transparent attempt to evade judicial scrutiny," (*id.* at  ¶ 45), and that according to the New York Times, Defendants engage in "persistent, vigorous and varied efforts to increase student body racial and ethnic diversity." (*Id.* at ¶ 47).

Plaintiffs further allege that according to U-M's Diversity, Equity, and Inclusion Strategic Plan 2016-2021, Defendants fought "for the right to consider race as one factor in admissions decisions in pursuit of the educational benefits of diversity," (*id.* at ¶ 49), that according to U-M Vice Provost for Equity & Inclusion and Chief Diversity Officer Tabbye Chavous in January of 2019, "diversity, equity, and inclusion underpins [U-M's] institutional educational mission," and "applicants' DEI commitments should be one [admissions] criterion because DEI is central to higher education's mission, (*id.* at ¶ 51), and that U-M's DEI 2.0 Year 1 Progress Report states that Defendants' "[s]trategies for improving racial/ethnic diversity in student enrollment are coming to fruition, increasing representation of students of

color at U-M across all groups, with marked improvements for our most underrepresented groups" because their "DEI 1.0 evaluation data showed a need for focused attention to Black student and Native American student representation and experience." (*Id.* at ¶ 53).

Plaintiffs further allege that the U-M Computer Science and Engineering ("CSE") Climate, Diversity, Equity, and Inclusion Report for Academic Year 2022-23,[2] which explicitly references Article I, Section 26 of the Michigan Constitution, identifies "growth in the number of members of underrepresented groups amongst undergraduate and graduate students, faculty, and staff" as one of the goals of U-M's CSE programs. (*Id.* at ¶ 54). The report states that the "CSE Enrollment and Admissions Team (EAT) has identified new admissions pathways, including considerations for increasing the diversity of our undergraduate population" and that U-M CSE seeks "control over class composition and promotion of more diversity." (*Id.* at ¶ 55). The report further states that "CSE's undergraduate enrollment of Black students continues to be significantly below the national average and percentage of the population in the state. CSE Hispanic undergraduate enrollment increased over the past year (although rates stayed about equal) and continues to fall below both the percentage of the population in the state and the national average," indicating intent to orchestrate a particular demographic makeup for the student body. (*Id.* at ¶ 56).

---

[2] https://cse.engin.umich.edu/wp-content/uploads/sites/3/2025/03/Climate-Report-22-23.pdf

Finally, the report itself mentions the harm these strategies produce, noting that "there appears to be a change in self-reporting patterns this year which resulted in substantially fewer applicants identifying as male and Asian, without a corresponding increase in other categories. While we do not have data to point to particular reasons for this change, there may be a perception that applicants are disadvantaged by revealing that they are" Asian. (*Id.* at ¶ 57).

Plaintiffs further allege that Defendants intentionally use race in making admissions decisions, (*id.* at ¶ 59), that U-M rejects use of a "percentage plan," whereby admission is guaranteed to those students graduating at the top of their class regardless of race, because it "would have minimal or negative effects on racial diversity," which "further exemplifies U-M's intent and desire to racially engineer its student body," (*id.* at ¶ 60), that "[i]n October of 2024, U-M Vice Provost for Equity & Inclusion and Chief Diversity Officer Chavous posted that U-M 'can't minimize the need to continue to pay attention to race' publicly on LinkedIn," (*id.* at ¶ 64), that Defendants use the term "holistic" as "a euphemism for unconstitutional race-balancing," (*id.* at ¶ 77), and that U-M continues "to use 'holistic review' in its admissions process" as a euphemism for consideration of race. (*Id.* at ¶ 86). Plaintiffs further allege that in "August of 2023, U-M's general counsel demonstrated this priority by emphasizing the importance of U-M and other universities maintaining

plausible deniability about their use of race in admissions" after *SFFA* when he warned university administrators:

> You should be aware right now of the record you're creating ... What are your faculty saying in emails? What are they saying in public? … The key question in terms of creating the record is what can you say right now is the race-neutral explanation for doing it, and how do you avoid having your faculty colleagues muddy the record.

(*Id.* at ¶ 89).

Finally, Plaintiffs allege that after *SFFA* affirmed that race-based admissions policies are unconstitutional,[3] then-U-M President Defendant Ono publicly lamented that he was "deeply disheartened" as a result, (*id.* at ¶ 90), that U-M's "Diversity FAQ" webpage "flatly declares that 'socioeconomic status is not a substitute for race or ethnicity'" and "truly treating an applicant as an individual requires considering their race," (*id.* at ¶ 92), and that "U-M's priority is not to uplift the underserved, but to engineer a specific racial composition in its student body." (*Id.* at ¶ 95).

### e. Resulting damages to Plaintiffs

Against this backdrop, Stanley faced the U-M admissions process. (*Id.* at ¶ 97). Stanley attended Henry M. Gunn High School, ranked #14 in California by U.S. News & World Report and the #1 best public high school in the San Francisco Bay

---

[3] *See also Ames v. Ohio Department of Youth Services*, 605 U.S. ___ (2025) (constitutional protections against racial discrimination apply equally to all racial groups, including those not labeled "underrepresented").

Area according to Niche, where—among many other successes—he distinguished himself as a National Merit Scholarship finalist and achieved a perfect PSAT score and a 1590 out of 1600 on the SAT)—60 points above the 75th percentile of SAT scores for those students who were admitted and enrolled at U-M. (*Id.* at ¶¶ 98-101).[4] In addition to his extremely impressive academic credentials and extracurricular achievements, Stanley is a self-taught programmer whose extraordinary talent has earned him top honors in some of the world's most competitive coding contests— often outperforming professional engineers. (*Id.* at ¶ 104). For enrollment in the Fall of 2023, Stanley applied to the Computer Science program at U-M in Ann Arbor, hoping that his impressive individual merit would outweigh the well-known barriers facing Asian American applicants. (*Id.* at ¶¶ 123-24). Unfortunately, despite his outstanding academic credentials and internationally recognized accomplishments, his application was rejected by Defendants in January of 2023. (*Id.* at ¶ 125).

Plaintiff Nan Zhong's Minor Son ("the Minor Son") is currently in high school and anticipates applying to U-M for enrollment in the Fall of 2027. (*Id.* at ¶ 153). The Minor Son already demonstrates the academic excellence, intellectual curiosity, and extracurricular achievement that define top college applicants, and his GPA stands at a perfect 4.0 unweighted, even higher than Stanley's at the same stage,

---

[4] *See* https://obp.umich.edu/wp-content/uploads/pubdata/factsfigures/firstyearsprofile_umaa_2024_10-22-24.pdf.

placing him among the very top students in his class. (*Id.* at ¶ 154). However, based on Stanley's experience, the Minor Son has learned of the consistent pattern by which U-M discriminates against Asian American applicants, and has been discouraged and humiliated as a result. (*Id.* at ¶¶ 156-57). He has learned through friendship networks within his community and through publicly available reports that Asian American students who speak up for equal treatment under the law on college campuses and throughout academia are branded "racists" and ostracized on campus, and he is aware of admissions statistics indicating that—even among the most qualified candidates—Asian Americans applicants face significantly lower admission rates. (*Id.* at ¶¶ 158-59). As a result, he faces the imminent prospect of harm if he applies to U-M. (*Id.* at ¶ 160).

### III.   ARGUMENT

#### A. Standard of Review

In reviewing a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a court must examine the complaint in its entirety, *Tellabs, Inc. v. Makor Issues & Rts., Ltd*., 551 U.S. 308, 322 (2007), and assume the truth of all "well-pleaded factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). An adequate complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id*. On the other hand, the court must "construe the complaint in the light most favorable to the plaintiff," *Lipman v. Budish*, 974 F.3d 726, 740 (6th Cir.

2020), who need only provide "a short and plain statement of the claim showing that the pleader is entitled to relief" to "give the defendants fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal edits, quotation marks, and citation omitted). This standard does not require probability, but only "facial plausibility"—i.e., "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678-79.

Finally, this Court may consider publicly available data that is "central to [Plaintiffs'] claim[s], publicly available, and judicially noticeable." *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1168 (6th Cir. 2022) (citing *Greenberg v. Life Ins. Co. of Va*., 177 F.3d 507, 514 (6th Cir. 1999); *KBC Asset Mgmt. N.V. v. Omnicare, Inc. (In re Omnicare, Inc. Sec. Litig.)*, 769 F.3d 455, 466 (6th Cir. 2014) (public records central to proving or refuting a plaintiff's claims may be attached to a "motion to dismiss, and a court can then consider them in resolving the Rule 12(b)(6) motion without converting the motion to dismiss into a Rule 56 motion for summary judgment")). "According to the Federal Rules of Evidence, a 'court may judicially notice a[n] [adjudicative] fact that is not subject to reasonable dispute because it... can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d at 465-66 (citing Fed. R. Evid. 201(b)).

## B. *SFFA* reshaped the law of affirmative action.

In arguing that Plaintiffs have failed to state an adequate claim for intentional discrimination under the Equal Protection Clause or Title VI, Defendants fail to recognize the sea change represented by the Supreme Court's decision in *SFFA*. As previously noted, the affirmative action exception allowing good faith race discrimination in admissions was eliminated in Michigan in 2006, and federally by *SFFA* in 2023. Accordingly, while Defendants cite pre-*SFFA* case law in arguing that Plaintiffs' discrimination claims are inadequately pled, *SFFA*'s analysis is critical to understanding how the Sixth Circuit will view and analyze this case on appeal. Defendants' brief ignores the Supreme Court's reliance on statistical analysis in *SFFA* to find that Harvard and UNC had engaged in impermissible intentional discrimination prohibited by the Equal Protection Clause and Title VI.

In *SFFA*, the trial courts developed extensive factual records and found, by a preponderance of the evidence, that Harvard and the University of North Carolina ("UNC") were justified in engaging in the same kind of "holistic" applications process that Plaintiffs have alleged Defendants are using to hide their own intentional discrimination. After granting certiorari, the Supreme Court reversed, relying not on the kind of analysis Defendants claim the Sixth Circuit requires, but instead on a searching inquiry to determine whether race played an impermissible factor in the schools' admissions process—exactly what Plaintiff is seeking here. As

Justice Gorsuch noted in his concurrence, regarding the "holistic review" process, "in a process where applicants compete for a limited pool of spots, [a] tip for one race necessarily works as a penalty against other races." 600 U.S. at 294.

The only difference between the defendant universities in *SFFA* and U-M is that Harvard and UNC admitted their processes were race-conscious, while Plaintiffs allege that U-M is trying to obscure the role of race in its own "holistic review"— the very same legal term of art universities used pre-*SFFA* to insist that their use of race as a factor in admission decisions was legally and constitutionally permissible. At the same time, Plaintiffs allege that "[i]n the wake of *SFFA*, the percentage of Asian American students at top universities surged, validating what had long been suspected: elite schools would admit more qualified Asian students once merit was considered instead of race," whereas U-M "responded with defiance even after *SFFA* made clear that racial balancing violates both the Equal Protection Clause and Title VI." (ECF No. 35 at ¶¶ 72, 75).[5] Plaintiffs further allege that "the Asian American population in Michigan grew by over 40% from 2010 to 2020," while "[b]etween 2020 and 2024, Asian American enrollment at UM Ann Arbor dropped from 19.4% to 18.2%, despite explosive growth in the state's Asian population." (*Id.* at ¶¶ 130,

---

[5] *See also* https://obp.umich.edu/wp-content/uploads/pubdata/factsfigures/firstyearsprofile_umaa_2024_10-22-24.pdf, demonstrating that the number of Asian American students enrolling at U-M remained flat between 2020 and 2024.

131). This is *prima facie* evidence that Defendants are intentionally engaging in unlawful race discrimination under the guise of "holistic review."[6]

The *SFFA* plaintiffs submitted expert evidence involving mathematical modeling to predict whether admissions would go up if race were not a factor for Asian American applicants; Plaintiffs in this matter have identified experts who will perform the same kind of analysis to demonstrate—with the benefit of discovery—that U-M is engaged in the same "holistic review" process the Supreme Court confirmed was invalid in *SFFA*.

### C. Under *Ex Parte Young*, Plaintiffs' official-capacity § 1983 claims are not barred by sovereign immunity.

The Eleventh Amendment to the United States Constitution prohibits federal courts from exercising subject matter jurisdiction over a suit for money damages against a state or its agencies or officials sued in their official capacities. *See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc*., 506 U.S. 139, 144, 113 S. Ct. 684, 121 L. Ed. 2d 605 (1993). An exception exists pursuant to *Ex parte Young*, 209 U.S. 123, 159-160 (1908), however, for claims seeking prospective injunctive relief.

---

[6] To the extent that Defendants attempt to explain their "holistic" evaluation as accounting for likelihood of success, there is no question that Stanley should have been accepted to U-M's College of Engineering on this basis. Looking at U-M's own data, in 2022, 64.79% of students were employed upon graduating; in 2023, 59.24% of students were so employed; and in 2024, 53.99% of students were so employed. (ECF No. 35 at ¶ 118). On the other hand, Plaintiff was able to secure a job with Google shortly after being rejected by U-M, which has seen a dramatic decrease in graduate hires by Google at the same time. (*Id.* at ¶ 119). Google went from hiring 118 U-M graduates in 2022 to just 30 in 2024, with only three Computer Engineering hires. (*Id.* at ¶ 120).

The Supreme Court has held that "of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'" *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 n.10 (1989) (*citing Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985); *Ex parte Young*, 209 U.S. at 159-160). The Sixth Circuit has found that when claims are "prospective in nature," they are "appropriate subjects for *Ex parte Young* actions." *Carten v. Kent State Univ*., 282 F.3d 391, 396 (6th Cir. 2002) (citing *Turker v. Ohio Dep't. of Rehab. and Corrs*., 157 F.3d 453, 459 (6th Cir. 1998)).

The Sixth Circuit has further held that state universities (*McCormick v. Miami Univ*., 693 F.3d 654, 662 (6th Cir. 2012) ("the Eleventh Amendment does not preclude a suit against [*inter alia*, Miami University] for prospective injunctive relief")), the members of their governing boards (*Cox v. Shelby State Cmty. Coll*., 48 F. App'x 500, 504 (6th Cir. 2002) (reversing district court's dismissal of student's § 1983 claim against*, inter alia*, the Tennessee Board of Regents, to the extent that it sought the prospective injunctive relief of reinstatement)), and state school officials (*Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 637 (6th Cir. 2005) (claims against school "administrators and professors, in their official and individual capacities… are in no way precluded by the Eleventh Amendment")) are all subject to suits for prospective injunctive relief under *Ex parte Young*.

16

**D. Plaintiffs state claims for relief against the individual Defendants in their personal capacities under § 1983 and Title VI.**

Furthermore, the Eleventh Amendment "does not bar suits for damages against officers in their personal capacity under § 1983." *Maben v. Thelen*, 887 F.3d 252, 270 (6th Cir. 2018) (citing *Hafer v. Melo*, 502 U.S. 21, 25-27, 112 S. Ct. 358, 116 L. Ed. 2d 301 (1991)). In the Sixth Circuit, in order to plead a claim for money damages against state officials in their personal capacities, "all a complaint need do is afford the defendant 'fair notice of what the claim is and the grounds upon which it rests.'" *Moore v. City of Harriman*, 272 F.3d 769, 772 (6th Cir. 2001) (citing *Brooks v. American Broadcasting Companies, Inc*., 932 F.2d 495, 497 (6th Cir. 1991)). The individual Defendants are subject to suit in their personal capacities for money damages pursuant to § 1983 and Title VI.

**a. Qualified immunity does not bar Plaintiffs' claims.**

To overcome qualified immunity under § 1983, Plaintiff must show that "the right at issue was clearly established at the time of [the] defendant's alleged misconduct." *Kanuszewski v. Mich. HHS*, 927 F.3d 396, 413 (6th Cir. 2019) (citing *Barker v. Goodrich*, 649 F.3d 428, 433 (6th Cir. 2011)). Even at the summary judgment stage, dismissal on the basis of qualified immunity is inappropriate where there is evidence that an official had "knowledge or reason to know" that his actions would damage a plaintiff by violating his statutorily or constitutionally protected rights. *Buckner v. Kilgore*, 36 F.3d 536, 540 (6th Cir. 1994). It is "generally

17

inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity… Ordinarily, dismissal under Rule 12(b)(6) premised on defense of qualified immunity is inappropriate since this defense 'requires investigation into facts and evidence not available at the early stage of pleadings.'" *Smith v. Gallia Cty. Jail*, No. 2:20-cv-3089, 2021 U.S. Dist. LEXIS 123012, at *28 (S.D. Ohio July 1, 2021) (citing 61A Am. Jur. 2d Pleading § 535 (2010)).

Here, Plaintiffs have made copious allegations that Defendants were explicitly aware of Plaintiffs' well-established right to be free from race-based discrimination in college admissions, because race-conscious admissions have been illegal in Michigan since 2006. Moreover, as noted by Justice Roberts in *SFFA*, applicants also have a well-established federal right to be free from admissions programs that "lack sufficiently focused and measurable objectives warranting the use of race, unavoidably employ race in a negative manner, involve racial stereotyping, and lack meaningful end points," as the Supreme Court has "never permitted admissions programs to work in that way." 600 U.S. at 230.

More importantly, however, Defendants' qualified immunity arguments are inapplicable to this case because the Supreme Court has also explicitly held that the qualified immunity "defense is not available… [in] § 1983 cases against individuals where <u>injunctive relief is sought instead of or in addition to damages</u>," like this one. *Pearson v. Callahan*, 555 U.S. 223, 242 (2009) (emphasis supplied); *see also Endres*

*v. Ne. Ohio Med. Univ.*, 938 F.3d 281, 302 (6th Cir. 2019) (citing *Kanuszewski*, 927 F.3d 396 at 417-18; *Ward v. Polite*, 667 F.3d 727, 742 (6th Cir. 2012) (qualified immunity defense not applicable to claims for "injunctive or declaratory relief")).

### b. Plaintiffs have stated a plausible equal protection and § 1981 claims based on intentional discrimination.

As noted *supra*, Defendants' failure to recognize the sea change represented by the Supreme Court's decision in *SFFA* fatally undermines its arguments about Plaintiffs' claims brought pursuant to § 1983. While Defendants cite pre-*SFFA* case law in arguing that Plaintiffs' equal protection claim is inadequately pled, *SFFA*'s analysis is critical to understanding how this matter should be evaluated. In *SFFA*, the Supreme Court relied not on the kind of equal protection analysis Defendants claim the Sixth Circuit requires, but instead on the exact kind of searching inquiry to determine whether race played an impermissible factor in the schools' admissions process that Plaintiff seeks with regard to U-M.

In order to adequately plead an equal protection claim pursuant to § 1983, a plaintiff must allege "actions, statements, motives, or evidence of intent supporting a plausible conclusion that Defendants were acting with racial animus." *White v. Hlavaty*, No. 2:22-CV-13005-TGB-EAS, 2023 U.S. Dist. LEXIS 130105, at *9 (E.D. Mich. July 27, 2023). "To survive a motion to dismiss, Plaintiffs must plausibly allege that… race was a motivating factor in Defendants' conduct through direct or circumstantial evidence." *Id.* (citing *Heyne v. Metro. Nashville Pub. Sch.*,

19

655 F.3d 556, 571 (6th Cir. 2011)); *see also United States v. Avery*, 137 F.3d 343, 355 (6th Cir. 1997) ("This intentional discrimination can be proved through direct evidence, which seldom exists, or inferences can be drawn from valid relevant statistical evidence of disparate impact or other circumstantial evidence"). Accordingly, contrary to Defendants' repeated assertions in the memorandum supporting their motion, the statistical data alleged throughout Plaintiffs' SAC is neither "irrelevant" nor "insufficient."[7] *See McCleskey v. Kemp*, 481 U.S. 279, 293 (1987) (the Supreme Court "has accepted statistics as proof of intent to discriminate"); *Zamlen v. Cleveland*, 906 F.2d 209, 215 (6th Cir. 1990) (citing *Black v. City of Akron, Ohio*, 831 F.2d 131 (6th Cir. 1987)) ("statistical evidence may be introduced to show a discriminatory purpose"); *see also Walls v. Miss. State Dep't of Pub. Welfare*, 730 F.2d 306, 322 (5th Cir. 1984) ("statistical evidence may be used in a disparate treatment case to prove both motive and a pattern or practice of racial discrimination if gross statistical disparities… can be shown"); *Jones v. RS&H, Inc*., 775 F. App'x 978, 983 (11th Cir. 2019) ("Statistical information… may be relevant to prove discrimination… even in a case alleging an individual instance of intentional discrimination").

---

[7] Plaintiffs note that in Defendants' brief at page 18, note 11, Defendants ask this Court to grant reasonable inferences in their favor as a basis for granting their motion to dismiss. This is the reverse of the proper analysis at the 12(b)(6) stage, when all inferences are appropriately granted in Plaintiffs' favor.

Similarly, to state a claim under § 1981, a plaintiff "does not need to prove discriminatory intent, but rather… to allege facts making it plausible that such intent existed." *Inner City Contracting, LLC v. Charter Twp. of Northville*, 87 F.4th 743, 755 (6th Cir. 2023).

> In the § 1981 context, this means alleging sufficient facts to show that (1) the plaintiff belonged to a protected class; (2) the defendant intended to discriminate against him on the basis of race; and (3) the defendant's discriminatory conduct abridged a right enumerated in § 1981(a)… intentional discrimination[] can be shown through either direct evidence of discrimination or circumstantial evidence "which would support an inference of discrimination."

*Id.* (citing *Amini v. Oberlin College*, 440 F.3d 350, 358 (6th Cir. 2006); *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572 (6th Cir. 2000)).

In fact, the Sixth Circuit "has explicitly recognized that requiring plaintiffs to show intentional discrimination as part of their *prima facie* case could confuse litigants… although the trained litigator may recognize 'intentional discrimination' encompasses both direct and circumstantial evidence, the undefined term has the potential to befuddle parties and courts alike[.]" *Inner City Contracting*, *LLC v. Charter Twp. of Northville*, 87 F.4th 743, 755 (6th Cir. 2023) (internal citation and quotation marks omitted)). Including intentional discrimination as a part of a plaintiff's *prima facie* case is "inappropriate" and "propagates the false notion that a plaintiff must provide direct evidence of the defendant's intent to discriminate…" *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 872 (6th Cir. 2001).

21

Regardless, as laid out *supra* in § II(c), Plaintiffs repeatedly allege intentional, conscious discrimination by Defendants. (ECF No. 35 at ¶¶ 6, 22-23, 40-41, 45, 47, 49, 51, 53-57, 59-60, 64, 77, 86, 89, 90, 92, 95). Far from alleging merely disparate impact, Plaintiffs have plausibly alleged Defendants' desire and intent to discriminate against Asian Americans using racial balancing in favor of other preferred racial minorities. The sheer number of specific discriminatory statements and other evidence of intent to discriminate alleged in the SAC clearly more than meets the plausibility pleading standard established by *Iqbal* and *Twombly*.

### c. Plaintiffs have stated a plausible Title VI claim based on intentional discrimination.

Similarly, Defendants' failure to recognize the importance of the Supreme Court's decision in *SFFA* to this case dooms their arguments regarding Plaintiffs' Title VI claim as well. As above, while Defendants cite pre-*SFFA* case law in arguing that Plaintiffs' Title VI claim is inadequately pled, *SFFA*'s analysis in overturning the trial courts' findings in Harvard and UNC's favor is also critical to understanding how the Sixth Circuit will view and analyze Plaintiffs' Title VI claim on appeal. As noted above, the statistical facts Plaintiffs cite in the SAC are *prima facie* evidence that Defendants are intentionally engaging in unlawful race discrimination under the guise of "holistic review."

Even prior to *SFFA*, however, a "Title VI plaintiff lacking direct evidence of discrimination [could] use circumstantial evidence to prove his case." *Amadasu v.*

*Donovan*, No. 1:01-cv-210, 2006 U.S. Dist. LEXIS 30635, 2006 WL 1401648, at *7 (S.D. Ohio May 18, 2006). Circumstantial evidence includes evidence that the defendant treated similarly-situated persons of a different race more favorably. (*Id*.). In *Reeves v. Shawnee State Univ*., No. 1:16-CV-00765, 2017 U.S. Dist. LEXIS 29674, at *19 (S.D. Ohio Mar. 1, 2017), for example, allegations that the plaintiff "was dismissed from the nursing program based on false reports from his preceptors, but that white contemporaries whose performance on grades, clinicals and precepted experience were at or below plaintiff's were permitted to complete their precept experience and graduate," and that the plaintiff "was not permitted to re-take the precept experience, but that white students with worse performances were permitted to do so" were adequate to state a claim under Title VI and survive a 12(b)(6) motion to dismiss. "The allegations here that lower-performing white students were permitted to complete the precepted experience, re-take the precepted experience, and re-train in areas in which they made mistakes are sufficient in this case to raise the inference of intentional discrimination." *Id.* at **19-20.

Defendants further incorrectly claim that "Plaintiffs must show that similarly situated members of the nonprotected class received more favorable treatment than they received" by identifying specific comparators in their complaint. (*See* Def. Br. at 23). However, as noted *supra*, "a plaintiff is not required to plead a *prima facie* case in order to survive motion to dismiss. 'Put more plainly, a plaintiff need not

allege facts aligning with her claim's every element, which she will have to prove for her claim to survive summary judgment. She certainly does not need to identify' by name a 'similarly situated' non-protected [comparator.]" *Horne v. Pentastar Aviation, LLC*, No. 23-11439, 2024 U.S. Dist. LEXIS 67603, at *24 (E.D. Mich. Apr. 12, 2024) (citing *Kaminski v. Elite Staffing, Inc*., 23 F.4th 774, 777 (7th Cir. 2022); *Carlson v. CSX Transp., Inc*., 758 F.3d 819, 830 (7th Cir. 2014) (explaining that a 'plaintiff is not required to identify similarly situated comparators at the pleading stage' and noting that a plaintiff '…will often not be able to answer those questions without discovery'")).

### E. Plaintiff Nan Zhong has demonstrated adequate injury-in-fact and risk of imminent harm to confer standing on his Minor Son.

Despite Defendants' insistence that Nan Zhong has failed to adequately allege "that his son suffered the requisite injury in fact" to have standing as a plaintiff in this action, the Supreme Court has specifically found – based on U-M's own prior actions – that the inability to compete on equal footing with other applicants is a cognizable injury-in-fact. *Gratz*, 539 U.S. at 262; *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc*., 528 U.S. 167, 184 (2000). In order to satisfy standing requirements, Nan Zhong must allege that his Minor Son has "concrete plans" to apply to U-M, with some specification of when this will take place, in order to "support a finding of the 'actual or imminent' injury" required for standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992); *see also Binno v. ABA*, 826 F.3d 338,

24

351 (6th Cir. 2016) (allegations that blind law school applicant would face a discriminatory application process if she wanted to attend the relevant school stated "particularized injuries judicially cognizable under our standing jurisprudence").

Here, Plaintiffs allege that the Minor Son explicitly intends on "applying to Michigan for the Fall 2027 enrollment." (ECF No. 35 at ¶ 153). This is a clear allegation both of a concrete plan and when it will take place. Accordingly, based on the foregoing, Plaintiffs have adequately established the standing of Nan Zhong to proceed in this matter on behalf of his Minor Son, a prospective U-M applicant who faces a clear risk of imminent harm from Defendants.

## IV.  CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that this Court DENY Defendants' Motion to Dismiss their SAC.

Respectfully Submitted,

**NACHTLAW, P.C.**

*/s/ David A. Nacht*
David A. Nacht (P47034)
Fabiola A. Galguera (P84212)
*Attorneys for Plaintiff*
501 Avis Drive, Suite 3
Ann Arbor, MI 48108
(734) 663-7550
dnacht@nachtlaw.com
fgalguera@nachtlaw.com

Dated: November 12, 2025

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was filed electronically with the

Court's electronic filing system on November 12, 2025. Notice of this filing will be

sent by the Court's electronic filing system to all parties of record.

/s Grace Cathryn Cretcher<br>Grace Cathryn Cretcher, Associate Attorney

Dated: November 12, 2025